IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHDIOCESE OF MILWAUKEE, | ) | Case No. 11-20059-SVK |
| | ) | |
| Debtor. | ) | |
| | ) | |

**APPLICATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO FED. R. BANKR. P. 2014 FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE EMPLOYMENT OF BUSINESS MANAGEMENT INTERNATIONAL AS A CONSULTANT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, <u>NUNC PRO TUNC TO MAY 17, 2011</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the above-captioned case hereby submits this *Application of the Official Committee of Unsecured Creditors Pursuant to Fed. R. Bankr. P. 2014 for Entry of an Order Authorizing and Approving the Employment of Business Management International as a Consultant to the Official Committee of Unsecured Creditors, Nunc Pro Tunc to May 17, 2011* (the "<u>Application</u>"). In support of this Application, the Committee relies on the Affidavits of Laurel Loehlin (the "<u>Loehlin Affidavit</u>") and the Affidavit of Matthew K. Babcock (the "<u>Babcock Affidavit</u>"), both filed concurrently herewith, and respectfully represents as follows:

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
        kbrown@pszjlaw.com
        gbrown@pszjlaw.com

1

# I. JURISDICTION

1. The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Application is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 328, 504, 1102, and 1103 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

# II. SUMMARY OF RELIEF SOUGHT

3. By this Application, the Committee seeks to employ Business Management International ("BMI") as computer consultants to assist the Committee's proposed financial advisors with converting raw, electronic accounting data from the Debtor (as defined below) into readable format and running reports on that data necessary for the Committee's proposed financial advisors to perform their asset analyses. The Committee seeks an initial cap of $15,000 in fees and expenses for BMI's work in this case, subject to additional motions to increase that amount.

# III. BACKGROUND

4. On January 4, 2011, the Archdiocese of Milwaukee (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.	The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case (the "Bankruptcy Case").

6.	On January 24, 2011, (the "Committee Formation Date"), the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee to represent all unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code. *See* Docket No. 86.

7.	On January 25, 2011, the Committee determined to retain, subject to Court approval, Pachulski Stang Ziehl & Jones LLP ("PSZJ") as counsel to represent the Committee in all matters during the pendency of this Bankruptcy Case. The Court approved the Committee's retention of PSZJ.

8.	After the Committee Formation Date, the Committee determined to retain, subject to Court approval, Berkeley Research Group, LLC ("BRG") as its financial advisor in the Bankruptcy Case. The Committee's application to retain BRG is currently pending.

9.	Upon review of the Debtor's Schedules and Statement of Financial Affairs, based on information elicited at the Section 341(a) meeting of creditors in this Bankruptcy Case, and during discussions that Committee counsel and BRG held with Debtor's counsel and the Debtor's Chief Financial Officer in April 2011, the Committee

3

05058-003\DOCS_LA:238565.6

Case 11-20059-svk    Doc 281    Filed 06/13/11    Page 3 of 14

has identified several areas of inquiry regarding the potential transfer of property of the estate in the months and years preceding the filing of the Bankruptcy Case:

    *a.*    <u>$55 million transferred to Trust in 2008</u>: The Debtor's financial statements state that the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "<u>Perpetual Care Trust</u>") was established on April 2, 2007. The Perpetual Care Trust and the assets therein are not listed as property of the estate on the Debtor's schedules. *See also* footnote to SOFA line 10b (asserting that the Perpetual Care Trust was created "to formalize the existing trust relationship" relating to future care of mausoleums, crypts, and gravesites that the Debtor owns). In March 2008, after the Wisconsin Supreme Court permitted sex abuse personal injury cases to be prosecuted against the Debtor, the Debtor funded the Perpetual Care Trust with approximately $55 million. The source of the $55 million is not clear. Therefore, the Committee seeks to investigate whether the transfer of the $55 million used to fund the Perpetual Care Trust is avoidable and/or whether that $55 million is property of the Debtor's estate.

