UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                         Chapter 11
Archdiocese of Milwaukee,                                     Case No.  11-20059-svk
                    Debtor.

## MEMORANDUM DECISION ON THE COMMITTEE'S MOTION
## FOR STANDING ON FRAUDULENT TRANSFER CLAIMS

Introduction and Background

The Archdiocese of Milwaukee (the "Debtor") filed a voluntary petition under Chapter

11 of the Bankruptcy Code on January 4, 2011.  The statute of limitations for pursuing avoidance

claims, such as preferences and fraudulent transfers, will expire on January 4, 2013.  *See* 11

U.S.C. § 546(a).  On May 25, 2012, the Official Committee of Unsecured Creditors (the

"Committee") filed a Motion for an Order (I) Authorizing the Committee to Assert, Litigate, and

Settle an Adversary Proceeding on Behalf of the Bankruptcy Estate to Avoid and Recover

Fraudulent Transfers Relating to Transfers from the Debtor's Parish Deposit Fund and (II)

Compelling Debtor to Identify to the Committee the Recipients and Amounts and Dates of the

Transfers.

The alleged fraudulent transfer identified by the Committee occurred over seven years

ago.  In 2005, the Debtor transferred in excess of $35 million from the "Parish Deposit Fund" to

the Southeastern Wisconsin Catholic Parishes Investment Management Trust (the "Southeastern

Parish Trust") and/or directly to Parishes and other affiliates of the Debtor (collectively, the

"Parishes").[1]  The Committee contends the transfer was made with actual intent to hinder, delay,

---

[1] For ease of reference, the Court will refer to the transfer of the approximately $35 million as one
transfer, while recognizing that in reality numerous smaller transfers to individual transferees and the

or defraud creditors based on minutes of a 2003 finance committee meeting in which the finance committee discussed creating a trust to "shelter" the Parish Deposit Fund. The Committee seeks to file a Complaint against the Southeastern Parish Trust and the Parishes to recover the transfer pursuant to Wis. Stat. § 242.04(1)(a) and 11 U.S.C. §§ 544(a), 544(b), and 550(a). The Committee also asks that the Court require the Debtor to identify all persons and/or entities that received transfers from the Parish Deposit Fund from and after January 1, 2004 and the dates and the amounts of the transfers. The Debtor vigorously objects to the Committee's Motion. The parties fully briefed the issues, and the Court held a hearing on December 6, 2012. This is the Court's Memorandum Decision setting forth the Court's findings of fact and conclusions of law.

<u>Jurisdiction</u>

The parties do not dispute that this Court has authority to enter a final order deciding the Committee's Motion. The Committee and the Debtor both expressly consented and raised no objection to the Court's consideration and entry of a final order on the Motion. If the Court granted the Committee derivative standing to file Complaints against the Parishes, the Court's authority to enter final orders in the ensuing adversary proceedings would need to be revisited.

<u>Derivative Standing</u>

Section 544 of the Bankruptcy Code vests the bankruptcy trustee with "avoiding powers." "An avoiding power is the power of the trustee to undo certain voluntary or involuntary transfers of the debtor's interests in property in order to bring the property back into the bankruptcy estate for distribution purposes." Susan V. Kelley, GINSBERG & MARTIN ON BANKRUPTCY, § 8.01 (5th ed. Supp. 2012). In a Chapter 11 case, unless a trustee has been appointed, the debtor in possession exercises the avoiding powers. 11 U.S.C. § 1107. If a debtor

Trust were involved in the transaction. The Court also will delineate all the transferees as "Parishes" although schools and other affiliates invested in and received transfers from the Parish Deposit Trust.

2

in possession or trustee unjustifiably refuses to bring an avoidance action, the creditors'

committee, with approval of the bankruptcy court, may do so. *See, e.g.*, *Fogel v. Zell*, 221 F.3d

955, 965 (7th Cir. 2000) ("If a trustee unjustifiably refuses a demand to bring an action to

enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy

court to bring the action in place of, and in the name of, the trustee."). The standing of a

committee to exercise the trustee's avoiding powers is called "derivative standing." The parties

agree that the Committee should be granted derivative standing if two tests are met: (1) the claim

is colorable; and (2) the Debtor unjustifiably refuses to pursue it.

<u>Is the Claim Colorable?</u>

A claim is colorable if it could survive a motion to dismiss. *Fail-Safe LLC v. A.O. Smith

Corp.*, 744 F. Supp. 2d 831, 855 (E.D. Wis. 2010); *see also PW Enters. v. N.D. Racing Comm'n

(In re Racing Servs.)*, 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if

they would survive a motion to dismiss."). The Supreme Court explained the standard for

evaluating whether a claim survives a motion to dismiss in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-

79 (2009) (internal citations and quotations omitted):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to state a claim to relief that is plausible on its face. . . . The
> plausibility standard is not akin to a probability requirement, but it asks for more
> than a sheer possibility that a defendant has acted unlawfully. Where a complaint
> pleads facts that are merely consistent with a defendant's liability, it stops short of
> the line between possibility and plausibility of entitlement to relief. . . .
> Determining whether a complaint states a plausible claim for relief will, as the
> Court of Appeals observed, be a context-specific task that requires the reviewing
> court to draw on its judicial experience and common sense. But where the well-
> pleaded facts do not permit the court to infer more than the mere possibility of
> misconduct, the complaint has alleged -- but it has not show[n] -- that the pleader
> is entitled to relief.

