# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **In re:** | **Case No. 11-20059-svk** |
| **ARCHDIOCESE OF MILWAUKEE,** | **Chapter 11** |
| **Debtor.** | **Hon. Susan V. Kelley** |

## DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION DATED FEBRUARY 12, 2014 PROPOSED BY THE ARCHDIOCESE OF MILWAUKEE

The Archdiocese of Milwaukee, debtor and debtor-in-possession (the "Archdiocese" or "Debtor") provides this Disclosure Statement for the Plan of Reorganization (the "Plan") filed by the Archdiocese. A copy of the Plan accompanies this Disclosure Statement as **Exhibit A**.[1]

This Disclosure Statement is presented to certain holders of Claims and Interests to satisfy the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). Section 1125 of the Bankruptcy Code requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable investor, typical of the Debtor's creditors, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above, and use of this Disclosure Statement for any other purpose is not authorized.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED.**

**NO REPRESENTATIONS CONCERNING THE ARCHDIOCESE, INCLUDING THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE ARCHDIOCESE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN, OTHER THAN AS CONTAINED IN THIS**

---

[1] Capitalized terms set forth herein have the meaning assigned to such terms in the Plan unless otherwise indicated.

Daryl L. Diesing
Bruce G. Arnold
Francis H. LoCoco
Lindsey M. Greenawald
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-4894
Telephone: (414) 273-2100
Facsimile: (414) 223-5000

DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE ARCHDIOCESE, WHO SHALL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE ARCHDIOCESE AND OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AUDIT OR INDEPENDENT REVIEW EXCEPT AS SPECIFICALLY SET FORTH HEREIN.  ACCORDINGLY, ALTHOUGH EVERY EFFORT HAS BEEN MADE TO BE ACCURATE, THE ARCHDIOCESE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE ARCHDIOCESE OR ITS FINANCIAL CONDITION IS ACCURATE OR COMPLETE. THE PROJECTED FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND, BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE ARCHDIOCESE'S ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN.

THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, PROVIDED THAT HISTORICAL FINANCIAL INFORMATION IS REPORTED AS OF JUNE 30, 2013, THE END OF THE DEBTOR'S MOST RECENT FISCAL YEAR, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY, NOR HAVE ANY SUCH BODIES PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  EACH CREDITOR IS URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.

Pursuant to the Bankruptcy Code, this Disclosure Statement was filed on February 12, 2014.  The Bankruptcy Court will hold a hearing on the adequacy of the information set forth in this Disclosure Statement at [_____] Central Standard Time on [_____], 2014 in Room 126 of the United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code with respect to the contents of the Plan and Disclosure Statement.  The Bankruptcy Court will hold a hearing on confirmation of the Plan at a date and time to be determined, however not less than twenty-eight (28) days from the date the Bankruptcy Court

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 2 of 125

approved the Plan and Disclosure Statement. At that time, the Bankruptcy Court will review a ballot report concerning votes cast for acceptance or rejection of the Plan and will determine whether the Plan is in the best interests of the Creditors.

To obtain, at your cost, additional copies of this Disclosure Statement, please contact:

Christopher N. Lerario
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 978-5779
clerario@whdlaw.com

# TABLE OF CONTENTS

I.    OVERVIEW OF PLAN AND TREATMENT OF CLAIMS............................................10

II.   BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE.........................20

    A.    Description of the Archdiocese...............................................................20

    B.    Legal Structure of the Archdiocese and the Parishes.............................21

    C.    Religious Orders .....................................................................................22

    D.    Juridic Persons and Property Ownership ................................................22

    E.    The Clergy Sex Abuse Crisis and the Archdiocese's Response .............23

    F.    Procedures Followed When Abuse is Reported......................................27

    G.    Success of the Archdiocese's Implementation of Procedures to Protect Children From Sexual Abuse...................................................................28

    H.    Purpose and Goals of the Chapter 11 Filing ..........................................30

III.  OPERATIONS OF THE DEBTOR ....................................................................31

    A.    Annual Revenue......................................................................................31

    B.    Annual Operating Expenditures..............................................................31

IV.   ASSETS OF THE DEBTOR .............................................................................32

    A.    Real Property. .........................................................................................33

        1.    Undeveloped Land ......................................................................34

        2.    Property In Use for Religious Purposes......................................34

        3.    Property Leased to Others...........................................................34

        4.    Cemetery Properties in Active Use.............................................35

        5.    Leasehold Interests.....................................................................35

    B.    Personal Property ....................................................................................35

|   |   | 1. | Insurance Recoveries ................................................................35 |
|   |   | 2. | Life Insurance Policies..............................................................36 |
|   |   | 3. | Cash..........................................................................................36 |
|   |   | 4. | Additional Personal Property....................................................36 |
|   |   | 5. | Accounts Receivable.................................................................36 |

|   | C. | Beneficial Interest in Cemetery Perpetual Care Trust ...........................37 |
|   | D. | Other Unavailable Assets......................................................................37 |

| V. | | THE CHAPTER 11 CASE ..................................................................................38 |
|   | A. | Forensic Investigation of Financial Records and Operating Expenses by Committee's Financial Advisor ............................................................39 |
|   | B. | Litigation during the Chapter 11 Case ..................................................39 |
|   |   | 1. | Determining the Legally Enforceable Claims............................39 |
|   |   | 2. | Determining The Major Assets Available for Distribution .......46 |
|   | C. | Document Publication............................................................................54 |
|   |   | 1. | Motions to Produce Documents and Take Depositions.............55 |
|   |   | 2. | Motions Requesting the Release of Documents ........................55 |
|   |   | 3. | Stipulation to the Voluntary Public Release of Documents Regarding Abusers...................................................................56 |
|   | D. | Other Matters .......................................................................................56 |
|   |   | 1. | Mediation ..................................................................................56 |
|   |   | 2. | Future Claims Representative....................................................57 |
|   |   | 3. | Motion to Suspend Interim Compensation ................................57 |
|   |   | 4. | Rule 2019 Motion .....................................................................57 |
|   | E. | Expenditures in the Chapter 11 Case ....................................................57 |
|   |   | 1. | Largest Fee Expenditures By Category .....................................59 |
|   |   | 2. | Disbursements............................................................................63 |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 5 of 125

       3.       Expenditures if a Plan is Not Confirmed ...................................64

VI.    DEBTOR'S VOLUNTARY NON-MONETARY UNDERTAKINGS FOR THE
      PROTECTION OF CHILDREN .................................................................65

VII.   GENERAL STRUCTURE OF THE PLAN ...................................................67

     A.    Classification of Claims.................................................................67

     B.    Definition of Claims and Treatment of Claims.......................................69

        1.       Park Bank Secured Claim (Class 1).........................................69

        2.       Priority Claims (Class 2)....................................................69

        3.       Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims
                  (Class 3) ................................................................................70

        4.       Archdiocese of Milwaukee Priests' Pension Plan Claims (Class 4)..........70

        5.       Archdiocesan Cemeteries of Milwaukee Union Employees'
                  Pension Plan Claims (Class 5) ....................................................70

        6.       Archdiocese of Milwaukee Lay Employees' Pension Plan Claims
                  (Class 6) ................................................................................70

        7.       Perpetual Care Claims (Class 7) ...............................................71

        8.       Pre-Petition Settlement Claims (Class 8)....................................71

        9.       Archdiocesan Abuse Survivor Claims Subject to Statute of
                  Limitations Defenses (Class 9) ..................................................71

        10.    Archdiocesan Abuse Survivor Claims with No Factual Basis for
                  Fraud (Class 10) ....................................................................72

        11.    Religious Order Abuse Survivor Claims (Class 11).................................72

        12.    Lay Person Abuse Survivor Claims (Class 12).........................................72

        13.    Other Non-Debtor Entity Abuse Survivor Claims (Class 13) ..................73

        14.    Unknown Abuse Survivor Representative Claim (Class 14)....................73

        15.    Disallowed or Previously Dismissed Abuse Survivor Claims
                  (Class 15) ................................................................................75

        16.    General Unsecured Creditor Claims (Class 16).........................................75

17. Charitable Gift Annuity Claims (Class 17).................................................76

18. Penalty Claims (Class 18)........................................................................76

C. Proposed Settlements Embodied in Plan .............................................................76

1. Insurance Litigation – Settlement with the LMI ......................................76

2. Cemetery Trust Settlement ......................................................................83

3. Faith In Our Future Trust Settlement.........................................................98

4. Pending Abuse Survivor Claims Objections and Appeals of Abuse Survivor Claims Objections...................................................................101

D. Reservation of Rights.......................................................................................102

E. Modification and Assumption of the Cousins Center Leases .............................102

1. Lease from De Sales Preparatory Seminary, Inc. ...................................102

2. Sublease to the Milwaukee Bucks ..........................................................102

F. Sources of Funding for the Plan.........................................................................102

1. Proceeds of Modified Cousins Center Sublease ......................................102

2. Loan Renewal from Park Bank.................................................................102

3. Quarterly Distributions from the Cemetery Trust....................................102

4. Continuation of Parish Assessments........................................................102

5. Continuation of Annual Catholic Stewardship Appeal............................102

6. Income from Cemeteries..........................................................................103

7. Miscellaneous donations, bequests, fees for services, rent and grants......................................................................................................103

G. Means of Implementing Litigation Trust for Abuse Survivors .........................103

1. Vesting Assets in the Insurance Litigation Trust.....................................103

2. Insurance Litigation Trust Assets ...........................................................103

3. Assumption of Plan Obligations and Liability for Claims.......................103

4. Unknown Abuse Survivor Claims ...........................................................103

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 7 of 125

|   | 5. | Insurance Litigation Trust Documents and Administration | 104 |

| H. | Effects of Confirmation | | 106 |
|   | 1. | Dissolution of the Committee | 106 |
|   | 2. | Discharge Injunction | 107 |
|   | 3. | Channeling Injunction in Plan | 107 |
|   | 4. | Continuation of Insurance Policies | 108 |
|   | 5. | Insurance Neutrality | 108 |
|   | 6. | Exculpation; Limitation of Liability | 109 |

| I. | The Reorganized Debtor | | 109 |
|   | 1. | Continued Corporate Existence, Corporate Action and Vesting of Assets | 109 |

| J. | Miscellaneous Provisions | | 110 |
|   | 1. | Rejection of Unassumed Executory Contracts | 110 |
|   | 2. | Final Order | 110 |
|   | 3. | Amendments and Modifications | 110 |
|   | 4. | U.S. Trustee Reports | 110 |
|   | 5. | No Waiver | 110 |
|   | 6. | Tax Exemption | 110 |
|   | 7. | Non-Severability | 111 |
|   | 8. | Revocation | 111 |
|   | 9. | Controlling Documents | 111 |
|   | 10. | Governing Law | 111 |
|   | 11. | Notices | 112 |
|   | 12. | Filing of Additional Documents | 112 |
|   | 13. | Powers of Officers | 112 |
|   | 14. | Direction to a Party | 112 |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 8 of 125

15. Successors and Assigns..........................................................................113

16. Certain Actions ....................................................................................113

17. Final Decree .........................................................................................113

VIII. BEST INTERESTS TEST AND FINANCIAL FEASIBILITY.....................................113

 A. Best Interests.....................................................................................113

  1. Legal Standard for the Best Interests Test .................................113

  2. Hypothetical Chapter 7 Liquidation Analysis...........................114

 B. Financial Feasibility...........................................................................121

IX. PLAN AS SETTLEMENT COMMUNICATION ...........................................121

X. RULE 9019, CRAMDOWN REQUESTS....................................................122

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............122

 A. Tax Consequences to Creditors ...........................................................122

 B. Tax Consequences to the Debtor ........................................................123

 C. Tax Consequences to the Insurance Litigation Trust...........................123

XII. ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS.........................................................................................123

 A. Acceptance by Impaired Classes ........................................................123

 B. Voting Procedures..............................................................................124

  1. Ballots ...................................................................................124

  2. Deadline for Voting ................................................................125

  3. Importance of Your Vote ........................................................125

XIII. RECOMMENDATION AND CONCLUSION...............................................125

Case 11-20059-svk  Doc 2524  Filed 02/12/14  Page 9 of 125

# I.       OVERVIEW OF PLAN AND TREATMENT OF CLAIMS

Immediately prior to the commencement of this case, the Archdiocese had seventeen (17) pending claims asserted against it for sexual abuse in cases pending in Milwaukee County Circuit Court, where the plaintiffs were represented by Jeff Anderson & Associates, P.A. (the "Anderson Firm").  In response to the Archdiocese's request to identify any other claims, the Anderson Firm also made formal demand on the Archdiocese on behalf of six (6) additional claimants, for a total of twenty-three (23) claims.  The Archdiocese's operating expenses and programs had been cut as much as possible to fund expenses and compensation related to sexual abuse.  However, it was clear that anticipated litigation expenses could not continue to be funded.

In an attempt to settle the twenty-three (23) claims, the Archdiocese offered $4.6 million -- all it had in unrestricted assets except for $1 million -- to settle the claims.  When that offer was rejected, the Archdiocese chose to file the above-captioned chapter 11 proceeding (the "Chapter 11 Case").  At the beginning of the Chapter 11 Case, the Archdiocese again offered to give all of its available monetary assets to its Creditors.  That was rejected by the Official Committee of Unsecured Creditors (the "Committee"), which chose to demand that assets belonging to others such as parish property, parish deposit funds, and trust funds established for other charitable purposes be added to the chapter 11 assets and distributed to Abuse Survivor Claimants.  In fact, the Committee spent and caused the Debtor to incur approximately $12 million in professional fees having courts confirm what the Archdiocese had consistently and publically reported as the assets available to creditors.  Court rulings have now established that none of the Committee's allegations were correct.

However, all the money originally available to creditors has been spent along with substantial additional monies that must be paid as required by applicable bankruptcy law.

Meanwhile, the Anderson Firm purchased unprecedented amounts of advertising to convince hundreds of people to file claims that the Anderson Firm lawyers knew were subject to legal objections, raising unfounded hopes with the Abuse Survivors that they would receive a large financial recovery.

For the preservation of the Church and the well-being of all constituencies, especially the Abuse Survivors, the Archdiocese must find a way to move forward with the scarce resources available.

To that end, the Archdiocese consented to the release of all records about clergy abuse that were requested by the Anderson Firm, but only after carefully redacting information that might identify an Abuse Survivor and cause more harm.  The Plan is intended to distribute the remaining assets as equitably as possible to enable the Abuse Survivors to move forward, and to enable the Archdiocese and parishioners to move forward.  The alternative is years of litigation where none of the parties is able to reach closure and the assets of the Debtor are further reduced.

The Plan divides the various creditors into classes.  The Plan provides payments from funds set aside for Abuse Survivor Claims.  Individuals are eligible for a financial settlement if

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 10 of 125

their claims are not barred by the court decisions in this case or by law, and assuming, without investigation, that all allegations are true.

However, consistent with the Archdiocese's desire to help with the resources it may have, the Debtor is committed to providing therapy assistance to as many Abuse Survivor Claimants as possible, whether it be by payment from the Archdiocese or by the Archdiocese assisting the Abuse Survivor with obtaining assistance from the appropriate third-party entity. The Archdiocese will assist those abused by members of religious orders by facilitating requests between those Abuse Survivors and the appropriate religious orders. The Debtor will make therapy assistance available to those abused by lay persons because those Abuse Survivors have limited avenues available to request therapy assistance. Finally, with the exception of those Abuse Survivors whose pre-petition settlements specifically provided for cash in lieu of ongoing therapy assistance and those whose Claims have been disallowed, the Archdiocese will make therapy assistance available to nearly all Abuse Survivor Claimants that report sexual abuse by an Archdiocesan Priest. There is no cap on the therapy assistance available, and the Archdiocese is striving to provide therapy assistance for as long as it is medically appropriate.

One important feature of the Plan is the creation of the Insurance Litigation Trust. The Insurance Litigation Trust will be initially funded by a $3,715,398.83 settlement with one insurer, the LMI (often referred to as Lloyds or the London Market Insurers). The Insurance Litigation Trust will have the option of pursuing insurance litigation against the Non-Settling Insurers (as such term is defined in Section VII.C.1hereof) or distributing the money (or a part thereof) to the holders of Class 9 and Unknown Abuse Survivor Claims. The goal is to add significantly to the money available to the holders of Class 9 and Unknown Abuse Survivor Claims through a successful recovery from the Non-Settling Insurers.

With respect to the monetary treatment of claims, the following chart summarizes the treatment. However, please refer to the Plan and the description of the Plan in Section VII of the Disclosure Statement for a more complete description of the treatment of creditors.

| Class | Type of Claim and Treatment | Claim Information |
|---|---|---|
| | **Administrative Expense Claims**<br><br>• Unimpaired<br><br>• <u>Treatment</u>: Paid in full in cash on the Effective Date or on such other terms to which the parties agree | Estimated: $4,500,000 |
| 1 | **Park Bank Secured Claim**<br><br>• Impaired<br><br>• <u>Treatment</u>: Park Bank will retain its lien on the Park Bank Collateral; Reorganized Debtor and Park Bank will amend the Park Bank Loan Documents to provide as follows:<br><br>    o   Allow liens securing a new loan from the Cemetery Trust subordinate in priority pursuant to Park Bank; | Scheduled: $4,389,512.60<br><br>Claimed (Claim No. 133): $4,649,912.50 |

Case 11-20059-svk   Doc 2524   Filed 02/12/14   Page 11 of 125

| | | |
|---|---|---|
| | ○ Pay accrued interest and principal necessary to amortize the loan over ten (10) years;<br><br>○ Three (3) year term;<br><br>○ Balloon payment of accrued interest and principal due on at the expiration of the three year term;<br><br>○ Interest of 5.25 percent per annum;<br><br>○ No prepayment penalty; and<br><br>○ Monthly payments of $59,093/month ($709,116/year). | |
| 2 | **Priority Claims**<br><br>• Unimpaired<br><br>• <u>Treatment</u>: Paid in full in cash on the Effective Date. | |
| 3 | **Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims**<br><br>• Impaired<br><br>• <u>Treatment</u>: The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Retiree Medical Plan. The Archdiocese will not make any payment with respect to the filed claim. Instead, the Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Priests' Retiree Medical Plan as they become due. | Scheduled: $13,693,375<br><br>Claimed (Claim No. 153): $14,067,936 |
| 4 | **Archdiocese of Milwaukee Priests' Pension Plan Claims**<br><br>• Impaired<br><br>• <u>Treatment</u>: The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's employed priests accrued under the Archdiocese of Milwaukee Priests' Pension Plan. The Archdiocese will not make any payment with respect to the current projected withdrawal liability. Instead, the Archdiocese will continue to meet its obligations under the Priests' Pension Plan as they become due. | Scheduled: unknown<br><br>Claimed (Claim Nos. 149 and 150): $3,298,176 |
| 5 | **Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan Claims**<br><br>• Impaired<br><br>• <u>Treatment</u>: The Archdiocese will assume its participation in the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan. The Archdiocese will not make any | Scheduled: $1,169,580<br><br>Claimed (Claim No. 152): $1,056,358 |

| | | |
|---|---|---|
| | payment with respect to the current projected withdrawal liability. Instead, the Archdiocese will continue to meet its obligations under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan as they become due. The Archdiocese will assume the Collective Bargaining Agreement, as modified on May 11, 2011, with the Cemetery Employees, Local 113, Laborers International Union of America, AFL-C10. | |
| 6 | **Archdiocese of Milwaukee Lay Employees' Pension Plan Claims**<br><br>• Impaired<br><br>• <u>Treatment</u>: The Archdiocese will assume its participation in the Archdiocese of Milwaukee Lay Employees' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's lay employees accrued under the Archdiocese of Milwaukee Lay Employees' Pension Plan through the Effective Date. The Archdiocese will not make any payment with respect to current projected withdrawal liability. Instead, the Archdiocese will continue to meet its obligations for its own employees under the Archdiocese of Milwaukee Lay Employees' Pension Plan as they become due. | Scheduled: unknown<br><br>Claimed (Claim Nos. 148 and 151): $37,376,072 (Total Withdrawal Liability Without Allocation to an Individual Employer) |
| 7 | **Perpetual Care Claims**<br><br>• Impaired<br><br>• <u>Treatment</u>: The Reorganized Debtor will have no legal obligation to provide perpetual care arising out of the purchase of plots, crypts or mausoleums prior to the Petition Date. The Reorganized Debtor, at its discretion, may, in keeping with its canonical obligations, provide care to the Milwaukee Catholic Cemeteries. The Reorganized Debtor will honor its contractual obligations to future purchasers of cemetery plots, crypts or mausoleums. | Estimated: $246,000,000<br><br>Claimed (Claim No. 179): To Be Determined |
| 8 | **Pre-Petition Settlement Claims**<br><br>• <u>Definition</u>: The Pre-Petition Settlement Claims mean Claims that the Archdiocese objected to on the following grounds:<br><br>(i) the holder of the Claim and the Archdiocese are parties to a valid pre-petition settlement agreement releasing the Archdiocese from any liability associated with the Abuse and<br><br>(ii) the Claims are time-barred by the applicable statute of limitations. | Scheduled: $702,000<br><br>Remaining Settlement Payments (2014-2015): $107,000<br><br>Approximate Number of Claimants: 84 |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 13 of 125

| | | |
|---|---|---|
| | • Impaired<br>• <u>Treatment</u>: The contractual rights of the holders of Pre-Petition Settlement Claims will be reinstated in full on the Effective Date; any further claims made by the Class 8 Claimants in the Chapter 11 Case will receive no payment on account of such additional claims. | |
| 9 | **Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses**<br><br>• <u>Definition</u>: The Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses mean Claims that the Archdiocese objected to on the following grounds:<br><br>    (i) a determination of whether fraud has been committed cannot be made absent a full trial of the claim and<br><br>    (ii) the Claims are time-barred by the applicable statute of limitations.<br><br>    The estimated number of Claimants in Class 9 is 128<br><br>• Impaired<br>• <u>Treatment</u>:<br><br>    o *Monetary*: Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses Abuse Survivor Fund: $3,715,398.83 initially plus up to $284,601.17 if collection from the Insolvent London Market Insurers to be deposited in the Insurance Litigation Trust to be allocated by the Insurance Litigation Trustee as follows: (i) $250,000 to be set aside for the Unknown Abuse Survivor Reserve; and (ii) $3,465,398.83 plus fifty percent (50%) of the proceeds from the Insolvent London Market Insurers to be allocated between (x) per capita distribution among Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses Claimants and (y) litigation resources to fund the Insurance Litigation, which amount shall not exceed $1,000,000. If the Insurance Litigation Trustee chooses to distribute the entire $3,465,398.83 to Class 9 Claimants, each Class 9 Claimant will receive approximately $27,073.<br><br>    o *Insurance Recoveries*: Ninety-five percent (95%) of the Insurance Recoveries shall be set aside for distribution to holders of Class 9 Claims. Five percent (5%) of the Insurance Recoveries shall be set aside for the Unknown Abuse Survivor Reserve. Any funds | Scheduled: unknown<br><br>Claimed: unknown<br><br>Approximate Number of Claimants: 128<br><br>Therapy Fund for all eligible Abuse Survivor Claimants: $500,000 plus the commitment to add funds in future years if there is a shortfall |

| | | |
|---|---|---|
| | remaining in the Unknown Abuse Survivor Reserve, after payment of all Allowed Unknown Abuse Survivor Claims, will be distributed to Class 9 Claimants and Unknown Abuse Survivor Claimants as determined by the Insurance Litigation Trustee.<br><br>   o  *Therapy*: Each holder of a Class 9 Claim shall also be entitled to request therapy payment assistance from the Therapy Fund. Such assistance shall be requested in accordance with the Therapy Payment Process. | |
| 10 | **Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud**<br><br>• <u>Definition</u>: The Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud mean Claims that the Archdiocese objected to on the following grounds:<br><br>   (i) under the theory of fraud advanced by State Court Counsel, the Claims do not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the claim holder and<br><br>   (ii) the Claims are time-barred by the applicable statute of limitations.<br><br>• Impaired<br><br>• <u>Treatment</u>:<br><br>   o  *Therapy:* Each holder of a Class 10 Claim shall be entitled to request therapy payment assistance from the Therapy Fund. Such assistance shall be requested in accordance with the Therapy Payment Process. | Scheduled: unknown<br><br>Claimed: unknown<br><br>Approximate Number of Claimants: 165<br><br>Therapy Fund for all eligible Abuse Survivor Claimants: $500,000 plus the commitment to add funds in future years if there is a shortfall |
| 11 | **Religious Order Abuse Survivor Claims**<br><br>• <u>Definition</u>: The Religious Order Abuse Survivor Claims mean Claims that allege Abuse solely by a member of a Religious Order and that the Debtor objected to on the following grounds:<br><br>   (i) the Claims are against a non-debtor entity;<br><br>   (ii) under the theory of fraud advanced by State Court Counsel, the Claims do not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the claim holder; and<br><br>   (iii) the Claims are time-barred by the applicable statute of limitations.<br><br>• Impaired | Scheduled: unknown<br><br>Claimed: unknown<br><br>Approximate Number of Claimants: 95 |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 15 of 125

| | | |
|---|---|---|
| | • Treatment:<br><br>    o *Therapy:* The Archdiocese of Milwaukee will assist holders of Class 11 Claims with obtaining therapy payment assistance by facilitating communication and requests for therapy payment assistance between the holders of Class 11 Claims and the appropriate Religious Order. | |
| 12 | **Lay Person Abuse Survivor Claims**<br><br>• <u>Definition</u>: The Lay Person Abuse Survivor Claims mean Claims that allege Abuse solely by a Lay Person and that the Debtor objected to on the following grounds:<br><br>    (i) the Claims are against a non-debtor entity;<br><br>    (ii) under the theory of fraud advanced by State Court Counsel, the Claims do not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the claim holder; and<br><br>    (iii) the Claims are barred by the applicable statute of limitations.<br><br>• Impaired<br><br>• <u>Treatment</u>:<br><br>    o *Therapy:* Each holder of a Class 12 Claim shall be entitled to request therapy payment assistance from the Therapy Fund. Such assistance shall be requested in accordance with the Therapy Payment Process. | Scheduled: unknown<br><br>Claimed: unknown<br><br>Approximate Number of Claimants: 43<br><br>Therapy Fund for all eligible Abuse Survivor Claimants: $500,000 plus the commitment to add funds in future years if there is a shortfall |
| 13 | **Other Non-Debtor Entity Abuse Survivor Claims**<br><br>• <u>Definition</u>: The Other Non-Debtor Entity Abuse Survivor Claims mean Claims that allege Abuse by a person other than an Archdiocesan Priest, a Religious Order Member, or a Lay Person and that the Archdiocese objected to on the following grounds:<br><br>    (i) the Claim is against a non-debtor entity;<br><br>    (ii) under the theory of fraud advanced by State Court Counsel, the Claims do not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the claim holder; and<br><br>    (iii) the Claims are time-barred by the applicable statute of limitations.<br><br>• Impaired | Scheduled: unknown<br><br>Claimed: unknown<br><br>Approximate Number of Claimants: 10 |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 16 of 125

| | | |
|---|---|---|
| | • Treatment:<br><br>   o *Therapy:* The Archdiocese of Milwaukee will assist holders of Class 13 Claims with obtaining therapy payment assistance by facilitating communication and requests for therapy payment assistance between the holders of Class 13 Claims with the appropriate entity. | |
| 14 | **Unknown Abuse Survivor Representative Claim**<br><br>• Impaired<br><br>• Unknown Abuse Survivor Proofs of Claim or Complaints must be filed within six (6) years of the Effective Date<br><br>• Allowance Process:<br><br>   o Holders of Unknown Abuse Survivor Claims may elect to proceed with allowance under the Unknown Abuse Survivor Claim Settlement Process by filing an Unknown Abuse Survivor Proof of Claim with the Special Arbitrator or through the Unknown Abuse Survivor Claim Litigation Process by filing a complaint in the District Court against the Insurance Litigation Trustee.<br><br>   o If a holder of an Unknown Abuse Survivor Claim elects the Unknown Abuse Survivor Claim Settlement Process, the Claim will be Allowed if the Special Arbitrator finds by a preponderance of the evidence that:<br><br>      ▪ The individual's claim meets the definition of an Unknown Abuse Survivor Claim;<br><br>      ▪ The holder was a minor at the time of the Abuse;<br><br>      ▪ The Claim alleges sexual abuse of a minor; and<br><br>      ▪ The Abuse was perpetrated by an Archdiocesan Priest.<br><br>   o If a holder of an Unknown Abuse Survivor elects the Unknown Abuse Survivor Claim Litigation process, the allowance of the Claim will be determined by a trial of such Claim conducted by the District Court or by a settlement between the holder of the Claim and the Insurance Litigation Trustee.<br><br>• Treatment: Allowed Unknown Abuse Survivor Claims will be paid by the Insurance Litigation Trustee from the Unknown Abuse Survivor Reserve or from the Insurance Recoveries. | Therapy Fund for all eligible Abuse Survivor Claimants: $500,000 plus the commitment to add funds in future years if there is a shortfall |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 17 of 125

| | | |
|---|---|---|
| | ○ *Monetary*:<br><br>  ▪ To the extent that the Insurance Litigation Trustee prosecutes the Insurance Litigation, and the Insurance Litigation is unresolved at the time that the Unknown Abuse Survivor Claim is Allowed, the holder of an Allowed Unknown Abuse Survivor Claim shall receive a Pro Rata distribution on account of such claim from any Insurance Recoveries when such proceeds are distributed.<br><br>  ▪ To the extent that the Insurance Litigation Trustee elects not to proceed with the Insurance Litigation or the Insurance Litigation is resolved at the time that the Unknown Abuse Survivor Claim is Allowed, the holder of an Allowed Unknown Abuse Survivor Claim shall receive, on the seventh (7th) anniversary of the Effective Date, the lesser of: (i) a Pro Rata distribution of the Unknown Abuse Survivor Reserve; or (ii) the amount distributed to any individual holder of a Archdiocesan Abuse Survivor Claim Subject to Statute of Limitations Defenses Claim. The Insurance Litigation Trustee may, in his or her sole discretion, make a distribution to a holder of an Allowed Unknown Abuse Survivor Claim at an earlier date.<br><br>○ *Insurance Recoveries*: Ninety-five percent (95%) of the Insurance Recoveries shall be set aside for distribution to holders of Class 9 Claims. Five percent (5%) of the Insurance Recoveries shall be set aside for the Unknown Abuse Survivor Reserve. Any funds remaining in the Unknown Abuse Survivor Reserve, after payment of all Allowed Unknown Abuse Survivor Claims, will be distributed as determined by the Insurance Litigation Trustee.<br><br>○ *Therapy*: Each holder of an Allowed Unknown Abuse Survivor Claim shall be entitled to request therapy payment assistance from the Therapy Fund. Such assistance shall be requested in accordance with the Therapy Payment Process. | |
| 15 | **Disallowed or Previously Dismissed Abuse Survivor Claims**<br><br> • <u>Definition</u>: The Disallowed or Previously Dismissed Abuse | Scheduled: unknown |

WHD/10150918.1

18

| | | |
|---|---|---|
| | Survivor Claims means any Claim that: | Claimed: unknown |
| | (i) has been Disallowed by the Bankruptcy Court; | |
| | (ii) dismissed with prejudice by another Court of competent jurisdiction; | Approximate Number of Claimants: 51 |
| | (iii) does not allege sexual abuse of a minor; | |
| | (iv) would be disallowed by the law of the case if the litigation on the Claim were to continue, *see Order Disallowing Proof of Claim No. 173 Filed by A-75 and Proof of Claim No. 482 Filed by A-367* [Dkt. No. 1232]; or | |
| | (v) was not timely filed because the Claim was not filed until after the Abuse Survivors Bar Date established in the Bar Date Order. | |
| | • Impaired | |
| | • <u>Treatment</u>: No Distribution; provided, however, that the Debtor may, in its sole discretion, provide therapy to holders of Class 15 Claims. | |
| 16 | **General Unsecured Creditor Claims** | Scheduled: |
| | • Impaired | $3,848,585.32 |
| | • <u>Treatment</u>: If the holders of Class 16 Claims vote in number and amount sufficient to cause Class 16 to accept the Plan, each holder of a Class 16 Claim shall receive the lesser of (i) the amount of their Allowed Claim or (ii) $5,000 on the Claims Payment Date in full satisfaction, settlement, and release of the Claim. If the holders of Class 16 Claims do not vote in number and amount sufficient to cause Class 16 to accept the Plan, each holder of a Class 16 Claim shall not receive or retain any property under the plan on account of such Claims. | Reserve: $250,000 |
| 17 | Charitable Gift Annuity Claims | |
| | • Unimpaired | |
| | <u>Treatment</u>: The Archdiocese will continue to meet its obligations under the Charitable Gift Annuities as they become due. | |
| 18 | Penalty Claims | |
| | • Impaired | |
| | • <u>Treatment</u>: The legal, equitable, and contractual rights of each holder of a Class 17 Claim will be reinstated in full on the Effective Date. | |

## II.     BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE

### A.     Description of the Archdiocese

The Diocese of Milwaukee was established on November 28, 1843, and was elevated to an Archdiocese[2] on February 12, 1875, by Pope Pius IX.  At that time, a "diocese" was defined as a territorial division within the Catholic Church.  It was always understood, however, that a diocese was also composed of the Catholic faithful.  Today, a diocese is described as a portion of the Catholic Christian faithful entrusted to a bishop for him to shepherd with the cooperation of the presbyterate (the body of priests).  A diocesan bishop has the responsibility to assist all the Christian faithful in a specific geographical region with their spiritual needs.

The region served by the Archdiocese consists of 4,758 square miles in southeast Wisconsin which includes the following counties: Dodge, Fond du Lac, Kenosha, Milwaukee, Ozaukee, Racine, Sheboygan, Walworth, Washington and Waukesha (the "Region").

There are approximately 625,765 registered Catholics in the Region.

The primary role of the Archdiocese is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to individuals of the Roman Catholic faith, parishes, and schools in the Region.  In its own words, the mission of the Archdiocese is:

- to serve Catholic parishes, schools, and institutions so that they may effectively carry out their mission;

- to serve the people of God in southeastern Wisconsin; and

- to serve the broader community.

