## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                Chapter 11
Archdiocese of Milwaukee,                            Case No. 11-20059-svk
          Debtor.

## MEMORANDUM DECISION
## DISALLOWING CLAIM NOS. 572, 591, 78, 222, 628, 571 and 576
## AND DENYING MOTION FOR SUMMARY JUDGMENT ON CLAIM NO. 467

The Archdiocese of Milwaukee (the "Debtor" or the "Archdiocese") filed this Chapter 11 case on January 4, 2011. Numerous survivors of clergy sex abuse filed proofs of claim in the Debtor's case. Most claims were filed under seal to protect the confidentiality of the claimants.[1] The majority of the claims alleged sexual abuse that occurred thirty or more years before the Debtor filed bankruptcy. The Debtor objected to these claims based on the statute of limitations and filed motions for summary judgment on a limited number of claims. In 2012, this Court decided that the negligence claims were barred by the statute of limitations, but that whether the statute of limitations had run on the fraud claims was a disputed issue of fact for trial. The fraud claims are based on the Debtor's alleged misrepresentation that the Debtor did not know of the priests' histories of sexually molesting children and that it did not know the priests were dangerous to children when the Debtor placed the priests in parishes where they could prey on other children.

Now the Debtor has filed motions for summary judgment alleging that it could not have made misrepresentations to Claimants A-455, A-474, A-14, A-121, A-454, A-511, A-459 and A-352 (the "Claimants") about certain pedophile priests, because the Debtor had no knowledge that

---

[1] When a claimant filed a proof of claim requesting confidentiality, the Court assigned an "A-" number to the claimant. This decision refers to the claimants by their respective numbers.

1

the priests had abused children prior to abusing the Claimants.[2]  The Claimants responded, and the Court held a hearing on March 4, 2015.  After considering the affidavits, pleadings, materials in the record, and arguments of counsel, the Court issued a preliminary oral ruling at the hearing, which is memorialized by this memorandum decision.  This memorandum decision constitutes the Court's findings of fact and conclusions of law concerning the motions.

## I.    JURISDICTION

Allowing proofs of claim falls within the core jurisdiction of the bankruptcy court under 28 U.S.C. §§ 1334 and 157(b)(2)(B).  Unlike the entry of a final order on a state law counterclaim, allowance of claims was not deemed unconstitutional in *Stern v. Marshall*, 131 S. Ct. 2594, 2614 (2011).  In *Stern*, the Supreme Court reaffirmed that bankruptcy courts have the authority to restructure the debtor-creditor relationship and determine "creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res."  *Id.*  Accordingly, this Court can enter a final order, instead of proposed findings of fact and conclusions of law.

## II.    FACTS

### a.    Claimant A-455

Claimant A-455 filed Claim No. 572.  She was abused by a therapist between 1976 and 1977, when she was 16 years old.  (Docket No. 2833 at 71.)  The therapist was an employee of Catholic Social Services, now known as Catholic Charities.[3]  (*Id*. at 73.)  Neither the Debtor's records nor the records produced by Catholic Charities contained any evidence that the Debtor

---

[2]  The Debtor had objected to another claim, No. 521 filed by Claimant A-406, on the same basis.  On February 25, 2015, the Debtor withdrew without prejudice the motion for summary judgment on that claim.  (Docket No. 2999.)

[3] The Debtor also objected to this claim on the basis that Catholic Charities is a separate corporation, and the therapist was neither an employee nor agent of the Debtor.  Since there is no evidence that the Debtor knew about the therapist's history of abuse prior to his abuse of A-455, the Court need not reach the agency issue.

2

knew of the therapist's history of abusing children prior to 1977. The Claimant did not produce any affidavits indicating that the Debtor had knowledge of the therapist's abusive conduct.

### b. Claimant A-474

Claimant A-474 filed Claim No. 591 stating that he was abused between 1975 and 1977 by Gale Leifeld and in 1974 by James Buser. (*Id.* at 80.) The abusers were not Diocesan priests, but members of the Capuchin order. Leifeld was an administrator and Buser an instructor at St. Lawrence Seminary.[4] (*Id.* at 79.) A-474 is now deceased. No affidavits produced by the Claimant show that the Debtor knew about Leifeld's or Buser's history of abuse before 1977. Neither the Debtor's records nor the documents produced by the Capuchin order show that the Debtor was aware of Leifeld's or Buser's misconduct prior to 1977. A-474 produced a draft audit report that suggests that a priest told Archbishop Weakland about sexual abuse at St. Lawrence Seminary. (Docket No. 2998 at 3.) However, the audit report was amended to clarify that neither Leifeld's identity nor the subject matter of sex abuse was revealed to Archbishop Weakland. (Docket No. 3008 at 25.) Moreover, even ignoring the amended audit report, Archbishop Weakland was installed Archbishop of Milwaukee on November 8, 1977, and the alleged conversation with him occurred in 1979, two years after Claimant A-474 was abused. (Docket No. 2998 at 3.)