    *b.*    <u>Allegedly Restricted Trusts</u>: Furthermore, the Debtor has scheduled three trusts at Schedule B

(Personal Property) as containing more than $5.8 million, cumulatively, that the Debtor allegedly cannot access to pay creditor claims in this bankruptcy case. These trusts include the St. Aemilian Trust, the Mary B. Finnigan Endowment Fund, and the Rapp Trust Fund. However, the Committee's professionals seek to analyze, inter alia, whether the alleged trusts and the property therein are properly restricted and thus inaccessible to the estate's creditors.

        c.      <u>Faith in Our Future</u>: The Debtor has made payments, as recently as December 2010, to a public relations firm that helped "launch the largest development campaign in the [Archdiocese's] history to raise $105 million over a three-year period." *See* http://www.emeraldislepr.com/portfolio_IC.html. That same website indicates that more than $80 million has been raised in the campaign. The Debtor's own website states that 40% of this Faith in Our Future campaign is dedicated to the Debtor's initiatives and expenses incurred in the campaign itself. Moreover, at the Section 341(a) meeting of creditors, the Debtor's Chief Financial Officer, John Marek, testified that the Archbishop Listecki and Reverend Sklba – both high-level functionaries at the Archdiocese of Milwaukee – are two of the five people in charge of this campaign.

However, the Debtor has not accounted for any of these funds in its schedules and statement of financial affairs. The Committee seeks to investigate the ownership of those funds.

    *d.* <u>Parish Deposit Fund</u>: The Debtor's financial statements indicate that the Debtor held more than $70 million in a so-called "Parish Deposit Fund" in 2004. However, at some point in 2005, the Debtor's financials no longer record the existence of the Parish Deposit Fund. The Committee does not know what happened to those funds, by whom they were owned, and whether those funds are subject to avoidance actions. This is yet another area of inquiry for BRG.

    *e.* <u>Avoidance Actions</u>: BRG has identified several payments, at least two of which each exceed $1 million, that appear to be avoidable preferential transfers and/or fraudulent transfers.

10. In short, the information adduced thus far regarding the Debtor's financial picture necessitates the financial advisory expertise of BRG in order to test the Debtor's narrow view of what constitutes property of the estate in this Bankruptcy Case.

11. Primary among the information that BRG believes is integral to its understanding of these financial questions are data contained in the Debtor's electronic

6

05058-003\DOCS_LA:238565.6

Case 11-20059-svk Doc 281 Filed 06/13/11 Page 6 of 14

general ledger/accounting system, which is run on a Microsoft software known as Great Plains.[1] Based on BRG's prior experience in the Catholic Church-related bankruptcy case of *In re Society of Jesus, Oregon Province* (Bankr. D. Or., Case No. 09-30938-elp11), BRG requires the expertise of computer consultants who can convert the data in Great Plains into a format that BRG can use, who can assist in the running of reports of the Great Plains data, and can provide the software license for BRG's use of the Great Plains software. BMI is a firm that employs precisely the computer consultants who can assist BRG and the Committee in these ways. Counsel for the Committee has informed Debtor's counsel of the need for BMI's retention in this case.

12. BMI is a computer consultant firm that owns software licenses entitling it to run the Great Plains software. One of its professionals, Susan Spitko, has extensive experience and training with the specific version of the Great Plains software that the Debtor uses. As set forth below, Ms. Spitko will be the professional at BMI who will perform most of the work on this project. She will work under the supervision of Laurel Loehlin, who is submitting an affidavit on behalf of BMI and who has signed the Verified Statement in support of this Application.

13. In order to use the Debtor's Great Plains data and have BRG run and analyze the necessary reports from that data, the Committee needs to either acquire a

---

[1] Microsoft renamed the Great Plains software a few years ago as "Microsoft Dynamics GP" when it acquired four different companies with four different accounting software packages (Great Plains, Navision, Axapta, and Solomon). *See* Loehlin Affidavit, filed concurrently herewith. Microsoft consolidated those software packages under one division and renamed then. *See id.* Most users in the industry continue to refer to Microsoft Dynamics GP as "Great Plains." *See id.*

7

05058-003\DOCS_LA:238565.6

Case 11-20059-svk    Doc 281    Filed 06/13/11    Page 7 of 14

Great Plains license and related software, at an estimated cost of up to $10,000; or hire a computer consultant who already has a license, the software, the training, and the experience to run the necessary reports at BRG's direction. The Committee has concluded that the most cost-effective approach is to retain a computer consultant, generally, and BMI, specifically.