And, in discussing the evaluation of a committee's request for derivative standing, the bankruptcy court in *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004), explained:

> Further, in ascertaining whether a plaintiff has stated a cognizable claim, the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses. *Griesenbeck v. Am. Tobacco Co.*, 897 F. Supp. 815, 820 (D.N.J. 1995). A complaint may be subject to dismissal for the failure to state a legally cognizable claim when an affirmative defense appears on its face. *ALA. Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Although a motion to dismiss normally invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citation omitted); *see generally* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1990) ("A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate).

With these principles in mind, the Court evaluates the allegations made by the Committee to determine whether the Committee has stated a colorable claim. The Committee contends that either one of two avoiding power provisions authorizes the recovery of the alleged fraudulent transfer: 11 U.S.C. § 544(a)(2) or § 544(b).[2]

## Section 544(a) Strong Arm Power

Section 544(a) is known as the "strong arm clause," and the trustee is said to be exercising the "strong arm power." Generally the strong arm power comes into play when a transferee claims title to or an interest (such as a security interest) in the debtor's real or personal property, and the trustee tries to attack the claim because of inadequate or incomplete documentation, or for some other failure in completing the formalities of the transfer. The trustee looks for an unrecorded mortgage, an unperfected security interest, or some other defective transaction that a good faith purchaser or a judgment creditor could attack under state

---

[2] At the hearing, the Committee orally amended its Motion to add § 544(a)(1).

law.  *See* GINSBERG & MARTIN ON BANKRUPTCY, *supra* § 9.01[B].  Although more commonly

used to attack unperfected security interests or defective mortgages or deeds, the strong arm

power of § 544(a) can be used to prosecute fraudulent transfers, assuming state law would permit

that.  *Id.*

> The Committee would prefer to proceed under § 544(a)(2), which provides:

> (a)  The trustee shall have, as of the commencement of the case, and *without
> regard to any knowledge of the trustee or of any creditor*, the rights and powers
> of, or may avoid any transfer of property of the debtor or any obligation incurred
> by the debtor that is voidable by --
> . . .
> (2) a creditor that extends credit to the debtor at the time of the commencement of
> the case, and obtains, at such time and with respect to such credit, *an execution
> against the debtor that is returned unsatisfied* at such time, whether or not such a
> creditor exists. . . .

11 U.S.C. § 544(a)(2) (emphasis added).

> Steven Boyce explained the history and operation of § 544(a)(2) in his article, *Koch

*Refining* and *In re Ozark*:  The Chapter 7 Trustee's Standing to Assert an Alter Ego Cause of

Action, 64 AM. BANKR. L.J. 315, 321-22 (1990):

> A judgment creditor with an execution returned unsatisfied has the right to seek
> equitable remedies in the form of state supplemental proceedings or a creditor's
> bill.  A supplemental proceeding or a creditor's bill, in turn, provides the creditor
> with a procedural device to discover and reach property not leviable upon at law. .
> . . At common law the supplementary proceeding is in the form of a creditor's
> bill.  A creditor's bill is a bill in equity filed by creditors to reach and subject
> assets of the defaulting debtor to the payment of the creditor's judgment, assets
> which could not be reached through execution at law.  The conditions precedent
> to bringing a creditor's bill are the issuance of an execution and return of the
> execution unsatisfied, equivalent to the language found in section 544(a)(2).  A
> creditor's bill may be employed to reach property fraudulently conveyed and to
> pursue the alter ego remedy.

> Although Wisconsin previously recognized the creditor's bill, that equitable remedy has

been displaced by Chapter 816 of the Wisconsin Statutes.  In *Crown Castle USA, Inc. v. Orion

*Constr. Group, LLC*, 2012 WI 29, 339 Wis. 2d 252, 811 N.W.2d 332, the Wisconsin Supreme

5

Court traced the history of the statute back to the creditor's bill. The court stated that the statute completely replaced the creditor's bill, and it strictly construed the language of the statute. The court refused to imply a statutory right when the legislature had not afforded it:

> Accordingly, our analysis of Wisconsin's supplemental proceeding statute is now, as it has been since 1856, focused exclusively on the statute that provides creditors the statutory right to supplemental proceedings. In interpreting Wis. Stat. § 816.06, we confine ourselves to its language, context, and statutory history to determine the scope of the statutory right that Wis. Stat. § 816.06 confers. Considering each facet of this plain meaning analysis in turn, we conclude that § 816.06 does not grant a judgment creditor the right to compel a non-judgment debtor third party to testify at a supplemental proceeding.

*Id.* ¶ 18.