While the ecclesiastical organization of a diocese is governed by canon law, the business and financial affairs of the Roman Catholic Church (the "Church") vary across the world because they are governed by a combination of local civil law and canon law.  Within the United States, the civil organization of dioceses varies from state to state.

The Archdiocese provides certain ecclesiastical services and pastoral care to the two hundred two (202) parishes, ninety six (96) Catholic elementary and middle schools, fourteen (14) Catholic high schools (collectively with the Catholic elementary, middle, and high schools, the "Schools"), and various other Catholic-based social and community service organizations that operate in the Region.

---

[2] An archdiocese is a diocese that is important due to its size or historical significance, and is governed by an archbishop.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 20 of 125

The Archdiocese has approximately one hundred fifty-eight (158) employees and forty-eight (48) seasonal cemetery employees. There are also approximately six (6) counselors paid on a commission basis.

As a religious organization, the Archdiocese has no significant, ongoing for-profit business activities or business income. Its annual operating budget is approximately $24 million.

Payroll, facilities, and education account for over half of the budget. The Archdiocese provides millions of dollars of assistance to needy individuals, charities, and organizations located within the Region.

Revenue for the Archdiocese comes from a variety of sources, including donations, parish and school assessments, some fee-based services, the annual Catholic Stewardship Appeal, bequests, cemetery revenues, and grants from charitable funds and other charities, portions of which are also subject to donor restrictions.

**B.      Legal Structure of the Archdiocese and the Parishes**

Since 1903, the Archdiocese has been and continues to be a Wisconsin civil corporation.

The Archdiocese operates pursuant to Chapter 181 of Wisconsin Statutes, with the Archbishop acting as its sole Corporate Member. Many business or financial decisions are also subject to canon law which requires the Archbishop to consult with a Finance Council comprised of lay and clergy as well as a College of Consultors consisting of priest members.

The Parishes located within the Archdiocese are separate civil corporations. Other than a few Parishes which are wholly-owned by religious orders, the Parishes are all organized and operate pursuant to Wis. Stat. § 187.19. In Wisconsin, parish corporations have been separately incorporated since 1883 (Wis. Stat. § 187.19 is based on Chapter 37 of the Laws of Wisconsin (1883)) and many of the Parishes came into existence in 1883, with the majority incorporated prior to 1930. In accordance with the Wisconsin Statutes, each Parish has a designated Board of Trustees as prescribed by statute. Parishes own their own property, finance their own activities, manage their own assets and are responsible for their own corporate activities.

The Archdiocese's Chapter 11 Case differs significantly from the diocesan bankruptcy cases in Spokane, Washington, Tucson, Arizona, Portland, Oregon, San Diego, California, and Fairbanks, Alaska (the "Corporation Sole Bankruptcies"). In each of those cases, the parishes existed civilly as unincorporated associations as parts of the diocese's civil corporation. This single corporation, i.e., "corporation sole," held title to all parish property. Because title to the parish property was held by the corporate sole, a central issue in those cases was whether property of the parishes was included within the diocese's bankruptcy estate.

In contrast to the Corporation Sole Bankruptcies, the Archdiocese does not hold title to any property of the Parishes.

The Parishes have not sought bankruptcy relief and are not debtors in the above-captioned proceeding.

### C. Religious Orders

Canon law provides for the creation of "institutes of consecrated life and societies of apostolic life" which enable men and women who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Church without becoming members of the Church hierarchy. The most well-known form of consecrated life is that of "religious institutes" (hereinafter, the "Religious Orders"), which are characterized by the public profession of vows, life in common as brothers and sisters, and a separation from the world proper to the character and purpose of each institute.

Under canon law, Religious Orders are public juridic persons having separate and distinct canonical legal existence from the dioceses, parishes, and the Church itself. The Religious Orders within the Archdioceses are largely of pontifical right and therefore are autonomous, and exempt from the direct authority and governance of the local dioceses where they operate. These Religious Order members do not report to, or take direction from diocesan bishops, who have no authority to supervise, punish, or reassign Religious Order members.

### D. Juridic Persons and Property Ownership

Canon law recognizes "juridic persons," which are the subjects in canon law of obligations and rights which correspond to their nature. Under canon law, "ownership of goods belongs to that juridic person which has legitimately acquired them." Administrators of those juridic persons who hold that property have a fiduciary duty to protect and wisely manage that property for the purposes for which it is held. The property of one juridic person in the Church cannot be transferred to third parties, including other juridic entities, without observing the canonical norms on alienation of property.

Administrators of a juridic person are required to fulfill certain duties under canon law, including:

1. Perform their duties with the diligence of a good householder.

2. Ensure that the ownership of ecclesiastical goods is safeguarded in ways which are valid in civil law.

3. Observe the provisions of canon law and civil law, and the stipulations of the founder or donor or lawful authority; they are to take special care that damage will not be suffered by the Church through the non-observance of the civil law.

4. Seek accurately and at the proper time the income and produce of the goods, guard them securely and expend them in accordance with the wishes of the founder or lawful norms.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 22 of 125

### E.    The Clergy Sex Abuse Crisis and the Archdiocese's Response

A tragedy that runs contrary to every teaching and tradition of the Church[3] unfolded in the Church as a whole and in the Archdiocese in particular: a number of Archdiocesan clergy took advantage of their positions of trust and respect in the community to sexually abuse children.

The Archdiocese addressed the survivors of Abuse at an earlier date and in a substantially different way than other dioceses. Acknowledging the issue of clergy sexual abuse of minors in the Archdiocese in the late 1980s, the Archdiocese developed a process for receiving and responding to reports of Abuse by clergy and assigned a professionally trained staff member to direct this process.

In 1989, the Archdiocese established Project Benjamin, an initiative that brought together Abuse Survivor advocates, healthcare professionals, judicial and law enforcement representatives and clinical social workers and therapists to assist in the Archdiocese's response to Abuse Survivors. In a multi-faceted approach focused on healing, the Archdiocese provided a contact person for Abuse Survivors, who also coordinated referrals for therapy, and developed education on sexual abuse. Therapy has been offered and provided to Abuse Survivors in this fashion since 1988. Individuals are able to select a therapist of their choice. An outside mental health professional with expertise in mental health treatment reviewed treatment plans to ensure individuals received quality therapy that met their needs. At this same time, the Archdiocese implemented the use of required criminal background checks for employees working with children or youth. Dating back 20 years to 1994, the Archdiocese was one of the first dioceses in the country to implement a Code of Ethical Standards for Church Leaders (the "Code of Ethical Standards") for those engaged in church ministry. It is currently in its eighth edition.[4]

In the late 1980's and into the mid-1990's, the Archdiocese began utilizing canonical procedures at its disposal to permanently remove priests from ministry if they had sexually abused a minor. Previously, priests had been forced to retire and agree not to exercise any ministry. Those restrictions were reinforced with canonical strictures. Several priests were laicized. Canonical processes were underway against several priests when they died. A small number of priests had been permitted to exercise ministry after past sexual abuse had been alleged or discovered. This step was only taken after extensive therapeutic interventions and with assurances from psychological experts. Nonetheless, in early 2002, it was determined that an independent panel of experts should review these cases and make recommendations about their continuation in ministry. The panel of experts was likewise charged with the responsibility to make a recommendation of whether or not there should be a "zero tolerance" policy so that regardless of treatment and risk assessment, no priest with a substantiated case of sexual abuse of minors would be able to exercise ministry. In addition, the panel was to review the sexual abuse

---

[3] References to the term "Church" refer to the universal church of Roman Catholic belief, seated in the Vatican and currently headed by Pope Francis.

[4] The current edition of the Code of Ethical Standards is available at http://www.archmil.org/Resources/Code-Ethical-Standards-Leaders.htm.

policies and procedures used by the Archdiocese and make recommendations about them. This panel came to be known as the Eisenberg Commission (the "Commission"), named after the now deceased Dean of Marquette University Law School, Howard B. Eisenberg. In April 2002, this Commission released its preliminary report, which confirmed that appropriate policies and procedures were in place but that they needed to be more clearly and openly presented to the community. The Commission further recommended that whenever a non-frivolous allegation is made to civil authorities or the Archdiocese that a diocesan priest has been involved in any sexual misconduct with a minor, that priest should be immediately removed from active ministry pending conclusion of either the civil or internal Archdiocese adjudication of the matter. The Commission emphasized, however, that an allegation or charge is not the same thing as proof of guilt. Thus, this initial removal would be temporary, pending the outcome of the investigation.

The Commission also recommended that, upon conviction, plea of guilty, or determination by the internal Archdiocese adjudication process that a priest had sexually abused the child, the priest should be permanently removed from active ministry and divested of authority to perform priestly duties. The Commission advocated a "Zero Tolerance" policy when the allegations were admitted or proven. In the preliminary report, the Commission was not prepared to come to a conclusion about the priests whose files it reviewed and it requested more time for those considerations. The adoption of the *Charter for the Protection of Children and Young People* (the "Charter") by the United States Conference of Catholic Bishops (the "USCCB") in June 2002 rendered moot this final aspect of the Commission's work.

In spring 2002, the U.S. Bishops adopted the Charter, which adopted a "one strike" policy with regard to clergy serving in any active, public ministry, and also included policies requiring:

- permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor;

- requirement of criminal background checks for adults, including clergy, who work with children and youth;

- implementation of educational programs for the prevention of child sexual abuse for both adults and children;

- provision of behavioral guidelines/ethical standards for ministry;

- establishment of outreach for Abuse Survivors; and

- creation of review boards to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

While the provisions of the Charter may have been new for many dioceses in the United States, the Archdiocese already had policies in place in almost every one of these categories.

Case 11-20059-svk     Doc 2524     Filed 02/12/14     Page 24 of 125

Not only has the Archdiocese continuously satisfied the Charter, but it has taken many additional steps, not required by the Charter, to protect children from Abuse and to provide healing for those who have been harmed. These additional measures include:

- hiring a full time victim assistance coordinator to implement the Archdiocesan response to sexual abuse through the Sexual Abuse Prevention and Response Services office;

- hiring a full time safe environment coordinator to oversee implementation of all requirements to promote the safety of children and youth;

- providing counseling referrals, spiritual direction, therapy support and other services to assist people who have been Abused or affected by Abuse. To date, the Archdiocese has spent over $33 million, not including the costs of the Chapter 11 Case, on settlements and therapy for the survivors of clergy sexual Abuse;

- making Archbishop Listecki, Bishop Sklba, Bishop Hying and, previously, Bishop Callahan and then-Archbishop Dolan, available to meet with individuals who have suffered or been affected by clergy sexual abuse;

- requiring Safe Environment education for all priests, deacons, staff and volunteers in all Parishes and Schools;

- providing age-appropriate education for school and religious education children to equip them with the skills to help them protect themselves from abuse;

- requiring all church personnel to sign the Code of Ethical Standards;

- creating a Community Advisory Board[5] to review and improve the response of the Archdiocese to those who have experienced or been affected by clergy sexual abuse or abuse by other church personnel;

- conducting healing services, Masses and other forms of reconciliation events for survivors in the Archdiocese;

- requiring intensive background screening as well as psychological testing for those wishing to enter the seminary;

- conducting an annual outside audit of compliance with the Charter; and

- establishing a Diocesan Review Board, which is currently chaired by former Lt. Governor Margaret Farrow, that reviews individual reports from independent

---

[5] The Community Advisory Board includes members who are survivors of clergy sexual abuse, family members of survivors, survivor advocates, professional psychologists and therapists, and members of the Archdiocesan staff.

investigators regarding substantiation of allegations and makes independent recommendations to the Archbishop regarding a priest's suitability for ministry.

All policies and procedures on sexual abuse of minors are posted on the website of the Archdiocese. *See* http://www.archmil.org/offices/safeguarding.htm. Ongoing updates on safe environment issues are circulated to all parish staff and volunteers who have regular contact with minors. The Archdiocese actively participates in the Charter Compliance Audit protocols. While the USCCB policies give dioceses the option of selecting a streamlined audit process without an onsite audit team for two out of every three years, the Archdiocese has chosen to have a full, on-site outside audit every year, receiving exemplary reports from the independent auditors. In October 2013, the Archdiocese participated in its most recent audit, and the audit team found the Archdiocese to be in full compliance with the Charter. In addition to its own process of on-site compliance audits of parishes, the Archdiocese participates in the parish audits conducted by the same annual audit team. Parishes and Schools are required to submit annual compliance reports to the Archdiocese as well. Safe Environment Week is used as an annual opportunity to bring to the attention of the community the importance of keeping children and youth safe from harm. An annual Mass of Atonement during this week publicly reiterates the Archdiocese's desire to express sorrow and remorse that the evil of sexual abuse occurred in the Archdiocese and harmed individuals. Priests are provided with preaching aids to reach out to their parish communities and address this important issue. A plan is being developed to provide special training for select priests to be able to provide focused spiritual and pastoral care for those who have been harmed and are seeking spiritual assistance.

The Archdiocese has consistently sought the assistance of outside and independent reviews. In addition to the Commission and the audit teams noted above, in the early 1990s, retired Milwaukee County Circuit Court Judge Leander Foley led a review of all known priest-offender files to determine if any cases fell within the criminal statute of limitations and should be referred to the appropriate authority or, if a criminal referral was not possible because of the expiration of the criminal statute of limitations, to ensure that appropriate action was taken to avoid risk of further offenses.

In 2002, this process was repeated when civil authorities reviewed the Archdiocese's files to verify that there were no prosecutable criminal cases falling within the criminal statute of limitations.

In 2004, then-Archbishop Timothy M. Dolan directed a complete, external, forensic review of every diocesan priest's file to make sure that no allegations of clergy sexual abuse of a minor had gone undiscovered or unreported.

Recognizing the need for a process outside the archdiocesan structure to address claims of Abuse of minors by diocesan clergy, Archbishop Dolan led the Archdiocese's initiative to introduce an independent, voluntary mediation system in January 2004. The system was created in collaboration with Eva M. Soeka, a nationally recognized expert in dispute resolution and the Director of Marquette University's Center for Dispute Resolution. Moreover, when the mediation system was accessed for a case involving a clergy member who was still alive, the appropriate county's district attorney was contacted with information about the report. This

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 26 of 125

voluntary program was developed and instituted at a time when Wisconsin law did not provide any viable civil cause of action for any Abuse Survivors.

The Archdiocese was one of the first dioceses in the country to provide a public listing of all diocesan priests restricted from ministry in accordance with the Charter. On July 9, 2004, the Archdiocese publicly provided the names of all such priests, and continues to do so on the Archdiocese's website, updating the list as needed.[6]

On July 1, 2013, the Archdiocese voluntarily published historical records, timelines principally prepared by counsel for the Abuse Survivors, narratives, depositions and deposition exhibits regarding forty-two (42) of the forty-five (45) priests who have been publicly listed on the Archdiocesan website since 2004 for having had at least one substantiated act of sexual abuse of a minor. Similar information regarding a 43rd priest will also be published.[7] The Archdiocese has also voluntarily agreed to publish similar documents and information regarding any offending priests who are added to the published list in the future and even after the Archdiocese's Plan is confirmed.

### F.     Procedures Followed When Abuse is Reported

Since the advent of the Charter and for years before then, every report of clergy sexual abuse of a minor, regardless of when the offense occurred, has been taken very seriously. When an allegation is made against a priest, deacon or other cleric who is still alive, whether currently in ministry or not, all such reports are handed over promptly to the district attorney of the county in which the alleged offense took place. The Archdiocese has committed itself to a policy of cooperation with the civil officials who are charged with handling these matters.

If the civil authorities cannot proceed with a criminal action for any reason and the case is returned to the Archdiocese, a formal independent investigation begins. In accordance with the provisions of canon 1722 (Code of Canon Law), the cleric is immediately removed from any current ministry and prohibited from any public exercise of ministry during the investigation.[8] The investigation is conducted by independent outside investigators who have substantial experience as former law enforcement officials with expertise in the investigation of sexual abuse crimes. The independent investigator conducts his or her own investigation without any involvement, interference or direction by the Archdiocese. The independent investigator takes whatever steps are necessary to arrive at a compilation of the facts in the case.

---

[6] The public listing states: "In line with the assurances given in the Charter for the Protection of Children and Young People, these are the names of the diocesan priests of the Archdiocese of Milwaukee who have been (or would be if they were still alive) restricted from all priestly ministries, may not celebrate the sacraments publicly, or present themselves as priests in any way. In addition, in accordance with the canonical norms that have been established, the allegations against any living priest are sent to the Congregation for the Doctrine of Faith in Rome."

[7] With the agreement of State Court Counsel, the Archdiocese did not post the historical records regarding two (2) priests to protect the identity of the Abuse Survivors.

[8] The Archdiocese does not remove the accused cleric during the criminal investigation because law enforcement officials maintain that such removal could interfere in the investigation.

Upon the conclusion of his or her investigation, the independent investigator presents factual findings to the Diocesan Review Board. The Diocesan Review Board is comprised of six members, only one of whom is a priest. The Diocesan Review Board independently reviews the findings of the investigator and makes recommendations to the Archbishop regarding the substantiation of the allegation and suitability for ministry.

The Archdiocese and the Archbishop have committed to full cooperation in this independent investigative process. In every case, upon conviction, plea of guilty or determination by the Diocesan Review Board that there is a preponderance of evidence that a cleric has sexually abused a minor, the Diocesan Review Board makes a recommendation to the Archbishop. If the allegation is substantiated, exercising his episcopal authority, the Archbishop will permanently remove the cleric from active ministry and divest him of authority to function as a cleric in any capacity. Proper canonical procedures are observed at all stages, including referral of the case to the Vatican Congregation for the Doctrine of the Faith. Archbishop Listecki has publicly committed himself to abiding by all recommendations made by the Diocesan Review Board.

G.      **Success of the Archdiocese's Implementation of Procedures to Protect Children From Sexual Abuse**

Clergy sexual abuse of minors has been a sad and painful chapter in the history of the Church and in the lives of many innocent children. However, the success of the procedures implemented by the Archdiocese demonstrates that this crisis was a historical event that will not be repeated as long as the Archdiocese and the Church remain vigilant in following the safeguards that have been put in place over the last two decades.

An analysis of the claims filed in the Chapter 11 Case serves to illustrate the success of the Archdiocese's initiatives. After the Bankruptcy Court entered an order establishing deadlines for filing claims (the "Bar Date Order" (*see* Section V.B.1(a)), both the Archdiocese and certain lawyers for Abuse Survivors, including the Anderson Firm, engaged in an extensive and robust notice campaign to make sure that any and all potential claimants came forward to file Proofs of Claim (the "Claims").

Eventually, 578 Claims were filed, almost all of them by persons alleging sexual abuse. The vast majority of these Claims involve allegations of sexual abuse that occurred in the 1960's or 1970's. Only seven claims allege sexual abuse after 1990, six of which occurred in the 1990s, and the last which allegedly occurred in 2003. Thus, nearly 99% of the sexual abuse that has been alleged in the Claims occurred more than 20 years ago and some of that abuse occurred much longer ago than that. The chart below shows the Proofs of Claim sorted by decade:

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 28 of 125



Approximately 150 Claims allege abuse by persons who are not employed or controlled by the Archdiocese. These claims involve allegations of abuse by Lay Persons or members of Religious Orders. Any claims of which the Archdiocese becomes aware involving Religious Order priests have been referred to the district attorney for the county where the abuse is alleged to have occurred. If the allegation relates to a member of a Religious Order, the Archdiocese also sent notices to the applicable Religious Order superior.

With respect to those Claims alleging abuse by Archdiocesan Priests, nearly all of the claims allege abuse by priests who are not in active ministry. Most of these priests are either deceased or laicized. The remaining priests have either been permanently restricted from ministry or have left ministry voluntarily. For the very few Claims alleging abuse by priests who are still active, the Archdiocese followed the rigorous procedures summarized above. Those claims have either been investigated and found to be unsubstantiated or are still under investigation.

To put the claims data in perspective:

- Deceased –Approximately 70% of the Claims involving Archdiocesan Priests allege abuse by an Archdiocesan Priest who is now deceased.

- Laicized – Approximately 20% of the Claims involving Archdiocesan Priests allege abuse by an Archdiocesan Priest who has been laicized.

- Restricted – Approximately 4% of the Claims involving Archdiocesan Priests allege abuse by an Archdiocesan Priest who is restricted from ministry

- Retired – Approximately 3% of Claims involving Archdiocesan Priests allege abuse by an Archdiocesan Priest who is retired.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 29 of 125

- Left Ministry – Approximately 2% of the Claims involving Archdiocesan Priests allege abuse by an Archdiocesan Priest who has permanently left ministry.

- The total percentage of claims alleging abuse by a priest who is deceased or no longer in ministry is approximately 99%.

The foregoing analysis demonstrates that the tragedy of clerical sexual abuse of minors was a historical event, that offending clerics are deceased or have been removed, and that children are safe in the Archdiocese. In fact, at a February 29, 2012 hearing in this case, the Bankruptcy Court summarized its findings as follows:

> The [Bankruptcy] Court gave assurances that after a review of each and every [proof] of claim, no public safety concerns are raised by the proofs of claim filed by the abuse claimants. The vast majority of the claims allege abuse that occurred in the 1950's, 1960's and 1970's. For the most part, the alleged abusers named in the claims are those previously identified by the Debtor as having substantiated abuse claims made against them. Many of those individuals are deceased; the others have been removed from priestly ministry. Accordingly, . . . **no public safety concern is present . . . .**

[Dkt. No. 659 (emphasis added)].

The safeguards that have been implemented through the Charter and the additional steps that have been taken voluntarily by the Archdiocese have worked and, through continued vigilance, will continue to work. The Archdiocese has implemented effective measures designed to safeguard young people, and it has worked with civil authorities to review clergy files to allow any criminal proceedings to move forward and bring justice to clergy accused of these crimes. With its limited resources, the Archdiocese has done the best it can to compensate Abuse Survivors who have come forward.

### H. Purpose and Goals of the Chapter 11 Filing

The Archdiocese filed its chapter 11 petition for the following reasons:

- To continue its outreach and support to Abuse Survivors as an ongoing ministry of the Church;

- To carry on the essential ministries and services of the Archdiocese so it can continue to meet the needs of the Parishes, parishioners, and others who rely on the Church for spiritual, pastoral, and human assistance, thereby allowing the Archdiocese to move forward on stable financial ground to continue its ministry and mission in service to the people of southeastern Wisconsin;

- To provide compensation for the unresolved claims of Abuse Survivors including those Abuse Survivors who had not yet come forward; and

- To fairly allocate the Archdiocese's remaining income and assets among the legitimate competing interests for such property, recognizing that it is not possible to pay all alleged Claims and Interests in full.

Failure to file the Chapter 11 Case also would likely have resulted in a cessation of the Archdiocese's ministry, education, and charitable outreach, upon which so many people rely.

## III. OPERATIONS OF THE DEBTOR

### A. Annual Revenue

The Debtor's annual budget of approximately $24 million is principally funded by three sources of revenue. Approximately $7.2 to $7.4 million is received in the form of donations raised in the annual Catholic Stewardship Appeal. Cemetery sales (lots, crypts, niches, burial services, markers, etc.) and distributions received from the Archdiocese of Milwaukee Cemetery Perpetual Care Trust (the "Cemetery Trust") account for approximately $6.4 million. Of that amount, $1,950,000 was provided by the Cemetery Trust to help defray the cost of providing perpetual care to the cemeteries in the fiscal year ending June 30, 2013. Assessments on Parishes and Schools account for approximately $6.5 million. The Archdiocese funds the remaining budget from miscellaneous income sources including grants, fees for services, donations, bequests and rents.

Many Parishes are poor and collecting parish assessments is often difficult. Parish assessments are made on the basis of parish collections. The assessment is 4% of the parish's regular collections. The assessments have been a relatively reliable source of income, but plateaued in recent years, reflecting the Parishes' own challenges to raise operating funds. Nevertheless, projections for the Plan assume collections will remain stable.

Much of the money received by the Archdiocese is donor restricted, which means that the money must be used for the purposes that the donor specifies. Almost all grants and the majority of donations and bequests have traditionally been donor restricted. The money raised in the Catholic Stewardship Appeal is also donor restricted and may only be used for specific charitable purposes outlined in the annual appeal and in the designated fiscal year.

Concern continues that the Catholic Stewardship Appeal will not continue to yield the amounts realized in recent years. While donations have been stable, the size of the donor base is contracting as the Church sees level or declining attendance. However, for purposes of Plan projections, the Catholic Stewardship Appeal donations have been assumed to increase modestly in the years following the Archdiocese's emergence from chapter 11.

### B. Annual Operating Expenditures

To save expenses so more money could be used for payments to Abuse Survivors and to address the clergy abuse scandal, the Archdiocese sold property, liquidated investments, and eliminated approximately 40% of its staff and operations by 2008. Since that time the Archdiocese has been operating at reduced levels which have adversely impacted the scope of the religious and charitable work the Archdiocese is able to accomplish. In 2002, the

Archdiocesan budget for operating expenses, including programs and charitable services was $39 million. In 2013, that same budget was $24 million.

The Archdiocese believes it has reduced expenses as far as possible and still maintain its essential mission and provide for the needy. The Archdiocese's current annual expenses vary somewhat from year to year, but can be summarized in the following categories which are estimated for the fiscal year ending June 30, 2014:

| | |
|---|---|
| Staff wages & benefits | $11,247,494 |
| Facility and operational costs | $2,262,227 |
| Cemeteries cost of sales | $905,500 |
| Assessments and other purchased services | $493,306 |
| Ministries' services and support | $4,287,674 |
| Charitable grants & donations | $3,199,264 |
| Other expenses | $1,034,236 |
| Debt service | $759,556 |
| Capital expenditures | $238,000 |
| Legal and audit | $451,300** |
| *Total* | $24,878,557 |

**excludes Chapter 11 expenditures

The Archdiocese believes there is no place to cut additional expenses effectively and the projections of the Archdiocese's expected operating expenditures for the first three years after confirmation of the Plan are attached as **Exhibit C**, reflect the Archdiocese's belief that it will still be able to fulfill its educational, spiritual and charitable mission by operating on a balanced budget supported by the continued generosity of Catholic parishioners and benefactors.

For a more detailed view of the Archdiocese's historical financial performance, a copy of the Archdiocese's fiscal year 2013 audited financial statements, which are also available on-line at http://www.archmil.org/Resources/ArchdioceseofMilwaukeeAuditedFinancialStatements.htm, are attached as **Exhibit D**. The Archdiocese has also filed monthly operating reports with the Bankruptcy Court throughout the Chapter 11 Case and the Committee's financial consultants have monitored or reviewed all of the Archdiocese's financial reporting during the Chapter 11 Case and for the ten (10) years prior to the commencement of the Chapter 11 Case.

## IV.   ASSETS OF THE DEBTOR

The Archdiocese has very limited assets available for use under the Plan. Many of the Archdiocese's assets are subject to use restrictions or leases that limit, in whole or in part, their value for use under the Plan.

The Archdiocese's property is generally comprised of the following categories of property:

1. Real Property, consisting of:

   a. Undeveloped Land

   b. Property in Use for Religious Purposes

   c. Property Leased to Others

   d. Cemetery Properties in Active Use

   e. Leasehold Interests

2. Personal Property, consisting of:

   a. Insurance Recoveries

   b. Life Insurance Policies

   c. Cash

   d. Additional Personal Property

   e. Accounts Receivable

3. Beneficial Interest in the Cemetery Perpetual Trust

Because of the nature of the property, much of the Debtor's property is not available for distribution to pay chapter 11 expenses or for distributions to creditors. The property has limited resale value, is necessary for the effective reorganization of the Debtor, or has restrictions that make realizing any value from the sale of the property nearly impossible.

The following is a summary of the availability of the assets of the Debtor for use under the Plan. As explained in Section VIII.A.2(a), the Debtor believes that the realizable value of the Debtor's assets that is available for distribution to creditors, after the payment of administrative expenses, is approximately $794,000.

**A. Real Property.**

As of June 30, 2013, the Real Property owned by the Debtor consisted of the following categories: (1) Undeveloped Land; (2) Property in Use for Religious Purposes; (3) Property Leased to Others; (4) Cemetery Property; and (5) Leasehold Interests.

The only Real Property available for purposes of paying chapter 11 expenses or distributions to creditors is the Undeveloped Land. The Properties in Use for Religious Purposes, Property Leased to Others, Cemetery Property, and Leasehold Interests have limited realizable value or are subject to restrictions, which make it nearly impossible for the Debtor to realize any value in connection with a sale of these properties.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 33 of 125

1.      Undeveloped Land

The Undeveloped Land consists of five properties, which have been available for sale through qualified real estate brokers.  Outside of a plan, the Undeveloped Land would likely be sold at liquidation values in quick sales.  The cumulative realizable value of the Undeveloped Land in liquidation is approximately $2,957,175.  Portions of the Undeveloped Land have been designated, via zoning, for use as a Catholic cemetery, which may significantly impair its ability to be sold.  In addition, the Archdiocese believes that due to the decline in market values for undeveloped property, the ability to sell these properties promptly may not be feasible.

The Archdiocese intends to use these properties as security for the $2,000,000 Cemetery Trust Loan as further described in Section VII.C.2 of the Disclosure Statement.  The Debtor believes this provides greater value for the Plan than sales of the land because it allows the Debtor to convert the properties into cash at a higher value than could be realized by selling the properties for their liquidation value in a declining real estate market.

2.      Property In Use for Religious Purposes

The Property in Use for Religious Purposes consists of the UW-Milwaukee Newman Center, the UW-Whitewater Newman Center, and the Marian Shrine.  None of these properties have significant value.  As described in Section VIII.A of this Disclosure Statement, the Archdiocese estimates that the aggregate liquidation value of these properties is approximately $495,000, which is less than the aggregate appraised value of the properties as a result of market changes since the last appraisals and the costs and expenses that would be incurred in liquidation.

The Marian Shrine has de minimis resale value and consequently does not add any available value for the Plan.  The Marian Shrine's best use is for its intended religious purpose.

The UW-Milwaukee Newman Center and the UW-Whitewater Newman Center are used for campus ministry and provide the best value under the plan by continuing to serve their religious purpose and facilitating ongoing ministry to university students.

3.      Property Leased to Others

The Property Leased to Others consists of St. Joseph High School, St. Thomas More High School, Pius XI High School, and St. Charles Youth Home.  Because of the debt encumbering these properties, the long-term leases on the properties, the use restrictions, and the fact that the Debtor does not own the majority of the improvements on the properties, the Debtor is unlikely to receive any value by attempting to sell the properties.

As of June 30, 2013, all of the properties comprising the Property Leased to Others were encumbered by notes and mortgages in favor of third-parties (which would have to be satisfied before the Archdiocese would be entitled to any proceeds), and the majority of the improvements on each of the properties are owned by other parties.  In addition, St. Joseph High School, St. Thomas More High School, and Pius XI High School are each subject to a long-term Ground Lease and a Use Dedication and have a restriction on use limited to operation of a Catholic high school.  As a result, the Archdiocese has a very limited ability to sell any of these properties, and even if it could, the Archdiocese is unlikely to receive any proceeds from such a sale.

4.         Cemetery Properties in Active Use

The Debtor owns nine (9) properties in active use as Catholic cemeteries. The ongoing operation of these properties as cemeteries will provide a source of funding for the Plan. These properties have no other realizable value because value is only derived from the Archdiocese operating the properties as cemeteries. Even if religious practices would allow the sale of these cemeteries, the cost of caring for these cemeteries would likely make the cemeteries unmarketable.

5.         Leasehold Interests

The Debtor has a leasehold interest in the Archbishop Cousins Catholic Center (the "Cousins Center").

The Cousins Center is owned by De Sales Preparatory Seminary, Inc. ("De Sales"). The outstanding debt on the Cousins Center currently exceeds its liquidation value. Consequently, a sale of the property would not provide any value for the Plan.

On the Effective Date, the Archdiocese will enter into a new lease of the Cousins Center and an amendment to the current sublease of a portion of the Cousins Center to the Milwaukee Bucks, Inc. (the "Milwaukee Bucks"). The terms of the new lease and the amended sublease will provide the Archdiocese with additional proceeds for use in the Plan.

**B.       Personal Property**

The Archdiocese has miscellaneous personal property. Although some of this personal property is available for use under the Plan, much of it either has a low value or would be difficult to sell or to otherwise realize value for use under the Plan.

The only items of Personal Property that are available to pay chapter 11 expenses and distributions to creditors are the Insurance Recoveries (as such term is defined below) and the Life Insurance Policies. As part of the Plan, the Debtor is assigning the rights to the Insurance Recoveries to the Class 9 and Unknown Abuse Survivor Claims. Presently, the Debtor would be able to realize approximately $293,990 from the cash liquidation value of the Life Insurance Policies.

The remaining items of Personal Property are necessary for the effective reorganization of the Debtor. Further, because of the unique religious nature of the property and/or the properties' age, there is likely limited realizable value if the property was to be sold.

1.         Insurance Recoveries

As part of the Plan, rights to pursue recoveries from the Non-Settling Insurers, except for any recoveries attributable to payment of defenses costs recovered in the OneBeacon Adversary Proceeding or otherwise (the "Insurance Recoveries") will be assigned to the Insurance Litigation Trust to benefit the holders of Class 9 (Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses) and Unknown Abuse Survivor Claims.

### 2. Life Insurance Policies

The Archdiocese is the beneficiary of six (6) life insurance policies. As of June 30, 2013, the cash surrender value of these polices was approximately $293,990. Although these life insurance policies have some cash surrender value, terminating the policies for that cash surrender value rather than continuing to hold them until eventual payout would not realize material value for the Plan.

### 3. Cash

The Archdiocese tries to maintain operating cash on hand of approximately $2,000,000. As of June 30, 2013, the Debtor was fortunate enough to have approximately $2,500,000 in cash on hand. The Archdiocese's savings were largely depleted during the pendency of the Chapter 11 Case to pay administrative expenses, largely consisting of legal and accounting fees associated with the chapter 11 process. The current cash on hand is necessary for the effective reorganization of the Debtor because it represents approximately one month of operating expenses of the Debtor and is the minimum amount that is necessary to provide a sufficient safety margin for operations.