### c. Claimant A-14

Claimant A-14 filed Claim No. 78 alleging abuse by Donald Musinski when she was seven to fourteen years old. (Docket No. 2833 at 85.) The last incident occurred in 1971, and she reported it in 1997. (*Id.* at 85, 87.) The Debtor filed an affidavit stating that Claimant A-14

---

[4] The Debtor also objected to this claim based on the fact that Leifeld and Buser are members of the Capuchin order, and as such, neither employees nor agents of the Debtor. There is no evidence that the Debtor had knowledge of Leifeld's or Buser's history of abuse prior to A-474's abuse, and the Court need not reach the agency issue.

3

was the first person to report abuse by Musinski to the Debtor. (Docket No. 2832-2.) A-14 alleged that Musinski abused three other minors in the 1970s and 1980s. (Docket No. 2983 at 34.) However, A-14 produced no evidence that anyone reported Musinski's abusive activities to the Debtor prior to 1971. A-14's affidavit states that she reported the abuse in 1997, and received some counseling sessions. (Docket No. 2985.)

### d. Claimant A-121

Claimant A-121 filed Claim No. 222 alleging abuse by John Wagner in 1976 when A-21 was 15 years old. (Docket No. 2833 at 121.) A-121 did not report his abuse to the Debtor at that time, and although the documents filed by the Debtor and the Claimant show that Wagner had a long history of abusing children, there is no evidence that the Debtor knew about it until long after A-121 was abused. A timeline prepared by Jeff Anderson & Associates PA from documents previously produced by the Debtor (the "Timeline") shows the first report about Wagner may have occurred in 1982. (*Id.* at 270.) Another record appears to show the first report in 1986. (Docket No. 2984-17 at 1.) At oral argument, A-121's attorney pointed out that three claims were filed in the bankruptcy case alleging abuse by Wagner prior to 1976, but the attorney conceded that none of the other Claimants stated that they told the Debtor or anyone on its behalf about the abuse at the time.

### e. Claimant A-511

Claimant A-511 filed Claim No. 628 alleging abuse in 1976 and 1977 by Priest X.[5] (Docket No. 2833 at 156.) The Claimant told a woman at her school about the abuse, but she does not recall the woman's name. (*Id.*) According to the Debtor's affidavit, A-511 was the first person to claim abuse by Priest X. (Docket No. 2832-2.)

---

[5] A-511's abuser is not being publicly identified because there are no other allegations of abuse against him.

### f. Claimant A-454

Claimant A-454 filed Claim 571 alleging abuse by George Etzel from 1974 to 1981 when she was between seven and fourteen years old. (Docket No. 2833 at 150-51.) She told her mother in 1980, but never told the Debtor about the abuse. (*Id*.) There is no evidence that the Debtor had any knowledge prior to A-454's abuse that Etzel had abused anyone. The Timeline shows the first report may have occurred in August 1982. (*Id*. at 278.)

### g. Claimant A-459

Claimant A-459 filed Claim No. 576 alleging abuse by James Arimond from 1974 through 1976 when A-459 was ten to twelve years old. (*Id*. at 185.) A-459 did not report his abuse to the Debtor until 2008. (*Id*.) There is no evidence that the Debtor had knowledge of Arimond's history of abuse prior to 1976, and the Timeline shows the Debtor first became aware of the allegations in December 1989. (*Id*. at 284.) Barbara Cusack testified that the Debtor first learned of Arimond's misconduct in late 1989 when he was arrested. (Docket No. 2994-1 at 235.) At his deposition, Arimond himself testified that he was unaware of any information the Debtor had that Arimond had abused anyone prior to the abuse suffered by A-459. (Docket No. 3008 at 40.)

### h. Claimant A-352

William Murphy abused A-352 between 1970 and 1972 when A-352 was between eleven and thirteen years old and a student at St. John's School for the Deaf. (Docket No. 2833 at 190.) A-352 filed Claim No. 467. In contrast to the other Claimants, there is evidence that suggests that the Debtor received reports of Murphy's misconduct prior to 1972. For example, in a June 10, 1997 letter, Fr. David Walsh advised Rev. Thomas Brundage:

> I was stationed in Chicago as chaplain of the deaf from 1955 until 1963. I believe it was in the early part of that period that several deaf teen agers . . . made some remarks that Fr. Murphy was taking advantage of them. . . . I drove to Milwaukee

and met with then Archbishop Meyer.  Later he informed me that Fr. Murphy had
at first denied the charges but two weeks later admitted them. . . . Archbishop
Cousins called a meeting of the teachers at St. John's school.

(Docket No. 2984-1.)