14. The Committee's counsel has experience with BMI similarly assisting the Committee and BRG's predecessor entity in two other cases. In *In re Society of Jesus, Oregon Province*, the bankruptcy court approved the retention of BMI to assist with Great Plains. In addition, the bankruptcy court in *In re Catholic Diocese of Wilmington, Inc.* (Bankr. D. Del., Case No. 09-13560), approved the employment of BMI to make readable raw financial data on the debtor's electronic financial software known as Navision. (Whether dealing with Great Plains, as in the instant case and *In re Society of Jesus, Oregon Province*, or else handling Navision software in *In re Catholic Diocese of Wilmington, Inc.*, BMI provided the same services that the Committee and BRG require here, namely extracting financial data from software and running reports at the direction of the Committee and its financial advisors.

## IV. RELIEF REQUESTED AND BASIS FOR RELIEF

15. By this Application, the Committee seeks to employ and retain BMI, *nunc pro tunc* to May 17, 2011, as its computer consultants in connection with the BRG's utilization of raw data from the Debtor's Great Plains accounting system, as set

8

05058-003\DOCS_LA:238565.6

Case 11-20059-svk    Doc 281    Filed 06/13/11    Page 8 of 14

forth in this Application. The Committee understands that BMI will seek compensation from the Debtor's estate at BMI's regular hourly rates for its professionals and paraprofessionals, and reimbursement of expenses incurred on the Committee's behalf, subject to Court approval after notice and a hearing on BMI's fee application(s).

16. The Committee is familiar with the professional standing and reputation of BMI, and understands and recognizes that BMI has experience providing precisely the type of computer consultant services relating to Great Plains as is needed in the instant case. Moreover, the Committee is aware that BRG has experience working with BMI in circumstances (a diocesan bankruptcy case) involving the same software (Great Plains) at issue in this case.[2]

17. Based on these facts, the Committee believes that BMI is well-qualified to render the services described below.

18. Subject to Court approval in accordance with section 330(a) of the Bankruptcy Code, compensation will be payable to BMI on an hourly basis of $200, plus reimbursement of BMI's actual, necessary expenses and other charges it incurs. These rates are set at a level designed to compensate BMI fairly for the work of its professionals and paraprofessionals, and to cover fixed and routine overhead expenses.[3] It is BMI's policy to charge its clients in all areas of practice for all other expenses incurred in

---

[2] The individuals at BRG who are proposed to work in the instant case as financial advisors to the Committee were employees of LECG, LLC during their work in the cases of *In re Society of Jesus, Oregon Province* and *In re Catholic Diocese of Wilmington, Inc.*
[3] These rates are subject to periodic adjustments to reflect economic and other conditions.

9

05058-003\DOCS_LA:238565.6

Case 11-20059-svk    Doc 281    Filed 06/13/11    Page 9 of 14

connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier charges, mail and express mail charges, special or hand delivery charges, document retrieval, photocopying charges, charges for mailing supplies, travel expenses, expenses for "working meals," computerized research, transcription costs, as well as non-ordinary overhead expenses such as secretarial and other overtime. BMI will charge the estate for these expenses in a manner and at rates consistent with charges made generally to BMI's other clients. BMI believes that it is more fair to charge these expenses to the clients incurring them than to increase the hourly rates and spread the expenses among all clients.

19. Hiring BMI will be more cost-effective to the estate than having the Committee purchase a Great Plains software license and the accompanying software (costing between $6,000 and $10,000) and having BRG run certain reports on the Great Plains data that BMI can provide more efficiently due to its expertise with the software..