Chapter 816 of the Wisconsin Statutes does not provide a creditor with the right to pursue a fraudulent transfer. Because Bankruptcy Code § 544(a)(2) limits the Committee to the powers of a creditor with an execution returned unsatisfied, and in Wisconsin, such a creditor is confined to the powers spelled out in Chapter 816, and Chapter 816 does grant the right to institute a fraudulent transfer suit, the Committee cannot use § 544(a)(2) to avoid the transfer. At the hearing, the Committee argued that any creditor can bring an action under Wis. Stat. § 242.04(a), not just a creditor with an execution returned unsatisfied. However, the strong arm power of § 544(a)(2) does not belong to any creditor; it specifically equips a creditor with an execution returned unsatisfied. After the *Crown Castle* case, that particular type of creditor has limited rights in Wisconsin. The Court is not suggesting that a creditor can no longer pursue fraudulent transfers in Wisconsin, but rather that a trustee in bankruptcy cannot use § 544(a)(2) as a predicate for pursuing a creditor's fraudulent transfer claim.

Assuming, arguendo, that the Committee could pursue a fraudulent transfer claim using the strong arm power of § 544(a)(2) (or using § 544(a)(1) pursuant to the Committee's amended Motion), the next issue is whether the introductory phrase of the strong arm clause – "without

regard to any knowledge of the trustee or of any creditor," – nullifies the statute of limitations for fraudulent transfers.  The Committee relies for support on *Collins v. Kohlbert & Co. (In re Southwest Supermarkets, LLC)*, 325 B.R. 417, 426-27 (Bankr. D. Ariz. 2005), in which Judge Haines stated:  "Actions brought by trustees under § 544(a), unlike those assertable under § 544(b), are assertable 'without regard to any knowledge of the trustee or any creditor.'  Consequently, if the limitations on such an action is subject to a discovery rule, such as the discovery rule for actual fraudulent transfers, the action is assertable on behalf of the hypothetical creditor who is hypothesized to have had no knowledge of the wrongdoing."  In this case, the applicable statute of limitations contains a discovery rule.  Wis. Stat. § 893.425 provides that an action for the recovery of a transfer made with the actual intent to defraud creditors must be brought "within 4 years after the transfer is made . . . or, if later, within one year after the transfer . . . is or could reasonably have been discovered by the claimant."  Under the *Southwest Supermarkets* court's interpretation of the strong arm clause, this discovery rule does not apply, because even if a creditor could have discovered or did discover the fraudulent transfer, the trustee wielding the strong arm power is not deemed to know about it.  The logical end of the argument is that no statute of limitations applies to an intentional fraudulent transfer.

The *Southwest Supermarkets* court did not cite any precedent or legislative history supporting this startling proposition.  The court did not address the long line of cases in which the distinction is drawn between "actual knowledge" – like a debtor in possession has of its own transactions – and "constructive notice," which is implied in various transactions.  For example, in *In re Sandy Ridge Oil Co.*, 807 F.2d 1332, 1336 (7th Cir. 1986), the Seventh Circuit Court of Appeals distinguished between actual knowledge and constructive notice of a real estate deed.  In fact, it certified the question of whether a certain defect would destroy constructive notice.

7

The court in *Southwest Supermarkets* played down the evisceration of the statute of limitations by pointing out: "[F]or sixty years Delaware has effectively eliminated any statute of limitations for actions against self-dealing fiduciaries." *Southwest Supermarkets*, 325 B.R. at 427. But this is not exactly the current state of the law in Delaware. According to *Norman v. Elkin*, 2007 U.S. Dist. LEXIS 72725, *12-13 (D. Del. Sept. 26, 2007):

> As a threshold matter, Plaintiff contends that Defendants cannot assert the statute of limitations defense because Elkin is a corporate fiduciary who personally benefitted from the alleged wrongdoing. Plaintiff relies on the exception set forth by the Delaware Supreme Court in *Bovay v. Byllesby*, 27 Del. Ch. 381, 38 A.2d 808 (Del. 1944). Under the exception, as summarized later by the Court of Chancery, "in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profited personally from their misconduct.". . . The state court cases following *Bovay* have restricted the exception, and the trend in the case law is to apply the *Bovay* exception as a basis on which to toll the statute of limitations where actionable self-dealing is alleged. . . . Thus, the Court understands the rule, as it stands today, to allow the statute of limitations to be tolled in derivative actions alleging wrongful self-dealing by a corporate fiduciary until the shareholder knew or had reason to know of the facts constituting the alleged wrong.

It appears that a discovery rule *does* apply to fiduciary self-dealing claims in Delaware, and the lack of such a limitation does not support the *Southwest Supermarkets* court's reading of the strong arm clause.

As the Debtor points out, Judge Clevert held in *In re Standard Law Enforcement Supply Co.*, 74 B.R. 608 (Bankr. E.D. Wis. 1987), that the hypothetical lack of actual knowledge did not strip a judgment lien creditor of constructive notice. In discussing the rights of a judicial lien creditor (not a bona fide purchaser, a distinction that the Committee relies on some cases to make), Judge Clevert said: "Although § 544(a) vests a trustee with the power to avoid transfers regardless of the trustee's actual knowledge, *the trustee is still bound by constructive or inquiry notice*." *Id.* at 612 (emphasis added); *see also In re Suggs*, 355 B.R. 525, 528-29 (Bankr.

8

M.D.N.C. 2006) (judgment lien creditor subject to constructive notice of lis pendens). This Court concludes that either § 544(a) does not give the Committee the right to bring a fraudulent transfer action at all based on Wisconsin law, or if it does, it still is subject to the "discovery rule" of the Wisconsin statute of limitations.