### 4. Additional Personal Property

The Archdiocese owns additional assets consisting generally of religious jewelry and vestments, vehicles, office equipment, cemetery equipment, and cemetery personal property.

As of June 30, 2013, the estimated liquidation value of these additional items of personal property was approximately $525,925.

Some have speculated about the value of the religious jewelry and art of the Archdiocese. However, the value of the jewelry and art owned by the Archdiocese is nominal. Liquidation value is estimated to be under $25,000. Other religious items, such as the liturgical vestments, do not have material resale value.

Equipment (other than office equipment) and vehicles are primarily used for the care of the Milwaukee Catholic Cemeteries. Further, there is a limited market for most of these assets, and although certain items may be able to be sold, doing so is not likely to realize significant value for the Plan. Certain portions of this property are specialty use items (such as the cemetery-use items) that have a limited market for resale.

The office equipment is necessary to the Debtor's reorganization and has a limited resale value because it no longer represents standards sought by purchasers of such equipment and consequently provides the most value by facilitating ongoing operations of the Archdiocese and the resulting continued funding of the Plan.

### 5. Accounts Receivable

As of June 30, 2013, the Archdiocese's Accounts Receivable, net of doubtful accounts, reported for financial accounting purposes is $3,868,799.87; however, almost all of the net Accounts Receivable are due from Parishes, charitable pledges, and installment payments for

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 36 of 125

future burial rights.  The Debtor believes that the net amount collectable in a liquidation would be negligible.  It must be noted that Accounts Receivable in this context includes loan receivables and similar amounts owed to the Debtor.  The Parishes fund 4% of their regular collections as payment for services received from the Archdiocese.  These continuing collections from the Parishes provide a source of funding for the Plan and will be better used in the reorganization of the Debtor.

Further, if the Accounts Receivable are not used to fund continuing Archdiocesan operations, it is unlikely that the current accounts receivable would be collectable.  As described in Section VIII.A, the Debtor estimates that with the costs of collection, the Debtor would realize no value upon the liquidation of the Accounts Receivable.

In the event that the Archdiocese is unable to continue providing services to the Parishes as a result of reductions in necessary assets or staff, it is likely to face difficulty collecting assessments from Parishes due to the Archdiocese no longer providing the services that the assessments pay for.  In addition, even if the Archdiocese could continue to collect a portion of the regular collections of the Parishes, it is likely that those parish collections (as well as collections from the Catholic Stewardship Appeal and other donations) would decline as a result of the decreased services provided by the Archdiocese, decreasing available value under the Plan.

### C.       Beneficial Interest in Cemetery Perpetual Care Trust

Although the Archdiocese receives certain distributions from the Cemetery Trust as reimbursement for costs incurred by the Archdiocese for providing perpetual care of the cemeteries, the Cemetery Trust is a distinct legal entity whose assets are legally restricted to the purposes of the Cemetery Trust.  The Archdiocese does not have control of the Cemetery Trust or a right to receive assets for any purpose other than for the perpetual care and maintenance of cemetery properties.  Sections V.B.2(e)and VII.C.2 of this Disclosure Statement discuss the history of the litigation regarding the Cemetery Trust and the proposed settlement under the Plan. Although the assets of the Cemetery Trust are not included in the Estate, the Archdiocese will receive a loan from the Cemetery Trust, secured by a portion of the Archdiocese's real estate assets that would not otherwise provide value for the Plan.  Without the loan, the Plan may not be feasible.

### D.       Other Unavailable Assets

The Archdiocese holds cash and investments subject to donor and other use restrictions. These assets may only be used for their designated purpose, and are not available for use under the Plan.  The assets include the St. John's Burse (to provide deaf and hearing impaired ministry) and the St. Aemilian Trust (to provide facilities for orphans, dependent, neglected, and delinquent children; to provide rehabilitation, treatment and other welfare service needed for such purposes; and to promote education, charity and religion).

## V.     THE CHAPTER 11 CASE

On January 4, 2011 (the "Petition Date"), the Archdiocese filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Code, commencing its case in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Bankruptcy Court").

On January 24, 2011, the United States Trustee for the Eastern District of Wisconsin (the "U.S. Trustee") appointed the Committee, consisting of the following members:

Charles Linneman (Acting Chairperson)
c/o Jeff Anderson & Associates, P.A
366 Jackson Street
St. Paul, MN 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6543

Dean Weissmueller
c/o Jeff Anderson & Associates, P.A
366 Jackson Street
St. Paul, MN 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6543

Kevin Wester
c/o Jeff Anderson & Associates, P.A
366 Jackson Street
St. Paul, MN 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6543

Karen Konter
c/o Jeff Anderson & Associates, P.A
366 Jackson Street
St. Paul, MN 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6543

Peter Neels
c/o Jeff Anderson & Associates, P.A
366 Jackson Street
St. Paul, MN 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6543

While a committee is appointed in a chapter 11 case to represent all of the unsecured creditors, the composition of the Committee in this case is somewhat unusual because all of the members of the Committee are from one class of creditors, the Abuse Survivors, and all are individually represented by the Anderson Firm.

The Committee chose separate counsel, paid for by the Estate, to represent it as a Committee. The Committee's choice of counsel, the law firm of Pachulski Stang Ziehl & Jones LLP ("PSZJ"), was appointed on February 24, 2011. The Debtor has made allegations throughout the Chapter 11 Case that the Committee and its counsel, PSZJ, have been improperly representing the Abuse Survivors to the exclusion of other unsecured Creditors. No action has yet been taken on these allegations during the Chapter 11 Case.

### A. Forensic Investigation of Financial Records and Operating Expenses by Committee's Financial Advisor

On July 19, 2011, the Bankruptcy Court entered an Order approving the Committee's retention of Berkeley Research Group, LLC ("BRG") as financial advisors for the Committee. As of February 2013,[9] BRG has requested fees of $265,492.50 and expenses of $1,332.49. BRG has already exceeded its Bankruptcy Court-approved fee cap of $250,000, which was initially capped at $100,000. Given that BRG has not filed a fee application for the past 11 months, the Debtor expects that BRG is substantially further beyond the fee cap.

The Committee retained BRG for the purpose of assisting the Committee in evaluating the Archdiocese's financial disclosures, providing forensic accounting and investigations, analyzing any prepetition transfers, investigating the Archdiocese's assets, evaluating trusts and restricted assets, and evaluating the Archdiocese's relationship with the Parishes.

BRG and PSZJ were given complete access to the Debtor's financial system, the compiled and raw data on the Debtor's computerized financial systems, and approximately 66,000 pages of the Debtor's financial and business documents. This production was in addition to the approximately 57,000 documents provided to State Court Counsel related to the investigation of sexual abuse. In addition, the Debtor's chief financial officer was made available to BRG as often as BRG requested, including regular weekly phone calls during the early part of the Chapter 11 Case.

BRG has not identified any improprieties or any financial discrepancies in the financial information reported by the Debtor. BRG did not identify any preferences that should be pursued nor did it discover any unreported assets that might be included in the Debtor's estate. Even though the Committee unsuccessfully tried to recharacterize certain assets that had been openly reported and disclosed by the Debtor, there has been no dispute about the accuracy of the Debtor's financial reporting.

### B. Litigation during the Chapter 11 Case

The litigation in the Chapter 11 Case has centered around three issues: (1) determining which Claims are legally enforceable; (2) determining the assets of the Estate; and (3) the public release of the Archdiocese's files.

#### 1. Determining the Legally Enforceable Claims

Similar to most chapter 11 proceedings, this case has a variety of types of claims ranging from typical trade claims from vendors to secured claims of a bank lender. Very few of the traditional claims have been in dispute in this case. However, this case has two types of Claims that are much different than those found in a typical chapter 11 proceeding.

---

[9] February 2013 is the last month for which BRG filed a fee application.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 39 of 125

The first of these unusual Claims are Claims for perpetual care of the Milwaukee Catholic Cemeteries. With respect to the Claims for perpetual care, a proof of claim was filed on behalf of the entire Class of Claims by the Debtor as provided for in Bankruptcy Rule 3004. In connection with the preparation of its financial reports, the Debtor had the certified public accountants Keegan, Linscott & Kenon, PC calculate the present value of the Debtor's perpetual care obligations. That obligation as of January 4, 2011, the Petition Date, is $246,433,002.

When the Chapter 11 Case began, the Debtor was aware that twenty-three (23) individuals had made formal demands on the Archdiocese or had filed lawsuits against the Debtor alleging sexual abuse by clergy. The Debtor believed at the time and still believes that these twenty-three (23) claims are barred by the applicable statute of limitation and other legal defenses to those claims. The Debtor also believes that all other Abuse Survivor Claims are barred by the applicable statute of limitation and other legal defenses.

However, a chapter 11 proceeding is designed to provide an opportunity for anyone believing that they have a claim against the debtor to assert that claim, subject of course to any party in interest's right to object to the claim. From the outset of the case, the Debtor openly and repeatedly signaled that it would be objecting to claims that were not legally enforceable. The Debtor believes this is one of its obligations as a debtor in possession in the Chapter 11 Case.

Because of the sensitive nature of Abuse Survivor Claims and the potential that identification of Abuse Survivors would cause further harm to those Abuse Survivors, the Debtor, counsel in the case, and the Bankruptcy Court have been extremely concerned about the confidentiality of Abuse Survivor identities and their claims.

For administration of a chapter 11 proceeding, a bar date needs to be established by the Bankruptcy Court to serve as a deadline for the filing of claims. Negotiations between the Committee and the Debtor over (i) the length of time for filing claims; (ii) the forms required for Abuse Survivor claim filing; (iii) provisions to protect the confidentiality of Abuse Survivor identities; and (iv) the content and amount of notice to Abuse Survivors, were extraordinarily difficult and lengthy. Ultimately, a stipulation was reached and presented to the Bankruptcy Court.

(a)     Bar Date Order and Privacy Provisions for Abuse Survivors

On July 7, 2011, the Bankruptcy Court entered an order authorizing special confidentiality procedures for Abuse Survivors. The Order permitted the parties to file information containing the names of Abuse Survivors under seal, meaning that the information filed with the Bankruptcy Court would be confidential.

On July 14, 2011, the Bankruptcy Court entered an order setting bar dates and approving of the form and manner of notice of the Bar Dates (the "Bar Date Order"). The Bar Date Order set October 17, 2011, at 4:00 p.m. Central Standard Time as the General Bar Date for all creditors except Abuse Survivors. The Bar Date Order set February 1, 2012 at 4:00 p.m. Central Standard Time as the "Abuse Survivors Bar Date."

The Bar Date Order also approved of the form of notice, the form of the Abuse Survivor Proof of Claim Form, and the amount of and manner in which the Archdiocese was to provide

notice to Abuse Survivors. To provide notice of the case to unknown claimants, the Debtor published notices in twenty-four (24) state and national publications, provided postings in schools and parishes, e-mailed and mailed notices to current parishioners and alumni, and mailed notifications to therapists, counselors, hospitals, libraries, and police stations in the area. Information about the Chapter 11 Case was provided (and is still available) on the Archdiocese's website, and it was also made available on the websites for the vast majority of the Parishes.

In addition, the Anderson Firm provided unprecedented notice of the Abuse Survivors Bar Date. The Anderson Firm aired over 17,000 television advertisements about the Abuse Survivors Bar Date. This included approximately 6,976 30-second commercials; 10,455 60-second commercials; and forty-eight (48) 30-minute infomercials. These television ads were at most times of the day and night and included coverage leading up to the Super Bowl. The Brennan Law Firm also ran advertisements about the Bar Date. The Anderson Firm posted information about the Abuse Survivors Bar Date on its main website, its Facebook page, its Twitter account, and its YouTube channel. The Anderson Firm also created a Wisconsin specific website, Facebook page, Twitter account, and YouTube channel and posted information about the Abuse Survivors Bar Date on these mediums as well. Certain professionals, including Marci Hamilton, also republished information about the Abuse Survivors Bar Date on their personal Facebook pages and Twitter accounts.

In addition, local and national press coverage of the Chapter 11 Case has been extensive. Many hearings in this case have been followed by a press-conference on the courthouse steps and numerous articles in the local papers on the outcome of the hearing. The national media, especially the New York Times, have consistently published articles about the major developments in this case. These media stories are then reposted (and redistributed to their constituencies) by entities like the Anderson Firm, Abuse Tracker, SNAP, Marci Hamilton, and BishopAccountability.org.

By the Abuse Survivors Bar Date, 572 Abuse Survivors Claims had been filed. Subsequently, four (4) additional Abuse Survivor Claims were filed. During the pendency of the case, eight (8) Abuse Survivor Claims have either been disallowed or voluntarily withdrawn. As a result, the total number of currently pending Abuse Survivors Claims is 568.

(b)  Payment under Pre-Petition Settlement Agreements

As of the Petition Date, the Archdiocese owed $702,000 under twenty-two (22) settlement agreements that had been reached in pre-petition voluntary mediations with Abuse Survivors. The Archdiocese believes that each of these settlement agreements is valid and enforceable, and the Archdiocese always intended to honor its obligations. Accordingly, on March 14, 2011, the Archdiocese first sought permission to continue to meet its obligations to certain Abuse Survivors pursuant to the terms of the pre-petition settlement agreements and to pay for therapy for Abuse Survivors. On April 18, 2011, the Bankruptcy Court entered an Order permitting the Archdiocese to pay for certain psychological counseling and therapy for Abuse Survivors with an annual cap on such expenditures of $100,000. On June 30, 2011, the Bankruptcy Court entered an Order permitting the Archdiocese to pay the $311,000 it owed to Abuse Survivors in calendar year 2011 pursuant to the terms of the settlement agreements.

The Archdiocese also sought the Bankruptcy Court's permission to continue to honor the Pre-Petition Settlement Agreements with the In-Settlement Abuse Survivors and make the payments outstanding in calendar years 2012 and 2013. On March 1, 2012, the Bankruptcy Court entered an Order permitting the Archdiocese to pay the $167,000 it owed to Abuse Survivors in 2012 pursuant to the terms of the settlement agreements. On February 26, 2013, the Bankruptcy Court entered an Order permitting the Archdiocese to pay the $92,000 it owed to Abuse Survivors in calendar year 2013 pursuant to the terms of the settlement agreements. The Committee objected to two of the three motions to authorize the Archdiocese to honor its pre-petition settlement agreements.

(c)    Objections to Claims

The Debtor believes it has an obligation to file objections to Claims which are not legally enforceable, including the Abuse Survivor Claims. The Debtor believes that the Abuse Survivor Claims are all legally unenforceable; nevertheless, the Debtor believes that the Abuse Survivor Claimants will demand hundreds of millions of dollars in compensation. As a result the Debtor must object to the Abuse Survivor claims because the Debtor cannot afford to pay 576 legally unenforceable Claims and paying 576 legally unenforceable Claims would compromise the Debtor's fiduciary duty to the Estate and the other Creditors. Even though the Debtor believes that the Claims are legally unenforceable, the Debtor is committed to assisting the Abuse Survivors even if the Debtor cannot offer monetary compensation. For example, the Debtor remains committed to its undertakings for the protection of children, agreed to the public release of documents now and in the future, and has provided and will continue to provide therapy assistance to Abuse Survivors.

The Archdiocese pursued a targeted claims objection process designed to minimize the costs to the Estate, while at the same time resolving the major legal issues applicable to the Abuse Survivor Claims -- the applicability of the statute of limitations, the enforceability of the settlement agreements, the Debtor's liability for Claims of abuse involving non-Debtor entities, and the legal sufficiency of State Court Counsel's claims based on fraud.

As a result, while the Archdiocese filed objections in broad categories, the Archdiocese limited the litigation of the claims objections to only a handful of Claims. Despite the Archdiocese's targeted approach, the Committee and the Anderson Firm have, at every turn, drawn out the claims objection process. PSZJ has failed to assist with the claims objection process, even when the Claimants admit that their Claims are legally unsupportable, and instead has provided substantial assistance to the individual Claimants in the objection process.

The Anderson Firm has withdrawn claims whenever there was a risk of an adverse ruling. It has amended nearly every single Abuse Survivor Claim to contain a boilerplate list of identical allegations, most of which cannot be supported for individual claimants. For example, the Anderson Firm makes assertions about what the Archdiocese knew about an alleged abuser in circumstances where the proof of claim does not even identify the abuser. Such pleadings do not comply with Federal Rule of Bankruptcy Procedure 9011.

On November 22, 2011, the Archdiocese filed objections to the Claims filed under seal by three Claimants, A-12, A-13, and A-49.  The Archdiocese filed a motion for summary judgment on the basis that the Claims were barred by the statute of limitations.  As to Claimant A-49, the Archdiocese also argued that the Claim was barred by virtue of a settlement and release entered into between the Archdiocese and Claimant A-49.  Early in the case, the Bankruptcy Court determined that all negligence claims were time-barred and held that the Bankruptcy Court did not have enough information to rule on alleged fraud claims.  *In re Archdiocese of Milwaukee*, 470 B.R. 495 (Bankr. E.D. Wis. 2012).  The Bankruptcy Court also ruled that Claimant A-49's claim was barred by virtue of the settlement agreement and Claimant A-49's failure to plead the facts necessary for a claim of rescission.  *In re Archdiocese of Milwaukee*, No. 11-20059-svk, 2012 WL 528141  (Bankr. E.D. Wis. Feb.  17, 2012).

The Claimants and the Archdiocese appealed these rulings to the District Court.  On October 29, 2012, the District Court issued a ruling declining to hear the Archdiocese's appeal of the Bankruptcy Court's ruling on the fraud statute of limitations.  The District Court affirmed the Bankruptcy Court's dismissal of Claimant A-49's claim and agreed that all negligence-based claims are barred by the statute of limitations.  The ruling on negligence effectively disallows all negligence-based claims made by Abuse Survivors.

Claimant A-49 appealed the District Court's decisions, and the case is currently pending before the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit").  The appeal is fully briefed and was fully submitted on April 17, 2013.  A decision by the Seventh Circuit is still pending.

After the conclusion of discovery, Claimant A-13 withdrew his claim against the Archdiocese.  The resolution of Claimant A-12's claim is currently pending before the Bankruptcy Court.  Discovery has been completed.

(ii)    April 2012 Claims Objections

On April 24, 2012, the Archdiocese filed objections to seven (7) Abuse Survivor Claims.  After extensive and costly briefing, two (2) of the seven Claimants **admitted** that their claims were legally unsupportable, but nevertheless sought to have their claims dismissed without prejudice, meaning that the Claims would be dismissed for the time being, but could be brought later.  The Bankruptcy Court held that dismissal without prejudice was not an allowable remedy under the Bankruptcy Code, and the Bankruptcy Court disallowed the two claims.  With respect to the remaining five (5) claims: (i) the Bankruptcy Court disallowed one claim as barred by the statute of limitations based on the claimant's subjective knowledge; (ii) the Bankruptcy Court ruled that one Claimant, Claimant A-282, could not introduce confidential mediation communications in an attempt to upset the settlement agreement and therefore the claim was barred by virtue of the prior settlement agreement, *In re Archdiocese of Milwaukee*, No. 11-20059-svk, 2013 WL 796106  (Bankr. E.D. Wis. March 4, 2013); and (iii) as to the remaining three claims, the Bankruptcy Court held that fact issues precluded a ruling on summary judgment.  Discovery has not yet been conducted on these three claims.

The Bankruptcy Court's decision on the introduction of mediation communications (Claim A-282) was appealed to the District Court. On October 22, 2013, the District Court issued a decision affirming the decision of the Bankruptcy Court. This decision affects the eighty-four (84) Abuse Survivor Claimants (out of the 576 Abuse Survivor Claims) who have previously entered into settlement agreements and it follows that these eighty-four (84) Claimants will ultimately have their Claims dismissed if the Claimants continue to pursue the Claims. Counsel for the majority of these Claimants, the Anderson Firm, has indicated that the Claimants will not voluntarily withdraw their Claims.

The District Court's decision affirming the dismissal of Claimant A-282's Claims was appealed to the Seventh Circuit on December 13, 2013. The briefing on this appeal is scheduled to commence on March 24, 2014.

### (iii)     November 2012 Claims Objections

On November 13, 2012, the Archdiocese filed objections to sixty-two (62) Abuse Survivor Claimants who previously settled their claims (*see* discussion of Claim A-282 in Section V.B.1(c)(ii) above). The Archdiocese filed two motions for summary judgment in connection with these claims. The first motion for summary judgment applied to approximately eighteen (18) Claimants. Each of these Claimants was either represented by counsel during the negotiation of the settlement agreement or entered into a settlement agreement in connection with the dismissal of the Claimant's lawsuit against the Archdiocese. The second motion for summary judgment applied to two (2) Claimants who, in addition to entering into settlement agreements, did not allege facts that would support a fraud claim. The essence of this motion for summary judgment is that, based on the facts known by all of the parties, the Debtor did not know that the alleged abuser was an abuser prior to the alleged harm to the Claimant and consequently could not have intentionally covered up any prior history about the abuse. A decision for the Debtor on this summary judgment motion would ultimately result in the Bankruptcy Court disallowing at least eighty-four (84) of the 576 Abuse Survivor Claims.

The Debtor had agreed to stay further proceedings on the November 2012 Claims Objections until the District Court issued a decision with respect to A-282. In correspondence dated October 24, 2013, the Debtor asked the Anderson Firm whether the Anderson Firm clients would consent to the Bankruptcy Court entering an Order disallowing the Claims of all other similarly situated claimants. The Anderson Firm indicated that it would not consent to such an Order, and Claimant A-282 appealed the dismissal of the Claim to the Seventh Circuit on December 13, 2013.

### (iv)     January 2013 Claims Objections

On January 21, 2013, the Archdiocese filed objections to approximately 157 Claims. None of these Claims report abuse by an Archdiocesan Priest. The Claims report abuse by lay persons, members of Religious Orders, and priests affiliated with a diocese other than the Archdiocese. These objections are pending resolution.

The Debtor believed that overarching legal issues with respect to these claims might be resolved in connection with the Debtor's objection to Claimant A-13's Claim. As a result, the

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 44 of 125

Debtor did not pursue litigation with respect to these Claims beyond filing the claims objections in an attempt to conserve estate resources. After discovery it became clear that Claimant A-13 could not maintain a claim against the Archdiocese and the Claimant withdrew the Claim instead of risking an adverse ruling which may have resolved issues with respect to these 157 Claims. Quite apart from the statute of limitations issues attendant to each of these Claims, these various Claimants are unable to establish "fraud," as it has been defined by State Court Counsel, because there is no evidence that the Debtor had any prior knowledge that any of these non-debtor persons had previously abused someone.

(v)     March 2013 Claims Objections

On March 9, 2013, the Archdiocese filed objections to approximately 196 Claims on the basis that the Claims failed to state any facts which could even remotely serve as the basis to prove fraud. The March 2013 Claims Objections fall into four categories: (i) Claims that allege abuse by an Archdiocesan Priest as to whom the Archdiocese has no record of receiving any prior reports of abuse; (ii) Claims that allege Abuse by an Archdiocesan Priest on the Substantiated List of Abusers, where the alleged act of abuse occurred at a time prior to the Archdiocese first learning of reports of abuse involving the priest; (iii) Claims that do not provide information sufficient to identify the abuser; and (iv) Claims that do not allege sexual abuse of a minor.

On March 9, 2013, the Debtor also filed objections to two (2) claims that were filed after the Abuse Survivors Bar Date.

(vi)     September 2013 Claims Objections

During the week of September 7, 2013, the Archdiocese filed objections to approximately 146 Claims in the following categories: (i) remaining settled Claimants -- addressing those Claimants who allege Abuse by more than one person and the settlement only relates to one individual; (ii) Claimants who previously filed lawsuits which were dismissed by other courts with prejudice; and (iii) the other Claimants whose Claims are time-barred.

(vii)    February 11, 2014 Claims Objections

On February 11, 2014, the Archdiocese filed objections to the remaining Abuse Survivor Claims, and amended the Archdiocese's objection to approximately sixteen (16) Abuse Survivor Claims to reflect the results of the Archdiocese's internal analysis of these Claims since the original objections were filed.

(viii)   Summary of Claims Objections

It is important to note that the Debtor's objections relate to the legal enforceability of the Abuse Survivor Claims. The Debtor's insurers have echoed all of the Debtor's objections. The objections do not dispute that abuse occurred. If the Bankruptcy Court upholds the objections of the Debtor, all Abuse Survivor Claims in this chapter 11 case would be disallowed. On the other hand, the Plan proposed by the Debtor allocates Plan consideration consisting of available money, therapy and support based on the relative potential for the various types of claims to be allowed by the Bankruptcy Court if the Bankruptcy Court resolved all of the claim objections.

Where an abuser is from or was employed by an entity other the Debtor, the Plan provides that the Debtor will assist the Abuse Survivor in contacting the appropriate entity, such as a Religious Order.

If the Bankruptcy Court's rulings and expected rulings (based on prior rulings and comments on similar issues) are upheld by appellate courts, 128 Claims would be left unresolved. The Debtor believes these Claims all should be disallowed based on the applicable statute of limitations as a matter of law based on the amount of publicly available notice. The Debtor also believes that the allegations made by the Claimants are insufficient to meet the stringent standard to prove fraud. State Court Counsel assert that application of the statute of limitations to these types of claims must be made on a case-by-case basis after an inquiry into each Claimant's subjective knowledge of information about facts which would put Claimant on inquiry notice about the potential for a claim.

The litigation involving Claimant A-12 is a case study in what could be required with respect to discovery on statute of limitations issues for these 128 Claimants. Several depositions were taken that led to the identification of a witness who provided sworn testimony that Claimant A-12 was told that the Debtor had knowledge of previous abuse perpetrated by the person who abused Claimant A-12. Notwithstanding this information, provided decades previously, Claimant A-12 failed to file a lawsuit within the 6-year statute of limitations for fraud. Similar discovery and investigation of the other Claims in Class 9 would be expensive and time-consuming

The Plan avoids requiring the Bankruptcy Court to (i) make a determination concerning the application of the statute of limitations to the 128 individual claims where that is the primary legal objection and (ii) ruling on a case-by-case basis on the Debtor's continued assertion that no fraud ever occurred with respect to each of the 128 Claimants. Instead, the Plan provides the 128 Claimants with the availability of therapy and the distribution of approximately $3,465,398.83 plus any recoveries received from the Non-Settling Insurers that can be divided among the 128 Claimants and/or used to pursue insurance recoveries.

2.     Determining The Major Assets Available for Distribution

After extensive investigation by BRG, the Committee's forensic financial advisors, and PSZJ, the Committee's general counsel, no claim has been made that the Debtor has not accurately identified the business assets available for utilization in the Plan. Unfortunately, those assets consist primarily of a few parcels of vacant land, which has proven difficult to sell or monetize. Available cash and other assets at the beginning of the case have largely been used up during the course of the Chapter 11 Case to pay for administrative expenses consisting of professional fees.

The Committee sought to recover five (5) types of assets for inclusion in the Estate. In response to the Committee's assertions, counsel for the Debtor provided the Committee with detailed factual and legal reasons why the assets sought by the Committee could not legally be included in the Estate. The five (5) asset types included: (1) funds in the Cemetery Trust that had been set aside for perpetual care of the Archdiocesan cemeteries; (2) funds that had been distributed in 2005 which had been jointly invested by participants (primarily Parishes and

Schools) in what was known as the Parish Deposit Fund; (3) assets of the Parishes; (4) money which had been given by parishioners and benefactors directly to the Faith In Our Future Trust for Catholic education and faith formation; and (5) real estate leased by the Debtor known as the Cousins Center.

The Archdiocese has consistently maintained that pursuit of the five (5) asset categories cannot be factually or legally justified and is a waste of the Debtor's resources that otherwise could be paid to Creditors. With respect to two of the actions -- the assets which were in the Parish Deposit Fund and the assets of the Parishes -- the Bankruptcy Court, after extensive briefing and oral argument, denied the Committee's request to prosecute these claims because the claims were not legally colorable and the Archdiocese was justified in refusing to pursue the asset recovery actions against the Parishes and Schools. These decisions were not appealed and any right to appeal has expired. Further details on the litigation of the five (5) asset categories follows:

(a)     Parish Deposit Fund Litigation

For many years, the Archdiocese served as a fiduciary to a fund known as the Parish Deposit Fund. Participation in the fund was elective and its purpose was to provide Catholic entities within the geography of the Archdiocese with economies of scale and administrative ease in the handling of their respective investments and excess funds. The Parish Deposit Fund provided a vehicle for the Parishes and other entities to pool their monies to earn a better rate of return. At its peak in 2004, the Parish Deposit Fund had more than 200 accounts and more than $76 million.

In June 2005, in an effort to reduce administrative overhead, the Archdiocese chose to close the Parish Deposit Fund, offering the Parishes and other Catholic entities who participated in the Parish Deposit Fund the option to either invest and manage their own funds, or move their investments to the Southeastern Wisconsin Catholic Parish Investment Management Trust, a newly created fund custodied by U.S. Bank, N.A., and managed by J.P. Morgan. No one, including the Committee, disputed that the funds in the Parish Deposit Fund were originally the money of the parishes and other Catholic entities that had placed the money in the Parish Deposit Fund for investment.

After lengthy oral discussions with the Debtor, on April 26, 2012, the Committee sent the Archdiocese's lawyers a letter demanding that the Archdiocese pursue avoidance actions against the Parishes and certain other Catholic entities challenging the return of funds from the Parish Deposit Fund to them and/or the Southeastern Wisconsin Catholic Parish Investment Trust.

On May 18, 2012, the Archdiocese responded to the Committee's demand, stating that the Archdiocese would not pursue the avoidance actions against the Parishes and other Catholic entities because the claims were not colorable. The Archdiocese explained in writing that the avoidance actions were not colorable because, among other reasons, they were time-barred by the applicable statute of limitations, the money in the Original Parish Trust was never the Archdiocese's property, the Committee's claim could not satisfy the requirements of the Uniform Fraudulent Transfer Act, and because the Archdiocese was merely returning money to

its rightful owner and the Committee could not demonstrate any attempt to hinder or delay creditors.

On May 25, 2012, the Committee filed a motion requesting that the Bankruptcy Court grant the Committee derivative standing to pursue avoidance actions against the Parishes, certain Catholic Entities, and the Southeastern Wisconsin Catholic Parish Investment Trust (the "PDF Standing Motion").

On December 10, 2012, the Bankruptcy Court issued an order and decision denying the Committee's request for derivative standing. *In re Archdiocese of Milwaukee*, 483 B.R. 855 (Bankr. E.D. Wis. 2012). The Bankruptcy Court held that the Committee had not stated a colorable claim that the transfers were avoidable fraudulent transfers and that the Archdiocese justifiably refused to bring the claims due to the enormous cost (the Committee estimated it would cost the Archdiocese over $1,000,000 in legal fees), the delay that would be caused by the litigation, the questions about collectability, and the adverse effect on the Archdiocese's reorganization that would ensue.

PSZJ spent approximately $405,000 prosecuting the PDF Standing Motion. The Archdiocese spent approximately $219,000 defending the PDF Standing Motion. Cumulatively, with other professionals, the PDF Derivative Motion cost the Estate approximately $676,000. The cost to the Estate is likely higher because the cost only reflects the total fees expended on the PDF Standing Motion, does not account for research charges or other expenses, and does not account for the delay added to resolving this case.

> (b)     Substantive Consolidation/Alter Ego Litigation Against the Parishes

After numerous discussions with the Debtor's counsel and with counsel for the Parishes, on October 15, 2012, the Committee sent a letter to the Archdiocese demanding that the Archdiocese pursue a claim against the Parishes that the assets of the Parishes were purportedly assets of the Estate. The Committee demanded that the Archdiocese pursue claims against the Parishes or stipulate to the Committee's standing to do so.

On October 17, 2012, the Archdiocese sent an initial reply to the Committee's October 15, 2012 demand stating that the facts asserted by the Committee were incorrect, but that the Archdiocese would convene a meeting of the Archdiocese's Board of Directors on October 23, 2012, to consider the Committee's demand and that the Archdiocese would inform the Committee of the Board of Directors' decision by October 24, 2012.

On October 24, 2012, the Archdiocese further responded to the Committee's demand that the Archdiocese pursue the Parishes. The Archdiocese stated that it would not pursue the avoidance action against the Parishes and explained in writing why such an action was meritless, would waste the Estate's resources, and would likely expose the Estate to liability for bringing a frivolous action. The Archdiocese also stated that the Archdiocese's Board of Directors met and decided not to stipulate to the Committee's standing to pursue an avoidance action.

The Archdiocese also expressed its belief that counsel for the Parishes and the Committee were in discussions regarding entering into a tolling agreement with respect to any legal action.

The Archdiocese requested that the Committee wait until the following week to file any motion with respect to the Parishes to allow the Parishes time to respond to the Committee's request regarding a tolling agreement.

Nevertheless, on October 25, 2012, one day after the Debtor's response, the Committee filed a motion requesting that the Bankruptcy Court grant the Committee standing to pursue claims against the Parishes (the "Substantive Consolidation Standing Motion"). The Committee sought standing to pursue a claim that the Parishes were the alter egos of the Archdiocese and that the Parishes and the Archdiocese should be substantively consolidated.

On December 7, 2012, the Bankruptcy Court issued an order and decision denying the Committee's request for derivative standing. The Bankruptcy Court found that there was not "sufficient entanglement" of the Parishes' and the Archdiocese's affairs, and that the Archdiocese's creditors did not rely on them being one entity. Further, the Bankruptcy Court found that any request for substantive consolidation would severely prejudice the Parishes and their creditors. *In re Archdiocese of Milwaukee*, 483 B.R. 693 (Bankr. E.D. Wis. 2012).