Sister Mary Claude Telderer, a teacher at the school, also wrote a letter concerning the
events during Archbishop Meyer's tenure:  "One summer a pall hung over St. John's. . . . <u>Fr.
Murphy had to leave</u>. . . . I believe it was Bishop Meyer who reversed the decision and Father
Murphy was allowed to remain at St. John's School for the Deaf."  (Docket No. 2984-7 at 2,
emphasis in original.)

A meeting summary from May 16, 1974 details that Archbishop Cousins began by
indicating that Murphy would relinquish his position at St. John's while a complete investigation
of the charges was conducted.  (Docket No. 2984-4 at 1.)  A letter containing accusations about
Murphy to Archbishop Cousins from a student who wished to remain anonymous stated, "In
1960 you or another bishop had warned him about immodest things, Fr. Walsh of Chicago told
you about him."  (Docket No. 2984-6.)  Many of the authors and recipients of the
correspondence as well as meeting participants are now dead.  Although Sister Telderer is still
living, she is 93 years old.  But the documents themselves either come from the Debtor's own
files or were produced in earlier litigation with the Debtor.

## III. ANALYSIS

### a. Summary Judgment Standard

Summary judgment is governed by Rule 7056 of the Federal Rules of Bankruptcy
Procedure, incorporating Rule 56 of the Federal Rules of Civil Procedure, and should be granted
if the movant can establish that there is no genuine issue of material fact and that the movant is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). Material facts are those that "might affect the outcome of the suit." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### b. Bankruptcy Claim Allowance

Section 502(b) of the Bankruptcy Code provides that in considering an objection to a

creditor's claim, the bankruptcy court:

> after notice and a hearing, shall determine the amount of such claim in lawful
> currency of the United States as of the date of the filing of the petition, and shall
> allow such claim in such amount, except to the extent that –
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under
> any agreement or applicable law for reason other than because such claim is
> contingent or unmatured;

11 U.S.C. § 502(b)(1). The Supreme Court has stated that § 502(b)(1) "is most naturally

understood to provide that, with limited exceptions, any defense to a claim that is available

outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of*

*America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).

### c. Statute of Limitations on Derivative Negligence Claims

The Claimants all allege that the Debtor acted either negligently or fraudulently in

dealing with the Claimants and their abusers. The Debtor argues that the statute of limitations

for claims based on this conduct expired prior to the filing of the Debtor's bankruptcy petition.

In 2012, this Court analyzed the fraud and negligence statute of limitations in this case. *In re*

*Archdiocese of Milwaukee*, 470 B.R. 495 (Bankr. E.D. Wis. 2012). Relying on decisions from

the Wisconsin Supreme Court, the Court held that to the extent the claims were based on the

Debtor's negligent failure to warn the Claimants about their abusers, the claims were

"derivative" of and governed by the same statute of limitations as the original abuse claims

against the priests. *Id.* at 501. However, "[F]raud claims are not derivative claims, but rather,

intentional torts where the wrongful act is the Archdiocese's fraudulent representation that it did

7

not know of the priests' histories of sexually molesting children and that it did not know the priests were dangerous to children. Fraud claims, if proven, provide a separate cause of the plaintiffs' injuries." *Id.* (quoting *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 50, 303 Wis. 2d 34, 734 N.W.2d 827). In the 2012 decision, the Court found a disputed issue of material fact existed about whether the evidence put the Claimants on notice of the Debtor's alleged fraud to start the statute of limitations clock. *Id.* at 504.[6] Therefore the Court granted the Debtor's summary judgment motion as to the negligence claims but denied the motion as to the fraud claims.

The Claimants ask the Court to reconsider its decision about the negligent failure to warn claims "in light of the impact it could have on Claimants' rights against the insurance companies." (Docket No. 2983 at 2.) But the Court's analysis remains correct. The Wisconsin Supreme Court's definition of a "derivative claim" in this context is one based on an "employee's wrongful act that causes injury to another, which wrongful act is alleged to have been caused by the employer's negligence." *John Doe 1*, 2007 WI 95, ¶ 24 n.11. This definition is equally applicable to a negligent failure to warn claim as it is to a negligent failure to supervise claim. Accordingly, the Court concludes that the Claimants' negligent failure to warn or

---

[6] The Debtor asks the Court to revisit the statute of limitations issue on the fraud claims citing the information it contends was brought home to the Claimants in the form of publicity about the priest sex abuse scandal. The Debtor also points to alleged admissions that the Claimants' counsel made in other cases that everyone knew about the priest sex abuse scandal. But these Claimants have filed affidavits stating that they did not see the publicity or the list of abusers on the Debtor's website. The Court's opinion that this is a disputed fact for trial has not changed, although the Court regrets calling the inquiry a "subjective test." *Id.* at 503. As more aptly explained by the district court, the test has subjective and objective elements. *In re Archdiocese of Milwaukee*, 482 B.R. 792, 798 (E.D. Wis. 2012); *see also John BBB Doe v. Archdiocese of Milwaukee*, 565 N.W.2d 94, 116 (Wis. 1997) (Abrahamson, S., concurring) ("But by its very nature, the discovery rule is a matter largely of a plaintiff's mental state (using both the subjective and objective criteria); a plaintiff's mental state is not a matter amenable to categorical application.")

negligent failure to supervise claims are derivative of the original abuse claims, and the statute of limitations has run.