20. Based on BRG's previous work experience with BMI, the Committee estimates that BMI would spend between 20 and 40 hours running the reports that BRG and PSZJ identify as necessary for the analysis of the Debtor's financial picture. It is impossible to pinpoint the exact number of hours that BMI will work until BRG and BMI have access to the Great Plains raw data (which the Debtor has still not produced). BMI may also encounter unforeseen issues in extracting the data that may require unanticipated hours of work. Nonetheless, the Committee's estimate of a $15,000

10

fee cap in this matter takes into account the fact that BMI already has extensive experience in extracting data from the Great Plains software and running the required reports as BRG directs. Therefore, hiring BMI will enable BRG to conduct analysis at the Committee's request and will cost less than having BRG purchase the requisite software and licenses to do so..

21. The professional services that BMI will render to the Committee include, but shall not be limited to, the following:

    *a.* Coordinating the export of the Debtor's raw data on Great Plains to BRG and BMI;

    *b.* Extracting raw data from Great Plains and rendering it readable to BRG;

    *c.* Running reports of the raw data on Great Plains at the direction of the Committee, its counsel, and BRG. BMI is not being asked to analyze the Debtor's liability to any particular survivor of sexual abuse; and

    *d.* Providing such other services to the Committee and its professionals as may be necessary in the case.

22. BMI intends to work closely with all of the Committee's professionals to ensure that there is no unnecessary duplication of services performed or charged to the Debtor's estate.

23. Neither BMI nor any of its professional or paraprofessionals, insofar as the Committee has been able to ascertain, represent any interest adverse to the

Debtor, its estate, its creditors, and the Committee in the matters upon which BMI is to be engaged. BMI is a "disinterested person," as the Committee understands this term to be defined, within the meaning of section 101(14), as modified by section 1103(b), of the Bankruptcy Code.

24. To the best of the Committee's knowledge, BMI has no prior connection with the Debtor, its creditors, or any other party-in-interest, or their respective attorneys or accountants in the matters upon which it is to be engaged that would in any way disqualify it from representing the Committee.

25. BMI has indicated a willingness to act as a computer consultant upon the Committee's behalf, in accordance with the terms of this Application.

26. The Committee submits that it is necessary to employ BMI as its computer consultant to ensure that the interests of the Committee, and general unsecured creditors, are adequately represented in an efficient and effective manner. The Committee believes that, in light of BMI's focus, its experience with Great Plains, and its prior work in two other Catholic Church-related bankruptcy cases, BMI is well suited to provide computer consultant services to the Committee in this case.

27. On May 17, 2011, BRG and PSZJ began discussing the logistics of the Committee's retention of BMI, subject to approval by the Court. Therefore, the

Committee requests that any order entered authorizing such retention be effective as of May 17, 2011.[4]

## V. COMPENSATION

28. Pursuant to section 330(a) of the Bankruptcy Code and Local Bankruptcy Rule 2014, the Committee proposes a fee cap for BMI in the amount of $15,000 relating to its work in this case.

29. The Committee further proposes that it may seek increases of that fee cap by making applications to this Court. Because the Debtor has not yet provided the Great Plains raw data to the Committee or its professionals, BMI cannot yet inform the Court of the precise dollar amounts necessary for this work.

[remainder of page left intentionally blank]

---

[4] BMI estimates that it expended less than 5 hours in May 2011 relative to its position as proposed computer consultant to the Committee in this case.

## VI. NOTICE

30. Notice of this Motion has been given to (i) the U.S. Trustee; (ii) counsel to the Debtor; and (iii) those parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## VII. PRIOR REQUEST

31. The Committee has not filed this Application or any similar document in the instant case or in any other court to employ BMI in this bankruptcy case.

WHEREFORE, the Committee requests entry of an Order substantially in the form attached hereto, authorizing the Committee to employ and retain BMI as financial advisor to the Committee, *nunc pro tunc* to May 17, 2011, and granting such other and further relief as is just and proper.

Dated: June 9, 2011

OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHDIOCESE OF MILWAUKEE

By: *Charles W. Linneman*

Chair of the Official Committee of Unsecured Creditors