### § 544(b) Fraudulent Transfer

The Committee stands on firmer ground in asserting the fraudulent transfer claim under Bankruptcy Code § 544(b). That provision allows the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . . ." 11 U.S.C. § 544(b). The trustee's rights under § 544(b) are limited to the "rights of an existing unsecured creditor because § 544(b) rights are completely derivative of those of an actual unsecured creditor." *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852 (S.D.N.Y. 1998) (citations and quotations omitted). Further, the trustee will be able to attack the transfer only to the extent a creditor with an allowable claim can avoid the transfer under applicable state law. *Id.* Accordingly, there is no question under § 544(b) that the applicable Wisconsin statute of limitations, including the discovery rule, binds the trustee, although if the statute of limitations has not expired by the petition date, the trustee's statute of limitations is extended for another two years. *Id.* at 853; *see also* 11 U.S.C. § 546(a).

### Statute of Limitations

The Committee alleges that the Debtor's transfer of the Parish Deposit Fund was made with actual intent to hinder, delay, or defraud a creditor and therefore is avoidable under Wis. Stat. § 242.04(a). As noted above, the statute of limitations for bringing an action under this provision is "within 4 years after the transfer is made . . . or, if later, within one year after the transfer . . . is or could reasonably have been discovered by the claimant." Wis. Stat. § 893.425.

9

Since the transfer in this case was made in June 2005, more than four years have passed, and the "discovery rule" applies. The Committee argues that a creditor could not reasonably have discovered the transfer, but the Debtor disagrees.

The Debtor submitted the Affidavit of Kim Kasten who, since 2000, has been the Debtor's employee responsible for processing and accounting for all contributions and redemptions to and from the Parish Deposit Fund. (Kasten Affidavit ¶ 4). According to Ms. Kasten, the Parish Deposit Fund was created as an optional pooled investment fund for Catholic entities, and the Debtor and the Parishes contributed funds. (*Id*. ¶ 3). Due to the economies of scale, the Parish Deposit Fund offered interest rates that were far in excess of what the individual Parishes could achieve investing their own funds. (*Id*. ¶ 6). The Parish Deposit Fund was held in a segregated account, and the funds invested by the Parishes never passed through the Debtor's general bank accounts. (*Id*. ¶ 9). The Parishes could make periodic investments into the Parish Deposit Fund and receive all or a portion of their money back, upon request, with minimal delay. (*Id.* ¶¶ 7, 10). The Parish Deposit Fund's existence was disclosed and published in the Debtor's audited financial statements, which have been posted on the Debtor's website since 2002. (*Id.* ¶ 17). The 2004 audited financial statement (attached to the Committee's Motion as Exhibit B-1) contained a note describing the Parish Deposit Fund as follows:

NOTE 7 - Parish Deposit Fund

The Archdiocese serves as a fiduciary to a fund known as the Parish Deposit Fund (the "Fund"). Participation in the fund is elective and its purpose is to provide Catholic entities within the geography of the Archdiocese with economies of scale and administrative ease in the handling of their respective investments and excess funds. The underlying Fund pays interest quarterly to its owners/depositors at a rate of 2.25% as of June 30, 2004 determined by the fiduciary based on current market conditions and the return on existing investments. The rules of the Fund require five-day written notice for withdrawals. No fees are charged by the Archdiocese for its fiduciary services. Monies owned by the Archdiocese in the

amount of $17,842,675 which it chooses to keep in the Fund are separately accounted for and documented.

The Fund is shown as a noncurrent asset in the statement of financial position. . . . $56,637,509 of the Fund's assets are payable to parishes and other Catholic organizations as of June 30, 2004. This amount is shown as a noncurrent liability in the statement of financial position.

The Debtor closed the Fund in June 2005. (Kasten Affidavit ¶ 13). The Debtor sent a letter to the Parishes advising them of the option of having their funds returned to them or in participating in the new Southeastern Parish Trust. (*Id*. ¶ 14, Exhibit D to Committee's Motion). The majority of the Parishes opted for return of their funds. (Kasten Affidavit ¶ 16). The audited financial statement dated June 30, 2005, which was promptly posted on the Debtor's website, reported the closure of the Parish Deposit Fund. (*Id*. ¶ 18). According to the Debtor, the note to the 2005 financial statement said:

The Archdiocese served as a fiduciary to a fund known as the [Parish Deposit Fund]. Participation in the fund was elective and its purpose was to provide Catholic entities within the geography of the Archdiocese of Milwaukee with economies of scale and administrative ease in the handling of their respective investments and excess funds. . . . The fund had been shown as a non-current asset in the statement of financial position with an offsetting noncurrent liability to the other Catholic organizations. The fund was closed in June 2005.

(6/22/12 Debtor's Obj. at 13).

The Debtor relies on the public disclosure of the transfer of the Parish Deposit Fund to the Parishes and the Southeastern Parish Trust to counter the Committee's argument that the transfer could not reasonably have been discovered. However, the disclosures do not really go as far as the Debtor intimates; close review of the financial statements merely reveals the existence of the Parish Deposit Fund and then its closure in 2005. From the public disclosures, without the benefit of Ms. Kasten's explanation, it is difficult to know what happened to the Parish Deposit

11

Fund. A reader would know that the Parish Deposit Fund was "closed," not necessarily that it was transferred to the Parishes or the Southeastern Parish Trust.