PSZJ spent approximately $342,000 prosecuting the Substantive Consolidation Standing Motion. The Debtor spent approximately $121,000 defending the Substantive Consolidation Standing Motion. Cumulatively, with other professionals, the Substantive Consolidation Standing Motion cost the Estate approximately $492,000. The cost to the Estate is likely higher because the cost only reflects the total fees expended on the Substantive Consolidation Standing Motion, does not account for research charges or other expenses, and does not account for the delay added to resolving this case.

(c)    FIOF Litigation

In 2007, the Faith In Our Future Trust (the "FIOF Trust") was created and launched a campaign to raise $105 million for Catholic education and faith formation in Southeastern Wisconsin. Governed by a Board of Trustees, consisting of three prominent civic leaders and the Archbishop, the FIOF Trust is a section 501(c)(3) charitable organization created for the purpose of raising funds for Catholic education and faith formation. Lead gifts were made by private individuals and a fundraising campaign was launched jointly by participating Parishes and the FIOF Trust. All expenses of the campaign were paid for by the FIOF Trust. All funds raised were donor restricted to the purposes of the FIOF Trust. Sixty percent (60%) of the pledges received by the FIOF Trust were, when paid by the donor, distributed to the donor's parish to be used only for the restricted purposes permitted by the FIOF Trust (as made applicable in each Parish's unique circumstances) in support of Catholic education and faith formation.

Some examples of the restricted uses of the FIOF Trust funds include the Catholic School Champions Endowment Fund to provide scholarships for elementary and high school students who could not otherwise afford a Catholic education, the Leaders of the Future Endowment Fund to support young men studying for the priesthood and the formation of adult lay leaders, and the Living Faith Fund, which provides support for the expansion of Catholic campus ministry at both public and private campuses in Southeast Wisconsin.

On October 15, 2012, the Committee sent the Debtor a letter demanding the Archdiocese prosecute certain claims against the FIOF Trust.

On October 17, 2012, the Archdiocese responded to the Committee's demand, stating that the facts cited by the Committee were incorrect, but that the Archdiocese would convene a meeting of the Archdiocese Board of Directors on October 23, 2012, to consider the Committee's demand, and that the Archdiocese would inform the Committee of the Board of Directors' decision by October 24, 2012.

On October 24, 2012, the Archdiocese further responded to the Committee's demand that the Archdiocese pursue the avoidance actions against the FIOF Trust. The Archdiocese stated that it would not pursue an action against the FIOF Trust and explained in writing why such was legally meritless, would waste the Estate's resources, and would likely expose the Estate to liability for bringing a frivolous action. The Archdiocese also stated that the Archdiocese's Board of Directors met and decided not to stipulate to the Committee's standing to pursue an avoidance action against the FIOF Trust.

The Archdiocese also stated that it understood that the FIOF Trust and the Committee were in discussions regarding entering into a tolling agreement with respect to any action against the FIOF Trust. The Archdiocese requested that the Committee wait to file any motion with respect to the FIOF Trust until the following week to allow the FIOF Trust time to respond to the Committee's request regarding a tolling agreement.

Nevertheless, on October 26, 2012, the Committee filed a motion seeking derivative standing to pursue avoidance actions against the FIOF Trust (the "FIOF Standing Motion"). The Committee asserts that the Archdiocese "fraudulently transferred" the goodwill of the Archdiocese by allegedly providing the FIOF Trust with the names, addresses and/or donor histories of the registered Catholics and other potential donors. Choosing to ignore the underlying facts, the Committee alleged (incorrectly) that the Archbishop and other of the Archdiocese's employees spent time, effort and energy, while being paid by the Archdiocese, to develop the FIOF Trust campaign and solicit donations to it. The Committee alleged that the donor lists, and employee time along with the goodwill of the Archdiocese they represent were transferred to the FIOF Trust with the intent to hinder, delay or defraud creditors and/or for which the Archdiocese did not receive reasonably equivalent value. Despite receiving incontrovertible written information from the Debtor to the contrary, the Committee made the unprecedented claim that the FIOF Trust's solicitation of donors interfered with the Archdiocese's customary annual fundraising and was intended to place the money beyond the reach of the Archdiocese's creditors. As pointed out by the Debtor to the Committee, fundraising efforts by the Archdiocese in Catholic Stewardship Appeal, the Archdiocese's primary annual fundraising effort, were not affected during the time funds were being raised by the FIOF Trust.

On November 9, 2012, the Archdiocese, in the interests of judicial economy, and to avoid the expenses of responding to further frivolous claims by the Committee, entered into a stipulation with the Committee and the FIOF Trust extending the time period to bring a potential action against the FIOF Trust. On November 9, 2012, the Committee withdrew the FIOF

Standing Motion. On December 18, 2013, the Bankruptcy Court entered any order extending the tolling period until June 30, 2014.

Despite the Committee's assertions, the Debtor believes there is absolutely no merit in the Committee's position on the FIOF Trust. Moreover, some of the Bankruptcy Court's rulings in the Parish Deposit Fund litigation referred to above may be applicable by analogy to the FIOF Trust and further undermine the Committee's position. Consequently, the Debtor believes that further pursuit of the FIOF Trust would be a waste of the Estate's resources. A further analysis of the merits of the Committee's claims against the FIOF Trust and a proposed settlement of the Estate's claims against the FIOF Trust is provided in Section VII.C.3.

(d)     Cousins Center/De Sales Litigation

On October 24, 2012, the Archdiocese responded to the Committee's demand that the Archdiocese pursue an avoidance action related to the Cousins Center. The Archdiocese stated that it would not pursue the avoidance action and explained why such an action was legally meritless and would waste the Estate's resources. The Archdiocese also stated that the Archdiocese Board of Directors met and decided not to stipulate to the Committee's standing to pursue an avoidance action.

The Archdiocese also stated that it understood that the counsel for De Sales Preparatory Seminary, Inc. ("De Sales"), the owner of the Cousins Center, and the Committee were in discussions regarding entering into a tolling agreement with respect to any action. The Archdiocese requested that the Committee wait until the following week to file any motion with respect to De Sales and the Cousins Center to allow De Sales time to respond to the Committee's request regarding a tolling agreement.

On October 30, 2012, the Committee, the Archdiocese, and De Sales entered into a stipulated tolling agreement extending the time to bring a potential action against De Sales. On December 18, 2013, the Bankruptcy Court entered any order extending the tolling period until June 30, 2014.

The business issues involved with the Cousins Center are complicated. While the Archdiocese occupies the Cousins Center for a nominal rent plus payment of all heat and maintenance expenses, the property has always been owned by De Sales and was formerly built and operated as the preparatory high school for potential priests. Now, it is used as office space for the Archdiocese, its chapel is occasionally used for public functions, and its gymnasium and related facilities are subleased to the Milwaukee Bucks for use as a practice facility. The sublease is intended to defray costs of operation, because the facility, which was built in 1962 and has not been significantly updated, is functionally obsolete in many ways. The facility has old mechanical systems and, due to the age of the building and historic construction materials, any alterations are likely to be very expensive.

The Cousins Center is also subject to a mortgage of approximately $4.4 million in favor of Park Bank.

While the Debtor disagrees with the Committee's legal theories which it believes might allow consolidation of the Cousins Center into the Estate, the combination of underlying debt,

the rights of the subtenant, and the functional obsolescence of the building would make inclusion in the Estate a pyrrhic economic victory. In the Plan, the Debtor seeks to restructure its relationships with the Milwaukee Bucks and De Sales so that it can continue to enjoy relatively inexpensive occupancy costs for its going forward operations, leaving more funds available for the Archdiocese to fulfill its educational, spiritual, and charitable mission.

(e)     Cemetery Trust Litigation, Adversary Proceeding
Case No. 11-02459

The Cemetery Trust contains funds which can only be used for the perpetual care of the Milwaukee Catholic Cemeteries. The Committee asserted early in the Chapter 11 Case that the funds held in the Cemetery Trust must be included with the Estate's assets and used primarily for payment of Abuse Survivor Claims.

As further explained in Section VII.C.2 of the Disclosure Statement, the Archdiocese always believed that the funds have been held in trust as they accumulated for the purpose of supporting perpetual care. Records as early as 1903 indicate that these funds were held in such a manner.

Because the Cemetery Trust annually disburses approximately $1,950,000 to the Archdiocese to help offset a portion of the cost of providing perpetual care of the Milwaukee Catholic Cemeteries, failure of the Archdiocese to receive these funds would have a major negative impact on the viability of the Archdiocese. Resolution of issues related to the Cemetery Trust is also key to determining the treatment of the claim to provide perpetual care, the present value of which has been estimated at approximately $246,433,002.

To expedite resolution of the issues raised by the Committee, the Cemetery Trust began an adversary proceeding in July 2011 asking the Bankruptcy Court for a judgment determining that funds in the Cemetery Trust were not property of the Estate. Even though significant decisions have been rendered in favor of the Cemetery Trust, it is clear that that litigation is far from complete unless it can be settled within the Plan. An analysis of the issues involved in the Cemetery Trust Litigation and a proposed settlement of the Estate's claims against the Cemetery Trust is provided in Section VII.C.2 below.

The Cemetery Trust litigation has already cost the Debtor's Estate approximately $2,480,000 in fees. As of December 31, 2013, the Committee's professionals have spent over $1,594,000 alone pursuing the Cemetery Trust. These estimates do not include the costs incurred by the Cemetery Trust.

(f)     Insurance Coverage Litigation

(i)     LMI and Stonewall

In other Catholic church related chapter 11 proceedings, the availability of insurance coverage for sexual abuse claims was an important asset for recovery by Abuse Survivors. In this case, all of the Debtor's insurers have flatly rejected the availability of **any** coverage for the Abuse Survivor Claims. Adverse decisions concerning coverage in the Wisconsin state courts have also made recovery difficult for the Debtor. However, the importance of insurance

coverage caused the Debtor and the Committee to explore all potentially available theories of recovery.

On November 13, 2012, the Archdiocese and two (2) Abuse Survivors filed a complaint seeking a declaratory judgment that the insurance policies issued by the London Market Insurers (the "LMI") and Stonewall Insurance Company ("Stonewall") provide coverage for certain Abuse Survivor Claims (the "Insurance Coverage Adversary Proceeding"). The Archdiocese argues that certain policies issued by the LMI and Stonewall in the 1960s and 1970s provide coverage due to the policies' definition of "occurrence" and the decision in *United Pacific Insurance Co. v. The McGuire Co.*, 281 Cal. Rptr. 375 (Ct. App. 1991).

On January 15, 2013, the LMI and Stonewall filed a motion to withdraw the reference as to the entirety of the Insurance Coverage Adversary Proceeding. On February 22, 2013, the District Court granted the motion to withdraw the reference in its entirety. As a result, all matters in the Insurance Coverage Adversary Proceeding are currently pending before the District Court.

On April 8, 2013, the Archdiocese filed a motion for judgment on the pleadings. The Archdiocese asked the District Court to issue a decision that the LMI Answer and Complaint for Declaratory Relief was filed without authority and in violation of Wisconsin Statutes § 618.44. The Archdiocese asked the District Court to dismiss the LMI Answer and Complaint for Declaratory Relief or to issue an order that the LMI insurance policies were issued in violation of Wisconsin Statutes § 618.44 and, as a result, the LMI may not take any steps to enforce any of the provisions in the insurance policies against the Archdiocese. The motion for judgment on the pleadings is fully briefed.

On May 20, 2013, the LMI filed a motion for partial summary judgment. The LMI asked the District Court to issue a ruling that there is no insurance coverage under the LMI insurance policies because many of the claims do not allege abuse during the LMI policy periods, the claims are barred by the statute of limitations, the First Amendment prevents a court from inquiring into assertions of negligence against the Archdiocese, the claims do not comply with the Wisconsin and federal law requirements to plead fraud with specificity and particularity, many of the claims were previously litigated and/or settled, and because the Archdiocese is not liable for Abuse perpetrated by non-Archdiocesan priests, personnel, or entities. The LMI also argued that the claims based on fraud are not covered by the LMI insurance policies. The motion for partial summary judgment is fully briefed.

On September 5, 2013, the Archdiocese and the LMI asked the District Court for a sixty (60) day stay of proceedings to allow the LMI and the Archdiocese to engage in mediation with regard to the availability of any insurance coverage by the LMI. On September 13, 2013, the District Court granted a stay of proceedings until November 12, 2013. On November 22, 2013, the District Court granted the Debtor's and the LMI's request for a further stay. The District Court granted the request and extended the stay until the settlement agreement between the Debtor and the LMI is approved by a confirmation Order and such confirmation Order is final and non-appealable. A discussion of the proposed settlement is contained in Section VII.C.2(i) below. The adversary proceeding as to Stonewall continues but is currently subject to the stay issued by the District Court.

(ii)     OneBeacon

On January 22, 2014, OneBeacon filed a motion requesting that the Bankruptcy Court terminate the automatic stay as to OneBeacon to permit OneBeacon to file its response to the Debtor's petition for review in the Wisconsin Supreme Court.  Prior to the Petition Date, the Archdiocese was involved in several lawsuits arising out of allegations of sexual abuse by former priests.  *See* Section 0.  The Debtor tendered the defense of these actions to various insurance companies, including OneBeacon.  OneBeacon accepted the tender of defense subject to a reservation of rights.  OneBeacon then moved the trial courts for a determination that there was no coverage.  Both the trial courts and the Wisconsin Court of Appeals determined that there was no coverage.  The Archdiocese filed a petition for review with the Wisconsin Supreme Court on December 23, 2010.  OneBeacon's response to the petition for review was due on January 10, 2011, but it was not filed because the Archdiocese filed its petition for relief under the Bankruptcy Code on January 4, 2011, which stayed all proceedings in the state court litigation.  Through the motion to terminate the automatic stay, OneBeacon is requesting that the Bankruptcy Court lift the stay to permit OneBeacon to file its response to the petition for review with the Wisconsin Supreme Court and, to the extent the Wisconsin Supreme Court grants the petition for review, to permit the Wisconsin Supreme Court to determine whether there is coverage under the OneBeacon policies.

On February 5, 2014, the Archdiocese filed its objection to OneBeacon's motion to terminate the automatic stay, urging the Bankruptcy Court to deny the motion because of the harm it could cause to the Debtor's careful and extensive efforts to file the Plan because of the potential further delays and costs associated with piecemeal litigation of the coverage issues, and because OneBeacon should, at a minimum, be compelled to reimburse the Archdiocese for approximately $2,600,000 in defense costs incurred by the Archdiocese but not yet paid by OneBeacon.  On March 12, 2014, the Bankruptcy Court will hold a preliminary hearing on the motion to terminate the automatic stay.

On January 22, 2014, the Archdiocese filed a complaint seeking a declaratory judgment (the "OneBeacon Adversary Proceeding") that OneBeacon was required to reimburse the Debtor approximately $2,600,000 for fees and expenses incurred as part of OneBeacon's agreement to accept the Archdiocese's tender of defense.  OneBeacon's answer to the complaint was not yet due as of the date of the filing of the Plan.  On March 12, 2014, the Bankruptcy Court will conduct a preliminary hearing in connection with the OneBeacon Adversary Proceeding.

C.      **Document Publication**

Although the scope of a chapter 11 case is properly limited to issues related to the financial assets and liabilities of the debtor, much of this case has involved resolving issues regarding the public release of documents and certain non-monetary undertakings demanded by the Committee and State Court Counsel.  While the parties have generally agreed that a court would have limited authority to require the Debtor to release its files related to the sexual abuse of minors or implement certain programs with respect to the protection of children, the Committee and State Court Counsel have spent a significant amount of time and money litigating these issues.  The litigation regarding the release of the documents and the release of the documents cost the Estate in excess of $665,000.

1.         Motions to Produce Documents and Take Depositions

      (a)       Motion to Lift Stay

On May 20, 2011, the Committee filed a motion requesting that the Bankruptcy Court lift the automatic stay to permit the Anderson Firm to take certain depositions in the lawsuits that were pending against the Archdiocese prior to the Petition Date. The Bankruptcy Court denied the Committee's motion, but stated that it would permit the Anderson Firm and the Committee to file a "Rule 2004" motion, as Federal Rule of Bankruptcy Procedure 2004 provides the mechanism by which parties request discovery in bankruptcy proceedings.

      (b)       Rule 2004 Depositions and Document Production

On July 20, 2011, the Committee and the Anderson Firm filed a joint motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requesting the depositions of certain individuals and the production of documents. On August 30, 2011, the Bankruptcy Court entered an Order directing the examination of Bishop Sklba, Archbishop Weakland, and Daniel Budzynski and the production of certain documents pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Rule 2004 Order"). The subject of the Rule 2004 examinations was limited to: (i) who perpetrated sexual abuse in the Archdiocese; (ii) what the Archdiocese knew about that sexual abuse, when did the Archdiocese have knowledge, and what did the Archdiocese do in response to that knowledge; and (iii) whether there are additional survivors of sexual abuse who have not received notice by first-class mail of the February 1, 2012 bar date for filing proofs of claim. The Rule 2004 Order also required the Archdiocese to produce certain documents. The Archdiocese produced approximately 57,000 pages of documents.

2.         Motions Requesting the Release of Documents

Since the beginning of the case, the Committee and State Court Counsel have sought the public release of the Archdiocese's files, including personnel files. There is no provision in the Bankruptcy Code that requires a debtor to release personnel files. To circumvent this, the Anderson Firm attached the majority of what the Debtor produced in response to the Rule 2004 Order to its response to the claims objections even though the documents were not relevant to the claims objections. The Anderson Firm then filed two motions seeking the release of the documents.

On February 27, 2012, the Anderson Firm filed a Motion to Unseal Documents and Depositions. The Committee joined the motion. The Bankruptcy Court denied the motion on the basis that the documents and deposition transcripts contained confidential information and were exempt from public disclosure pursuant to the Bankruptcy Code. The Anderson Firm initially appealed the Bankruptcy Court's decision, but then dismissed the appeal.

On January 17, 2013, the Anderson Firm filed a Motion to Modify the Protective Order, seeking the release of documents and the deposition transcripts, the identical relief sought in the Motion to Unseal Documents and Depositions. As detailed below, the parties thereafter reached a consensual resolution of this motion at a considerable monetary cost to the Estate to perform the necessary redactions.

3.      Stipulation to the Voluntary Public Release of Documents Regarding Abusers

On February 27, 2012, the Anderson Firm, on behalf of certain Abuse Survivors, filed a motion to unseal certain documents and depositions.  On April 9, 2012, the Bankruptcy Court entered an Order denying the motion to unseal.

On January 17, 2013, certain Claimants filed a renewed motion regarding the documents and depositions and sought to modify the Bankruptcy Court's protective order to allow the release of certain documents and depositions.  On April 3, 2013, the Archdiocese, counsel for the Committee, and State Court Counsel filed a stipulation regarding the release of documents and narrative summaries of the released documents.  On April 3, 2013, the Bankruptcy Court entered an Order approving the stipulation.  The Order was based on the Anderson Firm's request for the parties to release approximately 2700 pages of priest files, depositions, and exhibits to depositions, as well as to publish narrative summaries of the documents released.  State Court Counsel's request continued to expand, and on July 1, 2013, the Debtor voluntarily released approximately 6,000 pages of documents and published narrative summaries of the documents on the Archdiocese's website.  The documents and the narrative summaries are available on the Archdiocese's website at http://www.archmil.org/reorg/clergy-offenders-info/clergy-offenders.htm.  In addition, the Archdiocese posted timelines principally prepared by the Anderson Firm regarding forty-two (42) of the priests named on the Archdiocese's website.

The Anderson Firm reviewed all of the documents originally produced by the Archdiocese, and selected the documents to be released.  The Anderson Firm and counsel for the Archdiocese spent a significant amount of time reviewing the documents and redacting any information that could potentially lead to the identification of an Abuse Survivor.  All redactions to the documents were agreed to by the Anderson Firm.

The total cost to the estate to produce the documents, redact the documents, and then publish the documents exceeded $665,000.  The majority of this expense related to reviewing the documents to ensure that information that might identify an Abuse Survivor was redacted.

**D.      Other Matters**

1.      Mediation

On April 27, 2012, the Committee filed a motion for the appointment of a case mediator.  On July 17, 2012, the Bankruptcy Court entered an order appointing Randall J. Newsome, retired Chief Bankruptcy Judge of the Northern District of California, as case mediator.  The mediation lasted for approximately three (3) months, during which time all litigation in the Chapter 11 Case was stayed.  The mediation ended on October 12, 2012.  Although the parties made some progress, no matters were resolved during the mediation.  The mediation cost the Estate approximately $741,000, including $84,374 paid to the mediator, $275,000 in fees attributable to the Committee's professionals, and $382,000 in fees attributable to Debtor's counsel.

2.      Future Claims Representative

On May 29, 2013, the Archdiocese filed an application requesting the Bankruptcy Court appoint Deloitte Financial Advisory Services as legal representative for future claimants. The motion was disputed by the Committee. On September 20, 2013, the Bankruptcy Court entered an order appointing Stephen S. Gray of Deloitte Financial Advisory Services as the legal representative for future claimants (hereinafter referred to as the "Unknown Abuse Survivor Representative").

3.      Motion to Suspend Interim Compensation

On January 24, 2013, the Archdiocese filed a request with the Bankruptcy Court to amend the Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals. Specifically, the Archdiocese requested that the Bankruptcy Court enter an order suspending further compensation to professionals until confirmation of a plan. The Archdiocese made this request to stabilize the Archdiocese's cash flow. On February 21, 2013, and February 22, 2013, the Bankruptcy Court held a hearing on the motion, and granted the relief sought in the motion. Since February 22, 2013, the professionals have continued to submit fee applications as required by the procedures for interim compensation, but the Archdiocese has not remitted payment to the professionals for the fee applications.

4.      Rule 2019 Motion

On October 18, 2013, the Debtor filed a motion requesting that the Anderson Firm comply with the disclosure requirements of Federal Rule of Bankruptcy Procedure 2019. The motion followed the Debtor's request that the Anderson Firm and the other State Court Counsel that represent multiple creditors voluntarily comply with the disclosure requirements of Federal Rule of Bankruptcy Procedure 2019. Upon the direction of the Committee's general counsel, PSZJ, the Anderson Firm and the other State Court Counsel declined to make the required Federal Rule of Bankruptcy Procedure 2019 disclosures.

The Debtor filed the motion because the potential conflicts of interest in multiple party representations require a complete disclosure of agreements among the creditors in order to allow the Bankruptcy Court and the Parties to evaluate the Plan and the Disclosure Statement. This evaluation necessarily includes disclosures about the entities representing multiple creditors and what conflicts these entities might have that affect the representation of the creditors.

On November 12, 2013, and January 16, 2014, the Anderson Firm filed certain documents under seal, including examples of the different fee agreements authorizing the Anderson Firm to act on behalf of individual Claimants. The Debtor continues to assess whether the Anderson Firm has complied with Federal Rule of Bankruptcy Procedure 2019 and, even if it has, what are the consequences of the representation of multiple creditors in the circumstances of this case.

E.      **Expenditures in the Chapter 11 Case**

As of February 7, 2014, the total fees and expenses incurred by the professionals was approximately $12,492,000. After accounting for amounts previously paid and retainers, the

total current amount outstanding to professionals based on fee applications and estimates provided to the Debtor is approximately $4,305,000.

| Debtor | | | | | | |
|---|---|---|---|---|---|---|
| **Professional** | **Fees** | **Expenses** | **Total** | **Previously Received** | **Retainer** | **Outstanding** |
| WHD** | $5,963,439.40 | $50,160.87 | $6,013,600.27 | $4,262,207.24 | $432,352.28 | $1,319,040.75 |
| L&M | $65,000.00 | $0.00 | $65,000.00 | $0.00 | $25,000.00 | $40,000.00 |
| BVBOV | $63,488.00 | $103.20 | $63,591.20 | $37,841.50 | $25,000.00 | $749.70 |
| O'Neil | $78,749.25 | $64.26 | $78,813.51 | $33,080.01 | $25,000.00 | $20,733.50 |
| Q&B | $377,763.10 | $1,504.60 | $379,267.70 | $70,399.69 | $151,065.86 | $157,802.15 |
| Baker Tilly | $233,528.59 | $70,581.00 | $304,109.59 | $164,138.70 | $0.00 | $139,970.89 |
| | | | | | | |
| **Subtotal** | **$6,781,968.34** | **$122,413.93** | **$6,904,382.27** | **$4,567,667.14** | **$658,418.14** | **$1,678,296.99** |

| Committee | | | | | | |
|---|---|---|---|---|---|---|
| **Professional** | **Fees** | **Expenses** | **Total** | **Previously Received** | **Retainer** | **Outstanding** |
| PSZJ | $4,196,378.86 | $440,439.25 | $4,636,818.11 | $2,326,153.17 | $0.00 | $2,310,664.94 |
| HSW | $436,885.09 | $12,811.08 | $449,696.17 | $303,016.58 | $0.00 | $146,679.59 |
| BRG | $265,492.50 | $1,332.49 | $266,824.99 | $221,772.09 | $0.00 | $45,052.90 |
| Richler | $173,071.00 | $6,073.92 | $179,144.92 | $91,749.36 | $0.00 | $87,395.56 |
| Hamilton | $59,400.00 | $2,360.63 | $61,760.63 | $24,864.00 | $0.00 | $36,896.63 |
| | | | | | | |
| **Subtotal** | **$5,131,227.45** | **$463,017.37** | **$5,594,244.82** | **$2,967,555.20** | **$0.00** | **$2,626,689.62** |
| | | | | | | |
| **Total** | **$11,913,195.79** | **$585,431.30** | **$12,498,627.09** | **$7,535,222.34** | **$658,418.14** | **$4,304,986.61** |
| | | | | | | |
| ** The WHD fees reflect the fees that have been billed and not reimbursed by Resolute Management, Inc. | | | | | | |

Because certain professionals have not provided updated estimates to the Debtor, the Debtor estimates that the total amount outstanding is currently approximately $4,500,000. [10] The

---

[10] Debtor's Professionals:

The fee and expense information for Buelow Vetter Buikema Olson & Vliet ("BVBOV") Leverson and Metz S.C. ("L&M"), O'Neil, Cannon, Hollman, Dejong & Laing S.C. ("O'Neil"), Quarles & Brady LLP ("Q&B"), and WHD is current (based on fee applications or estimates provided by the professional) through December 2013.

The fee and expense information noted for Baker Tilly Virchow Krause, LLP ("Baker Tilly") is current (based on fee applications or estimates provided by the professional) through October 2013.

(footnote continued)

Debtor estimates that the professionals will incur an additional $1,000,000 in fees and expenses in connection with the Chapter 11 Case.

During the pendency of the Chapter 11 Case many questions have arisen regarding the expenditures by professionals, particularly questions regarding how much money has been spent and for what purposes. To provide some explanation of the expenditures in this case, the Debtor prepared the summary below, which is based on a review of the fee applications filed to date.

           1.        Largest Fee Expenditures By Category

The table and chart below summarize the largest categories of fee expenditures in the Chapter 11 Case.

These categories account for approximately 85% of legal fees incurred to date.

*[Remainder of Page Intentionally Left Blank]*

---

Committee's Professionals:

The fee and expense information for PSZJ and Howard Solocheck & Weber S.C. ("HSW") is current (based on fee applications or estimates provided by the professional) through December 2013.

The fee and expense information the Law Offices of Paul A. Richler ("Richler") is current (based on fee applications or estimates provided by the professional) through October 2013.

The fee and expense information for Marci A. Hamilton ("Hamilton") is current (based on fee applications or estimates provided by the professional) through May 2013.

The fee and expense information for Berkeley Research Group, LLC ("BRG") is current (based on fee applications or estimates provided by the professional) through February 2013.

| Category | Amount | | Percent of All Legal Fees |
|---|---|---|---|
| **Asset Litigation** | | | |
| Cemetery Trust | $2,480,513.56 | | |
| Parish Deposit Fund and Substantive Consolidation | $1,168,039.09 | | |
| Other Asset Litigation - FIOF Trust and Cousins Center | $200,503.75 | | |
| | | $3,849,056.41 | 32.31% |
| **Claims Related Issues (Bar Date, Claims Administration, and Document Production)\*** | | | |
| Depositions and Document Production | $665,017.88 | | |
| Bar Date | $263,230.48 | | |
| Committee Claims Administration/Objections | $190,258.63 | | |
| WHD Claims Administration | $304,008.54 | | |
| | | $1,422,515.52 | 11.94% |
| **Insurance** | | $848,324.95 | 7.12% |
| **Mediation** | | $741,383.83 | 6.22% |
| **Claims Objections** | | | |
| WHD Claims Objections | $549,008.63 | | |
| Committee Claims Administration/Objections | $190,258.63 | | |
| | | $739,267.26 | 6.21% |
| **Plan and Disclosure Statement** | | $731,237.75 | 6.14% |
| **Typical Debtor Operating Expenditures** | | $821,842.25 | 6.90% |
| **Fee Applications** | | $377,995.50 | 3.17% |
| **Retention of Professionals** | | $258,467.25 | 2.17% |
| **Non Legal Committee Categories** | | $160,085.75 | 1.34% |
| **General Creditors Committee** | | $112,501.75 | 0.94% |
| | | | |
| **Total** | | $10,062,678.22 | 84.47% |

Claims Related Issues relate to the Bar Date negotiations, claims administration (reviewing Abuse Survivor Claims upon receipt, responding to inquiries from Abuse Survivor Claimants, and the redaction, production, and public release of various files).

The Debtor believe that the fees and expenses incurred in the Claims Related Issues are related to the defense of Claims, and, accordingly, requested that OneBeacon reimburse the debtor for the fees and expenses incurred. OneBeacon did not respond to the Debtor's requests. Consequently, the Debtor commenced the OneBeacon Adversary Proceeding.

The amount attributable to Committee Claims Administration/Objections category is split equally between Claims Related Issues and Claims Objections.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 60 of 125



## Summary of Largest Expenditures by Category

- Asset Litigation
- Claims Related Issues (Bar Date, Claims Administration, and Document Production)*
- Insurance
- Mediation
- Claims Objections
- Plan and Disclosure Statement
- Typical Debtor Operating Expenditures
- Fee Applications
- Retention of Professionals
- Non Legal Committee Categories
- General Creditors Committee
- Other

Values shown on chart: 0.94%, 2.17%, 1.34%, 15.53%, 32.31%, 3.17%, 6.90%, 6.14%, 6.21%, 6.22%, 7.12%, 11.94%

(a)    Asset Litigation

The single-largest category of fee expenditures to-date relates to the Committee's pursuit of various asset recovery theories.

The Committee demanded that the Debtor pursue five (5) separate asset recovery actions: (1) an action against the Cemetery Trust; (2) an action related to the Parish Deposit Fund; (3) an action for substantive consolidation against the Parishes; (4) an action against the FIOF Trust; and (5) an action against De Sales related to the Cousins Center. Each of these actions is discussed in more detail in Section V.B.2.

To date, the pursuit of these asset recovery theories has not resulted in any recovery for the Estate, and the Debtor does not believe there is any future potential recovery associated with the Committee's asset recovery theories. The Bankruptcy Court already found two of the Committee's proposed recovery actions to be non-colorable -- the action related to the Parish Deposit Fund and the action for substantive consolidation against the Parishes. The District Court entered a judgment prohibiting any action against the Cemetery Trust. Based on prior rulings, the proposed action against the FIOF Trust is not tenable and certainly not colorable and the action involving the Cousins Center is not likely to produce any material benefit to creditors, even if successful. The Debtor has believed since the commencement of the Chapter 11 Case that these claims would not result in any recovery for the Estate and explained this to the

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 61 of 125

Committee on multiple occasions. Despite this, the Committee chose to pursue all of its asset recovery theories.

The fees attributable to pursuing these asset recovery theories (which are currently estimated at $3,849,000) account for over 32% of all fees incurred to-date.

The actual cost of the Committee's pursuit of the asset recovery theories is likely higher, because it does not include research costs, non-billable travel time, travel costs, and other expenses that are attributable to the pursuit of these asset recovery theories. The total amount incurred by the Committee for expenses and for non-billable travel time alone currently exceeds $595,000, and the Debtor believes that a substantial amount of this cost is attributable to the pursuit of the asset recovery theories.

The estimate does not include an allocation of fees incurred by PSZJ for the months of November 2013 to January 2014[11] and fees incurred by Marci Hamilton from May 2013 to January 2014 because the professionals have not filed fee applications for these time periods.

As a result, the Debtor believes that the Committee has likely caused the Estate to incur fees and expenses attributable to the pursuit of the Committee's various asset recovery theories in excess of $4,000,000.

The table below outlines the fees spent on each of the asset recovery theories:

| Billing Entity | Cemetery Trust | Parish Deposit Fund | Substantive Consolidation | FIOF Trust | Cousins Center | Total |
|---|---|---|---|---|---|---|
| PSZJ | $1,345,104.75 | $405,187.50 | $342,185.00 | $104,247.00 | $46,803.50 | **$2,243,527.75** |
| HSW | $96,247.56 | $28,992.77 | $24,484.69 | $7,020.64 | $3,152.04 | **$159,897.69** |
| BRG | $110,678.00 | $4,771.50 | $4,771.50 | $8,761.50 | $0.00 | **$128,982.50** |
| Hamilton | $42,450.00 | $16,950.00 | $0.00 | $0.00 | $0.00 | **$59,400.00** |
| | | | | | | |
| **Subtotal** | **$1,594,480.31** | **$455,901.77** | **$371,441.19** | **$120,029.14** | **$49,955.54** | **$2,591,807.94** |
| | | | | | | |
| WHD | $886,033.25 | $219,869.08 | $120,827.05 | $19,914.96 | $10,604.13 | **$1,257,248.47** |
| | | | | | | |
| **Total** | **$2,480,513.56** | **$675,770.85** | **$492,268.24** | **$139,944.09** | **$60,559.66** | **$3,849,056.41** |

---

[11] PSZJ incurred a total of approximately $107,000 in fees in November and December of 2013 (based on estimates provided by PSZJ), but has not filed fee applications for these months.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 62 of 125

(b)     Claims Administration and Claims Litigation

Given the number of claims filed and the Debtor's belief regarding the potential scope of the monetary demands by the Claimants, the Debtor had no choice but to examine the legal enforceability of the claims and object to legally unenforceable claims.