### d. Intentional Misrepresentation Claims

The Claimants' remaining claims are based on fraudulent or negligent misrepresentation. In *John Doe 1*, the Wisconsin Supreme Court listed the elements of a claim for intentional misrepresentation: "(1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment." 2007 WI 95, ¶ 38. The court also noted that acts – such as assigning a priest to a parish – can be the equivalent of a representation. *Id*. at ¶ 44.

The abusive priests in *John Doe 1* were Siegfried Widera and Franklyn Becker. *Id*. at ¶¶ 3, 7. The plaintiffs alleged that by placing these priests at a parish, the Archdiocese affirmatively represented to children and their families that the priests did not have a history of molesting children. *Id*. at ¶ 41. Importantly, the plaintiffs specifically alleged that the Archdiocese knew that these representations about Widera's and Becker's history "were untrue when made." *Id*. at ¶ 45. As explained in a footnote, among other details, the complaints alleged that Widera had been criminally convicted of child molestation and that the Archdiocese knew of the conviction, and that the Archdiocese received numerous complaints about Becker prior to his abuse of the plaintiff. *Id*. at ¶ 45 n.13. The court concluded that the complaints stated a claim for fraud. *Id*. at ¶ 47.

By contrast, in *Doe 67C v. Archdiocese of Milwaukee*, 2005 WI 123, ¶¶ 53, 56, 284 Wis. 2d 307, 700 N.W.2d 180, the Wisconsin Supreme Court dismissed a complaint for fiduciary fraud and breach of a fiduciary duty (assuming without deciding that there is a fiduciary duty

9

between the Archdiocese and its parishioners), because there was no evidence that the Archdiocese knew about the plaintiff's abuser's proclivities at the time the plaintiff was abused. The court stated: "However, if the Archdiocese did not possess such information at the time of the alleged abuse, then by definition it could not conceal it." *Id.* at ¶ 56.

In this case, there is no evidence that the Debtor knew that Leifeld, Buser, Wagner, Musinski, Arimond, Etzel, or Priest X had a history of molesting children prior to their abuse of the Claimants. The Claimants themselves did not report their abuse to the Debtor until years later, if at all, and they have failed to unearth any documents or witnesses that show that the Debtor was aware of the abusive conduct of these particular priests until after the Claimants were abused. Under the *John Doe 1* and *Doe 67C* standard, Claimants A-455, A-474, A-14, A-121, A-454, A-459 and A-511 do not have viable claims for fraud against the Debtor.

However, Claimant A-352 offered several documents purporting to show that prior to 1972, the Debtor was aware of Murphy's abuse of children at St. John's School for the Deaf. For example, Fr. Walsh's letter maintains that he told Archbishop Meyer that Murphy was "taking advantage of" students at St. John's School before 1963. (Docket No. 2984-1.) Sr. Telderer's letter confirms that during Archbishop Meyer's tenure a "pall" hung over St. John's, but "Archbishop Meyer reversed the decision [to require Murphy to leave] and Father Murphy was allowed to remain at St. John's School for the Deaf." (Docket No. 2984-7 at 2.) The letter to Archbishop Cousins from one of Murphy's abuse survivors provides more evidence that the Debtor knew prior to 1972: "In 1960 you or another bishop had warned him about immodest things, Fr. Walsh of Chicago told you about him." (Docket No. 2984-6.)

### e. Admissibility of Documents Supporting A-352's Fraud Claim

The Debtor argues that these documents are inadmissible hearsay, but the Court agrees with the Claimant that hearsay exceptions could apply to permit each of the documents to be

admitted into evidence.  Under each exception, in order to authenticate the evidence the Claimant

seeks to admit, he must "produce evidence sufficient to support a finding that the item is what

the proponent claims it is."  Fed. R. Evid. 901(a).

### 1.  Business Records Exception

Specifically, the business records exception could apply to admit the meeting summary

if:

> (A)  the record was made at or near the time by--or from information transmitted
> by--someone with knowledge;
> (B)  the record was kept in the course of a regularly conducted activity of a business,
> organization, occupation, or calling, whether or not for profit;
> (C)  making the record was a regular practice of that activity;
> (D)  all these conditions are shown by the testimony of the custodian or another
> qualified witness, or by a certification that complies with Rule 902(11) or (12) or
> with a statute permitting certification; and
> (E)  the opponent does not show that the source of information or the method or
> circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  Although the Debtor points out that the person who recorded the meeting

summary is not known and presumably is deceased, the witness who introduces the record does

not necessarily need to create the record.  The witness could be a custodian of the record who has

knowledge of the procedures under which the record was created.  *See, e.g., United States v.*