The Committee cites *Fid. Nat'l Title Ins. Co. v. Howard Sav. Bank*, 436 F.3d 836 (7th Cir. 2006), but this case is distinguishable. In *Fidelity*, owners of a title company caused the company to remove money from escrow accounts to buy certificates of deposit ("CDs") from banks. The owners then pledged the CDs for personal loans and authorized the banks to apply the CDs in satisfaction of the personal loans. Five years later, Fidelity, which insured the escrow accounts, discovered that money was missing and sued one of the banks. At that time, Fidelity interviewed the title company's controller, who told Fidelity that office "scuttlebutt" was that CDs occasionally were pledged for personal use. Within a month, Fidelity learned the identity of additional banks that received the CDs, but Fidelity did not sue the other banks for more than a year after it interviewed the controller. Under the same one-year discovery rule applicable here,[3] the Seventh Circuit held that Fidelity's suit was time barred. Fidelity argued that to start the clock ticking, a claimant had to know the particular fraudulent transfers that occurred. Judge Posner rejected this argument, stating: "All you have to know or suspect is that such transfers are occurring; for knowing that, it is irresponsible to sit back and wait until the particular transfers are identified to you." *Id.* at 840. Judge Posner also said that the discovery statute of limitations does not begin to run unless there is something "fishy" about the transfer, and that the transfer must have been made to someone who is a fraudulent transferee, or it is not a fraudulent transfer.

In this case arguably there was something "fishy" about the transfer: over $35 million was removed from the Debtor's balance sheet in 2005 when the Debtor was being sued for priest

---

[3] Illinois and Wisconsin have adopted the Uniform Fraudulent Transfer Act, although Debtor's counsel pointed out at the hearing that some states apply a "judicial gloss" on the statute of limitations that Wisconsin courts would not necessarily follow.

sex abuse and it had publicly started a mediation program for sex abuse victim/survivors. The Debtor's financial statements disclosing the existence and then closing of the Parish Deposit Fund were readily available on the internet. The Committee posited that only by publicly disclosing the alleged intent of the transfer ("shelter the Parish Deposit Fund"; a/k/a, according to the Committee, "defraud the abuse survivors") would the discovery clock start ticking. But this reads too much into *Fidelity*. As Judge Posner pointed out, it is not necessary to know the particular fraudulent transfers that occurred to trigger the duty of inquiry.

Moreover, *Fidelity* confirmed that there is no fraudulent transfer unless the transferee either "suspected that the money they were getting had a tainted origin or provided no consideration for receiving the money." *Id.* at 840. Here, the Parish Transferees could not have suspected that they were receiving tainted money because they thought they were getting their own money back. And they gave good consideration – the release of any claim against the Debtor for the return of the money. In short, *Fidelity* does not support the Committee's argument that a creditor reasonably could not have discovered the transfer prior to one year before the bankruptcy petition.

The Committee also attempts to spin the facts here so they fall within the exception to the discovery rule announced in cases like *Lippe* and *G-I Holdings*, *supra*. Those cases involved tort claimants afflicted with asbestos-related injuries who did not manifest symptoms until the statute of limitations arguably had run. The court in *Lippe* found the fraudulent transfer claims timely because the tort claimants could not have known they had a claim to avoid a fraudulent transfer if they did not know they were creditors of the debtor. The court held: "Accordingly, asbestos-victim claimants who were unaware of any asbestos injury prior to the two years before Keene filed for bankruptcy are not barred from asserting an actual fraud claim against any of the

13

corporate defendants because the actual fraud claim is not time-barred.  This category of claimants can be considered 'actual creditors' pursuant to § 544(b). . . ." *Lippe,* 225 B.R. at 855.

At first blush, the claims of the asbestos claimants and abuse survivors appear analogous. Like the asbestos claimants with delayed symptoms, some abuse survivors were injured many years ago, but only recently became aware of their claims.  However, in *John BBB Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 565 N.W.2d 94 (1997), the Wisconsin Supreme Court unambiguously answered the question of when an abuse survivor's claim accrues.  As Justice Abrahamson summarized in her dissent:  "A plaintiff who while a minor was sexually assaulted by a person in a position of trust (such as a clergyperson) is, as a matter of law, irrebuttably presumed to have discovered the injury and the cause thereof at the moment of the assault, regardless of whether the plaintiff repressed all memory of the assault or the plaintiff did not know and should not have reasonably known of the injury or cause thereof." *John BBB Doe*, 211 Wis. 2d at 367, 565 N.W.2d at 116.  Therefore, under Wisconsin law, unlike the asbestos claimants, the abuse survivors' claims are deemed to have accrued at the time of the abuse. Accordingly, they share the same duty as the Debtor's other creditors to discover and investigate alleged fraudulent transfers.  The Court also rejects the Committee's arguments that the various rulings of the Wisconsin courts regarding the statute of limitations on abuse claims changes the statute of limitations for the discovery of the Debtor's alleged fraudulent transfer.  This case does not easily compare to the cases relied on by the Committee.