Although most Claimants chose not to include a specific monetary demand, the first four Claims filed in the Chapter 11 Case provide a glimpse of the extraordinary disconnect between the Archdiocese's resources and the demands made by at least one State Court Counsel. Claims 27 to 30 seek $5,000,000 ***each***, a cumulative amount that exceeds all of the Archdiocese's assets, both restricted and unrestricted.

As discussed further in Section V.B.1(c) above, the Archdiocese pursued a targeted approach to the claims objections designed to resolve the overarching legal issues while minimizing the cost to the Estate. However, because of the number of Abuse Survivor Claims filed in the Chapter 11 Case, the Debtor estimates that the unreimbursed cost to the Estate to defend these claims -- which includes ***both*** objecting to Claims when appropriate and analyzing Abuse Survivor Claims, responding to inquiries and demands (including demands for discovery and for the public release of documents) from Abuse Survivors, and negotiating with Abuse Survivors – exceeds $2,600,000. Of this total amount, the Debtor estimates that approximately $549,000 (or 4.6% of total fees to date) was spent on the discrete task of preparing, filing, and litigating the Claims Objections, which is just one component of the Archdiocese's costs of defending itself.

If OneBeacon honors its promise to fully reimburse the Archdiocese for the costs of defending itself, the total amount of fees and expenses outstanding will be reduced to $1,659,171.

2.     Disbursements

To date, the professionals in this case have incurred in excess of $585,000 in expenses. The Debtor's professionals have incurred approximately $122,000 in expenses, and the Committee professionals have incurred approximately $463,000 in expenses.

The table and chart below summarize the various expenditures in the Chapter 11 Case by general counsel for the Debtor (noted as WHD below) and general counsel for the Committee (noted as PSZJ below).

| | PSZJ | WHD | Total | Percent of Total |
|---|---|---|---|---|
| Research | $287,957.09 | $13,419.99 | **$301,377.08** | 51.48% |
| Travel | $69,374.71 | $4,000.86 | **$73,375.57** | 12.53% |
| Outside Services/Expert Witnesses | $36,539.07 | $5,414.30 | **$41,953.37** | 7.17% |
| Photocopying | $14,798.59 | $10,074.06 | **$24,872.65** | 4.25% |
| Court Reporting Services | $1,170.75 | $8,664.17 | **$9,834.92** | 1.68% |
| Postage, Couriers & Delivery | $2,304.96 | $4,103.07 | **$6,408.03** | 1.09% |
| Other | $7,547.64 | $4,431.85 | **$11,979.49** | 2.05% |
| | | | | |
| **Total** | **$419,692.81** | **$50,108.30** | **$469,801.11** | **80.25%** |



3.      Expenditures if a Plan is Not Confirmed

The Plan provides for the end of spiraling litigation costs, the preservation of all claims against Non-Settling Insurers, and $8,000,000 in cumulative settlement proceeds. In addition, it provides a mechanism for potential additional recoveries from insurance companies. The alternative is continuing litigation, at a likely cost of over $13,000,000, and forfeiting **all** of the approximately $8,000,000 in settlement proceeds.

Based on current expenditures by professionals, the Debtor estimates that it would take five years and approximately $14,000,000 -- if not more if the Insurance Companies and State court Counsel require trials on each individual Abuse Survivor Claim[12] -- in additional fees to resolve the outstanding issues in the Chapter 11 case, if the Plan is not confirmed.

## VI.  DEBTOR'S VOLUNTARY NON-MONETARY UNDERTAKINGS FOR THE PROTECTION OF CHILDREN

The Archbishop and the Reorganized Debtor agree to adhere to the non-monetary undertakings set forth below for a period of at least ten (10) years:

- The Charter was adopted by bishops of the United States in June 2002. It was revised in 2005 and again in 2011. The Essential Norms for Diocesan Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons were revised and issued in 2006 (the "Essential Norms"). The Archdiocese is committed to following the requirements of the Charter and complying with each of the Essential Norms, or those requirements and norms of any future documents issued by the USCCB.

- The Archdiocese has voluntarily participated and will continue to voluntarily participate in audits (currently scheduled annually) of its compliance with the Charter by the current audit agency contracted by the USCCB, or any of its successor audit agencies. These audits include, at the request of the Archdiocese, on site reviews of compliance by parishes and schools.

- The Archdiocese is committed to additional policies, procedures and initiatives that continue to advance the spirit of the Charter. The Diocesan Review Board (or its successor group) will continue to review all allegations of sexual abuse of a minor by a member of the clergy and make recommendations to the Archbishop about the substantiation of the report and the fitness for ministry of the accused. The Diocesan Review Board (or its successor group) will also fulfill its responsibility to review all policies, procedures and protocols related to both sex abuse prevention and response. The Archbishop will annually renew his commitment to the Diocesan Review Board (or its successor group) affirming his resolve to follow their recommendations. *See* **Exhibit E**.

- The Archbishop will also maintain his Community Advisory Board (or its successor group) to provide advice and counsel on the Archdiocese's response to clergy sexual abuse of minors, including its safe environment programming; its response and outreach to abuse survivors; and its policies, procedures and protocols related to clergy sexual abuse. The chair(s) of the Community Advisory

---

[12] See Section VIII.A.2(b) infra for a discussion of the cost of litigation necessary to adjudicate each Abuse Survivor Claim to the point that is necessary for insurance coverage, i.e., a determination for each claim that the Archdiocese is liable to the claimant and that an insurer provided coverage for such liability.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 65 of 125

Board (or its successor group) will be encouraged to identify at least one additional abuse survivor to serve as a board member.

- The Archdiocese will review its mandatory reporting training protocols with the Community Advisory Board (or its successor group) on an annual basis.

- The Archdiocese will continue to develop, publish and implement its child abuse prevention/safe environment curriculum for all Catholic Schools and religious education programs in the Archdiocese. The curriculum will be designed to educate children, young people, parents, teachers and other volunteers about child sexual abuse. The curriculum will be age-appropriate and include instruction on ways to prevent, identify and report child sexual abuse. The safe environment program will be reviewed with the Community Advisory Board (or its successor group) every three (3) years.

- Policies, procedures and protocols on clergy sexual abuse of minors will be disseminated through the archdiocesan website (which currently has the information in place) and through materials distributed to Parishes and Schools by the archdiocesan office for Sexual Abuse Prevention and Response Services and the Safe Environment office (or their successor offices).

- The Archdiocese will continue to distribute information on how sexual abuse of a minor can be reported. This will include encouragement to report suspected abuse to law enforcement authorities. In addition, the Archdiocese will provide contact information for making reports to non-Church run agencies with the ability to accept such reports, in each of the 10 counties of the Archdiocese.

- The Code of Ethical Standards will continue to be given to all clergy, including the Archbishop and Auxiliary Bishop(s) and all church personnel and will continue to be available on the Archdiocesan web site. All church personnel and all volunteers who have regular contact with minors are required to document that they have read, understand, and agree to abide by the Code of Ethical Standards. The Code of Ethical Standards will be reviewed by the Diocesan Review Board (or its successor group) on an annual basis to determine the need for revision. Education programs on the Code of Ethical Standards will be included in Parish, School, and seminary workshops. The Code of Ethical Standards includes the sexual abuse policies of the Archdiocese and the mandatory reporting requirements.

- For a period of at least five (5) years, the Archdiocese will continue providing information about reporting sexual abuse to parishes and schools, with a particular emphasis on this topic during Safe Environment Week and Sexual Abuse Prevention Month.

- The seminary formation program for seminarians at Saint Francis de Sales Seminary will continue to address topics of sexual abuse of minors, prevention and detection of sexual abuse, and reporting of suspected sexual abuse.

Seminarians will continue to be required to read the Code of Ethical Standards and sign the acknowledgement form that they have done so.

- An organization policy will be implemented requiring the Archbishop, all ecclesiastical officers, department heads and office directors, and any official diocesan spokesperson to refer to clergy abuse survivors as "abuse survivors," "survivors of clergy sexual abuse," or other term recommended by abuse survivor advocates. The policy will prohibit any reference, either verbally or in print, to substantiated abuse survivors as "alleged," for example, "alleged abuse survivors," or "alleged victims."

- The Archdiocese will continue to designate a "Victim Assistance Coordinator" who will coordinate outreach and support to abuse survivors.

- The Archbishop will send a personal letter of apology to any abuse survivor (or immediate family member) of clergy sexual abuse of a minor by a diocesan priest who requests such a letter.

- The Archbishop will meet personally with any abuse survivor (or immediate family member) of clergy sexual abuse of a minor by a diocesan priest who requests such a meeting.

- Within thirty (30) days of the effective date of the Plan, the Archbishop will issue a written statement of gratitude to survivors of clergy sexual abuse of minors who have had the courage to come forward and tell their story. This statement will be posted on the archdiocesan website for as long as the list of abusive priests is maintained.

- The Archdiocese will not enter into any settlement agreement with an Abuse Survivor which contains a confidentiality clause, unless specifically requested by the Abuse Survivor with the individual's request noted in the text of the agreement.

- The Archdiocese will publish the names of diocesan priests of the Archdiocese who have been (or would be if they were still alive) restricted from all priestly ministries, may not celebrate the sacraments publicly, or present themselves as priests in any way. These names will be published on the archdiocesan website (or its successor) for as long as it is technologically practical. If cases are substantiated regarding a member of the clergy not previously listed, the name(s) will be added to the list.

## VII.    GENERAL STRUCTURE OF THE PLAN

### A.    Classification of Claims

The categories of Claims listed below classify Claims (except Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation, and distribution pursuant

to the Plan. As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Priority Claims are not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims are treated separately as unclassified Claims on the terms set forth in Article II of the Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Park Bank Secured Claim | Impaired | Yes |
| 2 | Priority Claims | Unimpaired | No |
| 3 | Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims | Impaired | Yes |
| 4 | Archdiocese of Milwaukee Priests' Pension Plan Claims | Impaired | Yes |
| 5 | Archdiocesan Cemeteries of Milwaukee Union Employees' Union Pension Plan Claims | Impaired | Yes |
| 6 | Archdiocese of Milwaukee Lay Employees' Pension Plan Claims | Impaired | Yes |
| 7 | Perpetual Care Claims | Impaired | No |
| 8 | Pre-Petition Settlement Claims | Impaired | No |
| 9 | Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses | Impaired | Yes |
| 10 | Archdiocesan Abuse Survivor Claims With No Factual Basis for Fraud | Impaired | No |
| 11 | Religious Order Abuse Survivor Claims | Impaired | No |
| 12 | Lay Person Abuse Survivor Claims | Impaired | No |
| 13 | Other Non-Debtor Entity Abuse Survivor Claims | Impaired | No |
| 14 | Unknown Abuse Survivor Representative Claim | Impaired | Yes |
| 15 | Disallowed or Previously Dismissed Abuse Survivor Claims | Impaired | No |
| 16 | General Unsecured Creditor Claims | Impaired | Yes |
| 17 | Charitable Gift Annuity Claims | Unimpaired | No |

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 68 of 125

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 18 | Penalty Claims | Impaired | No |

Consistent with section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular Class only to the extent the Claim is within the description of the Class, and a Claim is classified in a different Class to the extent it is within the description of that different Class.

### B.    Definition of Claims and Treatment of Claims

The treatment of Claims in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding an Allowed Claim may have in or against the Archdiocese or its property.  This treatment supersedes and replaces any agreements or rights those Persons have in or against the Archdiocese or its property.  All distributions under the Plan will be tendered to the Person holding the Allowed Claim in accordance with the terms of the Plan.

**EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

1.    Park Bank Secured Claim (Class 1)

The Park Bank Secured Claim means the secured claim of Park Bank in the approximate amount of $4,389,512.50 arising out of that certain loan dated October 12, 2006.

Park Bank shall retain its Lien on the Park Bank Collateral to secure the obligations due to Park Bank on its Allowed Secured Claim pursuant to the Plan.  The Reorganized Debtor and Park Bank will amend the Park Bank Loan Documents to allow liens of subordinate priority that are subordinated to Park Bank's lien and interests pursuant to an intercreditor agreement in form and substance acceptable to Park Bank, in its sole discretion.  The amended loan documents between the Reorganized Debtor and Park Bank shall provide for payment of accrued interest plus principal necessary to amortize the principal over ten (10) years.  The amended loan documents shall have a three (3) year term with a balloon payment of accrued interest and principal due at the expiration of the three (3) year term.  The amended loan documents shall bear interest at 5.25 percent per annum and shall not be subject to any prepayment premium. Payments of $59,093 shall be required monthly.

2.    Priority Claims (Class 2)

Priority Claims mean Allowed Claims described in, and entitled to priority under section 507(a) and section 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

Unless the holder of an Allowed Class 2 Claim and the Archdiocese agree to a different treatment, on the later of the Effective Date (or as soon thereafter as is practicable) and the date a

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 69 of 125

Class 2 Claim becomes an Allowed Claim (or as soon thereafter as is practicable), the Debtor shall pay each such Allowed Class 2 Claim in full, in Cash, without interest.

### 3. Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims (Class 3)

A Class 3 Claim means any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocese of Milwaukee Priests' Retiree Medical Plan.

The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Retiree Medical Plan. The Archdiocese will not make any payment with respect to any Claim filed in the Chapter 11 Case with respect to Class 3 Claims. The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Priests' Retiree Medical Plan as they become due.

### 4. Archdiocese of Milwaukee Priests' Pension Plan Claims (Class 4)

A Class 4 Claim means any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocese of Milwaukee Priests' Pension Plan.

The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's employed priests under the Archdiocese of Milwaukee Priests' Pension Plan. The Archdiocese will not make any payment with respect to any Claim filed in the Chapter 11 Case with respect to Class 4 Claims. The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Priests' Pension Plan as they become due.

### 5. Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan Claims (Class 5)

A Class 5 Claim means any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan.

The Archdiocese will assume its participation in the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan. The Archdiocese will not make any payment with respect to any claim filed in the Chapter 11 Case with respect to Class 5 Claims. The Archdiocese will continue to meet its obligations under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan as they become due. The Archdiocese will assume the Collective Bargaining Agreement, as modified on May 11, 2011, with the Cemetery Employees, Local 113, Laborers International Union of America, AFL-C10.

### 6. Archdiocese of Milwaukee Lay Employees' Pension Plan Claims (Class 6)

A Class 6 Claim means any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocese of Milwaukee Lay Employees' Pension Plan.

The Archdiocese will assume its participation in the Archdiocese of Milwaukee Lay Employees' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's lay employees accrued under the Archdiocese of Milwaukee Lay Employee's Pension Plan through the Effective Date. The Archdiocese will not make any payment with respect to any Claim filed in the Chapter 11 Case with respect to Class 6 Claims. The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Lay Employees' Pension Plan as they become due.

7.      Perpetual Care Claims (Class 7)

A Class 7 Claim means any Claim arising from the Debtor's obligations to provide ongoing maintenance and care at the Milwaukee Catholic Cemeteries.

The Reorganized Debtor will have no legal obligation to provide perpetual care arising out of the purchase of plots, crypts, or mausoleums prior to the Petition Date. The Reorganized Debtor, at its discretion, may, in keeping with its canonical obligations, provide care to the Milwaukee Catholic Cemeteries. The Reorganized Debtor will honor its contractual obligations to future purchasers of cemetery plots, crypts, or mausoleums.

8.      Pre-Petition Settlement Claims (Class 8)

Class 8 Claims (Pre-Petition Settlement Claims) means any Claim that the Archdiocese objected to on the following grounds: (i) the holder of the Claim and the Archdiocese are parties to a valid settlement agreement releasing the Archdiocese of liability associated with the Abuse and (ii) the Claims are time-barred by the applicable statute of limitations. The Class 8 Claims are listed on **Exhibit F**.

The contractual rights of each holder of a Class 8 Claim under his or her Abuse Survivor Settlement Agreement will be reinstated in full on the Effective Date; any further claims made by Class 8 Claimants in the Chapter 11 Case will receive no payment on account of such additional claims.

9.      Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses (Class 9)

Class 9 Claims (Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses) means any Claim that the Archdiocese objected to on the following grounds: (i) a determination of whether fraud has been committed cannot be made absent a full trial of the Claim and (ii) the Claim is time-barred by the applicable statute of limitations. The Class 9 Claims are listed on **Exhibit G**.

In addition to the right to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process, each holder of a Class 9 Claim (Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses) shall receive, in full satisfaction, settlement, and release of his or her Claim, a claim against the Insurance Litigation Trust for a Pro Rata distribution on such claim from the Insurance Litigation Trust in accordance with the terms agreed to by holders of Class 9 Claims (Archdiocesan Abuse Survivor Claims

Subject to Statute of Limitations Defenses) and Allowed Unknown Abuse Survivor Claims and the Insurance Litigation Trustee.

> 10. Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud (Class 10)

Class 10 Claims (Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud) means any Claim that the Archdiocese objected to on the following grounds: (i) under the theory of fraud advanced by State Court Counsel, the Claim does not allege any facts that the Archdiocese knew that the Abuser had previously abused and consequently the Archdiocese could not have engaged in fraud and (ii) the Claim is time-barred by the applicable statute of limitations. The Class 10 Claims are listed on **Exhibit H**.

Other than Therapy Assistance, holders of Class 10 Claims (Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud) shall not receive or retain any property under the Plan on account of such Claims.

Each holder of a Class 10 Claim (Archdiocesan Abuse Survivor Claims with No Factual Basis for Fraud) shall be entitled to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process.

> 11. Religious Order Abuse Survivor Claims (Class 11)

A Class 11 Claim means any Claim that alleges Abuse solely by a member of a Religious Order and that the Debtor objected to on the following grounds: (i) the Claim is against a non-debtor entity; (ii) under the theory of fraud advanced by State Court Counsel, the Claim does not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the Claim holder; and (iii) the Claim is time-barred by the applicable statute of limitations. The Class 11 Claims are listed on **Exhibit I**.

Holders of Class 11 Claims (Religious Order Abuse Survivor Claims) shall not receive or retain any property under the Plan on account of such Claims.

The Archdiocese will assist holders of Class 11 Claims (Religious Order Abuse Survivor Claims) with obtaining therapy payment assistance by facilitating communication and requests for therapy payment assistance between the holders of Class 11 Claims (Religious Order Abuse Survivor Claims) and the appropriate Religious Order.

> 12. Lay Person Abuse Survivor Claims (Class 12)

Class 12 Claims (Lay Person Abuse Survivor Claims) means any Claim that alleges Abuse solely by a Lay Person and that the Debtor objected to on the following grounds: (i) the Claim is against a non-debtor entity (ii) under the theory of fraud advanced by State Court Counsel, the Claim does not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the Claim holder; and (i) the Claim is barred by the applicable statute of limitations. The Class 12 Claims are listed on **Exhibit J**.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 72 of 125

Other than Therapy Assistance, holders of Class 12 Claims (Lay Person Abuse Survivor Claims) shall not receive or retain any property under the Plan on account of such Claims.

Each holder of a Class 12 Claim (Lay Person Abuse Survivor Claims) shall be entitled to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process.

13.    Other Non-Debtor Entity Abuse Survivor Claims (Class 13)

Class 13 Claims (Other Non-Debtor Entity Abuse Survivor Claims) means any Claim that alleges Abuse by a person other than an Archdiocesan Priest, a member of a Religious Order, or a Lay Person and that the Archdiocese objected to on the following grounds: (i) the Claim is against a non-debtor entity; (ii) under the theory of fraud advanced by State Court Counsel, the Claim does not allege any of the facts required to prove that the Archdiocese engaged in fraudulent conduct with respect to the Claim holder; and (iii) the Claim is time-barred by the applicable statute of limitations. The Class 13 Claims are listed on **Exhibit K**.

Holders of Class 13 Claims (Other Non-Debtor Entity Abuse Survivor Claims) shall not receive or retain any property under the Plan on account of such Claims.

The Archdiocese will assist holders of Class 13 Claims (Other Non-Debtor Entity Abuse Survivor Claims) with obtaining therapy payment assistance by facilitating communication and requests for therapy payment assistance between the holders of Class 13 Claims (Other Non-Debtor Entity Abuse Survivor Claims) and the appropriate entity.

14.    Unknown Abuse Survivor Representative Claim (Class 14)

The Class 14 Claim (Unknown Abuse Survivor Representative Claim) means the claim of the Unknown Abuse Survivor Representative on behalf of the Unknown Abuse Survivor Claimants.  Unknown Abuse Survivor Claims mean any Claim that is neither timely filed nor deemed to be timely filed and that is held by:

　　i.　Individuals who are under the age of 18 as of the Petition Date; or

　　ii.　Individuals who were mentally ill when their cause of action accrued and whose statute of limitations period, if not for their mental illness, would have expired within five years of the Petition Date; or

　　iii.　Individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired; or

　　iv.　Individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired because the claimant did not discover both the injury and the causal relationship between the injury and the sexual abuse prior to the Abuse Survivors Bar Date; or

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 73 of 125

> v. Any other individual or class of individuals the Unknown Abuse Survivor Representative can identify that would have a claim that an individual later asserts is not barred by the Abuse Survivors Bar Date.

A holder of an Unknown Abuse Survivor Claim may elect to proceed with allowance under the Unknown Abuse Survivor Settlement Process or the Unknown Abuse Survivor Litigation Process by (i) filing with the Special Arbitrator an Unknown Abuse Survivor Proof of Claim on or before the sixth (6th) anniversary of the Effective Date, or (ii) filing a complaint in the District Court naming the Insurance Litigation Trustee as defendant on or before the sixth (6th) anniversary of the Effective Date, which filing of such complaint constitutes an election by an Unknown Abuse Survivor Claimant of the Unknown Abuse Survivor Litigation Process. An Unknown Abuse Survivor Claim Allowed under this Section is referred to as an Allowed Unknown Abuse Survivor Claim.

If a holder of an Unknown Abuse Survivor Claim elects to proceed with allowance under the Unknown Abuse Survivor Settlement Process, the Claim shall be Allowed if the Special Arbitrator determines, after appropriate investigation, that the holder of such claim has proven by a preponderance of the evidence that:

(a) Such holder's Claim meets the definition of an Unknown Abuse Survivor Claim above; and

(b) Such holder was minor at the time of the Abuse; and

(c) The claim alleges sexual abuse of a minor; and

(d) Such Abuse was perpetrated by an Archdiocesan Priest.

If a holder of an Unknown Abuse Survivor Claim elects to proceed with allowance under the Unknown Abuse Survivor Litigation Process, such Claim will be determined either by a trial of such Claim conducted by the District Court, or a settlement between the holder of the Claim and the Insurance Litigation Trustee. Such Claim is subject to any and all defenses available under applicable law.

All Unknown Abuse Survivor Claims filed after the sixth (6th) anniversary of the Effective Date will have no right to payment or any other right under the Plan, and all such claims will be discharged under Article 12.2 of the Plan.

The Unknown Abuse Survivor Representative Claim shall be deemed satisfied when the Insurance Litigation Trust is funded.

Allowed Unknown Abuse Survivor Claims will be paid by the Insurance Litigation Trustee from the Unknown Abuse Survivor Reserve or from the Insurance Litigation Trust as described below:

(a) To the extent that the Insurance Litigation Trustee prosecutes the Insurance Litigation, and the Insurance Litigation is unresolved at the time that the Unknown Abuse Survivor Claim is Allowed, the holder of an Allowed Unknown

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 74 of 125

Abuse Survivor Claim shall receive a claim against the Insurance Litigation Trust for a Pro Rata distribution on account of such Claim from any Insurance Recoveries.

(b) To the extent that the Insurance Litigation Trustee elects not to proceed with the Insurance Litigation or the Insurance Litigation is resolved at the time the Unknown Abuse Survivor Claim is Allowed, the holder of an Allowed Unknown Abuse Survivor Claim shall receive, on the seventh (7th) anniversary of the Effective Date, the lesser of: (i) a claim against the Insurance Litigation Trust for a Pro Rata distribution of the Unknown Abuse Survivor Reserve; or (ii) a claim against the Insurance Litigation Trust for a the amount distributed to any individual holder of a Class 9 Claim. The Insurance Litigation Trustee may, in his or her sole discretion, make a distribution to a holder of an Allowed Unknown Abuse Survivor Claim at an earlier date.

(c) Each holder of an Allowed Unknown Abuse Survivor Claim shall be entitled to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process. The Archdiocese may, in in keeping with its charitable purposes, provide Therapy Assistance to holders of Disallowed Unknown Abuse Survivor Claims.

Other than for Therapy Assistance requested in accordance with the Therapy Payment Process, holders of Allowed Unknown Abuse Survivor Claims shall have no claim for compensation or otherwise against the Reorganized Debtor.

15. Disallowed or Previously Dismissed Abuse Survivor Claims (Class 15)

Class 15 Claims (Disallowed or Previously Dismissed Abuse Survivor Claims) mean any Claim that (i) has been Disallowed by the Bankruptcy Court; (ii) dismissed with prejudice by another Court of competent jurisdiction; (iii) does not allege sexual abuse of a minor; (iv) would be disallowed by the law of the case if the litigation on the Claim were to continue, *see Order Disallowing Proof of Claim No. 173 Filed by A-75 and Proof of Claim No. 482 Filed by A-367* [Dkt. No. 1232]; or (v) was not timely filed because the Claim was not filed until after the Abuse Survivors Bar Date established in the Bar Date Order. The Class 15 Claims are listed on **Exhibit L**.

Holders of Class 15 Claims (Disallowed or Previously Dismissed Abuse Survivor Claims) shall not receive or retain any property under the Plan on account of such claims.

16. General Unsecured Creditor Claims (Class 16)

Class 16 Claims (General Unsecured Creditor Claims) means any Unsecured Claim that is not listed as disputed, contingent or unliquidated on the Debtor's Schedules or was filed by General Unsecured Creditors (as opposed to Abuse Survivors), and, to which, the Debtor has no legal basis for objection. The Class 16 Claims are listed on **Exhibit M**.

If the holders of Class 16 Claims vote in number and amount sufficient to cause Class 16 to accept the Plan, each holder of a Class 16 Claim shall receive the lesser of (i) the amount of

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 75 of 125

their Allowed Claim or (ii) $5,000 on the Claims Payment Date in full satisfaction, settlement, and release of the Claim.  If the holders of Class 16 Claims do not vote in number and amount sufficient to cause Class 16 to accept the Plan, each holder of a Class 16 Claim shall not receive or retain any property under the plan on account of such Claims.

17.    Charitable Gift Annuity Claims (Class 17)

Class 17 Claims (Charitable Gift Annuity Claims) mean any Claim arising under charitable gift annuity agreements with the Debtor.

The legal, equitable, and contractual rights of each holder of a Class 17 Claim will be reinstated in full on the Effective Date.

18.    Penalty Claims (Class 18)

Class 18 Claims (Penalty Claims) means any Claim against the Debtor, whether secured or unsecured, for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim.

Holders of Class 18 Claims (Penalty Claims) shall not receive or retain any property under the Plan on account of such claims.

**C.    Proposed Settlements Embodied in Plan**

A court considering whether to approve a settlement between the estate and a third party must find that the proposed settlement is in the best interests of creditors.  Courts look at the litigation's probability of success, complexity, cost to prosecute, delay and inconvenience. *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir. 1987).  The court must also find that the value of the settlement is reasonably equivalent to the value of the claims surrendered.  This test is met if the settlement falls within the range of reasonably possible litigation outcomes.  *In re Doctors Hospital of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).

1.    Insurance Litigation – Settlement with the LMI

(a)    Overview of the LMI Settlement

A large portion of this Disclosure Statement is devoted to a description of the LMI Settlement Agreement because it is a critical component of the Plan.  Without it, there would be no recovery for the Abuse Survivors and it is not likely that the Debtor could pay its administrative expense claims.

In other diocesan bankruptcy proceedings, insurance played a significant factor in payments to Abuse Survivors and was the principal component in funding for Abuse Survivor payments.  This Chapter 11 Case is different since all Archdiocesan insurers denied any responsibility to pay Abuse Survivor Claims based on earlier legal decisions and the nature of the Claims.  Prior to the Chapter 11 Case, OneBeacon, the insurer that is "primary" on many of

the policies obtained rulings from Wisconsin Circuit Courts and the Wisconsin Court of Appeals indicating that there was no coverage under OneBeacon's policies for Abuse Survivor Claims. In essence, these Courts determined that the statute of limitations had run on negligence claims so the only remaining claims were based on fraud, and as a matter of public policy and the language in the insurance contracts, no coverage was available for claims based on fraud.

For certain years, the London Market Insurers (sometimes referred to as the "LMI," "Lloyds," or "Lloyds of London") provided coverage above the Archdiocese's self-insured retention. They had the same defenses as OneBeacon and in addition had the defense that their policies were "indemnity" policies meaning that they only needed to repay the Archdiocese after the Archdiocese was found liable under state law and paid the Abuse Survivor Claims. In other words, the amount of liability had to be determined and paid before any payment was due from the insurers such as the LMI. In the meantime, the Debtor would have to shoulder all of its own litigation expenses. The LMI also had many other defenses to coverage; after demands by the Debtor for coverage, LMI provided the Debtor with a letter describing all of the defenses that spanned 21 pages.

The language in the LMI policies and another insurer (for different years) -- Stonewall -- had a somewhat unusual definition of "accident or occurrence." Special insurance counsel for the Committee suggested an unproven theory about how the definition in the LMI and Stonewall Insurance policies could be used to require coverage from these two insurance companies.

After early negotiations failed, the Debtor sued the LMI and Stonewall for a determination that there was coverage. Because of the extreme complexity of the issues and importance of the litigation to the insurance companies in other matters across the country, resolution of these cases, especially with the LMI, could easily take five to ten years and tens of millions of dollars. The likelihood of winning is highly uncertain since this theory has never been completely tested and was only raised in one other reported case. Moreover, the Debtor does not have the funds to continue the litigation to a conclusion.

After extensive negotiations and mediation, the LMI agreed to "buy-back" its insurance policies from all the entities covered by the policies for $8 million rather than continue the litigation. The motivation for the LMI is to achieve finality and to never have to address this issue again. Stonewall, which provided insurance for a more limited number of years, has not made a settlement offer. It is important to note that the LMI buy-back is conditioned on a buy-back of the LMI policies that covered over 200 Catholic entities and all must sign off. All of the money received will be used to pay Abuse Survivor Claims and administrative expenses. For permanently giving up their policy rights and coverage the other insureds will only receive a release from further Abuse Survivor Claims even though there has never been a successful Claim made against any of them. The litigation against Stonewall will continue in the Insurance Litigation Trust. If successful or settled, the money will be used to make additional payments to Abuse Survivor Claims.

A more technical and detailed description of the claims and the LMI Settlement follows:

(b)     The Insurance Coverage Adversary Proceeding

The London Market Insurers (the "LMI") subscribed severally, not jointly, the London Policies.[13] On November 13, 2012, the Debtor, Donald Marshall and Dean Weissmuller (the "Additional Plaintiffs," and collectively with the Debtor, the "Insurance Coverage Plaintiffs"), filed a Complaint for Declaratory Relief in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Insurance Coverage Complaint") against several LMI and Stonewall Insurance Company initiating the Insurance Coverage Adversary Proceeding, seeking insurance coverage for the abuse claims filed in the Chapter 11 Case under the Litigated Policies. The Insurance Coverage Complaint made the following allegations against the Litigated Policies: that they cover all claims whether or not they are "accidents"; that the "expected and intended" language in the policies is inapplicable; that the insurers are obligated to pay "all sums" without regard to whether the damage of the underlying claimant occurred in other time periods; and, that there is coverage under the policies for claims proven at trial against the Archdiocese by Weissmuller[14] premised on negligent conduct and premised upon reckless conduct.

On January 15, 2013, the LMI filed their Answer, Affirmative Defenses, and Counterclaim in the Insurance Coverage Adversary Proceeding. The LMI denied the Insurance Coverage Plaintiffs' allegations and sought a ruling that there is no coverage under the Litigated Policies for Weissmuller's claim or the approximately 576 tort claims filed in the Chapter 11 Case, because the tort claims do not present legal liability to the Debtor and there is no potential for coverage under the Litigated Policies and established Wisconsin law for tort claims that allege fraud or volitional conduct against the Debtor.

On April 8, 2013, the Insurance Coverage Plaintiffs filed a Motion for Judgment on the Pleadings (the "Insurance Coverage Pleadings Motion") against the LMI alleging that the Litigated Policies failed to identify and describe information required by the Wisconsin surplus lines insurance statutes and that the LMI failed to deposit security for any probable judgment. Plaintiffs sought to strike the pleadings filed by the LMI and void all defenses available to the LMI. On May 20, 2013, the LMI opposed the Insurance Coverage Pleadings Motion.

On May 20, 2013, LMI filed a Motion for Partial Summary Judgment in the Insurance Coverage Adversary Proceeding (the "LMI Summary Judgment Motion"), which asserted there was no insurance coverage for the Insurance Coverage Plaintiffs or for any of the tort claims asserted in the Chapter 11 Case, because the Litigated Policies only indemnify the Debtor for sums it is obligated to pay for reason of liability imposed upon it by law, and the claims do not present legal liability to the Debtor for the following reasons: (1) many of the 576 claims did not allege abuse at any time during the periods covered by the Litigated Policies; (2) any claims based on negligence and negligent misrepresentation are barred by Wisconsin's three-year statute of limitations and any claims purportedly alleging fraud are barred by Wisconsin's six-year statute of limitations; (3) the

---

[13] The subscribers to the London Policies include insolvent London Market Companies (hereafter the "Insolvent London Market Insurers"). There are also Co-Subscribers that may have provided co-insurance on some policy layers with the LMI. The Insolvent London Market Insurers and the Co-Subscribers were not represented in the Insurance Coverage Adversary Proceeding. The Insolvent London Market Insurers and the Co-Subscribers are not part of, or subject to, the Settlement Agreement. LMI will not "gross-up" for any Settlement Agreement amount that is the responsibility of Insolvent London Market Insurers.

[14] Only Weissmuller, not Marshall, sought coverage under the Litigated Policies.