*Keplinger*, 776 F.2d 678, 693-94 (7th Cir. 1985) ("But the business records exception contains

no requirement that a 'qualified witness' must have personally participated in the creation or

maintenance of a document, nor even know who actually recorded the information.  Rather, the

phrase 'other qualified witness' in Rule 803(6) is to be given 'the broadest possible

interpretation' -- the witness need only be someone who 'understands the system.'"); *Rosenberg*

*v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980) ("Any person in a position to attest to the

authenticity of certain records is competent to lay the foundation for the admissibility of the

records; he need not have been the preparer of the record, nor must he personally attest to the

11

accuracy of the information contained in the records."); *United States v. Reese*, 568 F.2d 1246, 1252 (6th Cir. 1977) ("The rule is absent any requirement that the record's 'custodian or other qualified witness' have personal knowledge of the particular evidence contained in the record."). The meeting summary was located in the Debtor's own records in Murphy's personnel file. The custodian of those files could lay the evidentiary foundation necessary to authenticate the meeting summary.[7]

### 2. Ancient Documents Exception

Under the ancient documents exception, statements contained in documents that are "at least 20 years old and whose authenticity is established" are admissible, regardless of whether the declarant is available as a witness. Fed. R. Evid. 803(16). Under Rule 901(b)(8), to authenticate a document under the ancient documents exception, the proponent must submit evidence that the document "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." Any suspicion surrounding the document must relate to whether the document is what it purports to be, not suspicion regarding the veracity of the information contained in the document. *United States v. Kalymon*, 541 F.3d 624, 633 (6th Cir. 2008) ("Suspicion does not go to the content of the document, but instead, 'to whether the document is what it purports to be.' The content of the document is a matter of evidentiary weight left to the sole discretion of the trier of fact."); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, §

---

[7] The Court rejects the Claimant's argument that the letters to the Debtor from Fr. Walsh and Sister Telderer are business records because they were found and maintained in the Debtor's files. *See Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 194-95 (4th Cir. 2003) ("To qualify for the business records exception, the document must be prepared by someone acting 'in the course of a regularly conducted business activity. If, however, the supplier of the information does not act in the regular course, an essential link is broken . . . .'"); *Datamatic Servs. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990) ("If the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception. . . ."); Fed. R. Evid. 803 advisory committee's notes.

901.11[2] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2014).  Moreover, due to the required age of the document, it is virtually assured that the statements contained in the document were made prior to the controversy, which reduces the possibility that the document was created with an improper motive.  Weinstein at § 803.18.  If a document is ultimately authenticated as an ancient document under Rule 901(b)(8), it is automatically excepted from the rule against hearsay.  *Id.* at § 901.11[1].

The letter from the abuse survivor to Archbishop Cousins is dated May 24, 1973, and the document includes a copy of the envelope with the postmark from May 1973.  (Docket No. 2984-6 at 2.)  According to the Claimant's attorney, this letter was produced in earlier litigation with the Debtor.  The letter states:  "From 1950 to present Rev. Lawrence Murphy still plays the immodest things with the deaf boys (aged 11 to 18 yrs. old) and even me.  In 1960 you or another bishop had warned him about immodest things, Fr. Walsh of Chicago told you about him.  Fr. Murphy told me no sin to play immodest things with him."  (*Id.* at 1.)  Since the letter qualifies as an ancient document, contains a copy of the envelope with a postmark, and corroborates that Fr. Walsh advised the Debtor of Murphy's misconduct, the Court concludes that, assuming the Claimants could lay a foundation that the letter was produced by the Debtor in earlier litigation, the letter is admissible under the ancient documents exception.

### 3.  Residual Exception

Finally, the residual exception is a general exception that allows hearsay to be admitted if there are circumstantial guarantees of the document's trustworthiness, the document is offered as evidence of a material fact, the document is more probative than other evidence that the proponent can obtain, and admitting the evidence will best serve the purposes of the rules of evidence and the interests of justice.  Fed. R. Evid. 807.  A residual exception was considered necessary in order "(1) To provide sufficient flexibility to permit the courts to deal with new and

unanticipated situations, (2) To preserve the integrity of the specifically enumerated exceptions, [and] (3) To facilitate the basic purpose of the Federal Rules of Evidence: truth ascertainment and fair adjudication of controversies." *United States v. Sposito*, 106 F.3d 1042, 1048 (1st Cir. 1997). However, the Seventh Circuit Court of Appeals has cautioned that the exception should be used rarely, so that the exception does not swallow the hearsay rule. *See Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979).