At bottom, the inquiry is whether an unsecured creditor of the Debtor reasonably could have discovered the transfer before January 5, 2010 (within one year of the Debtor's petition). On one hand, the financial statements disclosing the existence and closing of the Parish Deposit Fund were public, and the disappearance of a large "noncurrent asset" was available for

investigation, at a time when the abuse survivors were filing lawsuits and involved in a mediation program with the Debtor. On the other hand, the bald statement "the Parish Deposit Fund was closed," does not suggest by itself that millions of dollars were transferred to the Parishes, and the 2003 Finance Council minutes declaring "[c]urrently, we are working on setting up a Trust Fund to shelter the Parish Deposit Fund" was not revealed until the discovery process in the Debtor's bankruptcy case. Although an extremely close case is presented, the Court concludes that the Committee has stated a plausible claim that a creditor reasonably could not have discovered the transfer.

Parishes as Good Faith Transferees

Section 242.08(1) of the Wisconsin Statutes provides a defense to a "person who took in good faith and for a reasonably equivalent value." The Debtor argues that the Parishes easily satisfy this defense; after all, they merely were receiving a transfer of their own money. The Committee contends that, because of the interlocking leadership of the Parishes and the Debtor, the Archbishop's knowledge of the allegedly fraudulent transfer taints the Parishes. The only Wisconsin case that the Committee cites is *Grove Holding Corp. v. First Wis. Nat'l Bank*, 12 F. Supp. 2d 885, 895 (E.D. Wis. 1998). In that case, the court stated that knowledge of a corporate officer is imputed to a corporation relating to any matter over which the officer has management or control. In its Memorandum Decision on the Committee's Motion for Standing on Alter Ego and Substantive Consolidation Claims, issued December 7, 2012, this Court reviewed the provisions of Wis. Stat. § 187.19 dictating the requirements of Wisconsin law for parishes within the Roman Catholic church. Under that statute, the bishop is the president of the parish corporation, and the pastor is the vice-president. Under Wis. Stat. § 187.19(5), the bishop, vicar-general, pastor, treasurer (a lay person), and secretary (a lay person) constitute the board of

15

directors of the parish corporation, and their unanimous consent is required to incur debt in excess of $300 or to sell or mortgage parish property. Although the Archbishop has a title and position within each Parish corporation, as the Court noted in the prior Memorandum Decision:

> The Parish Corporations located within the [Debtor] are separate civil corporations. Other than a few Parish Corporations which are wholly-owned by religious orders, the Parish Corporations are all organized and operate pursuant to Wis. Stat. § 187.19. In Wisconsin, parish corporations have been separately incorporated since 1883 (Wis. Stat. § 187.19 is based on Chapter 37 of the Laws of Wisconsin (1883), and many of the Parish Corporations came into existence in 1883, with the majority incorporated prior to 1930). In accordance with the Wisconsin Statutes, each Parish Corporation has a designated Board of Trustees as prescribed by statute. **Parish corporations own their own property, finance their own activities, manage their own assets and are responsible for their own corporate activities.**

(1/4/11 Marek Affidavit, Docket No. 6) (emphasis added).

The Committee argues that given the Archbishop's ability to manage Parish assets and finances, the Archbishop's knowledge about the transfer should be imputed to the Parishes. But there is no evidence (or facts plausibly pled) that the Archbishop exercised any of that authority or control with respect to the Parish Deposit Fund. In fact, the Debtor sent a letter to all the Parishes giving them the opportunity to withdraw their funds or invest in the new Southeastern Parish Trust. If the Archbishop truly controlled the transfer from the Parishes' point of view, there would be no point to sending the letter. He simply would have decided to transfer all the money to the Southeastern Parish Trust or return all the money to the Parishes. In short, the status of the Archbishop as president and board member of the Parish corporations does not, without more, render the Parishes bad faith transferees of the Parish Deposit Fund transfer.

The Committee cites *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207 (Bankr. D. Nev. 2007), as an example of a case in which a court imputed fraudulent intent and knowledge to a transferee. Before filing bankruptcy, the debtor, NADN, sold tax shelters and

Case 11-20059-svk    Doc 1221    Filed 12/10/12    Page 16 of 23

other products described by the court as "close to worthless," and the officers and other

corporations they established "knowingly participated in a wide-ranging scheme which used

NADN to extract money from NADN's customers for the ultimate benefit" of the officers. *Id*. at

213. The court described the lack of good faith in the corporate officers as follows:

> With respect to Coolidge and Rodrigues, they authorized or received transfers
> which they knew, or should have known, were unlawful or unconscionably
> obtained. Further, they accepted these transfers at a time when they knew, or
> should have known, that NADN was insolvent, and at a time at which they knew,
> or should have known, that NADN had "cooked" its books to show unearned
> income as earned. In short, they were active participants in a scheme to bleed
> NADN of any cash, to their benefit and to creditors' detriment.

*Id.* at 224.

The court then imputed this bad faith to the corporations that these individuals controlled.

The instant case shares none of the elements of control and bad faith described in *National Audit

Defense*. The only component the cases have in common is that the Archbishop is the sole

member of the Debtor corporation, and he is an officer and board member of the Parish

corporations. There is no fact alleged that the Archbishop controlled the receipt of the transfer

by the Parishes – in fact, as shown by the Debtor's letter, the Parishes, independently of the

Archbishop, had the option of return of their funds or participation in the new Southeastern

Parish Trust. To impute allegedly fraudulent intent under these circumstances goes too far.