First Amendment prevents the court from inquiring into assertions of negligence against the Debtor; (4) the claims that purport to allege fraud fail to comply with Wisconsin and federal law requirements to plead fraud with specificity and particularity; (5) many of the tort claimants previously litigated and/or settled their claims; and (6) the Debtor is not legally liable for alleged abuse perpetrated by non-Diocesan priests, personnel, or entities. Separate and apart from the legal liability arguments, the LMI also argued there is no potential for coverage under the Litigated Policies and established Wisconsin law for claims that allege or may allege fraud or volitional conduct against the Debtor, because (1) any such claims do not constitute an "Occurrence" under the Litigated Policies since injuries from fraud or volitional conduct can never be "unexpected" and "unintended"; (2) fraud or volitional conduct does not constitute a fortuitous loss and violates the known loss doctrine; (3) Marshall's claim and hundreds of other tort claims in the Chapter 11 Case did not allege "personal injury" during the policy periods of the Litigated Policies; (4) fraud and volitional conduct does not give rise to damages on account of "personal injuries" as defined in the Litigated Policies; (5) Wisconsin law and public policy prohibit insurance coverage for fraud and volitional conduct; and (6) the Debtor is precluded from seeking coverage for claims alleging fraud and other volitional conduct that were previously tendered to London Market Insurers, coverage was litigated, and the Debtor lost and abandoned coverage for fraud claims.

The Debtor and the Additional Plaintiffs filed oppositions to the LMI Summary Judgment Motion. The LMI filed replies in further support of the LMI Summary Judgment Motion. The Insurance Coverage Pleadings Motion and the LMI Summary Judgment Motion were fully briefed and pending in the District Court at the time that the Debtor and the LMI entered into the LMI Settlement Agreement. The proceedings on the Insurance Coverage Pleadings Motion and the LMI Summary Judgment Motion are currently stayed.

(c)      The Settlement Terms

Under the LMI Settlement Agreement, the LMI agree to accept the gross settlement amount of eight million Dollars ($8,000,000) against the "Subject Insurance Policies." [15] Because LMI subscribed the "Subject Insurance Policies" severally, not jointly, and the Insolvent London Market Insurers are not participating in the LMI Settlement Agreement, the net amount to be paid by the LMI will be Seven Million, Four Hundred and Thirty Thousand, Seven Hundred and Ninety-seven Dollars and Sixty-six Cents ($7,430,797.66) (the "LMI Settlement Amount").

One-half of the LMI Settlement Amount will be paid as the "Buy-Back Payment"[16] in exchange for a buy-back of the "Subject Insurance Policies", free and clear of the "Interests" of all Persons in the "Subject Insurance Policies," and a release of the LMI by the Debtor and all of the other entities covered by the Subject Insurance Policies (called the "Related Entities") of all "Claims." The LMI are similarly releasing the Debtor and the "Related Entities" from all "Claims."

---

[15] For purposes of this paragraph, the term "Subject Insurance Policies" has the meaning ascribed to it in the LMI Settlement Agreement.

[16] For purposes of this paragraph, the following terms have the meanings ascribed to them in the LMI Settlement Agreement: "Buy-Back Payment," "Subject Insurance Policies," "Interests," "Related Entities," "Claims," "Medicare Claims," "Approval Order," and "Confirmation Order."

The LMI's obligation to make the "Buy-Back Payment" is subject to the Bankruptcy Court issuing an Order, pursuant to sections 363(f) and 105(a) of the Bankruptcy Code, barring, estopping, and permanently enjoining all Persons from asserting any (a) "Claims" against the "Subject Insurance Policies"; (b) "Claims" against the LMI with regard to, by reason of, based on, arising out of, relating to, or in any way connected with, the "Subject Insurance Policies"; and (c) "Medicare Claims." The "Buy-Back Payment" will be paid to the Insurance Litigation Trust when both the "Approval Order" and the "Confirmation Order" have become final and non-appealable for all purposes.

The other half of the LMI Settlement Amount will be paid as the "Plan Payment,"[17] in exchange for the entry of an Order by the Bankruptcy Court imposing a non-consensual release, remise, and discharge of all "Claims" relating to the "Subject Insurance Policies," including all "Abuse Claims," "Contribution Claims," "Direct Action Claims," "Extra-Contractual Claims," "Medicare Claims" and "Trust Claims" by all Persons who now hold or in the future may hold such "Claims" against the Settling Insurers, pursuant to section 105 of the Bankruptcy Code. The "Plan Payment" will be paid to the Debtor's bankruptcy estate when both the "Approval Order" and the "Confirmation Order" have become final and non-appealable for all purposes, and may be used to defray the administrative expenses of this Chapter 11 Case, as approved by the Bankruptcy Court. In addition, the "Related Entities" will receive the release, remise, and discharge of all "Abuse Claims" and "Trust Claims" by all Persons who now hold or in the future may hold such "Claims", pursuant to section 105 of the Bankruptcy Code.

Certain of the LMI that provided coverage are unable, or likely to be unable to pay claims. This sub-set of the LMI is listed on **Exhibit P** and referred to herein as the "Insolvent London Market Insurers". The Archdiocese and the LMI believe that the Archdiocese would receive an additional estimated $640,000 by filing a claim with the United Kingdom's Financial Services Compensation Scheme. *See generally* http://www.fscs.org.uk/. Fifty percent (50%) of any recovery received by the Archdiocese from filing a claim with the United Kingdom's Financial Services Compensation Scheme will be allocated to the Insurance Litigation to be distributed among the holders of Class 9 Claims and Unknown Abuse Survivor Claims in amounts as determined by the Insurance Litigation Trustee after consultation with the holders of Class 9 Claims, Allowed Unknown Abuse Survivor Claims, and the Unknown Abuse Survivor Representative. The remaining fifty percent (50%) may be used by the Archdiocese for any purpose, including, without limitation, the payment of administrative expenses.

The parties to the LMI Settlement Agreement will also include all the Related Entities (as that term is defined in the LMI Settlement Agreement). Under the policy buy-back, the Archdiocese and the Related Entities will sell back their respective interests in the policies and give the LMI and the Related Entities releases. In exchange, the LMI and the Related Entities will be given an injunction under the Plan (as discussed more fully below). The policies will be sold to the LMI under 11 U.S.C. § 363, free and clear of all interests. As part of the Plan

---

[17] For purposes of this paragraph, the following terms have the meanings ascribed to them in the LMI Settlement Agreement: "Plan Payment," "Claims," "Subject Insurance Policies," "Abuse Claims," "Contribution Claims," "Direct Action Claims," "Extra-Contractual Claims," "Medicare Claims," "Trust Claims," "Approval Order," "Confirmation Order," and "Related Entities."

confirmation hearing, and after broad notice to all known claimants, their lawyers, the Committee, the Unknown Abuse Survivor Representative, and any other entity that might be affected, a hearing under Federal Rule of Bankruptcy Procedure 9019 will be held. The Archdiocese will provide notice using newspapers with a national circulation.

The above description is subject to, and governed by, the LMI Settlement Agreement. Any conflict between the terms of the LMI Settlement Agreement and the above description, or between the LMI Settlement Agreement and the Plan, is governed by the LMI Settlement Agreement. For a complete recitation of the terms of the LMI Settlement Agreement, see the LMI Settlement Agreement attached hereto as **Exhibit O**.

(d)        Analysis of the Settlement with the London Market Insurers

The Archdiocese entered into the Settlement because it: (a) provides immediate financial benefit to the Estate and its creditors; (b) eliminates the uncertainty of litigation; (c) stops the spiraling costs of professional fees that are sharply reducing any potential economic benefit to creditors; and (d) provides an economic benefit to the estate from the LMI, which has asserted numerous coverage defenses that the LMI intends to vigorously litigate if an agreement is not reached.

The LMI Settlement Agreement meets the requirements under Seventh Circuit case law to approve a settlement. Should the LMI Settlement Agreement be approved, then the LMI will pay the LMI Settlement Amount. Three Million, Seven Hundred and Fifteen Thousand, Three Hundred and Ninety-eight Dollars and Eighty-three Cents ($3,715,398.83) will be allocated to the Insurance Litigation Trust to be used to pay Claimants. Three Million, Seven Hundred and Fifteen Thousand, Three Hundred and Ninety-eight Dollars and Eighty-three Cents ($3,715,398.83) may be used by the Archdiocese for any purpose, including the payment of administrative expenses. These funds would be unavailable to the Claimants and the Archdiocese should the LMI Settlement Agreement not be approved.

Given the competing priorities within the estate, the proposed compromise is fair, equitable, and is in the best interests of the Estate, because it is well within the reasonable range of litigation possibilities. Not only does the Archdiocese believe that this is the best settlement possible given the circumstances and facts related to this dispute, but furthermore, this dispute – and the potential to add an immediate, substantial sum of money into the estate – represents one of the final hurdles standing in the way of the Archdiocese being in a position to file a motion to close these bankruptcy proceedings.

Should the LMI Settlement Agreement not be approved, there is little chance of any net recovery from the LMI. The Insurance Coverage Adversary Proceeding is being vigorously litigated. While the Debtor filed the Insurance Coverage Pleadings Motion, the LMI opposed it and set forth strong defenses they believe will defeat the Insurance Coverage Pleadings Motion. Even if the Debtor were to prevail with the Insurance Coverage Pleadings Motion, there is no guarantee that the District Court would grant and award the remedy the Debtor seeks. The LMI also filed the LMI Summary Judgment Motion premised on long-standing Wisconsin precedent regarding the availability of insurance coverage for claims alleging misrepresentation or intentional or volitional

acts, and other arguments. Should the LMI prevail, the Debtor would not be able to collect any money from the LMI.

Even if the LMI were to not prevail in the LMI Summary Judgment Motion, complex factual questions would remain, including, but not limited to: (1) whether negligent misrepresentation or fraud or other intentional or volitional acts occurred; (2) what was the alleged fraud or misrepresentation and when did it happen; (3) when did the alleged injuries take place; (4) which Litigated Policies, if any, would be triggered by the tort claimants' allegations against the Debtor; (5) if it is determined that there is an "occurrence," how many occurrences took place; and (6) how any potentially covered losses would be allocated across policy periods and among the Debtor's other insurers. The remaining fact issues would result in expensive and protracted discovery.

Accordingly, should the LMI Settlement Agreement not be approved, the Insurance Coverage Adversary Proceeding could be decided in favor of the LMI and there would be no recovery and/or the litigation could continue for many years. Under either scenario, the Abuse Survivor Claimants may not obtain any recovery or not obtain any timely recovery in this Chapter 11 Case. The duration and complexity of the litigation indicates that it is likely to be very expensive for the Debtor even if it should prevail on both the Insurance Coverage Pleadings Motion and the LMI Summary Judgment Motion. However, it is unlikely that the Debtor would prevail on both motions. Thus, the settlement allows the LMI and the Debtor to end their dispute and save years of burdensome and costly litigation and discovery.

The settlement provides a benefit to the Estate because it provides the Estate with $7,430,797.66 to pay the Abuse Survivor Claimants and to defray the administrative expenses in the Chapter 11 Case. The Archdiocese was able to achieve this favorable result, in large part, because the LMI desired to extinguish the Subject Insurance Policies (as that term is defined in the LMI Settlement Agreement), including the rights of any Related Entities (as that term is defined in the LMI Settlement Agreement). At the LMI's insistence, the LMI Settlement Agreement requires any entity claiming rights as a Related Entity to release the LMI, with the parallel requirement that the Plan contain a narrowly tailored release of the Related Entities which are giving up their insurance rights against the LMI.

The Archdiocese believes that the LMI Settlement Agreement is the only way to get insurance money from the LMI, and that the insurance buyback is fair and fundamentally necessary to the reorganization. Moreover, by the Related Entities giving up their rights under the insurance policies so as to make LMI's contribution possible, and by the LMI contributing nearly $8,000,000 to the Archdiocese, the Related Entities and the LMI are contributing substantial assets to the Archdiocese's reorganization that are necessary and critical to the Archdiocese's reorganization. The LMI have made it clear that the LMI will not contribute to the Estate outside of the context of a complete policy buy-back. The Related Entities' participation is essential. The Related Entities will not release their rights under the policies unless they are also given a release. Given the Archdiocese's extremely limited funds, an injection of nearly $8,000,000 into the estate is an absolutely essential component to any meaningful compensation for the Archdiocese's creditors. If the Archdiocese did not provide these releases, there is little, if any, likelihood that the reorganization would be a success. Likewise, a substantial majority of the creditors agree or should agree to the releases and the proposed Plan. Finally, the Plan provides for the payment of

substantially all of the claims of the classes affected by the releases, with the money from these policies being used only to pay individuals who could have ultimately received money under these policies or for administrative expenses that would have otherwise been drawn from the estate.

The London Market Insurers may be referred to herein collectively as the "Settling Insurers" or individually as a "Settling Insurer." This settlement does not impact the claims the Archdiocese may have against any non-settling Insurer, which are listed on **Exhibit Q** (the "Non-Settling Insurers"). As further described in Section VII.G, the rights to pursue recoveries against the Non-Settling Insurers will be assigned to the Insurance Litigation Trust for the benefit of holders of Class 9 and Unknown Abuse Survivor Claims.

2.      Cemetery Trust Settlement

On June 28, 2011, the Archbishop, as Trustee of the Cemetery Trust, filed a declaratory judgment adversary proceeding seeking an order from the Bankruptcy Court declaring that the Cemetery Trust's funds are not part of the Archdiocese's Estate (the "Cemetery Trust Litigation"). The Committee disagreed and filed counterclaims demanding that the Cemetery Trust funds be transferred to the Archdiocese's Estate.

The Cemetery Trust Litigation involves a dispute over the creation of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust in April of 2007 (referred to herein as the "Cemetery Trust") and the application of federal statutory and constitutional law. The creation of the Cemetery Trust formalized and continued the practices used by the Archdiocese to fulfill its canonical duties and its promises to purchasers of grave sites that it would place funds in trust that will support perpetual care of the grave sites.

Since at least the early 1900s, the Archdiocese accepted money to be held in trust for the care of grave sites. For several decades, the Archdiocese told buyers of grave sites that it would put money aside for perpetual care. Buyers of grave sites were assured that funds had been set aside for that purpose. Consistent with that promise, the Archdiocese put a portion of the money from grave site sales into a separate account segregated from the Archdiocese's general funds. There was a regular and separate audit of the trust fund each year by an independent auditor, and the money was invested by a separate group of outside investment managers. Because the funds were held in trust, special attention was given to ensuring that the funds were separated from the Archdiocese's general funds and ensuring that these perpetual care funds would be there for their intended and pledged purpose -- the care for the resting places of the departed. Perpetual care has important meaning in the Catholic faith. It is to protect the sanctity of the body so that it can one day be reunited with the soul. Catholic cemeteries are sacred places maintained in a way that helps to fulfill God's promise about death and resurrection. In 2008, the Archdiocese transferred the funds, which at the time were still held in trust in the separate account, to a new formal trust.

The Committee alleges that the Cemetery Trust assets should be treated as property of the estate and distributed primarily to Abuse Survivors. The Committee's professionals have already spent over $1,593,000 in fees in the Cemetery Trust Litigation, and when combined with

the Debtor's costs to respond to the Committee, the estate has incurred fees of over $2,478,000 related to the Cemetery Trust Litigation.[18] Based on reports from Committee counsel, the Debtor expects that the Committee will request several hundreds of thousands of dollars in additional fees related to the current appeals, motions to disqualify the presiding judge in the Cemetery Trust Litigation, and motions to vacate the judge's decisions.

On July 30, 2013, the District Court held that the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb *et seq*.) ("RFRA") and the First Amendment to the United States Constitution "prevent[ed] the Committee from appropriating the funds in the [Cemetery] Trust because doing so would substantially burden the [Cemetery] Trustee's free exercise of religion." On August 1, 2013, the District Court issued a judgment implementing that holding, granted the Cemetery Trust's request for judgment, as a non-movant under Federal Rule of Civil Procedure 56(b)(1), denied the Committee's motion for partial summary judgment, and dismissed the Cemetery Trust Litigation (the "Cemetery Trust Judgment"). The Committee appealed the Cemetery Trust Judgment. Unless the Seventh Circuit Court of Appeals, or if further appealed, the United States Supreme Court, reverses the Cemetery Trust Judgment, no claim can be made by the Committee or the Estate to the funds in the Cemetery Trust.

The Plan proposes a settlement of the appeals in the Cemetery Trust Litigation by the Cemetery Trust (i) making a $2,000,000 million line of credit available to the Archdiocese and (ii) committing the Cemetery Trust to reimburse the Archdiocese at least $1,950,000 per year for costs incurred in maintaining the Milwaukee Catholic Cemeteries (as defined below). In exchange, the appeal of the District Court's decision will be dismissed and the Cemetery Trust will receive a global release of all claims against the Cemetery Trust (the "Cemetery Trust Settlement").

This Section of the Disclosure Statement explains the (i) background of the Milwaukee Catholic Cemeteries, the Cemetery Trust, the Cemetery Trust Litigation and the Cemetery Trust Settlement and (ii) the reasons the Cemetery Trust Settlement is in the best interests of the Estate. The Archdiocese entered into the Cemetery Trust Settlement because it (i) provides immediate financial benefit to the Estate and its Creditors; (ii) eliminates the uncertainty of litigation; (iii) stops the spiraling costs of professional fees that are sharply reducing any potential economic benefit to Creditors; and (iv) provides an economic benefit to the Estate from the Cemetery Trust, which does not have any obligations to the Archdiocese. If the Cemetery Trust Judgment is affirmed on appeal, the Cemetery Trust will not have any legal obligation to provide any economic benefit to the estate.

THE SETTLEMENT OF THE CEMETERY TRUST LITIGATION IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND IS THEREFORE PROVISIONAL UNTIL AND UNLESS APPROVED IN A CONFIRMED PLAN OF REORGANIZATION NO LONGER SUBJECT TO APPEAL.

---

[18] This estimate reflects fee applications filed as of February 7, 2014. Actual fees are likely significantly higher because the Committee's professionals have not filed fee applications for several months – PSZJ has not filed fee applications for the months of November – January 2014 and Marci Hamilton (special constitutional counsel to the Committee) has not filed fee applications for the months of June – January 2014.

The Cemetery Trust is not, and has never been, in chapter 11. The Cemetery Trust is a separate entity from the Archdiocese. The Cemetery Trust has its own counsel. The Trustee of the Cemetery Trust has his own separate and distinct duties under both canon law and state law.

(a)     Milwaukee Catholic Cemeteries

Since 1857, and in furtherance of its religious mission, the Archdiocese has operated and maintained certain Catholic cemeteries and mausoleums (the "Milwaukee Catholic Cemeteries"). The Milwaukee Catholic Cemeteries consist of the following Catholic burial facilities within the geographic boundaries of the Archdiocese: All Saints Cemetery & Mausoleum, Calvary Cemetery & Mausoleum, Holy Cross Cemetery & Mausoleum, Holy Trinity Cemetery, Mount Olivet Cemetery & Mausoleum, Resurrection Cemetery & Mausoleum, Saint Adalbert Cemetery & Mausoleum, and Saint Joseph Cemetery & Mausoleum. The Archdiocese also maintains three (3) small cemetery properties that are called St. Martin's Cemetery, Blessed Sacrament Cemetery, and St. Mary's Cemetery. The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres of land in which more than 500,000 individuals are interred. An estimated 3,000 burials take place each year.

The Archdiocese is responsible for hiring and supervising the people responsible for the day-to-day care and operations of the Milwaukee Catholic Cemeteries. Therefore, the Cemetery Trust and its predecessor have contributed funds to the Archdiocese to be used solely for the reimbursement of maintenance and upkeep expenses of the Milwaukee Catholic Cemeteries. The Archdiocese's cost of maintaining the Milwaukee Catholic Cemeteries is, and always has been, more than the amount received from the Cemetery Trust.

(b)     Cemetery Trust Factual Background

Similar to the process required by Wisconsin law for secular cemeteries, the Archdiocese put money into trust, in an account separate from the Archdiocese's general funds, to ensure the perpetual care of the Milwaukee Catholic Cemeteries and to hold money paid by friends, relatives and others for the continuing care of grave sites. For many years, the perpetual care fund was referred to as the "Income Care" fund because the concept was to use the income from invested funds to perpetually care for the grave sites until the body could be reunited with the soul in accord with Catholic religious beliefs.

By the mid-1960s, the Archdiocese had the Income Care fund (the "Original Trust Fund") audited annually by independent accounting firms. As with any matter that dates back over 100 years, the written records are not complete, but records going as far back as the 1920's confirm the concept of perpetual care and the separation of money held in trust.

In the early 1900s, the Archdiocese began allowing individuals to specifically endow lots by entering into contracts for care of specific cemetery lots with the Archdiocese. In 1929, Archbishop Messmer directed the development of policies to address the way funds were held in trust in the Handbook of Calvary, Holy Cross, Holy Trinity and Mt. Olivet Cemeteries (the "1929 Handbook"). The 1929 Handbook was designed to be a reference for the public. The 1929 Handbook specifically provided:

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 85 of 125

> Any owner of a lot or grave, or of an interest in any lot or grave in any of the cemeteries, or any other person so disposed, may place *in trust* with said "Archdiocese of Milwaukee," a fund to be invested, the annual net interest on which is to be used to keep in order a lot, graves, and memorials thereon . . . . TRUSTEESHIP. To meet such necessity, the said "Archdiocese of Milwaukee" received *in trust*, funds provided by lot holders or those interested in lots or graves, or by other persons, as endowments for perpetual care. Such sums as are deposited during lifetime of the depositor or bequeathed by last will and testament are set aside in a special fund called the Perpetual Care or Endowment Fund, in accordance with the terms of the following agreement: "Archdiocese of Milwaukee," . . . acknowledges that it has this day received from . . . which said sum it agrees to invest and reinvest in good and sufficient securities such as are lawful for the investment of perpetual care funds of cemeteries, and to apply the net annual income accruing from such investment to the annual care of said lot, which is to be as follows . . . .

Specific arrangements for perpetual care became more common by the mid-1930s. The Archdiocese began offering burial lots that included perpetual care services as a purchase option. The Archdiocese maintained detailed accounting summaries of perpetual care funds received, with the intention that such endowments were to be used only for the provision of care for specific endowed plots. The Archdiocese invested these endowed monies in such investments thought suitable for trust funds, e.g., certificates of deposit, real estate, securities, and loans.

By the mid-1960s audit reports for the Milwaukee Catholic Cemeteries (which had its own financial statements) recorded "Income Care Corpus Collections" which were collected each year and added to an "Income Care Fund" and characterized as "Trust Fund Deposits by Lot Owners" or "Trust Fund Deposits by Purchasers of Burial Privileges." As of the end of 1964, the balance in the Income Care Fund was $2,402,900.66.

In 1969, the Archdiocese established an investment account with the First Wisconsin Trust Company to hold perpetual care funds, and also, for a few years, other trust funds, including pension trust funds; seminary trust funds; and cemetery burial deposits held in trust by the Archdiocese pursuant to state law. All of these trust funds invested by the First Wisconsin Trust Company received a pro-rata share of investment gains and losses and paid the fees and expenses of the account on a pro-rata basis. The account was subject to annual audits by Arthur Andersen and other public accounting firms and there was never any deficiency in any investor funds in the account.

As of the early 1970s, care had been endowed for approximately 40 percent (40%) of the graves and crypts in the Milwaukee Catholic Cemeteries. While family members maintained some of the grave sites for which care had not been purchased, this practice was becoming increasingly rare. As a result, in 1977, then-Archbishop Cousins issued a new Cemetery Handbook that provided that the Archdiocese would provide care for all grave sites and the

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 86 of 125

Archdiocese made the decision to include perpetual care in the sale price of all grave sites as a matter of canonical duty and charity.

By February of 1979, the last of the non-perpetual care trust funds were removed from the account at First Wisconsin Trust. Thus, for more than thirty-five (35) years, the perpetual care funds were held in a segregated account that contained no other funds. There has been a regular audit of the Original Trust Fund each year by an independent auditor, and the money held in trust for perpetual care was managed by an investment advisory firm different from that which managed the Archdiocese's general fund.

In 2007, the Archdiocese Finance Council reviewed the sacred duty of providing perpetual care, and it unanimously recommended that the Archdiocese formalize the way it fulfilled the responsibility for the trust funds held for the perpetual care of the Milwaukee Catholic Cemeteries and those deceased whose families chose to bury them in the Catholic faith.

The Archdiocese Finance Council recommended to then-Archbishop Timothy Dolan that the Original Trust Fund, already held in a separate account, be transferred to a new formal trust to help honor the fundamental promise all Catholic cemeteries make to the deceased and their families -- that the Church will preserve and maintain cemeteries as sacred places forever. Archbishop Dolan sought and received Vatican approval because both canon law and his own ecclesiastical responsibilities required him to seek approval of the new trust entity as a proper place to keep the funds so that the restricted purpose (i.e., Income Care) of the funds be maintained.

On April 2, 2007, the Cemetery Trust was established to formalize the trust relationship in which perpetual care funds had been held, as recited in the document establishing the Cemetery Trust:

> **WHEREAS,** the Archdiocese holds certain funds designated for the perpetual care of Cemeteries and Mausoleums within the geographic boundaries of the Archdiocese ("Perpetual Care Funds"); and

> **WHEREAS,** the Archdiocese desires and intends to formalize the trust relationship in which the Perpetual Care Funds are held by creating the trust hereinafter described.

After obtaining the necessary Vatican approval, the Perpetual Care Funds were transferred in 2008, dollar for dollar, from the Income Care Fund to the Cemetery Trust -- at the time a little over $55 million.

(c)     Cemetery Trust Litigation

The Cemetery Trust, on behalf of itself and its beneficiaries, commenced the Cemetery Trust Litigation on June 28, 2011, asking the Court to determine that allegations by the Committee, in the media and in court, about the unsecured creditor's rights to the Cemetery Trust were unfounded. Pursuant to a stipulation approved by the Bankruptcy Court granting the Committee standing to respond to the complaint, the Committee filed an answer, affirmative

defenses, and multiple avoidance and turnover counterclaims under the Bankruptcy Code seeking the Cemetery Trust's funds. The Cemetery Trust answered the Committee's counterclaims, denying any right to relief on them.

The Cemetery Trust filed an amended complaint on January 13, 2012, substituting the Cemetery Trustee, Archbishop Jerome Listecki, as plaintiff, and adding claims that both the U.S. Constitution's First Amendment and RFRA preclude any determination that the Cemetery Trust or its funds are property of the estate. The Cemetery Trust alleged, among other things, that using the Cemetery Trust to pay the Archdiocese's creditors would substantially and impermissibly burden a sincere religious exercise. The Cemetery Trust also asserted that the care and maintenance of the Milwaukee Catholic Cemeteries and the remains of those interred therein are a fundamental exercise of the Catholic faith, which cannot be substantially burdened by even a generally applicable, neutral government law.

On May 25, 2012, the Committee filed a motion for partial summary judgment limited to the application of RFRA and the First Amendment and several of the Committee's related affirmative defenses.

As part of its response to the motion for partial summary judgment, the Cemetery Trust submitted the Declaration of Archbishop Listecki -- attesting to, among other things, the importance of cemeteries and their care within the Catholic faith, his ecclesiastical responsibilities, and the substantial burdens that any transfer of the Cemetery Trust's funds to the estate would impose. The Cemetery Trust requested that the Bankruptcy Court not merely deny the Committee's motion but, pursuant to the Federal Rules of Civil Procedure, grant judgment in the Cemetery Trustee's favor ending the litigation on constitutional and statutory grounds.

On January 17, 2013, the Bankruptcy Court issued a written decision on the Committee's motion and granted the Committee's motion for partial summary judgment in full. On July 30, 2013, the District Court reversed the Bankruptcy Court's decision and held that "RFRA and the First Amendment prevent the Committee from appropriating the funds in the [Cemetery] Trust because doing so would substantially burden the [Cemetery] Trustee's free exercise of religion." On August 1, 2013, the District Court issued a judgment implementing the decision by granting the Cemetery Trust judgment, denying the Committee's motion for partial summary judgment, and dismissing the Cemetery Trust Litigation.

The Committee thereafter filed three (3) motions and three (3) appeals regarding the District Court's decision. Through the motions, the Committee first sought to determine whether United States District Court Judge Rudolph Randa, like most other Catholics in Milwaukee, had relatives among the 500,000 deceased interred in the Cemeteries -- information that was and still is publicly available -- and then sought to retrospectively recuse Judge Randa and vacate his ruling based on this information. The District Court denied both the motion to recuse and the motion to vacate.

The Committee not only appealed the District Court's decision, but the Committee also filed a petition for a writ of mandamus challenging Judge Randa's ability to rule on the Cemetery Trust Litigation and any attempt to settle or compromise the Cemetery Trust Litigation through a plan of reorganization or otherwise, and filed appeals regarding the denial of the motion to

vacate and the motion to recuse. These three (3) appeals are currently pending before the Seventh Circuit where the parties are currently briefing the issues raised on appeal.

All of these issues will determine whether the Committee's arguments on the state law issues, which are discussed below, can even be considered by the courts. Only if the Committee is successful on appeal will the state law issues, such as whether the Original Trust Fund constituted an enforceable trust, be considered by the courts. The litigation on the state law issues, if it goes forward, is expected to take years and cost millions of dollars in professional fees to resolve.

(d)     The State Law Legal Issues that Must Be Decided IF the Cemetery Trust Judgment is Reversed

In addition to the First Amendment and RFRA issues, the Cemetery Trust asserts that the trust assets are not property of the Estate under the Bankruptcy Code because the Archdiocese had no legal or equitable interest in the Cemetery Trust as of the commencement of the Chapter 11 Case. The Cemetery Trust is an express trust pursuant to the terms of the Cemetery Trust agreement.

The Cemetery Trust further asserts that the Original Trust Fund was always an enforceable trust under Wisconsin law and consequently, the funds retained their character as trust assets when they were simply transferred to a more formal trust. The Original Trust Fund meets the requirements under Wisconsin law for both a resulting trust and a charitable/religious trust, both of which are recognized under state law.

Wisconsin Statutes expressly permit a trust to be created for charitable and religious purposes, including but not limited to, trusts for the advancement of religion. The Cemetery Trust argues that the Archdiocese established the Original Trust Fund and the Cemetery Trust for charitable purposes, namely to fulfill the Archdiocese's canonical and moral obligations to provide perpetual care for the Milwaukee Catholic Cemeteries. Consequently, the Cemetery Trust assets must be used solely for religious, charitable, or other lawful trust purposes and not to benefit anyone or anything else, including the Archdiocese.

Under the resulting trust doctrine, a trust is deemed to exist not only because of an express intention to create a trust but rather by implication from the circumstances by which the holder of funds acquired title. The Archdiocese acquired title to funds for perpetual care over many years and in a series of transactions involving the sales of graves, crypts, and mausoleums. While the documentation underlying such transactions may have varied over time, a theme common to and persistent in such transactions was that the Archdiocese would provide perpetual care of its cemeteries and would set aside funds for that purpose. The essential nature of providing care in perpetuity -- which turns out to be a very long time -- implies the establishment of a perpetual care fund, which is commonly understood under the laws of most states, including Wisconsin, to be a trust fund. *See, e.g.,* 1921 Wis. Session Laws ch. 408 § 1 ("Any person, firm or bank, trust company or other corporation, ***having in its custody or control any trust funds known as cemetery perpetual care funds or funds of like meaning*** received from any source other than by the last will of a testator, shall, upon demand therefor, transfer and deliver such funds to the cemetery association, town, city or village having the management and

control of the cemetery wherein the lot to be benefited by such funds is situated, and such funds shall be managed and invested as provided in section 1443d.") (emphasis added).

While the Committee admits that the Cemetery Trust cannot be reached by creditors if the Original Trust Fund is a valid trust, the Committee asserts that (i) the Original Trust Fund either was never an enforceable trust under state law or (ii) the Original Trust Fund's character as a trust was lost under state law by the way it was administered.

The Committee argues that because the Original Trust Fund was not subject to a formal trust agreement, the Cemetery Trust was not an enforceable trust. In this respect the Committee questions whether it was the purchasers of the grave sites who intended to put money into trust or, rather, the Archdiocese that intended to put money into trust. In early years, money from purchasers of Income Care was put into the Original Trust Fund. This practice is evidenced by the 1929 Handbook referenced above.

In recent decades, a portion of the proceeds from each sale of a grave site, or an equivalent amount, was put into the Original Trust Fund, mirroring the requirements under Wisconsin law for non-religious cemeteries. The Committee claims that the Cemetery Trust must trace the proceeds of each grave site sale to the Original Trust Fund based on the legal theory that the individual grave site purchasers were the persons intending to create the trust. This is an issue of proof (assuming only for argument that the Committee is correct in its legal position) that will require the examination of hundreds of thousands, if not millions, of records.

Even if the grave site purchasers were considered to be the donors of the majority of the trust corpus (as opposed to the Archdiocese by its practice of placing 50% of burial plot sales and $100 from crypts sales first into the Original Trust Fund and later into the Cemetery Trust), the question exists if the funds need to be traced. The Committee argues that a legal test known as the "lowest intermediate balance" test must be applied to see if the funds should be paid to the Estate or the trust(s) beneficiaries. The Cemetery Trust and the Debtor believe the lowest intermediate balance test is only intended to resolve issues where there is a deficiency in trust assets and that it does not apply in this case.

The Cemetery Trust also maintains that establishing the intent of the grave site purchasers and the tracing of funds is not necessary because the Archdiocese's donative intent to place the funds in the Original Trust Fund is sufficient intent to create a trust corpus.

The Committee counters that if the Archdiocese did create the trust corpus, that makes the Original Trust Fund a "self-settled trust" of which the Archdiocese is the beneficiary and the Committee further argues that under state law self-settled trusts are not exempt from creditor claims. The Committee's self-settled trust argument would not be applicable if the Original Trust Fund was a charitable trust, but would require a factual determination regarding who is the true beneficiary if the Original Trust Fund was a resulting trust.