The first requirement of the exception is that the documents have a guaranty of trustworthiness. To make this determination, courts examine the probable motivation of the declarant in making the statement, the circumstances under which it was made, and the knowledge and qualifications of the declarant. *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999) (citing *Cook v. Hoppin*, 783 F.2d 684, 690-91 (7th Cir. 1986)). The Court also may consider whether the statement is corroborated by other evidence. *United States v. Mokol*, 939 F.2d 436, 439-40 (7th Cir. 1991). Fr. Walsh's letter meets the test for trustworthiness. As the chaplain for the deaf community in Chicago, he is obviously a reliable witness. The context of his letter is apparent: it summarizes the information Fr. Walsh had about Murphy, the source of the information, and the people he told. (In addition to advising Archbishop Meyer and Archbishop Cousins, he reported his concerns about Murphy to the Apostolic Delegate in Washington.) (Docket No. 2984-1.)

Other evidence corroborates Fr. Walsh's statements. The letter states that Fr. Walsh met with Archbishop Meyer in the early part of Fr. Walsh's tenure, from 1955 until 1963. After the meeting, Archbishop Meyer informed Fr. Walsh that Murphy originally denied the charges, but later admitted them. "He was sent to some retreat house in northern Wisconsin and told to return

14

to St. John's to undue (sic) the harm he had done."[8] (Docket No. 2984-1.) The abuse survivor's letter to Archbishop Cousins identifies Fr. Walsh by name, and states, "In 1960 you or another bishop had warned [Murphy] about immodest things." (Docket No. 2984-6 at 1.) Fr. Walsh's letter also indicates that he called Archbishop Cousins and reported Murphy's continued misconduct. "Shortly after that Fr. Murphy was removed from the diocese." These facts also are corroborated by the meeting summary from 1974. (Docket No. 2984-4.)

The meeting summary offers further support for the reliability of Fr. Walsh's statements. The summary references a misstatement made in a "flyer." According to Fr. Walsh, St. John's students apparently prepared the flyer (referred to in Fr. Walsh's letter as a circular) to complain about Murphy and "placed [the flyer] on the windshields of priests at a clergy meeting." (Docket No. 2984-1.) The flyer states: "Around 1960's a priest who was working with the deaf adults in Chicago went to Milwaukee and told Archbishop Cousins about Lawrence C. Murphy and his actions. Archbishop Cousins gave Lawrence C. Murphy a final warning." (Docket No. 2984-5.) In referring to this accusation in the flyer, the meeting summary states: "[Redacted] charged that Archbishop Cousins had knowledge of complaints as far back as 1960. This was denied. It was pointed out that the "flyer" was in error. The incident referred to concerned Archbishop Meyer in 1957 or 1958." (Docket No. 2984-4 at 1.) By making this "correction" the meeting summary corroborates Fr. Walsh's statement that he reported Murphy's misconduct to Archbishop Meyer early in Fr. Walsh's tenure as chaplain.

In addition to trustworthiness, Fr. Walsh's letter satisfies the other elements of the residual exception. The letter is clearly material to and highly probative of the issue of when the Debtor learned of Murphy's history of abuse. And admitting the letter would serve the interest

---

[8] Sister Telderer's letter confirms that Murphy had to leave and it was Archbishop Meyer who allowed him to return to St. John's. (Docket No. 2984-7 at 2.)

of justice. The Claimants have accused the Debtor of covering up incidents of clergy sex abuse to avoid scandal. The Debtor denies knowing about Murphy's misconduct until after 1972. The letter appears highly probative of a key issue in this case concerning when the Debtor knew about Murphy's history of abusing children at St. John's School.

In summary, at least the meeting summary (as a business record), abuse survivor letter to Archbishop Cousins (as an ancient document) and Fr. Walsh's letter (under the residual exception) qualify as hearsay exceptions. Assuming a witness could authenticate it, the flyer could be admissible, and Sister Telderer's letter might also qualify for admission under the residual exception to the hearsay rules. But even without the flyer and Sister Telderer's letter, Claimant A-352 has submitted potentially admissible evidence from which the inference can be drawn that reports about Murphy's abuse of students at St. John's School reached the Debtor prior to 1972. Therefore, A-352's claim should not be disallowed on summary judgment.

### f. Negligent Misrepresentation Claims

Arguably, a claim for negligent misrepresentation is not a "derivative" claim, and is governed by the same discovery rule statute of limitations as fraud. *See Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶ 18, 308 Wis. 2d 103, 746 N.W.2d 762 ("We hold that Wis. Stat. § 893.93(1)(b) is the applicable statute of limitations given the allegations of fraud and misrepresentation upon which the Stuarts' claims, including both their HIPA and negligence claims, are based."). Negligent misrepresentation requires proof that (1) the defendant made a representation of fact to the plaintiff;[9] (2) the representation was false; (3) the plaintiff believed and relied on the misrepresentation to his detriment or damage; and (4) the defendant breached a

---

[9] The Court assumes that the representation that a priest is safe to work with children is a representation of fact. But the Debtor makes a compelling argument that such a representation is one of opinion as to the quality or value of the priest, which would not be actionable as misrepresentation. (Docket No. 3005 at 18.)

duty of care owed to the plaintiff in making the representation. *Ollerman v. O'Rourke Co.*, 288 N.W.2d 95, 99 (Wis. 1980). Initially, as with the fraudulent misrepresentation claim, if the representation of fact is that the Debtor knew of the priests' history of abuse and placed them in parishes anyway, there is no evidence that the Debtor knew of the history of these particular priests, other than Murphy. The Claimants contend that they have negligent misrepresentation claims "based on the Archdiocese's act of placing a priest in a parish and representing him as safe as well as failing to disclose to Claimants the dangers of clergy sexual abuse." (Docket No. 2983 at 28.)