<u>The Transfer was not the Debtor's Property</u>

Similar to the question of whether the Parishes were good faith transferees of the Parish

Deposit Fund is whether the Fund itself was the Debtor's property or the Parishes' property. In

*Begier v. IRS*, 496 U.S. 53, 58-59 (1990), the Supreme Court held that that a trustee could not

avoid a transfer if the property would not have been part of the bankruptcy estate if it had not

been transferred. Thus the question is whether the money in the Parish Deposit Fund would have

17

been property of the Debtor's bankruptcy estate if the Debtor had not closed the Parish Deposit Fund. The Committee argues that in administering the Parish Deposit Fund, the Debtor was a bank, and the Parishes were depositors. The Committee notes that a bank's relationship with its depositors is not a trust relationship, but rather a debtor-creditor relationship. The Debtor responds that the relationship was not that of a bank with its depositors, but that of a "resulting trust" or "property held for the benefit of another."

The Parish Deposit Fund model was analyzed in another diocesan bankruptcy case. In *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 432 B.R. 135 (Bankr. D. Del. 2010), the creditors' committee sought a declaratory judgment that no trust relationship existed between the diocese and the parishes, charitable organizations, and schools with respect to a pooled investment account ("PIA"). The PIA and the Parish Deposit Fund feature many similarities, including the purpose, voluntary nature, ability of investors to withdraw their funds upon request, and belief by both the diocese and the investors that all funds within the PIA remained the property of the investors. The bankruptcy court in the *Diocese of Wilmington* concluded that the funds in the PIA were held in a resulting trust. Quoting the Restatement (First) of Trusts, the court defined a resulting trust as arising "where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of." *Id.* at 149 (internal citations and emphasis omitted). The *Diocese of Wilmington* court found the following facts "overwhelming" in establishing a resulting trust:

> There is no question that every party that participates in the pooled investment program has transferred money to the Debtor for the Debtor to deposit in the PIA

> and invest those funds on the investors' behalf through the purchase of securities. The evidence also establishes that the parties have intended for those funds to remain the property of the investors and that the investors could withdraw the funds at any time. These intentions are manifested by the actions of the parties. For example, a number of investors have, from time to time, withdrawn some or all of their funds. Another used its funds in the PIA as collateral for a loan. In addition, the Debtor provided the investors with summary quarterly statements identifying each investor as the owner of its investments.

*Id.* Having determined that a resulting trust existed, the court next determined whether the parishes could trace their funds in the PIA. The court noted that the transfers into the PIA were made into the diocesan operating account before being transferred into the PIA, and the Wilmington diocese transferred funds back and forth between its operating account and the PIA based on its own liquidity needs. *Id.* at 143. The parishes argued that for purposes of tracing the trust funds, the court should look solely to the debtor's meticulous accounting records. The court emphatically rejected the suggestion:

> *This argument, however, ignores the fact that the trust funds were deposited and withdrawn from the operating account and not the PIA.* Thus, the defendants must identify and trace the trust funds (i) to and from the operating account; and (ii) between the operating account and the PIA. This is what they cannot due [sic]. The defendants did not present any evidence sufficient to trace the funds in this manner because no such evidence exists. As such, they simply cannot meet their burden.

*Id.* at 159 (emphasis in original).

There was one exception to the court's ruling; one of the parishes, St. Ann's, had a formal trust agreement and deposited its funds directly into the PIA. Applying the lowest intermediate balance test, the court noted that the balance in the PIA never dipped below the amount that St. Ann's invested. Therefore, St. Ann's was able to trace its funds in the PIA, and those funds were not property of the estate.

Unlike the majority of the investors in the *Diocese of Wilmington* case, all of the Parishes' funds in this case were deposited into one segregated bank account. (Kasten Affidavit

¶ 9).  The funds were not commingled in the Debtor's operating account and transferred back

and forth.  (*Id.*).   All the funds here were like the St. Ann's funds in *Diocese of Wilmington* –

deposited into and segregated within the Parish Deposit Fund.  The funds easily are traceable as

a result.  The facts here support the conclusion that the parties intended that the Parishes' money

deposited into the Parish Deposit Fund at all times belonged to the Parishes.  The program was

voluntary, the Parishes could withdraw their funds on request, and, most importantly, the Debtor

did not use these funds for operations, but rather maintained them in a segregated, independently

audited account that never was found to have a shortfall. (*Id.* ¶ 12).  Although the parishes in

Wilmington, other than St. Ann's, were not able to trace their funds, given the segregated nature

of the Parish Deposit Fund, and the lack of evidence that the balance in the account ever fell

short of the amount necessary to refund their deposits to the Parishes, the Parishes here easily

could do so.  Accordingly, the Committee has not stated a plausible claim that transfer of the

funds in the Parish Deposit Fund to the Parishes was made with the Debtor's property.