The Committee asserts that Archdiocese is the real beneficiary of the Cemetery Trust distributions, not the individuals buried and/or the families and friends of those buried in the cemeteries. The Committee also argues that, at times, the Archdiocese did not treat the trust assets separately enough. As an example, there were loans to the Archdiocese from the Original

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 90 of 125

Trust Fund in the early 1970s. Even though these loans were repaid in full with interest, the Committee asserts that the loans indicate a willingness on the part of the Archdiocese to use the money to further its purposes rather than solely for cemetery care and charitable purposes.

The Cemetery Trust is adamant that the Original Trust Fund is not a "self-settled" trust because the beneficiaries are the individuals buried in the Milwaukee Catholic Cemeteries and/or their families. In making cemeteries and mausoleums available to Catholics in Southeastern Wisconsin, the Archdiocese also promised to maintain the cemeteries as sacred places on a continuing basis forever. Even if the Cemetery Trust is a self-settled trust, the Cemetery Trust argues that the creditors should not be able to reach any of the assets. First, under Wisconsin law, self-settled trusts are permitted if the trusts are charitable trusts. Second, under Wisconsin law, payment to creditors is permissive -- not mandatory. Any payment in this case is precluded by the Wisconsin Constitution, which provides at least the same protections as are applied under RFRA. It is also contrary to Wisconsin public policy because it would leave hundreds of thousands of graves without funds for perpetual care. Third, even if creditors could theoretically reach the assets, payments to creditors are limited to payments actually due, not the Cemetery Trust principal.

A further complication with the Committee's position is that the Wisconsin statutes provide for the Wisconsin Attorney General to enforce the provisions of a charitable or religious trust. Any use of proceeds of the Cemetery Trust other than for their intended purposes will likely require the approval of the Wisconsin Attorney General.

The Committee also asserts that commingling of the Original Trust Funds with other trust funds for joint investment prior to 1979 destroyed the nature of the trust. The Cemetery Trust believes this argument is frivolous because joint investment of trust funds is a commonly accepted practice among not-for-profit entities and charities, because all the funds were accounted for by independent auditors, and because there was never any deficiency in any of the jointly invested funds.

The summary of legal arguments set forth above is not intended to be exhaustive of all the arguments or theories of each party to the Cemetery Trust Litigation and the Debtor's summary in no way commits any party to any argument or position. The summary is solely intended to assist the reader in understanding and evaluating the nature and complexity of the issues involved in the Cemetery Trust Litigation.

       (e)      Cemetery Trust Settlement

         (i)      Description of the Cemetery Trust Settlement

THE CEMETERY TRUST SETTLEMENT IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND IS THEREFORE PROVISIONAL UNTIL AND UNLESS APPROVED IN A CONFIRMED PLAN OF REORGANIZATION NO LONGER SUBJECT TO APPEAL.

A copy of the Cemetery Trust Settlement Term Sheet is attached hereto as **Exhibit R**. Below is a summary of the Cemetery Trust Settlement:

- The Cemetery Trust will reimburse the Archdiocese the actual cost of perpetual care expenses, up to $1,950,000 per year.

- In addition, the Cemetery Trust will lend to the Archdiocese up to $2,000,000. This is intended to help provide sufficient funding for the Plan of Reorganization.

- The interest rate per year will be the lesser of (i) One Year LIBOR (as determined and adjusted annually) plus two percent (2%), or (ii) five (5) percent; interest will be payable quarterly commencing June 30, 2014.

- The Archdiocese will repay the loan principal to the Cemetery Trust in $50,000 quarterly payments, starting on January 1, 2024, and continuing quarterly thereafter, with the entire remaining balance due December 31, 2034.

- The loan will be secured by all the major real estate assets owned or leased by the Archdiocese, including (i) a first mortgage lien on the real estate known as Prospect Hill (New Berlin), Plunkett Property (Germantown), Nicholson Road (Caledonia), Scarlet Property (Mount Pleasant), and All Souls (Franklin), (collectively, the "First Lien Properties"); and (ii) a second mortgage lien on the real estate known as the St. Charles Youth and Family Services Facility (Milwaukee) and the Archbishop Cousins Catholic Center (St. Francis) (collectively, the "Second Lien Properties"), with the lien on the Second Lien Properties subordinated to the current mortgage liens of Park Bank on those properties.

- The following contingencies must be satisfied: (a) the execution and delivery of, if required, approval from the Attorney General of the State of Wisconsin; (b) written consent of Park Bank to the grant of a second mortgage lien on the Second Lien Properties (oral agreement has been received); (c) agreement of De Sales Preparatory Seminary, Inc. to pledge the Archbishop Cousins Catholic Center as collateral on a non-recourse basis; and (d) confirmation of a plan of reorganization (or longer if subject to appeal) for the Archdiocese providing for (i) approval of the terms and conditions of the line of credit and authorizing the Archdiocese to enter into the loan, security and closing documents, and (ii) dismissal of the appeals in the pending Cemetery Trust Litigation with prejudice, and without costs as to any party.

- The Cemetery Trust will receive a global release of all claims.

The above summary is not intended to be a complete recitation of the terms of the Cemetery Trust Settlement, and parties should reference the attached Cemetery Trust Settlement Term Sheet.

(ii)    Analysis of the Proposed Cemetery Trust Settlement

The legal standard for approving a settlement under Federal Rule of Bankruptcy Procedure 9019 is set forth above. In brief, courts consider the following factors in evaluating a

proposed settlement: (i) the probability of success of the litigation; (ii) the difficulties to be encountered in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the interest of the creditors.

Any recovery for the Committee in the Cemetery Trust Litigation is unlikely. The continued pursuit of the litigation will take years and millions of dollars in legal fees and, even then, only permit the Committee to pursue its claims under federal bankruptcy law and state law. The only alternative to the Cemetery Trust Settlement is for the Committee to (i) pursue and prevail on appeal on the RFRA and First Amendment issues and **then** (ii) prevail on each of the bankruptcy and state law issues. Further, any recovery that the Committee might obtain from the Cemetery Trust, would, contrary to the Committee's assertion be payable to **all** Creditors and not just Abuse Survivors. Any recovery from the Cemetery Trust would need to be shared with all other Creditors, including the estimated $246,000,000 required to provide perpetual care to the Milwaukee Catholic Cemeteries. Under the Plan, the Debtor proposes to pay nothing on account of the Claims for perpetual care and instead pay all other available material assets to Class 9 Abuse Survivors. While this is the treatment proposed under the current Plan, there is a strong legal argument that the $246 million of perpetual care claims should be included in the distribution of non-Cemetery Trust assets under the Plan even if the Cemetery Trust assets cannot be reached by Creditors. In other words, if the perpetual care claims were included, there would be no meaningful recovery for any Abuse Survivor Class. Cash payments to Class 9 and the therapy payments to several classes of Abuse Survivors could not be made.

The Cemetery Trust Judgment denies any recovery to the Committee. Unless the Cemetery Trust Judgment, which is currently on appeal to the Seventh Circuit, is reversed, no recovery is available for Creditors from the Cemetery Trust. Briefing has just begun, and will not conclude until February 28, 2014. The Seventh Circuit will then schedule oral argument, and will later issue its decision. A decision could easily take as much as one (1) year from the date of the last-filed brief. The unsuccessful party in the appeal has the right to ask the United States Supreme Court to hear the case.

The Debtor expects that the Seventh Circuit appeals will be costly to the estate, primarily as a result of the legal fees generated by the Committee in pursuing three (3) pending appeals. The District Court's decision was issued on July 30, 2013. Since then, PSZJ said it spent over $162,000 in fees on issues related to the Cemetery Trust Litigation. PSZJ also incurred approximately $107,000 in fees in November and December. Because PSZJ has not filed fee applications for these months,[19] it is impossible to know how the money was spent on the Cemetery Trust Litigation, but the Debtor expects that a significant amount of the fees are attributable to the Cemetery Trust Litigation. PSZJ has not yet provided an estimate or filed a fee application for January. Consequently, the Debtor estimates that PSZJ alone has spent over $250,000 on issues related to the appeals of the Cemetery Trust Judgment.

---

[19] On February 11, 2014, PSZJ filed a fee application for the month of November 2014; however, for purposes of the Disclosure Statement, the information regarding fees and expenses is provided through February 7, 2014.

The final cost to the Estate for the expenditures of Committee professionals on the Cemetery Trust appeals is likely to be significantly higher -- even though those fees, like all professional fees, are subject to objection and court approval. First, the $250,000 estimate above does not include any fees attributable to special counsel Marci Hamilton, who the Committee insisted on retaining to address the constitutional issues presented in the Cemetery Trust Litigation. Second, the Debtor expects that the Committee professionals have and will continue to incur significant fees working on the pleadings to be submitted to the Seventh Circuit and preparing for oral argument.

Because of the RFRA and constitutional issues present, the party that loses before the Seventh Circuit can and probably will appeal to the United States Supreme Court. Such an appeal could add an additional two years to the case, and hundreds of thousands of dollars in legal fees. Conservatively, the Debtor estimates that the Committee professionals will alone incur in excess of an additional $1,000,000 in legal fees attributable to the Cemetery Trust Litigation. Moreover, the Debtor estimates that a resolution of the First Amendment and RFRA issues would take at least an additional two years, and raise the total fees expended on the Cemetery Trust Litigation to $3,300,000. During that time, any payment on claims would be delayed, and the Estate would continue to incur routine expenses and fees as a result of remaining in chapter 11.

Even if the First Amendment and RFRA issues are ultimately decided in the Committee's favor, the Committee still will not have established that it is entitled to recover any funds from the Cemetery Trust. Instead, the Committee will need to prevail on each of the state law issues.

As a prerequisite to litigating these state law issues, the Committee will likely request significant discovery. The history of the Milwaukee Catholic Cemeteries dates back to 1857. Simply locating and having law and accounting firms examine the relevant records would take thousands and thousands of hours. Experts for both sides would also have to review the records and provide reports. Although the Debtor and the Cemetery Trust disagree, the Committee has also indicated that it may be necessary to recreate and analyze, in detail, the status of the Cemetery Trust's funds at various points in time between 1857 and the present to resolve certain of the Committee's claims.

Many people with evidence are retired, and not all are located in Wisconsin. They would have to be located and their testimony taken in the states or countries where they live. The Committee informed the Cemetery Trust that if the Cemetery Trust Litigation continues, it intends to conduct no fewer than ten (10) depositions. The Committee already served five (5) deposition notices that will require extensive travel to complete, including a proposal to travel to Rome for depositions.

The Cemetery Trust would also have to take discovery.

Given the extensive nature of the likely discovery should the Committee prevail on appeal, it is impossible to estimate how much time and money will be required to complete discovery.

Resolution of the state law issues after the conclusion of discovery would likely entail consideration of a minimum of fifteen (15) separate legal and factual issues before the Bankruptcy Court could even consider whether there was a fraudulent transfer under state and federal law:

- Whether the Original Trust Fund must be subject to a formal, written trust to be enforceable;

- Whether the Original Trust Fund is a resulting trust;

- Whether the Original Trust Fund is a charitable trust;

- Whether a trust was created when purchasers of grave sites with "Income Care" paid money for purposes of obtaining "Income Care," currently referred to as perpetual care;

- Whether a trust was created when the Archdiocese set aside a portion of each sale of a grave site into the Original Trust Fund for the purpose of ensuring sufficient funds were set aside for the purpose of providing perpetual care;

- Whether the Bankruptcy Court must consider the donative intent of the individual purchasers of grave sites or the donative intent of the Archdiocese in setting aside funds in the Original Trust Fund for purposes of ensuring perpetual care; and, if so, what was the donative intent of the respective parties;

- Whether the Debtor is required to trace the proceeds of each individual grave site sale dating back over 150 years;

- Whether the "lowest intermediate balance test" applies to the Original Trust Fund;

- Whether there was ever a deficiency in the Original Trust Fund;

- Whether the Original Trust Fund is a self-settled trust;

- If the Original Trust Fund is a self-settled trust, whether the self-settled trust is permitted under Wisconsin law allowing the creation of a self-settled trust for charitable purposes;

- Whether the Original Trust Fund is a self-settled trust, and not a permitted self-settled charitable trust;

- If the Original Trust Fund is a self-settled trust, and not a permitted self-settled charitable trust, whether any distribution from the Cemetery Trust would violate the Wisconsin Constitution;

- Whether, regardless of the characterization of the Original Trust Fund, the creation of the Cemetery Trust in 2007 created a valid and legally enforceable Trust; and

- Whether any distribution from the Cemetery Trust would violate the Wisconsin Constitution.

The resolution of any one of most of the issues listed above in the Cemetery Trust's favor will result in the dismissal of the Committee's claims against the Cemetery Trust. The Debtor expects that several of the issues will be decided in the Cemetery Trust's favor, and that each time such an issue is decided, the Committee will appeal each of these decisions. It is entirely possible that the Committee would not consent to the dismissal of its claims against the Cemetery Trust absent a final resolution of all issues by the applicable appellate court, perhaps even the United States Supreme Court. These appeals will of course add years and hundreds of thousands, if not millions, of dollars to the cost of the case.

While the list above is not intended to be exhaustive, it is meant to provide examples of some of the legal issues that would still need to be resolved by courts if the Cemetery Trust Settlement is not approved. Only after each of these issues listed above has been resolved in the Committee's favor, could a court consider whether there was, as a factual matter, a fraudulent transfer.

There is little question that the discovery, litigation, and appeals of the state law issues will likely take millions of dollars and years to conclude. The Committee professionals are currently accruing legal fees attributable to the Cemetery Trust Litigation at a pace of over $617,200 per year. If the Cemetery Trust Litigation continues for five (5) more years at the same pace, fees for Committee professionals will likely exceed $3,086,000 during those five years, and the total amount spent on the Cemetery Trust Litigation during the entire pendency of this case will exceed $5,567,000, not including any costs incurred by the Debtor during the additional five (5) years. However, because the Cemetery Trust litigation has not been litigated as intensely and as fully as it could have been during the last 2 ½ years, it is likely actual expenses will be significantly higher. Of course, during the additional five (5) years the Debtor will continue to incur routine chapter 11 expenses as well.

Even if there is a recovery from the Cemetery Trust, such a recovery will not be the windfall that the Committee seeks at the expense of the Catholics in southeastern Wisconsin, the decedents interred in the Milwaukee Catholic Cemeteries, and other beneficiaries. First, if the Committee is entitled to recover from the Cemetery Trust, there is no guarantee that the Committee will be entitled to recover *all* of the funds in the Cemetery Trust because some of the funds may be determined to be held in trust or donor restricted even if the Committee is generally successful. Further, the Cemetery Trust will inevitably be diminished by the Cemetery Trust's expenses of litigation.

Any recovery would be also offset by the perpetual care claims against the Archdiocese. Contrary to the Committee's assertion, any funds recovered from the Cemetery Trust will have to be made available to all Creditors, not just Abuse Survivors. There is no legal justification for a distinction, and the Debtor would be obligated to make the amounts recovered available to all

Creditors – administrative Creditors (mostly professionals), Abuse Survivors, General Unsecured Creditors, and the Claim for perpetual care. Because administrative fees must be paid first in chapter 11, only net proceeds would be available to be split between all of these constituencies. In other words, the Cemetery Trust funds, after reduction for many millions of dollars of administrative expenses due to the lengthy litigation and failure to exit chapter 11, would need to be split between Abuse Survivor Claims and more than $265 million of other claims in the chapter 11. Even though recovery from the Cemetery Trust is subject to a large number of significant legal impediments, the failure to settle also will cause a loss of the $8 million settlement with the LMI (*see* Section VII.C.1) because that settlement is subject to Plan confirmation and consummation.

As explained in Section VIII.A, the maximum recovery in the Cemetery Trust Litigation is approximately $29,000,000, after the payment of administrative expenses. This puts the Bankruptcy Court and the Creditors in a position to balance a guaranteed recovery of $8,000,000 with no further risks, plus a $2,000,000 loan from the Cemetery Trust against a hypothetical maximum recovery of $29,000,000 in litigation that has already been dismissed by a United States District Court.

Finally, to the extent all of the funds in the Cemetery Trust are made available to the Estate and distributed to Creditors, the Debtor's ability to propose a feasible plan will be unlikely. The Debtor depends on the reimbursement from the Cemetery Trust to maintain the Milwaukee Catholic Cemeteries. The Debtor currently receives $1,950,000 annually from the Cemetery Trust as reimbursement for maintenance expenses, although the cost of the care and maintenance of the Milwaukee Catholic Cemeteries is greater than that amount and will likely grow in the coming years. If the Cemetery Trust is depleted, there will be no reimbursement, and the Archdiocese will have insufficient funds for the maintenance and care of the Milwaukee Catholic Cemeteries.

In contrast, the Cemetery Trust Settlement provides a monetary settlement now and a promise to continue to reimburse the Archdiocese for the care and maintenance of the Milwaukee Catholic Cemeteries. The case against the Cemetery Trust has been dismissed in the litigation to date, and neither the Debtor nor the Committee has any viable legal claims against the Cemetery Trust as a result of the Cemetery Trust Judgment. If the Cemetery Trust Judgment decision is affirmed on appeal, there will be no ability to recover any funds from the Cemetery Trust and any money expended prior to that date will be wasted.

The monetary settlement allows the Archdiocese to pay administrative expenses, and both the monetary settlement and the ongoing reimbursement allow the Archdiocese to propose a feasible Plan, which the Debtor expects to be confirmed. Because the LMI have no obligation to pay pursuant to the LMI Insurance Settlement unless the Plan is confirmed in a final non-appealable Order, the Cemetery Trust Settlement is also crucial to the LMI Insurance Settlement.

Based on the relevant factors in the applicable case law, the Archdiocese believes the Cemetery Trust Settlement represents the best possible outcome for the estate.

3. Faith In Our Future Trust Settlement

   (a) FIOF Trust

In 2007, the FIOF Trust was created and launched a campaign to raise money to support Catholic education and faith formation in the Southeastern Wisconsin Catholic Community and the global Church. Governed by a Board of Trustees, currently four in number, who are Joseph D. Kearney (Dean, Marquette University Law School), Kristine K. O'Meara (Retired Principal, Irgens Partners, LLC), Mary Ellen Stanek (Managing Director and Director of Asset Management, Robert W. Baird and Co.), and the Most Reverend Jerome E. Listecki, the FIOF Trust is a section 501(c)(3) charitable organization. Lead gifts were made by private individuals, and a fundraising campaign was launched jointly by participating Parishes and the FIOF Trust. All expenses of the campaign were paid for by the FIOF Trust. All funds raised were donor-restricted to the purposes of the FIOF Trust. In general, sixty percent (60%) of the pledges received by the FIOF Trust were, when paid by the donor, distributed to the donor's Parish to be used only for the restricted purposes permitted by the FIOF Trust (as made applicable to each Parish's unique circumstances) in support of Catholic education and faith formation.

Some examples of the restricted uses of the FIOF Trust funds include the FIOF Trust's Catholic School Champions Endowment Fund to provide scholarships for elementary and high school students who could not otherwise afford a Catholic education; its Leaders of the Future Endowment Fund to support young men studying for the priesthood and the formation of adult lay leaders; and its Living the Faith Fund, which provides support for the expansion of Catholic campus ministry at both public and private campuses in Southeast Wisconsin.

The FIOF Trust campaign was a combined effort of the FIOF Trust and the Parishes. The Parishes actively solicited their parishioners and donors for contributions based off a combined Parish donor list. The starting point for the donor list was an Archdiocesan list, which was nothing more than an aggregation of Parish member lists -- property of the Parishes. The initial list was then updated and corrected by each Parish. This updated list was then used for solicitations.

Any work that employees of the Archdiocese performed in connection with the FIOF campaign was done pursuant to an Administrative Services Agreement. Pursuant to the terms of the Administrative Services Agreement between the FIOF Trust and the Archdiocese, the Archdiocese advanced funds to pay for certain expenses of the FIOF Trust campaign, and the Archdiocese was then reimbursed in full, in cash, for all of its advances and services.

Solicitations were made based on the promises that all contributions to the FIOF Trust would be held in the FIOF Trust for the use and purpose set forth in the FIOF Trust campaign and for no other purpose. The pledge card used in the FIOF Trust campaign contains the following unambiguous restriction placed by each donor on his or her campaign donation:

> All contributions will be held in the *Faith in Our Future Trust* for the use and purposes set forth in the *Faith in Our Future Campaign* and for no other purposes. This campaign funds

**Catholic education and faith formation within the Church of southeastern Wisconsin.**

(b)     FIOF Trust Litigation

On October 15, 2012, the Committee sent correspondence to the Debtor, requesting that the Debtor pursue claims against the FIOF Trust or stipulate to the Committee's derivative standing to pursue such claims.  The Committee's claims were based on the Committee's allegation that the Archdiocese "fraudulently transferred" the goodwill of the Archdiocese by allegedly providing the FIOF Trust with donor names, and providing services to the FIOF Trust without consideration.  The Committee also alleged that the FIOF Trust could not launch its own capital campaign because doing so was designed to divert donations away from the Archdiocese.

On October 17, 2012, the Archdiocese responded to the Committee's letter.  The Archdiocese responded that legal and factual conclusions reached by the Committee were flatly untrue.  Regarding the Committee's assertion about diversions from the Catholic Stewardship Appeal, the Archdiocese produced data that showed that contributions to the Catholic Stewardship Appeal were not affected by the FIOF Trust.  Contributions to the Catholic Stewardship Appeal were approximately $7,640,000 and $7,650,000 in the fiscal years ended June 30, 2005 and June 30, 2006.  In fiscal years 2007 and 2008, contributions to the Catholic Stewardship Appeal were approximately $7,794,000 and $7,731,000.  The Archdiocese further stated that any potential claim to recover funds from the FIOF Trust would be subject to defenses based on the First Amendment and RFRA, and would constitute an invasion of a charitable trust triggering the involvement of the Wisconsin Attorney General.

Nonetheless, the Archdiocese convened a board meeting on October 23, 2012, to consider the Committee's demands.  On October 24, 2012, the Archdiocese further responded to the Committee, stating that the Archdiocese would not commence an avoidance action against the FIOF Trust, nor could the Archdiocese stipulate to the Committee's standing to do so.  The Archdiocese also requested that the Committee refrain from filing any motion with respect to the FIOF Trust for one week to allow counsel for the FIOF Trust time to respond to the Committee's request regarding a tolling agreement.

Nonetheless, two days later, the Committee filed the FIOF Standing Motion.  On November 9, 2012, the Archdiocese, in the interests of judicial economy, and to avoid the expenses of responding to further frivolous claims by the Committee, entered into a stipulation with the Committee and the FIOF Trust extending the time period to bring a potential action against the FIOF Trust.  On November 9, 2012, the Committee withdrew the FIOF Standing Motion.  On December 18, 2013, the Bankruptcy Court entered an order extending the tolling period until June 30, 2014.

The Committee asserts that the Archdiocese "fraudulently transferred" the goodwill of the Archdiocese by allegedly providing the FIOF Trust with the names, addresses and/or donor histories of registered Catholics and other potential donors.  The Committee alleges that the Archbishop and other Archdiocesan employees spent time, effort and energy, while being paid by the Archdiocese, to develop the FIOF Trust campaign and solicit donations to it.  The Committee alleges that the donor lists, and employee time along with the goodwill of the

Archdiocese they represent were transferred to the FIOF Trust with the intent to hinder, delay or defraud creditors and/or for which the Archdiocese did not receive reasonably equivalent value. The Committee also claims that the FIOF Trust's solicitation of the Archdiocese's donors interfered with the Archdiocese's customary annual fundraising and was intended to place the money beyond the reach of the Archdiocese's creditors.

Because the Committee's factual assertions are incorrect, the Debtor does not believe that there is any merit to the Committee's proposed claims against the FIOF Trust. Taking each of the assertions in turn, (i) the donor lists were based off Parish member lists and were updated by the joint work of the FIOF Trust and the Parishes; (ii) any time spent by an Archdiocese employee attributable to the FIOF Trust campaign was fully reimbursed pursuant to the Administrative Services Agreement between the Archdiocese and the FIOF Trust; and (iii) there was no decrease in donations to the Catholic Stewardship Appeal either at the time of the FIOF Trust campaign or since the FIOF Trust campaign.

Thus far, the Archdiocese has addressed only the Committee's factual allegations, because the factual allegations made by the Committee are untrue. Even if the facts alleged by the Committee were true, the FIOF Trust would still have numerous legal defenses to the claims asserted by the Committee.

Further, the Debtor believes that any claim against the FIOF Trust would be barred by RFRA and the First Amendment. Any claim against the FIOF Trust would also constitute an invasion of a charitable trust, triggering the involvement of the Wisconsin Attorney General, who has a statutory responsibility to protect charitable trusts like the FIOF Trust.

Finally, the Trustees of the FIOF Trust have adamantly asserted that they feel they have a duty to defend the FIOF Trust Assets and will not participate in any settlement that uses any portion of the FIOF Trust Assets other than for the restricted purposes set forth in the agreement forming the FIOF Trust.

> (c) FIOF Trust Settlement
>
> (i) Description of the FIOF Trust Settlement

The Plan nonetheless proposes a settlement of any claim that the Archdiocese may have against the FIOF Trust by the FIOF Trust's agreeing to grant up to $200,000 of donations for programs selected by the Archdiocese that are within the restricted charitable purposes of the FIOF Trust. In exchange for a release from the Debtor and the Estate, the FIOF Trust has agreed that the Debtor may designate up to $200,000 of grant requests, and so long as the FIOF Trustees determine that such requests are within the restricted charitable purposes of the FIOF Trust, the selected grant requests will be automatically approved without the FIOF Trustees exercising their discretion.

For a complete recitation of the terms of the FIOF Trust Settlement Agreement please see the FIOF Trust Settlement Agreement, which is attached hereto as **Exhibit S**.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 100 of 125

A recitation of the legal standard for approving a settlement is set forth above.

The FIOF Trust Settlement meets the requirements under Seventh Circuit case law to approve a settlement.  The Committee's factual assertions, on which it bases its claims, are all incorrect.  As a result, based on the facts, there is virtually no likelihood of success.  The Bankruptcy Court's decision on December 10, 2012, with respect to trust property held in the Parish Deposit Fund, recognized that trust property is not property of the Estate.  The legal principles involved in that matter are even more compelling in this matter, leading to the conclusion that the Committee's position cannot be legally supported.  Further, any claim against the FIOF Trust is foreclosed by RFRA and the First Amendment.

The settlement provides a benefit to the Estate because it provides the Estate with $200,000 to fund programs of the Archdiocese, programs that would otherwise have to be funded by other assets of the Archdiocese.  This is especially so because the FIOF Trustees have previously rejected a number of grant requests made by the Archdiocese.

Absent the Committee's agreeing that the claims against the FIOF Trust are without merit, litigation would be necessary to pursue the Committee's claims against the FIOF Trust.  The Committee professionals have spent approximately $120,000 just to evaluate initial claims against the FIOF Trust and to file the FIOF Trust Standing Motion.  The Debtor believes that, were the Committee to continue to pursue the FIOF Trust, this cost would increase substantially.  Litigation would entail significant discovery and trial costs, and it would likely expose the Estate to liability for bringing a frivolous claim.  Given the costs incurred by the Committee to litigate other standing issues, the Debtor estimates that it would cost the Estate approximately $500,000 to litigate the issue of whether the Committee is entitled to derivative standing to prosecute the claims against the FIOF Trust.

If litigation against the FIOF Trust is not successful, the funds wasted pursuing meritless claims would not be available to Creditors, further reducing their recovery.  Because the likelihood of success is so minimal in this matter and the settlement provides material additional resources to the Estate, the Debtor believes the settlement provides a far better probability of successful outcome than pursuing further litigation.

4.     Pending Abuse Survivor Claims Objections and Appeals of Abuse Survivor Claims Objections

Confirmation of the Plan shall be a determination that, upon the Effective Date, any objections to all Abuse Survivor Claims other than Class 9 and Unknown Abuse Survivor Claims pending before the Bankruptcy Court and any appeals of objections to Abuse Survivor Claims other than Class 9 and Unknown Abuse Survivor Claims that are then pending are moot and deemed to be determined and resolved in accordance with the terms of, and the treatment accorded to those Claims in the Plan.  All parties to Abuse Survivor Claims objections other than holders of Class 9 and Unknown Abuse Survivor Claims shall be deemed to be enjoined pursuant to section 524 of the Bankruptcy Code from taking any action or pursuing any matter pertaining to an objection to Claim other than cooperating in the dismissal with prejudice of such

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 101 of 125

objection(s). Notwithstanding the foregoing, the Insurance Litigation Trustee may adopt procedures for determining the allowance of claims and the allocation and distribution of proceeds of the Insurance Litigation Trust and the rights of the holders of Class 9 Claims and Unknown Abuse Survivor Claims to object to any such procedures is fully preserved.

### D. Reservation of Rights

The Debtor reserves the right to sell property of the Estate and/or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the Confirmation Hearing or as soon thereafter as is practicable.

### E. Modification and Assumption of the Cousins Center Leases

#### 1. Lease from De Sales Preparatory Seminary, Inc.

Effective upon the Effective Date, the Archdiocese will enter into a new lease of the Cousins Center with its owner, De Sales Preparatory Seminary, Inc., pursuant to which the Archdiocese will lease the Cousins Center for ten (10) years for One Dollar per year, with five (5), five (5) year options to extend the lease. Under the new lease, the Archdiocese will pay all operating and maintenance expenses of the Cousins Center, which are currently approximately $700,000 per year, and continue to pay the outstanding obligations to Park Bank that are secured by the Cousins Center.

#### 2. Sublease to the Milwaukee Bucks

The Archdiocese is completing negotiations of an amendment to the current sublease of a portion of the Cousins Center to the Milwaukee Bucks and an assumption of the sublease as amended. The amendment, among other things, is expected to increase the annual rent paid by the Bucks by approximately $200,000 per year and is expected to extend the term of the sublease by providing the Milwaukee Bucks with options to continue occupying a portion of the Cousins Center through August 31, 2027.

### F. Sources of Funding for the Plan

The Debtor will use the following sources for funding the plan:

1. Proceeds of Modified Cousins Center Sublease

2. Loan Renewal from Park Bank

3. Quarterly Distributions from the Cemetery Trust

4. Continuation of Parish Assessments

5. Continuation of Annual Catholic Stewardship Appeal

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 102 of 125

6. Income from Cemeteries

7. Miscellaneous donations, bequests, fees for services, rent and grants

**G. Means of Implementing Litigation Trust for Abuse Survivors**

1. Vesting Assets in the Insurance Litigation Trust

On the Effective Date, all Insurance Litigation Trust Assets shall vest in the Insurance Litigation Trust, and the Debtor shall be deemed for all purposes to have transferred all of the Debtor's right, title, and interest in the Insurance Litigation Trust Assets to the Insurance Litigation Trust for the benefit of the holders of Class 9 (Archdiocesan Abuse Survivor Claims Subject to Statute of Limitations Defenses) Claims and Unknown Abuse Survivor Claims, whether or not such Claims are Allowed Claims as of the Effective Date. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor shall take all actions reasonably necessary to transfer control of any Insurance Litigation Trust Assets to the Insurance Litigation Trust. Upon the transfer of control of Insurance Litigation Trust Assets, the Reorganized Debtor shall have no further interest in or with respect to the Insurance Litigation Trust Assets.

2. Insurance Litigation Trust Assets

The Insurance Litigation Trust assets shall consist of $3,715,398.83 in cash, one-half of the estimated $569,000 the Archdiocese expects to receive by filing a claim with the United Kingdom's Financial Services Compensation Scheme (but only to the extent of 50% of any recoveries actually received), and the right to pursue recoveries against any Non-Settling Insurers, except for any recoveries attributable to payment of defenses costs recovered in the OneBeacon Adversary Proceeding or otherwise (the "Insurance Litigation Trust Assets").

3. Assumption of Plan Obligations and Liability for Claims

On the Effective Date, all of the Debtor's rights and obligations, if any, with respect to each and every Class 9 Claim and Unknown Abuse Survivor Claim, shall be assigned to and assumed by the Insurance Litigation Trust. In particular, and without limiting the generality of the foregoing, on the Effective Date the Insurance Litigation Trust shall assume liability for, and shall succeed to all rights and defenses of the Debtor with respect to, all Class 9 Claims and Unknown Abuse Survivor Claims arising prior to the Effective Date, **provided, however,** that such assumption of liability by the Insurance Litigation Trust shall not relieve any Insurer of any obligation arising under any Insurance Policy.

4. Unknown Abuse Survivor Claims

As explained in Section VII.B.14 and VII.G.5, all Unknown Abuse Survivor Claims will be channeled to the Insurance Litigation Trust.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 103 of 125

5.        Insurance Litigation Trust Documents and Administration

(a)        Insurance Litigation Trust Agreement

The Debtor shall file, as a Supplemental Plan Document, the proposed Insurance Litigation Trust Agreement with the Bankruptcy Court. The Insurance Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to govern the rights, powers, obligations, and appointment and removal of the Insurance Litigation Trustee. The Insurance Litigation Trust shall be established for the sole purpose of liquidating and distributing the Insurance Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business.

(b)        Distributions From the Insurance Litigation Trust

The Insurance Litigation Trustee may use the Insurance Litigation Trust Assets consisting of Cash in an amount not to exceed $1,000,000 to prosecute to the Insurance Litigation, **provided, however,** the Insurance Litigation Trustee shall provide the holders of Class 9 Claims reasonable notice, an opportunity to vote and an opportunity to be heard on what amount of the initial Cash deposited by the Debtor to the Insurance Litigation Trust will be distributed to the holders of Claims rather than used to pursue the Insurance Litigation, and provided further that $250,000 shall be set aside for the Unknown Abuse Survivor Reserve.

(c)        Appointment of the Insurance Litigation Trustee

The Debtor shall nominate an Insurance Litigation Trustee, who shall be identified in the Insurance Litigation Trust Agreement Filed in accordance with Section VII.G.5. The Insurance Litigation Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Insurance Litigation Trustee on the Effective Date; **provided, however,** that the Person appointed as Insurance Litigation Trustee shall be permitted to act in accordance with the terms of the Insurance Litigation Trust Agreement from such earlier date as authorized by the Debtor, through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Insurance Litigation Trust Agreement and the Plan.

(d)        Rights and Responsibilities of the Insurance Litigation Trustee

The Insurance Litigation Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Insurance Litigation Trust Agreement, including the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges).

The Insurance Litigation Trustee shall be vested with the rights, powers and benefits set forth in the Insurance Litigation Trust Agreement. If there is any inconsistency or ambiguity between the Plan and Confirmation Order or the Plan and the Insurance Litigation Trust Agreement with respect Insurance Litigation Trustee's authority to act, the provisions of the Insurance Litigation Trust Agreement shall control.

Case 11-20059-svk   Doc 2524   Filed 02/12/14   Page 104 of 125

The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Insurance Litigation Trustee in his or her official capacity, with respect to his or her status, duties, powers, acts, or omissions as Insurance Litigation Trustee.

The Insurance Litigation Trustee shall liquidate and convert to Cash the Insurance Litigation Trust Assets, make timely distributions and not unduly prolong the duration of the Insurance Litigation Trust. The Insurance Litigation Trustee may, in his or her sole discretion, liquidate the Insurance Litigation Trust Assets by (i) distributing the Cash assets of the Insurance Litigation Trust pro rata to the holders of Class 9 Claims and establishing the Unknown Abuse Survivor Reserve or (ii) using the Cash assets of the Insurance Litigation Trust, not to exceed $1,000,000 to prosecute and/or settle the Insurance Litigation.

The Insurance Litigation Trustee shall be expressly authorized to do the following:

(i) prosecute, collect, comprise and settle the Insurance Litigation for any amount that the Insurance Litigation Trustee, believes in his or her sole discretion, is reasonable;

(ii) open and maintain bank accounts in the name of the Insurance Litigation Trust, draw checks and drafts thereon on the sole signature of the Insurance Litigation Trustee, and terminate such accounts as the Insurance Litigation Trustee deems appropriate;

(iii) sell or liquidate any Insurance Litigation Trust Asset, without further approval of or application to the Bankruptcy Court;

(iv) execute any documents, file any pleadings, and take any other actions related to, or in connection with, the liquidation of the Insurance Litigation Trust Assets and the exercise of the Insurance Litigation Trustee's powers granted herein, including the exercise of the Debtor's or the Committee's respective rights to conduct discovery and oral examination of any party under Federal Rule of Bankruptcy Procedure 2004;

(v) hold legal title to any and all rights of the beneficiaries in or arising from the Insurance Litigation Trust Assets, including the right to vote any Claim or Interest in an unrelated case under the Bankruptcy Code and to receive any distribution thereon;

(vi) protect and enforce the rights to the Insurance Litigation Trust Assets by any method he or she deems appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(vii) deliver distributions as may be authorized by the Plan;

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 105 of 125

(viii) file, if necessary, any and all tax returns with respect to the Insurance Litigation Trust; pay taxes, if any, properly payable by the Insurance Litigation Trust; and make distributions to the beneficiaries net of such taxes in accordance with the requirements hereof;

(ix) make all necessary filings in accordance with any applicable law, statute, or regulation;

(x) determine and satisfy any and all liabilities created, incurred or assumed by the Insurance Litigation Trust;

(xi) invest moneys received by the Insurance Litigation Trust or otherwise held by the Insurance Litigation Trust;

(xii) in the event that the Insurance Litigation Trustee determines that the beneficiaries or the Insurance Litigation Trust may, will, or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences; and

(xiii) utilize the Insurance Litigation Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Insurance Litigation Trustee.

The Insurance Litigation Trustee may request an expedited determination of taxes of the Insurance Litigation Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Insurance Litigation Trust for all taxable periods through the dissolution of the Insurance Litigation Trust.

(e) Retention of Professionals

The Insurance Litigation Trust may retain professionals, including counsel, accountants, financial advisors, auditors, and other agents on behalf of the Insurance Litigation Trust as necessary or desirable to carry out the obligations of the Insurance Litigation Trustee hereunder and under the Insurance Litigation Trust Agreement. More specifically, provided such representation is permitted by applicable law, the Insurance Litigation Trust may retain counsel or financial advisors in any matter related to administration of the Plan, including counsel that has acted as counsel for the Debtor or the Committee in the Chapter 11 Case.

(f) Miscellaneous Provisions

**H.    Effects of Confirmation**

1.    Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 106 of 125

be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

## 2. Discharge Injunction

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Archdiocese shall be discharged from any Claim that arose prior to the Effective Date, and all Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or Order against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff right of subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, the Plan or Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Plan. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

## 3. Channeling Injunction in Plan

In consideration of the promises and obligations of the Archdiocese and the Reorganized Debtor under the Plan, all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Abuse Survivor Claim arising prior to the Effective Date (other than an Abuse Survivor Claim that is an Administrative Claim) shall be forever barred and permanently enjoined from pursuing such Abuse Survivor Claim against any Protected Party based upon or in any manner arising from or related to any acts or omissions of any Protected Party including (w) for damages of any type, including bodily injury, personal injury, emotional distress, wrongful death, and/or loss of consortium, (x) for exemplary or punitive damages, (y) for attorneys' fees and other expenses, fees, or costs, (z) for any remedy at law, in equity or admiralty whatsoever, heretofore, now or hereafter asserted against any Protected Party; and all Abuse Survivor Claims arising prior to the Effective Date (other than Abuse Survivor Claims that are Administrative

Claims) shall be channeled to and shall be treated, administered, determined, and, if Allowed, paid under the procedures and protocols and in the amounts as established under the Plan and the Insurance Litigation Trust Agreement as the sole and exclusive remedy for all Abuse Survivor Claimants. The foregoing channeling injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Abuse Survivor Claims as provided in this Section shall inure to and for the benefit of the Protected Parties. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

4.  Continuation of Insurance Policies

All known Insurance Policies are listed on **Exhibit N**. Subject to the LMI Settlement Agreement, all Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code, to the extent such Insurance Policy is or was an Executory Contract of the Debtor, or continued in accordance with its terms pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an Executory Contract of the Debtor, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered. To the extent that any or all of the Insurance Policies are considered to be Executory Contracts, then the Plan shall constitute a motion to assume the Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to Sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Insurance Policy. The Debtor reserves the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

5.  Insurance Neutrality

Nothing in the Plan, any exhibit to the Plan, any Confirmation Order, or any other Order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Insurer, any Catholic Entity, the Insurance Litigation Trust, or any other insureds under any insurance policy in any manner; (ii) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any insurance policy in any respect; (iii) shall determine the reasonableness of the Plan or any settlement embodied by the Plan, in any way whatsoever; (iv) shall be subject to, controlled or affected by, *UNR Ind. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991); or (v) shall otherwise determine the applicability or nonapplicability of any provision of any insurance policy and any such rights and obligations shall be determined under the insurance policy and applicable law. Additionally, any action against any insurer related to any insurance policy shall be brought in a court of competent

Case 11-20059-svk   Doc 2524   Filed 02/12/14   Page 108 of 125

jurisdiction other than the Bankruptcy Court; *provided, however,* that nothing herein waives any right of any Catholic Entity, the Insurance Litigation Trust, or any Insurer to require arbitration to the extent the relevant insurance policy provides for such.

6. Exculpation; Limitation of Liability

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and Filing of the Chapter 11 Case, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Archdiocese and its officers, member, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of section 1125(e) of the Bankruptcy Code.

**I.    The Reorganized Debtor**

1. Continued Corporate Existence, Corporate Action and Vesting of Assets

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with the applicable laws of the State of Wisconsin, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

In accordance with sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the Confirmation Hearing) on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 109 of 125

### J.    Miscellaneous Provisions

#### 1.    Rejection of Unassumed Executory Contracts

The Confirmation of the Plan will constitute an assumption of the executory contracts and unexpired leases listed on **Exhibit Y**.

#### 2.    Final Order

Except as otherwise set as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtor (if prior to the Effective Date) or by the Reorganized Debtor (on or after the Effective Date) upon written notice to the Bankruptcy Court. Any party in interest may, on its own behalf, waive a requirement for a Final Order that results in favor of such part in interest without notice to the Bankruptcy Court or other parties in interest. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any Order that is not a Final Order.

#### 3.    Amendments and Modifications

The Debtor may modify the Plan at any time prior to the Confirmation Hearing in accordance with section 1127(a) of the Bankruptcy Code.  After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Reorganized Debtor, or the Insurance Litigation Trustee, as appropriate, may modify the Plan in accordance with section 1127(b) of the Bankruptcy Code by filing a motion on notice to the service list established by the *Order Establishing Case Management and Scheduling Procedures*, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.

#### 4.    U.S. Trustee Reports

From the Effective Date until a Final Decree is entered, the Reorganized Debtor shall, within thirty (30) days of the end of the fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines.

#### 5.    No Waiver

The failure of the Archdiocese to object to any Claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Insurance Litigation Trustee's right to object to such Claim, in whole or in part.

#### 6.    Tax Exemption

Pursuant to section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 110 of 125

a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed, stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 7. Non-Severability

Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Archdiocese.

### 8. Revocation

The Archdiocese reserves the right to revoke and withdraw the Plan prior to the Confirmation Date, in which case the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Archdiocese, the Committee, or any other Person or to prejudice in any manner the rights of the Archdiocese, the Committee, or any other Person in any further proceedings involving the Archdiocese, or be deemed an admission by the Archdiocese, including with respect to the amount or allowance of any Claim or the value of any property of the Estate.

### 9. Controlling Documents

In the event and to the extent that any provision of the Plan or the Insurance Litigation Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or Insurance Litigation Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Insurance Litigation Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Insurance Litigation Trust Agreement, the provisions of the Confirmation Order shall control and take precedence. To the extent that any provision of the Plan, the Insurance Litigation Trust Agreement or the Confirmation Order is inconsistent with the LMI Settlement Agreement, the LMI Settlement Agreement controls.

### 10. Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and any corporate governance matters with respect to the Insurance Litigation Trust or the Reorganized Debtor shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin, without giving effect to conflicts of law principles.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 111 of 125

11.    Notices

Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

**If to the Archdiocese or the Reorganized Debtor:**

Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
Telephone: (414) 273-2100
Facsimile: (414) 223-5000
Attn:   Daryl L. Diesing
          Bruce G. Arnold

**If to the Insurance Litigation Trust or the Insurance Litigation Trustee:**

The parties identified in the Insurance Litigation Trust Agreement to receive notices.

12.    Filing of Additional Documents

At any time before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Plan, the Archdiocese, the Insurance Litigation Trust, and/or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

13.    Powers of Officers

The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

14.    Direction to a Party

On and after the Effective Date, the Insurance Litigation Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 112 of 125

15.    Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor.  The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

16.    Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Archdiocese under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Archdiocese or organizational structure of the, Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

17.    Final Decree

Once the Estate has been fully administered, as referred to in Federal Rule of Bankruptcy Procedure 3022, the Reorganized Debtor or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case.

## VIII.   **BEST INTERESTS TEST AND FINANCIAL FEASIBILITY**

### A.    **Best Interests**

The following liquidation analysis will show that all Unsecured Creditors, including Abuse Survivors, will ***not*** receive any payment in a chapter 7 liquidation unless there is a significant recovery from the Cemetery Trust; and that, to the extent there is any payment, it will be ***less*** than the payment currently provided under the Plan.  Further, to the extent a chapter 7 trustee continues to pursue recoveries from the Insurance Companies -- and consequently continues litigation on claims objections -- there will likely be ***no*** recovery for unsecured creditors regardless of the amount of money received from the Cemetery Trust Litigation.

1.    Legal Standard for the Best Interests Test

Confirmation of the Plan generally requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan, property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

This analysis is hypothetical in this Chapter 11 Case, because, as a non-profit entity, the Debtor's Chapter 11 Case cannot be converted from a chapter 11 to a chapter 7 case without the

Debtor's consent, 11 U.S.C. § 1112(c). Accordingly, the Debtor believes that the best interests of creditors test in this Chapter 11 Case is analogous to the analysis in a chapter 9 case.

In a chapter 9 case, the best interests of creditors test is interpreted to mean that:

> [T]he plan must be better than the alternative that creditors have. In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds. Clearly, such a result is chaos . . .. [The courts] must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.

6 *Collier on Bankruptcy*, ¶ 943.03[7] [a] (16th ed. 2013).

The Debtor believes that the only true alternative to the Plan is dismissal and a race to the courthouse which generally benefits the first to sue and obtain judgments, while at the same time eroding the Debtor's value through continuing litigation costs. As of the Petition Date, there were seventeen (17) Claimants with lawsuits pending against the Archdiocese, and an additional six (6) Claimants who made formal demand on the Archdiocese immediately prior to the pre-petition mediation. These Claimants would be in a favorable position compared to the remaining Claimants. Further, the cost of the chapter 7 and chapter 11 proceedings and the litigation costs associated with the litigation of the Abuse Survivor Claims in state court proceedings would deplete the Archdiocese's assets to a point that would eliminate any recovery for Abuse Survivor Claimants and eliminate the Archdiocese's ability to provide ongoing therapy.

### 2. Hypothetical Chapter 7 Liquidation Analysis

Nevertheless, the Debtor believes that, in a hypothetical chapter 7 liquidation, creditors will receive less than they will likely receive under the Plan.

A chapter 7 liquidation would include the following potential costs and risks:

- In a chapter 7 liquidation, the Debtor believes that the perpetual care claims would be allowed in full and share along with the other unsecured claims. The Debtor believes that the perpetual care claims are allowable in an amount that exceeds $246,000,000. The perpetual care claims are currently not receiving any payment under the Plan.

- The Plan permits the Insurance Litigation Trustee, the Class 9 Claimants, and the Future Claimants' Representative to agree to a protocol for distribution to Claimants without litigation of each individual Claim. In a chapter 7 liquidation, a trial would likely be required to liquidate each Abuse Survivor Claim. Consequently, significant resources would be expended adjudicating or analyzing Abuse Survivor Claims in a chapter 7 case. *See* Section VIII.A.2(b).

- If the chapter 7 trustee continued to pursue recoveries from the Insurance Companies, the chapter 7 trustee would have to continue all claims litigation.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 114 of 125

Many of the Archdiocese's insurance policies are indemnity policies. This means that no insurance company can be required to pay any sums until (i) there is a court determination that the Archdiocese is liable to the Claimant; and (ii) there is a court determination that the insurance policy in question provided coverage for the Archdiocese's liability. Because the majority of the Archdiocese's Insurance Policies would not provide for the costs of defense, there is no cost to the Insurance Companies to forcing the chapter 7 trustee to litigate each individual Abuse Survivor Claim.

- In a liquidation, there would be no LMI Settlement.

- Unpaid chapter 7 and chapter 11 administrative expenses (which are currently estimated to reach $5,500,000) would use all of the Debtor's available assets unless a favorable recovery was achieved in the Cemetery Trust Litigation.

- A chapter 7 trustee would be entitled to compensation based on a percentage of all funds distributed to parties in interest, 11 U.S.C. § 326. This payment will dilute the amount of funds available to pay creditors.

- A chapter 7 trustee will not be able to provide for ongoing therapy for Abuse Survivors, and the Therapy Fund will not exist. There is no provision in the Bankruptcy Code that would permit the chapter 7 trustee to require the Debtor to provide for therapy to Abuse Survivors on an ongoing basis. Further, the litigation costs incurred by the chapter 7 trustee would likely deplete any assets available to fund the Therapy Fund.

Attached hereto as **Exhibit T** is a listing of the Debtor's assets and liabilities, including an estimated liquidation value for the Debtor's assets.

(a)     The Debtor's Assets

The chart below provides a summary of the assets -- other than a hypothetical recovery from the Cemetery Trust -- that would be available in a hypothetical chapter 7 liquidation.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 115 of 125

|  | Estimated Liquidation Value |
| --- | --- |
| **CURRENT ASSETS** | |
| | |
| **Real Property** | |
| Undeveloped Land | $2,957,175.00 |
| Property in Use for Religious Purposes | $495,000.00 |
| Property Leased to Others | $0.00 |
| Leasehold Interests | |
|       Cousins Center (encumbered by $4.4MM mortgage) | $0.00 |
| | |
| **Personal Property** | |
| Insurance Recoveries | unknown |
| Life Insurance Policies | $315,470.00 |
| Cash and Available Savings | $2,000,000.00 |
| Personal Property (office equipment) | $150,000.00 |
| Personal property (religious vestments, jewelry, and relics) | $20,000.00 |
| Personal Property (cemetery property) | $51,600.00 |
| Vehicles | $204,325.00 |
| Cemetery Equipment | $100,000.00 |
| Accounts Receivable | $0.00 |
| | |
| **Total Assets** | **$6,293,570.00** |

Section IV, and **Exhibit T** of the Disclosure Statement contain a more detailed analysis of the Debtor's assets and the liquidation value of these assets.

The Debtor is estimating that there are currently $4,500,000 in unpaid chapter 11 expenses as of the filing of the Plan, and that the professionals will incur an additional $1,000,000 in fees and expenses in connection with the Chapter 11 Case. Accordingly, the Debtor estimates that the realizable value of the Debtor's assets that is available for distribution to creditors after payment of outstanding administrative expenses is approximately $794,000.

(b)      Administrative Fees in a Hypothetical Chapter 7 Liquidation

The Debtor believes that the administrative fees in a chapter 7 liquidation could vary significantly depending on whether the chapter 7 trustee chooses to pursue recoveries from the Insurance Companies. Accordingly, the analysis below shows the estimated administrative fees in a hypothetical chapter 7 liquidation under two scenarios: (i) the chapter 7 trustee continues to pursue recoveries from the Insurance Companies and (ii) the chapter 7 trustee does **not** pursue recoveries from the Insurance Companies.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 116 of 125

In both scenarios, the analysis assumes that the fees in the Cemetery Trust Litigation continue to accrue at current rates -- the Committee professionals are currently incurring fees in the Cemetery Trust Litigation at a rate of approximately $600,000 per year. The Debtor also estimates that it would take an additional five (5) years to reach a final non-appealable decision in the Cemetery Trust Litigation and that the expected costs would rise on an annual basis.[20]

Further, both scenarios include $5,500,000 in legal fees attributable to accrued but unpaid chapter 11 expenses.[21]

(i)     Insurance Coverage Litigation Continues

The chart below shows the total expected administrative costs, including both costs already incurred in the chapter 11 proceeding and costs anticipated to be incurred in a hypothetical chapter 7 liquidation if the chapter 7 trustee were to continue to pursue recoveries from the Insurance Companies.

| Category | Amount |
|---|---|
| Routine Chapter 7 Matters | $1,000,000.00 |
| Cemetery Trust Litigation | $5,521,143.09 |
| Insurance Coverage Litigation | $500,000.00 |
| Cost to Resolve Issues Regarding Settled Claims | $250,000.00 |
| Cost to Resolve all Class 9 and Class 10 Claims | $73,250,000.00 |
| Cost to Resolve all other Abuse Survivor Claims | $250,000.00 |
| Existing Unpaid Administrative Expenses | $5,500,000.00 |
| | |
| **Total** | **$86,271,143.09** |

The analysis assumes that each of the Class 9 and Class 10 Claims (approximately 293 claims) will require individual discovery and litigation on the following issues:

(i) whether the abuse occurred;

---

[20] The Cemetery Trust Litigation was commenced on June 28, 2011, and has been pending for over two and a half years and the parties still have not received a final non-appealable ruling on the single issue that has been litigated thus far -- whether RFRA and the First Amendment bar the Committee's claims against the Cemetery Trust. Accordingly, the Debtor believes that it will take at least five (5) years to conduct discovery and reach a final non-appealable decision on all of the remaining issues in the Cemetery Trust Litigation. *See* Section VII.C.1(d) for a discussion of the remaining issues.

[21] As of the date of the filing of Plan and Disclosure Statement the Debtor estimates that there is $4,500,000 in accrued but unpaid legal fees. The Debtor estimates that the professionals would spend an additional $500,000 before this case could be converted to a chapter 7 liquidation.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 117 of 125

(ii) whether the abuser had previously abused another minor;

(iii) whether the Archdiocese was aware of prior reports of abuse;

(iv) when the Archdiocese became aware of prior reports of abuse;

(v) whether, if the Archdiocese was aware of reports of abuse prior to the time the Claimant was abused, this is sufficient to state a claim for fraud under Wisconsin law;

(vi) whether the Claimants can prove fraud if the Debtor did not intend any harm; and

(vii) whether the Claims are barred by the statute of limitations because the Claimant knew or should have known of the potential claim previously.

For purposes of this analysis, the Debtor assumed that it would cost approximately $250,000 to adjudicate each claim including both discovery and litigation of all of the issues noted above.

The analysis further assumes that the remaining classes of claims could be resolved by a determination of the overarching legal issues applicable to these claims -- whether the Claimants are bound by their settlement agreements and whether the Archdiocese is liable for individuals employed by non-debtor entities.

(ii)     No Further Litigation Against Insurance Companies

The chart below shows the total expected administrative costs, including both costs already incurred in the chapter 11 proceeding and costs anticipated to be incurred in a hypothetical chapter 7 liquidation if the chapter 7 trustee did not pursue recoveries from the Insurance Companies, and consequently stopped all claims litigation.

| Category | Amount |
|---|---|
| Routine Chapter 7 Matters | $1,000,000.00 |
| Cemetery Trust Litigation | $5,521,143.09 |
| Cost to Administer Abuse Survivor Claims | $432,000.00 |
| Existing Unpaid Administrative Expenses | $5,500,000.00 |
| | |
| **Total** | **$12,453,143.09** |

The analysis assumes that there would be no further cost associated with the objections to Abuse Survivor Claims, but that the chapter 7 trustee would continue to incur costs regarding the administration of the Abuse Survivor Claims.  The cost to administer the Abuse Survivor Claims

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 118 of 125

is assumed to be $500 per claim for the review of each abuse claim and $500 per claim for the review of each claim seeking reconsideration after the initial award.[22]

(c)     Potential Recovery in the Cemetery Trust Litigation

In the Cemetery Trust Litigation, the Committee maintains that it is entitled to recover approximately $54,643,489 that was transferred from the Original Trust Fund to the Cemetery Trust Fund. *See* Sections V.B.2(e) and VII.C.2 for a summary of the history of the Cemetery Trust, the Cemetery Trust Litigation, and the Cemetery Trust Settlement.

Even if the Committee is entirely successful in its claims regarding the Cemetery Trust, the Committee would likely only seek to recover a maximum amount of approximately $41,000,000. In 2007, the Archdiocese transferred approximately $54,634,489 from the Original Trust Fund to the Cemetery Trust. The Cemetery Trust has returned to the Debtor approximately $13,388,253 since the funding of the Cemetery Trust for reimbursement for amounts the Archdiocese spent on the perpetual care of the Milwaukee Catholic Cemeteries.

Fraudulent conveyance remedies under Wisconsin law provide for a return of the property transferred. Consequently, the maximum potential recovery from the Cemetery Trust, before administrative expenses, is $41,246,236 ($54,634,489 less $13,388,253). To assess the portion of this amount available to prepetition creditors (of all types) the administrative expenses (which could range from approximately $12,000,000 to $87,000,000) must be deducted, leaving almost no recovery for prepetition creditors or a maximum amount of approximately $29,000,000, depending on the success of the Cemetery Trust Litigation, to be allocated to all creditor claims.

(d)     Potential Recovery in a Hypothetical Chapter 7 Liquidation

There are three potential outcomes in a hypothetical chapter 7 liquidation: (i) the chapter 7 trustee is unsuccessful in the Cemetery Trust Litigation; (ii) the chapter 7 trustee is successful in the Cemetery Trust Litigation and continues the claims objections process and the pursuit of recoveries from the Insurance Companies; or (iii) the chapter 7 trustee is successful in the Cemetery Trust Litigation and discontinues the claims objections or the pursuit of recoveries from the Insurance Companies.

To summarize, in the first and second scenarios, there is **_no_** recovery for any Unsecured Creditors, including Abuse Survivors regardless of the valuation of the Abuse Survivor Claims and the treatment and valuation of all other Unsecured Creditor Claims. In the third scenario -- where there is complete success in the Cemetery Trust Litigation and no pursuit of the Insurance

---

[22] For the sake of simplicity, the Debtor assumed that approximately half of the claimants would request to have their claims re-reviewed. The Debtor expects that the Claims Reviewer would provide for no or minimal recovery to all of the Claimants in Classes 8, 10-13, and 15 because there is no legal basis to support their claims against the Debtor (approximately 450 total claims). The Debtor expects that a significant portion of these Claimants, if not all, will then seek to have their claims reviewed.

Companies -- there is a minimal recovery for Unsecured Creditors -- approximately $8,300 per Abuse Survivor.[23]

The first scenario is shown in **Exhibit U**. In a hypothetical liquidation, there would be no recovery for unsecured creditors absent a recovery from the Cemetery Trust Litigation.[24] For example, assuming that chapter 7 trustee does not prevail in the Cemetery Trust Litigation, does not continue the objections to Abuse Survivor Claims to save expenses, and consequently must forego any recovery from the Insurance Companies, there will be no recovery for any Unsecured Creditors, including Abuse Survivors.

The second scenario is shown in **Exhibit V**. Even if there is some recovery from the Cemetery Trust, any recovery would likely be offset in its entirety by the legal fees incurred in the administration of the chapter 7 proceeding. For example, if the chapter 7 trustee continued to pursue recoveries from the Insurance Companies, and therefore was required to pursue claims litigation, there would likely be no recovery for any Unsecured Creditors because the administrative costs of the litigation involving the Cemetery Trust, the Insurance Companies, the Claims, and general chapter 7 administrative expenses would likely exceed any recovery from the Cemetery Trust.

The third scenario, which is shown in **Exhibit W**, assumes that there is a full recovery in the Cemetery Trust Litigation. If there is a full recovery in the Cemetery Trust Litigation, the only way to provide any recovery to Unsecured Creditors is to forego recoveries from the Insurance Companies (because there can be no recovery against an Insurance Company without litigation of the underlying merits of each individual Abuse Survivor Claim). In this scenario, the amount each Abuse Survivor could potentially recover would be approximately $8,300. However, if this payment were to occur at all, it would **not** occur until the conclusion of the Cemetery Trust Litigation in a final non-appeal order, which will likely take five (5) years, if not more.[25]

Because the hypothetical chapter 7 payment (i) is less than what is currently being paid to Class 9 Claimants, (ii) will not occur for at least five (5) years, (iii) will eliminate therapy

---

[23] For purposes of this analysis, the Debtor estimated the Abuse Survivor Claims at an average of $72,000 per Claim and included all abuse Survivor Claims except Class 15 Claims (Disallowed Or Previously Dismissed) and Claims that have been voluntarily withdrawn by the Claimants (for ease of reference and to avoid confusion, the withdrawn Claims are also listed on the Class 15 list). The $72,000 average is based on average pre-petition settlement amounts. Further, it reflects the legal differences between claims.

Assuming a $72,000 *average* amount per Claimant recognizes an estimation of approximately $324,000 per Class 9 Claim and a minimal estimation for the remaining Classes of Claims -- recognizing that there are no facts to prove "fraud," (as such term is defined by State Court Counsel) and therefore, there is no basis for seeking to impose liability on the Archdiocese.

The estimation is only relevant in the third scenario. In both the first and second scenario there is no recovery for Abuse Survivors, regardless of the estimation of their Claims.

[24] This result is the same regardless of the estimation of the Abuse Survivor Claims.

[25] *See* footnote 20 supra.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 120 of 125

payments to all eligible Abuse Survivor Claimants, (iv) and is not likely to occur given the weakness of the Committee's claims against the Cemetery Trust, the Debtor believes that all Creditors receive better treatment in the Plan proposed by the Debtor than in a hypothetical chapter 7 liquidation.

### B. Financial Feasibility

To confirm the Plan, the Bankruptcy Court must determine that the Plan is feasible which means that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

To determine feasibility, the Debtor carefully considered its expected income, expenses and obligations after the Plan is confirmed. Attached to this Disclosure Statement as **Exhibit C** are financial projections prepared by the Debtor's Chief Financial Officer. The projected expenses are based on historic operating expenses which have been adjusted for inflation and expected project and replacement needs. Significant effort has been taken to minimize expenses and reduce costs. The projections assume that the Archdiocese's main offices will remain at the Cousins Center as a cost saving measure. The operating assumptions in the projections have been reviewed and approved by the Archdiocese Finance Council.

The income side of the projections assumes that the Archdiocese reaches a successful resolution with the Milwaukee Bucks to increase the amount of rent paid for use of a portion of the Cousins Center. With declining church attendance and the impact of the sex abuse scandals, there is some concern that the Reorganized Debtor will be able to maintain the level of charitable giving that it has received historically. The projections assume that Parish assessments will continue at historical levels and charitable giving through the Catholic Stewardship Appeal will initially stay approximately level and then slowly rise in the following years. The Debtor believes that this is the most logical outcome that it can predict assuming that it diligently pursues its fundraising efforts which it fully intends to do.

The Debtor's financial projections show that it expects to essentially "breakeven" in the next few years. A major assumption in that regard is that the Cemetery Trust Litigation is settled as provided in the Plan with the commitment by the Cemetery Trust to distribute at least $1.95 million per year to reimburse the Archdiocese for expenses it incurs for the perpetual care of cemeteries.

As long as the Debtor's Plan is not substantially modified, the Debtor believes that the Plan is feasible and that it will be able to meet its future obligations.

## IX. PLAN AS SETTLEMENT COMMUNICATION

The Plan (including in Article V) furnishes or offers or promises to furnish -- or accepts or offers or promises to accept -- valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are disputed as to validity and/or amount (including Abuse Survivor Claims and the Insurance Litigation). Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity

of, any disputed Claim or Cause of Action. Additionally, counsel for any Abuse Survivor should treat the Plan and the Disclosure Statement as an offer of settlement that must be transmitted to his or her client in accordance with applicable rules and standards governing the practice of law before the Bankruptcy Court.

## X.   RULE 9019, CRAMDOWN REQUESTS

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Debtor requests approval of all compromises and settlements included in the Plan, including the compromises and settlements set forth in Article V of the Plan. In addition, through the Plan, the Debtor requests confirmation of the Plan as a Cramdown Plan with respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan.

## XI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPT ESTATE ARE COMPLEX.**

**THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR HAS THE ARCHDIOCESE OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**EACH HOLDER OF A CLAIM SHOULD CONSULT ITS TAX ADVISORS IN ORDER TO UNDERSTAND FULLY THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES TO THEM OF THE PLAN.**

The following summary is a general discussion of certain of the potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The Federal income tax consequences to any particular Creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

**THE SUMMARY SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY. EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS.**

### A.   Tax Consequences to Creditors

A creditor that receives cash in satisfaction of its Claim will generally recognize gain or loss in an amount that is equal to the difference between (i) the amount of cash received by such

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 122 of 125

creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim.

The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

In the case of a cash basis creditor, any amounts received that are allocable to a Claim for accrued interest (unless previously reported as taxable income by the creditor) will be includable as interest income. In the case of an accrual basis creditor, any amounts received that are allocable to a claim for accrued interest will, to the extent not previously included in gross income, be includable as interest income. The extent to which consideration distributable under the Plan is allocable to such interest is not clear. Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### B. Tax Consequences to the Debtor

The Debtor is a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a not-for-profit corporation, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to the Debtor.

### C. Tax Consequences to the Insurance Litigation Trust

The Insurance Litigation Trust may satisfy the requirements of a Designated Settlement Fund under section 468B of the Tax Code or a Qualified Settlement Fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Insurance Litigation Trust as a Designated Settlement Fund or a Qualified Settlement Fund.

The Debtor expresses no opinion regarding whether the Insurance Litigation Trust is a Designated Settlement Fund or a Qualified Settlement Fund. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Insurance Litigation Trust is a Designated Settlement or a Qualified Settlement Fund. Accordingly, each Creditor is urged to consult its own tax advisor regarding the characterization of the Insurance Litigation Trust and the tax consequences of such characterization.

### XII. ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS

### A. Acceptance by Impaired Classes

The Bankruptcy Code requires that, to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has

classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtor has complied with applicable provisions of the Bankruptcy Code; (iv) the Debtor has proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the plan has been accepted by the requisite votes of Creditors in each Class (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtor; (viii) the Plan is in the "best interests" of all holders of Claims in an Impaired Class; and (ix) all fees and expenses payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

The Debtor believes that the Plan satisfies all the requirements of confirmation.

**B.      Voting Procedures**

**1.      Ballots**

If voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the reverse side of the Ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DEBTOR AT 414-273-2100.  THE ARCHDIOCESE AND COUNSEL FOR THE ARCHDIOCESE CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for purposes of voting on the Plan.  If you hold claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class.

Mail your completed Ballot(s) to:

> Whyte Hirschboeck Dudek S.C.
> 555 East Wells Street, Suite 1900
> Milwaukee, WI 53202
> Telephone: (414) 273-2100
> Facsimile: (414) 223-5000
> Attn:   Daryl L. Diesing
>              Bruce G. Arnold

**DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT**.

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 124 of 125

**FACSIMILE, E-MAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one Ballot voting the same Claim before the Voting Deadline, the last Ballot received before the Voting Deadline will supersede all prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a Ballot within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

**YOU MAY NOT CHANGE YOUR VOTE AFTER THE VOTING DEADLINE PASSES.**

2.      Deadline for Voting

**TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON [—].**

3.      Importance of Your Vote

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds n amount and a majority in number of Allowed Claims in that Class that Vote.

**ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PLAN. YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

## XIII.   RECOMMENDATION AND CONCLUSION

**THE ARCHDIOCESE BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN SHOULD BE CONFIRMED. THE ARCHDIOCESE STRONGLY RECOMMENDS THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.**

Dated:  Milwaukee, Wisconsin                 Respectfully submitted,
            February 12, 2014

                                                            ARCHDIOCESE OF MILWAUKEE


                                                    By: _____
                                                            Most Reverend Jerome E. Listecki
                                                            Archbishop of Milwaukee

Case 11-20059-svk    Doc 2524    Filed 02/12/14    Page 125 of 125