In *Doe 67C*, the suit alleged claims for negligence, fiduciary fraud and breach of fiduciary duty arising from sexual abuse committed by George Nuedling between 1960 and 1962. 2005 WI 123, ¶¶ 2-3. The court concluded that for any of the negligence claims to survive, the complaint "had to allege that the Archdiocese knew or had a basis for knowing that Nuedling was a child molester <u>as of 1960-62</u>." *Id.* at ¶ 6 (emphasis in original). The court held: "[T]o sustain this [breach of fiduciary duty] claim, Doe must have alleged that the Archdiocese knew or should have known the material information as of 1960." *Id.* at ¶ 56.

As do the Claimants in this case, the plaintiff in *Doe 67C* alleged that Nuedling committed numerous instances of sexual abuse of children, but the plaintiff did not allege that the Debtor knew about Nuedling's misconduct prior to 1962. Most of the reports about Nuedling dated from the 1980s. *Id.* at ¶ 38. Here, other than Claimant A-352 who has alleged and pointed to evidence that the Debtor knew about Murphy's abuse of students prior to 1972, the Claimants have not alleged that the Debtor knew about their abusers' history prior to the dates when the Claimants were abused. Claimant A-121 points out that at least three other children were abused by Wagner before A-121 was abused, but there is no evidence that reports of that abuse reached the Debtor. Under the standard in *Doe 67C*, absent allegations that the Debtor had

17

material information about the Claimants' abusers prior to when the Claimants were abused, their Claims must be disallowed.

### 1.   Nondisclosure as a Negligent Misrepresentation

Liability for negligent failure to disclose requires a duty to disclose. *See Grube v. Daun*, 496 N.W.2d 106, 115 (Wis. Ct. App. 1992) ("For allegations of intentional misrepresentation through nondisclosure, the general rule is that 'silence, a failure to disclose a fact, is not an intentional misrepresentation unless the seller has a duty to disclose.  If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the nonexistence of the fact.'  *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95, 99-100 (1980) (footnote omitted).  This general rule also applies to negligent misrepresentation and strict responsibility.")  Whether Wisconsin recognizes a cause of action for negligent misrepresentation by nondisclosure is an "open question." *Kaloti Enters. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 13 n.3, 283 Wis. 2d 555, 699 N.W.2d 205.  A fiduciary relationship between the parties can create a duty to disclose. *Ollerman*, 288 N.W.2d at 102.

The Claimants suggest that the Debtor had a fiduciary relationship with the Claimants, but this is another question the courts in Wisconsin have not answered. *See Doe 67C*, 2005 WI 123, ¶ 50 n.9 ("The issue of whether Doe and the Archdiocese have a fiduciary relationship is an open question.")  The Claimants rely on *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999), but that case did not hold that the Archdiocese has a fiduciary relationship with all parishioners.  In fact it declined to express a view on that issue and focused instead on the distinctive relationship that the abuse victim had with the priest, which was known to the Diocese. *Id.* at 429.  The plaintiff in *Martinelli* was a Catholic High School student who "had, and the Diocese knew he had, a special and privileged relationship with Father Brett . . . as a member of 'Brett's Mavericks,' the small group of boys interested in liturgical

18

reform in the Catholic Church to whom Brett acted as a mentor and spiritual advisor." *Id.* The court of appeals found that "based on the particulars of his ties to Brett and the Diocese's knowledge and sponsorship of that relationship" the jury was reasonable in its conclusion that the relationship was fiduciary in nature. *Id.* Here, the Claimants have not alleged that the Debtor knew about any relationship that they had with their abusers. One or more of the Claimants suggest a "special relationship" such as cleaning the priest's home or serving as an altar boy, but evidence similar to that in *Martinelli* is lacking.

The Claimants urge that the Debtor's knowledge that other priests were abusers satisfies the standard. The Court rejects this argument. Isolated instances of priest sex abuse of minors by other priests does not compel the conclusion that the Debtor should have known that these particular priests were abusers years before their identities were reported to the Debtor. The emphasis in *Doe 67C* on the Debtor's lack of knowledge of Nuedling's proclivities until the 1980s confirms the Court's conclusion. Moreover, even if a duty to warn could be conjured based on the crimes of other priests, the Debtor's negligent failure to warn these Claimants likely would be a derivative claim as defined by *John Doe 1*, and the statute of limitations has expired.

At oral argument, the Claimants' counsel stated that in cases involving the Boy Scouts, other trial courts had held that general awareness of child sex abuse is sufficient to create a duty to warn and liability for negligent misrepresentation. But in the case attached to Attorney Brennan's affidavit, *Doe v. Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 1:09-cv-00351-BLW, 2012 U.S. Dist. LEXIS 124658 (D. Idaho Aug. 31, 2012), the defendants had prior knowledge that the specific scout master had a history of molesting children. The court remarked: "Indeed, Doe claims that both the Boy Scout and Church defendants had specific notice that Arnold was a child molester and danger to children." *Id.* at *5. In *Doe v. Presiding Bishop*, before the plaintiff was abused, another parent told the Bishop

(who also was a member of the local Council for the Boy Scouts of America) that his son had been molested, and the Bishop said he would take care of it. *Id.* The court cautioned that "[t]he scope of any duty to disclose [the alleged risk of sexual abuse by adult male volunteers] by the Boy Scouts Defendants would naturally be limited by the extent of the Scout Defendants' knowledge regarding the risks of sexual abuse in scouting." *Id.* at *39-40. Rather than relying on the Scout Defendants' general knowledge, the court pointed out: "Doe contends that Scout Defendants knew and hid specific knowledge of Arnold's earlier abuse of another boy scout. Doe bases this claim on Richard White's testimony that he told Bishop Hales, prior to the abuse of Doe, that Arnold had molested White's own son." *Id.* at *40.

As in *Doe 67C*, the court focused on the "specific" knowledge about the particular abuse perpetrator rather than general knowledge about other child molesters in the Boy Scout organization's files. No Wisconsin court has held that general knowledge of clergy sexual abuse (or Boy Scout master sexual abuse) creates a duty to disclose on the Archdiocese or the Boy Scouts. The Court agrees with the Debtor that this Court should not create new Wisconsin law on this issue. *See, e.g., Landess v. Borden, Inc.*, 667 F.2d 628, 631 n.3 (7th Cir. 1981) ("Until the highest state court adopts the [proposed cause of action], we are not at liberty to do so on its behalf.")

In sum, the Wisconsin Supreme Court has not expressly recognized the existence of a claim for negligent misrepresentation by nondisclosure. In our context, such a claim could only be viable if the Court determined that the Debtor acted as a fiduciary to the Claimants. But the Wisconsin courts also have never acknowledged that the Archdiocese owes a fiduciary duty to the children in its parishes. Assuming that the negligent failure to disclose claim and the fiduciary relationship both exist, the Claimants have not shown that the Debtor knew of the history of the particular abusers who abused the Claimants. The allegation that the Archdiocese

had notice of a particular priest's history or "special" relationship with children prior to the Claimant's abuse is a common thread in other cases that is missing from the Claimants' Claims. The Court rejects the Claimants' argument that knowledge of other pedophile priests created a duty to warn or disclose the risks of these pedophile priests to the Claimants and their families. Since none of the Claimants are able to allege that the Debtor had notice of their particular abusers' histories prior to the time that the Claimants were abused, their negligent misrepresentation claims are unenforceable under Wisconsin law.

### IV. CONCLUSION

Given the ruling by the Wisconsin Supreme Court that all derivative negligence claims share the statute of limitations with the original incidents of abuse, the Claimants are left with claims for fraud and negligent misrepresentation. The *John Doe 1* and *John Doe 67C* decisions support this Court's conclusion that unless the Claimant can allege that the Debtor knew about a perpetrator's history of abuse before the Claimant was abused, the Claimant cannot state a claim for intentional misrepresentation. Moreover, general knowledge that other priests had abused other children does not imply that the Debtor should have known that these perpetrators would abuse these Claimants, sufficient to state a claim for negligent misrepresentation.

Claimant A-352's circumstance is different. The inference can reasonably be drawn from Fr. Walsh's letter, the meeting summary and the letter from the abuse survivor to Archbishop Cousins that reports about Murphy's abuse of students at St. John's School reached the Debtor before 1972. By allowing Murphy to remain at the school where he could prey on Claimant A-352 and other children, the Debtor made either an intentional or negligent misrepresentation. The Court cannot determine as a matter of law when sufficient information was brought home to Claimant A-352 about his claims against the Debtor to start the statute of limitations clock. This issue presents a question of fact for a trial.

21

Accordingly, the Court will enter an Order granting the Debtor's motions for summary judgment as to Claim Nos. 572, 591, 78, 222, 628, 571 and 576 and denying the motion for summary judgment on Claim no. 467.

Dated: March 24, 2015

By the Court:

Susan V. Kelley
Chief U.S. Bankruptcy Judge