<u>The Debtor Justifiably Refused to Bring this Action</u>

     Assuming that the Committee's allegations could survive a Motion to Dismiss (a doubtful

proposition given the preceding discussion), the Committee also must satisfy the Court that the

Debtor unjustifiably refuses to bring the Claim.  While cautioning that the court should not

conduct a "mini-trial," the Eighth Circuit described the test to be applied and factors to be

considered in *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs.)*, 540 F.3d 892, 901 (8th

Cir. 2008) (internal citations and quotations omitted):

> At bottom, the determination of whether the trustee unjustifiably refuses to bring
> a creditor's proposed claims will require bankruptcy courts to perform a cost-
> benefit analysis.  While by no means exhaustive, among the factors the court
> should consider in conducting this analysis are: (1) the probabilities of legal
> success and financial recovery in event of success; (2) the creditor's proposed fee

arrangement; and (3) the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.

The first element of a cost-benefit analysis is cost. Here, the Committee candidly concedes that prosecution of this litigation against the Parishes would cost the Debtor over $1 million in legal fees.[4] The Committee contends that the potential $35 million award substantially justifies the expense. But the Committee oversimplifies the analysis. First, the Committee would bear the burden of proving that the Debtor committed intentional fraud in making the transfer. Although it is possible that discovery might reveal additional evidence, the Debtor already gave thousands of documents to the Committee in the course of informal discovery. Of these reams of paper, the only document evidencing intent to hinder, delay, or defraud creditors is the 2003 finance committee meeting minutes in which the Committee seizes on one sentence: "Currently, we are working on setting up a Trust Fund to shelter the Parish Deposit Fund." The sentence, when read in context, does not necessarily constitute the smoking gun on which the Committee hangs its hat. More evidence would be required to prove an intentional fraudulent transfer, and no proffer of that evidence has been made. Of course the Parishes would be entitled to the full airing of their defenses. To develop this evidence and conduct a trial – actually probably over 100 trials – would take many months. The Debtor's Chapter 11 case has been pending close to two years, and no plan has been filed. The status of this case should be much closer to a plan proposal than months, if not years, of protracted expensive litigation of dubious merit.

Even assuming that the Committee prevailed in its lawsuits, the ever looming question of collectability remains. At the hearing on the Motion, the Debtor argued that some of the

---

[4] There is no suggestion as in some of the cases that the Committee would fund the cost of the litigation. The Committee's legal fees for suing the Parishes would be paid by the Debtor as an expense of administration of the bankruptcy case. *See* 11 U.S.C. §§ 330, 503(b).

Parishes, schools, and other affiliates that received a return of their investment from the Parish Deposit Fund would be hard pressed to return this money. Presumably, these entities would look to their parishioners, students, and benefactors to help fund any judgment rendered against them. This would have an adverse effect on their continued support of the Debtor. Without the support of these individuals, the Debtor undoubtedly will struggle to meet its obligations and fund a Chapter 11 plan. In response to this bleak scenario, the Committee's counsel stated at the hearing: "Where is the money? I don't know where the $35 million is." In the Court's experience, many individuals and entities are worse off financially than they were in 2005. It is not unreasonable to surmise that a Parish that invested money in the Parish Deposit Fund and received the return of its investment in June 2005 no longer has the money and was unable to replenish it after the Great Recession of 2008. However, the Committee has not sought to confirm or deny this supposition; it stubbornly insists that the Debtor provide financial information on the Parishes, while the Debtor obstinately retorts that the Parishes are separate corporations, and the Committee should ask the Parishes for the information. The Debtor presumably properly took the issue of collectability into consideration when analyzing whether to bring these claims, and the Court cannot find the refusal to bring the claims as a result unjustifiable.

If the Committee avoided the transfer to the Parishes, and the Parishes returned the money to the bankruptcy estate, the Parishes would be entitled to file proofs of claim as creditors. *See* 11 U.S.C. § 502(d). Accordingly, the Committee's suggestion that spending $1 million in legal fees would net $35 million for the estate is not correct. The cost-benefit analysis must consider the large number of potential claims to be added to pool of creditors, thereby reducing the net effect of the recovery.

22

In sum, due to the difficulties the Committee would face in proving a case of actual fraudulent transfer, and in light of the valid defenses that the Parishes could advance, not to mention the time, expense and drain on the Debtor's resources that would accompany this litigation, the cost does not outweigh the benefit to be attained. The Court concludes that the Debtor did not unjustifiably refuse to prosecute this avoidance claim against the Parishes.

The Debtor contends that if the Committee's arguments are correct, the outcome would require the Court to use the Bankruptcy Code to make the funds available to creditors in violation of the Religious Freedom and Restoration Act ("RFRA"). Because it has found that the Committee should not otherwise be granted standing to pursue its claims, the Court will leave this issue for another day.

Conclusion

Finding that the Parishes appear to be good faith transferees for value and that the money that the Parishes deposited into and received from the Parish Deposit Fund was not property of the Debtor, the Court concludes that the Committee has not stated a colorable claim that the transfer to the Parishes is an avoidable fraudulent transfer. Even assuming a colorable claim exists, the Debtor has not unjustifiably refused to bring this claim due to the enormous cost, delay, questions about collectability and adverse effect on the Debtor's reorganization that would ensue. The Committee's Motion for Standing on these fraudulent transfer claims should be denied. A separate order will be entered.

Dated: December 10, 2012

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge