# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:                                          Case No. 11-20059-svk

**ARCHDIOCESE OF MILWAUKEE,**                   **Chapter 11**

                            **Debtor.**         **Hon. Susan V. Kelley**

## SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 25, 2015, PROPOSED BY THE ARCHDIOCESE OF MILWAUKEE

Dated as of September 25, 2015

WHYTE HIRSCHBOECK DUDEK S.C.
Daryl L. Diesing
Bruce G. Arnold
Francis H. LoCoco
Lindsey M. Greenawald
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
Telephone: (414) 273-2100
Facsimile: (414) 223-5000
Email: ddiesing@whdlaw.com
        barnold@whdlaw.com
        flococo@whdlaw.com
        lgreenawald@whdlaw.com

*Counsel to the Debtor*

# TABLE OF CONTENTS

ARTICLE I: DEFINITIONS AND INTERPRETATION ................................................................. 5
    1.1    DEFINED TERMS ........................................................................................... 5
    1.2    INTERPRETATION ......................................................................................... 5
    1.3    TIME PERIODS ............................................................................................... 6
    1.4    EXHIBITS ......................................................................................................... 6

ARTICLE II: TREATMENT OF UNCLASSIFIED CLAIMS ...................................................... 6
    2.1    ADMINISTRATIVE CLAIMS ....................................................................... 6
    2.2    STATUTORY FEES ......................................................................................... 8
    2.3    PRIORITY TAX CLAIMS .............................................................................. 8

ARTICLE III: CLASSIFICATION OF CLAIMS ......................................................................... 8
    3.1    SUMMARY ...................................................................................................... 8
    3.2    CLASSIFICATION .......................................................................................... 9
    3.3    IMPAIRMENT; VOTING .............................................................................. 10

ARTICLE IV: TREATMENT OF CLASSIFIED CLAIMS ........................................................ 10
    4.1    PARK BANK SECURED CLAIM (CLASS 1) ............................................ 10
    4.2    PRIORITY CLAIMS (CLASS 2) ................................................................. 11
    4.3    ARCHDIOCESE OF MILWAUKEE PRIESTS' RETIREE MEDICAL
            PLAN CLAIMS (CLASS 3). ......................................................................... 11
    4.4    ARCHDIOCESE OF MILWAUKEE PRIESTS' PENSION PLAN
            CLAIMS (CLASS 4) ..................................................................................... 11
    4.5    ARCHDIOCESAN CEMETERIES OF MILWAUKEE UNION
            EMPLOYEES' PENSION PLAN CLAIMS (CLASS 5) ................................ 12
    4.6    ARCHDIOCESE OF MILWAUKEE LAY EMPLOYEES' PENSION
            PLAN CLAIMS (CLASS 6) .......................................................................... 12
    4.7    PERPETUAL CARE CLAIMS (CLASS 7) ................................................. 12
    4.8    ABUSE SURVIVOR PLAN POOL CLAIMS (CLASS 8) ............................ 12
    4.9    UNSUBSTANTIATED CLAIMS RECEIVING A DISTRIBUTION AT
            THE CREDITORS' COMMITTEE'S REQUEST (CLASS 9) .......................... 13
    4.10  DISALLOWED OR PREVIOUSLY DISMISSED ABUSE SURVIVOR
            CLAIMS (CLASS 10) ................................................................................... 14
    4.11  FUTURE CLAIMANT REPRESENTATIVE CLAIM (CLASS 11) .................. 14
    4.12  GENERAL UNSECURED CREDITOR CLAIMS (CLASS 12) ........................ 16
    4.13  CHARITABLE GIFT ANNUITY CLAIMS (CLASS 13) ................................ 16
    4.14  PENALTY CLAIMS (CLASS 14) ............................................................... 16

ARTICLE V: SETTLEMENTS EMBODIED IN PLAN ............................................................ 17
    5.1    INSURANCE LITIGATION .......................................................................... 17
    5.2    CEMETERY TRUST LITIGATION ............................................................. 21
    5.3    FAITH IN OUR FUTURE TRUST ............................................................... 22
    5.4    PENDING ABUSE SURVIVOR CLAIMS OBJECTIONS AND
            APPEALS OF ABUSE SURVIVOR CLAIMS OBJECTIONS ......................... 23

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 2 of 329

5.5      RESERVATION OF RIGHTS ................................................................. 23

ARTICLE VI: MEANS OF IMPLEMENTATION OF THE AMENDED PLAN .................... 23
6.1      IMPLEMENTATION OF PLAN ......................................................... 23
6.2      FUNDING THE AMENDED PLAN .................................................... 23
6.3      ALLOCATION OF PLAN FUNDS ..................................................... 24
6.4      ADMINISTRATION OF PROPERTY AND OPERATIONS ................... 25
6.5      THERAPY FUND ............................................................................ 26
6.6      COUSINS CENTER ......................................................................... 26
6.7      OPERATING LEASES AND REAL ESTATE LEASES ....................... 26
6.8      CONTINUATION OF FCR ............................................................... 26
6.9      VESTING OF ASSETS IN THE PLAN TRUST .................................. 27
6.10    ASSUMPTION OF PLAN OBLIGATIONS AND LIABILITY FOR
         CLAIMS ......................................................................................... 27
6.11    RETENTION OF JURISDICTION ..................................................... 27

ARTICLE VII: THE PLAN TRUST ...................................................................................... 29
7.1      FORMATION AND FUNDING OF THE PLAN TRUST ..................... 29
7.2      PLAN TRUST ASSETS .................................................................... 29
7.3      PLAN AGREEMENT ....................................................................... 29
7.4      DISTRIBUTIONS FROM THE PLAN TRUST .................................... 30
7.5      INDEMNIFICATION OF THE SETTLING INSURERS ....................... 30
7.6      TAX MATTERS ............................................................................... 30
7.7      APPOINTMENT OF THE PLAN TRUSTEE ...................................... 30
7.8      RIGHTS AND RESPONSIBILITIES OF THE PLAN TRUSTEE ......... 30
7.9      INVESTMENT POWERS; PERMITTED CASH EXPENDITURES ........ 31
7.10    REGISTRY OF BENEFICIAL INTERESTS ....................................... 31
7.11    NON-TRANSFERABILITY OF INTERESTS ...................................... 31
7.12    TERMINATION ............................................................................... 31
7.13    LIABILITY; INDEMNIFICATION .................................................... 32
7.14    RETENTION OF PROFESSIONALS ................................................. 32
7.15    SUCCESSION TO LITIGATION ....................................................... 32

ARTICLE VIII: INSURANCE POLICIES ............................................................................ 32
8.1      CONTINUATION OF INSURANCE POLICIES ................................. 32
8.2      PLAN NEUTRALITY AS TO INSURANCE POLICIES ..................... 33

ARTICLE IX: PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION .................... 33
9.1      RESERVATION OF RIGHTS TO OBJECT TO CLAIMS ................... 33
9.2      OBJECTIONS TO CLAIMS .............................................................. 34
9.3      SERVICE OF OBJECTIONS ............................................................. 34
9.4      DETERMINATION OF CLAIMS ...................................................... 34
9.5      NO DISTRIBUTIONS PENDING ALLOWANCE ............................... 35
9.6      CLAIM ESTIMATION .................................................................... 35

ARTICLE X: DISTRIBUTIONS UNDER THE AMENDED PLAN ........................................ 35
10.1    TIMING OF DISTRIBUTIONS ....................................................... 35

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 3 of 329

10.2 PAYMENT DATE ........................................................................................... 35
10.3 UNDELIVERABLE DISTRIBUTIONS ......................................................... 35
10.4 SETOFFS ....................................................................................................... 36
10.5 NO INTEREST ON CLAIMS ....................................................................... 36
10.6 WITHHOLDING TAXES ............................................................................. 36

ARTICLE XI: EFFECTIVENESS OF THE AMENDED PLAN ................................... 36
11.1 CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE ........................... 36
11.2 NOTICE OF EFFECTIVE DATE ................................................................. 37
11.3 WAIVER OF CONDITIONS ....................................................................... 37
11.4 EFFECT OF NON-OCCURRENCE OF CONDITIONS ..................................... 37

ARTICLE XII: EFFECTS OF CONFIRMATION ........................................................ 37
12.1 DISSOLUTION OF THE COMMITTEE ..................................................... 37
12.2 DISCHARGE INJUNCTION ...................................................................... 37
12.3 CHANNELING INJUNCTION ................................................................... 38
12.4 EXCULPATION; LIMITATION OF LIABILITY .......................................... 39
12.5 TIMING ....................................................................................................... 39

ARTICLE XIII: THE REORGANIZED DEBTOR ....................................................... 39
13.1 CONTINUED CORPORATE EXISTENCE ................................................. 39
13.2 VESTING OF ASSETS ............................................................................... 40
13.3 IDENTITY OF OFFICERS OF REORGANIZED DEBTOR .......................... 40
13.4 FURTHER AUTHORIZATION ................................................................... 40
13.5 COMMITMENT TO CHILD PROTECTION & TRANSPARENCY .............. 40

ARTICLE XIV: MISCELLANEOUS PROVISIONS .................................................... 43
14.1 REJECTION OF UNASSUMED EXECUTORY CONTRACTS ..................... 43
14.2 FINAL ORDER ........................................................................................... 43
14.3 AMENDMENTS AND MODIFICATIONS ................................................. 43
14.4 U.S ............................................................................................................... 43
14.5 NO WAIVER ............................................................................................... 43
14.6 TAX EXEMPTION ...................................................................................... 43
14.7 NON-SEVERABILITY ............................................................................... 44
14.8 REVOCATION ............................................................................................ 44
14.9 CONTROLLING DOCUMENTS ................................................................. 44
14.10 GOVERNING LAW ................................................................................... 44
14.11 NOTICES .................................................................................................... 45
14.12 FILING OF ADDITIONAL DOCUMENTS ................................................ 45
14.13 POWERS OF OFFICERS ........................................................................... 45
14.14 DIRECTION TO A PARTY ........................................................................ 45
14.15 SUCCESSORS AND ASSIGNS ................................................................. 45
14.16 CERTAIN ACTIONS ................................................................................. 45
14.17 FINAL DECREE ......................................................................................... 46
14.18 AMENDED PLAN AS SETTLEMENT COMMUNICATION ..................... 46
14.19 CONTRIBUTION RIGHTS ........................................................................ 46

ARTICLE XV: BANKRUPTCY RULE 9019 REQUEST ............................................................ 46

ARTICLE XVI: CONFIRMATION REQUEST ........................................................................ 47

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 5 of 329

# INTRODUCTION

Archdiocese of Milwaukee, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), proposes this Second Amended Chapter 11 Plan of Reorganization (the "Amended Plan") pursuant to the provisions of the Bankruptcy Code.

All creditors are encouraged to consult the *Fourth Amended Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization Dated September 25, 2015, Proposed by the Archdiocese of Milwaukee* (the "Disclosure Statement") before voting to accept or reject the Amended Plan. Among other information, the Disclosure Statement contains discussions of the Debtor, the historical background of the Chapter 11 Case and the prepetition period, and a summary and analysis of the Amended Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Amended Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for approval of the Amended Plan on **November 9, 2015, beginning at 9:00 a.m**.

## ARTICLE I:
## DEFINITIONS AND INTERPRETATION

**1.1    DEFINED TERMS**. For the purposes of the Amended Plan, except as expressly provided and unless the context otherwise requires, all capitalized terms not otherwise defined in context have the meanings ascribed to them in **Exhibit B** hereto.

**1.2    INTERPRETATION**.  For purposes of the Amended Plan:

(**a**)    any term that is not defined herein, but that is used in the Bankruptcy Code and/or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code and/or the Bankruptcy Rules, as applicable;

(**b**)    the terms "including"  or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

(**c**)    whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

(**d**)    the rules of construction set forth in § 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

(**e**)    any reference in the Amended Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(f)     any reference in the Amended Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

(g)     unless otherwise specified, all references in the Amended Plan to "Articles," "Sections,"  "Schedules" and "Exhibits" are references to Articles, Sections, Schedules and Exhibits of or to the Amended Plan;

(h)     the words "herein," "hereof," and "hereto" refer to the Amended Plan in its entirety rather than to a particular portion of the Amended Plan;

(i)     captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Amended Plan or otherwise affect the interpretation of the Amended Plan; and

(j)     the Amended Plan supersedes all prior drafts of the Amended Plan, and all prior negotiations, agreements, and understandings with respect to the Amended Plan, evidence of which shall not affect the interpretation of any provision of the Amended Plan.

**1.3     TIME PERIODS**.  In computing any period of time prescribed or allowed by the Amended Plan, unless otherwise expressly provided, the provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply.  If any act under the Amended Plan is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Enlargement of any period of time prescribed or allowed by the Amended Plan shall be governed by the provisions of Federal Rule of Bankruptcy Procedure 9006(b).

**1.4     EXHIBITS**.  All Exhibits to the Amended Plan (including the Supplemental Plan Documents) are hereby incorporated by reference and made part of the Amended Plan as if set forth fully herein.

## ARTICLE II:
## TREATMENT OF UNCLASSIFIED CLAIMS

**2.1     ADMINISTRATIVE CLAIMS**.  As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Amended Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article.

(a)     **Treatment.**  Subject to the bar date provisions herein and additional requirements for Professionals and certain other Persons set forth below, each holder of an Allowed Administrative Claim against the Debtor shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash equal to the Allowed amount of such Administrative Claim, unless the holder agrees or shall have agreed to other treatment of such Claim no less favorable to the Debtor.

**(b)      General Administrative Bar Date.**

(1)      Except as otherwise set forth in this Section, requests for payment of Administrative Claims must be Filed and served on the Post-Confirmation Notice Parties no later than thirty (30) days after a notice of the Effective Date is Filed with the Bankruptcy Court (the "Administrative Claim Bar Date") and served on the Post-Confirmation Notice Parties, the Service List, and the Professionals.  Holders of Administrative Claims (including the holders of any Claims for federal, state or local taxes, but excluding Professional Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtor, the Reorganized Debtor, or any of their property. Notwithstanding the foregoing, any Bar Dates established during the course of this Chapter 11 Case shall remain in full force and effect.

(2)      All objections to allowance of Administrative Claims (excluding Professional Claims) must be Filed by any parties in interest no later than ninety (90) days after the Administrative Claim Bar Date (the "Administrative Claim Objection Deadline").  The Administrative Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the Debtor upon the Filing of a notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court.  Thereafter, the Administrative Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any party in interest.  If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, as may be extended, such Administrative Claim will be deemed Allowed, subject to the Bankruptcy Court's discretion to extend such objection deadline retroactively.  For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph, as may be extended, shall control over any contrary deadline set forth in any requests for payment of Administrative Claims.

**(c)      Bar Date for Professional Claims.**

(1)      All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall File and serve on the Post-Confirmation Notice Parties an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than sixty (60) days after a notice of the Effective Date is filed with the Bankruptcy Court and served (the "Professional Claim Bar Date") on the Post-Confirmation Notice Parties, the Service List, and the Professionals.

(2)     Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be Filed no later than forty-five (45) days after the Professional Claim Bar Date (the "Professional Claim Objection Deadline").  The Professional Claim Objection Deadline may be initially extended for an additional forty-five (45) days at the sole discretion of the Debtor upon the Filing of a notice of the extended Professional Claim Objection Deadline.  Thereafter, the Professional Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any party in interest.

**(d)     Cap on Professional's Fees.**  Any fees incurred by PSZJ between July 18, 2015, and the Effective Date are capped at $250,000.  Any fees incurred by WHD between July 18, 2015, and the Effective Date are capped at $1,000,000.

**2.2     STATUTORY FEES**.  All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. After the Effective Date, the Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered.  In addition, the Debtor shall File post-Confirmation Date quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate.

**2.3     PRIORITY TAX CLAIMS**.  With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, the Debtor shall (i) pay such Claim in Cash as soon as practicable after the Effective Date, or (ii) provide such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor, as applicable, in writing, provided such treatment is no less favorable to the Debtor than the treatment set forth in clause (i) of this sentence.

**ARTICLE III:**
**CLASSIFICATION OF CLAIMS**

**3.1     SUMMARY**. The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of the Amended Plan, and distribution pursuant to the Amended Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Park Bank Secured Claim | Impaired | Yes |
| 2 | Priority Claims | Unimpaired | No |
| 3 | Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims | Unimpaired | No |
| 4 | Archdiocese of Milwaukee Priests' Pension Plan Claims | Unimpaired | No |
| 5 | Archdiocesan Cemeteries of Milwaukee Union Employees' Union Pension Plan Claims | Unimpaired | No |
| 6 | Archdiocese of Milwaukee Lay Employees' Pension Plan Claims | Unimpaired | No |
| 7 | Perpetual Care Claims | Impaired | No |
| 8 | Abuse Survivor Plan Pool Claims | Impaired | Yes |
| 9 | Unsubstantiated Claims Receiving a Distribution at the Creditors' Committee's Request | Impaired | Yes |
| 10 | Disallowed or Disputed Claims | Impaired | No |
| 11 | Future Claimants Representative Claim | Impaired | Yes |
| 12 | General Unsecured Creditor Claims | Impaired | Yes |
| 13 | Charitable Gift Annuity Claims | Unimpaired | No |
| 14 | Penalty Claims | Impaired | No |

**3.2    CLASSIFICATION**.  The Claims against the Debtor shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Article II).  Consistent with § 1122 of the Bankruptcy Code, a Claim is classified by the Amended Plan in a particular Class only to the extent the Claim is within the description of the Class, and a Claim is classified in a different Class to the extent it is within the description of that different Class.

### 3.3    IMPAIRMENT; VOTING.

**(a)    Non-Voting Classes.**

(1)    Class 2 (Priority Claims) is Unimpaired by the Amended Plan and holders of Claims in this Class are conclusively presumed to have accepted the Amended Plan.

(2)    Classes 3 (Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims), 4 (Archdiocese of Milwaukee Priests' Pension Plan Claims), 5 (Archdiocesan Cemeteries of Milwaukee Union Employees' Union Pension Plan Claims), 6 (Archdiocese of Milwaukee Lay Employees' Pension Plan Claims), and 13 (Charitable Gift Annuity Claims) are Unimpaired by the Amended Plan and holders of Claims in these Classes are conclusively presumed to have accepted the Amended Plan.

(3)    Class 7 (Perpetual Care Claims) is Impaired, but because holders of Claims in this Class will not retain or receive any property under the Amended Plan on account of such Claims, this Class is presumed to have rejected the Amended Plan.

(4)    Class 10 (Disallowed or Disputed Claims) is Impaired.  While Claimants in this Class will be entitled to receive therapy paid for by the Debtor, or, if applicable, will be referred to other entities for therapy paid for by the applicable entity, the Class is presumed to have rejected the Amended Plan because it is not receiving a financial settlement.

(5)    Class 14 (Penalty Claims) will not be receiving any distribution under the Amended Plan and will be deemed to have rejected the Amended Plan.

**(b)    Voting Classes.**  Classes 1 (Park Bank Secured Claim), 8 (Abuse Survivor Plan Pool Claims), 9 (Unsubstantiated Claims Designated by the Creditors' Committee), 11 (Future Claimants Representative Claim), and 12 (General Unsecured Creditor Claims), are (or may be) Impaired by the Amended Plan, and holders of Claims in these Classes shall be entitled to vote to accept or reject the Amended Plan.

### ARTICLE IV:
### TREATMENT OF CLASSIFIED CLAIMS

### 4.1    PARK BANK SECURED CLAIM (CLASS 1).

**(a)    Definition**.  The Park Bank Secured Claim means the secured claim of Park Bank in the approximate amount of $4,389,512.50 arising out of that certain loan dated October 12, 2006.

**(b)    Treatment**. Park Bank shall retain its Lien on the Park Bank Collateral to secure the obligations due to Park Bank on its Allowed Secured Claim pursuant to the Amended Plan.  The Reorganized Debtor and Park Bank will amend the Park Bank Loan

Documents to allow liens of subordinate priority to Park Bank's lien and interests pursuant to an intercreditor agreement in form and substance acceptable to Park Bank, in its sole discretion. The amended loan between the Reorganized Debtor and Park Bank shall provide for payment of accrued interest plus principal necessary to amortize the principal over ten (10) years. The amended loan shall have a three (3) year term with a balloon payment of accrued interest and principal due at the expiration of the three (3) year term. The amended loan shall bear interest at 5.25 percent (5.25%) per annum and shall not be subject to any prepayment premium. Payments of $59,093 shall be required monthly.

**4.2    PRIORITY CLAIMS (CLASS 2).**

    **(a)    Definition**. Priority Claims mean Allowed Claims described in, and entitled to priority under § 507(a) and § 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

    **(b)    Treatment**. Unless the holder of an Allowed Class 2 Claim and the Archdiocese agree to a different treatment, on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an Allowed Claim (or as soon thereafter as is practicable), the Debtor shall pay each such Allowed Class 2 Claim in full, in Cash, without interest.

**4.3    ARCHDIOCESE OF MILWAUKEE PRIESTS' RETIREE MEDICAL PLAN CLAIMS (CLASS 3).**

    **(a)    Definition.** A Class 3 Claim means any Claim against the Debtor for potential liability arising under the Archdiocese of Milwaukee Priests' Retiree Medical Plan.

    **(b)    Treatment**. The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Retiree Medical Plan. The Archdiocese will not make any payment with respect to any Claim filed in the Chapter 11 Case with respect to Class 3 Claims. The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Priests' Retiree Medical Plan as they become due.

**4.4    ARCHDIOCESE OF MILWAUKEE PRIESTS' PENSION PLAN CLAIMS (CLASS 4).**

    **(a)    Definition.** A Class 4 Claim means any Claim against the Debtor for liability arising under the Archdiocese of Milwaukee Priests' Pension Plan.

    **(b)    Treatment**. The Archdiocese will assume its participation in the Archdiocese of Milwaukee Priests' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's employed priests under the Archdiocese of Milwaukee Priests' Pension Plan, which was fully funded as of June 30, 2014. The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Priests' Pension Plan as they become due.

**4.5     ARCHDIOCESAN CEMETERIES OF MILWAUKEE UNION EMPLOYEES' PENSION PLAN CLAIMS (CLASS 5)**.

      **(a)     Definition**.  A Class 5 Claim means any Claim against the Debtor for liability arising under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan.

      **(b)     Treatment**.  The Archdiocese will assume its participation in the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan.  The Archdiocese will continue to meet its obligations under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan as they become due.  The Archdiocese will assume the Collective Bargaining Agreement, as modified on April 3, 2014, with the Cemetery Employees, Local 113, Laborers International Union of America, AFL-C10.

**4.6     ARCHDIOCESE OF MILWAUKEE LAY EMPLOYEES' PENSION PLAN CLAIMS (CLASS 6)**.

      **(a)     Definition**.  A Class 6 Claim means any Claim against the Debtor for liability arising under the Archdiocese of Milwaukee Lay Employees' Pension Plan.

      **(b)     Treatment**.  The Archdiocese will assume its participation in the Archdiocese of Milwaukee Lay Employees' Pension Plan pursuant to the multi-employer agreement among the Archdiocese and all participating employers to pay all benefits due to the Archdiocese's lay employees accrued under the Archdiocese of Milwaukee Lay Employee's Pension Plan.  The Archdiocese will continue to meet its obligations under the Archdiocese of Milwaukee Lay Employees' Pension Plan as they become due.

**4.7     PERPETUAL CARE CLAIMS (CLASS 7)**.

      **(a)     Definition**.  A Class 7 Claim means any Claim arising from the Debtor's obligations to provide ongoing maintenance and care at the Milwaukee Catholic Cemeteries.  The Class 7 Claim includes the claim filed by the Debtor on November 16, 2011, on behalf of the purchasers of graves, crypts, mausoleum space, income care, endowment care, perpetual care, and the estates, legal representatives, heirs, successors, assigns, and beneficiaries of decedents buried, interred, or otherwise preserved in the Milwaukee Catholic Cemeteries.

      **(b)     Treatment**.  The Reorganized Debtor will arguably be discharged from all contractual and other civil liability to provide perpetual care and maintenance of the Milwaukee Catholic Cemeteries.  Even if it is discharged from contractual liability, the Reorganized Debtor intends to continue to maintain the Milwaukee Catholic Cemeteries because canon law requires it to continue caring for the Cemeteries.

**4.8     ABUSE SURVIVOR PLAN POOL CLAIMS (CLASS 8)**.

      **(a)     Definition.** The Class 8 Claims are those claims that meet the following criteria:

1. The Claimant did not release the Archdiocese from liability associated with the Abuse; and

2. The Claim alleges sexual abuse of a minor by either (a) a priest on the List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at a Catholic Entity.

The Class 8 Claims are listed on **Exhibit F**.

      **(b)**    **Treatment**.  In addition to the right to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process, each holder of a Class 8 Claim shall receive, in full satisfaction, settlement, and release of his or her Claim, a claim against the Plan Trust for a distribution on account of such claim from the Plan Trust in accordance with the Allocation Protocols, provided that the Claimant releases the Catholic Entities and the Settling Insurers in accordance with Section 7.4(b) of the Amended Plan; **_provided, however, that_** the satisfaction, settlement, and release of the claim shall in no way impact, diminish, or affect the liability of any Non-Settling Insurer, which liability shall continue unaffected by the terms of the Amended Plan or the discharge(s) and/or injunction(s) granted to the Protected Parties under the Amended Plan and Bankruptcy Code §1141(d).  The Plan Trustee shall make all payments to Class 8 Claimants who provide signed releases within the later of: (i) ninety (90) days after the Plan Funding Date; or (ii) thirty (30) days after the Plan Trustee's receipt of the signed release.  The Plan Trustee will have no obligation to make any payment to Class 8 Claimants who do not provide a signed release to the Plan Trustee on or before the sixth (6th) anniversary of the Effective Date.

      **(c)**    **Therapy Assistance.**  Each holder of a Class 8 Claim shall be entitled to request therapy payment assistance from the Therapy Fund.  Such assistance shall be requested in accordance with the Therapy Payment Process.

      **4.9**    **UNSUBSTANTIATED CLAIMS RECEIVING A DISTRIBUTION AT THE CREDITORS' COMMITTEE'S REQUEST (CLASS 9).**

      **(a)**    **Definition.**  The Class 9 Claims are those claims that meet the following criteria:

1. The Claimant did not release the Archdiocese from liability associated with the Abuse; and

2. The Claim alleges sexual abuse of a minor by either (a) an Archdiocesan Priest who is not on List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at an entity that is not a Catholic Entity.

The Class 9 Claims are listed on **Exhibit G**.

      **(b)**    **Treatment.**  Each holder of a Class 9 Claim that releases the Catholic Entities and the Settling Insurers in accordance with Section 7.4(b) of the Amended Plan shall receive $2,000 from the Plan Trust in full satisfaction, settlement, and release of his

or her claim; **provided, however, that** the satisfaction, settlement, and release of the claim shall in no way impact, diminish, or affect the liability of any Non-Settling Insurer, which liability shall continue unaffected by the terms of the Amended Plan or the discharge(s) and/or injunction(s) granted to the Protected Parties under the Amended Plan and Bankruptcy Code §1141(d). The Plan Trustee shall make all payments to Class 9 Claimants who provide signed releases within the later of: (1) thirty (30) days after the Plan Funding Date or (ii) thirty (30) days after the Plan Trustee's receipt of the signed release. The Plan Trustee will have no obligation to make any payment to Class 9 Claimants who do not provide a signed release to the Plan Trustee on or before the sixth (6th) anniversary of the Effective Date.

(c) **Therapy Assistance**. Each holder of a Class 9 Claim shall be entitled to request therapy payment assistance from the Therapy Fund. Such assistance shall be requested in accordance with the Therapy Payment Process.

**4.10    DISALLOWED OR PREVIOUSLY DISMISSED ABUSE SURVIVOR CLAIMS (CLASS 10)**.

(a) **Definition**. The Class 10 Claims are those claims that do not meet the criteria of a Class 8 or Class 9 Claim because:

1. Pursuant to a valid settlement agreement, the Claimant released the Archdiocese from liability associated with the Abuse; or

2. The Claim does not allege sexual abuse of a minor; or

3. The Claim alleges sexual abuse of a minor by someone other than an Archdiocesan Priest or a member of a Religious Order or Lay Person working at a Catholic Entity.

The Class 10 Claims are listed on **Exhibit H**.

(b) **Treatment**. Holders of Class 10 Claims shall not receive or retain any property under the Amended Plan on account of such Claims. However, to the extent a Class 10 Claimant and the Archdiocese are parties to a settlement agreement, the Claimant's rights under the settlement agreement will be honored including existing arrangements regarding therapy assistance.

**4.11    FUTURE CLAIMANT REPRESENTATIVE CLAIM (CLASS 11)**.

(a) **Definition**. The Class 11 Claim means the Claim of the FCR on behalf of the FCR Claimants. Notwithstanding anything to the contrary in any prior Order, an FCR Claims means any Claim that is neither timely filed nor deemed to be timely filed and that is held by:

i.    Individuals who are under the age of 18 as of the Petition Date; or

ii. Individuals who were mentally ill when their cause of action accrued and whose statute of limitations period, if not for their mental illness, would have expired within five years of the Petition Date; or

iii. Individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired; or

iv. Individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired because the claimant did not discover both the injury and the causal relationship between the injury and the sexual abuse prior to the Abuse Survivors Bar Date; or

v. Any other individual or class of individuals the FCR can identify that would have a claim that an individual later asserts is not barred by the Abuse Survivors Bar Date.

**(b)** **FCR Claim Process.** A holder of an FCR Claim must file an FCR Claim with the Plan Trustee on or before the sixth (6th) anniversary of the Effective Date. The Claim will be entitled to a distribution if the Claims Reviewer, in consultation with the FCR, determines, after appropriate investigation, that the holder of such claim has proven by a preponderance of the evidence that such holder's Claim meets the definition of (i) an FCR Claim and (ii) a Class 8 or Class 9 Claim.

**(c)** **FCR Claims after the Sixth (6th) Anniversary of the Effective Date**. All FCR Claims filed after the sixth (6th) anniversary of the Effective Date will have no right to payment or any other right under the Amended Plan.

**(d)** **Treatment.**

(1) The Debtor's and the Reorganized Debtor's obligations to the FCR and the FCR Claimants will be fulfilled upon the funding of the Plan Trust; provided that FCR Claimants have no interest in the Plan Trust Assets other than the FCR Reserve and any net proceeds received from the claim filed in the United Kingdom's Financial Services Compensation Scheme from the OIC Run-off Limited and the London and Overseas Insurance Company Limited proposed scheme of arrangement.

(2) FCR Claims will be paid by the Plan Trustee solely from the FCR Reserve as follows:

(i) If the FCR Claim meets the definition an FCR Claim and a Class 8 Claim, and the Claimant releases the Catholic Entities and the Settling Insurers in accordance with Section 7.4(b) of the Amended Plan, the Claimant shall be entitled to a distribution from the FCR Reserve in accordance with the Allocation Protocol. Distribution to such Claimants shall occur on or before the

seventh (7th) anniversary of the Effective Date. The Plan Trustee may, after consultation with the FCR, make a distribution at an earlier date.

(ii)     If the FCR Claim meets the definition of an FCR Claim and a Class 9 Claim and the holder of the Claim releases the Catholic Entities and the Settling Insurers in accordance with Section 7.4(b) of the Amended Plan, the holder of the Claim shall receive up to $2,000, which amount shall be determined in accordance with the Allocation Protocol.

(3)     Other than for Therapy Assistance requested in accordance with the Therapy Payment Process, holders of FCR Claims shall have no claim for compensation or otherwise against the Reorganized Debtor.

(e)     **Therapy Assistance**. Each holder of an FCR Survivor Claim that meets the definition of (i) an FCR Claim and (ii) a Class 8 or Class 9 Claim shall be entitled to request therapy payment assistance from the Therapy Fund in accordance with the Therapy Payment Process. The Archdiocese may, in keeping with its charitable purposes, provide Therapy Assistance to holders of FCR Claims that do not meet the definition of (i) an FCR Claim and (ii) a Class 8 or Class 9 Claim.

## 4.12     GENERAL UNSECURED CREDITOR CLAIMS (CLASS 12).

(a)     **Definition.** Class 12 Claims (General Unsecured Creditor Claims) mean any Unsecured Claim that is not listed as disputed, contingent or unliquidated on the Debtor's Schedules and was filed by General Unsecured Creditors (as opposed to Abuse Survivors), and, to which, the Debtor has no legal basis for objection. The Class 12 Claims are listed on **Exhibit I**.

(b)     **Treatment**. If the holders of Class 12 Claims vote in number and amount sufficient to cause Class 12 to accept the Amended Plan, each holder of a Class 12 Claim shall receive from the Reorganized Debtor the lesser of (i) the amount of their Allowed Claim or (ii) $5,000 on the Claims Payment Date in full satisfaction, settlement, and release of the Claim. If the holders of Class 12 Claims do not vote in number and amount sufficient to cause Class 12 to accept the Amended Plan, each holder of a Class 12 Claim shall not receive or retain any property under the Amended Plan on account of such Claims.

## 4.13     CHARITABLE GIFT ANNUITY CLAIMS (CLASS 13).

(a)     **Definition.** Class 13 Claims (Charitable Gift Annuity Claims) mean any Claim arising under charitable gift annuity agreements with the Debtor.

(b)     **Distribution.** The legal, equitable, and contractual rights of each holder of a Class 13 Claim will be reinstated in full on the Effective Date.

## 4.14     PENALTY CLAIMS (CLASS 14).

(a)      **Definition**.  Class 14 Claims (Penalty Claims) mean any Claim against the Debtor, whether secured or unsecured, for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim.

(b)      **Distribution.**  Holders of Class 14 Claims (Penalty Claims) shall not receive or retain any property under the Amended Plan on account of such claims.

## ARTICLE V:
## SETTLEMENTS EMBODIED IN PLAN

**5.1      INSURANCE LITIGATION**.

(a)      **Insurance Settlement Agreements**.  A representative example of the Insurance Settlement Agreements is attached hereto as **Exhibit N**.  All of the Insurance Settlement Agreements are hereby incorporated by reference and made part of the Amended Plan as if set forth fully herein.

(b)      **Resolution of the LMI Insurance Litigation**.  The Confirmation Order shall provide that, subject to the occurrence of the Effective Date, the Debtor shall dismiss its claims in the Insurance Coverage Adversary Proceeding, with prejudice and that Donald Marshall and Dean Weissmueller are prohibited from continuing to pursue their claims in the Insurance Coverage Adversary Proceeding.  Within three (3) Business Days after the Effective Date, the Debtor, and the LMI shall withdraw (or move to dismiss with prejudice, to the extent necessary) their claims against each other in the LMI Insurance Litigation, and shall jointly move for a dismissal of the claims of Donald Marshall and Dean Weissmueller in the Insurance Coverage Adversary Proceeding against LMI, with prejudice, with each side to bear its own fees and costs.  The Confirmation Order shall further state that the Plan Trustee may not make any payments to Donald Marshall or Dean Weissmueller until their claims in the Insurance Coverage Adversary Proceeding against LMI have been dismissed with prejudice, and that the Plan Trustee shall provide a certification of its compliance with this provision to each of the Catholic Entities and the Settling Insurers and permit reasonable audits by such Persons, to confirm compliance with this provision.   The costs of any such audit shall be borne by the requesting Person.

(c)     **Resolution of the John Doe 21 State Court Action.**   The Confirmation Order shall provide that, subject to the occurrence of the Effective Date, John Doe 21 is prohibited from continuing to pursue the State Court Action with prejudice. The Confirmation Order shall further state that the Plan Trustee may not make any payment to John Doe 21 until the State Court Action has been dismissed, with prejudice, with each side to bear its own fees and costs, and that the Plan Trustee shall provide a certification of its compliance with this provision to each of the Catholic Entities and the Settling Insurers and permit reasonable audits by such Persons, to confirm compliance with this provision.  The costs of any such audit shall be borne by the requesting Person.

(d)     **The Settling Insurers' Payments**.

(1)     Under the Insurance Settlement Agreements, the Settling Insurers will pay the cumulative amount of $10,705,798 (the "Insurance Settlement Amount") in exchange for the consideration set forth in the Insurance Settlement Agreements.

(2)     One half of the Insurance Settlement Amount will be paid as the Buy-Back Payment in exchange for a buy-back of any and all Insurance Policies issued by the Settling Insurers (the "Settling Insurer Policies"), free and clear of the "Interests" [1] of all Persons in the Settling Insurer Policies, and a release of the Settling Insurers by the Debtor and all of the other entities covered by the Settling Insurer Policies (called the "Related Entities") of all "Claims."  The Settling Insurers are similarly releasing the Debtor and the "Related Entities" from all "Claims."  The Settling Insurers' obligation to make the "Buy-Back Payment" is subject to the Bankruptcy Court issuing an Order, pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, barring, estopping, and permanently enjoining all Persons from asserting any (a) "Claims" against the Settling Insurer Policies; (b) "Claims" against the Settling Insurers with regard to, by reason of, based on, arising out of, relating to, or in any way connected with, the Settling Insurer Policies; and (c) "Medicare Claims."  The "Buy-Back Payment" will be paid to the Plan Trust within thirty (30) business days after the first business day after both the "Approval Order" and the "Confirmation Order" have become final and non-appealable for all purposes.

(3)     The other half of the Insurance Settlement Amount will be paid as the Plan Payment, in exchange for the entry of an Order by the Bankruptcy Court imposing a non-consensual release, remise, and discharge of all "Claims" [2] relating to the Settling Insurer Policies, including all "Abuse Claims," "Contribution Claims," "Direct Action Claims," "Extra-Contractual Claims,"

---

[1] For purposes of this paragraph, the following terms have the meanings ascribed to them in the LMI Settlement Agreement: "Interests," "Related Entities," "Claims," "Medicare Claims," "Approval Order," and "Confirmation Order."

[2] For purposes of this paragraph, the following terms have the meanings ascribed to them in the LMI Settlement Agreement: "Claims," "Abuse Claims," "Contribution Claims," "Direct Action Claims," "Extra-Contractual Claims," "Medicare Claims," "Trust Claims," "Approval Order," "Confirmation Order," and "Related Entities."

"Medicare Claims" and "Trust Claims" by all Persons who now hold or in the future may hold such "Claims" against the Settling Insurers, pursuant to §105 of the Bankruptcy Code. The "Plan Payment" will be paid to the Estate within thirty (30) business days after the first business day after both the "Approval Order" and the "Confirmation Order" have become final and non-appealable for all purposes, and may be used to defray the administrative expenses of this Chapter 11 Case, as approved by the Bankruptcy Court. In addition, the "Related Entities" will receive the release, remise, and discharge of all "Abuse Claims" and "Trust Claims" by all Persons who now hold or in the future may hold such "Claims," pursuant to §105 of the Bankruptcy Code.

(4)     The above description is subject to, and governed by, the respective Insurance Settlement Agreements. Any conflict between the terms of the Insurance Settlement Agreements and the above description, or between the Insurance Settlement Agreements and the Amended Plan, is governed by the Insurance Settlement Agreements.

(5)     Certain of the LMI that provided coverage are unable, or likely to be unable to pay claims. This sub-set of the LMI is listed on **Exhibit M** and referred to herein as the "Insolvent London Market Insurers." The Archdiocese and the LMI believe that amounts are sometimes recovered from insolvent insurers by filing a claim with the United Kingdom's Financial Services Compensation Scheme.[3] The Debtor believes the amount of a claim might be as much as $569,000. However, there is no assurance of any recovery. Fifty percent (50%) of any recovery received by the Archdiocese from filing a claim with the United Kingdom's Financial Services Compensation Scheme, after paying the costs of retaining special counsel to pursue the Archdiocese's insurance recovery from the OIC Run-off Limited and the London and Overseas Insurance Company Limited proposed scheme of arrangement (the "Orion Scheme"), will be allocated to the Plan Trust and the Plan Trustee will place these proceeds in the FCR Reserve for the benefit of FCR Claims. The remaining fifty percent (50%) may be used by the Archdiocese for any purpose.

**(e)     Releases**. The Amended Plan hereby incorporates the Related Entities Release and the Settling Insurers Release (as such terms are defined in the LMI Settlement Agreement) contained in the LMI Settlement Agreement.

(1)     The Settling Insurers Release requires, pursuant to § 105 of the Bankruptcy Code, a release, remise, and discharge of all Claims with regard to, by reasons of, based on, arising out of, relating to, or in any way connected with the Settling Insurer Policies, including all Abuse,[4] Contribution, Direct Action,

---

[3] *See generally* http://www.fscs.org.uk/.

[4] For purposes of this paragraph, the following terms have the meanings ascribed to them in the LMI Settlement Agreement: "Claims," "Abuse Claims," "Contribution Claims," "Direct-Action Claims," Extra-Contractual Claims," "Medicare Claims," and "Trust Claims."

Extra-Contractual, Medicare, and Trust Claims, against the Settling Insurers, by all Persons who now hold or in the future may hold such Claims.

(2)     The Related Entities Release requires, pursuant to § 105 of the Bankruptcy Code, a release, remise, and discharge of all Abuse[5] and Trust Claims by all Persons who now hold or in the future may hold such Claims.

**(f)     Medicare Secondary Payor Act and Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173).**   The Amended Plan hereby incorporates the MSP and MMSEA reporting provisions contained in the LMI Settlement Agreement at section 1.AA(xii).

**(g)     Judgment Reduction.**

(1)     In any proceeding, suit, or action involving the Plan Trust and one or more other insurers, where any insurer has asserted, asserts, or could assert any Contribution Claim[6] against a Settling Insurer, then any judgment obtained by the Plan Trust against such other insurer shall be automatically reduced by the amount, if any, that the Settling Insurers would have been liable to pay such other insurer as a result of that insurer's Contribution Claim by such other insurer against such Settling Insurer.  To effectuate this clause in any action against another insurer where Settling Insurers are not parties, the Plan Trust shall obtain a finding from that court of what amount such Settling Insurers would have been required to pay such other insurer under its Contribution Claim, before entry of judgment against such other insurer.

(2)     In any settlement agreement between the Plan Trust and another insurer, where such insurer has asserted, asserts, or could assert any Contribution Claim[7] against a Settling Insurer, then any settlement amount agreed by the settling parties shall be automatically reduced by the amount, if any, that such Settling Insurer would have been liable to pay such other insurer as a result of that insurer's Contribution so that the Contribution Claims by such other insurer against such Settling Insurer is thereby satisfied and extinguished entirely.  In the event that the settling parties are unable to agree on the amount of the Contribution Claim being extinguished, the settling parties shall obtain a finding from the court of what amount such Settling Insurer would have been required to pay such other insurer under its Contribution Claim.

---

[5] For purposes of this paragraph, the terms "Claims," "Abuse Claims," and "Trust Claims" have the meanings ascribed to them in the LMI Settlement Agreement.

[6] For purposes of this paragraph, the term "Contribution Claim" has the meaning ascribed to it in the LMI Settlement Agreement.

[7] For purposes of this paragraph, the term "Contribution Claim" has the meaning ascribed to it in the LMI Settlement Agreement.

(3)     Each Settling Insurer agrees that it will not pursue any Contribution Claim[8] that it might have against any insurer (a) described in Sections 5.1(g)(1) or 5.1(g)(2), whose Contribution Claim against a Settling Insurer is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against Settling Insurers.  Notwithstanding the foregoing, if a Person pursues a Contribution Claim against a Settling Insurer, then such Settling Insurer shall be free to assert its Contribution Claim against such Person.

(4)     The Plan Trustee shall use his best efforts to obtain, from all other insurers with which he executes a settlement after the Effective Date, agreements similar to those contained in this Section.

**(h)     Additional Documentation; Non-Material Modifications.**  From and after the Effective Date, the Reorganized Debtor and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver and/or implement all notes, contracts, security agreements, mortgages, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Article without further Order of the Bankruptcy Court.  Additionally, the Reorganized Debtor and the Settling Insurers may make technical and/or immaterial alterations, amendments modifications or supplements to the terms of any settlement contained in this Article.  A Class of Claims that has accepted the Amended Plan shall be deemed to have accepted the Amended Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class.  An Order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an Order in aid of consummation of the Amended Plan and shall not require the re-solicitation of votes on the Amended Plan.

**5.2     CEMETERY TRUST LITIGATION**.  The following provisions shall become effective on the Effective Date:

**(a)     Resolution of Cemetery Trust Litigation.**  In consideration of the Cemetery Trust's agreement to make the Cemetery Trust Reimbursement, the Cemetery Trust Contribution, and the Cemetery Trust Loan, the Confirmation Order shall (i) provide that, subject to the occurrence of the Effective Date, the Cemetery Trust Litigation is dismissed, with prejudice; and (ii) declare that, subject to the occurrence of the Effective Date, the Cemetery Trust is not property of the Estate pursuant to § 541(d) of the Bankruptcy Code.  As soon as practicable after the Effective Date the Cemetery Trust shall withdraw (or move to dismiss with prejudice, to the extent necessary) any appeal(s) pending in the Cemetery Trust Litigation.

**(b)     Cemetery Trust Reimbursement**.  The Cemetery Trust will make a distribution to the Archdiocese in the amount of $5 million to partially offset the Archdiocese's costs for providing perpetual care of the Milwaukee Catholic Cemeteries

---

[8] For purposes of this paragraph, the term "Contribution Claim" has the meaning ascribed to it in the LMI Settlement Agreement.

incurred from January 4, 2011, the Petition Date, through the confirmation of the Amended Plan.

(c) **Cemetery Trust Contribution.**  The Cemetery Trust will make a contribution to the Plan Trust in the amount of $8 million.

(d) **Cemetery Trust Loan.**  On or before the Effective Date, the Cemetery Trust and the Debtor shall enter into the Cemetery Trust line of credit, pursuant to which the Cemetery Trust agrees to loan the Debtor up to Three Million Dollars ($3,000,000) pursuant to the terms and conditions listed on the Cemetery Trust Term Sheet attached as **Exhibit P** to this Plan (the "Cemetery Trust Loan").

(e) **Timing**.  The Cemetery Trust shall have no obligation to make the Cemetery Trust Reimbursement or the Cemetery Trust Contribution or make any distributions pursuant to the Cemetery Trust Loan until the Confirmation Order is a final non-appealable Order.  The Cemetery Trust shall make the Cemetery Trust Reimbursement and the Cemetery Trust Contribution within thirty (30) days after the Confirmation Order becomes a final non-appealable Order.

(f) **Additional Documentation; Non-Material Modifications.**  From and after the Effective Date, the Reorganized Debtor and the Cemetery Trust shall be authorized to enter into, execute, adopt, deliver and/or implement all notes, contracts, security agreements, mortgages, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Section without further Order of the Bankruptcy Court.  Additionally, the Reorganized Debtor and the Cemetery Trust may make technical and/or immaterial alterations, amendments modifications or supplements to the terms of any settlement contained in this Section.  A Class of Claims that has accepted the Amended Plan shall be deemed to have accepted the Amended Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class.  An Order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an Order in aid of consummation of the Amended Plan and shall not require the re-solicitation of votes on the Amended Plan.

**5.3** **FAITH IN OUR FUTURE TRUST**.  The following provisions shall become effective on the Effective Date:

(a) **Resolution and Settlement.**  In consideration of the Faith In Our Future Trust's (the "FIOF Trust") commitment to provide Two Hundred Thousand Dollars ($200,0000) to fund a program of the Debtor's choosing, provided that the program is consistent with the restricted charitable purposes  of the FIOF Trust, the Confirmation Order shall provide that, subject to the occurrence of the Effective Date, all claims of the Debtor against the FIOF Trust currently existing under any theory of fraudulent conveyance, usurpation of corporate opportunity, or otherwise are dismissed, released, and forever discharged.

**(b)     Termination of Existing Tolling Agreement.**  The Stipulated Tolling Agreement Extending Time Periods [Dkt. No. 1061] between the Committee, the Archdiocese, and the Trustees of the FIOF Trust dated November 9, 2012, as extended, shall be deemed to be null and void upon the occurrence of the Effective Date.  The Committee will not be allowed to seek derivative standing in the Debtor's name to pursue any Cause of Action against the FIOF Trust.

**(c)     Additional Documentation; Non-Material Modifications.**  From and after the Effective Date, the Reorganized Debtor and the FIOF Trust shall be authorized to enter into, execute, adopt, deliver and/or implement all notes, contracts, security agreements, mortgages, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Section without further Order of the Bankruptcy Court.  Additionally, the Reorganized Debtor and the FIOF Trust may make technical and/or immaterial alterations, amendments modifications or supplements to the terms of any settlement contained in this Section.  A Class of Claims that has accepted the Amended Plan shall be deemed to have accepted the Amended Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class.  An Order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an Order in aid of consummation of the Amended Plan and shall not require the re-solicitation of votes on the Amended Plan.

**5.4     PENDING ABUSE SURVIVOR CLAIMS OBJECTIONS AND APPEALS OF ABUSE SURVIVOR CLAIMS OBJECTIONS**.  The Debtor or the Reorganized Debtor, as appropriate, will withdraw the  objections to the Abuse Survivor Claims or will stipulate that the objections are moot upon the request of the Committee or the Plan Trustee.

**5.5     RESERVATION OF RIGHTS**.  The Debtor reserves the right to sell property of the Estate and/or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval.  Notice of any such sale or compromise sought as part of the Amended Plan shall be filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the Confirmation Hearing or as soon thereafter as is practicable.

**ARTICLE VI:**
**MEANS OF IMPLEMENTATION OF THE AMENDED PLAN**

**6.1     IMPLEMENTATION OF PLAN**.  The Debtor proposes that the Amended Plan be implemented and consummated through the means contemplated by § 1123 of the Bankruptcy Code on and after the Effective Date.

**6.2     FUNDING THE AMENDED PLAN**.

**(a)**     Ordinary course post-Effective Date operations of the Archdiocese shall continue to be paid from ordinary operating income of the Archdiocese.

**(b)     Cemetery Trust Contributions.**

Case 11-20059-svk     Doc 3313     Filed 11/06/15     Page 24 of 329

(1)     On or before the Effective Date, the Archdiocese will establish a line of credit with the Cemetery Trust in the amount of $3,000,000 as contemplated in the Cemetery Trust Term Sheet.  The Archdiocese will draw upon the line of credit to make the additional payments required by the Amended Plan and make additional draws as needed to pay Professional Claims when they are approved.

(2)     The Cemetery Trust shall make the Cemetery Trust Contribution and the Cemetery Trust Reimbursement within thirty (30) days after the Amended Plan is approved in a Final non-appealable Order.

(3)     The provisions of the Cemetery Trust Term Sheet provide that the Debtor sell the First Lien Properties that were provided to the Cemetery Trust as Collateral for the Cemetery Trust Loan.  This includes the properties known as Prospect Hill (New Berlin), Plunkett Property (Germantown), Nicholson Road (Caledonia), Scarlet Property (Mount Pleasant), and All Souls (Franklin).  Because the Debtor has been unsuccessfully trying to sell the First Lien Properties for a number of years, it may take a substantial period of years to sell them.  At such time(s) as they are sold it will be a sale pursuant to the Amended Plan regardless of the use of the proceeds and confirmation of the Amended Plan will be a determination by the Bankruptcy Court that transfer(s) of title to purchaser(s) are transfers pursuant to the provisions of § 1146(a) of the Bankruptcy Code and exempt from taxation, including Wisconsin real estate transfer taxes.

(c)     Contributions from the Settling Insurers as described in Section 5.1.

(d)     Distribution from the St. Aemilian Trust in accordance with the St. Aemilian Trust's purpose permitting distributions for the establishment of facilities for orphans, dependent, neglected and delinquent children, for rehabilitation, treatment and other welfare services needed for such ends, and for the promotion of education, charity, and religion.

(e)     Voluntary contribution from the Priests' Continuing Formation Program.

**6.3     ALLOCATION OF PLAN FUNDS**.  The funds are expected to be distributed as follows:

(a)     **Professional Fees**.  An amount equal to the Allowed Professional Claims that are subject to a Final Order of the Bankruptcy Court following the Professional Claim Bar Date.

(b)     **Therapy Fund.**  An amount equal to $500,000.

(c)     **Plan Trust.**  The Plan Trust assets shall consist of $21,250,000 in cash, one-half of the estimated $569,000[9] the Archdiocese expects to receive by filing a claim

---

[9] This is the aggregate claim before costs of collection, which are expected to be substantial.

with the United Kingdom's Financial Services Compensation Scheme (but only to the extent of 50% of any recoveries actually received), and the right to pursue recoveries against any Non-Settling Insurers (the "Plan Trust Assets").

(1)     **Cash Assets.**   An amount equal to $21,250,000.

(i)     The Plan Trustee shall establish the Class 9 Reserve in an amount equal to $2,000 per Class 9 Claim.

(ii)     The Plan Trustee shall establish the FCR Reserve in an amount equal to $250,000.

(iii)     The funds for the Class 9 Reserve and the FCR Reserve shall come from the $21,250,000 paid to the Plan Trust.

(2)     **Non-Cash Assets.**   The Plan Trust Assets include certain non-cash assets, which will be allocated as follows:

(i)     One-half of the amount the Archdiocese receives by filing a claim with the United Kingdom's Financial Services Compensation Scheme (but only to the extent of 50% of any recoveries actually received) will be allocated to the FCR Reserve.

(ii)     The right to pursue claims against Non-Settling Insurers. Any recoveries from any Non-Settling Insurers shall be allocated as follows: (a) ninety-five percent (95%) of any other insurance recoveries from the Non-Settling Insurers will be allocated for distributions to the holders of Class 8 Claims; and (b) five percent (5%) of any other insurance recoveries from the Non-Settling Insurers will be allocated to the FCR Reserve.

**(d)     General Unsecured Creditor Claims**.  Class 12 will be paid if the holders of the Class votes to Accept the Amended Plan; no payment to the Class will be made if the Class does not vote to Accept the Amended Plan.  The holder of a Class 12 Allowed Claim shall only be entitled to receive the lesser of (x) the Allowed amount of such Claim or (y) $5,000.  Payments to Class 12 are not expected to exceed $250,000.

**6.4     ADMINISTRATION OF PROPERTY AND OPERATIONS**.

After the Effective Date, the Debtor will evaluate the administration of the Milwaukee Catholic Cemeteries to determine that the Cemeteries are compliant with the best practices for administration of Catholic cemeteries and what must be done to make it reasonably probable that the Archdiocese will have sufficient financial ability to perform its obligations for perpetual care. This may include transfer of title to the Milwaukee Catholic Cemeteries to another entity such as a single member limited liability company or non-stock corporation.  The Debtor will undertake this evaluation within three years of confirmation of the Amended Plan.  Any transfer of title of any of the Milwaukee Catholic Cemeteries will be a sale pursuant to the Amended Plan and confirmation of the Amended Plan will be a determination by the Bankruptcy Court that transfer(s) of title of any of the Milwaukee Catholic Cemeteries are transfers pursuant to the

provisions of § 1146(a) of the Bankruptcy Code and exempt from taxation, including Wisconsin real estate transfer taxes.

**6.5    THERAPY FUND**.

(a)    In keeping with the Archdiocese's religious and charitable mission, the Archdiocese will establish a Therapy Fund, which shall be held in trust for the benefit of the holders of Class 8, 9, 10, and FCR Claims (the "Therapy Fund").

(b)    The Therapy Fund will be funded by a contribution of $500,000 from the Parishes.

(c)    The Archdiocese shall be responsible for the administration of the Therapy Fund and making payments for therapy requests from holders of Class 8, 9, and FCR Claims submitted and approved pursuant the Therapy Payment Process.

(d)    **Therapy Payment Process.**  The procedures for Abuse Survivors to request therapy assistance (the "Therapy Payment Process") are described in **Exhibit U**.

(e)    To the extent that money remains in the Therapy Fund ten (10) years after the Effective Date, such money may be used by the Archdiocese for expenses incurred in the on-going conduct of its Safe Environment program and/or for education about the prevention of sexual abuse.

**6.6    COUSINS CENTER**.

(a)    **Cousins Center Leases.**  On July 7, 2015, the Bankruptcy Court authorized the Archdiocese to amend and restate the lease of the Cousins Center with De Sales Preparatory Seminary, Inc. ("De Sales") and to assume the nonresidential real property sublease with the Milwaukee Bucks, LLC, (the "Bucks") as amended by the amendment to the sublease.   The Archdiocese will continue to occupy the Cousins Center, and the Bucks will continue to sublease a portion of the Cousins Center.

(b)    **Termination of Existing Tolling Agreement.**  The Stipulated Tolling Agreement Extending Time Periods [Dkt. No. 1040] between the Committee, the Archdiocese, and De Sales dated October 30, 2012, shall be deemed to be null and void upon the occurrence of the Effective Date.  The Committee will not be allowed to seek derivative standing in the Debtor's name to pursue any Cause of Action against De Sales.

**6.7    OPERATING LEASES AND REAL ESTATE LEASES**.  The Confirmation of the Amended Plan will constitute an assumption of the executory contracts and unexpired leases listed on **Exhibit W**.

**6.8    CONTINUATION OF FCR**.  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the FCR shall continue until he or his successor resigns or the funds in the FCR Reserve are completely distributed as provided in Section 4.11 of the Amended Plan.  From and after the Effective Date, the FCR's duties and powers shall

continue as described in the Orders Pursuant to §§ 105 and 1009 of the Bankruptcy Code Appointing Stephen Gerlach as Legal Representative for Future Claimants.

**6.9    VESTING OF ASSETS IN THE PLAN TRUST**.  On the Plan Funding Date, all Plan Trust Assets shall vest in the Plan Trust, and the Debtor shall be deemed for all purposes to have transferred all of the Debtor's right, title, and interest in the Plan Trust Assets to the Plan Trust for the benefit of the holders of Class 8, Class 9, and FCR Claims, whether or not such Claims are Allowed Claims.  On the Plan Funding Date, or as soon as practicable thereafter, the Reorganized Debtor shall take all actions reasonably necessary to transfer any Plan Trust Assets to the Plan Trust.  Upon the transfer of control Plan Trust Assets, the Reorganized Debtor shall have no further interest in or with respect to the Plan Trust Assets.

**6.10    ASSUMPTION OF PLAN OBLIGATIONS AND LIABILITY FOR CLAIMS**.  On the Effective Date, all of the Debtor's rights and obligations, if any, with respect to each and every Class 8 Claim, Class 9 Claim, and FCR Claim, shall be assigned to and assumed by the Plan Trust.  In particular, and without limiting the generality of the foregoing, on the Effective Date the Plan Trust shall assume liability for, and shall succeed to all rights and defenses of the Debtor with respect to, all Class 8 Claims, Class 9 Claims, and FCR Claims arising prior to the Effective Date, provided, however, that such assumption of liability by the Plan Trust shall not relieve any Insurer of any obligation arising under any Insurance Policy.

**6.11    RETENTION OF JURISDICTION**.

(a)    **By the Bankruptcy Court.**  Pursuant to §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. §§ 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain (i) original and exclusive jurisdiction over the Chapter 11 Case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case, (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Amended Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Amended Plan.  Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

(1)    over disputes concerning the ownership of Claims;

(2)    over disputes concerning the distribution or retention of consideration under the Amended Plan;

(3)    over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims, other than Abuse Survivor Claims;

(4)    over proceedings to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtor, the Estate, or Plan Trust, or property abandoned or transferred by the Debtor, the Estate, or the Plan Trust;

(5)     over proceedings to determine the amount, if any, of interest to be paid to holders of Allowed General Unsecured Claims if Allowed General Unsecured Claims (including any Claims entitled to a distribution pursuant to § 726(a)(1)-(4) of the Bankruptcy Code) are paid in full pursuant to the terms of the Amended Plan;

(6)     over matters related to the Assets of the Estate or of the Plan Trust, including liquidation of Plan Trust Assets;

(7)     over matters relating to the subordination of Claims;

(8)     to enter and implement such Orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(9)     to consider and approve modifications of or amendments to the Amended Plan, to cure any defects or omissions or to reconcile any inconsistencies in any Order of the Bankruptcy Court, including the Confirmation Order;

(10)     to issue Orders in aid of execution, implementation, or consummation of the Amended Plan;

(11)     over disputes arising from or relating to the Amended Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

(12)     over requests for allowance and/or payment of Claims entitled to priority under §§ 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

(13)     over all Fee Applications;

(14)     over matters concerning state, local, or federal taxes in accordance with §§ 346, 505, and 1146 of the Bankruptcy Code;

(15)     over conflicts and disputes among the Plan Trust, the Reorganized Debtor, and holders of Claims, including Abuse Survivor Claims;

(16)     over disputes concerning the existence, nature, or scope of the Debtor's discharge or the Channeling Injunction, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(17)     to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Amended Plan, the Debtor or its property, the Reorganized Debtor or its

property, the Estate or its property, the Plan Trust or its property, Plan Trustee, the Professionals, or the Confirmation Order;

       (18)    to enter a Final Decree closing the Chapter 11 Case;

       (19)    to enforce all orders previously entered by the Bankruptcy Court; and

       (20)    over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Amended Plan.

      **(b)**    **By the District Court.**  Pursuant to §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

      **(c)**    **Actions to Collect Amounts Owed Pursuant to the Plan.** Notwithstanding anything to the contrary in this Section, the Debtor, the Reorganized Debtor nor the Plan Trustee will be required to commence an adversary proceeding to collect amounts owed pursuant to the Amended Plan and/or any settlements embodied in the Amended Plan.  Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

      **(d)**    **Case Closure.**  The existence and continued operation of the Plan Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Case.  In an action involving the Plan Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Plan Trustee from the Plan Trust Assets in accordance with an order of the Bankruptcy Court.

**ARTICLE VII:**
**THE PLAN TRUST**

    **7.1**    **FORMATION AND FUNDING OF THE PLAN TRUST**.  On or prior to the Plan Funding Date, the Plan Trust shall be formed and funded with all of the Plan Trust Assets. The holders of Class 8 Claims, Class 9 Claims, and FCR Claims shall be the sole beneficiaries of the Plan Trust, subject to any Plan Trust Agreement provision(s) regarding reserves.

    **7.2**    **PLAN TRUST ASSETS**.  The Plan Trust Assets and the allocation of the Plan Trust Assets are as set forth in Section 6.3(c).

    **7.3**    **PLAN AGREEMENT**.  The proposed Plan Trust Agreement is attached hereto as **Exhibit S**.  The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business.

**7.4     DISTRIBUTIONS FROM THE PLAN TRUST**.

(a)     The Plan Trustee may use the Plan Trust Assets to prosecute litigation against the remaining Non-Settling Insurers, **provided, however,** that $250,000 shall be set aside for the FCR Reserve and that $2,000 per Class 9 Claimant shall be set aside for the Class 9 Claimants (the "Class 9 Reserve").

(b)     Each Claimant receiving a payment from the Plan Trust shall sign a written general release that remises, releases, covenants not to sue, and forever discharges all Settling Insurers and the Catholic Entities from and against all Claims.

(c)     **Insurance Recoveries**. The Archdiocese shall place fifty percent (50%) of any funds received from the Archdiocese's filing a claim with the United Kingdom's Financial Services Compensation Scheme in the FCR Reserve for the benefit FCR Claims.  For all other insurance recoveries, the Plan Trustee shall allocate ninety-five percent (95%) of any other insurance recoveries for distribution to holders of Class 8 Claims and five percent (5%) shall be allocated to the FCR Reserve.

**7.5     INDEMNIFICATION OF THE SETTLING INSURERS**.  The Plan Trustee shall indemnify the Settling Insurers as provided for in the Insurance Settlement Agreements and comply with the provisions of the Insurance Settlement Agreements applicable to it.

**7.6     TAX MATTERS**.  The Plan Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain assets and liabilities of the Debtor and a representative of the Estate for delineated purposes within the meaning of § 1123(b)(3) of the Bankruptcy Code.  The Plan Trust is expected to be tax exempt.  The Plan Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the IRC and the Treasury Regulations promulgated thereunder, and Wisconsin law and the regulations promulgated thereunder, and shall pay from the Plan Trust all taxes, assessments, and levies upon the Plan Trust, if any.

**7.7     APPOINTMENT OF THE PLAN TRUSTEE**.  Eric Schwarz (Omni Management Acquisition Corp.) shall be the Plan Trustee, pursuant to the Plan Trust Agreement. The Plan Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Plan Trustee on the Effective Date; provided, however, that Plan Trustee shall be permitted to act in accordance with the terms of the Plan Trust Agreement from such earlier date as authorized by the Debtor, through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Plan Trust Agreement and the Amended Plan.

**7.8     RIGHTS AND RESPONSIBILITIES OF THE PLAN TRUSTEE**.

(a)     The Plan Trustee shall be deemed the Estate's representative in accordance with §1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Amended Plan and the Plan Trust Agreement, including the powers of a trustee under §§ 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and

privileges).  If there is any inconsistency or ambiguity between the Amended Plan and Confirmation Order or the Amended Plan and the Plan Trust Agreement with respect Plan Trustee's authority to act, the provisions of the Plan Trust Agreement shall control.

(b)     The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Plan Trustee in his official capacity, with respect to his status, duties, powers, acts, or omissions as Plan Trustee.

(c)     The Plan Trustee shall liquidate and convert to Cash the Plan Trust Assets, make timely distributions and not unduly prolong the duration of the Plan Trust.

(d)     The Plan Trustee may request an expedited determination of taxes of the Plan Trust under § 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust.

**7.9     INVESTMENT POWERS; PERMITTED CASH EXPENDITURES**.  All funds held by the Plan Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Plan Trust Agreement.  The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Plan Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Plan Trust and any professionals' fees); and (iii) to satisfy other liabilities incurred by the Plan Trust in accordance with the Amended Plan or the Plan Trust Agreement.

**7.10     REGISTRY OF BENEFICIAL INTERESTS**.  To evidence the beneficial interest in the Plan Trust of each holder of such an interest, the Plan Trustee shall maintain a registry of such holders.

**7.11     NON-TRANSFERABILITY OF INTERESTS**.  Any transfer of an interest in the Plan Trust shall not be effective until and unless the Plan Trustee receives written notice of such transfer.

**7.12     TERMINATION**.

(a)     The Plan Trust shall terminate after its liquidation, administration and distribution of the Plan Trust Assets in accordance with the Amended Plan and its full performance of all other duties and functions set forth herein or in the Plan Trust Agreement.  The Plan Trust shall terminate no later than the later of: (i) twelve (12) months after the termination of the Insurance Litigation, whether such termination is by a final order by a court of last resort or a settlement between the parties to the Insurance Litigation or (ii) the  seventh (7th) anniversary of the Effective Date.

(b)     Any amount remaining in the FCR Reserve after the later of: (i) the 1st anniversary of the conclusion of the Insurance Litigation or (ii) the seventh (7th) anniversary of the Effective Date will be distributed to a charitable entity mutually agreed upon by the Debtor or the Reorganized Debtor, as appropriate, and the FCR.

**7.13   LIABILITY; INDEMNIFICATION**.  Neither the Reorganized Debtor or its respective member, designees, or professionals, nor the Plan Trustee or any duly designated agent or representative of the Plan Trustee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of such Plan Trustee, other than for specific acts or omissions resulting from such Plan Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Plan Trustee may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Plan Trustee shall not be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Trustee or its respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Plan Trust shall indemnify and hold harmless the Plan n Trustee and its members, designees, and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, Claims, costs, and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding, or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or, the Amended Plan, or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty.

**7.14   RETENTION OF PROFESSIONALS**.  The Plan Trust may retain professionals, including counsel, accountants, financial advisors, auditors, and other agents on behalf of the Plan Trust, and at the Plan Trust's sole expense, as necessary or desirable to carry out the obligations of the Plan Trustee hereunder and under the Plan Trust Agreement.  More specifically, provided such representation is permitted by applicable law, Plan Trust may retain counsel or financial advisors in any matter related to administration of the Amended Plan, including counsel that has acted as counsel for the Debtor or the Committee in the Chapter 11 Case.

**7.15   SUCCESSION TO LITIGATION**.  On the Effective Date, and subject fully to Article V, the Plan Trust shall succeed to the interests of the Debtor in the any litigation pending against a Non-Settling Insurer.

**ARTICLE VIII:**
**INSURANCE POLICIES**

**8.1   CONTINUATION OF INSURANCE POLICIES**.  All known Insurance Policies are listed on **Exhibit J**.  Subject to the Insurance Settlement Agreements, all Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to §§ 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code, to the extent such Insurance Policy is or was an Executory Contract of the Debtor, or continued in accordance with its terms

pursuant to §1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an Executory Contract of the Debtor, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered. To the extent that any or all of the Insurance Policies are considered to be Executory Contracts, then the Amended Plan shall constitute a motion to assume the Insurance Policies in connection with the Amended Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Insurance Policy. The Debtor reserves the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

**8.2    PLAN NEUTRALITY AS TO INSURANCE POLICIES**. The rights of the parties under the Insurance Settlement Agreements shall be determined exclusively under the Insurance Settlement Agreements and those provisions of the Approval Orders[10] and the Conformation Order implementing the Insurance Settlement Agreements. Solely with respect to the Non-Settling Insurers, nothing in the Amended Plan, any exhibit to the Amended Plan, any Confirmation Order, or any other Order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Insurer, any Catholic Entity, the Plan Trust, or any other insureds under any insurance policy in any manner; (ii) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any insurance policy in any respect; (iii) shall be a determination of the reasonableness of the Amended Plan or any settlement embodied by the Amended Plan, in any way whatsoever; (iv) shall be subject to, controlled or affected by, *UNR Ind. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991); or (v) shall otherwise determine the applicability or nonapplicability of any provision of any insurance policy and any such rights and obligations shall be determined under the insurance policy and applicable law. Additionally, any action against any insurer related to any insurance policy (except with respect to those actions enjoined by the injunctions set forth in Article XII of the Amended Plan) shall be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided, however,* that nothing herein waives any right of any Catholic Entity, the Plan Trust, or any Insurer to require arbitration to the extent the relevant insurance policy provides for such.

**ARTICLE IX:**
**PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION**

**9.1    RESERVATION OF RIGHTS TO OBJECT TO CLAIMS**. Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Amended Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor or the Plan Trustee, as applicable, shall be deemed to have a reservation of any and all

---

[10] For purposes of this paragraph, the term "Approval Order" has the meaning set forth in the LMI Settlement Agreement.

rights, interests and objections of the Debtor, the Committee, or the Estate to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured or unsecured, including any and all rights, interests and objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Abuser Survivor Claims, General Unsecured Claims, Liens, and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtor's or Committee's failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Reorganized Debtor's or the Plan Trustee's, as applicable, rights to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

**9.2     OBJECTIONS TO CLAIMS**.  Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the Allowance of any Claim.  From and after the Effective Date, the Reorganized Debtor or the Plan Trustee, as applicable, will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtor as of the Effective Date), provided, however, that nothing in this Section shall affect the right of any party in interest (including the Reorganized Debtor and the Plan Trustee) to object to any Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Amended Plan.  Further, nothing in this Section shall prohibit the Plan Trustee or the FCR from objecting to or establishing procedures for the allowance or estimation of Class 8, Class 9, or FCR Claims.  Unless otherwise provided in the Amended Plan or by Order of the Bankruptcy Court, any objections to non-Abuse Survivor Claims by the Reorganized Debtor will be Filed and served not later than one (1) year after the later of (i) the Effective Date or (ii) the date such Claim is Filed, provided that the Reorganized Debtor may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by Filing a motion with the Bankruptcy Court without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Amended Plan.

**9.3     SERVICE OF OBJECTIONS**.  An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods:  (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such holder in the Chapter 11 Case.

**9.4     DETERMINATION OF CLAIMS**.  From and after the Effective Date, any Claim as to which a Proof of Claim or motion or request for payment was timely Filed in the Chapter 11 Case, or deemed timely Filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending)), liquidated pursuant to (i) an Order of the Bankruptcy

Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim; and (c) an application to otherwise limit recovery with respect to such Claim, Filed by the Debtor, the Reorganized Debtor, or any other party in interest on or prior to any applicable deadline for Filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Amended Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, interests, or Causes of Action that the Debtor the Reorganized Debtor or the Plan Trust may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U. S .C. § 157.

**9.5   NO DISTRIBUTIONS PENDING ALLOWANCE**.  No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

**9.6   CLAIM ESTIMATION**.  To effectuate distributions pursuant to the Amended Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if prior to the Effective Date) and the Reorganized Debtor (with respect to non-Abuse Survivor Claims) or the Plan Trustee (on and after the Effective Date and with respect to Abuse Survivor Claims), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes; or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Amended Plan.

**ARTICLE X:**
**DISTRIBUTIONS UNDER THE AMENDED PLAN**

**10.1   TIMING OF DISTRIBUTIONS**.  On the Plan Funding Date, or as soon thereafter as practical, the Reorganized Debtor shall make the Cash payment required by the Amended Plan to the Plan Trust and establish the Therapy Fund.  As soon as practicable after the Effective Date, the Reorganized Debtor shall make the payments required by the Amended Plan to the holders of Class 12 Claims.

**10.2   PAYMENT DATE**.  Whenever any payment or distribution to be made under the Amended Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**10.3   UNDELIVERABLE DISTRIBUTIONS**.  If payment or distribution to the holder of an Allowed Claim under the Amended Plan is returned for lack of a current address for the holder or otherwise, the Reorganized Debtor or the Plan Trustee, as applicable, shall File

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 36 of 329

with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment.  If, after the passage of six (6) months, the payment or distribution still cannot be made, the Reorganized Debtor of the Plan Trustee, as applicable, may make the payment to the Therapy Fund.  All Allowed Claims paid as provided in this Section shall be deemed satisfied and released, with no recourse to the Reorganized Debtor or the Plan Trustee, as applicable, or property of the Reorganized Debtor or the Plan Trustee, as applicable, upon payment to the Therapy Fund, to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

      **10.4****SETOFFS**.  The Reorganized Debtor or the Plan Trustee, as applicable, may, to the extent permitted under applicable law, set off against any Allowed Claim and the distributions to be made pursuant to the Amended Plan on account of such Allowed Claim, the Claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Plan Trustee, as applicable, may hold against the holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Amended Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Plan Trustee, as applicable, of any such Claims, rights, and Causes of Action that the Reorganized Debtor or the Plan Trustee, as applicable, possesses against such holder.

      **10.5****NO INTEREST ON CLAIMS**.  Unless otherwise specifically provided for in the Amended Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor or the Plan Trust and a Claimant and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and Claimant shall not be entitled to interest accruing on or after the Petition Date on any Claim.  In addition, and without limiting the foregoing or any other provision of the Amended Plan, Confirmation Order, or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

      **10.6****WITHHOLDING TAXES**.  The Reorganized Debtor and the Plan Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  As a condition to making any distribution under the Amended Plan, the Reorganized Debtor and the Plan Trust may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**ARTICLE XI:**
**EFFECTIVENESS OF THE AMENDED PLAN**

      **11.1****CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**.  The Amended Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below or, in the alternative, waived by the Debtor.

**(a)      Entry of Confirmation Order.**  Subject fully to Sections 11.3 and 11.4, the Confirmation Order is a Final Order.

**(b)      Cemetery Trust Settlement and Loan.** The Debtor and the Cemetery Trust shall have entered into the Cemetery Trust Settlement, the Bankruptcy Court shall have approved the Cemetery Trust Settlement, and the parties have executed the Cemetery Trust Loan Documents.

**(c)      Insurance Settlements.**  The Debtor, the Related Entities, and the Settling Insurers shall have executed the Insurance Settlement Agreements and the Bankruptcy Court shall have approved the Insurance Settlement Agreements.

**(d)      Plan Trust**.  The Plan Trust shall have been formed.

**(e)      Appointment of Plan Trustee.**  The appointment of the Plan Trustee shall have been approved by Order of the Bankruptcy Court.

**11.2      NOTICE OF EFFECTIVE DATE**. The Debtor shall file a Notice of Effective Date with the Bankruptcy Court within seven (7) days after the occurrence of the Effective Date.

**11.3      WAIVER OF CONDITIONS**.  The Debtor, with the Committee's consent, may waive any of the conditions to the occurrence of the Effective Date other than 11.1(a).

**11.4      EFFECT OF NON-OCCURRENCE OF CONDITIONS**.  If substantial consummation of the Amended Plan does not occur, the Amended Plan will be null and void in all respect and nothing contained in the Amended Plan or the Disclosure Statement will (i) constitute a waiver or release of any Claims by or against the Debtor; (ii) prejudice in any manner the rights of the Debtor or the Plan Trust; (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtor in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Debtor in any court or other forum.

**ARTICLE XII:**
**EFFECTS OF CONFIRMATION**

**12.1      DISSOLUTION OF THE COMMITTEE**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

**12.2      DISCHARGE INJUNCTION**

Case 11-20059-svk      Doc 3313      Filed 11/06/15      Page 38 of 329

Except as otherwise expressly provided in the Amended Plan or in the Confirmation Order, on the Effective Date, pursuant to §1141(d) of the Bankruptcy Code, the Archdiocese shall be discharged from any Claim that arose prior to the Effective Date (other than Abuse Survivor Claims that arose after the Petition Date), and all Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or Order against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff right of subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Amended Plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, the Amended Plan or Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Amended Plan. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

**12.3    CHANNELING INJUNCTION**

In consideration of the promises, obligations, and/or payments of the Archdiocese, the Reorganized Debtor, the Related Entities, and the Settling Insurers under the Amended Plan, all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Abuse Survivor Claim arising prior to the Effective Date (other than an Abuse Survivor Claim that arose after the Petition Date) shall be forever barred and permanently enjoined from pursuing such Abuse Survivor Claim against any Protected Party based upon or in any manner arising from or related to any acts or omissions of any Protected Party including (w) for damages of any type, including bodily injury, personal injury, emotional distress, wrongful death, and/or loss of consortium, (x) for exemplary or punitive damages, (y) for attorneys' fees and other expenses, fees, or costs, (z) for any remedy at law, in equity or admiralty whatsoever, heretofore, now or hereafter asserted against any Protected Party; and all Abuse Survivor Claims arising prior to the Effective Date (other than Abuse Survivor Claims that arose after the Petition Date) shall be channeled to and shall be treated, administered, determined, and, if Allowed, paid under the procedures and protocols and in the amounts as established under the Amended Plan and the Plan Trust Agreement as the sole and exclusive remedy for all Abuse Survivor Claimants. The

foregoing channeling injunction is an integral part of the Amended Plan and is essential to the Amended Plan's consummation and implementation. It is intended that the channeling of the Abuse Survivor Claims as provided in this Section shall inure to and for the benefit of the Protected Parties. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

## 12.4    EXCULPATION; LIMITATION OF LIABILITY

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and Filing of the Chapter 11 Case, the formulation, negotiation, and/or pursuit of confirmation of the Amended Plan, the consummation of the Amended Plan, and/or the administration of the Amended Plan and/or the property to be distributed under the Amended Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Amended Plan. Without limiting the generality of the foregoing, the Archdiocese and its officers, member, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of § 1125(e) of the Bankruptcy Code.

## 12.5    TIMING

When the Plan Trust receives all payments from a Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, the injunctions, releases, and discharges to which such Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Amended Plan, the Confirmation Order, the Approval Orders,[11] and/or the Bankruptcy Code shall become effective; for the avoidance of doubt as to the meaning of "when," the aforementioned injunctions, releases, and discharges shall not become effective until the Plan Trust receives all such payments from such Settling Insurer.

## ARTICLE XIII:
## THE REORGANIZED DEBTOR

**13.1    CONTINUED CORPORATE EXISTENCE**. The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with the applicable laws of the State of Wisconsin, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under

---

[11] For purposes of this paragraph, the term "Approval Orders," means the respective Approval Orders referred to and defined in the Insurance Settlement Agreements.

applicable state law, except as such rights may be limited and conditioned by the Amended Plan and the documents and instruments executed and delivered in connection therewith.

**13.2    VESTING OF ASSETS**.  In accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Amended Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the Confirmation Hearing) on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims.  On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Amended Plan or the Confirmation Order.

**13.3    IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**.  In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Person proposed to serve as the sole corporate member of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on **Exhibit V**.

**13.4    FURTHER AUTHORIZATION**.  The Reorganized Debtor shall be entitled to seek such Orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Amended Plan.

**13.5    COMMITMENT TO CHILD PROTECTION & TRANSPARENCY**.  The Archbishop and the Reorganized Debtor agree to adhere to the non-monetary undertakings set forth below for a period of at least ten (10) years:

**(a)**    The Charter was adopted by bishops of the United States in June 2002.  It was revised in 2005 and again in 2011.  The Essential Norms for Diocesan Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons were revised and issued in 2006 (the "Essential Norms").  The Archdiocese is committed to following the requirements of the Charter and complying with each of the Essential Norms, or those requirements and norms of any future documents issued by the USCCB.

**(b)**    The Archdiocese has voluntarily participated and will continue to voluntarily participate in audits (currently scheduled annually) of its compliance with the Charter by the current audit agency contracted by the USCCB, or any of its successor audit agencies.  These audits include, at the request of the Archdiocese, on site reviews of compliance by parishes and schools.

**(c)**    The Archdiocese is committed to additional policies, procedures and initiatives that continue to advance the spirit of the Charter.  The Diocesan Review Board (or its successor group) will continue to review all allegations of sexual abuse of a minor by a member of the clergy and make recommendations to the Archbishop about the

substantiation of the report and the fitness for ministry of the accused.  The Diocesan Review Board (or its successor group) will also fulfill its responsibility to review all policies, procedures and protocols related to both sex abuse prevention and response. The Archbishop will annually renew his commitment to the Diocesan Review Board (or its successor group) affirming his resolve to follow their recommendations.  *See* **Exhibit E**.

       **(d)**      The Archbishop will also maintain his Community Advisory Board (or its successor group) to provide advice and counsel on the Archdiocese's response to clergy sexual abuse of minors, including its safe environment programming; its response and outreach to abuse survivors; and its policies, procedures and protocols related to clergy sexual abuse.  The chair(s) of the Community Advisory Board (or its successor group) will be encouraged to identify at least one additional abuse survivor to serve as a board member.

       **(e)**      The Archdiocese will review its mandatory reporting training protocols with the Community Advisory Board (or its successor group) on an annual basis.

       **(f)**      The Archdiocese will continue to develop, publish and implement its child abuse prevention/safe environment curriculum for all Catholic Schools and religious education programs in the Archdiocese.  The curriculum will be designed to educate children, young people, parents, teachers and other volunteers about child sexual abuse. The curriculum will be age-appropriate and include instruction on ways to prevent, identify and report child sexual abuse.  The safe environment program will be reviewed with the Community Advisory Board (or its successor group) every three (3) years.

       **(g)**      Policies, procedures and protocols on clergy sexual abuse of minors will be disseminated through the archdiocesan website (which currently has the information in place) and through materials distributed to Parishes and Schools by the archdiocesan office for Sexual Abuse Prevention and Response Services and the Safe Environment office (or their successor offices).

       **(h)**      The Archdiocese will continue to distribute information on how sexual abuse of a minor can be reported.  This will include encouragement to report suspected abuse to law enforcement authorities.  In addition, the Archdiocese will provide contact information for making reports to non-Church run agencies with the ability to accept such reports, in each of the 10 counties of the Archdiocese.

       **(i)**      The Code of Ethical Standards will continue to be given to all clergy, including the Archbishop and Auxiliary Bishop(s) and all church personnel and will continue to be available on the Archdiocesan web site.  All church personnel and all volunteers who have regular contact with minors are required to document that they have read, understand, and agree to abide by the Code of Ethical Standards.  The Code of Ethical Standards will be reviewed by the Diocesan Review Board (or its successor group) on an annual basis to determine the need for revision.  Education programs on the Code of Ethical Standards will be included in Parish, School, and seminary workshops.

The Code of Ethical Standards includes the sexual abuse policies of the Archdiocese and the mandatory reporting requirements.

(j)     For a period of at least five (5) years, the Archdiocese will continue providing information about reporting sexual abuse to parishes and schools, with a particular emphasis on this topic during Safe Environment Week and Sexual Abuse Prevention Month.

(k)     The seminary formation program for seminarians at Saint Francis de Sales Seminary will continue to address topics of sexual abuse of minors, prevention and detection of sexual abuse, and reporting of suspected sexual abuse.  Seminarians will continue to be required to read the Code of Ethical Standards and sign the acknowledgement form that they have done so.

(l)     An organization policy will be implemented requiring the Archbishop, all ecclesiastical officers, department heads and office directors, and any official diocesan spokesperson to refer to clergy abuse survivors as "abuse survivors," "survivors of clergy sexual abuse," or other term recommended by abuse survivor advocates.  The policy will prohibit any reference, either verbally or in print, to substantiated abuse survivors as "alleged," for example, "alleged abuse survivors," or "alleged victims."

(m)     The Archdiocese will continue to designate a "Victim Assistance Coordinator" who will coordinate outreach and support to abuse survivors.

(n)     The Archbishop will send a personal letter of apology to any abuse survivor (or immediate family member) of clergy sexual abuse of a minor by a diocesan priest who requests such a letter.

(o)     The Archbishop will meet personally with any abuse survivor (or immediate family member) of clergy sexual abuse of a minor by a diocesan priest who requests such a meeting.

(p)     Within thirty (30) days of the effective date of the Amended Plan, the Archbishop will issue a written statement of gratitude to survivors of clergy sexual abuse of minors who have had the courage to come forward and tell their story.  This statement will be posted on the archdiocesan website for as long as the list of abusive priests is maintained.

(q)     The Archdiocese will not enter into any settlement agreement with an Abuse Survivor which contains a confidentiality clause, unless specifically requested by the Abuse Survivor with the individual's request noted in the text of the agreement.

(r)     The Archdiocese will publish the names of diocesan priests of the Archdiocese who have been (or would be if they were still alive) restricted from all priestly ministries, may not celebrate the sacraments publicly, or present themselves as priests in any way.  These names will be published on the archdiocesan website (or its successor) for as long as it is technologically practical.  If cases are substantiated

regarding a member of the clergy not previously listed, the name(s) will be added to the list.

## ARTICLE XIV:
## MISCELLANEOUS PROVISIONS

**14.1    REJECTION OF UNASSUMED EXECUTORY CONTRACTS**.  On the Effective Date, except for any Executory Contract (i) that was previously assumed or rejected by an Order of the Bankruptcy Court (including the Confirmation Order) or otherwise pursuant to § 365 of the Bankruptcy Code; (ii) that is subject to a pending motion to assume or reject before the Bankruptcy Court, (iii) that is expressly assumed in the Amended Plan; or (iv) that is listed on **Exhibit W**, each Executory Contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejection pursuant to §§ 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**14.2    FINAL ORDER**.  Except as otherwise set as otherwise expressly provided in the Amended Plan, any requirement in the Amended Plan for a Final Order may be waived by the Debtor (if prior to the Effective Date) or by the Reorganized Debtor (on or after the Effective Date) upon written notice to the Bankruptcy Court.  Any party in interest may, on its own behalf, waive a requirement for a Final Order that results in favor of such part in interest without notice to the Bankruptcy Court or other parties in interest.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any Order that is not a Final Order.

**14.3    AMENDMENTS AND MODIFICATIONS**.  The Debtor may modify the Amended Plan at any time prior to the Confirmation Hearing in accordance with § 1127(a) of the Bankruptcy Code.  After the Confirmation Date and prior to "substantial consummation" (as such term is defined in § 1101(2) of the Bankruptcy Code) of the Amended Plan, the Reorganized Debtor, or the Plan Trustee, as appropriate, may modify the Amended Plan in accordance with § 1127(b) of the Bankruptcy Code by filing a motion on notice to the service list established by the *Order Establishing Case Management and Scheduling Procedures*, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.

**14.4    U.S. TRUSTEE REPORTS**.  From the Effective Date until a Final Decree is entered, the Reorganized Debtor shall, within thirty (30) days of the end of the fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines.  The Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

**14.5    NO WAIVER**.  The failure of the Archdiocese to object to any Claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Plan Trustee's right to object to such Claim, in whole or in part.

**14.6    TAX EXEMPTION**.  Pursuant to § 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 44 of 329

made pursuant to and under the Amended Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Amended Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed, stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**14.7    NON-SEVERABILITY**

Except as specifically provided herein, the terms of the Amended Plan constitute interrelated compromises and are not severable, and no provision of the Amended Plan may be stricken, altered, or invalidated, except by amendment of the Amended Plan by the Archdiocese.

**14.8    REVOCATION**.  The Archdiocese reserves the right to revoke and withdraw the Amended Plan prior to the Confirmation Date, in which case the Amended Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Archdiocese, the Committee, or any other Person or to prejudice in any manner the rights of the Archdiocese, the Committee, or any other Person in any further proceedings involving the Archdiocese, or be deemed an admission by the Archdiocese, including with respect to the amount or allowance of any Claim or the value of any property of the Estate.

**14.9    CONTROLLING DOCUMENTS**.  In the event and to the extent that any provision of the Amended Plan or Plan Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Amended Plan or Plan Trust Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of the Plan Trust Agreement is inconsistent with any provision of the Amended Plan, the Amended Plan shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Amended Plan or the Plan Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.  To the extent that any provision of the Amended Plan, the Plan Trust Agreement, or the Confirmation Order is inconsistent with the Insurance Settlement Agreements, the Insurance Settlement Agreements control.

**14.10    GOVERNING LAW**.  Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure), and unless specifically stated, the rights, duties, and obligations arising under the Amended Plan, any agreements, documents, and instruments executed in connection with the Amended Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and any corporate governance matters with respect to the Plan Trust or the Reorganized Debtor shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin, without giving effect to conflicts of law principles.

**14.11   NOTICES**.  Any notices or requests by parties in interest under or in connection with the Amended Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

**If to the Debtor or the Reorganized Debtor:**

Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
Telephone:  (414) 273-2100
Facsimile:  (414) 223-5000
Attn:   Daryl L. Diesing
          Bruce G. Arnold

**If to the Plan Trust or the Plan Trustee:**

The parties identified in the Plan Trust Agreement to receive notices.

**14.12   FILING OF ADDITIONAL DOCUMENTS**.  At any time before "substantial consummation" (as such term is defined in § 1102(2) of the Bankruptcy Code) of the Amended Plan, the Archdiocese, the Plan Trust, and/or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Amended Plan, or otherwise to comply with applicable law.

**14.13   POWERS OF OFFICERS**.  The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Amended Plan.

**14.14   DIRECTION TO A PARTY**.  On and after the Effective Date, the Plan Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Amended Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Amended Plan.

**14.15   SUCCESSORS AND ASSIGNS**.  The Amended Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor.  The rights, benefits, and obligations of any entity named or referred to in the Amended Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**14.16   CERTAIN ACTIONS**.  By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Amended Plan that would otherwise require approval of the officers of the Archdiocese under the Amended

Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Amended Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Amended Plan involving the Archdiocese or organizational structure of the, Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

**14.17   FINAL DECREE**.  Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case.

**14.18   AMENDED PLAN AS SETTLEMENT COMMUNICATION**.  The Amended Plan furnishes or offers or promises to furnish -- or accepts or offers or promises to accept -- valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are disputed as to validity and/or amount (including Abuse Survivor Claims and the Insurance Litigation).  Accordingly, the Amended Plan, the Disclosure Statement, and any communications regarding the Amended Plan or the Disclosure Statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any disputed Claim or Cause of Action.

**14.19   CONTRIBUTION RIGHTS**.  Except as set forth in Section 5.1(g) nothing in the Amended Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Wisconsin law, or any other applicable statutory or common law, of reduction, credit, or setoff, arising from the settlement and resolution of the Abuse Survivor Claims.

**ARTICLE XV:**
**BANKRUPTCY RULE 9019 REQUEST**

**15.1**     Pursuant to Bankruptcy Rule 9019 and through the Amended Plan, the Debtor requests approval of all compromises and settlements included in the Amended Plan, including the compromises and settlements set forth in Article V.  In addition, through the Amended Plan, the Debtor requests confirmation of the Amended Plan as a Cramdown Amended Plan with respect to any Impaired Class that does not accept the Amended Plan or is deemed to reject the Amended Plan.

## ARTICLE XVI:
## <u>CONFIRMATION REQUEST</u>

**16.1**    The Debtor hereby requests confirmation of the Amended Plan as a Cramdown Plan with respect to any Impaired Class that does not accept the Amended Plan or is deemed to have rejected the Amended Plan.

Respectfully submitted,

Archdiocese of Milwaukee

_____

By:  Archbishop Jerome E. Listecki
Its:  President and Sole Member

**Exhibit B – Definitions**

[*Remainder of Page Intentionally Left Blank*]

## Definitions to the Amended Plan

1. "1929 Handbook" means the Handbook of Calvary, Holy Cross, Holy Trinity and Mt. Olivet Cemeteries.

2. "Abuse" means any and all acts or omissions that the Archdiocese may be legally responsible for that in any way arise out of, are based upon, or involve sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually related psychological or emotional harm or contacts or interactions of a sexual nature between a child and an adult. A child may be Abused whether or not this activity involves explicit force, whether or not this activity involves genital or other physical contact and whether or not there is physical, psychological or emotional harm to the child.

3. "Abuse Survivor Bar Date" means February 1, 2012 at 4:00 p.m. Central Standard Time.

4. "Abuse Survivor Claim" means any Claim against the Debtor related to or arising out of any and all acts or omissions that in any way arise out of, are based upon, or involve actual or alleged Abuse by a Person for whom the Debtor is or was legally responsible, whom the Debtor failed to control, direct, train or supervise, or about whose acts or propensities the Debtor failed to warn, disclose or provide information, including but not limited to Abuse Survivor Plan Pool Claims, Unsubstantiated Claims Receiving a Distribution at the Creditors' Committee's Request, and Disallowed or Previously Dismissed Abuse Survivor Claims.

5. "Abuse Survivor Plan Pool Claims" means any Abuse Survivor Claim that meets the following criteria: (i) the Claimant did not release the Archdiocese from liability associated with the Abuse; and (ii) the Claim alleges sexual abuse of a minor by either (a) a priest on the List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at a Catholic Entity. The Abuse Survivor Plan Pool Claims are listed on **Exhibit F.**

6. "Abuse Survivor" means anyone who has experienced Abuse.

7. "Abuser" means a perpetrator of Abuse.

8. "Administrative Claim Bar Date" has the meaning set forth in Section 2.1(b)(1) of the Amended Plan.

9. "Administrative Claim Objection Deadline" shall have the meaning set forth in Section 2.1(b)(2) of the Amended Plan.

10. "Administrative Claim" means a Claim for costs and expenses of administration that is allowable and entitled to priority under §§ 503, 507(a)(2) and/or 507(b) of the Bankruptcy Code, including any post-petition tax claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

11. "Allocation Claims Reviewer" or "ACR" means the person, including the designee of such person, who will assess Abuse Survivor Claims and any FCR Claims. Subject to the Amended Plan's provisions for replacement of the Abuse Claims Reviewer, the Abuse Claims Reviewer is Paul Finn.

12. "Allocation Protocol" means the protocols set forth in **Exhibit T**.

13. "Allow," "Allowed," or "Allowance" when used with respect to a Claim against the Debtor or property of the Debtor, means a Claim: (a) which has been listed on the Schedules and not designated as disputed, contingent or unliquidated and no objection to the scheduled amount has been timely filed; (b) as to which a Proof of Claim has been timely filed, or deemed timely filed by order of the Bankruptcy Court, and either (i) no objection thereto has been or will be timely filed, or application to subordinate or otherwise limit recovery has been or will be made or (ii) the Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court; (c) which has been allowed under the provisions of the Amended Plan; (d) which is a Professional Claim for which a fee award amount has been approved by Final Order of the Bankruptcy Court; or (e) which is allowed pursuant to any stipulation of amount and nature of Claim executed by the Reorganized Debtor and the holder of the Claim on or after the Effective Date. To the extent the term "Allowed" is used in the Amended Plan with respect to a specified Class of Claims or an unclassified category of Claims (i.e., "Allowed [Class designation/unclassified Claim category] Claim"), the resulting phrase shall mean an Allowed Claim of the specified Class or unclassified category of Claims.

14. "Amended Plan" means this chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

15. "Anderson Firm" means the law firm of Jeff Anderson & Associates P.A.

16. "Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan" means the single employer defined benefit pension plan for the benefit of certain employee members of the Laborers International Union, Local 113.

17. "Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan Claims" mean any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan.

18. "Archdiocesan Priest" means a priest ordained by the Archdiocese of Milwaukee.

19. "Archdiocese of Milwaukee Lay Employees' Pension Plan Claims" mean any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocese of Milwaukee Lay Employees' Pension Plan.

20. "Archdiocese of Milwaukee Lay Employees' Pension Plan" means the noncontributory multiple employer defined benefit pension plan for the benefit of the Archdiocese's full-time lay employees (except for the union employees of the cemetery and mausoleum

operations) who have been employed for a year or more, together with the employees of those participating employers located within the boundaries of the Archdiocese that chose to adopt the pension plan.

21. "Archdiocese of Milwaukee Priests' Pension Plan Claims" mean any Claim against the Debtor for potential withdrawal or similar liability arising under the Archdiocese of Milwaukee Priests' Pension Plan.

22. "Archdiocese of Milwaukee Priests' Pension Plan" means the contributory multiple employer defined benefit pension plan for the benefit of priests incardinated in the Archdiocese.

23. "Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims" means any Claim against the Debtor arising under the Milwaukee Priests' Retiree Medical Plan.

24. "Archdiocese of Milwaukee Priests' Retiree Medical Plan" means the post-retirement health, dental, and vision insurance benefits plan for the benefit of retired Archdiocesan Priests.

25. "Archdiocese" and "Archdiocesan" refers to the public juridic person of the Roman Catholic Archdiocese of Milwaukee under Canon Law.

26. "Assets" of the Debtor or the Estate means, collectively, any and all property of the Debtor or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including Cash (including the residual balance of any reserves established under the Amended Plan, but not the Plan Trust) and Causes of Action.

27. "Baker Tilly" means Baker Tilly Virchow Krause, LLP.

28. "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject the Amended Plan.

29. "Bankruptcy Code" means title 11 of the United States Code, §§ 101-1532, as now in effect or as hereafter amended.

30. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Wisconsin.

31. "Bankruptcy Rules" means, as the context requires, the Federal Rules of Bankruptcy Procedure applicable to this Chapter 11 Case and/or the local bankruptcy rules for the Bankruptcy Court as now in effect or as the same may from time to time hereafter be amended.

32. "Bar Date" means the date or dates established by the Bankruptcy Court as the last date for filing proofs of claim against the Debtor, including the Bar Dates established pursuant to the Bar Date Order. The Amended Plan does not affect or extend any date

established by any other Order and the earliest date applicable to the filing or assertion of any Claim shall govern and control.

33. "Bar Date Order" means the *Order Approving Debtors Motion for Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 331].

34. "BMI" means Business Management International.

35. "BRG" means Berkeley Research Group, LLC.

36. "Bucks" means the Milwaukee Bucks, LLC.

37. "Business Day" means any day that is not a Saturday, a Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

38. "Buy-Back Payment" means the payment by the Settling Insurers to the Plan Trust of a sum equal to fifty percent (50%) of their respective portion of the Insurance Settlement Amount for the buy-back of all interests of the Catholic Entities in the Settling Insurer Policies.

39. "BVBOV" means Buelow Vetter Buikema Olson & Vliet, LLC.

40. "Canon Law" means the Code of Canon Law of the Roman Catholic Church, as codified in 1983 and as may hereafter be amended, and all binding universal and particular laws of the Roman Catholic Church.

41. "Cash" means cash or cash equivalents, including wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

42. "Catholic Entities" means the Archdiocese and the Related Entities.

43. "Cause of Action or" "Causes of Action" means, except as provided otherwise in the Amended Plan, the Confirmation Order or any document, instrument, release or other agreement entered into in connection with the Amended Plan, all Claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims of the Debtor and/or its Estate, the Committee, or the Plan Trust (as successor to the Debtor and/or its Estate), including an action that is or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any Person based on law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, including Designated Causes of Action and any action brought pursuant to §§ 522, 541-545, 547-51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or cross-claim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

44. "Cemetery Trust" means the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust.

45. "Cemetery Trust Contribution" means the Eight Million Dollar ($8,000,000) contribution by the Cemetery Trust to the Plan Trust.

46. "Cemetery Trust Litigation" means the adversary proceeding entitled *Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust v. Official Committee of Unsecured Creditors*, Case No. 11-02459 originally filed in the Bankruptcy Court.

47. "Cemetery Trust Loan" means the Cemetery Trust line of credit, pursuant to which the Cemetery Trust agrees to loan the Debtor up to Three Million Dollars ($3,000,000) pursuant to the terms and conditions listed on the Term Sheet attached as **Exhibit P** to this Plan.

48. "Cemetery Trust Reimbursement" means the Five Million Dollar ($5,000,000) reimbursement by the Cemetery Trust to partially offset the Archdiocese's costs for providing perpetual care of the cemeteries incurred from January 4, 2011, the Petition Date, through the confirmation of the Amended Plan.

49. "Cemetery Trust Settlement Agreement" means the settlement agreement between the Cemetery Trust and the Archdiocese.

50. "Channeling Injunction" means the injunction imposed pursuant to Section 12.3 of the Amended Plan.

51. "Chapter 11 Case" means the chapter 11 case, *In re Archdiocese of Milwaukee*, No. 11-20059-svk, pending in the Bankruptcy Court.

52. "Charter" means the Charter for the Protection of Children and Young People adopted by the United States Conference of Catholic Bishops in June 2002.

53. "Church" means the Roman Catholic Church.

54. "Claim" has the same meaning as that term is defined in § 101(5) of the Bankruptcy Code.

55. "Claimant" means a holder of a Claim.

56. "Class 9 Reserve" means the reserve established for the benefit of Class 9 Claims pursuant to section 6.3 of the Amended Plan.

57. "Class" means a category of holders of Claims as set forth in Article III of the Amended Plan pursuant to Bankruptcy Code § 1122.

58. "Code of Ethical Standards" means the Code of Ethical Standards for Church Leaders which is available at http://www.archmil.org/Resources/Code-Ethical-Standards-Leaders.htm.

59. "Committee" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case, as such committee may be constituted from time to time.

60. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

61. "Confirmation Hearing" means the hearing or hearings before the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Amended Plan, as may be continued or adjourned.

62. "Confirmation Order" means the order of the Bankruptcy Court confirming the Amended Plan pursuant to § 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

63. "Continental" means CNA Insurance Company (a/k/a Continental Casualty Company).

64. "Cousins Center" means the Archbishop Cousins Catholic Center.

65. "Cramdown Plan" means the Amended Plan if it is confirmed by the Bankruptcy Court pursuant to § 1129(b) of the Bankruptcy Code.

66. "Creditor" means any holder of a Claim against the Debtor (including Abuse Survivor Claims) arising prior to the Effective Date.

67. "De Sales" means De Sales Preparatory Seminary, Inc.

68. "Debtor" means the Archdiocese of Milwaukee, as debtor and as debtor-in-possession in the Chapter 11 Case.

69. "Disallowed or Previously Dismissed Abuse Survivor Claims" means any Abuse Survivor Claim that does not meet the criteria of a Class 8 or Class 9 Claim because: (i) pursuant to a valid settlement agreement, the Claimant released the Archdiocese from liability associated with the Abuse; or (ii) the Claim does not allege sexual abuse of a minor; or (iii) the Claim alleges sexual abuse of a minor by someone other than an Archdiocesan Priest or a member of a Religious Order or Lay Person working at a Catholic Entity. The Disallowed or Previously Dismissed Abuse Survivor Claims are listed on **Exhibit H**.

70. "Disallowed" when used with respect to a Claim against the Debtor, or property of the Debtor, means a Claim or any portion thereof that (i) has been disallowed by Final Order; (ii) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed

timely filed under applicable law or the Amended Plan; (iii) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Amended Plan; (iv) has been withdrawn by agreement of the Debtor and the holder thereof; or (v) has been withdrawn by the holder thereof; provided, however that disallowed and late-filed Abuse Survivor claims are not Disallowed Claims.

71. "Discharged Claim" means every Claim, or portion thereof, which has been Disallowed or discharged in the Chapter 11 Case.

72. "Disclosure Statement" means the disclosure statement for the Amended Plan approved by the Bankruptcy Court pursuant to § 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 (including all schedules and exhibits thereto), as such disclosure statement may be amended or modified from time to time.

73. "Disputed" when used with respect to a Claim against the Debtor or property of the Debtor, means a Claim: (i) designated as disputed, contingent or unliquidated in the Debtor's schedules filed in connection with the Chapter 11 Case; (ii) which is the subject of an objection, appeal or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order; or (iii) which during the period prior to the deadline fixed by the Amended Plan or the Bankruptcy Court for objecting to such Claim, is in excess of the amount Scheduled as other than disputed, unliquidated or contingent. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Amended Plan unless the Debtor or the Reorganized Debtor, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Amended Plan with respect to a specified Class of Claims or an unclassified category of Claims (i.e., "Disputed [Class designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified Class or unclassified category of Claims.

74. "District Court" means the United States District Court for the Eastern District of Wisconsin.

75. "Effective Date" means the date upon which the conditions in Section 11.1 of the Amended Plan have been satisfied.

76. "Essential Norms" means the Essential Norms for Diocesan Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons.

77. "Estate" means the estate created in the Chapter 11 Case pursuant to § 541 of the Bankruptcy Code.

78. "Exculpated Parties" means, collectively, (i) the Debtor, the Estate, and the Committee and (ii) the respective officers, directors, employees, members, attorneys, financial advisors, and professionals of a Person identified in the preceding clause (i).

79. "Executory Contract" means any executory contract or unexpired lease subject to § 365 of the Bankruptcy Code, between the Debtor and any other Person.

80. "FCR" means Stephen Gerlach (Deloitte Financial Advisory Services), or his successor.

81. "FCR Claims" mean any Claim that is neither timely filed nor deemed to be timely filed and that is held by: (i) individuals who are under the age of 18 as of the Petition Date; or (ii) individuals who were mentally ill when their cause of action accrued and whose statute of limitations period, if not for their mental illness, would have expired within five years of the Petition Date; or (iii) individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired; or (iv) individuals who were abused in a jurisdiction outside of Wisconsin whose statute of limitations period, pursuant to controlling law, has not expired because the claimant did not discover both the injury and the causal relationship between the injury and the sexual abuse prior to the Abuse Survivors Bar Date; or and (v) any other individual or class of individuals the FCR can identify that would have a claim that an individual later asserts is not barred by the Abuse Survivors Bar Date.

82. "FCR Claimant" means a holder of an FCR Claim.

83. "Future Claimant Representative Claim" means the claim of the FCR on behalf of the FCR Claimants.

84. "FCR Reserve" means the reserve established for the benefit of FCR Claimants pursuant to Section 6.3 of the Amended Plan.

85. "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

86. "FIIA" means the Fiduciary Income Investment Account.

87. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or District Court, as applicable, or its authorized designee in the Chapter 11 Case.

88. "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

89. "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction, as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, review, reargue, or rehear shall have been waived in writing, or, in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing shall have expired; *provided, however, that*

the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order." For the avoidance of doubt, if the Amended Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("Substantial Consummation"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order.

90. "FIOF Standing Motion" means the *Motion of the Official Committee of Unsecured Creditors for Order Authorizing Committee to Assert, Litigate and Settle Adversary Proceeding on Behalf of the Bankruptcy Estate Against the Trustees of the Faith in Our Future Trust, Solely in Their Capacities as Trustees* [Dkt. No. 1027].

91. "FIOF Trust" means the Faith in Our Future Trust.

92. "Firemen's Fund" means Fireman's Fund Insurance Companies.

93. "First Excess Umbrella Liability Policies" means those First Excess Umbrella Liability Policies subscribed by LMI effective from July 1, 1967, to August 1, 1973, with limits of $4 million excess of $1 million.

94. "First Lien Properties" means, when used in connection with the Cemetery Trust Settlement, the real estate known as Prospect Hill (New Berlin), Plunkett Property (Germantown), Nicholson Road (Caledonia), Scarlet Property (Mount Pleasant), and All Souls (Franklin).

95. "General Unsecured Creditor" means every creditor other than holders of Administrative Claims, Priority Claims, Priority Tax Claims, Archdiocese of Milwaukee Priests' Retiree Medical Plan Claims, Archdiocese of Milwaukee Priests' Pension Plan Claims, Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan Claims, Archdiocese of Milwaukee Lay Employees' Pension Plan Claims, Perpetual Care Claims, Abuse Survivor Claims, Charitable Gift Annuity Claims, or Penalty Claims.

96. "Gift Annuity Claims" means Claims arising under charitable gift annuity agreements with the Debtor.

97. "Granite" means Granite State Insurance Company.

98. "Hamilton" means Marci A. Hamilton.

99. "HSW" means Howard Solocheck & Weber, S.C.

100. "Impaired" means "impaired" within the meaning of § 1124 of the Bankruptcy Code.

101. "Insolvent London Market Insurers" means those Persons listed on **Exhibit M** to the Amended Plan. Insolvent London Market Insurers means insolvent London Market Companies. There are also non-LMI that may have provided co-insurance on some policy layers with LMI (hereafter, the "Co-Subscribers"). The Insolvent London

Market Insurers and the Co-Subscribers were not represented in the Insurance Coverage Adversary Proceeding. The Insolvent London Market Insurers and the Co-Subscribers are not part of, or subject to, the Settlement Agreement. LMI will not "gross-up" for any Settlement Agreement amount that is the responsibility of Insolvent London Market Insurers.

102.    "Insurance Company" or "Insurer" means (a) any Person or entity that during any period of time either (i) provided Insurance Coverage to the Debtor or (ii) issued an Insurance Policy to the Debtor; and (b) any Person or Entity owing a duty to defend and/or indemnity the Debtor under any Insurance Policy.

103.    "Insurance Coverage Adversary Proceeding" means the adversary proceeding entitled *Archdiocese of Milwaukee et. al. v. Stonewall Insurance Company et. al.*, Case No. 12-02835, commenced by the Debtor and the Additional Plaintiffs on November 13, 2012.

104.    "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Non-Settling Insurer or any Insurance Policy issued by a Non-Settling Insurer and/or rights thereunder.

105.    "Insurance Policy" means (i) any contract of insurance in effect on or before the Effective Date issued or allegedly issued by any insurance company or insurance broker to or for the benefit of the Debtor or any predecessor in interest of the Debtor, or (ii) any contract of insurance in effect on or before the Effective Date issued or allegedly issued by any insurance company or insurance broker to or for the benefit of the Debtor, for which coverage might exist for an Abuse Survivor Claim.

106.    "Insurance Settlement Agreements" means the settlement agreements between the Archdiocese and the Settling Insurers.

107.    "Insurance Settlement Amount" means the net sum of $10,705,797.66 paid by the Settling Insurers.

108.    "Insurance Settlement Motion" means the *Motion for Order Approving Settlement Agreements and Policy Buy-Back Agreements* filed on December 17, 2014.

109.    "Insurance Settlement" means, individually, a settlement between the Archdiocese and a Settling Insurer, and, collectively, the settlements between the Archdiocese and the Settling Insurers.

110.    "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

111.    "Interstate" means Interstate Fire & Casualty Company.

112.    "IRC" means the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.,* as may be amended.

113.	"KCC" means Kurtzman Carson Consultants LLC.

114.	"L&M" means Leverson and Metz, S.C.

115.	"Lay Person" means any person who is not an Archdiocesan Priest, a priest ordained by a diocese under than the Archdiocese, or a Religious Order Member.

116.	"Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Debtor as contemplated by § 101(37) of the Bankruptcy Code.

117.	"List of Substantiated Abusers" means the list of names of diocesan priests of the Archdiocese who have been (or would be if they were still alive) restricted from all priestly ministries, may not celebrate the sacraments publicly, or present themselves as priests in any way, which is currently available at http://www.archmil.org/reorg/clergy-offenders-info/clergy-offenders.htm.

118.	"Litigated Policies" means, collectively, the Umbrella Liability Policies, the First Excess Umbrella Liability Policies, and the Second Excess Umbrella Liability Policies.

119.	"Lloyd's Underwriters" means:

	(a)	All past, present and future trustees, officers, directors, employees, subsidiaries, affiliates, representatives, attorneys and agents of the Persons set forth in Sections 119(a) to (e) (inclusive), if any, solely in such capacity; and

	(b)	All the past, present and future employees (if any), representatives, attorneys, and agents of the Persons set forth in Section 119.(a), and their respective predecessors and successors, if any, solely in such capacity; and

	(c)	All the respective heirs, executors, successors (including Equitas Insurance Limited ("EIL") to the extent EIL is a successor to any of the Persons identified in Section 119.(a), hereof, with respect to the subject matter of the LMI Settlement Agreement), assigns (including any administrator, receiver, trustee, personal representative, or equivalent appointee/s under relevant insolvency law), reinsurers and retrocessionaires (as such) of any of the Persons identified in Section 119(a), hereof.

	(d)	All Underwriters, members, or Names at Lloyds, London (including former underwriters, members or Names) who through their participation in syndicates (including those identified on Attachment B-Section I and B-Section II to the LMI Settlement Agreement), severally subscribed, each in his own proportionate share, to one or more of the Subject Insurance Policies (as that term is defined in the LMI Settlement Agreement).  Lloyd's Underwriters shall also include, without limitation, all Underwriters, members or Names at Lloyd's, London, (including former underwriters, members and Names) whether or not they participated in the syndicates identified in Attachment B-Section I and B-Section II to the LMI Settlement Agreement, who, through their participation in syndicates (including those identified on Attachment B-Section I and B-Section II to the LMI Settlement Agreement) severally subscribed any of the

Subject Insurance Policies (as that term is defined in the LMI Settlement Agreement) in favor of the Catholic Entities (as that term is defined in the LMI Settlement Agreement): (a) the existence of which has not presently been established; or (b) the existence of which has been established but as to which identities of names, members, or syndicates are not presently known;

(e)     Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their claims handling agent and/or service provider, solely in such capacity;

(f)     EIL to the extent it is not a successor to the Persons identified in Section 119.(a), with respect to the subject matter of the LMI Settlement Agreement;

(g)     For the avoidance of doubt, the Underwriter Third Party Beneficiaries, who receive certain specified benefits under the LMI Settlement Agreement, are not Lloyd's Underwriters for the purpose of this definition.

(h)     Resolute and the Equitas Entities;

(i)     The past, present and future reinsurers and retrocessionaires of the Equitas Entities or any of them, including National Indemnity Company and any other Person from time to time controlled (whether directly or indirectly), by Berkshire Hathaway, Inc., that provides retrocessional reinsurance to any one or more of the Equitas Entities, solely in such capacity;

(j)     The respective heirs, executors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise) or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in Sections 119.(a) to (e) (inclusive) above.

120.    "LMI Settlement Agreement" means the settlement agreement between the London Market Insurers and the Archdiocese.

121.    "LMI Settlement Amount" means Seven Million, Four Hundred and Thirty Thousand, Seven Hundred and Ninety-seven Dollars and Sixty-six Cents ($7,430,797.66), which is the solvent LMI's share of the gross settlement amount of Eight Million Dollars ($8,000,000).

122.    "London Market Companies" means all the companies doing business in the London Insurance Market, which severally subscribed, each in its own proportionate share, one or more of the Subject Insurance Policies (as such term is defined in the LMI Settlement Agreement) (such insurers are identified in Attachment B to the LMI Settlement Agreement). London Market Companies shall also include those companies doing business in the London insurance markets (but only those companies identified in Section I of Attachment B to the LMI Settlement Agreement and that make the payment called for in Attachment D to the LMI Settlement Agreement) who subscribed any insurance policies (a) the existence of which has not presently been established but which provided insurance to the Catholic Entities (as such term is defined in the LMI Settlement

Agreement) or (b) the existence of which has been established but the identity of such company as a subscribing insurer is not presently known. As used herein, "companies" shall mean the named corporate entity and all predecessors, successors, affiliates, pool companies as such, and subsidiaries. It is further expressly understood that "companies" are parties to the LMI Settlement Agreement only with respect to the policies issued or subscribed by them in the London insurance markets (as opposed to insurance markets located elsewhere).

123. "London Market Insurers" means Lloyd's Underwriters and the London Market Companies. The terms "London Market Insurers" and "LMI" are used interchangeably in the Amended Plan and Disclosure Statement and have the same meaning.

124. "London Policies" means, collectively, the Umbrella Liability Policies, the First Excess Umbrella Liability Policies, the Second Excess Umbrella Liability Policies, the Excess Umbrella Policies, the Package Policies, the Excess Broadform Policies and the Excess All-Risk Policies.

125. "Milwaukee Catholic Cemeteries" means the cemeteries and mausoleums operated or maintained by the Archdiocese, including but not limited to the following Catholic burial facilities: All Saints Cemetery & Mausoleum, Calvary Cemetery & Mausoleum, Holy Cross Cemetery & Mausoleum, Holy Trinity Cemetery, Mount Olivet Cemetery & Mausoleum, Resurrection Cemetery & Mausoleum, Saint Adalbert Cemetery & Mausoleum, Saint Joseph Cemetery & Mausoleum, St. Martin's Cemetery, Blessed Sacrament Cemetery, and St. Mary's Cemetery. The definition of Milwaukee Catholic Cemeteries includes any cemetery or mausoleum that the Archdiocese currently operates or maintains or may in the future operate or maintain.

126. "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173)", which imposes reporting obligations on those Persons with payment obligations under the MSP.

127. "MSP" means 42 U.S.C. § 1395y *et seq*., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

128. "Non-Settling Insurers" means those insurers listed on **Exhibit L**.

129. "O'Neil" means O'Neil, Cannon, Hollman, Dejong & Laing, S.C.

130. "OneBeacon Adversary Proceeding" means the adversary proceeding against OneBeacon Insurance Company commenced on January 22, 2014.

131. "OneBeacon" means Commercial Union Insurance Company (n/k/a OneBeacon Insurance Company).

132. "Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction.

133. "Original Trust Fund" has the meaning ascribed to it in Section VII.C.2. of the Disclosure Statement.

134. "Orion Scheme" means the OIC Run-off Limited and the London and Overseas Insurance Company Limited proposed scheme of arrangement.

135. "Package Policies" means the Combined Property, Casualty, and Crime Insurance Policies subscribed by LMI in favor of the Debtor, effective May 15, 1982, to July 1, 1987, with General Liability Coverage limits of 80% of $140,000 each occurrence excess of a $60,000 Self-Insured Retention.

136. "Park Bank Loan Collateral" means the collateral, as such is more fully described in the Park Bank Loan Documents, securing the Park Bank Loan.

137. "Park Bank Loan Documents" means the documents evidencing the Park Bank Loan.

138. "Park Bank Loan" means that certain loan dated October 12, 2006, between the Archdiocese of Milwaukee and Park Bank.

139. "Park Bank Secured Claim" means the secured claim of Park Bank in the approximate amount of $4,389,512.50 arising out of that certain loan dated October 12, 2006.

140. "PDF Standing Motion" means the *Motion of the Official Committee of Unsecured Creditors for Order (I) Authorizing Committee to Assert, Litigate, and Settle an Adversary Proceeding on Behalf of the Bankruptcy Estate to Avoid and Recover Fraudulent Transfers Relating to Transfers From the Debtor's Parish Deposit Fund and (II) Compelling Debtor to Identify to the Committee the Recipients and Amounts and Dates of the Transfers* [Dkt. No. 806].

141. "Penalty Claims" means a Claim against the Debtor, whether secured or unsecured, for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim.

142. "Perpetual Care Claims" mean any Claim arising from the Debtor's obligations to provide ongoing maintenance and care at the Milwaukee Catholic Cemeteries.

143. "Person" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated association, government or any political subdivision thereof, or other entity.

144. "Petition Date" means January 4, 2011, the date on which the Debtor commenced the Chapter 11 Case.

145. "Plan Funding Date" means the first Business Day after all of the payments to the Plan Trust described in Section 6.2 of the Amended Plan have been made.

146. "Plan Payment" means the payment by the Settling Insurers to the Estate of a sum equal to fifty percent (50%) of their respective portion of the Insurance Settlement Amount for the releases contained in the Insurance Settlement Agreements.

147. "Plan Trust Agreement" means the trust agreement establishing the Plan Trust, as may be amended.

148. "Plan Trust Assets" means $21,250,000 in cash, one-half of the estimated $569,000 the Archdiocese expects to receive by filing a claim with the United Kingdom's Financial Services Compensation Scheme (but only to the extent of 50% of any recoveries actually received), and the right to pursue recoveries against any Non-Settling Insurers.

149. "Plan Trust" means the trust created for the benefit of holders of Class 8 Claims, Class 9 Claims, and the holders of FCR Claims in accordance with the Amended Plan and Confirmation Order.

150. "Plan Trustee" means, the Person appointed as trustee of the Plan Trust in accordance with the terms of the Amended Plan, the Confirmation Order, and the Plan Trust Agreement, or any successor appointed in accordance with the terms of the Amended Plan, Confirmation Order, and the Plan Trust Agreement.

151. "Post-Confirmation Notice Parties" means the Reorganized Debtor, the Committee until it is dissolved, the Plan Trust, and the U.S. Trustee.

152. "Priority Claim" means Allowed Claims described in, and entitled to priority under §§ 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

153. "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in § 507(a)(8) of the Bankruptcy Code.

154. "Pro Rata" means, with respect to any Distribution on account of any Allowed Claim in any Class, the ratio of (i) the amount of such Allowed Claim to (ii) the sum of (a) all Allowed Claims in such Class and (b) the aggregate maximum allowable amount of all Disputed Claims in such Class.

155. "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Case.

156. "Professional Claims Bar Date" has the meaning set forth in Section 2.1(c)(1) of the Amended Plan.

157. "Professional Claims Objection Deadline" has the meaning set forth in Section 2.1(c)(2) of the Amended Plan.

158. "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

159. "Proof of Claim" means a proof of claim filed in the Chapter 11 Case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

160. "Protected Party" means any of the Debtor, the Reorganized Debtor, the Settling Insurers, the Catholic Entities and their respective predecessors and successors, and their past, present, and future members, trustees, officers, officials, employees, agents, representatives, servants, contractors, consultants, professionals, volunteers, attorneys, professionals, affiliates; insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns.

161. "PSZJ" means Pachulski Stang Ziehl & Jones, LLP.

162. "Q&B" means Quarles & Brady, LLP.

163. "Region" means the region served by the Archdiocese, which consists of 4,758 square miles in southeast Wisconsin and includes the following counties: Dodge, Fond du Lac, Kenosha, Milwaukee, Ozaukee, Racine, Sheboygan, Walworth, Washington and Waukesha.

164. "Related Entities" means those persons listed on **Exhibit O**, their predecessors and successors; all their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and any other Person that was in the past or is now  affiliated with, related to or associated with the Related Entities including any corporations that have been acquired by, merged into or combined with a Related Person or its predecessors, or the Related Entities' past and present subsidiaries, affiliates, successors and assigns; *provided, however*, Persons within the definition of Archdiocese are not within the definition of "Related Entities."

165. "Religious Order Member" means a member of a Religious Order.

166. "Religious Order(s)" means "institutes of consecrated life and societies of apostolic life" which enable men and women who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Church without becoming members of the Church hierarchy, including but not limited Alexian Brothers (Immaculate Conception Province), Congregation of the Mission, Congregation of the Holy Spirit, Redemptorist Congregation (Denver Province), Missionary Fraternity of Mary (Guatemala), Legionaries of Christ, Missionary Congregation of the Blessed Sacrament, Camillian Fathers and Brothers, Marian Fathers (Lithuanian), Maryknoll, Missionaries of Our Lady of La Salette, Discalced Carmelite Fathers (Washington Province), Coventual Franciscans of St. Bonaventure Province, Sisters of Charity of the Blessed Virgin Mary, Carmelite Sisters of the Divine Heart of Jesus, Carmelite Hermit of the Trinity (Solitary), Sisters of the Resurrection, Congregation of Sisters of St. Agnes, Felician Sisters, Discalced Carmelite Nuns (Pewaukee), Daughters of Charity, Daughters of Divine Charity, Franciscan Sisters of Our Lady, Franciscan Sisters of Perpetual Adoration, Franciscan Sisters of St. Clare,

Franciscan Sisters of St. Joseph (Hamburg, N.Y.), Sisters of the Immaculate Heart of Mary, Mother of Christ (Nigeria), Missionary Sisters of the Holy Family (Poland), Sisters of the Third Order of St. Dominic of the Congregation of St. Catherine Siena (Racine), Dominican Sisters of Sinsinawa, Congregation of the Most Holy Rosary, Dominican Sisters of the Perpetual Rosary, Dominican Sisters of the Immaculate Conception Province (Justice, Ill), Dominican Sisters of Peace (Columbus, OH), Vietnamese Dominican Sisters, Sisters of St. Rita, Benedictine Sisters of Pontifical Jurisdiction, Erie, PA, Franciscan Sisters of Little Falls, Minnesota, Franciscan Sisters of Our Lady of Perpetual Help (St. Joseph, Missouri), Sisters of St. Francis of Christ the King (Lemont, Ill.), School Sisters of St. Francis (St. Joseph Convent, Milwaukee), Sisters of St. Francis of Assisi (St. Francis Convent, St. Francis, WI), Franciscan Sisters, Daughters of the Sacred Hearts of Jesus and Mary (Wheaton, Ill.), Hospital Sisters of the Third Order of St. Francis (Springfield, Ill., Poor Handmaids of Jesus Christ, Sisters of Mercy of the Americas, Sisters of Charity of St. Joan Antida, Sisters of the Divine Savior, Sister Servants of Christ the King, Sisters of St Elizabeth of Hungary, Sisters of St. Joseph of the Third Order of St. Francis (Province of St Joseph), Sisters of the Sorrowful Mother, School Sisters of Notre Dame (Central Pacific Province), Schoenstatt Sisters of Mary, and Order of Marianitas de Jesus (Ecuador).

167. "Reorganization Assets" means, collectively, all Assets of the Debtor and the Estate. For the avoidance of doubt, the Reorganization Assets do not include the Plan Trust Assets.

168. "Reorganized Debtor" means Archdiocese of Milwaukee, on and after the Effective Date.

169. "Resolute" means Resolute Management Services Limited (formerly known as Equitas Management Services Limited).

170. "RFRA" means the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb *et seq.*).

171. "Richler" means the Law Offices of Paul A. Richler.

172. "Rule 3013 Motion" means the *Debtor's Motion to Determine Classification of Claims Pursuant to 11 U.S.C. § 1122 and Bankruptcy Rule 3013* filed on August 24, 2015.

173. "Scheduled" means, with respect to any Claim, that such Claim is listed on the Schedules.

174. "Schedules" means the Debtor's schedules of assets and liabilities filed with the clerk of the Bankruptcy Court pursuant to pursuant to § 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

175. "Schools" mean the Catholic elementary schools, Catholic middle schools, and Catholic high schools that operate in the Region.

176. "Second Excess Umbrella Liability Policies" means those Second Excess Umbrella Liability Policies subscribed by LMI effective from July 1, 1967, to August 1, 1973, with limits of $5 million excess of $5 million.

177. "Second Lien Properties" mean, when used in connection with the Cemetery Trust Settlement, the real estate known as the St. Charles Youth and Family Services Facility (Milwaukee) and the Archbishop Cousins Catholic Center (St. Francis).

178. "Secured Claim" means a Claim that is secured by a Lien on, or security interest in, property of the Debtor, or that has the benefit of rights of setoff under § 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined by the Bankruptcy Court pursuant to §§ 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, as applicable.

179. "Settling Insurer Policies" means and all Insurance Policies issued by a Settling Insurer.

180. "Settling Insurer" means the Insurers listed on **Exhibit K**.

181. "Seventh Circuit" means the United States Court of Appeals for the Seventh Circuit.

182. "State Court Counsel" means, collectively or individually, as the context requires: Jeff Anderson & Associates, P.A.; Aiken & Scoptur S.C.; Brennan Law Offices, L.L.C.; Robert L. Elliott Law Office; Jacobs & Crumplar, P.A.; James, Vernon & Weeks, P.A. Jody L. Shipper; Kosnoff Fasy; Michael G. Brady Law Offices; Schober, Schober & Mitchell, S.C.; Shollenberger & Januzi, LLP; Smith, Gunderson, and Rowen, S.C.; Law Office of Daniel W. Stevens; the Neuberger Firm, P.A.; Griffin Law Center, LLC

183. "Statement of Financial Affairs" means the Debtor's statement of financial affairs filed with the clerk of the Bankruptcy Court pursuant to § 521(a) of the Bankruptcy Code, as the same may have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

184. "Stonewall" means Stonewall Insurance Company.

185. "Substantive Consolidation Standing Motion" means the *Motion of the Official Committee of Unsecured Creditors for Order Authorizing Committee to Assert, Litigate, and Settle an Adversary Proceeding for a Declaratory Judgment that the Parishes Within the Archdiocese of Milwaukee are Alter Egos of the Archdiocese and Parish Assets are Property of the Estate, For Turnover, and/or for Substantive Consolidation of the Parishes and the Archdiocese* [Dkt. No. 1025]

186. "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Amended Plan and Filed with the Bankruptcy Court at least fourteen (14) days prior to the Confirmation Hearing.,

187. "Supreme Court" means the United States Supreme Court.

188. "Tax Code" means the Internal Revenue Code of 1986, as amended.

189. "Therapy Assistance" means reimbursement of therapy expenses from the Therapy Payment Fund pursuant to the Therapy Payment Process.

190. "Therapy Fund" means the fund established pursuant to Section 6.5 of the Amended Plan.

191. "Therapy Payment Process" means the procedures for requesting Therapy Assistance from the Therapy Fund outlined in **Exhibit U**.

192. "TIG" means TIG Insurance Company as Successor by Merger to International Insurance Company as Successor by Merger to International Surplus Lines Insurance Company.

193. "Treasury Regulations" means 31 C.F.R. §§ 900 *et seq.*

194. "U.S. Trustee" means the Office of the United States Trustee for the Eastern District of Wisconsin.

195. "Umbrella Liability Policies" means those Umbrella Liability Policies subscribed by LMI in favor of the Debtor effective from July 1, 1967, to August 1, 1973, with limits between 85% and 100% of $1 million. The Umbrella Liability Policies are excess of either: (1) underlying insurance, or (2) $10,000 each occurrence.

196. "Unimpaired" means, with respect to a Class of Claims, that such Class is not Impaired.

197. "Unrestricted Asset" means an Asset of the Estate that is not subject to any legally enforceable restriction requiring use or disposition of such Asset for a particular purpose and precluding use of such Asset for the Debtor's general corporate purposes.

198. "Unsecured Claims" means Claims which are not secured by any property of the Debtor's Estate and which are not part of any other Class defined in this Plan.

199. "Unsubstantiated Claims Receiving a Distribution at the Creditors' Committee's Request" means any Abuse Survivor Claim that meets the following criteria: (i) the Claimant did not release the Archdiocese from liability associated with the Abuse; and (ii) the Claim alleges sexual abuse of a minor by either (a) an Archdiocesan Priest who is not on List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at an entity that is not a Catholic Entity. The Unsubstantiated Claims Receiving a Distribution at the Creditors' Committee's Request are listed on **Exhibit G**.

200. "USCCB" means the United States Conference of Catholic Bishops.

201. "Voting Deadline" means the deadline established by the Bankruptcy Court by which a holder of a Claim must execute and deliver its Ballot in order to cast a vote to accept or reject the Amended Plan.

202. "WHD" means Whyte Hirschboeck Dudek S.C.

**Exhibit C – Plan Projections**

[*Remainder of Page Intentionally Left Blank*]

**Archdiocese Of Milwaukee**
**Post-Chapter 11 Projections**
7/21/2015

| | FY 13 Actual | FY 14 Actual | FY15 Prelim | Projected Year 1 | Projected Year 2 | Projected Year 3 |
|---|---|---|---|---|---|---|
| **Sources of Cash:** | | | | | | |
| **Operating Revenues, Gains, and Other Support** | | | | | | |
| Contributions for Charitable Activities | $ 9,705,214 | $ 11,022,373 | $ 10,350,403 | $ 10,231,000 | $ 10,457,500 | $ 10,720,795 |
| Assessments | 6,797,545 | 7,023,863 | 7,116,179 | 7,258,000 | 7,403,000 | 7,566,000 |
| Tuition and Fees for Ministry Programs | 630,179 | 686,702 | 659,355 | 725,000 | 660,000 | 740,000 |
| Cemetery Revenues | 4,676,826 | 4,544,125 | 4,496,053 | 4,500,000 | 4,500,000 | 4,590,000 |
| Distributions from Perpetual Care Trust | 1,950,000 | 1,950,000 | 1,950,000 | 1,950,000 | 1,950,000 | 1,950,000 |
| Investment Income | 517,167 | 429,249 | 271,271 | 185,000 | 185,000 | 185,000 |
| Loan Proceeds Retained to Fund CH 11 Expenses | | | | 300,000 | | |
| Other Revenues | 851,114 | 583,984 | 825,916 | 993,000 | 995,000 | 1,005,000 |
| Total Revenues, Gains, and Other Support | $ 25,128,045 | $ 26,240,296 | $ 25,669,177 | $ 26,142,000 | $ 26,150,500 | $ 26,756,795 |
| | | | | | | |
| **Uses of Cash:** | | | | | | |
| **Operating Expenses** | | | | | | |
| Staff Wages and Benefits | $ 11,406,235 | $ 11,618,378 | $ 11,082,458 | $ 11,495,000 | $ 11,816,860 | $ 12,147,732 |
| Facility and Operating Costs | 2,494,782 | 2,642,651 | 3,247,191 | 2,553,000 | 2,623,390 | 2,695,961 |
| Training, Certification, Ministries Travel | 343,196 | 416,613 | 314,734 | 495,500 | 430,500 | 495,500 |
| Ministries Program Expenses and Supplies | 1,043,848 | 1,241,661 | 1,132,007 | 1,219,000 | 1,178,380 | 1,266,948 |
| Assessments | 410,139 | 358,187 | 360,979 | 370,000 | 381,100 | 392,533 |
| Cost of Sales - Cemeteries | 786,531 | 794,503 | 938,091 | 938,000 | 938,000 | 956,760 |
| Purchased Services - Ministries & Other | 2,214,485 | 2,452,835 | 2,289,700 | 2,365,000 | 2,435,950 | 2,484,669 |
| Professional Services | 265,993 | 298,967 | 61,879 | 450,000 | 250,000 | 260,000 |
| Charity & Contractual Grants & Donations | 3,521,576 | 4,136,505 | 3,488,935 | 3,400,000 | 3,450,000 | 3,500,000 |
| Other Expenses | 986,645 | 1,073,804 | 1,143,470 | 1,075,700 | 1,097,214 | 1,119,158 |
| Reorganization Expenses | 4,017,637 | 3,737,980 | 2,732,222 | 350,000 | 35,000 | - |
| Total Operating Expenses | $ 27,491,067 | $ 28,772,084 | $ 26,791,666 | $ 24,711,200 | $ 24,636,394 | $ 25,319,261 |
| | | | | | | |
| **Cash Available for Other Requirements** | $ (2,363,022) | $ (2,531,788) | $ (1,122,489) | $ 1,430,800 | $ 1,514,106 | $ 1,437,534 |
| | | | | | | |
| **Other Cash Requirements** | | | | | | |
| Debt Service | | | | | | |
| Park Bank 1st R.E.M | $ 247,511 | $ 237,740 | $ 214,446 | $ 708,156 | $ 708,156 | $ 708,156 |
| Perpetual Care Trust Loan | | | | 83,100 | 83,100 | 83,100 |
| Total Debt Service | $ 247,511 | $ 237,740 | $ 214,446 | $ 791,256 | $ 791,256 | $ 791,256 |
| Capital Expenditures | $ 464,140 | $ 458,825 | $ 550,574 | $ 575,000 | $ 595,000 | $ 550,000 |
| **Net Cash Available After Other Requirements** | $ (3,074,673) | $ (3,228,353) | $ (1,887,509) | $ 64,544 | $ 127,850 | $ 96,278 |

*Data per preliminary closing

**Exhibit D – Fiscal Year 2014 Audited Financial Statements**

[*Remainder of Page Intentionally Left Blank*]

# ARCHDIOCESE OF MILWAUKEE
# (DEBTOR IN POSSESSION)

Milwaukee, Wisconsin

FINANCIAL STATEMENTS

Including Independent Auditors' Report

As of and for the Years Ended June 30, 2014 and 2013

**ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)**

TABLE OF CONTENTS
As of and for the Years Ended June 30, 2014 and 2013

**Independent Auditors' Report**                                    1 - 2

**Financial Statements**

    Statements of Financial Position                            3 - 4

    Statements of Activities                                    5 - 6

    Statements of Cash Flows                                       7

    Notes to Financial Statements                              8 - 32



INDEPENDENT AUDITORS' REPORT

Baker Tilly Virchow Krause, LLP
777 E Wisconsin Ave, 32nd Floor
Milwaukee, WI 53202-5313
tel 414 777 5500
fax 414 777 5555
bakertilly.com

The Most Reverend Jerome E. Listecki, Archbishop of Milwaukee
Archdiocese of Milwaukee (Debtor in Possession)
Milwaukee, Wisconsin

We have audited the accompanying financial statements of the Archdiocese of Milwaukee (Debtor in Possession), which comprise the statements of financial position as of June 30, 2014 and 2013, and the related statements of activities and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Archdiocese of Milwaukee (Debtor in Possession) as of June 30, 2014 and 2013, and the changes in its net assets and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

Page 1

an independent member of
BAKER TILLY
INTERNATIONAL    An Affirmative Action Equal Opportunity Employer

*Uncertainties Regarding the Future Outcome of Bankruptcy and Litigation*

As discussed in Notes 1 and 2 to the financial statements, the Archdiocese of Milwaukee (Debtor in Possession) filed a petition for relief under Chapter 11 of the bankruptcy law. The Archdiocese of Milwaukee (Debtor in Possession) continues operations as a debtor in possession. As discussed in Note 2 to the financial statements, there is a case pending regarding the treatment of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust assets as part of the Archdiocese of Milwaukee's (Debtor in Possession) estate. As discussed in Note 10 to the financial statements the Archdiocese of Milwaukee (Debtor in Possession) is a defendant in numerous lawsuits and abuse claims. At this stage of the Chapter 11 proceedings, it is not possible to predict the likely outcome or disposition of the above matters, or whether the magnitude may be material. The financial statements do not include any adjustments that might result from these uncertainties. Our opinion is not modified with respect to these matters.

*Baker Tilly Virchow Krause, LLP*

Milwaukee, Wisconsin
October 23, 2014

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

## STATEMENTS OF FINANCIAL POSITION
As of June 30, 2014 and 2013

### *ASSETS*

| | 2014 | 2013 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 12,610,367 | $ 10,556,728 |
| Short-term investments | 4,031,477 | 1,638,180 |
| Receivables | 4,370,804 | 3,868,799 |
| Other assets | 1,232,538 | 1,179,088 |
| Total Current Assets | 22,245,186 | 17,242,795 |
| Ground burial and mausoleum crypt sites | 5,669,156 | 6,057,094 |
| Property and equipment, net | 4,597,352 | 4,359,691 |
| Beneficial interest in Cemetery Perpetual Care Trust | 64,102,395 | 59,310,960 |
| | | |
| **INVESTMENTS AND OTHER ASSETS** | | |
| Long-term investments | 7,682,674 | 10,330,042 |
| Custodial investments held for others | 2,527,970 | 2,624,949 |
| Cemeteries pre-need trust fund account | 3,806,396 | 3,623,148 |
| Charitable gift annuities investments | 539,041 | 592,419 |
| Other assets | 895,197 | 1,037,990 |
| Total Investments and Other Assets | 15,451,278 | 18,208,548 |
| **TOTAL ASSETS** | $ 112,065,367 | $105,179,088 |

Page 3

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 77 of 329

### LIABILITIES AND NET ASSETS

| | 2014 | 2013 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Current maturities of charitable gift annuities | $ 70,755 | $ 74,750 |
| Accounts payable | 1,423,286 | 1,040,225 |
| Accrued professional fees | 6,369,943 | 2,531,674 |
| Contributions payable | 2,460,636 | 2,351,264 |
| Collections to be forwarded to other entities | 1,082,378 | 996,024 |
| Total Current Liabilities | 11,406,998 | 6,993,937 |
| | | |
| Equity of others held as custodial investments | 2,527,970 | 2,624,949 |
| | | |
| Charitable gift annuities | 362,639 | 389,660 |
| | | |
| Deferred revenue | 3,806,396 | 3,623,148 |
| | | |
| **PRE-PETITION LIABILITIES** | | |
| Note payable | 4,389,513 | 4,649,913 |
| Pre-Chapter 11 payables | 505,639 | 582,639 |
| Contractual contributions payable | 3,378,537 | 3,378,537 |
| Accrued post-retirement and pension benefits | 21,450,880 | 16,940,543 |
| Total Pre-Petition Liabilities | 29,724,569 | 25,551,632 |
| | | |
| Total Liabilities | 47,828,572 | 39,183,326 |
| | | |
| **NET ASSETS** | | |
| Unrestricted | | |
| Undesignated operating (deficit) | (17,082,573) | (10,596,899) |
| Designated | 4,161,949 | 4,559,567 |
| Limited to perpetual care of cemeteries | 64,102,395 | 59,310,960 |
| Total Unrestricted Net Assets | 51,181,771 | 53,273,628 |
| | | |
| Temporarily restricted | 9,338,658 | 9,005,768 |
| | | |
| Permanently restricted | 3,716,366 | 3,716,366 |
| Total Net Assets | 64,236,795 | 65,995,762 |
| | | |
| **TOTAL LIABILITIES AND NET ASSETS** | $ 112,065,367 | $105,179,088 |

See accompanying notes to financial statements.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 78 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

## STATEMENTS OF ACTIVITIES
For the Years Ended June 30, 2014 and 2013

| | 2014 | | | |
| --- | --- | --- | --- | --- |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| **OPERATING REVENUE, GAINS, AND OTHER SUPPORT** | | | | |
| Contributions for charitable activities | $ 1,888,715 | $ 9,133,658 | $ - | $ 11,022,373 |
| Assessments | 7,023,863 | - | - | 7,023,863 |
| Tuition and fees for ministry programs | 686,702 | - | - | 686,702 |
| Cemetery revenues | 4,544,125 | - | - | 4,544,125 |
| Distributions from Perpetual Care Trust | 1,950,000 | - | - | 1,950,000 |
| Investment income | 373,187 | 56,062 | - | 429,249 |
| Other revenues | 583,984 | - | - | 583,984 |
| Net assets released from restrictions | 9,272,569 | (9,272,569) | - | - |
| Total Revenue, Gains, and Other Support | 26,323,145 | (82,849) | - | 26,240,296 |
| **OPERATING EXPENSES** | | | | |
| Wages and benefits | 11,618,378 | - | - | 11,618,378 |
| Facility and operating costs | 2,642,651 | - | - | 2,642,651 |
| Training, certifications, and ministries travel | 416,613 | - | - | 416,613 |
| Bad debts | 284,352 | - | - | 284,352 |
| Ministries program expenses and supplies | 1,241,661 | - | - | 1,241,661 |
| Assessments | 358,187 | - | - | 358,187 |
| Cost of sales - cemeteries | 794,503 | - | - | 794,503 |
| Purchased services - ministries and other | 2,452,835 | - | - | 2,452,835 |
| Professional services | 298,967 | - | - | 298,967 |
| Charity and contractual grants and donations | 4,136,505 | - | - | 4,136,505 |
| Other expenses | 1,311,544 | - | - | 1,311,544 |
| Depreciation | 420,467 | - | - | 420,467 |
| Total Operating Expenses | 25,976,663 | - | - | 25,976,663 |
| Operating Income (Loss) | 346,482 | (82,849) | - | 263,633 |
| **NON-OPERATING ACTIVITIES** | | | | |
| Net realized and unrealized gains (losses) | (120,389) | 415,739 | - | 295,350 |
| Gain on sale of property and equipment | 315,310 | - | - | 315,310 |
| Pension related changes other than net periodic pension cost | (3,707,755) | - | - | (3,707,755) |
| Change in beneficial interest in trust | 4,812,475 | - | - | 4,812,475 |
| Total Non-Operating Activities | 1,299,641 | 415,739 | - | 1,715,380 |
| **REORGANIZATION ACTIVITIES** | | | | |
| Reorganization expenses | (3,737,980) | - | - | (3,737,980) |
| **CHANGE IN NET ASSETS** | (2,091,857) | 332,890 | - | (1,758,967) |
| NET ASSETS - Beginning of Year | 53,273,628 | 9,005,768 | 3,716,366 | 65,995,762 |
| **NET ASSETS - END OF YEAR** | $ 51,181,771 | $ 9,338,658 | $ 3,716,366 | $ 64,236,795 |

| | 2013 | | |
| Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|
| $   1,368,249 | $   8,336,965 | $            - | $   9,705,214 |
| 6,797,545 | - | - | 6,797,545 |
| 630,179 | - | - | 630,179 |
| 4,676,826 | - | - | 4,676,826 |
| 1,950,000 | - | - | 1,950,000 |
| 458,353 | 58,814 | - | 517,167 |
| 851,114 | - | - | 851,114 |
| 8,445,784 | (8,445,784) | - | - |
| 25,178,050 | (50,005) | - | 25,128,045 |
| 11,406,235 | - | - | 11,406,235 |
| 2,494,782 | - | - | 2,494,782 |
| 343,196 | - | - | 343,196 |
| 238,553 | - | - | 238,553 |
| 1,043,848 | - | - | 1,043,848 |
| 410,139 | - | - | 410,139 |
| 786,531 | - | - | 786,531 |
| 2,214,485 | - | - | 2,214,485 |
| 265,993 | - | - | 265,993 |
| 3,521,576 | - | - | 3,521,576 |
| 1,234,156 | - | - | 1,234,156 |
| 477,046 | - | - | 477,046 |
| 24,436,540 | - | - | 24,436,540 |
| 741,510 | (50,005) | - | 691,505 |
| (418,573) | 119,717 | - | (298,856) |
| 1,050 | - | - | 1,050 |
| 3,002,739 | - | - | 3,002,739 |
| 3,164,230 | - | - | 3,164,230 |
| 5,749,446 | 119,717 | - | 5,869,163 |
| (4,017,637) | - | - | (4,017,637) |
| 2,473,319 | 69,712 | - | 2,543,031 |
| 50,800,309 | 8,936,056 | 3,716,366 | 63,452,731 |
| $ 53,273,628 | $ 9,005,768 | $ 3,716,366 | $ 65,995,762 |

See accompanying notes to financial statements.

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

STATEMENTS OF CASH FLOWS
For the Years Ended June 30, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |
| Change in net assets | $ (1,758,967) | $ 2,543,031 |
| Adjustments to reconcile total non-operating activities to net cash flows from operating activities: |  |  |
| Depreciation and amortization | 420,467 | 477,046 |
| Net realized/unrealized (gains) losses | (295,350) | 298,856 |
| Gain on sale of property and equipment | (315,310) | (1,050) |
| Change in beneficial interest in Cemetery Perpetual Care Trust | (4,812,475) | (3,164,230) |
| Change in charitable gift annuities | (31,016) | (26,335) |
| Changes in assets and liabilities: |  |  |
| Receivables and payables | 3,469,043 | 311,147 |
| Other assets | 89,343 | 214,650 |
| Ground burial and mausoleum crypt sites | 387,938 | 325,102 |
| Deferred revenue | 183,248 | (187,883) |
| Accrued postretirement and pension benefits | 4,510,337 | (1,998,063) |
| Net Cash Flows from Operating Activities | 1,847,258 | (1,207,729) |
|  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |
| Payments received on notes receivable | 33,152 | 40,496 |
| Purchase of property and equipment | (396,128) | (637,789) |
| Proceeds from the sale of property and equipment | 54,910 | 1,050 |
| Proceeds from sale of investments | 7,476,773 | 6,960,319 |
| Purchase of investments | (6,960,243) | (5,140,221) |
| Payments received on mortgages receivable | 8,542 | 8,542 |
| Net change in collections to be forwarded to other entities | 86,354 | (24,137) |
| Net change in equity of others held as custodial investments | (96,979) | 10,643 |
| Net Cash Flows from Investing Activities | 206,381 | 1,218,903 |
|  |  |  |
| **Net Change in Cash and Cash Equivalents** | 2,053,639 | 11,174 |
|  |  |  |
| CASH AND CASH EQUIVALENTS - Beginning of Year | 10,556,728 | 10,545,554 |
|  |  |  |
| **CASH AND CASH EQUIVALENTS - END OF YEAR** | $ 12,610,367 | $ 10,556,728 |
|  |  |  |
|  |  |  |
| **Supplemental cash flow disclosures** |  |  |
| Cash paid for interest | $ 237,740 | $ 247,511 |
| Cash paid for reorganization activities | 170,896 | 3,340,159 |
|  |  |  |
| **Noncash investing and financing activities** |  |  |
| Purchase of property included in accounts payable | 262,000 | - |
| Proceeds from sale of property paid on note payable | 260,400 | - |

See accompanying notes to financial statements.

Page 7

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 1 - Petition for Relief Under Chapter 11

On January 4, 2011, the Archdiocese of Milwaukee (Debtor-in-Possession) (the "Archdiocese") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Wisconsin. Under Chapter 11, certain claims against the Archdiocese in existence prior to the filing are stayed while the Archdiocese continues business operations as a Debtor in Possession. These claims are reflected in the statements of financial position as "Pre-Petition Liabilities" within the liabilities section of the statement. Claims could change subsequent to the filing date resulting from rejection of executory contracts and a determination by the Court of allowed claims. A bar date for the filing of general creditor claims was set at October 17, 2011. A bar date for the filing of claims of abuse survivors was set at February 1, 2012.  All expenses related to the reorganization are shown separately in the statements of activities.

The Archdiocese received permission from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations, including the costs of employee wages, benefits, and expense reimbursements; construction in progress; certain psychological counseling and therapy costs for abuse survivors; certain contractual settlement amounts to abuse survivors; and costs incident to voluntary mediations with two abuse survivors.

On February 12, 2014 the Archdiocese filed its Plan of Reorganization ("Plan") and Disclosure Statement. On May 28, 2014, the Bankruptcy Court entered an order approving the Disclosure Statement.  The hearing on the confirmation of the Plan was scheduled on October 14-17, 2014.  On June 20, 2014, the Bankruptcy Court entered an order cancelling the confirmation hearing.  The Bankruptcy Court held that it did not have jurisdiction to conduct the plan confirmation hearing because of the appeal pending in the United States Court of Appeals for the Seventh Circuit regarding the Cemetery Trust litigation.  On July 3, 2014, the Archdiocese appealed the Bankruptcy Court's decision, and the appeal is currently pending before the United States District Court for the Eastern District of Wisconsin.

## NOTE 2 - Summary of Significant Accounting Policies

*Nature of Activities*

The Archdiocese is a not-for-profit Wisconsin corporation, without capital stock. The Archdiocese provides ministerial support and services to parishes and other Catholic entities within a ten-county region of Southeast Wisconsin.  The Archdiocese has a Board of Directors which oversees all ordinary administration. The Archbishop of Milwaukee serves as the canonical administrator of the Archdiocese. The Archdiocese is exempt from income taxes under the provisions of Section 501(c)(3) of the Internal Revenue Code. However, any unrelated business income may be subject to taxation.  Accordingly, the financial statements do not include any amounts for capital stock.

The financial statements include corporate assets, liabilities, and operations of the Archdiocese of Milwaukee, primarily based in the Chancery/Central offices and Cemeteries and Mausoleums.

Under the laws of the state of Wisconsin, parishes, their related schools, and certain other Catholic entities operating within the boundaries of the Archdiocese are not under the fiscal and operating control of the Archdiocese and, therefore, in accordance with accounting principles generally accepted in the United States of America are not included in the financial statements.

Page 8

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 82 of 329

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Basis of Accounting*

The financial statements have been prepared on the accrual basis of accounting. All significant balances and transactions between the specific activities have been eliminated in the financial statements.

*Cash and Cash Equivalents*

Cash equivalents are defined as securities and other short-term investments with maturities at date of acquisition of approximately three months or less.

*Investments*

Investments are generally recorded at fair value based upon quoted market prices, when available, or estimates of fair value. Donated assets are recorded at fair value at the date of donation or, if sold immediately after receipt, at the amount of sales proceeds received (which are considered a fair measure of the value at the date of donation). Those investments for which fair value is not readily determinable are carried at cost or, if donated, at fair value at the date of donation, or if no value can be estimated, at a nominal value. The Archdiocese records the change of ownership of bonds and stocks on the day a trade is made. Investment income or loss and unrealized gains or losses are included in the statements of activities as increases or decreases in unrestricted net assets unless the income or loss is restricted by donor or law.

*Receivables*

The Archdiocese uses the allowance method to account for uncollectible accounts receivable. The allowance is based on historic collection experience and a review of the current status of receivables. Bad debts are charged against the allowance when deemed uncollectible. Notes receivable arising from the sale of mausoleum crypts are typically collectible in monthly installments, including interest, over four years. Receivables are presented net of allowance for doubtful accounts of $3,483,247 and $3,210,396 at June 30, 2014 and 2013, respectively. Net receivables as of June 30 consist of:

|  | 2014 | 2013 |
|---|---|---|
| Accounts and notes | $ 2,939,014 | $ 2,459,533 |
| Fixed income settlements | 30,049 | 33,503 |
| Current portion of note receivable | 33,152 | 31,954 |
| Contributions | 483,829 | 448,053 |
| Parish obligations | 826,242 | 798,705 |
| Mortgages | - | 8,542 |
| Interest and dividends | 58,518 | 88,509 |
| Total Accounts Receivable | $ 4,370,804 | $ 3,868,799 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 83 of 329

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Life Insurance Contributions*

Donors have contributed multiple life insurance policies on their lives to the Archdiocese. The cash surrender value of $185,545 and $293,989 at June 30, 2014 and 2013, respectively, is included in long-term other assets on the statements of financial position.

Miscellaneous revenue has been recorded for the change in cash surrender value of these policies. Contribution revenue is recorded when the policy is cashed in.

*Property and Equipment*

Acquisitions of property and equipment in excess of $1,000 and expenditure for improvements and betterments that materially prolong the useful lives of assets are capitalized.

Land, buildings, and equipment are primarily carried at cost.

Depreciation is recorded on a straight-line basis over the estimated useful lives of the assets as follows:

|  | Years |
|---|---|
| Buildings | 50 |
| Building and Land Improvements | 5 - 40 |
| Land improvements | 20 |
| Furniture and Fixtures | 10 |
| Equipment | 3 - 10 |
| Vehicles | 5 |

The Archdiocese follows current authoritative guidance for accounting for conditional asset retirement obligations. The guidance refers to a legal obligation to perform an asset retirement activity even if the timing and/or settlement is conditional on a future event that may or may not be within the control of an organization. Accordingly, if the Archdiocese has sufficient information to reasonably estimate the fair value of an obligation in connection with an asset retirement, it is required to recognize a liability at the time the liability is incurred. Since the Archdiocese is not aware of any material required remediation that would result in an asset retirement obligation, the Archdiocese has not recorded an asset retirement obligation.

*Impairment of Long-Lived Assets*

The Archdiocese reviews long-lived assets, including property and equipment and intangible assets, for impairment whenever events or changes in business circumstances indicate that the carrying amount of an asset may not be fully recoverable. An impairment loss would be recognized when the estimated future cash flows from the use of the asset are less than the carrying amount of that asset. There have been no such losses during the years ended June 30, 2014 and 2013.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 84 of 329

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Beneficial Interest in Cemetery Perpetual Care Trust*

The Archdiocese operates cemeteries which assist in caring for the faithful departed by performing an ancient corporal work of mercy – providing and maintaining appropriate facilities for burial of the dead. On April 2, 2007, the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Cemetery Trust") was created to formalize the trust relationship with respect to funds (the "Perpetual Care Funds") which were held under a fiduciary responsibility to adequately provide for the future care of mausoleums, crypts, and gravesites. In March 2008, all assets accumulated over time for the future care of cemeteries and mausoleums were moved to a separate investment account controlled by the Cemetery Trust. A beneficial interest in the Cemetery Perpetual Care Trust valued at the value of the Trust's assets appears on the statements of financial position in accordance with suggested accounting protocols. The Trust's assets consist primarily of cash and investments. The Cemetery Trust can and historically has made distributions to the Archdiocese of Milwaukee (Debtor-in-Possession) as reimbursement to help defray the costs incurred by the Archdiocese for providing services for the purpose of care and maintenance of cemeteries. The distributions totaled $1,950,000 for the years ended June 30, 2014 and 2013. The Cemetery Trust is a distinct legal entity whose assets are legally restricted to the purposes of the Cemetery Trust. The Archdiocese of Milwaukee (Debtor-in-Possession) disclaims control of the Cemetery Trust or a right to receive assets for any purpose other than for the care and maintenance of cemetery properties.

On June 28, 2011, the Cemetery Trust commenced an adversary proceeding against the Official Committee of Unsecured Creditors in the Archdiocese's pending Chapter 11 bankruptcy proceeding seeking an order declaring that the Cemetery Trust is not property of the Archdiocese's estate, and declaring that the Perpetual Care Funds are not property of the Archdiocese's estate. On September 13, 2011, the Official Committee of Unsecured Creditors (the "Committee") filed a counterclaim in the adversary proceeding commenced by the Cemetery Trust. The Committee sought an order declaring that the Cemetery Trust is not a valid trust, and a determination that the transfer of Perpetual Care Funds to the Cemetery Trust is an avoidable transfer under federal bankruptcy law and Wisconsin law. On January 13, 2012, the Cemetery Trust amended its complaint and added allegations that the Committee cannot use the Bankruptcy Code to make the Cemetery Trust property of the Archdiocese's estate because doing so would violate the Religious Freedom Restoration Act of 1993 ("RFRA"), and the First Amendment to the United States Constitution. On January 17, 2013, the Bankruptcy Court granted the Committee's motion for partial summary judgment, ruling that neither RFRA nor the First Amendment applied to prevent inclusion of the Cemetery Trust assets into the Archdiocese's estate. The Cemetery Trust appealed the Bankruptcy Court's decision and, on July 29, 2013, the District Court reversed the Bankruptcy Court ruling, and granted the Cemetery Trust's request for an order declaring that the Perpetual Care Funds are not property of the Archdiocese's estate. The District Court ruled that the Committee cannot use the Bankruptcy Code to make the Cemetery Trust property of the Archdiocese's estate because doing so would violate RFRA and the First Amendment. On August 26, 2013, the Committee appealed the District Court's ruling to the United States Court of Appeals for the Seventh Circuit. On June 2, 2014, the United States Court of Appeals for the Seventh Circuit conducted oral argument on the appeal of the District Court's ruling. A decision is pending.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 85 of 329

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Accounts Payable*

Accounts payable as of June 30 consist of:

|  | 2014 | 2013 |
|---|---|---|
| Accounts payable | $  863,960 | $  534,444 |
| Accrued liabilities | 491,752 | 392,717 |
| Deferred revenue | 22,484 | 49,311 |
| Fixed income settlements | 35,090 | 38,753 |
| Mediation and litigation settlements, sexual abuse therapy, and victim assistance payable - bankruptcy court approved | 10,000 | 25,000 |
| Total Accounts Payable | $ 1,423,286 | $ 1,040,225 |

*Accrued Professional Fees*

On March 26, 2013, the Bankruptcy Court entered an Order granting Modification of the Debtor's Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals. The Bankruptcy Court ordered that the Archdiocese may suspend payments of interim compensation and reimbursement of expenses to Professionals, including the attorneys and accountants for both the Archdiocese and the Committee. Notwithstanding the Order, the Archdiocese continues to record the fees and expenses sought by professionals as an expense and accrues the unpaid professional fees and expenses in accounts payable as they are submitted, pending further order of the Bankruptcy Court. On August 5, 2014, the Bankruptcy court ordered payment of $1,350,000 pro rata to all professionals by September 2, 2014.

*Contributions Payable*

Contributions payable represent unconditional promises to give to be paid by the Archdiocese in subsequent fiscal years. In 2007, the Archdiocese entered into an agreement was pay a contribution over an extended period of 15 years. The long-term portion of this contribution was previously discounted at 6% to its net present value, following accounting protocols. The full (undiscounted) amount of the unpaid contribution has been entered as a creditor claim for $3,378,537 and the discount of $527,983, which was previously associated with future payments was reversed in prior years.

Total contributions payable consists of contributions payable (current liabilities) of $2,460,636 and $2,351,264 as of June 30, 2014 and 2013, respectively and contractual contributions payable (pre-petition liabilities) of $3,378,537 as reported on the statements of financial position as of June 30, 2014 and 2013.

*Collections to be Forwarded to Other Entities*

Collections to be forwarded to other entities represent cash collected on behalf of other Catholic organizations and programs, mainly via the annual Combined Collections fund drive.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 86 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 2 - Summary of Significant Accounting Policies (cont.)

*Custodial Investments Held for Others*

The Archdiocese administers the investments for various programs and organizations within the geographical boundaries of the archdiocese of Milwaukee. These are not Archdiocesan funds. The Archdiocese may provide administrative services to help support these ministries and programs. The custodial investments held for others as of June 30 consist of:

|  | 2014 | 2013 |
|---|---|---|
| Priests' Continuing Formation Program | $ 2,148,199 | $ 2,154,054 |
| Other | 379,771 | 470,895 |
| Total | $ 2,527,970 | $ 2,624,949 |

*Net Assets*

Net assets, revenues, gains and losses are classified based on external donor imposed restrictions. Accordingly, net assets of the Archdiocese are classified and reported as follows:

**Unrestricted Net Assets** - Resources of the Archdiocese which have not been restricted by donor-imposed stipulations.

**Temporarily Restricted Net Assets -** Cash and other assets received with donor-imposed stipulations which limit the use of the donated assets. The stipulations either expire by passage of time or can be fulfilled and removed by actions of the Archdiocese pursuant to those stipulations.

**Permanently Restricted Net Assets** - Cash and other assets received from donors subject to stipulations that they be maintained in perpetuity by the Archdiocese. Such restrictions can neither expire with the passage of time nor be removed by fulfillment of a stipulated purpose. If the donor does not restrict the allowed use of the income, the Archdiocese may determine the earned income's availability for general or specific purposes.

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Board Designated Net Assets*

The Archdiocese may designate a portion of unrestricted net assets for a specific purpose. At June 30, designated unrestricted net assets consist of the following:

Specific Purposes

The Board of Directors has designated certain unrestricted net assets consistent with the purposes set forth in the original instruments as of June 30 as follows:

|  | 2014 | 2013 |
|---|---|---|
| St. John's Burse (for deaf and hearing impaired ministry) | $ 509,364 | $ 506,607 |
| St. Aemilian Trust (for the establishment of facilities for orphans, dependent, neglected, and delinquent children, for rehabilitation, treatment and other welfare services needed for such ends, and the promotion of education, charity and religion) | 3,218,026 | 3,603,288 |
| Set aside for future construction costs at cemeteries | 64,025 | 64,025 |
| General operations and other | 370,534 | 385,647 |
| Total Designated Net Assets | $ 4,161,949 | $ 4,559,567 |

The Archdiocese has an economic interest, as defined by accounting standards, in the Cemetery Trust. Trust funding occurs as part of the sale of burial rights, and trust funds are subject to a fiduciary obligation to be used for the purpose of perpetual care of Archdiocesan Cemeteries.

|  | 2014 | 2013 |
|---|---|---|
| Limited to perpetual care of cemeteries | $ 64,102,395 | $ 59,310,960 |

*Revenue Recognition*

Contributions, including unconditional promises to give, are recognized in the period received. Conditional promises are not recognized until they become unconditional, that is when the conditions on which they depend are substantially met.

The Archdiocese reports gifts of cash and other assets as restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the statements of activities as net assets released from restrictions.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 88 of 329

**ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)**

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

**NOTE 2 - Summary of Significant Accounting Policies** (cont.)

*Cemetery and Mausoleum Sales*

The Archdiocese records revenue on sales of cemetery plots and mausoleum crypts at the date of sale as it has no legal obligation, beyond a short rescission period, to refund any such sale. As such, no reserve for sale returns has been established. As a matter of policy, the Archdiocese has refunded sales under certain circumstances at amounts equal to or less than the original sales price, with the units then returned to inventory. This policy is subject to amendment at any time. The Archdiocese also allows customers to purchase cemetery plots and mausoleum crypts through the installment method in which customers are given four years to pay. Revenue from these sales is recognized immediately as there is little uncertainty as to the collectibility of the balance of the purchase price. There is a fiduciary obligation which exists to hold certain of the funds collected for perpetual care. As of March 2008, the funds which must be held for the perpetual care of the cemeteries were deposited into the Cemetery Trust.

*Contributed Services*

Volunteers contribute personal time to assist the Archdiocese in performing various services. Volunteer services are not recorded by the Archdiocese, as these services do not require specialized expertise as defined by generally accepted accounting principles.

*Leased Facilities*

The Archdiocese of Milwaukee (Debtor-in-Possession) occupies premises owned by DeSales Preparatory Seminary, Inc. As the lessee, the Archdiocese is responsible for payment of operating and maintenance costs of the facilities.

*Fundraising Costs*

Fundraising costs consisting primarily of payroll, fringe benefits, supplies, and professional services for fiscal years ended June 30, 2014 and 2013 were $1,244,746 and $1,201,952, respectively.

*Reclassifications*

For comparability, certain 2013 amounts have been reclassified to conform with classifications adopted in 2014. The reclassifications have no effect on reported amounts of net assets or change in net assets.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities and the reported amounts of revenues and expenses. Actual results could be different from those estimates.

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 3 - Fair Value of Financial Instruments

As defined by suggested accounting protocols, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. In determining fair value, the Archdiocese uses various valuation methods including the market, income, and cost approaches. The assumptions used in the application of these valuation methods are developed from the perspective of market participants pricing the asset or liability. Inputs used in the valuation methods can be either readily observable, market corroborated, or generally unobservable inputs. Whenever possible the Archdiocese attempts to utilize valuation methods that maximize the use of observable inputs and minimizes the use of unobservable inputs. Based on the observation of the inputs used in the valuation methods, the Archdiocese is required to provide the following information according to the fair value hierarchy. The fair value hierarchy ranks the quality and reliability of the information used to determine fair values. Assets and liabilities measured, reported, and/or disclosed at fair value will be classified and disclosed in one of the following three categories:

Level 1 - Quoted market prices in active markets for identical assets or liabilities.

Level 2 - Observable market based inputs or unobservable inputs that are corroborated by market data.

Level 3 - Unobservable inputs that are not corroborated by market data.

The table below presents the balances of assets measured at fair value on a recurring basis by level within the hierarchy.

| | June 30, 2014 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Money market funds | $ - | $ 3,882,458 | $ - | $ 3,882,458 |
| Commercial bonds | - | 2,047,985 | - | 2,047,985 |
| US Government bonds | - | 4,721,549 | - | 4,721,549 |
| US Government agency securities | - | 2,216,025 | - | 2,216,025 |
| Other investments | - | - | 1,926,483 | 1,926,483 |
| Beneficial interest in Cemetery Perpetual Care Trust | - | - | 64,102,395 | 64,102,395 |
| Total Assets | $ - | $ 12,868,017 | $ 66,028,878 | $ 78,896,895 |

| | June 30, 2013 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Money market funds | $ - | $ 944,808 | $ - | $ 944,808 |
| US Government bonds | - | 6,438,264 | - | 6,438,264 |
| Commercial bonds | - | 3,225,686 | - | 3,225,686 |
| US Government agency securities | - | 2,948,161 | - | 2,948,161 |
| Other investments | - | - | 1,664,833 | 1,664,833 |
| Beneficial interest in Cemetery Perpetual Care Trust | - | - | 59,310,960 | 59,310,960 |
| Total Assets | $ - | $ 13,556,919 | $ 60,975,793 | $ 74,532,712 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 90 of 329

**NOTE 3 - Fair Value of Financial Instruments** (cont.)

Money market funds are classified as Level 2 as they are not traded in an active market.

The Archdiocese classifies investments in bonds and US Government agency securities as Level 2 items as they are not publicly traded in active markets. The bonds are invested in US Government, corporate, and foreign issues.

The Archdiocese classifies other investments which are held at the Archdiocese of Milwaukee Catholic Community Foundation, Inc. ("CCF") as Level 3. It is not possible to determine a daily value of the Archdiocese's portion of the commingled investment portfolio. The portfolio is divided among a group of investment managers to achieve diversification. CCF's policy requires a written distribution request to be submitted at least 60 days prior to the required distribution date. If a request is for more than 50% of the account balance at the time of the request, CCF reserves the right to defer payment of the amount for up to six months after receipt of the written distribution request.

The Archdiocese classifies the beneficial interest in the Cemetery Perpetual Care Trust as Level 3. It is valued based on the value of the underlying assets held by the Trust.

The changes in Level 3 assets measured at fair value on a recurring basis are summarized as follows:

| | Other Investments | | Beneficial Interest in Cemetery Perpetual Care Trust | | Total |
|---|---|---|---|---|---|
| Balance, June 30, 2013 | $ | 1,664,833 | $ | 59,310,960 | $ | 60,975,793 |
| Deposits | | - | | 308,218 | | 308,218 |
| Withdrawals | | (12,764) | | (1,950,000) | | (1,962,764) |
| Investment Income | | 274,414 | | 6,433,217 | | 6,707,631 |
| Balance, June 30, 2014 | $ | 1,926,483 | $ | 64,102,395 | $ | 66,028,878 |

| | Other Investments | | Beneficial Interest in Cemetery Perpetual Care Trust | | Total |
|---|---|---|---|---|---|
| Balance, June 30, 2012 | $ | 1,542,202 | $ | 56,127,527 | $ | 57,669,729 |
| Deposits | | - | | 321,399 | | 321,399 |
| Withdrawals | | (28,819) | | (1,950,000) | | (1,978,819) |
| Investment Income | | 151,450 | | 4,812,034 | | 4,963,484 |
| Balance, June 30, 2013 | $ | 1,664,833 | $ | 59,310,960 | $ | 60,975,793 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 91 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 4 - Investments

Investments by type, as of June 30 are:

|  | 2014 | 2013 |
|---|---|---|
| Cash | $ 3,793,058 | $ 3,586,986 |
| Money market funds | 3,882,458 | 944,808 |
| US Government bonds | 4,721,549 | 6,438,264 |
| Commercial bonds | 2,047,985 | 3,225,686 |
| US Government agency securities | 2,216,025 | 2,948,161 |
| Other investments | 1,926,483 | 1,664,833 |
| Total | $ 18,587,558 | $ 18,808,738 |

The classification of investments, as reflected on the statements of financial position, as of June 30 are:

|  | 2014 | 2013 |
|---|---|---|
| Short-term investments | $ 4,031,477 | $ 1,638,180 |
| Long-term investments | 7,682,674 | 10,330,042 |
| Invested funds held for others | 2,527,970 | 2,624,949 |
| Prepaid burials and deposits | 3,806,396 | 3,623,148 |
| Charitable gift annuities investments | 539,041 | 592,419 |
| Total | $ 18,587,558 | $ 18,808,738 |

Net realized and unrealized gains (losses) for all Archdiocese investments for the years ended June 30 are:

|  | 2014 | 2013 |
|---|---|---|
| Net realized gains on investments | $ 322,905 | $ 210,769 |
| Net unrealized gains (losses) on investments | (27,555) | (509,625) |
| Total | $ 295,350 | $ (298,856) |

Investment securities are exposed to various risks such as interest rate, market, and credit. Due to the level of risk associated with certain investment securities and the level of uncertainty related to changes in the value of investment securities, it is at least reasonably possible that changes in risks in the near term would materially affect the amounts reported in the financial statements.

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 5 - Contributions Receivable

Contributions receivable are reported in the statements of financial position net of allowances for uncollectible amounts and unamortized discounts.

Unconditional promises (pledges/contributions) to give that are expected to be collected in future years are recorded at the present value of estimated future cash flows, when significant. The discounts on those amounts are computed using a risk-free interest rate applicable to the year in which the promise is expected to be received. Amortization of the discount is included in contribution revenue.
The contributions receivable balance as of June 30 is expected to be collected according to the following schedule:

|  | 2014 | 2013 |
|---|---|---|
| Less than one year | $ 581,829 | $ 512,053 |
| Less: Allowance for doubtful accounts | (98,000) | (64,000) |
| Net Contributions Receivable | $ 483,829 | $ 448,053 |

## NOTE 6 - Ground Burial and Mausoleum Crypt Sites

These properties are recorded at original cost and consist of the following as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Mausoleum crypts | $ 2,880,976 | $ 3,262,553 |
| Cemetery land and facilities held for burial privileges | 2,788,180 | 2,794,541 |
| Total | $ 5,669,156 | $ 6,057,094 |

The Archdiocese does not provide depreciation on these properties. The cost of individual crypts and cemetery plots are allocated based on the costs of completion and are recorded as expense upon sale.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 93 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 7 - Property and Equipment

Property and equipment are summarized as follows as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Land | $ 1,217,243 | $ 1,247,626 |
| Land improvements | 1,585,896 | 1,462,288 |
| Construction in progress | 262,000 | 32,710 |
| Buildings | 9,323,189 | 9,278,904 |
| Furniture and fixtures | 68,768 | 40,041 |
| Equipment | 1,091,737 | 1,280,869 |
| Vehicles | 726,609 | 874,154 |
| Future parish sites | 358,629 | 358,629 |
| Total | 14,634,071 | 14,575,221 |
| Less: Accumulated depreciation | (10,036,719) | (10,215,530) |
| Net Property and Equipment | $ 4,597,352 | $ 4,359,691 |

Property and equipment includes certain land, buildings, and equipment (other than leasehold improvements and equipment owned directly by the tenants) being used by St. Joseph High School, Inc.; Pius XI High School, Inc.; St. Thomas More High School, Inc; and St. Charles Youth and Family Services, Inc. The Archdiocese and the high schools have entered into lease agreements for a term ending in 2043 with a renewal option for 15 years. The property and equipment being used by Pius XI High School, Inc. is subject to a mortgage entered into by Pius XI High School, Inc. for up to $6,800,000. The land and property being used by St. Thomas More High School, Inc. is subject to a mortgage entered into by St. Thomas More High School, Inc. for up to $1,100,000 and a line of credit up to $1,000,000. The mortgages and line of credit are non-recourse as to the Archdiocese. The Archdiocese and St. Charles Youth and Family Services Inc. have entered into a lease ending in 2017 with renewal options for 10 years for part of the property utilized by St. Charles in its ministry.

A portion of the St. Charles property was sold to accommodate a highway renovation project. The proceeds were used to pay down the loan from Park Bank.

## NOTE 8 - Business Note

At June 30, 2014 and 2013, the Archdiocese was indebted to Park Bank for $4,389,513 and $4,649,913, respectively. Interest is payable monthly at 5.25%. The note matures on June 30, 2015, and is secured pursuant to a Business Note dated June 30, 2010, as amended, by a mortgage on the Archbishop Cousins Catholic Center (pursuant to a guaranty by DeSales Preparatory Seminary, Inc., which is the owner of the property) and the St. Charles Youth and Family Services, Inc. property. Interest expense was $237,740 and $247,511 for the years ended June 30, 2014 and 2013, respectively.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 94 of 329

## NOTE 9 - Accrued Mediation

In January 2004, the Archdiocese established an independent mediation system to address reports of diocesan clergy sexual abuse of minors. The Archdiocese accrued $40,000 and $132,000 as of June 30, 2014 and 2013, respectively, to cover mediation and litigation settlements, sexual abuse therapy, and victim assistance agreed to under mediation. The accrual is included in accounts payable and Pre-Petition liabilities on the statements of financial position. Payments of $210,026 and $226,911 for mediation and litigation settlements, sexual abuse therapy, and victim assistance were made during the years ended June 30, 2014 and 2013, respectively.

## NOTE 10 - Pending Litigation

The Archdiocese currently is a defendant in twelve lawsuits alleging personal injuries. At the time of the filing of Chapter 11 proceedings, all of the cases were on appeal for a determination of whether the Archdiocese has insurance coverage for the claims asserted in the lawsuits. These cases are now stayed because of the Chapter 11 filing of the Archdiocese. In addition, abuse claims have been filed against the Archdiocese pursuant to the Order Approving Debtor's Motion for Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (the "Bar Date Order"), which required that any abuse survivor who desired to file a claim do so by February 1, 2012. As of September 27, 2013, approximately 578 abuse claims had been filed against the Archdiocese. At this stage of the Chapter 11 proceedings, it is not possible to predict the likely outcome or disposition of the claims, or whether the magnitude may be material, as the outcome or disposition is subject to a claims allowance or disallowance process under the Federal Rules of Bankruptcy Procedure. Management has not accrued any additional expense for the claims which may be allowed, all of which will be subject to discharge or adjustment under a Plan of Reorganization in the Chapter 11 proceeding.

## NOTE 11 - Deferred Revenue

The Archdiocese has both short term and long term deferred revenue. Deferred revenue primarily includes unearned income relating to prepaid burial fees which are to be recognized as revenue as the services are performed. Pre need payments are treated as trust funds and handled in compliance with Wisconsin Statutes Chapter 157 which states that pre need trust funds may not be withdrawn until the obligations under the pre need sales contract have been fulfilled.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 95 of 329

## NOTE 12 - Charitable Gift Annuities

Charitable gift annuities consist of the following as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Charitable gift annuities, 7.00%. | $ 433,394 | $ 464,410 |
| Less: Current portion | (70,755) | (74,750) |
| Long-Term Portion | $ 362,639 | $ 389,660 |

Principal requirements on charitable gift annuities for years ending after June 30, 2014 are as follows:

| | |
|---|---|
| 2015 | $ 70,755 |
| 2016 | 66,126 |
| 2017 | 61,800 |
| 2018 | 57,757 |
| 2019 | 53,979 |
| Thereafter | 122,977 |
| Total | $ 433,394 |

## NOTE 13 - Intradiocesan

St. Francis de Sales Seminary, Inc. (the "Seminary") is a freestanding, separate legal entity. The Seminary has a Board of Trustees overseeing governance and administration. The Archdiocese contributes a Catholic Stewardship Appeal grant to the Seminary to fulfill one of the appeal solicitation purposes, and is paid by the Seminary for certain administrative services under a contract. The grant was $1,562,500 and $1,350,000 for the years ending June 30, 2014 and 2013, respectively. The contribution payable was $1,350,000 and $1,237,500 at June 30, 2014 and 2013, respectively.

In 2010, the Archdiocese of Milwaukee (Debtor-in-Possession) converted an intradiocesan receivable to an intradiocesan note receivable. The long-term portion of this note receivable has been discounted at 3.75% to its net present value and is included in other long-term assets on the statements of financial position. The amount receivable is as follows for the years ended June 30 net of the discount of $224,199 at June 30, 2014:

| | |
|---|---|
| 2015 | $ 33,152 |
| 2016 | 34,254 |
| 2017 | 35,836 |
| 2018 | 36,872 |
| 2019 | 38,574 |
| Thereafter | 564,116 |
| Total | $ 742,804 |

The Archdiocese guarantees a demand line of credit arrangement for St. Joseph's High School, Inc. in the amount of $300,000.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 96 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 14 - Employee Benefit Plans

The Archdiocese has several pension plans covering substantially all employees. The plans also cover certain individuals employed by Catholic corporations and activities which are located within the boundaries of the Archdiocese, but are not included among the entities that are under the fiscal management of the Archdiocese, as listed in Note 2.  A summary of each plan follows:

*Cemetery and Mausoleum Employees' Union Pension Plan*

Union employees of the cemetery and mausoleum operations are participants in this defined benefit plan. During the 2008 fiscal year, a change to the benefits calculation was negotiated so that in the future a calculation similar to that used in the Lay Employees' Pension Plan will be applicable to most union employees upon retirement.

The following table sets forth the plan's funded status and amounts recognized in the statements of financial position.

|  | 2014 | 2013 |
|---|---|---|
| Projected benefit obligation at end of year | $ 3,437,816 | $ 2,998,515 |
| Fair value of plan assets at end of year | 1,842,831 | 1,606,076 |
| Funded Status of the Plan, Recognized in the Statements of Financial Position | $ (1,594,985) | $ (1,392,439) |

At June 30 2014 and 2013, the amount of the accumulated benefit obligation was $2,185,319 and $2,034,763, respectively.

The assets related to the plan are primarily invested in a balanced investment fund.  These Level 2 inputs had a fair market value of $1,842,831 and $1,606,076 at June 30, 2014 and 2013, respectively. The fund is valued by the investment manager.

Amounts that have yet to be recognized as components of net periodic pension benefit cost for the years ended June 30:

|  | 2014 | 2013 |
|---|---|---|
| Unrecognized net loss | $ 555,921 | $ 402,491 |
| Unrecognized prior service credit | $ (412,806) | $ (448,796) |

The net amortization of the above amounts that are reclassified into a component of net periodic pension cost for the years ended June 30, 2014 and 2013 was $(35,990) and $(35,990), respectively.

The amounts expected to be recognized into net periodic pension benefit cost in the year ended June 30, 2015 are as follows:

| | |
|---|---|
| Unrecognized net loss | $ 23,057 |
| Unrecognized prior service credit | $ (35,990) |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 97 of 329

**NOTE 14 - Employee Benefit Plans** (cont.)

*Cemetery and Mausoleum Employees' Union Pension Plan (cont.)*

The amount of employee and employer contributions to the plan and the benefits paid by the plan for the years ended June 30 are as follows:

|  | 2014 | 2013 |
|---|---|---|
| Contributions | $ 84,307 | $ 93,063 |
| Benefits paid | $ 103,673 | $ 75,489 |

The Archdiocese expects to contribute approximately $95,000 to the plan during the year ended June 30, 2015.

Assumptions used in calculating pension expense were:

|  | 2014 | 2013 |
|---|---|---|
| Discount rate | 4.15% | 4.7% |
| Rate of increase in compensation levels next 2 years | 1.5 | 1.5 |
| Rate of increase in compensation levels | 3.0 | 3.0 |
| Expected long-term rate of return on assets | 7.0 | 7.0 |

Management determined the expected long-term rate of return on assets based on historical performance and investment portfolio allocations.

The following benefit payments are expected to be paid from the plan:

| | |
|---|---|
| 2015 | $ 88,488 |
| 2016 | 112,086 |
| 2017 | 109,984 |
| 2018 | 120,413 |
| 2019 | 151,775 |
| 2020 - 2023 | 924,047 |
| | $ 1,506,793 |

*Post-Retirement Benefits Other Than Pensions*

The Archdiocese provides defined benefit post-retirement health, dental, and vision insurance benefits to its diocesan priests. The vision benefits were added to the plan during the year ended June 30, 2008. Covered members become eligible for these benefits at retirement after meeting minimum age and service requirements. The costs of future benefits are accrued during the priest's active working career. The Archdiocese funds benefits on a pay as you go basis, with some retirees paying a portion of the costs.

At June 30, 2014 and 2013, the post-retirement health insurance benefit plan did not have any assets.

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 14 - Employee Benefit Plans (cont.)

*Post-Retirement Benefits Other Than Pensions  (cont.)*

The following table sets forth the plan's funded status and amounts recognized in the statements of financial position.

|  | 2014 | 2013 |
|---|---|---|
| Accumulated post-retirement benefit obligation | $ 19,855,895 | $ 15,548,104 |
| Fair value of plan assets | - | - |
| Funded Status of Plan, Recognized in the Statements of Financial Position | $ (19,855,895) | $ (15,548,104) |

Amounts that have yet to be recognized as components of net periodic benefit cost for the year ended June 30:

|  | 2014 | 2013 |
|---|---|---|
| Unrecognized net loss | $  6,395,215 | $  2,439,826 |
| Unrecognized prior service credit | $  (1,230,293) | $  (1,551,073) |

The net amortization of the above amounts that are reclassified into a component of net periodic benefit cost for the years ended June 30, 2014 and 2013 was $(255,991) and $(93,895), respectively.

The amounts expected to be recognized into net periodic benefit cost in the year ended June 30, 2015 are as follows:

| | |
|---|---|
| Unrecognized net loss | $      316,783 |
| Unrecognized prior service credit | $      (320,780) |

The amount of employer contributions to the plan and the benefits paid by the plan for the years ended June 30 are as follows:

|  | 2014 | 2013 |
|---|---|---|
| Employer contributions | $ 676,128 | $ 667,927 |
| Benefits paid | $ 676,128 | $ 667,927 |

The Archdiocese expects to contribute approximately $943,180 to the plan during the year ended June 30, 2015.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 99 of 329

**NOTE 14 - Employee Benefit Plans** (cont.)

*Post-Retirement Benefits Other Than Pensions (cont.)*

Expected benefit payments for the years ended June 30:

| | |
|---|---:|
| 2015 | $ 943,180 |
| 2016 | 973,799 |
| 2017 | 1,017,772 |
| 2018 | 1,070,299 |
| 2019 | 1,124,348 |
| 2020-2024 | 6,155,791 |
| | $ 11,285,189 |

The weighted average discount rate used to develop the present value of benefit obligations was 4.0% and 4.5% at June 30, 2014 and 2013, respectively. The weighted average discount rate used to develop the net post retirement expense was 4.5% and 4.0% at June 30, 2014 and 2013, respectively.

The medical cost trend rate used to value the accumulated post-retirement benefit obligation is 8.5% for 2015, and is assumed to decrease gradually to an ultimate rate of 4.5% in 2023. The dental and vision cost trend rates used for 2015 and thereafter are 4.5%.

*Lay Employees' Pension Plan*

This is a noncontributory multi-employer defined benefit plan administered by the Archdiocese of Milwaukee. The Plan name is the Archdiocese of Milwaukee Lay Employees' Pension Plan (the "Plan"), and the identifying number is 39-6268506. The Plan is exempt from filing IRS Form 5500. All full time lay employees of participating Catholic organizations located within the boundaries of the Archdiocese (except for the union employees of the cemetery and mausoleum operations) who have been employed for one year are covered by the plan. The benefits for employees in the Plan are based on the years of service and the applicable percentage of average monthly compensation of the employee. As this is a multi employer plan, valuation information is not available by employer. The Plan's most recent available information is as of June 30, 2013. The funded percentage of the Plan was in excess of 81%. The Plan had assets in excess of $207 and $190 million at June 30, 2013 and 2012, respectively, and total contributions to the Plan were in excess $7 million during 2013 and 2012. The Plan's actuarial present value of the accumulated plan benefits was approximately $255 million and $241 million at June 30, 2013, and 2012 respectively.

The Archdiocese of Milwaukee's participation in the Plan is less than 5% of the total contributions to the Plan. Pension expense for the years ended June 30, 2014 and 2013, respectively, was $346,144 and $343,180, which includes amortization of past service costs over 30 years. Annual contributions to the plan equal amounts accrued for pension expense.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 100 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

## NOTES TO FINANCIAL STATEMENTS
### As of and for the Years Ended June 30, 2014 and 2013

**NOTE 14 - Employee Benefit Plans** (cont.)

*Archdiocese of Milwaukee Priests' Pension Plan*

This is a contributory multi-employer defined benefit plan covering all archdiocesan priests. The Plan name is the Archdiocese of Milwaukee Priests' Pension Plan (the "Priests' Plan"), and the identifying number is 39-6234907. The Priests' Plan is exempt from filing IRS Form 5500. The benefit for priests in the Priests' Plan is normally a fixed monthly benefit, subject to adjustment if years of service are less than years of incardination. As this is a multi employer plan, valuation information is not available by employer. The Priests' Plan's most recent available information is as of June 30, 2013. The funded percentage of the Priests' Plan was in excess of 93%.The Priests' Plan had assets in excess of $30 million at June 30, 2013 and 2012, and total contributions to the Priests' Plan were in excess of $1.1 million during 2013 and 2012. The Priests' Plan's actuarial present value of the accumulated plan benefits was approximately $32 million at June 30, 2014 and 2013.

Pension expense for the years ended June 30, 2014 and 2013 was $48,699 and $34,998, respectively, which includes amortization of past service costs over 30 years. Annual contributions to the plan equal amounts accrued for pension expense.

**NOTE 15 - Temporarily Restricted Net Assets**

Temporarily restricted net assets consist of amounts restricted by donors for (a) other particular operating activities, (b) use in a specified future period, (c) investment for a specified term, or (d) combinations of the above.

Temporarily restricted net assets are restricted as follows as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Rapp Trust (for capital needs of St. Michael's Church in Mitchell, Wisconsin) | $ 359,272 | $ 320,585 |
| Other Funds with Purpose and/or Temporal Restrictions | 8,979,386 | 8,685,183 |
| Total Temporarily Restricted Net Assets | $ 9,338,658 | $ 9,005,768 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 101 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 16 - Permanently Restricted Net Assets

Permanently restricted net assets consist of amounts contributed by donors with the express intent that the principal be maintained in perpetuity. Donors have specified that the investment income be used for (a) scholarships, (b) other particular operating activities, or (c) other general expenses.

|  | 2014 | 2013 |
|---|---|---|
| Education Endowment Fund (for the support and furtherance of Roman Catholic education in the Catholic Archdiocese of Milwaukee) | $ 1,000,000 | $ 1,000,000 |
| Msgr. Eugene J. Kapalczynski Development Fund | 2,624,360 | 2,624,360 |
| General operations and other | 92,006 | 92,006 |
| Total Permanently Restricted Net Assets | $ 3,716,366 | $ 3,716,366 |

## NOTE 17 - Endowment

The Archdiocese follows the provisions of current authoritative guidance relating to endowments of not-for-profit organizations, which provides guidance on classifying net assets associated with donor-restricted endowment funds held an organization. A key component of the guidance is a requirement to classify the portion of a donor-restricted endowment fund that is not classified as permanently restricted net assets as temporarily restricted net assets until appropriated for expenditure.

Interpretation of Relevant Law – The Archdiocese has interpreted the Uniform Prudent Management of Institutional Funds Act (UPMIFA) as requiring the preservation of the fair value of the original gift as of the gift date of the donor restricted endowment funds absent explicit donor stipulations to the contrary. The Archdiocese classifies as permanently restricted net assets (a) the original value of gifts donated to the permanent endowment, (b) the original value of subsequent gifts to the permanent endowment, and (c) accumulations to the permanent endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment fund that is not classified as permanently restricted net assets is classified as temporarily restricted net assets until those amounts are appropriated for expenditure by the Archdiocese in a manner consistent with the standard of prudence prescribed by UPMIFA as adopted by the state of Wisconsin. If the fair value of the permanently restricted net asset at year end is below the original fair value, the deficit is recorded as an unrestricted unrealized loss.

Fund Objectives and Policies – The endowment funds assist the Archdiocese in its mission by providing support for Catholic education and for the support of operations and activities of the Archdiocese's programs and services. The endowment funds consist of donor restricted gifts. The endowment funds are invested in conservative fixed income investments to provide funding for the purposes supported by the endowments with a primary objective of maintaining the principal of the endowment assets. The Archdiocesan spending policy is that the income generated by the investments can be used for purposes which are consistent with the donor restrictions.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 102 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 17 - Endowment (cont.)

*Funds with Deficiencies*

From time to time, the fair value of assets associated with individual donor-restricted endowment funds may fall below the level that the donor requires the Archdiocese to retain as a fund of perpetual duration. In accordance with generally accepted accounting principles ("GAAP"), deficiencies of this nature that are reported in unrestricted net assets were $0 as of June 30, 2014 and 2013.

Endowment net asset composition by type of fund consists of the following as of June 30:

|  | 2014 | | | |
|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| --- | --- | --- | --- | --- |
| Donor restricted | $ - | $ 946,606 | $ 3,716,366 | $ 4,662,972 |

|  | 2013 | | | |
|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| --- | --- | --- | --- | --- |
| Donor restricted | $ - | $ 651,603 | $ 3,716,366 | $ 4,367,969 |

Changes in endowment net assets for the year ended June 30 are as follows:

|  | 2014 | | | |
|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| --- | --- | --- | --- | --- |
| Endowment net assets: June 30, 2013 | $ - | $ 651,603 | $ 3,716,366 | $ 4,367,969 |
| Investment return |  |  |  |  |
| Investment income | - | 56,062 | - | 56,062 |
| Net appreciation realized and unrealized | - | 415,739 | - | 415,739 |
| Total Investment Return | - | 471,801 | - | 471,801 |
| Appropriation for expenditure | - | (176,798) | - | (176,798) |
| Endowment Net Assets: June 30, 2014 | $ - | $ 946,606 | $ 3,716,366 | $ 4,662,972 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 103 of 329

**NOTE 17 - Endowment** (cont.)

|  | | 2013 | | |
|---|---|---|---|---|
|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Endowment net assets: June 30, 2012 | $ - | $ 577,989 | $ 3,716,366 | $ 4,294,355 |
| Investment return | | | | |
| Investment income | - | 58,814 | - | 58,814 |
| Net depreciation realized and unrealized | - | 119,717 | - | 119,717 |
| Total Investment Return | - | 178,531 | - | 178,531 |
| Appropriation for expenditure | - | (104,917) | - | (104,917) |
| Endowment Net Assets: June 30, 2013 | $ - | $ 651,603 | $ 3,716,366 | $ 4,367,969 |

**NOTE 18 - Operating Leases**

The Archdiocese leases equipment. All leases are accounted for as operating leases.

Future minimum lease payments as of June 30, 2014 are as follows:

| | |
|---|---|
| 2015 | $ 21,384 |
| 2016 | 21,152 |
| 2017 | 7,044 |
| 2018 | 7,044 |
| 2019 | 7,044 |
| Thereafter | 1,562 |
| | $ 65,230 |

Expense on the operating leases was $25,751 and $36,053 for the years ended June 30, 2014 and 2013, respectively

**NOTE 19 - Protected Self-Insurance Program**

The Archdiocese, both for itself and as the agent for all parishes and various other Catholic entities operating within the boundaries of the Archdiocese, entered into a protected self-insurance program to provide uniform property and liability coverage under a comprehensive plan. Premiums and loss reserves are determined and claims are processed by a service agency on a contractual basis.

Losses are paid from the loss fund of the protected self-insurance program to which premiums are paid by the participants. No single claim from the loss fund may exceed a specified maximum. Claims in excess of this maximum are fully covered by insurance. Any portion of the loss fund, which might revert back to the Archdiocese, is not measurable.

Page 30

## NOTE 20 - Administrative Services for Unrelated Organizations

The Archdiocese of Milwaukee (Debtor-in-Possession) provides administrative services to several unrelated organizations, including the Faith in Our Future Trust ("Trust"). Under the agreements the Archdiocese may advance payments for expenses, which are then reimbursed to the Archdiocese. Contributions to the Faith in Our Future Trust are donor restricted, and grants from the Trust can be made only for purposes of Catholic Education and Faith Formation, as specified and disclosed in materials provided to donors. The Archdiocese of Milwaukee (Debtor-in-Possession) does not have control or a beneficial interest in the net assets of the Faith in Our Future Trust or other unrelated organizations for which the Archdiocese of Milwaukee (Debtor-in-Possession) provides administrative services and, therefore, none of the activities of the Trust or the other unrelated entities are included in the Archdiocese financial statements.

## NOTE 21 - Financial Instruments

The following methods and assumptions were used to estimate the fair value of each class of financial instrument for which it is practical to estimate that value as of 2014 and 2013:

*Cash and Cash Equivalents*

The carrying value approximates fair value due to the short-term nature of the instruments.

*Notes and Mortgage Notes Receivable*

The carrying amount approximates fair value because of the variable nature of the associated interest rate or the short maturity of those instruments.

*Note Payable*

The carrying amount of the note payable approximates fair value due to the short term maturity of the instrument.

*Charitable Gift Annuities*

The carrying amount approximates fair value due to the short maturity of those instruments.

*Contributions Payable*

The carrying amount of the contributions payable approximates fair value due to the short term nature of the instruments.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 105 of 329

# ARCHDIOCESE OF MILWAUKEE (DEBTOR IN POSSESSION)

NOTES TO FINANCIAL STATEMENTS
As of and for the Years Ended June 30, 2014 and 2013

## NOTE 22 - Concentrations

The Archdiocese maintains cash balances in three institutions which exceed the federally insured limit of $250,000 for interest earning accounts. The Archdiocese has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

The employees of the cemetery and mausoleum operations are covered by a union contract that expires March 31, 2017. The contract covers approximately 10% - 30% of Archdiocese employees, varying based on seasonal employment levels.

## NOTE 23 - Subsequent Event

The Archdiocese has evaluated subsequent events through October 23, 2014 which is the date that the financial statements were approved and available to be issued.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 106 of 329

**Exhibit E – Archdiocese of Milwaukee Commitment to the Diocesan Review Board**

ARCHDIOCESE OF MILWAUKEE
COMMITMENT TO THE DIOCESAN REVIEW BOARD

The Archdiocese of Milwaukee Review Board was established by Archbishop Dolan in January 2003 in response to the *Charter for the Protection of Children and Young People*. It has continued to function since that time. When I came to the archdiocese I confirmed the work of the Review Board and met with them to give them the assurance that I am fully supportive of their important role.

I reaffirm my commitment to comply with the expectations of the *Charter*. Every situation in which a living priest or deacon in active ministry is accused of inappropriate behavior with minors will continue to be referred to the Diocesan Review Board for their consideration and their recommendation to me on actions to be taken. I pledge that I will provide the Diocesan Review Board with all the information that has been given to me or to anyone who receives such information on my behalf in these cases. I will continue to rely on their sage advice regarding how to investigate these cases.

While Diocesan Review Boards serve in an advisory capacity to the diocesan bishop, I intend to take seriously any recommendations they make to me. In a situation where I believe I am not able to follow their advice, I will provide my reasoning to them and invite their further input.

In the Archdiocese of Milwaukee, no cleric against whom there is a substantiated report of sexual abuse of a minor is exercising ministry. I rely on the Diocesan Review Board to assist me in maintaining this standard.

**Exhibit F – List of Class 8 Claims (Abuse Survivor Plan Claims)**

| Class 8 | |
|---|---|
| Count | Claim No. (A-#) |
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 12 |
| 5 | 13 |
| 6 | 14 |
| 7 | 16 |
| 8 | 18 |
| 9 | 19 |
| 10 | 22 |
| 11 | 27 |
| 12 | 29 |
| 13 | 30 |
| 14 | 31 |
| 15 | 33 |
| 16 | 34 |
| 17 | 35 |
| 18 | 36 |
| 19 | 37 |
| 20 | 38 |
| 21 | 39 |
| 22 | 40 |
| 23 | 42 |
| 24 | 44 |
| 25 | 45 |
| 26 | 47 |
| 27 | 48 |
| 28 | 51 |
| 29 | 52 |
| 30 | 53 |
| 31 | 56 |
| 32 | 58 |
| 33 | 59 |
| 34 | 60 |
| 35 | 62 |
| 36 | 64 |
| 37 | 65 |
| 38 | 66 |
| 39 | 67 |

| | |
|---|---|
| 40 | 69 |
| 41 | 70 |
| 42 | 71 |
| 43 | 73 |
| 44 | 76 |
| 45 | 79 |
| 46 | 80 |
| 47 | 81 |
| 48 | 84 |
| 49 | 86 |
| 50 | 89 |
| 51 | 90 |
| 52 | 91 |
| 53 | 92 |
| 54 | 96 |
| 55 | 97 |
| 56 | 98 |
| 57 | 100 |
| 58 | 102 |
| 59 | 105 |
| 60 | 106 |
| 61 | 107 |
| 62 | 108 |
| 63 | 109 |
| 64 | 111 |
| 65 | 113 |
| 66 | 120 |
| 67 | 121 |
| 68 | 123 |
| 69 | 126 |
| 70 | 127 |
| 71 | 130 |
| 72 | 131 |
| 73 | 133 |
| 74 | 134 |
| 75 | 136 |
| 76 | 137 |
| 77 | 138 |
| 78 | 140 |
| 79 | 141 |
| 80 | 142 |
| 81 | 145 |
| 82 | 146 |
| 83 | 147 |

2

| | |
|---|---|
| 84 | 150 |
| 85 | 151 |
| 86 | 152 |
| 87 | 153 |
| 88 | 154 |
| 89 | 155 |
| 90 | 156 |
| 91 | 157 |
| 92 | 158 |
| 93 | 160 |
| 94 | 162 |
| 95 | 164 |
| 96 | 166 |
| 97 | 167 |
| 98 | 169 |
| 99 | 170 |
| 100 | 171 |
| 101 | 176 |
| 102 | 178 |
| 103 | 183 |
| 104 | 185 |
| 105 | 188 |
| 106 | 189 |
| 107 | 190 |
| 108 | 193 |
| 109 | 196 |
| 110 | 198 |
| 111 | 200 |
| 112 | 201 |
| 113 | 203 |
| 114 | 204 |
| 115 | 206 |
| 116 | 207 |
| 117 | 210 |
| 118 | 211 |
| 119 | 212 |
| 120 | 213 |
| 121 | 215 |
| 122 | 216 |
| 123 | 218 |
| 124 | 220 |
| 125 | 225 |
| 126 | 227 |
| 127 | 228 |

3

| | |
|---|---|
| 128 | 229 |
| 129 | 232 |
| 130 | 235 |
| 131 | 237 |
| 132 | 238 |
| 133 | 239 |
| 134 | 242 |
| 135 | 243 |
| 136 | 244 |
| 137 | 245 |
| 138 | 246 |
| 139 | 250 |
| 140 | 251 |
| 141 | 253 |
| 142 | 255 |
| 143 | 256 |
| 144 | 257 |
| 145 | 259 |
| 146 | 260 |
| 147 | 261 |
| 148 | 262 |
| 149 | 263 |
| 150 | 266 |
| 151 | 267 |
| 152 | 270 |
| 153 | 273 |
| 154 | 276 |
| 155 | 277 |
| 156 | 279 |
| 157 | 283 |
| 158 | 284 |
| 159 | 285 |
| 160 | 286 |
| 161 | 287 |
| 162 | 292 |
| 163 | 293 |
| 164 | 296 |
| 165 | 297 |
| 166 | 299 |
| 167 | 300 |
| 168 | 301 |
| 169 | 304 |
| 170 | 305 |
| 171 | 307 |

| | |
|---|---|
| 172 | 308 |
| 173 | 309 |
| 174 | 313 |
| 175 | 314 |
| 176 | 316 |
| 177 | 318 |
| 178 | 319 |
| 179 | 321 |
| 180 | 322 |
| 181 | 324 |
| 182 | 325 |
| 183 | 326 |
| 184 | 328 |
| 185 | 329 |
| 186 | 330 |
| 187 | 331 |
| 188 | 332 |
| 189 | 333 |
| 190 | 339 |
| 191 | 340 |
| 192 | 341 |
| 193 | 342 |
| 194 | 343 |
| 195 | 344 |
| 196 | 349 |
| 197 | 350 |
| 198 | 351 |
| 199 | 352 |
| 200 | 354 |
| 201 | 355 |
| 202 | 358 |
| 203 | 359 |
| 204 | 360 |
| 205 | 361 |
| 206 | 362 |
| 207 | 365 |
| 208 | 366 |
| 209 | 369 |
| 210 | 370 |
| 211 | 372 |
| 212 | 373 |
| 213 | 374 |
| 214 | 375 |
| 215 | 376 |

| | |
|---|---|
| 216 | 377 |
| 217 | 381 |
| 218 | 382 |
| 219 | 383 |
| 220 | 387 |
| 221 | 388 |
| 222 | 391 |
| 223 | 392 |
| 224 | 394 |
| 225 | 395 |
| 226 | 397 |
| 227 | 398 |
| 228 | 400 |
| 229 | 401 |
| 230 | 403 |
| 231 | 404 |
| 232 | 405 |
| 233 | 406 |
| 234 | 407 |
| 235 | 408 |
| 236 | 409 |
| 237 | 412 |
| 238 | 413 |
| 239 | 414 |
| 240 | 415 |
| 241 | 417 |
| 242 | 418 |
| 243 | 419 |
| 244 | 420 |
| 245 | 421 |
| 246 | 422 |
| 247 | 423 |
| 248 | 424 |
| 249 | 425 |
| 250 | 426 |
| 251 | 431 |
| 252 | 432 |
| 253 | 433 |
| 254 | 434 |
| 255 | 436 |
| 256 | 437 |
| 257 | 438 |
| 258 | 442 |
| 259 | 443 |

6

| | |
|---|---|
| 260 | 445 |
| 261 | 447 |
| 262 | 450 |
| 263 | 453 |
| 264 | 454 |
| 265 | 455 |
| 266 | 456 |
| 267 | 457 |
| 268 | 458 |
| 269 | 459 |
| 270 | 461 |
| 271 | 462 |
| 272 | 463 |
| 273 | 464 |
| 274 | 466 |
| 275 | 467 |
| 276 | 469 |
| 277 | 471 |
| 278 | 472 |
| 279 | 475 |
| 280 | 476 |
| 281 | 477 |
| 282 | 478 |
| 283 | 479 |
| 284 | 481 |
| 285 | 482 |
| 286 | 484 |
| 287 | 486 |
| 288 | 489 |
| 289 | 490 |
| 290 | 491 |
| 291 | 492 |
| 292 | 493 |
| 293 | 494 |
| 294 | 495 |
| 295 | 496 |
| 296 | 498 |
| 297 | 499 |
| 298 | 500 |
| 299 | 501 |
| 300 | 502 |
| 301 | 503 |
| 302 | 504 |
| 303 | 505 |

7

| | |
|---|---|
| 304 | 506 |
| 305 | 507 |
| 306 | 508 |
| 307 | 512 |
| 308 | 513 |
| 309 | 514 |
| 310 | 515 |
| 311 | 516 |
| 312 | 517 |
| 313 | 518 |
| 314 | 519 |
| 315 | 521 |
| 316 | 524 |
| 317 | 525 |
| 318 | 530 |
| 319 | 532 |
| 320 | 534 |
| 321 | 536 |
| 322 | 537 |
| 323 | 539 |
| 324 | 540 |
| 325 | 541 |
| 326 | 542 |
| 327 | 544 |
| 328 | 545 |
| 329 | 548 |
| 330 | 549 |
| 331 | 550 |
| 332 | 551 |
| 333 | 552 |
| 334 | 553 |
| 335 | P-109 |
| 336 | P-116 |
| 337 | P-186 |
| 338 | P-196 |
| 339 | P-235 |
| 340 | P-253 |
| 341 | P-290 |
| 342 | P-334 |
| 343 | P-336 |
| 344 | P-346 |
| 345 | P-347 |
| 346 | P-351 |
| 347 | P-353 |

| 348 | P-396 |
|-----|-------|
| 349 | P-397 |
| 350 | P-399 |
| 351 | P-550 |
| 352 | P-71  |
| 353 | P-89  |
| 354 | P-9   |
| 355 | P-95  |

**Exhibit G – List of Class 9 Claims (Unsubstantiated Claims Receiving a Distribution at the Creditors' Committee's Request)**

| Count | Claim No. (A-#) |
|---|---|
| 1 | 4 |
| 2 | 7 |
| 3 | 8 |
| 4 | 10 |
| 5 | 17 |
| 6 | 23 |
| 7 | 24 |
| 8 | 28 |
| 9 | 41 |
| 10 | 43 |
| 11 | 46 |
| 12 | 54 |
| 13 | 63 |
| 14 | 72 |
| 15 | 74 |
| 16 | 75 |
| 17 | 82 |
| 18 | 83 |
| 19 | 87 |
| 20 | 88 |
| 21 | 119 |
| 22 | 135 |
| 23 | 139 |
| 24 | 144 |
| 25 | 161 |
| 26 | 165 |
| 27 | 168 |
| 28 | 174 |
| 29 | 175 |
| 30 | 177 |
| 31 | 179 |
| 32 | 180 |
| 33 | 182 |
| 34 | 186 |
| 35 | 192 |
| 36 | 195 |
| 37 | 199 |
| 38 | 205 |

| | |
|---|---|
| 39 | 214 |
| 40 | 217 |
| 41 | 221 |
| 42 | 230 |
| 43 | 231 |
| 44 | 233 |
| 45 | 247 |
| 46 | 248 |
| 47 | 249 |
| 48 | 258 |
| 49 | 264 |
| 50 | 268 |
| 51 | 269 |
| 52 | 275 |
| 53 | 288 |
| 54 | 291 |
| 55 | 294 |
| 56 | 302 |
| 57 | 310 |
| 58 | 312 |
| 59 | 315 |
| 60 | 327 |
| 61 | 334 |
| 62 | 335 |
| 63 | 336 |
| 64 | 338 |
| 65 | 345 |
| 66 | 347 |
| 67 | 357 |
| 68 | 363 |
| 69 | 371 |
| 70 | 378 |
| 71 | 380 |
| 72 | 389 |
| 73 | 393 |
| 74 | 396 |
| 75 | 399 |
| 76 | 428 |
| 77 | 430 |
| 78 | 435 |
| 79 | 439 |
| 80 | 440 |
| 81 | 441 |
| 82 | 460 |

11

| | |
|---|---|
| 83 | 465 |
| 84 | 468 |
| 85 | 470 |
| 86 | 473 |
| 87 | 474 |
| 88 | 480 |
| 89 | 483 |
| 90 | 509 |
| 91 | 511 |
| 92 | 520 |
| 93 | 522 |
| 94 | 523 |
| 95 | 526 |
| 96 | 527 |
| 97 | 528 |
| 98 | 529 |
| 99 | 531 |
| 100 | 538 |
| 101 | P-291 |
| 102 | P-329 |
| 103 | P-352 |
| 104 | P-665 |

**Exhibit H – List of Class 10 Claims (Disallowed or Previously Dismissed Abuse Survivor Claims**

| Class 10 | |
|---|---|
| **Count** | **Claim No. (A-#)** |
| 1 | 5 |
| 2 | 6 |
| 3 | 9 |
| 4 | 11 |
| 5 | 20 |
| 6 | 21 |
| 7 | 25 |
| 8 | 26 |
| 9 | 32 |
| 10 | 49 |
| 11 | 50 |
| 12 | 55 |
| 13 | 57 |
| 14 | 61 |
| 15 | 68 |
| 16 | 77 |
| 17 | 78 |
| 18 | 85 |
| 19 | 93 |
| 20 | 94 |
| 21 | 95 |
| 22 | 99 |
| 23 | 101 |
| 24 | 103 |
| 25 | 104 |
| 26 | 110 |
| 27 | 112 |
| 28 | 114 |
| 29 | 115 |
| 30 | 116 |
| 31 | 117 |
| 32 | 118 |
| 33 | 122 |
| 34 | 124 |
| 35 | 125 |
| 36 | 128 |
| 37 | 129 |
| 38 | 132 |

| | |
|---|---|
| 39 | 143 |
| 40 | 148 |
| 41 | 149 |
| 42 | 159 |
| 43 | 163 |
| 44 | 172 |
| 45 | 173 |
| 46 | 181 |
| 47 | 184 |
| 48 | 187 |
| 49 | 191 |
| 50 | 194 |
| 51 | 197 |
| 52 | 202 |
| 53 | 208 |
| 54 | 209 |
| 55 | 219 |
| 56 | 222 |
| 57 | 223 |
| 58 | 224 |
| 59 | 226 |
| 60 | 234 |
| 61 | 236 |
| 62 | 240 |
| 63 | 241 |
| 64 | 252 |
| 65 | 254 |
| 66 | 265 |
| 67 | 271 |
| 68 | 272 |
| 69 | 274 |
| 70 | 278 |
| 71 | 280 |
| 72 | 281 |
| 73 | 282 |
| 74 | 289 |
| 75 | 290 |
| 76 | 295 |
| 77 | 298 |
| 78 | 303 |
| 79 | 306 |
| 80 | 311 |
| 81 | 317 |
| 82 | 320 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 121 of 329

| | |
|---|---|
| 83 | 323 |
| 84 | 337 |
| 85 | 346 |
| 86 | 348 |
| 87 | 353 |
| 88 | 356 |
| 89 | 364 |
| 90 | 367 |
| 91 | 368 |
| 92 | 379 |
| 93 | 384 |
| 94 | 385 |
| 95 | 386 |
| 96 | 390 |
| 97 | 402 |
| 98 | 410 |
| 99 | 411 |
| 100 | 416 |
| 101 | 427 |
| 102 | 429 |
| 103 | 444 |
| 104 | 446 |
| 105 | 448 |
| 106 | 449 |
| 107 | 451 |
| 108 | 452 |
| 109 | 485 |
| 110 | 487 |
| 111 | 497 |
| 112 | 510 |
| 113 | 533 |
| 114 | 535 |
| 115 | 543 |
| 116 | 546 |
| 117 | 547 |
| 118 | P-115 |
| 119 | P-289 |
| 120 | P-637 |
| 121 | P-83 |

**Exhibit I – List of Class 12 Claims (General Unsecured Creditor Claims)**

[*Remainder of Page Intentionally Left Blank*]

| VENDOR NAME | AMOUNT OF CLAIM | AMOUNT OF PAYMENT UNDER PLAN |
|---|---|---|
| 104.7FM WDDW RADIO | $ 1,020.00 | $ 1,020.00 |
| 5 CORNERS PONTIAC | $ 1,299.07 | $ 1,299.07 |
| AMBASSADOR STEEL FABRICATION LLC | $ 2,160.00 | $ 2,160.00 |
| AMERICAN EXPRESS-360001 | $ 256.90 | $ 256.90 |
| ARAMARK | $ 655.70 | $ 655.70 |
| ARCHDIOCESE OF MILW. PERPETUAL CARE TRUST | $ 24,125.00 | $ 5,000.00 |
| ASSOCIATION OF CATHOLIC DIOCESAN ARCHIVISTS | $ 0.21 | $ 0.21 |
| ASSURED PEST CONTROL LLC | $ 19.84 | $ 19.84 |
| AT & T- 8100 | $ 52.21 | $ 52.21 |
| AT & T INTERNET SERVICES | $ 1,185.61 | $ 1,185.61 |
| AT&T ADVERTISING & PUBLISHING | $ 1,469.48 | $ 1,469.48 |
| AT&T-SBS | $ 3,842.10 | $ 3,842.10 |
| AURORA MEDICAL GROUP-MILW | $ 213.50 | $ 213.50 |
| B & H PHOTO - VIDEO, INC. | $ 674.81 | $ 674.81 |
| BECKER ELECTRICAL GROUP, INC. | $ 247.11 | $ 247.11 |
| BIONDAN NORTH AMERICA INC. | $ 2,359.80 | $ 2,359.80 |
| BLAKNEY, JOHN | $ 20.00 | $ 20.00 |
| BLANCO, YAMID | $ 50.00 | $ 50.00 |
| BOULANGER MARY | $ 50.00 | $ 50.00 |
| BOWLES, PEGGY | $ 270.94 | $ 270.94 |
| BP | $ 400.98 | $ 400.98 |
| BRENNAN J M INC. | $ 14,887.80 | $ 5,000.00 |
| CANON LAW PROFESSIONALS | $ 2,222.24 | $ 2,222.24 |
| CARDINAL STRITCH UNIVERSITY | $ 180.62 | $ 180.62 |
| CARQUEST AUTO PARTS STORES | $ 1,112.73 | $ 1,112.73 |
| CATHEDRAL OF ST. JOHN THE | $ 447.96 | $ 447.96 |
| CATHOLIC CEMETERY CONFERENCE | $ 11.05 | $ 11.05 |
| CATHOLIC HERALD THE | $ 1,588.12 | $ 1,588.12 |
| CDW GOVERNMENT, INC. | $ 162.75 | $ 162.75 |
| CINTAS CORPORATION | $ 779.50 | $ 779.50 |
| CINTAS FIRE PROTECTION | $ 618.69 | $ 618.69 |
| CITRIX ONLINE | $ 48.47 | $ 48.47 |
| CITY OF MILWAUKEE-NEIGHBORHOOD | $ 400.00 | $ 400.00 |
| CITY OF ST. FRANCIS | $ 3,975.32 | $ 3,975.32 |
| CLAUSEN, ANNA MARIE | $ 1,025.00 | $ 1,025.00 |
| CLEAR CHANNEL BROADCASTING, INC. | $ 4,252.00 | $ 4,252.00 |
| COMMUNICATION LINK | $ 232.00 | $ 232.00 |
| COUNTRY FLOWER SHOP | $ 364.00 | $ 364.00 |
| COUSINS SUBMARINES, INC. | $ 54.26 | $ 54.26 |
| CRESPO, MIGUEL SR. | $ 150.00 | $ 150.00 |
| DACA VI LLC | $ 620.00 | $ 620.00 |
| DATASTORE | $ 337.58 | $ 337.58 |
| DAVIS & KUELTHAU, S.C. | $ 250.00 | $ 250.00 |
| DELL MARKETING, L.P. | $ 5,944.82 | $ 5,000.00 |
| DELUXE BUSINESS CHECKS AND SOLUTIONS | $ 267.65 | $ 267.65 |
| DENTINO, DIANNA | $ 157.50 | $ 157.50 |
| DILLETT MECHANICAL SERVICE | $ 1,472.98 | $ 1,472.98 |
| DIVERSIFIED BENEFIT SERVICES, INC. | $ 226.54 | $ 226.54 |
| DOLAN PRODUCTIONS LLC | $ 600.00 | $ 600.00 |
| DOUSMAN TRANSPORT CO., INC. | $ 102.72 | $ 102.72 |
| ECONOMY LAMP COMPANY | $ 192.50 | $ 192.50 |
| EMERALD ISLE PR, INC. | $ 8,225.35 | $ 5,000.00 |
| ENVIRONMENTAL INNOVATIONS, INC. | $ 217.95 | $ 217.95 |
| EXEDE CORP | $ 485.27 | $ 485.27 |
| FAIR HARBOR CAPITAL, LLC AS ASSIGNEE OF BLAST CRAFT SERVICE, INC. | $ 4,867.50 | $ 4,867.50 |
| FAIR HARBOR CAPITAL, LLC AS ASSIGNEE OF CDI LOGISTICS | $ 1,045.47 | $ 1,045.47 |
| FAIR HARBOR CAPITAL, LLC AS ASSIGNEE OF HORST FAMILY TRUST | $ 2,920.00 | $ 2,920.00 |
| FASTENAL COMPANY | $ 132.19 | $ 132.19 |
| FDLC | $ 793.10 | $ 793.10 |
| FEDEX | $ 115.56 | $ 115.56 |
| FIFTH FLOOR RECORDING COMPANY | $ 416.00 | $ 416.00 |
| FILTRATION CONCEPTS, INC. | $ 844.75 | $ 844.75 |
| FOUNDATION FOR RELIGIOUS RETIREMENT | $ 100.00 | $ 100.00 |
| GEIS BUILDING PRODUCTS, INC. | $ 1,850.00 | $ 1,850.00 |
| GILLITZER FRANK ELECTRIC CO., LTD. | $ 1,880.33 | $ 1,880.33 |
| GLACIER STATE DISTRIBUTION SERVICES INC | $ 494.60 | $ 494.60 |
| GLOBALCOM INC. | $ 598.99 | $ 598.99 |
| GOETZINGER, ANDREA | $ 40.00 | $ 40.00 |
| GOOD SHEPHERD | $ 13.42 | $ 13.42 |

| VENDOR NAME | AMOUNT OF CLAIM | AMOUNT OF PAYMENT UNDER PLAN |
|---|---|---|
| GRAINGER | $ 190.90 | $ 190.90 |
| GRANITE RESOURCES CORP. | $ 1,815.00 | $ 1,815.00 |
| GREAT LAKES ROOFING | $ 20,000.00 | $ 5,000.00 |
| GREEN BAY DIOCESE TRIBUNIAL | $ 525.00 | $ 525.00 |
| GREEN BAY GLACIER | $ 179.70 | $ 179.70 |
| GREGS TRUE VALUE & JUST ASK RENTAL | $ 91.14 | $ 91.14 |
| HAIG/JACKSON COMMUNICATIONS, INC. | $ 300.00 | $ 300.00 |
| HEMSING VERY, REV. JOHN | $ 50.00 | $ 50.00 |
| HOLBUS BRIAN | $ 183.40 | $ 183.40 |
| HOLY ANGELS PARISH | $ 225.00 | $ 225.00 |
| HOME DEPOT CREDIT SERVICES | $ 1,941.77 | $ 1,941.77 |
| HSBC BUSINESS SOLUTIONS | $ 1,183.52 | $ 1,183.52 |
| INDUSTRIAL CONTROLS DISTRIBUTORS LLC | $ 40.20 | $ 40.20 |
| JACKLIN W.H.INCORPORATED | $ 13,645.00 | $ 5,000.00 |
| JANI-KING - MILWAUKEE REGION | $ 1,376.45 | $ 1,376.45 |
| JOHNSTONE SUPPLY | $ 319.41 | $ 319.41 |
| DACA VI, LLC AS ASSIGNEE OF JOSEPH CA CO | $ 648.37 | $ 648.37 |
| JOURNAL BROADCAST GROUP | $ 6,460.00 | $ 5,000.00 |
| JOURNAL SENTINEL, INC. | $ 160.00 | $ 160.00 |
| KARTHAUSER & SONS, INC. | $ 3,498.05 | $ 3,498.05 |
| KASER ROSE | $ 40.00 | $ 40.00 |
| KLEIN-DICKERT MILWAUKEE, INC. | $ 445.00 | $ 445.00 |
| KLUSMAN CHRISTOPHER | $ 142.20 | $ 142.20 |
| KNIGHTS SECURITY | $ 325.00 | $ 325.00 |
| KNIPPEL, VERY REV. KENNETH | $ 50.00 | $ 50.00 |
| KOSTECHKA, PATTY | $ 373.37 | $ 373.37 |
| KRAUSE FUNERAL HOME | $ 675.00 | $ 675.00 |
| KRUEGER COMMUNICATIONS, INC. | $ 343.50 | $ 343.50 |
| KUJAWA ENTERPRISES, INC. | $ 6,647.25 | $ 5,000.00 |
| LAKE SHORE BURIAL VAULT CO., INC. | $ 1,050.00 | $ 1,050.00 |
| LANGE SANDY | $ 125.00 | $ 125.00 |
| LARRY'S AUTO CLINIC, LTD. | $ 1,563.37 | $ 1,563.37 |
| LEE'S RENT IT | $ 75.21 | $ 75.21 |
| LEISING, JERRY | $ 40.00 | $ 40.00 |
| LENNY'S POOL SERVICE INC. | $ 105.75 | $ 105.75 |
| LINDNER BERNARD | $ 10.00 | $ 10.00 |
| LOEWEN & FONK, INC. | $ 1,635.00 | $ 1,635.00 |
| LP PHOTOCERAMICS INTERNATIONAL, INC. | $ 188.53 | $ 188.53 |
| LUMEN CHRISTI PARISH | $ 50.00 | $ 50.00 |
| M.H.S., Inc. | $ 3,378,536.59 | $ 5,000.00 |
| MACHULAK DOROTHY | $ 20.00 | $ 20.00 |
| MANCILLA ALMA | $ 100.00 | $ 100.00 |
| MAPA | $ 280.24 | $ 280.24 |
| MARANOWICZ BETHANY | $ 150.00 | $ 150.00 |
| MARQUETTE UNIVERSITY COLLEGE OF EDUCATION | $ 10.00 | $ 10.00 |
| MARTENS MARY | $ 150.00 | $ 150.00 |
| MATENAER THERESA V. | $ 374.00 | $ 374.00 |
| MATTHEWS INTERNATIONAL-BRONZE | $ 1,891.84 | $ 1,891.84 |
| MATTHEWS INTERNATIONAL-CORPORATE | $ 419.63 | $ 419.63 |
| MB BROOKFIELD LLC | $ 75.00 | $ 75.00 |
| MBUYI-BANDUKU CHARLES | $ 100.00 | $ 100.00 |
| MCI SMALL BUSINESS SERVICE | $ 137.76 | $ 137.76 |
| MEJIA AMALIA | $ 100.00 | $ 100.00 |
| MIDWEST ARCHIVES CONFERENCE | $ 0.25 | $ 0.25 |
| MILWAUKEE WATER WORKS | $ 30,589.67 | $ 5,000.00 |
| MUCHA ROBERT | $ 480.00 | $ 480.00 |
| NATIONAL ASSOCIATION OF CHURCH PERSONNEL ADMINISTRATORS | $ 1.32 | $ 1.32 |
| NATL FEDERATION FOR CATHOLIC YOUTH MINISTRY, INC. | $ 5.42 | $ 5.42 |
| NAWROCKI, REV. ROBERT | $ 44.20 | $ 44.20 |
| NEHER ELECTRIC SUPPLY,INC. | $ 243.57 | $ 243.57 |
| NEHLS, ZARA | $ 180.00 | $ 180.00 |
| NET RESULTS, INC. | $ 560.00 | $ 560.00 |
| NEUMAN POOLS INC | $ 2,490.98 | $ 2,490.98 |
| NORTH SIDE COAL AND OIL CO. | $ 5,772.81 | $ 5,000.00 |
| NORTH, ROXANE | $ 201.30 | $ 201.30 |
| NOVO 1 | $ 48.82 | $ 48.82 |
| O'DONNELL, FR. RICHARD | $ 41.00 | $ 41.00 |
| OFFICEMAX INCORPORATED | $ 85.36 | $ 85.36 |
| ONE COMMUNICATIONS | $ 603.14 | $ 603.14 |

| VENDOR NAME | AMOUNT OF CLAIM | AMOUNT OF PAYMENT UNDER PLAN |
|---|---|---|
| OROSA, REV. AUGUSTIN | $ 50.00 | $ 50.00 |
| OTIS ELEVATOR COMPANY | $ 63.15 | $ 63.15 |
| OUR LADY OF LOURDES PARISH | $ 50.00 | $ 50.00 |
| PARK BANK | $ 168.01 | $ 168.01 |
| PARTNERSHIP FOR PHILANTHROPIC PLANNING | $ 8.38 | $ 8.38 |
| PHILLIPS ANDREA VELLA | $ 75.00 | $ 75.00 |
| DACA VI, LLC AS ASSIGNEE OF PHOTOS BY MIKE | $ 446.50 | $ 446.50 |
| PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC | $ 235.95 | $ 235.95 |
| PITNEY BOWES, INC. | $ 164.70 | $ 164.70 |
| PLEASANT PRAIRIE UTILITIES | $ 369.87 | $ 369.87 |
| POFF BROS. LAND CARE | $ 296.75 | $ 296.75 |
| PRAXAIR DISTRIBUTION, INC. | $ 161.03 | $ 161.03 |
| PRINTGRAPHIX | $ 1,546.00 | $ 1,546.00 |
| PROFESSIONAL INTERPRETING ENTERPRISE, INC. | $ 155.00 | $ 155.00 |
| PROVEN DIRECT | $ 4,767.31 | $ 4,767.31 |
| PURCHASE POWER | $ 9,500.00 | $ 5,000.00 |
| QUILL CORPORATION | $ 16.07 | $ 16.07 |
| RADETSKI FR JOHN | $ 420.15 | $ 420.15 |
| DACA VI, LLC AS ASSIGNEE OF RAMAKER AND ASSOCIATES, INC | $ 467.50 | $ 467.50 |
| RANK ARVILLA | $ 471.48 | $ 471.48 |
| REINDERS BROTHERS, INC. | $ 687.93 | $ 687.93 |
| REUTEBUCH MARY SUE | $ 75.00 | $ 75.00 |
| RICHETTA JOHN | $ 41.50 | $ 41.50 |
| RICOH AMERICAS CORPORATION 73210 | $ 5,911.06 | $ 5,000.00 |
| RICOH AMERICAS CORPORATION-21146 | $ 425.28 | $ 425.28 |
| RIGHT CHOICE JANITORIAL SUPPLY, L.L.C. | $ 1,155.33 | $ 1,155.33 |
| RIVER RUN COMPUTERS, INC. | $ 488.36 | $ 488.36 |
| RODDICK GAYLE | $ 825.00 | $ 825.00 |
| ROMO JAIME DR | $ 20.68 | $ 20.68 |
| FAIR HARBOR CAPITAL AS ASSIGNEE OF RUFFALOCODY | $ 4,605.00 | $ 4,605.00 |
| SAFETY-KLEEN SYSTEMS, INC. | $ 256.15 | $ 256.15 |
| SAINT FRANCIS SEMINARY | $ 10,363.09 | $ 5,000.00 |
| SALENTINE PUMP & EQUIPMENT, INC. | $ 260.00 | $ 260.00 |
| SCHOOL SISTERS OF ST. FRANCIS | $ 1,284.87 | $ 1,284.87 |
| SCHUERMAN, REV. JIM-1099 | $ 100.00 | $ 100.00 |
| SCRIPTLOGIC CORPORATION | $ 7,161.12 | $ 5,000.00 |
| SELKEY, KAREN M | $ 45.00 | $ 45.00 |
| SENIOR FR. DONALD | $ 1,300.00 | $ 1,300.00 |
| SEXAUER, J.A., INC. | $ 361.17 | $ 361.17 |
| SHESTO SAFE & LOCK WORKS, LLC | $ 99.00 | $ 99.00 |
| SHORE COUNSELING AND CONSULTING | $ - | $ - |
| SMITH, CI, SANDI | $ 180.00 | $ 180.00 |
| SOBCZYK, BRYAN | $ 65.98 | $ 65.98 |
| SOFTCHOICE CORPORATION | $ 321.89 | $ 321.89 |
| SPAAY JOHN & RUTHANN | $ 75.00 | $ 75.00 |
| SPEEDWAY SUPERAMERICA LLC | $ 173.84 | $ 173.84 |
| SPIC AND SPAN, INC. | $ 53.96 | $ 53.96 |
| SPRING VALLEY | $ 1,517.25 | $ 1,517.25 |
| SPRINT-BOX 4181 | $ 1.20 | $ 1.20 |
| ST. CAMILLUS | $ 29.04 | $ 29.04 |
| ST. CATHERINE CONGREGATION-OCONOMOWOC | $ 4,398.50 | $ 4,398.50 |
| ST. FRANCIS XAVIER CATHOLIC CHURCH | $ 1,527.51 | $ 1,527.51 |
| ST. JOHN VIANNEY CONGREGATION BRK | $ 50.00 | $ 50.00 |
| ST. JOSEPH CENTER-MOTHERHOUSE | $ 35.00 | $ 35.00 |
| ST. LEONARD | $ 230.85 | $ 230.85 |
| ST. LOUIS CONSULTATION CENTER | $ 4,780.00 | $ 4,780.00 |
| ST. MARTIN DE PORRES | $ 75.00 | $ 75.00 |
| ST. ROSE OF LIMA PARISH-MILW | $ 800.00 | $ 800.00 |
| ST.ALPHONSUS PARISH-GRNDL | $ 50.00 | $ 50.00 |
| STAPLES ADVANTAGE | $ 1,440.15 | $ 1,440.15 |
| STARR, PHIL | $ 40.00 | $ 40.00 |
| STEMPER, T. H. COMPANY | $ 16.25 | $ 16.25 |
| STUDIO GEAR LLC | $ 150.00 | $ 150.00 |
| TDS METROCOM | $ 55.96 | $ 55.96 |
| TEUTEBERG INCORPORATED | $ 6,134.33 | $ 5,000.00 |
| THEYS, TOM | $ 50.00 | $ 50.00 |
| THOMAS ROBERT | $ 630.00 | $ 630.00 |
| THREE HOLY WOMEN PARISH | $ 300.00 | $ 300.00 |
| TIKALSKY, RUSSELL REV. | $ 3,251.42 | $ 3,251.42 |

| VENDOR NAME | AMOUNT OF CLAIM | AMOUNT OF PAYMENT UNDER PLAN |
|---|---|---|
| TIME WARNER CABLE-BOX 3237 | $ 67.62 | $ 67.62 |
| T-MOBILE | $ 39.84 | $ 39.84 |
| TOWN & COUNTRY MART | $ 988.60 | $ 988.60 |
| UNITED PARCEL SERVICE | $ 19.60 | $ 19.60 |
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS | $ 14,621.53 | $ 5,000.00 |
| USCCB PUBLISHING | $ 98.91 | $ 98.91 |
| UW-WHITEWATER | $ 513.40 | $ 513.40 |
| VALLEY NATIONAL GASES, INC. | $ 30.65 | $ 30.65 |
| VEOLIA ES SOLID WASTE MIDWEST, INC. C6 | $ 2,092.63 | $ 2,092.63 |
| WAGNER PLUMBING CO, INC. | $ 848.11 | $ 848.11 |
| WASTE MANAGEMENT OF MILWAUKEE | $ 134.10 | $ 134.10 |
| WE ENERGIES | $ 134,437.21 | $ 5,000.00 |
| WEEK OF PRAYER-GRAYMOOR ECUM. | $ 80.95 | $ 80.95 |
| WESTED | $ 19.65 | $ 19.65 |
| WISCONSIN GRIEF EDUCATION CENTER, INC. | $ 6,541.94 | $ 5,000.00 |
| WISCONSIN STRESS CNTRL CTR | $ 65.00 | $ 65.00 |
| WISCONSIN WHOLESALE TIRE | $ 446.63 | $ 446.63 |
| WITTLIFF, REV TOM | $ 58.00 | $ 58.00 |
| YELLOW BOOK OF ILLINOIS, LLC | $ 521.77 | $ 521.77 |
| ZANIN BRIAN-1099 | $ 75.00 | $ 75.00 |
| ZERKEL, FR. DONALD | $ 155.00 | $ 155.00 |
| ZIELINSKI, CINDY | $ 50.00 | $ 50.00 |
| ZIEN INC | $ 6,743.13 | $ 5,000.00 |
| ZOZAKIEWICZ, DANIEL | $ 96.00 | $ 96.00 |
| TOTAL: $ | 3,848,585.32 | $ 232,337.62 |

**Exhibit J – List of Archdiocesan Insurance Policies**

Life Insurance Policies

Equitable Variable Life Insurance Co.
Life Insurance Policy No. 45261172 for the benefit of the Debtor
Des Moines Service Center
PO Box BW
Des Moines, IA 50306

Northwestern Mutual Life Insurance Co.
Life Insurance Policy No. 10155450 for the benefit of the Debtor
Attn: Policy Services Dept
720 E Wisconsin Ave
Milwaukee, WI 53202

Northwestern Mutual Life Insurance Co.
Life Insurance Policy No. 12829155 for the benefit of the Debtor
Attn: Policy Services Dept
720 E Wisconsin Ave
Milwaukee, WI 53202

Northwestern Mutual Life Insurance Co.
Life Insurance Policy No. 12829169 for the benefit of the Debtor
Attn: Policy Services Dept
720 E Wisconsin Ave
Milwaukee, WI 53202

Northwestern Mutual Life Insurance Co.
Life Insurance Policy No. 13090746 for the benefit of the Debtor
Attn: Policy Services Dept
720 E Wisconsin Ave
Milwaukee, WI 53202

Liability Policies

Lloyd's // Insurance Policy Nos. MO-8537, MO-8538,
M0-8539, MO 9798/4851, MO 9799/4862, MO 9800/4863, MO 10420/5355,
MO 10421/5356, MO 10422/5413, 35-OS-8005, 35-OS-8015, SL 3974,
SL 3975, SLC 5964, SLC 5963, SLC 5965, ISL 3976, ISL 3317, ISL 3326,
ISL 3327, ICO 5167, ICO 5168, ICO 5169, ISL 3596, GHV 370/486, ISL 3595, ICO 5338

Commercial Union Insurance Company (n/k/a OneBeacon Insurance Company)
Insurance Policy Nos. AW8500460, AW1102119, AW1101229, AW197187, AWW197187,
AWW324772, MPAW324772, AWW452502, AWW548615

Lumbermans Mutual Group
Kemper Insurance Company
American Motorists Insurance Company
Insurance Policy No. 3SB005722

Federal Insurance Company
Chubb Group of Insurance Companies
Insurance Policy No. 79226398

Stonewall Insurance Company
Insurance Policy No. 35000800

CNA Insurance Company (a/k/a Continental Casualty Company)
Insurance Policy Nos. RDU3569674, RDU4014732, RDX1781640

Interstate Fire & Casualty Company
Insurance Policy Nos. 155-C-14022, 55C0020054, 83-0169208

Granite State Insurance Company
Insurance Policy No. 6685-6010

National Union Fire Insurance Company of Pittsburgh, PA
Insurance Policy No. SCL 662-9243

TIG Insurance Company
As Successor by Merger to International Insurance Company as Successor by Merger to
International Surplus Lines Insurance Company
Insurance Policy No. XSI 10283

Fireman's Fund Insurance Companies
Insurance Policy No. XLX-173-63-64

WHD/11894245.1

**Exhibit K –List of Settling Insurers**

London Market Insurers
Insurance Policy Nos. MO-8537, MO-8538,
M0-8539, MO 9798/4851, MO 9799/4862, MO 9800/4863, MO 10420/5355,
MO 10421/5356, MO 10422/5413, 35-OS-8005, 35-OS-8015, SL 3974,
SL 3975, SLC 5964, SLC 5963, SLC 5965, ISL 3976, ISL 3317, ISL 3326,
ISL 3327, ICO 5167, ICO 5168, ICO 5169, ISL 3596, GHV 370/486, ISL 3595, ICO 5338

Certain Underwriters at Lloyd's, London.

Ageas Insurance Limited (f/k/a Bishopsgate Insurance Company Ltd.).

Allianz Suisse Versicherungs-Gesellschaft AG (f/k/a Helvetia Accident Insurance Company, Helvetia Accident Gibbon N.M. Group, and Helvetia Accident Swiss Ins. Co.).

Assicurazioni Generali S.p.A (f/k/a General Insurance Company of Trieste and Venice).

Delta Lloyd Schadeverzekering NV (f/k/a Delta Lloyd Non Life Ltd.).

Dominion Insurance Company Ltd.

Excess Insurance Company Limited.

Harper Insurance Limited (f/k/a Turegum Insurance Company Ltd.).

Helvetia Swiss Insurance Company (f/k/a Alba General Insurance Company Limited).

London & Edinburgh Insurance Company Limited (f/k/a London & Edinburgh General Ins. Co. Ltd., London & Edinburgh General Ins. Co., and London & Edinburgh General Ltd.).

National Casualty Co.

National Casualty Co. of America.

National Casualty Co. of America Ltd.

NRG Victory Reinsurance Limited (f/k/a New London Reinsurance Ltd.).

Ocean Marine Insurance Company Limited (as successor-in-interest to Edinburgh Assurance Company Limited No. 2 A/C).

Ocean Marine Insurance Company Limited (as successor-in-interest to World Auxiliary Insurance Corporation Limited).

River Thames Insurance Company Limited.

Select Market Insurance Company (f/k/a Argonaut Northwest Insurance Company).

Stronghold Insurance Company Limited.

Winterthur Swiss Insurance Company (f/k/a Accident & Casualty Insurance Company, Accident & Casualty Company, Accident & Casualty No. 2 Account, Accident & Casualty No. 3 Account, Accident & Casualty Ins. Co. of Winterthur, Accident & Casualty Ins. Co. of Winterthur No. 2 Account, and Accident & Casualty Ins. Co. of Winterthur No. 3 Account).

Markel International Insurance Company Ltd.(f/k/a Terra Nova Insurance Company Ltd.).

Tenecom Ltd. (f/k/a Yasuda Fire & Marine Insurance Company of Europe Ltd.).

Sphere Drake Insurance Company, PLC.

CNA Reinsurance of London Ltd.

CNA Reinsurance Co. Ltd.

Unionamerica Insurance Company Limited (f/k/a St. Katherine Insurance Co. PLC)

Commercial Union Insurance Company (n/k/a OneBeacon Insurance Company)
Insurance Policy Nos. AW8500460, AW1102119, AW1101229, AW197187, AWW197187, AWW324772, MPAW324772, AWW452502, AWW548615

Federal Insurance Company
Chubb Group of Insurance Companies
Insurance Policy No. 79226398

Stonewall Insurance Company
Insurance Policy No. 35000800

CNA Insurance Company (a/k/a Continental Casualty Company)
Insurance Policy Nos. RDU3569674, RDU4014732, RDX1781640

Interstate Fire & Casualty Company
Insurance Policy Nos. 155-C-14022, 55C0020054, 83-0169208

Granite State Insurance Company
Insurance Policy No. 6685-6010

National Union Fire Insurance Company of Pittsburgh, PA
Insurance Policy No. SCL 662-9243

TIG Insurance Company

As Successor by Merger to International Insurance Company as Successor by Merger to
International Surplus Lines Insurance Company
Insurance Policy No. XSI 10283

Fireman's Fund Insurance Companies
Insurance Policy No. XLX-173-63-64

WHD/11894245.1

**Exhibit L –List of Non-Settling Insurers**

Lumbermans Mutual Group
Kemper Insurance Company
American Motorists Insurance Company
Insurance Policy No. 3SB005722

**Exhibit M – List of Insolvent London Market Insurers**

Swiss Union Insurance Company Limited

Minster Insurance Company Limited

Orion Insurance Company Limited

Orion Insurance Company "T" Acct.

North Atlantic Insurance Co.

Bellefonte Insurance Company

Walbrook Insurance Company Ltd.

Bermuda Fire & Marine Insurance Company Ltd.

Bermuda Fire & Marine Insurance Company

Southern American Ins. Co.

Andrew Weir Insurance Company Limited

Highlands Insurance Company

L.T.B. Highlands Insurance Company

London and Overseas Insurance Company Limited

English and American Insurance Company Limited

English and American Insurance Company Limited "M" Account

**Exhibit N – LMI Settlement Agreement**

[*Remainder of Page Intentionally Left Blank*]

WHD/11842543.1

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter the "Agreement") is made this ___ day of _____, 2015, by and between the Archdiocese of Milwaukee ("ADOM", as defined below) and the "Related Entities" (as defined below) (collectively, ADOM and the Related Entities are referred to herein as the "Catholic Entities"), on one hand, and certain Underwriters at Lloyd's, London, and certain London Market Insurance Companies (collectively, "London Market Insurers", as defined below), on the other hand, (the aforementioned parties being referred to hereinafter collectively as the "Parties" or individually as a "Party").

## WITNESSETH THAT:

WHEREAS, London Market Insurers severally subscribed certain policies providing insurance to the Catholic Entities ("Subject Insurance Policies", as defined below);

WHEREAS, certain of the Catholic Entities have incurred and may incur in the future certain liabilities, expenses, and losses arising out of certain claims;

WHEREAS, to attempt to address its liabilities for such claims, on January 4, 2011 ("Petition Date"), ADOM filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Wisconsin ("Bankruptcy Court") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* ("Bankruptcy Code"), Case Number 11-20059 ("Bankruptcy Case");

WHEREAS, the Subject Insurance Policies are property of the bankruptcy estate;

WHEREAS, ADOM and the Related Entities claim coverage under the Subject Insurance Policies;

WHEREAS, certain Catholic Entities tendered demands to London Market Insurers for coverage under the Subject Insurance Policies for such claims, and London Market Insurers dispute whether, and to what extent, coverage may attach with respect to any such claims under the Subject Insurance Policies ("Dispute");

WHEREAS, in an effort to obtain an adjudication of its rights for coverage under certain of the Subject Insurance Policies, on November 13, 2012, ADOM filed an action captioned *Archdiocese of Milwaukee, et al. v. Stonewall Insurance Co., et. al.,* in the Bankruptcy Court ("Declaratory Judgment Action");

WHEREAS, Donald Marshall and Dean Weissmuller, the alleged holders of Abuse Claims, were also named Plaintiffs on the Complaint for Declaratory Relief that initiated the Declaratory Judgment Action;

WHEREAS, several London Market Insurers are named defendants in the Declaratory Judgment Action;

WHEREAS, on February 22, 2013, the Declaratory Judgment Action was removed to the District Court of the Eastern District of Wisconsin by Order of the District Court;

WHEREAS, London Market Insurers have denied and continue to deny all substantive allegations and claims asserted against them in the Declaratory Judgment Action;

WHEREAS, on April 26, 2012, claimant John Doe 21 commenced an action in the Circuit Court for Racine County, Wisconsin, Case No. 12-CV-1464, against St. Louis Parish, alleging that he was abused by Father Daniel Budzynski, a parish priest at St. Louis Parish (one of the "Related Entities") between 1984 and 1986 ("State Court Action"), and that claim was tendered to certain of the London Market Insurers on May 21, 2012;

WHEREAS, whether or not they were subject to claims and whether or not they tendered demands to London Market Insurers, all Catholic Entities are settling with and release London Market Insurers pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the Subject Insurance Policies be sold, assigned, and transferred to London Market Insurers and that London Market Insurers shall buy back the Subject Insurance Policies by payment of the "Buy-Back Payment" (as defined below);

WHEREAS, it is the intention of the Parties that any and all interests of the Catholic Entities in the Subject Insurance Policies shall be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that the Catholic Entities shall (i) not retain any right, title, or interest in or to the Subject Insurance Policies, and (ii) release London Market Insurers from all "Claims" (as defined below), and that no London Market Insurer shall have any remaining duty or obligation of any nature whatsoever to any Catholic Entity;

WHEREAS, London Market Insurers are also making a contribution to support the "Plan" (as defined below) and the transactions contemplated thereunder ("Plan Payment", as defined below), and

in exchange will receive the "Settling Insurers Release" (as defined below), pursuant to the Plan;

WHEREAS, the Catholic Entities agree to sell their "Interests" (as defined below) under the Subject Insurance Policies back to London Market Insurers; that the Buy-Back Payment shall be transferred to the "Plan Trust" (as defined below); and that, in exchange, the Related Entities will receive the "Related Entities Release" (as defined below), pursuant to the Plan; and

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without London Market Insurers' admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all rights, obligations, and liabilities of London Market Insurers and the Catholic Entities with respect to the Subject Insurance Policies, including all rights, obligations, and liabilities relating to the aforesaid Claims, without prejudice to their respective positions on policy wordings or any other issues in the Dispute, the Declaratory Judgment Action, the State Court Action, or any other action.

<u>**AGREEMENTS:**</u>

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1. <u>**Definitions**</u>

The following definitions and the definitions used above apply to this Agreement as well as in any exhibits or attachments hereto. Where the listed terms are also further defined elsewhere in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other. The words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation," and the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with". (The words "include," "includes" and "including", and the phrase "relating to" are not capitalized herein.) All attachments hereto are incorporated herein to the same extent as if fully set forth herein. All

references to "Sections" are references to sections of this Agreement unless otherwise specified.

## A. **Abuse Claim**

The term "Abuse Claim" means any Claim relating to (a) sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia or sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult; (b) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, or intimidation; or (c) fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, or any other tort relating to the acts and/or omissions listed in subparts (a) and (b) of this sentence, for which a Catholic Entity is or was allegedly legally responsible under any legal theory whatsoever, including any act or omission by a Person (a) whom a Catholic Entity failed to control, direct, train or supervise; (b) about whose acts and propensities a Catholic Entity failed to warn, disclose or provide information; or (c) whom a Catholic Entity allegedly negligently hired or retained. A child or nonconsenting adult is abused whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological or emotional harm to the child or nonconsenting adult.

## B. **ADOM**

The term "ADOM" means:

(i)   the Archdiocese of Milwaukee; its predecessors and successors; all its past and present subsidiaries and the predecessors and successors of such subsidiaries; its past and present affiliates and joint ventures and their predecessors and successors; and all its past, present and future assigns; and,

(ii)  any other "Person" (as defined below) that was in the past or is now affiliated with, related to, or associated with ADOM, including any corporations that have been acquired by, merged into, or combined with ADOM or its predecessors, or ADOM's past and present subsidiaries, affiliates, successors and assigns; and,

(iii) any and all Persons named as insureds, other insureds, or otherwise insured or claimed to be insured under the Subject Insurance Policies and those Persons', subsidiaries', affiliates', successors' and assigns' directors, officers, agents and employees; *provided, however,* those Persons within the definition of "Related Entities" are not within the definition of "ADOM".

## C. **Approval Order**

The term "Approval Order" shall mean an order entered by the Bankruptcy Court, upon a hearing upon Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions. The wording of the Approval Order shall be mutually acceptable to ADOM and London Market Insurers. The Approval Order shall contain provisions:

(i) approving this Agreement, in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

(ii) authorizing the sale of the Subject Insurance Policies to London Market Insurers free and clear of all Interests of all Persons, with all rights under and Claims against the Subject Insurance Policies being fully extinguished without reservation;

(iii) authorizing and directing the Parties to perform their respective obligations under this Agreement;

(iv) entering the Bar Order;

(v) ordering that all Claims against and Interests in the Subject Insurance Policies are extinguished upon the date of entry of the Approval Order;

(vi) ordering that any Claims or Interests that any Person, including "CMS" (as defined below), might have against the Subject Insurance Policies or London Market Insurers relating to Claims paid or to be paid from the Buy-Back Payment attach to the Buy-Back Payment;

(vii) ordering any trustee appointed to administer any post-confirmation trust, including the Plan Trust, to perform the obligations imposed upon him or her, if any, by this Agreement; and,

(ix) incorporating the following separately entered findings of fact and conclusions of law adequately supporting

the sale and buy-back of the Subject Insurance Policies and as necessary to enter the Bar Order:

> a. ADOM demonstrated sound business reasons for the sale of the Subject Insurance Policies to London Market Insurers;

> b. This Agreement was negotiated extensively, at arms-length, and in good faith between ADOM and London Market Insurers. London Market Insurers are purchasers in good faith within the meaning of Bankruptcy Code § 363(m), and are entitled to all of the protections of that statute;

> c. London Market Insurers are bona fide good faith purchasers of the Subject Insurance Policies, for value;

> d. The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been disclosed to the Bankruptcy Court;

> e. The terms and conditions of this Agreement (including the consideration to be realized by ADOM's bankruptcy estate) are fair and reasonable;

> f. The transactions contemplated by this Agreement are in the best interests of ADOM's bankruptcy estate, its creditors, and other stakeholders;

> g. The only potential holders of Interests in or against the Subject Insurance Policies are the Catholic Entities and Persons who hold Claims against the Catholic Entities, whose Claims might be covered by the Subject Insurance Policies;

> h. The Related Entities are parties to the relief sought in the motion to approve this Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

> i. The Abuse Claims are subject to bona fide dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

> j. All holders of Claims against the Subject Insurance Policies could be compelled in a legal or

equitable proceeding to accept a money satisfaction of such Claims, therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

k. The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair and equitable;

l. In light of the: (1) probability of success in the litigation of the Declaratory Judgment Action; (2) difficulties, if any, to be encountered in the matter of collection; (3) complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) paramount interest of the creditors and a proper deference to their reasonable views, this Agreement is fair and equitable and in the best interest of ADOM's bankruptcy estate and its creditors;

m. The Buy-Back Payment is fair, adequate, and reasonable consideration for (1) the sale and buy-back by London Market Insurers of all of the Catholic Entities' Interests in the Subject Insurance Policies and any Interests of holders of Abuse Claims or other Claims in the Policies, directly or indirectly, and (2) the release of London Market Insurers contained in the Plan;

n. ADOM provided due and adequate notice of the (1) sale of the Subject Insurance Policies; (2) terms and conditions of this Agreement; and, (3) hearing on the sale, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown creditors;

o. It would be impractical to divide the Subject Insurance Policies between ADOM and the Related Entities, therefore, to realize the value of the Subject Insurance Policies for ADOM's bankruptcy estate requires that the sale include all Persons' Interests in the Subject Insurance Policies;

p. The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

q. The sale of the Subject Insurance Policies free and clear of Interests satisfies the requirements of § 363(f);

r.    The Claims of any Persons holding Claims that would be covered by the Subject Insurance Policies that are being acquired by the London Market Insurers pursuant to this Agreement are deemed to be "interests" as that term is used in Bankruptcy Code § 363(f); and,

s.    The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

The entry of the Approval Order containing all of the provisions set out in above sub-paragraphs (i)-(ix), but no provision that is contrary to or inconsistent with them, is a condition precedent to the performance of London Market Insurers' obligations under this Agreement.

### D. **Bankruptcy Notice**

The term "Bankruptcy Notice" means notice as required under Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 2002, 6004(a) and (c), and applicable local rules, sent to (a) all holders of Claims against the Catholic Entities, including Abuse Claims, and their attorneys, if any, who are known to ADOM; (b) the Future Claims Representative; (c) the Committee of Unsecured Creditors; (d) all insurers of the Catholic Entities; (e) the Secretary of the Department of Health and Human Services; (f) the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244-1850; (g) the United States Attorney for the Eastern District of Wisconsin; (h) all Persons who, in the opinion of any of the Parties, might reasonably be expected to be affected by the sale; and (i) all other Persons as directed by the Bankruptcy Court.  Notice shall also be given by (1) publication in the national editions of the New York Times, the Chicago Tribune, the Los Angeles Times and U.S.A. Today; (2) local publication within Milwaukee and the surrounding areas, including every county in which a Catholic Entity is located; (3) publication in three newspapers with the largest circulation in the State of Minnesota; and (4) publication in the largest newspapers in Arizona, California, Florida and Illinois.

### E. **Bar Order**

The term "Bar Order" means an order barring, estopping, and permanently enjoining all Persons from asserting any (a) Claims against the Subject Insurance Policies; (b) Claims against London Market Insurers relating to the Subject Insurance Policies; and (c) Medicare Claims.  The terms of the Bar Order

must be set forth in any motion or brief seeking approval of this Agreement and the Approval Order.

**F. Business Day**

The term "Business Day" means any day that is not a Saturday, Sunday, or legal holiday in the State of Wisconsin or the United Kingdom.

**G. Buy-Back Payment**

The term "Buy-Back Payment" means the payment by the London Market Insurers to the Plan Trust of a sum equal to fifty percent (50%) of their respective, allocated, several shares of the Settlement Amount, as set forth on Attachment D, for the buy-back of all Interests of the Catholic Entities in the Subject Insurance Policies.

**H. Claim**

The term "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any claim, assertion of right, complaint, cross-complaint, counterclaim, liabilities, rights, request, allegation, arbitration, mediation, lawsuit, litigation, direct action, administrative proceeding, cause of action, suit, action, lien, debt, bill, indemnity, equitable indemnity, right of subrogation, equitable subrogation, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, Proof of Claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or action, settlement, and/or any liability whatsoever, whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or

other eviction or other invasion of the right of private occupancy. For avoidance of doubt, "Claim" includes any Abuse Claim, any Contribution Claim, any Direct Action Claim, any Extra-Contractual Claim, any Medicare Claim and any Trust Claim.

### I. CMS

The term "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, and/or any other agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, including Claims for reimbursement of payments made to Trust Claim holders who recover from the Plan Trust (**"Medicare Claims"**).

### J. Confirmation Order

The term "Confirmation Order" means a confirmation order entered by the Bankruptcy Court after a confirmation hearing upon Bankruptcy Notice, in a form and substance as required by this Agreement, which has not been stayed. The wording of the Confirmation Order shall be mutually acceptable to ADOM and London Market Insurers. The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)   confirming the Plan;

(ii) specifically and individually ordering all Persons as set forth in the Plan to act or refrain from acting as specified in the Plan;

(iii)    incorporating the terms and provisions of the Bar Order as though fully set forth therein;

(iv)  ordering the entry of the Related Entities Release and the Settling Insurers Release;

(v) ordering that ADOM is discharged from all Claims, including all Abuse and Trust Claims;

(vi) including the Insurance Neutrality provision set forth in the Plan;

(vii) including the judgment reduction language set forth in Section 8 and in the Plan; and,

(viii)   incorporating the separately entered findings of fact and conclusions of law, which are required under §§ 1129(a), and, if applicable, 105(a) and 1129(b), of the Bankruptcy Code, to confirm the Plan and as necessary to dismiss with prejudice the State Court Action, and making the following findings:

a.   This Agreement is the fruit of long-term negotiations amongst the Catholic Entities and London Market Insurers, which began in July 2012;

b.   The Plan Payment paid by London Market Insurers under the Agreement provides good and valuable consideration to ADOM's bankruptcy estate, and enables unsecured creditors such as the holders of Abuse Claims and Trust Claims to realize distributions;

c.   This Agreement is therefore an essential component of the Plan;

d.   The Subject Insurance Policies are property of ADOM's bankruptcy estate and are therefore subject to the core jurisdiction of the Bankruptcy Court;

e.   The Abuse and Trust Claims against the Related Entities are within the jurisdiction of the Bankruptcy Court because the Related Entities are insured under the same insurance policies as ADOM;

f.   Because it would be impractical to divide the Subject Insurance Policies, it was necessary for ADOM to obtain the Related Entities' participation in this Agreement;

g.   The Related Entities would not release their Interests under the Subject Insurance Policies unless they obtained the benefits of the Related Entities Release, because to do so would have left them exposed to Abuse and Trust Claims, whether or not such Claims be valid and whether or not coverage exists under the Subject Insurance Policies for such Claims;

h.   Therefore, the Related Entities Release is necessary to the Agreement;

i.   The Agreement is necessary to the Plan because it provides significant funding for the Plan, and therefore the Related Entities Release is necessary to the Plan;

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 146 of 329

j. The Related Entities Release is narrowly tailored because it requires that only Abuse and Trust Claims against the Related Entities be released; other Claims, such as contract Claims or tort Claims that are not Abuse or Trust Claims, may still be asserted against the Related Entities;

k. The Claims against the Subject Insurance Policies are within the jurisdiction of the Bankruptcy Court because the Subject Insurance Policies are property of ADOM's bankruptcy estate;

l. London Market Insurers required that they obtain the benefits of the Settling Insurers Release, as a condition of entering into this Agreement, otherwise, without such protection, there would be no reason for them to contribute the Plan Payment;

m. Therefore, the Settling Insurers Release is necessary to this Agreement and the Plan;

n. The Settling Insurers Release is narrowly tailored because it only releases Claims relating to the Subject Insurance Policies;

o. London Market Insurers repurchased the subject Insurance Policies pursuant to this Agreement. London Market Insurers did not purchase any other assets of ADOM and are not a continuation of ADOM or engaging in a continuation of ADOM's business. London Market Insurers shall not have any responsibility or liability with respect to any of ADOM's other assets; and,

p. London Market Insurers are not, and shall not be deemed to be, a successor to ADOM by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in the Agreement, the Plan, or otherwise. London Market Insurers shall not assume, or be deemed to have assumed, any liabilities or other obligations of ADOM.

The entry of the Confirmation Order containing all of the provisions set out in above sub-paragraphs (i)-(viii), but no provision that is contrary to or inconsistent with them, is a condition precedent to the performance of London Market Insurers' obligations under this Agreement.

### K.  Contribution Claim

The term "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a debt, expense, or liability of its insured in a situation where two or more policies by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

### L.  Direct Action Claim

The term "Direct Action Claim" means any Claim by any Person against London Market Insurers, which is identical or similar to, or arises out of the same or similar acts or omissions giving rise to a Trust Claim, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer.

### M.  Equitas Entities

The term "Equitas Entities" means Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Policyholders Trustee Limited, and any other company from time to time in the Equitas Group.

### N.  Extra-Contractual Claim

The term "Extra-Contractual Claim" means any Claim against London Market Insurers, seeking any type of relief, including compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs or any other type of relief, on account of bad faith; failure to provide insurance coverage under any Subject Insurance Policy; failure or refusal to compromise and settle any Claim insured under any Subject Insurance Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; under any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy. Extra-Contractual Claims include any Claim relating to London Market Insurers' (a) handling of any request for insurance coverage for any Claim; and (b) conduct relating to the negotiation of this Agreement.

O.  **Final Order**

The term "Final Order" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, review, reargue, or rehear shall have been waived in writing in form and substance satisfactory to ADOM and London Market Insurers, and their counsel or, in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order". For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("Substantial Consummation"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order.

P.  **Future Claims Representative**

The term "Future Claims Representative" or "FCR" means Stephen S. Gray, or any other representative appointed by the Court in the Bankruptcy Case with the duties and obligations set forth in the Order Pursuant to §§ 105 and 1109 of the Bankruptcy Code Appointing Stephen S. Gray as Legal Representative for Future Claimants, Dated September 20, 2013, Docket Number 2393, in the Bankruptcy Case.

Q. **Plan Trust**

The term "Plan Trust" means the trust established under the Plan, which assumes liability for, and is established to pay, in whole or in part, "Trust Claims" (as defined below), pursuant to the Plan and, if applicable, § 105 of the Bankruptcy Code.

R.  **Interests**

The term "Interests" means all liens, Claims, encumbrances, interests and other rights of any nature, whether at law or in

equity, including Abuse, Contribution, Direct Action, Extra-Contractual, Medicare and Trust Claims.

**S.  Lloyd's Underwriters**

The term "Lloyd's Underwriters" means:

(i)   All Underwriters, members, or Names at Lloyds, London (including former underwriters, members or Names) who through their participation in syndicates (including those identified on Attachment B-Section I and B-Section II), severally subscribed, each in his own proportionate share, to one or more of the Subject Insurance Policies. Lloyd's Underwriters shall also include all Underwriters, members or Names at Lloyd's, London, (including former underwriters, members and Names) whether or not they participated in the syndicates identified in Attachment B-Section I and B-Section II, who, through their participation in syndicates (including those identified on Attachment B-Section I and B-Section II) severally subscribed any of the Subject Insurance Policies in favor of the Catholic Entities: (a) the existence of which has not presently been established; or (b) the existence of which has been established but as to which identities of names, members, or syndicates are not presently known;

(ii)  All the past, present and future employees (if any), representatives, attorneys, and agents of the Persons set forth in Section 1.S.(i), and their respective predecessors and successors, if any, solely in such capacity; and,

(iii) All the respective heirs, executors, successors (including Equitas Insurance Limited ("EIL") to the extent EIL is a successor to any of the Persons identified in Section 1.S.(i) with respect to the subject matter of this Agreement), assigns (including any administrator, receiver, trustee, personal representative, or equivalent appointee/s under relevant insolvency law), reinsurers and retrocessionaires (as such) of any of the Persons identified in Section 1.S.(i).

(iv)  For the avoidance of doubt, the Underwriter Third Party Beneficiaries, who receive certain specified benefits under this Agreement, are not Lloyd's Underwriters for the purpose of this definition.

**T.** **London Market Companies**

The term "London Market Companies" means all the companies doing business in the London Insurance Market, which severally subscribed, each in its own proportionate share, one or more of the Subject Insurance Policies (such insurers are identified in Attachment B to this Agreement). London Market Companies shall also include those companies doing business in the London insurance markets (but only those companies identified in Section I of Attachment B hereto and that make the payment called for in Attachment D hereto) who subscribed any insurance policies (a) the existence of which has not presently been established but which provided insurance to the Catholic Entities or (b) the existence of which has been established but the identity of such company as a subscribing insurer is not presently known. As used herein, "companies" shall mean the named corporate entity and all predecessors, successors, affiliates, pool companies as such, and subsidiaries. It is further expressly understood that "companies" are parties to this Agreement only with respect to the policies issued or subscribed by them in the London insurance markets (as opposed to insurance markets located elsewhere).

**U.** **London Market Insurers**

The term "London Market Insurers" means Lloyd's Underwriters and the London Market Companies.

**V.** **Medicare**

The term "Medicare" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., enacted July 1, 1966, including all subsequent amendments thereto.

**W.** **Medicare Beneficiary**

The term "Medicare Beneficiary" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Trust Claim.

**X.** **MSP or Medicare Secondary Payor Act**

The term "Medicare Secondary Payor Act" or "MSP" means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 151 of 329

**Y.  MMSEA**

The term "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173)", which imposes reporting obligations on those Persons with payment obligations under the MSP.

**Z.  Person**

The term "Person" means an individual, a corporation, a partnership, an association, a trust, any other entity or organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof.

**AA.  Plan**

The term "Plan" means a plan of reorganization that contains all of the following provisions but no provision that is contrary to or inconsistent with this Agreement or any of the following provisions; allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; and does not materially and adversely affect the rights, duties, or interests under this Agreement of London Market Insurers or the Catholic Entities. The wording of the Plan shall be mutually acceptable to ADOM and London Market Insurers. The Plan shall contain provisions:

(i)  incorporating this Agreement;

(ii) prohibiting plaintiff John Doe 21 from continuing to pursue the State Court Action;

(iii)    requiring (a) ADOM to dismiss its Claims against London Market Insurers in the Declaratory Judgment Action with prejudice, within three (3) Business Days after the entry of the Confirmation Order, (b) prohibiting plaintiffs Donald Marshall and Dean Weissmuller from continuing to pursue the Declaratory Judgment Action against London Market Insurers; and (c) requiring ADOM to move, jointly with the London Market Insurers, for a dismissal with prejudice of the claims of Donald Marshall and Dean Weismuller against London Market Insurers, with prejudice, in the Declaratory Judgment Action;

(iv) barring the Plan Trust from making any payment in respect of any Trust Claim belonging to (a) John Doe 21 until the State Court Action has been dismissed,

with prejudice, and (b) Donald Marshall and Dean Weissmuller before their Claims in the Declaratory Judgment Action have been dismissed, with prejudice. The Plan Trust shall provide a certification of its compliance with this Section 1.AA.(iv) to each of the Catholic Entities and the Settling Insurers, and permit reasonable audits by such Persons, to confirm the Plan Trust's compliance with this Section 1.AA.(iv);

(v) setting forth the Related Entities Release and the Settling Insurers Release;

(vi) establishing the Plan Trust, appointing a trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

(vii) describing the role of the FCR and seeking the appointment of the FCR to continue in his duties;

(viii) channeling all allowed Trust Claims to the Plan Trust;

(ix) denominating London Market Insurers as Settling Insurers;

(x) requiring that each claimant receiving a payment from the Plan Trust sign a written general release that remises, releases, covenants not to sue, and forever discharges all Settling Insurers and the Related Entities from and against all Claims;

(xi) including judgment reduction provisions identical to Section 8;

(xii) including the following provisions:

a. It is the position of ADOM that neither the Catholic Entities, the Plan Trust, nor the Settling Insurers will have any reporting obligations in respect of their contributions to the Plan Trust, or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by Plan Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Plan Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("HHS") that neither the Insurance Litigation Trust, the Catholic Entities nor the Settling Insurers have any

reporting obligations under MMSEA with respect to payments to the Plan Trust by the Catholic Entities or the Settling Insurers or payments by the Plan Trust to claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Seventh Circuit or the United States Supreme Court), or a letter from the Secretary of Health and Human Services confirming that the Catholic Entities and the Settling Insurers have no reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Plan Trust or with respect to contributions the Catholic Entities and the Settling Insurers have made or will make to the Plan Trust, the Plan Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the Catholic Entities and the Settling Insurers, and shall timely submit all reports that would be required to be made by the Catholic Entities or any of the Settling Insurers under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Plan Trust or with respect to contributions to the Plan Trust, including reports that would be required if the Catholic Entities and the Settling Insurers were determined to be "applicable plans" for purposes of MMSEA, or any of the Catholic Entities and the Settling Insurers were otherwise found to have MMSEA reporting requirements. The Plan Trust, in its role as reporting agent for the Catholic Entities and the Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

b. If the Plan Trust is required to act as a reporting agent for the Catholic Entities or the Settling Insurers pursuant to the provisions of Section 1.AA.(xii)a., the Plan Trust shall provide a written certification to each of the Catholic Entities and the Settling Insurers within ten (10) Business Days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.AA.(xii)a. have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance,

and (b) any payments to Medicare Beneficiaries that the Plan Trust did not report to CMS.

c. With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Plan Trust shall, upon request by any Catholic Entity or any of the Settling Insurers, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however,* that the Plan Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable. With respect to any such reports, the Plan Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by the Catholic Entities or the Settling Insurers, provide the Catholic Entities or the Settling Insurers copies of such resubmissions; *provided, however,* that the Plan Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable. In the event the Plan Trust is unable to remedy any issue of noncompliance, the provisions of Section 1.AA.(xii)g. shall apply.

d. If the Plan Trust is required to act as a reporting agent for the Catholic Entities or the Settling Insurers pursuant to the provisions of Section 1.AA.(xii)a., with respect to each Claim of a Medicare Beneficiary that was paid by the Plan Trust and not disclosed to CMS, the Plan Trust shall, upon request by the ADOM or any of the Settling Insurers, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information that may be necessary in the reasonable judgment of the Catholic Entities or any of the Settling Insurers to satisfy their obligations, if any, under MMSEA, as well as the

basis for the Plan Trust's failure to report the payment. In the event the Catholic Entities or any of the Settling Insurers inform the Plan Trust that it disagrees with the Plan Trust's decision not to report a Claim paid by the Plan Trust, the Plan Trust shall promptly report the payment to CMS. All documentation relied upon by the Plan Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

e. If the Plan Trust is required to act as a reporting agent for the Catholic Entities or the Settling Insurers pursuant to the provisions of Sec Section 1.AA.(xii)a., the Plan Trust shall make the reports and provide the certifications required by Sections 1.AA.(xii)a. and b. until such time as the Catholic Entities and each of the Settling Insurers determine, in their reasonable judgment, that they have no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Plan Trust or contributions to the Plan Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.AA.(xii)a., and if the Catholic Entities or any of the Settling Insurers reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Plan Trust shall promptly perform its obligations under Sections 1.AA.(xii)a. and b.

f. Section 1.AA.(xii)a.is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the Catholic Entities and/or the Settling Insurers are in fact "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Plan Trust or contributions to the Plan Trust under MMSEA or any other statute or regulation.

g. In the event that CMS concludes that reporting done by the Plan Trust in accordance with Section 1.AA.(xii)a. is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 156 of 329

timely manner, or if CMS communicates to the Plan Trust, the Catholic Entities or any of the Settling Insurers a concern with respect to the sufficiency or timeliness of such reporting, or there appears to the Catholic Entities or any of the Settling Insurers a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 1.AA.(xii)b., c., or d., or other credible information, then each of the Catholic Entities and the Settling Insurers shall have the right to submit its own reports to CMS under MMSEA, and the Plan Trust shall provide to any party that elects to file its own reports such information as the electing party may require in order to comply with MMSEA, including the full reports filed by the Plan Trust pursuant to Section 1.AA.(xii)a. without any redactions. The Catholic Entities and the Settling Insurers shall keep any information they receive from the Plan Trust pursuant to this Section 1.AA.(xii)g. confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

    h. Notwithstanding any other provisions hereof, if the Plan Trust is required to act as a reporting agent for the Catholic Entities or the Settling Insurers, then such Persons shall take all steps necessary and appropriate as required by CMS to permit any reports contemplated by this Section 1.AA.(xii) to be filed. Furthermore, until the Catholic Entities or the Settling Insurers provide the Plan Trust with any necessary information that may be provided by the CMS's Coordination of Benefits Contractor to effectuate reporting, the Plan Trust shall have no obligation to report under Section 1.AA.(xii)a. with respect to any such Person that has not provided such information, but only so long as such Person has not provided such information; and the Plan Trust shall have no indemnification obligation under Section 1.AA.(xii)k. to Catholic Entities or any Settling Insurer for any penalty, interest, or sanction that may arise solely on account of any Catholic Entity's or any Settling Insurer's failure to timely provide such information to the Plan Trust in response to a timely request by the Plan Trust for such information.

    i. In connection with the implementation of the Plan, the Trustee(s) of the Plan Trust shall obtain

prior to remittance of funds to claimants' counsel or the claimant, if pro se, in respect of any Trust Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Trust Claim; otherwise the Plan Trust shall withhold from any payment to the claimant funds sufficient to assure that any obligations owing or potentially owing under MSP relating to such Trust Claim are paid to CMS. The Plan Trust shall provide a quarterly certification of its compliance with this Section 1.AA.(xii) to each of the Catholic Entities and the Settling Insurers, and permit reasonable audits by such Persons, no more often than quarterly, to confirm the Plan Trust's compliance with this Section 1.AA.(xii). For the avoidance of doubt, the Plan Trust shall be obligated to comply with the requirements of this Section 1.AA.(xii) regardless of whether the Catholic Entities or any of the Settling Insurers elects to file its own reports under MMSEA pursuant to Section 1.AA.(xii)g.

j. Compliance with the provisions of this Section 1.AA.(xii) shall be a material obligation of the Plan Trust in favor of the Settling Insurers under any settlement agreements between any of those insurers and ADOM, which authorizes funding to the Plan Trust.

k. The Plan Trust shall defend, indemnify and hold harmless the Catholic Entities and the Settling Insurers from any Claims in respect of Medicare Claims reporting and payment obligations in connection with Trust Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Plan Trust's obligations under Section 1.AA.(xii); and,

(xiii)     including the following provision, to be entitled "Insurance Neutrality":

The rights of the Settling Insurers under their respective settlement agreements shall be determined exclusively under such settlement agreements and those provisions of the Approval Order(s) and the Confirmation Order implementing the respective settlement agreements. Solely with respect Non-Settling Insurers, as such term is defined in the Plan, nothing in the Plan, any exhibit to the Plan,

any confirmation order, or any other order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (a) shall affect, impair or prejudice the rights and defenses of any insurer, any Catholic Entity, the Plan Trust, or any other insureds under any insurance policy in any manner; (b) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any insurance policy in any respect; (c) shall be a determination of the reasonableness of the Plan or any settlement embodied by the Plan, in any way whatsoever; (d) shall be subject to, controlled or affected by, *UNR Ind. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991); or (e) shall otherwise determine the applicability or nonapplicability of any provision of any insurance policy and any such rights and obligations shall be determined under the insurance policy and applicable law. Additionally, any action against any insurer related to any insurance policy (except with respect to those actions enjoined by the injunctions set forth in the Plan) shall be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided, however,* that nothing herein waives any right of any Catholic Entity, the Plan Trust, or any insurer to require arbitration to the extent the relevant insurance policy provides for such.

For purposes of this Agreement, the term "Plan" includes all documents, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Plan Trust.

**BB.** <u>**Plan Payment**</u>

The term "Plan Payment" means the payment by the London Market Insurers to ADOM's bankruptcy estate of a sum equal to fifty percent (50%) of their respective, allocated, several shares of the Settlement Amount, as set forth on Attachment D, for the releases and other provisions contained in this Agreement.

**CC.  Related Entities**

The term "Related Entities" means:

(i)  Those Persons listed on Attachment E, their predecessors and successors; all their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and,

(ii) any other Person that was in the past or is now affiliated with, related to or associated with the Related Entities including any corporations that have been acquired by, merged into or combined with a Related Person or its predecessors, or the Related Entities' past and present subsidiaries, affiliates, successors and assigns; *provided, however*, Persons within the definition of "ADOM" are not within the definition of "Related Entities".

**DD.  Related Entities Release**

The term "Related Entities Release" means the release, remise, and discharge of all Abuse and Trust Claims by all Persons who now hold or in the future may hold such Claims, pursuant to § 105 of the Bankruptcy Code.

**EE.  Resolute**

The term "Resolute" means Resolute Management Services Limited (formerly known as Equitas Management Services Limited).

**FF.  Settlement Amount**

The term "Settlement Amount" means the gross sum of Eight Million United States Dollars ($8,000,000), which comprises the Buy-Back Payment and the Plan Payment.  Each London Market Insurer shall pay its respective, allocated several share pursuant to the terms of Section 2.  Each London Market Insurer's respective, allocated several share of the Settlement Amount is set forth on Attachment D.

**GG.  Settling Insurers**

The term "Settling Insurers" means London Market Insurers and any other insurer of ADOM that settles after the Petition Date and which seeks and obtains the protection of the Settling Insurers Release as part of its settlement with ADOM.

**HH.  Settling Insurers Release**

The term "Settling Insurers Release" means the release, remise, and discharge of all Claims relating to the Subject Insurance Policies, including all Abuse, Contribution, Direct Action, Extra-Contractual, Medicare and Trust Claims, by all Persons who now hold or in the future may hold such Claims against the Settling Insurers, pursuant to § 105 of the Bankruptcy Code.

**II.  Subject Insurance Policies**

The term "Subject Insurance Policies" means:  (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies subscribed by one or more of the London Market Insurers and providing insurance to the Catholic Entities whether or not listed in Attachment A hereto.

**JJ.  Trust Claims**

The term "Trust Claims" means (a) all Abuse Claims; and (b) all other Claims against ADOM or any of the Settling Insurers, the liability for which is transferred to the Plan Trust.

**KK.  Underwriter Third-Party Beneficiaries**

The term "Underwriter Third-Party Beneficiaries" means:

(i)  Resolute and the Equitas Entities;

(ii)  EIL to the extent it is not a successor to the Persons identified in Section 1.S.(i) with respect to the subject matter of this Agreement;

(iii) Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their claims handling agent and/or service provider, solely in such capacity;

(iv)  The past, present and future reinsurers and retrocessionaires of the Equitas Entities or any of them, including National Indemnity Company and any other Person from time to time controlled (whether directly or indirectly), by Berkshire Hathaway, Inc., that provides retrocessional reinsurance to any one or more of the Equitas Entities, solely in such capacity;

(v)  All past, present and future trustees, officers, directors, employees, subsidiaries, affiliates,

representatives, attorneys and agents of the Persons set forth in Sections 1.KK.(i) to (iv) (inclusive), if any, solely in such capacity; and,

(vi) The respective heirs, executors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise) or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in Sections 1.KK.(i) to (v) (inclusive) above.

## 2. **Payment of the Settlement Amount**

The total of the Settlement Amount shall be paid upon the completion of two separate steps. The first step shall be the sale of the Subject Insurance Policies back to London Market Insurers, pursuant to §§ 363(b), (f), and (m) and, if applicable, 105(a) of the Bankruptcy Code, and Bankruptcy Rules 6004 and 9019, free and clear of all Claims and Interests of all Persons. Bankruptcy Notice of the sale shall be given as required by the Bankruptcy Code or as ordered by the Bankruptcy Court. If, after a hearing, the Bankruptcy Court does not enter an approval order that meets the definition of "Approval Order" set forth in Section 1.C., this Agreement shall terminate automatically and become void. If, after a hearing, the Bankruptcy Court enters the Approval Order and subsequently enters the Confirmation Order, then, except as provided below, on the date that is thirty (30) Business Days after the first Business Day after the date that the Confirmation Order becomes a Final Order, London Market Insurers shall pay to the Plan Trust the Buy-Back Payment. The Buy-Back Payment shall be used by the Plan Trust for the payment of Trust Claims.

The second step shall be the Confirmation Order becoming a Final Order. If, after a confirmation hearing upon Bankruptcy Notice, the Bankruptcy Court does not enter a confirmation order that meets the definition of "Confirmation Order" set forth in Section 1.J., London Market Insurers, in their sole discretion, may either: (a) terminate this Agreement, at which point it will become void; or (b) continue this Agreement in effect temporarily while the Parties attempt to negotiate an alternative settlement that could be incorporated into a different plan of reorganization for confirmation by the Bankruptcy Court or an alternative Confirmation Order. If, after a confirmation hearing upon Bankruptcy Notice, the Bankruptcy Court enters a confirmation order that meets the definition of "Confirmation Order" set forth in Section 1.J., and the Confirmation Order subsequently becomes a Final Order,

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 162 of 329

then, except as provided below, on the date that is thirty (30) Business Days after the first Business Day after the date that the Confirmation Order becomes a Final Order, London Market Insurers shall pay to the bankruptcy estate of ADOM the Plan Payment. The Plan Payment may be used by the bankruptcy estate of ADOM for any legal purpose, including the payment of administrative expenses incurred by ADOM (including ADOM's share of any mediation-related costs, fees, and expenses).

No London Market Insurer entitled to the benefits of this Agreement shall have obligation to pay any amount set forth in Attachment C.

In the event that any Catholic Entity later agrees that any individual London Market Insurer listed in Attachment B may make a lesser payment or may make its payment on terms which differ from the foregoing, then the Catholic Entities shall offer the same payment terms to all other London Market Insurers listed in Attachment B. It is the purpose of this provision to ensure that all London Market Insurers listed in Attachment B shall have the same payment terms.

On the date that the Bankruptcy Court enters the Confirmation Order, the sale, assignment, and transfer of the Subject Insurance Policies by the Catholic Entities to London Market Insurers free and clear of all Interests of all Persons, including the Catholic Entities, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

If, before the Settlement Amount has been paid in full, a Related Entity becomes a debtor in a bankruptcy case or insolvency proceeding, under the Bankruptcy Code or otherwise, and any London Market Insurer has not satisfied its respective several payment obligation, then such London Market Insurers shall be excused from performance under this Agreement until such time as such Related Entity obtains, subject to the limitations imposed by the Bankruptcy Code and subject to the equitable powers of the Bankruptcy Court, an order from the Bankruptcy Court approving this Agreement under § 363(b), (f) and (m) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 and authorizing the assumption by such Parish or Related Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("Assumption"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof. Each Related Entity agrees that in the event of a

bankruptcy or other insolvency proceeding, it will not present any Claim for payment under this Agreement to any London Market Insurer, until such time as such Related Entity has made such Assumption and such Assumption has been approved by an order of the Bankruptcy Court or other applicable court, and such order has become a Final Order.

### 3. **Several Liability**

The Catholic Entities acknowledge that the obligations of the London Market Insurers are several, and not joint. The Catholic Entities agree that no London Market Insurer entitled to the benefits of this Agreement shall be liable for any settlement amount allocable to any other London Market Insurer. Accordingly, each identified London Market Insurer listed in Section I of Attachment B agrees to pay only its individual, respective, allocated share of the settlement amount, which amount is set forth in Attachment D, as applicable. The Catholic Entities shall not seek to recover from any individual London Market Insurer an amount in excess of its stated, respective, allocated share as set forth in Attachment D. Upon receipt of payment, the Catholic Entities shall be deemed to have released each paying London Market Insurer pursuant to the terms of Section 4 of this Agreement.

### 4. **Mutual Releases**

1. By the Catholic Entities

Upon the Plan Trust's receipt of each London Market Insurer's respective Buy-Back Payment, each Catholic Entity, and any subsequently appointed trustee or representative acting for each Catholic Entity, shall be deemed to remise, release, covenant not to sue, and forever discharge the following: (i) the London Market Insurer making such payment; (ii) each of that London Market Insurer's present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity and; (iii) the respective heirs, executors, administrators, successors, assigns and reinsurers (as such) of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all Claims that each Catholic Entity ever had, now has, or hereafter may have from the beginning of time to the date that the Confirmation Order becomes a Final Order ("Release").

Those London Market Insurers entitled to the Release but not identified on Attachment B to this Agreement, namely, those

Underwriters at Lloyd's and those London Market Companies described in the definition of London Market Insurers as Persons which subscribed a Subject Insurance Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of the Release (and to the Indemnity set forth in Section 5), one-hundred twenty (120) days after the Plan Trust's first receipt of a Buy-Back Payment described in Section 2.

It is the intention of each Catholic Entity to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies with respect to any past, present, or future Claims and to assure the settling London Market Insurers their peace and freedom from such Claims and from all assertions of rights in connection with such Claims, including the amounts set forth on Attachment C; *provided, however,* nothing in this Agreement shall affect the rights of the Catholic Entities to collect the amounts listed on Attachment C from those insurance companies listed on Attachment C.

Upon the Plan Trust's receipt of each London Market Insurer's respective Buy-Back Payment, any and all rights, duties, responsibilities, and obligations of such London Market Insurer created by or in connection with the Subject Insurance Policies is hereby terminated. As of the date of such payment the Catholic Entities have no insurance coverage under the Subject Insurance Policies. The Release is intended to operate as though the London Market Insurers which pay their respective Buy-Back Payments had never subscribed the Subject Insurance Policies.

The Release extends to all those London Market Insurers that subscribed any of the Subject Insurance Policies, which include both known and unknown policies. The Release also extends to all those London Market Companies identified in Section I of Attachment B that pay their respective Buy-Back Payments as regards their subscription of any of the Subject Insurance Policies, which include both known and unknown policies.

The Release also extends to the Underwriter Third-Party Beneficiaries, all of which are third-party beneficiaries of the terms of the Release.

Each Catholic Entity understands and acknowledges that by signing this Agreement, it, among other things, is releasing all Claims against the London Market Insurers, including Claims that it does not know or suspect to exist in its favor, which, if

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 165 of 329

known by such Catholic Entity, must have materially affected its settlement with the London Market Insurers, and expressly waives all rights it might have under any federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

Each Catholic Entity expressly assumes the risk that acts, omissions, matters, causes or things may have occurred which it does not know or does not suspect to exist. Each Catholic Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (i) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or, (ii) which restricts or prohibits the releasing of such claims.

2.   By London Market Insurers

At the same time the Release described in Section 4.A. becomes effective, each London Market Insurer so released, and any subsequently appointed trustee or representative acting for such London Market Insurer shall be deemed to remise, release, covenant not to sue, and forever discharge:  (i) each Catholic Entity; (ii) each of such Catholic Entity's present and former officers, directors, employees, partners, limited partners, shareholders,       members,       subsidiaries,       affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity; and (iii) the respective heirs, executors, administrators, successors, and assigns of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all Claims, which each such London Market Insurer ever had, now has or hereinafter may have from the beginning of time to the date that the Confirmation Order becomes a Final Order.

It is the intention of each London Market Insurer released under the Release to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

**5. <u>Indemnification</u>**

A.   The Plan Trust shall indemnify and hold harmless London Market Insurers in respect of any and all Claims arising under or relating in any way to the Subject Insurance Policies, including all Claims, whether Abuse, Contribution, Direct Action, Extra-Contractual, Medicare or Trust Claims, or otherwise, made by:   (i) other insurers of the Catholic Entities; (ii) any Person claiming to be insured under the Subject Insurance Policies; (iii) any Person who has made, will

or can make a Claim; (iv) any Person who has acquired or been assigned the right to make a Claim under the Subject Insurance Policies; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof, including the State of Minnesota, pursuant to the Minnesota Landfill Cleanup Act, Minn. Stat. § 115B.39 *et seq*. or the Minnesota Insurance Recovery Act of 1996, Minn. Stat. § 115B.441 *et seq*. This indemnification includes Claims made by Persons over whom the Plan Trust does not have control, including the Catholic Entities, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who asserts Claims against or rights to coverage under the Subject Insurance Policies. For purposes of the indemnification obligation of the Plan Trust, the term "Claim" also includes amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise.

B. The London Market Insurers shall have the right to defend, with counsel of their choice, all Claims identified under Section 5.A. London Market Insurers may begin the defense of any Claim upon receipt of such a Claim. London Market Insurers agree to notify the Plan Trust as soon as practicable of Claims identified under Section 5.A. and of its choice of counsel.

C. The Plan Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the London Market Insurers in defending such Claims. London Market Insurers shall defend any such Claim in good faith. In defense of any such Claim, London Market Insurers may settle or otherwise resolve a Claim without the prior consent of the Plan Trust.

D. This indemnification and hold harmless undertaking (Sections 5.A., B. and C.) shall also extend to the benefit of the Underwriter Third-Party Beneficiaries, all of which are third-party beneficiaries of the terms of this indemnification and hold harmless undertaking.

## 6. **Bankruptcy Obligations**

A. ADOM shall provide to London Market Insurers an initial draft of the proposed approval order, proposed findings of fact and conclusions of law in support of the Approval Order, and the proposed bar order twenty (20) days before ADOM submits the foregoing to the Bankruptcy Court, so that London Market Insurers may provide comments and suggestions. In the event that ADOM makes material revisions to any of the foregoing documents, then, as soon as possible, ADOM shall provide a copy

of such material revisions to London Market Insurers. London Market Insurers reserve the right to object to, inter alia, (i) any proposed approval order or findings of fact and conclusions of law in support thereof that do not satisfy all of the requirements of the definition of "Approval Order" set forth in Section 1.C., and (ii) any proposed bar order that does not satisfy all of the requirements of the definition of "Bar Order" set forth in Section 1.E.

B.   ADOM shall provide to London Market Insurers an initial draft of the proposed confirmation order and proposed findings of fact and conclusions of law in support of the confirmation order twenty (20) days before ADOM submits the foregoing to the Bankruptcy Court, so that London Market Insurers may provide comments and suggestions. In the event that ADOM makes material revisions to any of the foregoing documents, then, as soon as possible, ADOM shall provide a copy of such material revisions to London Market Insurers. London Market Insurers reserve the right to object to, inter alia, any proposed confirmation order or findings of fact and conclusions of law in support thereof that do not satisfy all of the requirements of the definition of "Confirmation Order" set forth in Section 1.J.

C.   ADOM shall provide to London Market Insurers an initial draft of the proposed plan of reorganization and proposed findings of fact and conclusions of law in support of the plan of reorganization ten (10) days before ADOM submits the foregoing to the Bankruptcy Court, so that London Market Insurers may provide comments and suggestions. In the event that ADOM makes material revisions to any of the foregoing documents, then, as soon as possible, ADOM shall provide a copy of such material revisions to London Market Insurers. London Market Insurers reserve the right to object to, inter alia, any proposed plan of reorganization or findings of fact and conclusions of law in support thereof that do not satisfy all of the requirements of the definition of "Plan" set forth in Section 1.AA. ("Non-Compliant Plan"). If ADOM proposes a Non-Compliant Plan, then London Market Insurers may contest such plan, and ADOM shall not request a hearing date on confirmation of such plan which is less than one hundred and twenty (120) Business Days after the date upon which such plan is filed in the Bankruptcy Court.

D.   ADOM will seek entry of the Confirmation Order together with supporting findings of fact and conclusions of law as set forth in Section I.J., including any required findings and conclusions under the Bankruptcy Code.

E. ADOM shall serve Bankruptcy Notice of the hearing(s) on confirmation of the Plan and approval of this Agreement and the time for filing objections thereto. The proposed form of notice shall be submitted to London Market Insurers for their approval no later than ten (10) days prior to the actual service of notice, such approval not to be unreasonably withheld.

F. In the event that any Person attempts to prosecute a Claim against London Market Insurers before the Confirmation Order becomes a Final Order, including an Abuse Claim, a Contribution Claim, a Direct Action Claim, an Extra-Contractual Claim, a Medicare Claim, a Trust Claim, a Claim relating to the Subject Insurance Policies, or a Claim made, or that could have been made, in the Coverage Litigation, then promptly following notice from London Market Insurers to do so, ADOM will file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code S 105(a), staying such Claims until the date that the Confirmation Order becomes a Final Order, or, alternatively, this Agreement is terminated under Section 2. *Provided, however*, if ADOM is unable to obtain a stay of any such action pending the confirmation of the Plan, and a claimant obtains a judgment against London Market Insurers, then ADOM and London Market Insurers agree that ADOM may, at its sole option, agree to reduce the Settlement Amount by the amount of any such judgment or, if ADOM does not reduce the Settlement Amount, London Market Insurers may terminate this Agreement, at which time it shall become void.

G. In the event that any Person attempts to prosecute an Abuse or Trust Claim against any Related Entity before the Confirmation Order becomes a Final Order, then promptly following notice from such Related Entity to do so, ADOM will file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code § 105(a), staying such Claims until the date that the Confirmation Order becomes a Final Order, or, alternatively, this Agreement is terminated under Section 2.

## 7. <u>Representations and Warranties</u>

A. ADOM represents and warrants that the notice required under the definition of "Bankruptcy Notice" includes all claimants whose names and addresses are known to ADOM or are readily ascertainable.

B. ADOM acknowledges and warrants that no Person other than a Catholic Entity has legal title or rights as an insured,

other insured, or otherwise insured or claims to be insured under the Subject Insurance Policies.

C.    Each Catholic Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation.

D.    ADOM represents and warrants that each Catholic Entity has the authority to execute this Agreement as a binding and legal obligation.

E.    Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

F.    Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

## 8. **Judgment Reduction Clause.**

A.    In any proceeding, suit, or action, including the Declaratory Judgment Action, to the extent the Declaratory Judgment Action remains pending against insurers that are not Settling Insurers and is assigned to the Plan Trust pursuant to the Plan, involving the Plan Trust and one or more other insurers, where any insurer has asserted, asserts, or could assert any Contribution Claim against a London Market Insurer, then any judgment obtained by the Plan Trust against such other insurer shall be automatically reduced by the amount, if any, that the London Market Insurers would have been liable to pay such other insurer as a result of that insurer's Contribution Claim so that the Contribution Claim by such other insurer against such London Market Insurer is thereby satisfied and extinguished entirely.   In order to effectuate this clause in any action against another insurer where London Market Insurers are not parties, the Plan Trust shall obtain a finding from that court of what amount such London Market Insurers would have been required to pay such other insurer under its Contribution Claim, before entry of judgment against such other insurer.

B.    In any settlement agreement between the Plan Trust and another insurer, where such insurer has asserted, asserts, or could assert any Contribution Claim against a London Market Insurer, then any settlement amount agreed by the settling parties shall be automatically reduced by the amount, if any, that such London Market Insurer would have been liable to pay

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 170 of 329

such other insurer as a result of that insurer's Contribution Claim so that the Contribution Claim by such other insurer against such London Market Insurer is thereby satisfied and extinguished entirely. In the event that the settling parties are unable to agree on the amount of the Contribution Claim being extinguished, the settling parties shall obtain a finding from the Court of what amount such London Market Insurer would have been required to pay such other insurer under its Contribution Claim.

C. Each London Market Insurer agrees that it will not pursue any Contribution Claim that it might have against any insurer (a) described in Sections 8.A. or B., whose Contribution Claim against London Market Insurers is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against London Market Insurers. Notwithstanding the foregoing, if a Person pursues a Contribution Claim against a London Market Insurer, then such London Market Insurer shall be free to assert its Contribution Claims against such Person.

D. The Plan Trust shall use its best efforts to obtain from all other insurers with which it executes a settlement after the date this Agreement has been fully executed, agreements similar to those contained in this Section 8.

## 9. Reasonably Equivalent Value

The Parties acknowledge and agree that: (i) this Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations; (ii) based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Declaratory Judgment Action, the payments received by the Plan Trust pursuant to this Agreement constitute a fair and reasonable settlement of ADOM's Claims asserted in the Declaratory Judgment Action, and the Claims raised in the Dispute; (iii) the payments and other benefits received under this Agreement by the Plan Trust and the Catholic Entities constitute reasonably equivalent value for the Release, indemnity, and other benefits received by London Market Insurers under this Agreement; and (iv) this Agreement constitutes a full and final resolution of all issues in the Declaratory Judgment Action.

## 10. Confidentiality

Except as necessary to obtain approval of this Agreement in the Bankruptcy Court, the Parties agree that all matters

relating to the terms, negotiation, and implementation of this Agreement shall be confidential and are not to be disclosed except by order of court or agreement, in writing, of the Parties, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of any London Market Insurers directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future, including any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons acting for such insurer. This Agreement may also be disclosed, as required, to the Inland Revenue, the Internal Revenue Service or other U.S. or U.K. governmental authority that properly requires disclosure, or as otherwise required by law.

In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Agreement prevents such disclosure. In the event such private litigant seeks an Order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall immediately give written notice by facsimile or hand-delivery to the other Party, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice shall be made under this paragraph to the persons identified in Section 16.

Material protected by this paragraph shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## 11. __Co-operation__

The Catholic Entities will undertake all reasonable actions to co-operate with London Market Insurers in connection with their respective reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers. Furthermore, the Parties shall use their reasonable

best efforts and cooperate as necessary or appropriate to effectuate the objectives of this Agreement.

## 12. **Non-Prejudice and Construction of Agreement**

This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the policies that are the subject of the Declaratory Judgment Action.

This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by London Market Insurers with regard to other insureds, and without prejudice with regard to positions taken by the Catholic Entities with regard to other insurers. Except for the express references to the Underwriter Third-Party Beneficiaries herein, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will assert that any ambiguity in this agreement shall be construed against another Party.

If any provision of the Plan, or any trust agreement or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. Neither the Plan nor any trust agreement shall be construed or interpreted to modify or affect any rights or obligations of London Market Insurers under this Agreement.

## 13. **No Modification**

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties.

## 14. **Execution**

There will be two signed originals of this Agreement.

## 15. <u>Governing Law</u>

This Agreement shall be governed by and shall be construed in accordance with the laws of Wisconsin.

## 16. <u>Notices</u>

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the following person:

| | |
|---|---|
| ADOM: | Archbishop Jerome E. Listecki<br>Archdiocese of Milwaukee<br>3501 South Lake Drive<br>Milwaukee, WI 53207-0912 |
| | Mr. John J. Marek, Chief<br>Financial Officer<br>Archdiocese of Milwaukee<br>3501 South Lake Drive<br>Milwaukee, WI 53207-0912 |
| With copies to: | Whyte Hirschboeck Dudek S.C.<br>Daryl L. Diesing, Esq.<br>555 East Wells Street<br>Suite 1900<br>Milwaukee, WI 53202-3819<br>Tel: 414.978.5523 |
| THE RELATED ENTITIES LISTED ON EXHIBIT F: | Foley & Lardner LLP<br>Thomas L. Shriner, Jr., Esq.<br>777 East Wisconsin Avenue<br>Milwaukee, WI 53202-5306<br>Tel: 414.297.5601 |
| EACH RELATED ENTITY LISTED ON EXHIBIT G | THE RESPECTIVE OFFICE AND/OR PERSON LISTED ON EXHIBIT G AS APPROPRIATE FOR NOTICE FOR SUCH ENTITY |
| LONDON MARKET INSURERS | |
| For Resolute: | Martin Futter, Esq. LLB (Hons)<br>PGDip (LPC)<br>Account Manager<br>Resolute Management Ltd.<br>London Underwriting Centre |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 174 of 329

```
                                    6th Floor, 3 Minster Court
                                    Mincing Lane
                                    London EC3R 7DD
                                    England
                                    Tel: +44 (0) 207 342 2455

For Company Leader:                 Steve Paton
                                    Senior Claims Handler
                                    Dominion Insurance Company
                                    6th Floor
                                    5-10 Bury Street
                                    London
                                    EC3A 5AT
                                    England
                                    Tel: + 44 (0) 207 256 3980

With copies to:                     Catalina J. Sugayan, Esq.
                                    Sedgwick LLP
                                    One North Wacker Drive
                                    Suite 4200
                                    Chicago, IL 60606-2841
                                    Tel: 312.849.1974

                                    Russell W. Roten, Esq.
                                    Duane Morris LLP
                                    865 South Figueroa Street
                                    Suite 3100
                                    Los Angeles, CA 90017-5450
                                    Tel: 213.689.7439
```

This Agreement, including the attachments, constitutes the entire Agreement between London Market Insurers and the Catholic Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect thereto.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement by their duly authorized representatives.

The London Market Insurers identified in Section I of Attachment B have respectively designated Sedgwick LLP as their attorneys-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

[Signature Pages Follow]

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 175 of 329

Signed:_____
     Archdiocese of Milwaukee


Signed:_____
     (For the London Market Insurers)



Signed:_____
     (Statutory Designee)

Most Reverend Archbishop Jerome E.
Listecki, pursuant to Wisconsin
Statutes section 187.19(11), on behalf
of defunct or dissolved Roman Catholic
churches, or related societies or
religious corporations, specifically
including but not limited to
Consolidated School District, Holy
Angels (Milwaukee), Mary Help of
Christians (West Allis), Our Lady of
Mt. Carmel (West Allis), St. Agnes
(Milwaukee), St. Anne (Milwaukee), St.
Boniface (Milwaukee), St. Emeric
(Milwaukee), St. Gall (Milwaukee), St.
Gerard (Milwaukee), St. John de Nepomuc
Parish (Milwaukee), St. Joseph (West
Allis), St. Leo (Milwaukee), and St.
Therese (Powers Lake)

Annunciation Congregation
(Fox Lake) (a/k/a
Annunciation Parish), on its
own behalf and as successor
in interest to the insurance
rights of to St. Gabriel
(Randolph), St. Mary's (Fox
Lake), and St. Mary's (Lost
Lake)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Blessed Sacrament
Congregation (Milwaukee)
(a/k/a Blessed Sacrament
Parish), on its own behalf
and as successor in interest
to the insurance rights of
Corpus Christi (Milwaukee),
Mother of Perpetual Help
(Milwaukee), Our Lady of
Sorrows (Milwaukee), St.
Philip Neri (Milwaukee), and
St. Stephen (Milwaukee)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Blessed John Paul II
Congregation (Milwaukee)
(a/k/a Blessed John Paul II
and Holy Wisdom), on its own
behalf and as successor in
interest to the insurance
rights of St. Alexander
(Milwaukee), St. Helen
(Milwaukee), and St. John
Kanty (Milwaukee)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Blessed Teresa of Calcutta
Congregation (North Lake)
(a/k/a Blessed Teresa of
Calcutta), on its own behalf
and as successor in interest
to the insurance rights of St.
Clare (North Lake) and St.
John (Monches)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Blessed Savior Parish
(Milwaukee)(a/k/a Blessed
Savior School), on its own
behalf and as successor in
interest to the insurance
rights of Corpus Christi
(Milwaukee), Mother of
Perpetual Help (Milwaukee),
Our Lady of Sorrows
(Milwaukee), St. Philip Neri
(Milwaukee), and St. Stephen
(Milwaukee)

Calvary Cemetery (Fond du Lac)

By: _____
    (Name)
Title: _____
Date: _____, 2015

By: _____
    (Name)
Title: _____
Date: _____, 2015

Blessed Trinity Congregation
(Sheboygan Falls) (a/k/a
Blessed Trinity), on its own
behalf and as successor in
interest to the insurance
rights of St. George (St.
George) and St. Mary
(Sheboygan Falls) and St.
Rose Lima (Sheboygan Falls)

Congregation of St. John's
Cathedral (Milwaukee) (a/k/a
Cathedral of St. John the
Evangelist)

By: _____
    (Name)
Title: _____
Date: _____, 2015

By: _____
    (Name)
Title: _____
Date: _____, 2015

Catholic Charities of the
Archdiocese of Milwaukee, Inc.
(a/k/a Catholic Charities and
Catholic Social Services;
f/k/a Catholic Social Services
of the Archdiocese of
Milwaukee, Inc. And Catholic
Social Welfare Bureau)

Calvary Cemetery
Calvary Cemetery, Sheboygan,
Wisconsin (a/k/a Calvary
Cemetery)

By: _____
    (Name)
Title: _____
Date: _____, 2015

By: _____
    (Name)
Title: _____
Date: _____, 2015

Catholic Cemetery Assoc. of
Racine, Inc.

By:_____
    (Name)
Title:_____
Date:_____, 2015

All Saints Catholic East
School System, Inc. (a/k/a
Catholic East Elementary)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Christ Child Christian
Formation Ministry, Inc.
(a/k/a Christ Child Academy)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Catholic Memorial High School
of Waukesha, Inc.(a/k/a
Catholic Memorial High School)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Christ King Congregation
(Wauwatosa)(a/k/a Christ King
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Consolidated Parochial
Elementary School Johnsburg
Marytown-Mt. Calvary-St.
Cloud, Inc. (a/k/a
Consolidated Parochial
Elementary)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Good Shepherd Congregation
(Eden) (a/k/a Congregation of
Good Shepherd), on its own
behalf and as successor in
interest the insurance rights
of to Our Lady of Angels
(Armstrong) and St. Mary
(Eden) and St. Michael
(Dotyville) and St. Michael
(Mitchell)

DeSales Preparatory Seminary,
Inc. (a/k/a DeSales Prep/ACCC)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Divine Savior Congregation
(Fredonia) (a/k/a Divine
Savior), on its own behalf and
as successor in interest to
the insurance rights of Holy
Cross (Holy Cross) and Mother
of Sorrows (Little Kohler) and
St. Mary (Belgium) and St.
Rose of Lima (Fredonia)

Cristo Rey Congregation
(Racine) (a/k/a Cristo Rey
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Divine Mercy Congregation
(South Milwaukee) (a/k/a
Divine Mercy), on its own
behalf and as successor in
interest to the insurance
rights of St. John (South
Milwaukee) and St. Mary
(South Milwaukee) and St.
Sylvester (South Milwaukee)
and St. Adalbert (South
Milwaukee)

Gesu Parish Inc.
(Milwaukee)(a/k/a Gesu Parish)

By:_____

By:_____

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 180 of 329

```
                  (Name)                      (Name)
Title:_____        Title:_____
Date:_____, 2015   Date:_____, 2015
```

Good Shepherd Congregation
(Menomonee Falls (a/k/a Good
Shepherd Parish)

```
By:_____           By:_____
     (Name)                        (Name)
Title:_____        Title:_____
Date:_____, 2015   Date:_____, 2015
```

Congregation of the Holy
Assumption (West Allis) (a/k/a
Holy Assumption Parish)

Holy Family Congregation (Fond
Du Lac) (a/k/a Holy Family),
on its own behalf and as
successor in interest to the
insurance rights of Sacred
Heart (Fond Du Lac) and St.
Joseph (Fond Du Lac) and St.
Louis (Fond Du Lac) and St.
Patrick (Fond Du Lac) and St.
Peter (Whitewater)

Congregation of the Holy
Apostles (New Berlin (a/k/a
Holy Apostles Parish)

```
By:_____           By:_____
     (Name)                        (Name)
Title:_____        Title:_____
Date:_____, 2015   Date:_____, 2015
```

Holy Cross Parish (Bristol),
on its own behalf and as
successor in interest to the
insurance rights of Holy Name
of Jesus (Wilmot) and St.
Scholastica (Bristol)

Holy Family Congregation
(Whitefish Bay) (a/k/a Holy
Family Parish)

```
By:_____           By:_____
     (Name)                        (Name)
Title:_____        Title:_____
Date:_____, 2015   Date:_____, 2015
```

Congregation of the Holy
Family (Reeseville)(a/k/a
Holy Family Parish)

Holy Sepulcher Cemetery

```
By:_____           By:_____
```

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 181 of 329

(Name)
Title: _____
Date: _____, 2015

Congregation of the Holy Name
(Sheboygan) (a/k/a Holy Name
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Holy Trinity Congregation
(Kewaskum (a/k/a Holy Trinity
Parish), on its own behalf
and as successor in interest
to the insurance rights of
St. Bridget (Wayne) and St.
Mathias (Auburn)

By: _____
    (Name)
Title: _____
Date: _____, 2015

The Congregation of the
Immaculate Conception
(Milwaukee) (a/k/a Immaculate
Conception Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Immaculate Conception
Congregation (Sheboygan)
(a/k/a Immaculate Conception
Parish)

By: _____
    (Name)

(Name)
Title: _____
Date: _____, 2015

Holy Trinity Congregation
(Newburg) (a/k/a Holy Trinity
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Congregation of the Immaculate
Conception (Burlington)(a/k/a
Immaculate Conception Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Congregation of the Immaculate
Conception (West Bend) (a/k/a
Immaculate Conception Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Lumen Christi Congregation
(Mequon) (a/k/a Lumen
Christi), on its own behalf
and as successor in interest
to the insurance rights of St.
Cecilia (Thiensville) and St.
James (Mequon)

By: _____
    (Name)

Title: _____
Date: _____, 2015

Immaculate Heart of Mary
Congregation (West Allis)
(a/k/a Immaculate Heart of
Mary)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Mary Queen of Heaven
Congregation (West Allis)
(a/k/a Mary Queen Of Heaven
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

M.H.S., Inc. (a/k/a Messmer
High School)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Mother of Good Counsel
Congregation (Milwaukee)
(a/k/a Mother of Good Counsel
Parish)

By: _____
    (Name)
Title: _____

Title: _____
Date: _____, 2015

Mary Queen of Saints Catholic
Academy

By: _____
    (Name)
Title: _____
Date: _____, 2015

Milwaukee Catholic Press
Apostolate (a/k/a Milwaukee
Catholic Press/Cath Herald The
Catholic Herald)

By: _____
    (Name)
Title: _____
Date: _____, 2015
Nativity of the Lord
Congregation (Cudahy)(a/k/a
Nativity of the Lord), on its
own behalf and as successor
the insurance rights of in
interest to Holy Family
(Cudahy) and St. Frederick
(Cudahy) and St. Joseph
(Cudahy)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Milwaukee Archdiocesan Office
for World Mission, Inc.
(Milwaukee)(a/k/a Office for
World Missions)

By: _____
    (Name)
Title: _____

Date: _____, 2015                Date: _____, 2015

                                             Our Lady of Divine Providence
                                             Congregation (Milwaukee)
                                             (a/k/a Our Lady Of Divine
                                             Providence), on its own behalf
                                             and as successor in interest
                                             to the insurance rights of St.
                                             Casimir (Milwaukee) and St.
                                             Mary of Czestochowa Church
Northwest Catholic School                    (Milwaukee)

By: _____                By: _____
    (Name)                                       (Name)
Title: _____                Title: _____
Date: _____, 2015                Date: _____, 2015


                                             Our Lady of Guadalupe
                                             Congregation (Milwaukee)
                                             (a/k/a Our Lady of Guadalupe)
                                             on its own behalf and as
                                             successor in interest to the
St. Mary's Congregation                      insurance rights of St.
(Milwaukee) (a/k/a Old St.                   Wenceslaus (Milwaukee)
Mary and St. Mary's (Old)
Church) (Milwaukee)

By: _____                By: _____
    (Name)                                       (Name)
Title: _____                Title: _____
Date: _____, 2015                Date: _____, 2015

Our Lady of Good Hope
Congregation (Milwaukee)                     Our Lady of Mount Carmel
(a/k/a Our Lady of Good Hope                 (Kenosha) (a/k/a Our Lady of
Parish)                                      Mt Carmel Parish)

By: _____                By: _____
    (Name)                                       (Name)
Title: _____                Title: _____
Date: _____, 2015                Date: _____, 2015

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 184 of 329

Our Lady of Lourdes
Congregation (Milwaukee)
(a/k/a Our Lady of Lourdes
Parish)

Congregation of Our Lady of
the Lakes (Random Lake) (a/k/a
Our Lady of the Lakes), on its
own behalf and as successor in
interest to the insurance
rights of St. Mary (Cascade)
and St. Mary (Random Lake) and
St. Nicholas (Dacada) St.
Patrick (Adell)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Congregation of the Holy
Rosary of Pompeii (Kenosha)
(a/k/a Our Lady of the Holy
Rosary and Our Lady of
Rosary)

Our Risen Savior
Congregation)(Woodhull) (a/k/a
Our Risen Savior-Woodhull), on
its own behalf and as
successor in interest to the
insurance rights of St. John
the Baptist (Woodhull) and St.
Mary (Eldorado) and St. John
the Baptist (Fond du Lac)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Our Lady, Queen of Peace
Congregation (Milwaukee)
(a/k/a Our Lady Queen of
Peace Parish)

Port Washington Catholic
School, Inc. (Port Washington)
(a/k/a Port Washington
Catholic Schools)

By:_____
    (Name)
Title:_____

By:_____
    (Name)
Title:_____

Date: _____, 2015  Date: _____, 2015

            Prince of Peace/Principe de
            Paz Congregation (Milwaukee)
            (a/k/a Prince of
            Peace/Principe de Paz), on its
            own behalf and as successor in
            interest to the insurance
Pius XI High School, Inc.   rights of St. Lawrence
(Milwaukee) (a/k/a Pius XI  (Milwaukee) and St. Matthew
High School)         (Milwaukee)

By: _____   By: _____
  (Name)         (Name)
Title: _____  Title: _____
Date: _____, 2015 Date: _____, 2015

            Queen of Apostles Congregation
            (Pewaukee) (a/k/a Queen of
            Apostles Parish), on its own
            behalf and as successor in
            interest to the insurance
Church of the Presentation  rights of Ss. Peter & Paul
B.V.M. (North Fond Du Lac)  (Pewaukee) and St. Mary
(a/k/a Presentation of the  (Pewaukee)
Blessed Virgin Mary)

By: _____   By: _____
  (Name)         (Name)
Title: _____  Title: _____
Date: _____, 2015 Date: _____, 2015

            Sacred Heart of Jesus
            Congregation (St. Francis)
            (a/k/a Sacred Heart of Jesus
Providence Catholic School  Parish)

By: _____   By: _____
  (Name)         (Name)
Title: _____  Title: _____
Date: _____, 2015 Date: _____, 2015

Congregation of the
Resurrection (Allenton)
(a/k/a Resurrection Parish),
on its own behalf and as
successor in interest to the
insurance rights of Sacred
Heart (Allenton) and Ss.
Peter & Paul (Nenno) and St.
Anthony (Allenton)

Sacred Heart Congregation
(Racine) (a/k/a Sacred Heart
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Society for the Propagation of
the Faith, Archdiocese of
Milwaukee (Milwaukee) (a/k/a
Society for the Propagation of
the Faith and Office for the
Propagation of the Faith and
Office for the Propagation of
the Faith)

Sacred Heart Congregation
(Milwaukee) (a/k/a Sacred
Heart Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Sacred Heart Congregation
(Horicon) (a/k/a Sacred Heart
Parish-Horicon), on its own
behalf and as successor in
interest to the insurance
rights of Immaculate
Conception (Juneau) and St.
Malachy (Muskego)

Ss. Cyril and Methodius
Congregation (Milwaukee)
(a/k/a Ss. Cyril & Methodius
Parish)

By:_____

By:_____

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 187 of 329

```
(Name)                              (Name)
Title:                              Title:
Date:              , 2015           Date:              , 2015
Sons of Zebedee: Ss. James
and John Congregation (Byron)
(a/k/a Sons of Zebedee), on
its own behalf and as
successor in interest to the
insurance rights of St. James     Ss. Peter and Paul (Milwaukee)
(Oakfield) and St. John           (a/k/a Ss. Peter & Paul
(Byron)                           Parish)
```

By: _____      By: _____
   (Name)                        (Name)
Title: _____      Title: _____
Date: _____, 2015        Date: _____, 2015

Ss. Cyril and Methodius'
Congregation (Sheboygan)          St. Agnes Congregation
(a/k/a Ss. Cyril & Methodius      (Butler) (a/k/a St. Agnes
Parish)                           Parish)

By: _____      By: _____
   (Name)                        (Name)
Title: _____      Title: _____
Date: _____, 2015        Date: _____, 2015

St. Adalbert's Congregation       St. Alphonsus Congregation
(Milwaukee) (a/k/a St.            (Greendale) (a/k/a St.
Adalbert Parish)                  Alphonsus Parish)

By: _____      By: _____
   (Name)                        (Name)
Title: _____      Title: _____
Date: _____, 2015        Date: _____, 2015

St. Aloysius' Congregation
(West Allis) (a/k/a St.           St. Andrews Congregation
Aloysius Parish)                  (Leroy) (a/k/a St. Andrew)

By: _____      By: _____
   (Name)                        (Name)
Title: _____      Title: _____
Date: _____, 2015        Date: _____, 2015

St. Alphonsus Congregation
(New Munster) (a/k/a St.
Alphonsus Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Andrew's Congregation
(Delavan) (a/k/a St. Andrew
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Anthony's Congregation
(Pewaukee) (a/k/a St. Anthony
on the Lake Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Anthonys Congregation
(Milwaukee) (a/k/a St.
Anthony Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Anthony's Congregation
(Kenosha) (a/k/a St. Anthony
of Padua Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Anthony's Congregation
(Menomonee Falls) (a/k/a St.
Anthony Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Augustin's Congregation
(Trenton) (a/k/a St. Augustine
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Augustinus Congregation
(Milwaukee) (a/k/a St.
Augustine Parish of Hippo)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 189 of 329

St. Augustin Congregation
(West Allis) (a/k/a St.
Augustine Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Benedict's Congregation
(Fontana) (a/k/a St. Benedict
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Bernard's Congregation
(Wauwatosa) (a/k/a St.
Bernard Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Brendan's Congregation
(Brandon) (a/k/a St. Brendan
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Bernadette Congregation
(Milwaukee) (a/k/a St.
Bernadette Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Bonifacius Congregation
(Germantown) (a/k/a St.
Boniface Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Bruno's Congregation
(Dousman) (a/k/a St. Bruno
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Catherine of Siena
Congregation (Ripon) (a/k/a
St. Catherine of Siena), on
its own behalf and as
successor in interest to the
insurance rights of St.
Patrick (Ripon) and St.
Wenceslaus (Ripon)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Catherine's Congregation
(76th Place) (Milwaukee)
(a/k/a St. Catherine of
Alexandria)

St. Catherine's Congregation
(51st and Center) (Milwaukee)
(a/k/a St. Catherine Parish)
on its own behalf and as
successor in interest to the
insurance rights of Holy
Redeemer (Milwaukee) and St.
Albert (Milwaukee) and St.
Nicholas (Kewaskum)

By:_____
      (Name)
Title:_____
Date:_____, 2015

By:_____
      (Name)
Title:_____
Date:_____, 2015

St. Catherine's Congregation
(Mapleton) (a/k/a St.
Catherine Parish and
Catharine's Congregation)

St. Charles Congregation
(Burlington) (a/k/a St.
Charles Borromeo Parish)

By:_____
      (Name)
Title:_____
Date:_____, 2015

By:_____
      (Name)
Title:_____
Date:_____, 2015

St. Catherine's Congregation
(Sharon) (a/k/a St. Catherine
Parish)

St. Charles Cemetery
Association

By:_____
      (Name)
Title:_____
Date:_____, 2015

By:_____
      (Name)
Title:_____
Date:_____, 2015

St. Charles Borromeo
Congregation (Milwaukee)
(a/k/a St. Charles Borromeo
Parish)

St. Charles Youth & Family
Services, Inc. (Milwaukee)
(a/k/a St. Charles, Inc.)

By:_____
      (Name)
Title:_____
Date:_____, 2015

By:_____
      (Name)
Title:_____
Date:_____, 2015

St. Charles Congregation
(Hartland) (a/k/a St. Charles
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Clare Congregation (Wind
Lake) (a/k/a St. Clare
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Columbkill's Congregation
(Elba) (a/k/a St. Columbkille
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Dominic Congregation
(Sheboygan) (a/k/a St.
Dominic Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Clement's Congregation
(Sheboygan) (a/k/a St. Clement
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Dominic's Congregation
(Brookfield) (a/k/a St.
Dominic Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Edward's Congregation
(Racine) (a/k/a St. Edward
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Congregation of St. Elizabeth
(Kenosha) (a/k/a St. Elizabeth
Parish), on its own behalf and
as successor in interest to
the insurance rights of St.
Casimir (Kenosha) and St.
George (Kenosha)

By:_____
    (Name)
Title:_____
Date:_____, 2015

Saint Elizabeth Ann Seton
(New Berlin)(a/k/a St.
Elizabeth Ann Seton Parish)

By:_____
   (Name)
Title:_____
Date:_____, 2015

St. Eugene Congregation (Fox
Point) (a/k/a St. Eugene
Parish)

By:_____
   (Name)
Title:_____
Date:_____, 2015

St. Frances Cabrini
Congregation (West Bend)
(a/k/a St. Frances Cabrini
Parish)

By:_____
   (Name)
Title:_____
Date:_____, 2015

St. Florian's Congregation (W
Milwaukee) (a/k/a St. Florian
Parish)

By:_____
   (Name)
Title:_____
Date:_____, 2015

Congregation of St. Francis
Borgia (Cedarburg) (a/k/a St.
Francis Borgia), on its own
behalf and as successor in
interest to the insurance
rights of Church of Divine
Word(Cedarburg)

By:_____
   (Name)
Title:_____
Date:_____, 2015

Saint Francis de Sales
Seminary, Inc. (a/k/a St.
Francis de Sales Seminary;
f/k/a St. Francis Seminary)

By:_____
   (Name)
Title:_____
Date:_____, 2015

Congregation of St. Francis
de Sales (Lake Geneva) (a/k/a
St. Francis de Sales Parish),
on its own behalf and as
successor in interest to the
insurance rights of St. Mary
(Pell Lake)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Francis Xavier (Brighton)
(a/k/a St. Francis Xavier
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Gregory the Great
Congregation (Milwaukee)
(a/k/a St. Gregory the Great
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Isidore Congregation (Mt.
Calvary), on its own behalf
and as successor in interest
to the insurance rights of
Holy Cross (Mt Calvary) and
St. Cloud (St. Cloud) and St.
Joseph (St. Cloud)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Gabriel Congregation
(Hubertus) (a/k/a St. Gabriel
Parish), on its own behalf and
as successor in interest to
the insurance rights of
Maternity of BVM (Richfield)
and St. Columba(Lake Five) and
St. Hubert (Hubertus)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Hyacinth's Congregation
(Milwaukee) (a/k/a St.
Hyacinth Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. James Congregation
(Franklin) (a/k/a St. James
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. James Congregation
(Mukwonago) (a/k/a St. James
Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 194 of 329

St. James Congregation
(Menomonee Falls) (a/k/a St.
James Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. James Congregation
(Kenosha) (a/k/a St. James
the Apostle Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Joan of Arc Congregation
(Nashotah) (a/k/a St. Joan of
Arc Parish and St. Joan of
Arc)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. John Nepomucene
Congregation (Racine) (a/k/a
St. John Nepomuk Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Jerome's Congregation
(Oconomowoc) (a/k/a St. Jerome
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

Saint John Neumann
Congregation (Waukesha) (a/k/a
St. John Neumann Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. John's Congregation
(Clyman) (a/k/a St. John the
Baptist Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

Congregation of St. John the
Baptist (Plymouth) (a/k/a St.
John the Baptist Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. John's Congregation
(Rubicon) (a/k/a St. John
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. Johns Congregation
(Johnsburg) (a/k/a St. John
the Baptist Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


Congregation of St. John the
Baptist (Union Grove) (a/k/a
St. John the Baptist Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. John Evangelist
Congregation (Kohler) (a/k/a
St. John the Evangelist
Parish and St. John)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. John, The Evangelist,
Congregation (Greenfield)
(a/k/a St. John the Evangelist
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. John The Evangelist
Congregation (Twin Lakes)
(a/k/a St. John the Evangelist
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. Joseph's Congregation (Big
Bend) (a/k/a St. Joseph
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015


St. Joseph's Congregation
(Lyons) (a/k/a St. Joseph
Parish), on its own behalf and
as successor in interest to
the insurance rights of St.
Kilian (Lyons Township)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. John Vianney Congregation
(Brookfield) (a/k/a St. John
Vianney Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Joseph Catholic Academy,
Inc. (Kenosha) (a/k/a St.
Joseph Catholic Academy)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Joseph's Congregation
(Grafton) (a/k/a St. Joseph
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Joseph's Congregation
(Waukesha) (a/k/a St. Joseph
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Josephs Congregation
(Wauwatosa) (a/k/a St. Joseph
Parish)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Katharine Drexel Parish
(Beaver Dam), on its own
behalf and as successor the
insurance rights of in
interest to St. Michael
(Beaver Dam) and St. Patrick
(Beaver Dam) and St. Peter's
(Beaver Dam) and Unified
Catholic Parish Schools of
Beaver Dam Educational
Association (Beaver Dam)


By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Joseph's Congregation
(Racine) (a/k/a St. Joseph
Parish)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Josephs Congregation
(Waupun) (a/k/a St. Joseph
Parish)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Jude Congregation
(Wauwatosa) (a/k/a St. Jude
The Apostle Parish)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Lawrence Congregation
(St. Lawrence) (a/k/a St.
Lawrence Parish), on its own
behalf and as successor in
interest to the insurance
rights of St. Mathias (Nabob)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Kilians Congregation
(Hartford) (a/k/a St. Kilian
Parish) on its own behalf and
as successor on interest to
the insurance rights of St.
Patrick (Erin)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Louis' Congregation
(Caledonia)(a/k/a St. Louis
Parish)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Mark's Congregation
(Kenosha) (a/k/a St. Mark
Parish)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Martin of Tours
Congregation (Franklin) (a/k/a
St. Martin of Tours Parish),
on its own behalf and as
successor in interest to the
insurance rights of Holy
Assumption (Franklin) and
Sacred Heart (Franklin)

By:_____
     (Name)
Title:_____
Date:_____, 2015

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 198 of 329

St. Leonard Congregation
(Muskego) (a/k/a St. Leonard
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Lucy Congregation
(Racine) (a/k/a St. Lucy
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Margaret Mary
Congregation (Milwaukee)
(a/k/a St. Margaret Mary
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary Magdalen
Congregation (Milwaukee)
(a/k/a St. Mary Magdalen
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's of the Hill
Congregation (Hubertus) (a/k/a
St. Mary of the Hill Parish
and St. Mary of the Hill)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Marys Congregation
(Kansasville) (a/k/a St. Mary
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation
(Lomira) (a/k/a St. Mary
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Port
Washington) (a/k/a St. Mary
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 199 of 329

St. Mary Congregation (Hales Corners) (a/k/a St. Mary Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Kenosha) (a/k/a St. Mary Parish) on its own behalf and as successor in interest to the insurance rights of St. Thomas Aquinas (Kenosha)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Marytown) (a/k/a St. Mary Parish and Visitation of BVM)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Menomonee Falls) (a/k/a St. Mary Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

Saint Mary's Congregation (Springvale) (a/k/a St. Mary Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Woodland) (a/k/a St. Mary Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Congregation (Elm Grove) (a/k/a St. Mary's Visitation and Visitation of BVM)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Matthew's Congregation (Neosho) (a/k/a St. Matthew Parish)

By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Marys Congregation
(Racine) (a/k/a St. Mary
Parish and St. Mary by the
Lake)


By: _____
    (Name)
Title: _____
Date: _____, 2015




St. Mary Congregation
(Waukesha ) (a/k/a St. Mary
Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mary's Springs Academy of
Fond du Lac, Wisconsin, Inc.
(Fond Du Lac) (a/k/a St.
Mary's Springs Academy)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Mathias Congregation
(Milwaukee) (a/k/a St.
Matthias Parish)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Michaels' Congregation
(Kewaskum) (a/k/a St. Michael
Parish and St. Michael), on
its own behalf and as
successor in interest to the
insurance rights of St. John
of God (Farmington)


By: _____
    (Name)
Title: _____
Date: _____, 2015

The St. Michael's Priest Fund
of the Archdiocese of
Milwaukee (Milwaukee) (a/k/a
St. Michael's Priest Fund)


By: _____
    (Name)
Title: _____
Date: _____, 2015

St. Matthew's Congregation
(Campbellsport) (a/k/a St.
Matthew Parish), on its own
behalf and as successor in
interest to the insurance
rights of St. Kilian (St.              St. Patrick's Congregation
Kilian) and St. Martin                 (Elkhorn) (a/k/a St. Patrick
(Ashford)                              Parish)


By: _____              By: _____
    (Name)                                 (Name)
Title: _____              Title: _____
Date: _____, 2015             Date: _____, 2015

St. Matthews Congregation              St. Patricks Congregation
(Oak Creek) (a/k/a St.                 (Racine) (a/k/a St. Patrick
Matthew Parish)                        Parish)


By: _____              By: _____
    (Name)                                 (Name)
Title: _____              Title: _____
Date: _____, 2015             Date: _____, 2015

St. Maximillian Kolbe                  St. Paul's Catholic Church
Congregation (Milwaukee)               (Genesee Depot) (a/k/a St.
(a/k/a St. Maximilian Kolbe)           Paul Parish)


By: _____              By: _____
    (Name)                                 (Name)
Title: _____              Title: _____
Date: _____, 2015             Date: _____, 2015

St. Michael's Congregation             St. Paul The Apostle
(Milwaukee) (a/k/a St.                 Congregation (Racine) (a/k/a
Michael Parish)                        St. Paul the Apostle Parish)


By: _____              By: _____
    (Name)                                 (Name)
Title: _____              Title: _____
Date: _____, 2015             Date: _____, 2015

St. Monica's Congregation
(Whitefish Bay) (a/k/a St.
Monica Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Patricks Congregation
(Milwaukee) (a/k/a St.
Patrick Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Patricks Congregation
(Whitewater) (a/k/a St.
Patrick Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015


St. Paul's Congregation
(Milwaukee) (a/k/a St. Paul
Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Peter Congregation (Port
Washington) (a/k/a St. Peter
of Alcantara Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Peter's Congregation
(Kenosha) (a/k/a St. Peter
Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Pius Congregation
(Wauwatosa) (a/k/a St. Pius X
Parish)


By:_____
     (Name)
Title:_____
Date:_____, 2015

Congregation of St. Richard
(Racine) (a/k/a St. Richard),
on its own behalf and as
successor in interest to the
insurance rights of Holy Name
(Racine) and Holy Trinity
(Racine) and St. Casimir
(Racine) and St. Rose (Racine)
and St. Stanislaus (Racine)

By:_____
     (Name)
Title:_____
Date:_____, 2015

St. Peter Claver Congregation
(Sheboygan) (a/k/a St. Peter
Claver Parish)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Peters Congregation (East
Troy) (a/k/a St. Peter
Parish)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Peter's Congregation
(Slinger) (a/k/a St. Peter
Parish and St. Peter)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Rafael the Archangel
Congregation (Milwaukee)
(a/k/a St. Rafael the
Archangel), on its own behalf
and as successor in interest
to the insurance rights of
Holy Spirit (Milwaukee) and
St. Barbara (Milwaukee) and
St. Ignatius (Milwaukee)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Rita's Congregation (West
Allis) (a/k/a St. Rita Parish)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Robert's Congregation
(Shorewood) (a/k/a St. Robert
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

The Congregation of St. Rose
(Milwaukee) (a/k/a St. Rose
Parish)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Sebastian Congregation
(Sturtevant) (a/k/a St.
Sebastian Parish)

By:_____
    (Name)
Title:_____
Date: _____, 2015

St. Rita's Congregation
(Racine) (a/k/a St. Rita
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Robert Bellarmine
Congregation (Union Grove)
(a/k/a St. Robert Bellarmine
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Roman Congregation
(Milwaukee) (a/k/a St. Roman
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

The St. Stanislaus
Congregation (Milwaukee)
(a/k/a St. Stanislaus Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Theresa's Congregation
(Eagle) (a/k/a St. Theresa
Parish and St. Theresa
Catholic Church)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Therese Congregation
(Kenosha) (a/k/a St. Therese
Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

St. Sebastian's Congregation
(Milwaukee) (a/k/a St.
Sebastian Parish)


By: _____
         (Name)
Title: _____
Date: _____, 2015

The St. Sebastian School
Foundation, Inc. (Milwaukee)
(a/k/a St. Sebastian School
Foundation)


By: _____
         (Name)
Title: _____
Date: _____, 2015

St. Stephans Congregation
(Oak Creek) (a/k/a St.
Stephen Parish)


By: _____
         (Name)
Title: _____
Date: _____, 2015

St. Thomas Aquinas
Congregation (Elkhart Lake)
(a/k/a St. Thomas Aquinas), on
its own behalf and as
successor in interest to the
insurance rights of St.
Fridolin (Glenbeulah) and St.
George (Elkhart Lake)


By: _____
         (Name)
Title: _____
Date: _____, 2015

St. Thomas Aquinas
Congregation (Waterford)
(a/k/a St. Thomas Aquinas
Parish)


By: _____
         (Name)
Title: _____
Date: _____, 2015

St. Veronica's Congregation
(Milwaukee) (a/k/a St.
Veronica Parish)


By: _____
         (Name)
Title: _____
Date: _____, 2015

St. Theresa's Congregation
(Theresa) (a/k/a St. Theresa
Parish)

St. Vincent Pallotti
Congregation (Milwaukee)
(a/k/a St. Vincent Pallotti
Parish), on its own behalf and
as successor in interest to
the insurance rights of Holy
Cross (Milwaukee) and St.
Anthony of Padua (Milwaukee)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Three Holy Women Congregation
(Milwaukee) (a/k/a Three Holy
Women), on its own behalf and
as successor in interest to
the insurance rights of Holy
Rosary Church (Milwaukee) and
St. Hedwig (Milwaukee) and St.
Rita Church (Milwaukee)

St. Therese Congregation
(Milwaukee) (a/k/a St.
Therese Parish)

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

Saint Thomas More High School,
Inc. (Milwaukee) (a/k/a St.
Thomas More High School; f/k/a
Thomas More High School, Inc.)

St. Thomas Aquinas Academy

By:_____
    (Name)
Title:_____
Date:_____, 2015

By:_____
    (Name)
Title:_____
Date:_____, 2015

The St. Vincent a Paulo
Congregation (Milwaukee)
(a/k/a St. Vincent de Paul
Parish)

St. William Congregation
(Waukesha) (a/k/a St. William
Parish)

By:_____

   (Name)

Title:_____

Date:_____, 2015

By:_____

Title:_____

Date:_____, 2015

Wauwatosa Catholic School,
Inc. (a/k/a Wauwatosa
Catholic School)

By:_____

   (Name)

Title:_____

Date:_____

## SCHEDULE OF ATTACHMENTS TO

## SETTLEMENT AGREEMENT

| | |
|---|---|
| Attachment A | List of known Subject Insurance Policies |
| Attachment B | List of London Market Insurers ("LMI"), with Part I showing Solvent LMI, and Part II showing Insolvent LMI |
| Attachment C | List of Insolvent LMI and their allocated shares of the Settlement Amount |
| Attachment D | List of Solvent LMI and their allocated shares of the Settlement Amount |
| Attachment E | List of Persons Comprising the Related Entities |
| Attachment F | List of Related Entities Represented by Foley & Lardner LLP |
| Attachment G | Notice Information for Related Entities Not Represented by Foley & Lardner LLP |

**Known Subject Insurance Policies**

**Umbrella Liability Policies effective July 1, 1967 to August 1, 1973**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | July 1, 1967 to July 1, 1968 | MO 8537 |
| 2) | July 1, 1968 to July 1, 1969 | MO 8537 |
| 3) | July 1, 1969 to July 31, 1970 | MO 8537 |
| 4) | August 1, 1970 to August 1, 1971 | MO 4857/9798 |
| 5) | August 1, 1971 to August 1, 1972 | MO 4857/9798 |
| 6) | August 1, 1972 to August 1, 1973 | MO 10420/5355 |

**1st Excess Umbrella Liability Policies effective July 1, 1967 to August 1, 1973**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | July 1, 1967 to July 1, 1968 | MO 8539 |
| 2) | July 1, 1968 to July 1, 1969 | MO 8539 |
| 3) | July 1, 1969 to July 31, 1970 | MO 8539 |
| 4) | August 1, 1970 to August 1, 1971 | MO 4862/9799 |
| 5) | August 1, 1971 to August 1, 1972 | MO 4862/9799 |
| 6) | August 1, 1972 to August 1, 1973 | MO 10421/5356 |

**2nd Excess Umbrella Liability Policies effective July 1, 1967 to August 1, 1973**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | July 1, 1967 to July 1, 1968 | MO 8538 |
| 2) | July 1, 1968 to July 1, 1969 | MO 8538 |
| 3) | July 1, 1969 to July 31, 1970 | MO 8538 |
| 4) | August 1, 1970 to August 1, 1971 | MO 9800/4863 |
| 5) | August 1, 1971 to August 1, 1972 | MO 9800/4863 |
| 6) | August 1, 1972 to August 1, 1973 | MO 10422/5413 |

**Excess Umbrella Liability Policies effective August 1, 1977 to August 1, 1979**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | August 1, 1977 to August 1, 1978 | 35 OS 8005 |
| 2) | August 1, 1978 to August 1, 1979 | 35 OS 8015 |

**Package Policies effective May 15, 1982 to July 1, 1987**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | May 15, 1982 to May 15, 1983 | SL 3974 / SLC 5963 |
| 2) | May 15, 1983 to May 15, 1984 | SL 3974 / SLC 5963 |
| 3) | May 16, 1984 to May 15, 1985 | SL 3974 / SLC 5963 |
| 4) | May 15, 1985 to July 1, 1986 | ISL 3317 / ICO 5167 |
| 5) | July 1, 1986 to July 1, 1987 | ISL 3595 / ICO 5338 |

**Excess Broadform Liability Policies effective May 15, 1982 to July 1, 1987**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | May 15, 1982 to May 15, 1983 | SL 3976 / SLC 5965 |
| 2) | May 15, 1983 to May 15, 1984 | SL 3976 / SLC 5965 |
| 3) | May 16, 1984 to May 15, 1985 | SL 3976 / SLC 5965 |
| 4) | May 15, 1985 to July 1, 1986 | ISL 3327 / ICO 5169 |
| 5) | July 1, 1986 to July 1, 1987 | ISL 3651 / GHV 370/486 |

**Excess All Risk Liability Policies effective May 15, 1983 to May 15, 1988**

| | Policy Year | Policy No. |
|---|---|---|
| 1) | May 15, 1983 to May 15, 1984 | SL 3975 / SLC 5964 |
| 2) | May 15, 1984 to May 15, 1985 | SL 3975 / SLC 5964 |
| 3) | May 16, 1985 to May 15, 1986 | ISL 3326 / ICO 5168 |
| 4) | May 15, 1986 to May 15, 1987 | ISL 3326 / ICO 5168 |
| 5) | May 15, 1987 to May 15, 1988 | ISL 3326 / ICO 5168 |
| 6) | July 1, 1986 to July 1, 1987 | ISL 3596 |

THE SUBJECT POLICIES INCLUDE ANY COMBINED PROPERTY, CASUALTY, AND CRIME INSURANCE POLICIES, DROP DOWN POLICIES, ADDITIONAL ORDER POLICIES, AND EXCESS POLICIES SUBSCRIBED SEVERALLY BY LONDON MARKET INSURERS

**ATTACHMENT B**

**Part I: List of London Market Insurers ("LMI")**

1. Certain Underwriters at Lloyd's, London.
2. Ageas Insurance Limited (f/k/a Bishopsgate Insurance Company Ltd.).
3. Allianz Suisse Versicherungs-Gesellschaft AG (f/k/a Helvetia Accident Insurance Company, Helvetia Accident Gibbon N.M. Group, and Helvetia Accident Swiss Ins. Co.).
4. Assicurazioni Generali S.p.A (f/k/a General Insurance Company of Trieste and Venice).
5. Delta Lloyd Schadeverzekering NV (f/k/a Delta Lloyd Non Life Ltd.).
6. Dominion Insurance Company Ltd.
7. Excess Insurance Company Limited.
8. Harper Insurance Limited (f/k/a Turegum Insurance Company Ltd.).
9. Helvetia Swiss Insurance Company (f/k/a Alba General Insurance Company Limited).
10. London & Edinburgh Insurance Company Limited (f/k/a London & Edinburgh General Ins. Co. Ltd., London & Edinburgh General Ins.  Co., and London & Edinburgh General Ltd.).
11. National Casualty Co.
12. National Casualty Co. of America.
13. National Casualty Co. of America Ltd.
14. NRG Victory Reinsurance Limited (f/k/a New London Reinsurance Ltd.).
15. Ocean Marine Insurance Company Limited (as successor-in-interest    to Edinburgh Assurance Company Limited No. 2 A/C).
16. Ocean Marine Insurance Company Limited (as successor-in-interest    to World Auxiliary Insurance Corporation Limited).
17. River Thames Insurance Company Limited.
18. Select Market Insurance Company (f/k/a Argonaut Northwest Insurance Company).
19. Stronghold Insurance Company Limited.
20. Winterthur Swiss Insurance Company (f/k/a Accident & Casualty Insurance Company, Accident & Casualty Company, Accident & Casualty No. 2 Account, Accident & Casualty No. 3 Account, Accident & Casualty Ins. Co. of Winterthur, Accident & Casualty Ins. Co. of Winterthur No. 2 Account, and Accident & Casualty Ins. Co. of Winterthur No. 3 Account).
21. Markel International Insurance Company Ltd.(f/k/a Terra Nova Insurance Company Ltd.).
22. Tenecom Ltd. (f/k/a Yasuda Fire & Marine Insurance Company of Europe Ltd.).

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 212 of 329

23. Sphere Drake Insurance Company, PLC.
24. CNA Reinsurance of London Ltd.
25. CNA Reinsurance Co. Ltd.
26. Unionamerica Insurance Company Limited (f/k/a St. Katherine Insurance Co. PLC)

## **ATTACHMENT B (Continued)**

## **Part II: List of Insolvent LMI**

1. Swiss Union Insurance Company Limited.
2. Minster Insurance Company Limited.
3. Orion Insurance Company Limited.
4. Orion Insurance Company "T" Acct.
5. North Atlantic Insurance Co.
6. Bellefonte Insurance Company.
7. Walbrook Insurance Company Ltd.
8. Bermuda Fire & Marine Insurance Company Ltd.
9. Bermuda Fire & Marine Insurance Company.
10. Southern American Ins. Co.
11. Andrew Weir Insurance Company Limited.
12. Highlands Insurance Company.
13. L.T.B. Highlands Insurance Company.
14. London and Overseas Insurance Company Limited.
15. English and American Insurance Company Limited.
16. English and American Insurance Company Limited "M" Account.

**ATTACHMENT C**

**Insolvent LMI Shares**

| London Market Company | Amount |
|---|---|
| 1. Swiss Union Insurance Company Limited | $217,097.25 |
| 2. Minster Insurance Company Limited | $144,976.81 |
| 3. Orion Insurance Company Limited | $43,787.41 |
| 4. Orion Insurance Company "T" Acct. | $0.00 |
| 5. North Atlantic Insurance Co. | $108,426.20 |
| 6. Bellefonte Insurance Company | $27,106.55 |
| 7. Walbrook Insurance Company Ltd. | $23,311.63 |
| 8. Bermuda Fire & Marine Insurance Company Ltd. | $2,499.22 |
| 9. Bermuda Fire & Marine Insurance Company | $0.00 |
| 10. Southern American Ins. Co. | $1,997.21 |
| 11. Andrew Weir Insurance Company Limited | $0.00 |
| 12. Highlands Insurance Company | $0.00 |
| 13. L.T.B. Highlands Insurance Company | $0.00 |
| 14. London and Overseas Insurance Company Limited | $0.00 |
| 15. English and American Insurance Company Limited | $0.00 |
| 16. English and American Insurance Company Limited "M" Account | $0.00 |
| **Total to Insolvent LMI** | **$569,202.34** |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 214 of 329

## ATTACHMENT D

### Solvent LMI Shares

| London Market Insurer | Amount |
|---|---|
| Certain Underwriters at Lloyd's, London | $4,067,101.67 |
| Excess Insurance Company Limited | $419,958.89 |
| Markel International Insurance Company Ltd. | $15,225.92 |
| Tenecom Ltd. | $6,544.78 |
| Sphere Drake Insurance Company, PLC | $40,797.65 |
| CNA Reinsurance of London Ltd. | $1.00 |
| Dominion Insurance Company Ltd. | $1,772,284.75 |
| River Thames Insurance Company Limited | $115,907.85 |
| Ocean Marine Insurance Company Limited | $158,327.30 |
| NRG Victory Reinsurance Limited | $213,241.74 |
| Harper Insurance Limited | $208,094.34 |
| London & Edinburgh Insurance Company Limited | $204,613.68 |
| Assicurazioni Generali S.p.A | $138,738.28 |
| National Casualty Co. | $9,996.90 |
| National Casualty Co. of America | $5,997.05 |
| Winterthur Swiss Ins. Co. (Accident & Cas.) | $25,488.83 |
| Winterthur Swiss Ins. Co. (Accident & Cas. #2) | $1.00 |
| Winterthur Swiss Ins. Co. (Accident & Cas. #3) | $1.00 |
| Select Market Insurance Company | $19,993.79 |
| Delta Lloyd Schadeverzekering NV | $3,994.42 |
| Ageas Insurance Limited | $3,483.84 |
| Stronghold Insurance Company Limited | $1.00 |
| Helvetia Swiss Insurance Company | $1.00 |
| Allianz Suisse Versicherungs-Gesellschaft AG | $1.00 |
| Unionamerica Insurance Company Limited | $1.00 |

**Net to Solvent LMI   $7,430,797.66**

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 215 of 329

## ATTACHMENT E

## LIST OF RELATED ENTITIES

| Location | City |
|---|---|
| 1.   Annunciation Congregation (Fox Lake) (a/k/a Annunciation Parish), on its own behalf and as successor in interest to the insurance rights of St. Gabriel (Randolph), St. Mary's (Fox Lake), and St. Mary's (Lost Lake) | Fox Lake |
| 2.   Blessed John Paul II Congregation (Milwaukee) (a/k/a Blessed John Paul II and Holy Wisdom Academy), on its own behalf and as successor in interest to the insurance rights of St. Alexander (Milwaukee), St. Helen (Milwaukee), and St. John Kanty (Milwaukee) | Milwaukee |
| 3.   Blessed Sacrament Congregation (Milwaukee) (a/k/a Blessed Sacrament Parish) | Milwaukee |
| 4.   Blessed Savior Parish (Milwaukee)(a/k/a Blessed Savior School), on its own behalf and as successor in interest to the insurance rights of Corpus Christi (Milwaukee), Mother of Perpetual Help (Milwaukee), Our Lady of Sorrows (Milwaukee), St. Philip Neri (Milwaukee), and St. Stephen (Milwaukee) | Milwaukee |
| 5.   Blessed Teresa of Calcutta Congregation (North Lake) (a/k/a Blessed Teresa of Calcutta), on its own behalf and as successor in interest to the insurance rights of St. Clare (North Lake) and St. John (Monches) | North Lake |
| 6.   Blessed Trinity Congregation (Sheboygan Falls) (a/k/a Blessed Trinity), on its own behalf and as Successor in interest to the insurance rights of St. George (St. George) and St. Mary (Sheboygan Falls) and St. Rose Lima (Sheboygan Falls) | Sheboygan Falls |
| 7.   Calvary Cemetery (Fond du Lac) | Fond Du Lac |
| 8.   Calvary Cemetery, Sheboygan, Wisconsin (a/k/a Calvary Cemetery) | Sheboygan |
| 9.   Congregation of St. John's Cathedral (Milwaukee) (a/k/a Cathedral of St. John the Evangelist) | Milwaukee |
| 10.  Catholic Cemetery Assoc. of Racine, Inc. | Racine |
| 11.  Catholic Charities of the Archdiocese of Milwaukee, Inc. (a/k/a Catholic Charities and Catholic Social Services; f/k/a Catholic Social Services of the Archdiocese of Milwaukee, Inc. and Catholic Social Welfare Bureau) | Milwaukee |

12. All Saints Catholic East School System, Inc. (a/k/a  Milwaukee
Catholic East Elementary)

13. Catholic Memorial High School of Waukesha,  Waukesha
Inc.(a/k/a Catholic Memorial High School)

14. Christ Child Christian Formation Ministry, Inc.  Sheboygan
(a/k/a Christ Child Academy)

15. Christ King Congregation (Wauwatosa)(a/k/a Christ  Wauwatosa
King Parish)

16. Good Shepherd Congregation (Eden) (a/k/a  Eden
Congregation of Good Shepherd), on its own behalf and as
successor in interest to the insurance rights of Our
Lady of Angels (Armstrong) and St. Mary (Eden) and St.
Michael (Dotyville) and St. Michael (Mitchell)

17. Consolidated Parochial Elementary School Johnsburg  Mt Calvary
Marytown-Mt. Calvary-St. Cloud, Inc. (a/k/a Consolidated
Parochial Elementary)

18. Cristo Rey Congregation (Racine) (a/k/a Cristo Rey  Racine
Parish)

19. DeSales Preparatory Seminary, Inc. (a/k/a DeSales  Milwaukee
Prep/ACCC)

20. Divine Mercy Congregation (South Milwaukee) (a/k/a  South
Divine Mercy), on its own behalf and as successor in  Milwaukee
interest to the insurance rights of St. John (South
Milwaukee) and St. Mary (South Milwaukee) and St.
Sylvester (South Milwaukee)and St. Adalbert (South
Milwaukee)

21. Divine Savior Congregation (Fredonia) (a/k/a Divine  Fredonia
Savior), on its own behalf and as successor in interest
to the insurance rights of Holy Cross (Holy Cross) and
Mother of Sorrows (Little Kohler) and St. Mary (Belgium)
and St. Rose of Lima (Fredonia)

22. Gesu Parish Inc. (Milwaukee)(a/k/a Gesu Parish)  Milwaukee

23. Good Shepherd Congregation (Menomonee Falls (a/k/a  Menomonee
Good Shepherd Parish)  Falls

24. Congregation of Holy Angels (West Bend) (a/k/a Holy  West Bend
Angels Parish)

25. Congregation of the Holy Apostles (New Berlin  New Berlin
(a/k/a Holy Apostles Parish)

26. Congregation of the Holy Assumption (West Allis)  West Allis
(a/k/a Holy Assumption Parish)

27. Holy Cross Parish (Bristol), on its own behalf and  Bristol

as successor in interest to the insurance rights of Holy
Name of Jesus (Wilmot) and St. Scholastica (Bristol)

| | |
|---|---|
| 28. Holy Family Congregation (Fond Du Lac) (a/k/a Holy Family), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Fond Du Lac) and St. Joseph (Fond Du Lac) and St. Louis (Fond Du Lac) and St. Patrick (Fond Du Lac) and St. Peter (Whitewater) | Fond Du Lac |
| 29. Congregation of the Holy Family (Reeseville)(a/k/a Holy Family Parish) | Reeseville |
| 30. Holy Family Congregation (Whitefish Bay) (a/k/a Holy Family Parish) | Whitefish Bay |
| 31. Congregation of the Holy Name (Sheboygan) (a/k/a Holy Name Parish) | Sheboygan |
| 32. Holy Sepulcher Cemetery | Cudahy |
| 33. Holy Trinity Congregation (Kewaskum (a/k/a Holy Trinity Parish), on its own behalf and as successor in interest to the insurance rights of St. Bridget (Wayne) and St. Mathias (Auburn) | Kewaskum |
| 34. Holy Trinity Congregation (Newburg) (a/k/a Holy Trinity Parish) | Newburg |
| 35. Congregation of the Immaculate Conception (Burlington)(a/k/a Immaculate Conception Parish) | Burlington |
| 36. The Congregation of the Immaculate Conception (Milwaukee) (a/k/a Immaculate Conception Parish) | Milwaukee |
| 37. Congregation of the Immaculate Conception (Saukville) (a/k/a Immaculate Conception Parish) | Saukville |
| 38. Immaculate Conception Congregation (Sheboygan) (a/k/a Immaculate Conception Parish) | Sheboygan |
| 39. Congregation of the Immaculate Conception (West Bend) (a/k/a Immaculate Conception Parish) | West Bend |
| 40. Immaculate Heart of Mary Congregation (West Allis) (a/k/a Immaculate Heart of Mary) | West Allis |
| 41. Lumen Christi Congregation (Mequon) (a/k/a Lumen Christi), on its own behalf and as successor in interest to the insurance rights of St. Cecilia (Thiensville) and St. James (Mequon) | Mequon |
| 42. Mary Queen of Heaven Congregation (West Allis) (a/k/a Mary Queen Of Heaven Parish) | West Allis |
| 43. Mary Queen of Saints Catholic Academy | West Allis |
| 44. M.H.S., Inc. (a/k/a Messmer High School) | Milwaukee |

45. Milwaukee Catholic Press Apostolate (a/k/a        Milwaukee
Milwaukee Catholic Press/Cath Herald and a/k/a The
Catholic Herald)

46. Mother of Good Counsel Congregation (Milwaukee)   Milwaukee
(a/k/a Mother of Good Counsel Parish)

47. Nativity of the Lord Congregation (Cudahy)(a/k/a  Cudahy
Nativity of the Lord), on its own behalf and as
successor in interest to the insurance rights of Holy
Family (Cudahy) and St. Frederick (Cudahy) and St.
Joseph (Cudahy)

48. Northwest Catholic School                        Milwaukee

49. Milwaukee Archdiocesan Office for World Mission,  Milwaukee
Inc. (Milwaukee)(a/k/a Office for World Missions)

50. St. Mary's Congregation (Milwaukee) (a/k/a Old St. Milwaukee
Mary and St. Mary's (Old) Church) (Milwaukee)

51. Our Lady of Divine Providence Congregation       Milwaukee
(Milwaukee) (a/k/a Our Lady Of Divine Providence), on
its own behalf and as successor in interest to the
insurance rights of St. Casimir (Milwaukee) and St. Mary
of Czestochowa Church (Milwaukee)

52. Our Lady of Good Hope Congregation (Milwaukee)    Milwaukee
(a/k/a Our Lady of Good Hope Parish)

53. Our Lady of Guadalupe Congregation (Milwaukee)    Milwaukee
(a/k/a Our Lady of Guadalupe) on its own behalf and as
successor in interest to the insurance rights of St.
Wenceslaus (Milwaukee)

54. Our Lady of Lourdes Congregation (Milwaukee) (a/k/a Milwaukee
Our Lady of Lourdes Parish)

55. Our Lady of Mount Carmel (Kenosha)(a/k/a Our Lady  Kenosha
of Mt Carmel Parish)

56. Congregation of the Holy Rosary of Pompeii        Kenosha
(Kenosha) (a/k/a Our Lady of the Holy Rosary and Our
Lady of Rosary)

57. Congregation of Our Lady of the Lakes (Random Lake) Random Lake
(a/k/a Our Lady of the Lakes), on its own behalf and as
successor in interest to the insurance rights of St.
Mary (Cascade) and St. Mary (Random Lake) and St.
Nicholas (Dacada) and St. Patrick (Adell)

58. Our Lady, Queen of Peace Congregation (Milwaukee) Milwaukee
(a/k/a Our Lady Queen of Peace Parish)

59. Our Risen Savior Congregation)(Woodhull) (a/k/a Our Woodhull
Risen Savior-Woodhull), on its own behalf and as

successor in interest to the insurance rights of St.
John the Baptist (Woodhull) and St. Mary (Eldorado) and
St. John the Baptist Parish (Fond du Lac)

| | |
|---|---|
| 60. Pius XI High School, Inc. (Milwaukee) (a/k/a Pius XI High School) | Milwaukee |
| 61. Port Washington Catholic School, Inc. (Port Washington) (a/k/a Port Washington Catholic Schools) | Port Washington |
| 62. Church of the Presentation B.V.M. (North Fond Du Lac) (a/k/a Presentation of the Blessed Virgin Mary) | North Fond Du Lac |
| 63. Prince of Peace/Principe de Paz Congregation (Milwaukee) (a/k/a Prince of Peace/Principe de Paz), on its own behalf and as successor in interest to the insurance rights of St. Lawrence (Milwaukee) and St. Matthew (Milwaukee) | Milwaukee |
| 64. Providence Catholic School | Union Grove |
| 65. Queen of Apostles Congregation (Pewaukee) (a/k/a Queen of Apostles Parish), on its own behalf and as successor in interest to the insurance rights of Ss. Peter & Paul (Pewaukee) and St. Mary (Pewaukee) | Pewaukee |
| 66. Congregation of the Resurrection (Allenton) (a/k/a Resurrection Parish), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Allenton) and Ss. Peter & Paul (Nenno) and St. Anthony (Allenton) | Allenton |
| 67. Sacred Heart of Jesus Congregation (St. Francis) (a/k/a Sacred Heart of Jesus Parish) | St. Francis |
| 68. Sacred Heart Congregation (Milwaukee) (a/k/a Sacred Heart Parish) | Milwaukee |
| 69. Sacred Heart Congregation (Racine) (a/k/a Sacred Heart Parish) | Racine |
| 70. Sacred Heart Congregation (Horicon) (a/k/a Sacred Heart Parish-Horicon), on its own behalf and as successor in interest to the insurance rights of Immaculate Conception (Juneau) and St. Malachy (Muskego) | Horicon |
| 71. Society for the Propagation of the Faith, Archdiocese of Milwaukee (Milwaukee) (a/k/a Society for the Propagation of the Faith and Office for the Propagation of the Faith and Office for the Propagation of the Faith) | Milwaukee |
| 72. Sons of Zebedee: Ss. James and John Congregation (Byron) (a/k/a Sons of Zebedee), on its own behalf and as successor in interest to the insurance rights of St. | Byron |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 220 of 329

James (Oakfield) and St. John (Byron)

73. Ss. Cyril and Methodius Congregation (Milwaukee)     Milwaukee
(a/k/a Ss. Cyril & Methodius Parish)

74. Sts. Cyril and Methodius' Congregation (Sheboygan)   Sheboygan
(a/k/a Sts. Cyril & Methodius Parish)

75. Ss. Peter and Paul (Milwaukee) (a/k/a Ss. Peter &    Milwaukee
Paul Parish)

76. St. Adalbert's Congregation (Milwaukee) (a/k/a St.   Milwaukee
Adalbert Parish)

77. St. Agnes Congregation (Butler) (a/k/a St. Agnes     Butler
Parish)

78. St. Aloysius' Congregation (West Allis) (a/k/a St.   West Allis
Aloysius Parish)

79. St. Alphonsus Congregation (Greendale) (a/k/a St.    Greendale
Alphonsus Parish)

80. St. Alphonsus Congregation (New Munster) (a/k/a St.  New Munster
Alphonsus Parish)

81. St. Andrews Congregation (Leroy) (a/k/a St. Andrew)  Leroy

82. St. Andrew's Congregation (Delavan) (a/k/a St.       Delavan
Andrew Parish)

83. St. Anthony's Congregation (Kenosha) (a/k/a St.      Kenosha
Anthony of Padua Parish)

84. St. Anthony's Congregation (Pewaukee) (a/k/a St.     Pewaukee
Anthony on the Lake Parish)

85. St. Anthony's Congregation (Menomonee Falls) (a/k/a  Menomonee
St. Anthony Parish)                                     Falls

86. St. Anthonys Congregation (Milwaukee) (a/k/a St.     Milwaukee
Anthony Parish)

87. St. Augustin's Congregation (Trenton) (a/k/a St.     Trenton
Augustine Parish)

88. St. Augustin Congregation (West Allis) (a/k/a St.    West Allis
Augustine Parish)

89. St. Augustinus Congregation (Milwaukee) (a/k/a St.   Milwaukee
Augustine Parish of Hippo)

90. St. Benedict's Congregation (Fontana) (a/k/a St.     Fontana
Benedict Parish)

91. St. Bernadette Congregation (Milwaukee) (a/k/a St.   Milwaukee
Bernadette Parish)

92. St. Bernard's Congregation (Wauwatosa) (a/k/a St.    Wauwatosa

Bernard Parish)

| | |
|---|---|
| 93. St. Bonifacius Congregation (Germantown) (a/k/a St. Boniface Parish) | Germantown |
| 94. St. Brendan's Congregation (Brandon) (a/k/a St. Brendan Parish) | Brandon |
| 95. St. Bruno's Congregation (Dousman) (a/k/a St. Bruno Parish) | Dousman |
| 96. St. Catherine's Congregation (76th Place) (Milwaukee) (a/k/a St. Catherine of Alexandria) | Milwaukee |
| 97. St. Catherine of Siena Congregation (Ripon) (a/k/a St. Catherine of Siena), on its own behalf and as successor in interest to the insurance rights of St. Patrick (Ripon) and St. Wenceslaus (Ripon) | Ripon |
| 98. St. Catherine's Congregation (Mapleton) (a/k/a St. Catherine Parish and Catharine's Congregation) | Mapleton |
| 99. St. Catherine's Congregation (51st and Center) (Milwaukee) (a/k/a St. Catherine Parish) on its own behalf and as successor in interest to the insurance rights of Holy Redeemer (Milwaukee) and St. Albert (Milwaukee) and St. Nicholas (Milwaukee) | Milwaukee |
| 100. St. Catherine's Congregation (Sharon) (a/k/a St. Catherine Parish) | Sharon |
| 101. St. Charles Congregation (Burlington) (a/k/a St. Charles Borromeo Parish) | Burlington |
| 102. St. Charles Borromeo Congregation (Milwaukee) (a/k/a St. Charles Borromeo Parish) | Milwaukee |
| 103. St. Charles Cemetery Association | Fond Du Lac |
| 104. St. Charles Congregation (Hartland) (a/k/a St. Charles Parish) | Hartland |
| 105. St. Charles Youth & Family Services, Inc. (Milwaukee) (a/k/a St. Charles, Inc.) | Milwaukee |
| 106. St. Clare Congregation (Wind Lake) (a/k/a St. Clare Parish) | Wind Lake |
| 107. St. Clement's Congregation (Sheboygan) (a/k/a St. Clement Parish) | Sheboygan |
| 108. St. Columbkill's Congregation (Elba) (a/k/a St. Columbkille Parish) | Elba |
| 109. St. Dominic's Congregation (Brookfield) (a/k/a St. Dominic Parish) | Brookfield |

110. St. Dominic Congregation (Sheboygan) (a/k/a St. Dominic Parish) — Sheboygan

111. St. Edward's Congregation (Racine) (a/k/a St. Edward Parish) — Racine

112. Saint Elizabeth Ann Seton (New Berlin)(a/k/a St. Elizabeth Ann Seton Parish) — New Berlin

113. Congregation of St. Elizabeth (Kenosha) (a/k/a St. Elizabeth Parish), on its own behalf and as successor in interest to the insurance rights of St. Casimir (Kenosha) and St. George (Kenosha) — Kenosha

114. St. Eugene Congregation (Fox Point) (a/k/a St. Eugene Parish) — Fox Point

115. St. Florian's Congregation (W Milwaukee) (a/k/a St. Florian Parish) — W Milwaukee

116. St. Frances Cabrini Congregation (West Bend) (a/k/a St. Frances Cabrini Parish) — West Bend

117. Congregation of St. Francis Borgia (Cedarburg) (a/k/a St. Francis Borgia), on its own behalf and as successor in interest to the insurance rights of Church of Divine Word(Cedarburg) — Cedarburg

118. Congregation of St. Francis de Sales (Lake Geneva) (a/k/a St. Francis de Sales Parish), on its own behalf and as successor in interest to the insurance rights of St. Mary (Pell Lake) — Lake Geneva

119. Saint Francis de Sales Seminary, Inc. (a/k/a St. Francis de Sales Seminary; f/k/a St. Francis Seminary) — St. Francis

120. St. Francis Xavier (Brighton) (a/k/a St. Francis Xavier Parish) — Brighton

121. St. Gabriel Congregation (Hubertus) (a/k/a St. Gabriel Parish), on its own behalf and as successor in interest to the insurance rights of Maternity of BVM (Richfield) and St. Columba(Lake Five) and St. Hubert (Hubertus) — Hubertus

122. St. Gregory the Great Congregation (Milwaukee) (a/k/a St. Gregory the Great Parish) — Milwaukee

123. St. Hyacinth's Congregation (Milwaukee) (a/k/a St. Hyacinth Parish) — Milwaukee

124. St. Isidore Congregation (Mt. Calvary), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Mt Calvary) and St. Cloud (St. Cloud) and St. Joseph (St. Cloud) — Mt Calvary

125. St. James Congregation (Franklin) (a/k/a St. James       Franklin
Parish)

126. St. James Congregation (Menomonee Falls) (a/k/a St.      Menomonee
James Parish)                                                 Falls

127. St. James Congregation (Mukwonago) (a/k/a St. James      Mukwonago
Parish)

128. St. James Congregation (Kenosha) (a/k/a St. James        Kenosha
the Apostle Parish)

129. St. Jerome's Congregation (Oconomowoc) (a/k/a St.        Oconomowoc
Jerome Parish)

130. St. Joan of Arc Congregation (Nashotah) (a/k/a St.       Nashotah
Joan of Arc Parish and St. Joan of Arc)

131. St. John Nepomucene Congregation (Racine) (a/k/a         Racine
St. John Nepomuk Parish)

132. Saint John Neumann Congregation (Waukesha) (a/k/a        Waukesha
St. John Neumann Parish)

133. St. John's Congregation (Rubicon) (a/k/a St. John        Rubicon
Parish)

134. St. John's Congregation (Clyman) (a/k/a St. John         Clyman
the Baptist Parish)

135. St. Johns Congregation (Johnsburg) (a/k/a St. John       Johnsburg
the Baptist Parish)

136. Congregation of St. John the Baptist (Plymouth)          Plymouth
(a/k/a St. John the Baptist Parish)

137. Congregation of St. John the Baptist (Union Grove)       Union Grove
(a/k/a St. John the Baptist Parish)

138. St. John, The Evangelist, Congregation (Greenfield)      Greenfield
(a/k/a St. John the Evangelist Parish)

139. St. John Evangelist Congregation (Kohler) (a/k/a         Kohler
St. John the Evangelist Parish and St. John)

140. St. John The Evangelist Congregation (Twin Lakes)        Twin Lakes
(a/k/a St. John the Evangelist Parish)

141. St. John Vianney Congregation (Brookfield) (a/k/a        Brookfield
St. John Vianney Parish)

142. St. Joseph Catholic Academy, Inc. (Kenosha) (a/k/a       Kenosha
St. Joseph Catholic Academy)

143. St. Joseph's Congregation (Big Bend) (a/k/a St.          Big Bend
Joseph Parish)

144. St. Joseph's Congregation (Grafton) (a/k/a St.           Grafton

Joseph Parish)

145. St. Joseph's Congregation (Lyons) (a/k/a St. Joseph    Lyons
Parish), on its own behalf and as successor in interest
to the insurance rights of St. Kilian (Lyons Township)

146. St. Joseph's Congregation (Racine) (a/k/a St.    Racine
Joseph Parish)

147. St. Joseph's Congregation (Waukesha) (a/k/a St.    Waukesha
Joseph Parish)

148. St. Josephs Congregation (Waupun) (a/k/a St. Joseph    Waupun
Parish)

149. St. Josephs Congregation (Wauwatosa) (a/k/a St.    Wauwatosa
Joseph Parish)

150. St. Jude Congregation (Wauwatosa) (a/k/a St. Jude    Wauwatosa
The Apostle Parish)

151. St. Katharine Drexel Parish (Beaver Dam), on its    Beaver Dam
own behalf and as successor in interest to the insurance
rights of St. Michael (Beaver Dam) and St. Patrick
(Beaver Dam) and St. Peter's (Beaver Dam) and Unified
Catholic Parish Schools of Beaver Dam Educational
Association (Beaver Dam)

152. St. Kilians Congregation (Hartford) (a/k/a St.    Hartford
Kilian Parish on its own behalf and as successor on
interest to the insurance rights of St. Patrick) (Erin)

153. St. Lawrence Congregation (St. Lawrence) (a/k/a St.    St. Lawrence
Lawrence Parish), on its own behalf and as successor in
interest to the insurance rights of St. Mathias (Nabob)

154. St. Leonard Congregation (Muskego) (a/k/a St.    Muskego
Leonard Parish)

155. St. Louis' Congregation (Caledonia)(a/k/a St. Louis    Caledonia
Parish)

156. St. Lucy Congregation (Racine) (a/k/a St. Lucy    Racine
Parish)

157. St. Luke Congregation (Brookfield) (a/k/a St. Luke    Brookfield
Parish)

158. St. Margaret Mary Congregation (Milwaukee) (a/k/a    Milwaukee
St. Margaret Mary Parish)

159. St. Mark's Congregation (Kenosha) (a/k/a St. Mark    Kenosha
Parish)

160. St. Martin of Tours Congregation (Franklin) (a/k/a    Franklin
St. Martin of Tours Parish), on its own behalf and as
successor in interest to the insurance rights of Holy

Assumption (Franklin) and Sacred Heart (Franklin)

| | |
|---|---|
| 161. St. Mary Magdalen Congregation (Milwaukee) (a/k/a St. Mary Magdalen Parish) | Milwaukee |
| 162. St. Mary's of the Hill Congregation (Hubertus) (a/k/a St. Mary of the Hill Parish and St. Mary of the Hill) | Hubertus |
| 163. St. Mary Congregation (Hales Corners) (a/k/a St. Mary Parish) | Hales Corners |
| 164. St. Marys Congregation (Kansasville) (a/k/a St. Mary Parish) | Kansasville |
| 165. St. Mary's Congregation (Kenosha) (a/k/a St. Mary Parish) on its own behalf and as successor in interest to the insurance rights of St. Thomas Aquinas (Kenosha) | Kenosha |
| 166. St. Mary's Congregation (Lomira) (a/k/a St. Mary Parish) | Lomira |
| 167. St. Mary's Congregation (Marytown) (a/k/a St. Mary Parish and a/k/a Visitation of BV (Marytown)) | Marytown |
| 168. Saint Mary's Congregation (Mayville) (a/k/a St. Mary Parish) | Mayville |
| 169. St. Mary's Congregation (Menomonee Falls) (a/k/a St. Mary Parish) | Menomonee Falls |
| 170. St. Mary's Congregation (Port Washington) (a/k/a St. Mary Parish) | Port Washington |
| 171. St. Marys Congregation (Racine) (a/k/a St. Mary Parish and St. Mary by the Lake) | Racine |
| 172. Saint Mary's Congregation (Springvale) (a/k/a St. Mary Parish) | Springvale |
| 173. St. Mary Congregation (Waukesha ) (a/k/a St. Mary Parish) | Waukesha |
| 174. St. Mary's Congregation (Woodland) (a/k/a St. Mary Parish) | Woodland |
| 175. St. Mary's Springs Academy of Fond du Lac, Wisconsin, Inc. (Fond Du Lac) (a/k/a St. Mary's Springs Academy) | Fond Du Lac |
| 176. St. Mary's Congregation (Elm Grove) (a/k/a St. Mary's Visitation and a/k/a Visitation of BVM (Elm Grove)) | Elm Grove |
| 177. St. Matthew's Congregation (Campbellsport) (a/k/a St. Matthew Parish), on its own behalf and as successor in interest to the insurance rights of St. Kilian (St. | Campbellsport |

Kilian) and St. Martin (Ashford)

| | |
|---|---|
| 178. St. Matthew's Congregation (Neosho) (a/k/a St. Matthew Parish) | Neosho |
| 179. St. Matthews Congregation (Oak Creek) (a/k/a St. Matthew Parish) | Oak Creek |
| 180. St. Mathias Congregation (Milwaukee) (a/k/a St. Matthias Parish) | Milwaukee |
| 181. St. Maximillian Kolbe Congregation (Milwaukee) (a/k/a St. Maximilian Kolbe) | Milwaukee |
| 182. St. Michaels' Congregation (Kewaskum) (a/k/a St. Michael Parish and St. Michael), on its own behalf and as successor in interest to the insurance rights of St. John of God (Farmington) | Kewaskum |
| 183. St. Michael's Congregation (Milwaukee) (a/k/a St. Michael Parish | Milwaukee |
| 184. The St. Michael's Priest Fund of the Archdiocese of Milwaukee (Milwaukee) (a/k/a St. Michael's Priest Fund) | Milwaukee |
| 185. St. Monica's Congregation (Whitefish Bay) (a/k/a St. Monica Parish) | Whitefish Bay |
| 186. St. Patrick's Congregation (Elkhorn) (a/k/a St. Patrick Parish) | Elkhorn |
| 187. St. Patricks Congregation (Milwaukee) (a/k/a St. Patrick Parish) | Milwaukee |
| 188. St. Patricks Congregation (Racine) (a/k/a St. Patrick Parish) | Racine |
| 189. St. Patricks Congregation (Whitewater) (a/k/a St. Patrick Parish) | Whitewater |
| 190. St. Paul's Catholic Church (Genesee Depot) (a/k/a St. Paul Parish) | Genesee Depot |
| 191. St. Paul's Congregation (Milwaukee) (a/k/a St. Paul Parish) | Milwaukee |
| 192. St. Paul The Apostle Congregation (Racine) (a/k/a St. Paul the Apostle Parish) | Racine |
| 193. St. Peter Claver Congregation (Sheboygan) (a/k/a St. Peter Claver Parish) | Sheboygan |
| 194. St. Peter Congregation (Port Washington) (a/k/a St. Peter of Alcantara Parish) | Port Washington |
| 195. St. Peters Congregation (East Troy) (a/k/a St. Peter Parish) | East Troy |

196. St. Peter's Congregation (Kenosha) (a/k/a St. Peter   Kenosha
Parish)

197. St. Peter's Congregation  (Slinger) (a/k/a St.   Slinger
Peter Parish and St. Peter)

198. St. Pius Congregation (Wauwatosa) (a/k/a St. Pius X   Wauwatosa
Parish)

199. St. Rafael the Archangel Congregation (Milwaukee)   Milwaukee
(a/k/a St. Rafael the Archangel), on its own behalf and
as successor in interest to the insurance rights of Holy
Spirit (Milwaukee) and St. Barbara (Milwaukee) and St.
Ignatius (Milwaukee)

200. Congregation of St. Richard  (Racine) (a/k/a St.   Racine
Richard), on its own behalf and as successor in interest
to the insurance rights of Holy Name (Racine) and Holy
Trinity (Racine) and St. Casimir (Racine) and St. Rose
(Racine) and St. Stanislaus (Racine)

201. St. Rita's Congregation (Racine) (a/k/a St. Rita   Racine
Parish)

202. St. Rita's Congregation (West Allis) (a/k/a St.   West Allis
Rita Parish)

203. St. Robert Bellarmine Congregation (Union Grove)   Union Grove
(a/k/a St. Robert Bellarmine Parish)

204. St. Robert's Congregation (Shorewood) (a/k/a St.   Shorewood
Robert Parish)

205. St. Roman Congregation (Milwaukee) (a/k/a St. Roman   Milwaukee
Parish)

206. The Congregation of St. Rose (Milwaukee) (a/k/a St.   Milwaukee
Rose Parish)

207. St. Sebastian's Congregation (Milwaukee) (a/k/a St.   Milwaukee
Sebastian Parish)

208. St. Sebastian Congregation (Sturtevant) (a/k/a St.   Sturtevant
Sebastian Parish)

209. The St. Sebastian School Foundation, Inc.   Milwaukee
(Milwaukee) (a/k/a St. Sebastian School Foundation)

210. The St. Stanislaus Congregation (Milwaukee) (a/k/a   Milwaukee
St. Stanislaus Parish)

211. St. Stephans Congregation (Oak Creek) (a/k/a St.   Oak Creek
Stephen Parish)

212. St. Theresa's Congregation (Eagle) (a/k/a St.   Eagle
Theresa Parish and St. Theresa Catholic Church)

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 228 of 329

| | |
|---|---|
| 213. St. Theresa's Congregation (Theresa) (a/k/a St. Theresa Parish) | Theresa |
| 214. St. Therese Congregation (Kenosha) (a/k/a St. Therese Parish) | Kenosha |
| 215. St. Therese Congregation (Milwaukee) (a/k/a St. Therese Parish) | Milwaukee |
| 216. St. Thomas Aquinas Congregation (Elkhart Lake) (a/k/a St. Thomas Aquinas), on its own behalf and as successor in interest to the insurance rights of St. Fridolin (Glenbeulah) and St. George (Elkhart Lake) | Elkhart Lake |
| 217. St. Thomas Aquinas Academy | Milwaukee |
| 218. St. Thomas Aquinas Congregation (Waterford) (a/k/a St. Thomas Aquinas Parish) | Waterford |
| 219. Saint Thomas More High School, Inc. (Milwaukee) (a/k/a St. Thomas More High School; f/k/a Thomas More High School, Inc.) | Milwaukee |
| 220. St. Veronica's Congregation (Milwaukee) (a/k/a St. Veronica Parish) | Milwaukee |
| 221. The St. Vincent a Paulo Congregation (Milwaukee) (a/k/a St. Vincent de Paul Parish) | Milwaukee |
| 222. St. Vincent Pallotti Congregation (Milwaukee) (a/k/a St. Vincent Pallotti Parish), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Milwaukee) and St. Anthony of Padua (Milwaukee) | Milwaukee |
| 223. St. William Congregation (Waukesha) (a/k/a St. William Parish) | Waukesha |
| 224. Three Holy Women Congregation (Milwaukee) (a/k/a Three Holy Women), on its own behalf and as successor in interest to the insurance rights of Holy Rosary Church(Milwaukee) and St. Hedwig (Milwaukee) and St. Rita Church (Milwaukee) | Milwaukee |
| 225. Wauwatosa Catholic School, Inc. (a/k/a Wauwatosa Catholic School) | Wauwatosa |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 229 of 329

# Attachment F

## List of Related Entities Represented by Foley & Lardner LLP

| Location | City |
|---|---|
| Annunciation Congregation (Fox Lake) (a/k/a Annunciation Parish), on its own behalf and as successor in interest to the insurance rights of St. Gabriel (Randolph), St. Mary's (Fox Lake), and St. Mary's (Lost Lake) | Fox Lake |
| Blessed John Paul II Congregation (Milwaukee) (a/k/a Blessed John Paul II and Holy Wisdom Academy), on its own behalf and as successor in interest to the insurance rights of St. Alexander (Milwaukee), St. Helen (Milwaukee), and St. John Kanty (Milwaukee) | Milwaukee |
| Blessed Sacrament Congregation (Milwaukee) (a/k/a Blessed Sacrament Parish) | Milwaukee |
| Blessed Savior Parish (Milwaukee)(a/k/a Blessed Savior School), on its own behalf and as successor in interest to the insurance rights of Corpus Christi (Milwaukee), Mother of Perpetual Help (Milwaukee), Our Lady of Sorrows (Milwaukee), St. Philip Neri (Milwaukee), and St. Stephen (Milwaukee) | Milwaukee |
| Blessed Teresa of Calcutta Congregation (North Lake) (a/k/a Blessed Teresa of Calcutta), on its own behalf and as successor in interest to the insurance rights of St. Clare (North Lake) and St. John (Monches) | North Lake |
| Blessed Trinity Congregation (Sheboygan Falls) (a/k/a Blessed Trinity), on its own behalf and as successor in interest to the insurance rights of St. George (St. George) and St. Mary (Sheboygan Falls) and St. Rose Lima (Sheboygan Falls) | Sheboygan Falls |
| Congregation of St. John's Cathedral (Milwaukee) (a/k/a Cathedral of St. John the Evangelist) | Milwaukee |
| Christ King Congregation (Wauwatosa)(a/k/a Christ King Parish) | Wauwatosa |
| Good Shepherd Congregation (Eden) (a/k/a Congregation of Good Shepherd), on its own behalf and as successor in interest to the insurance rights of Our Lady of Angels (Armstrong) and St. Mary (Eden) and St. Michael (Dotyville) and St. Michael (Mitchell) | Eden |
| Cristo Rey Congregation (Racine) (a/k/a Cristo Rey Parish) | Racine |

| | |
|---|---|
| Divine Mercy Congregation (South Milwaukee) (a/k/a Divine Mercy), on its own behalf and as successor in interest to the insurance rights of St. John (South Milwaukee) and St. Mary (South Milwaukee) and St. Sylvester (South Milwaukee)and St. Adalbert (South Milwaukee) | South Milwaukee |
| Divine Savior Congregation (Fredonia) (a/k/a Divine Savior), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Holy Cross) and Mother of Sorrows (Little Kohler) and St. Mary (Belgium) and St. Rose of Lima (Fredonia) | Fredonia |
| Gesu Parish Inc. (Milwaukee)(a/k/a Gesu Parish) | Milwaukee |
| Good Shepherd Congregation (Menomonee Falls (a/k/a Good Shepherd Parish) | Menomonee Falls |
| Congregation of Holy Angels (West Bend) (a/k/a Holy Angels Parish) | West Bend |
| Congregation of the Holy Apostles (New Berlin (a/k/a Holy Apostles Parish) | New Berlin |
| Congregation of the Holy Assumption (West Allis) (a/k/a Holy Assumption Parish) | West Allis |
| Holy Cross Parish (Bristol), on its own behalf and as successor in interest to the insurance rights of Holy Name of Jesus (Wilmot) and St. Scholastica (Bristol) | Bristol |
| Holy Family Congregation (Fond Du Lac) (a/k/a Holy Family), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Fond Du Lac) and St. Joseph (Fond Du Lac) and St. Louis (Fond Du Lac) and St. Patrick (Fond Du Lac) and St. Peter (Whitewater) | Fond Du Lac |
| Congregation of the Holy Family (Reeseville)(a/k/a Holy Family Parish) | Reeseville |
| Holy Family Congregation (Whitefish Bay) (a/k/a Holy Family Parish) | Whitefish Bay |
| Congregation of the Holy Name (Sheboygan) (a/k/a Holy Name Parish) | Sheboygan |
| Holy Trinity Congregation (Kewaskum (a/k/a Holy Trinity Parish), on its own behalf and as successor in interest to the insurance rights of St. Bridget (Wayne) and St. Mathias (Auburn) | Kewaskum |
| Holy Trinity Congregation (Newburg) (a/k/a Holy Trinity Parish) | Newburg |
| Congregation of the Immaculate Conception | Burlington |

| | |
|---|---|
| (Burlington)(a/k/a Immaculate Conception Parish) | |
| The Congregation of the Immaculate Conception (Milwaukee) (a/k/a Immaculate Conception Parish) | Milwaukee |
| Congregation of the Immaculate Conception (Saukville) (a/k/a Immaculate Conception Parish) | Saukville |
| Immaculate Conception Congregation (Sheboygan) (a/k/a Immaculate Conception Parish) | Sheboygan |
| Congregation of the Immaculate Conception (West Bend) (a/k/a Immaculate Conception Parish) | West Bend |
| Immaculate Heart of Mary Congregation (West Allis) (a/k/a Immaculate Heart of Mary) | West Allis |
| Lumen Christi Congregation (Mequon) (a/k/a Lumen Christi), on its own behalf and as successor in interest to the insurance rights of St. Cecilia (Thiensville) and St. James (Mequon) | Mequon |
| Mary Queen of Heaven Congregation (West Allis) (a/k/a Mary Queen Of Heaven Parish) | West Allis |
| Milwaukee Catholic Press Apostolate (a/k/a Milwaukee Catholic Press/Cath Herald and The Catholic Herald) | Milwaukee |
| Mother of Good Counsel Congregation (Milwaukee) (a/k/a Mother of Good Counsel Parish) | Milwaukee |
| Nativity of the Lord Congregation (Cudahy)(a/k/a Nativity of the Lord), on its own behalf and as successor in interest to the insurance rights of Holy Family (Cudahy) and St. Frederick (Cudahy) and St. Joseph (Cudahy) | Cudahy |
| St. Mary's Congregation (Milwaukee) (a/k/a Old St. Mary and St. Mary's (Old) Church) (Milwaukee) | Milwaukee |
| Our Lady of Divine Providence Congregation (Milwaukee) (a/k/a Our Lady Of Divine Providence), on its own behalf and as successor in interest to the insurance rights of St. Casimir (Milwaukee) and St. Mary of Czestochowa Church (Milwaukee) | Milwaukee |
| Our Lady of Good Hope Congregation (Milwaukee) (a/k/a Our Lady of Good Hope Parish) | Milwaukee |
| Our Lady of Guadalupe Congregation (Milwaukee) (a/k/a Our Lady of Guadalupe) on its own behalf and as successor in interest to the insurance rights of St. Wenceslaus (Milwaukee) | Milwaukee |
| Our Lady of Lourdes Congregation (Milwaukee) (a/k/a Our Lady of Lourdes Parish) | Milwaukee |

| | |
|---|---|
| Congregation of Our Lady of the Lakes (Random Lake) (a/k/a Our Lady of the Lakes), on its own behalf and as successor in interest to the insurance rights of St. Mary (Cascade) and St. Mary (Random Lake) and St. Nicholas (Dacada) and St. Patrick (Adell) | Random Lake |
| Our Lady, Queen of Peace Congregation (Milwaukee) (a/k/a Our Lady Queen of Peace Parish) | Milwaukee |
| Our Risen Savior Congregation)(Woodhull) (a/k/a Our Risen Savior-Woodhull), on its own behalf and as successor in interest to the insurance rights of St. John the Baptist (Woodhull) and St. Mary (Eldorado) and St. John the Baptist (Fond du Lac) | Woodhull |
| Church of the Presentation B.V.M. (North Fond Du Lac) (a/k/a Presentation of the Blessed Virgin Mary) | North Fond Du Lac |
| Prince of Peace/Principe de Paz Congregation (Milwaukee) (a/k/a Prince of Peace/Principe de Paz), on its own behalf and as successor in interest to the insurance rights of St. Lawrence (Milwaukee) and St. Matthew (Milwaukee) | Milwaukee |
| Queen of Apostles Congregation (Pewaukee) (a/k/a Queen of Apostles Parish), on its own behalf and as successor in interest to the insurance rights of Ss. Peter & Paul (Pewaukee) and St. Mary (Pewaukee) | Pewaukee |
| Congregation of the Resurrection (Allenton) (a/k/a Resurrection Parish), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Allenton) and Ss. Peter & Paul (Nenno) and St. Anthony (Allenton) | Allenton |
| Sacred Heart of Jesus Congregation (St. Francis) (a/k/a Sacred Heart of Jesus Parish) | St. Francis |
| Sacred Heart Congregation (Milwaukee) (a/k/a Sacred Heart Parish) | Milwaukee |
| Sacred Heart Congregation (Racine) (a/k/a Sacred Heart Parish) | Racine |
| Sacred Heart Congregation (Horicon) (a/k/a Sacred Heart Parish-Horicon), on its own behalf and as successor in interest to the insurance rights of Immaculate Conception (Juneau) and St. Malachy (Muskego) | Horicon |
| Sons of Zebedee: Ss. James and John Congregation (Byron) (a/k/a Sons of Zebedee), on its own behalf and as successor in interest to the insurance rights of St. James (Oakfield) and St. John (Byron) | Byron |

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 233 of 329

| | |
|---|---|
| Ss. Cyril and Methodius Congregation (Milwaukee) (a/k/a Ss. Cyril & Methodius Parish) | Milwaukee |
| Sts. Cyril and Methodius' Congregation (Sheboygan) (a/k/a Ss. Cyril & Methodius Parish) | Sheboygan |
| Ss. Peter and Paul (Milwaukee) (a/k/a Ss. Peter & Paul Parish) | Milwaukee |
| St. Adalbert's Congregation (Milwaukee) (a/k/a St. Adalbert Parish) | Milwaukee |
| St. Agnes Congregation (Butler) (a/k/a St. Agnes Parish) | Butler |
| St. Alphonsus Congregation (Greendale) (a/k/a St. Alphonsus Parish) | Greendale |
| St. Alphonsus Congregation (New Munster) (a/k/a St. Alphonsus Parish) | New Munster |
| St. Andrews Congregation (Leroy) (a/k/a St. Andrew) | Leroy |
| St. Andrew's Congregation (Delavan) (a/k/a St. Andrew Parish) | Delavan |
| St. Anthony's Congregation (Kenosha) (a/k/a St. Anthony of Padua Parish) | Kenosha |
| St. Anthony's Congregation (Pewaukee) (a/k/a St. Anthony on the Lake Parish) | Pewaukee |
| St. Anthony's Congregation (Menomonee Falls) (a/k/a St. Anthony Parish) | Menomonee Falls |
| St. Anthonys Congregation (Milwaukee) (a/k/a St. Anthony Parish) | Milwaukee |
| St. Augustin Congregation (West Allis) (a/k/a St. Augustine Parish) | West Allis |
| St. Augustinus Congregation (Milwaukee) (a/k/a St. Augustine Parish of Hippo) | Milwaukee |
| St. Benedict's Congregation (Fontana) (a/k/a St. Benedict Parish) | Fontana |
| St. Bernadette Congregation (Milwaukee) (a/k/a St. Bernadette Parish) | Milwaukee |
| St. Bernard's Congregation (Wauwatosa) (a/k/a St. Bernard Parish) | Wauwatosa |
| St. Bonifacius Congregation (Germantown) (a/k/a St. Boniface Parish) | Germantown |
| St. Brendan's Congregation (Brandon) (a/k/a St. Brendan Parish) | Brandon |
| St. Bruno's Congregation (Dousman) (a/k/a St. Bruno | Dousman |

Parish)

| | |
|---|---|
| St. Catherine's Congregation  (76th Place) (Milwaukee) (a/k/a St. Catherine of Alexandria) | Milwaukee |
| St. Catherine of Siena Congregation  (Ripon) (a/k/a St. Catherine of Siena), on its own behalf and as successor in interest to the insurance rights of St. Patrick (Ripon) and St. Wenceslaus (Ripon) | Ripon |
| St. Catherine's Congregation (Mapleton) (a/k/a St. Catherine Parish and Catharine's Congregation) | Mapleton |
| St. Catherine's Congregation (51st and Center) (Milwaukee) (a/k/a St. Catherine Parish) on its own behalf and as successor in interest to the insurance rights of Holy Redeemer (Milwaukee) and St. Albert (Milwaukee) and St. Nicholas (Kewaskum) | Milwaukee |
| St. Charles Congregation (Burlington) (a/k/a St. Charles Borromeo Parish) | Burlington |
| St. Charles Borromeo Congregation (Milwaukee) (a/k/a St. Charles Borromeo Parish) | Milwaukee |
| St. Charles Congregation (Hartland) (a/k/a St. Charles Parish) | Hartland |
| St. Clare Congregation (Wind Lake) (a/k/a St. Clare Parish) | Wind Lake |
| St. Clement's Congregation (Sheboygan) (a/k/a St. Clement Parish) | Sheboygan |
| St. Columbkill's Congregation (Elba) (a/k/a St. Columbkille Parish) | Elba |
| St. Dominic's Congregation (Brookfield) (a/k/a St. Dominic Parish) | Brookfield |
| St. Dominic Congregation (Sheboygan) (a/k/a St. Dominic Parish) | Sheboygan |
| St. Edward's Congregation (Racine) (a/k/a St. Edward Parish) | Racine |
| Saint Elizabeth Ann Seton (New Berlin)(a/k/a St. Elizabeth Ann Seton Parish) | New Berlin |
| Congregation of St. Elizabeth (Kenosha) (a/k/a St. Elizabeth Parish), on its own behalf and as successor in interest to the insurance rights of St. Casimir (Kenosha) and St. George (Kenosha) | Kenosha |
| St. Florian's Congregation (W Milwaukee) (a/k/a St. Florian Parish) | W Milwaukee |

| | |
|---|---|
| St. Frances Cabrini Congregation (West Bend) (a/k/a St. Frances Cabrini Parish) | West Bend |
| Congregation of St. Francis Borgia (Cedarburg) (a/k/a St. Francis Borgia), on its own behalf and as successor in interest to the insurance rights of Church of Divine Word(Cedarburg) | Cedarburg |
| Congregation of St. Francis de Sales (Lake Geneva) (a/k/a St. Francis de Sales Parish), on its own behalf and as successor in interest to the insurance rights of St. Mary (Pell Lake) | Lake Geneva |
| St. Francis Xavier (Brighton) (a/k/a St. Francis Xavier Parish) | Brighton |
| St. Gabriel Congregation (Hubertus) (a/k/a St. Gabriel Parish), on its own behalf and as successor in interest to the insurance rights of Maternity of BVM (Richfield) and St. Columba(Lake Five) and St. Hubert (Hubertus) | Hubertus |
| St. Gregory the Great Congregation (Milwaukee) (a/k/a St. Gregory the Great Parish) | Milwaukee |
| St. Hyacinth's Congregation (Milwaukee) (a/k/a St. Hyacinth Parish) | Milwaukee |
| St. Isidore Congregation (Mt. Calvary), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Mt Calvary) and St. Cloud (St. Cloud) and St. Joseph (St. Cloud) | Mt Calvary |
| St. James Congregation (Franklin) (a/k/a St. James Parish) | Franklin |
| St. James Congregation (Menomonee Falls) (a/k/a St. James Parish) | Menomonee Falls |
| St. James Congregation (Mukwonago) (a/k/a St. James Parish) | Mukwonago |
| St. James Congregation (Kenosha) (a/k/a St. James the Apostle Parish) | Kenosha |
| St. Jerome's Congregation (Oconomowoc) (a/k/a St. Jerome Parish) | Oconomowoc |
| St. Joan of Arc Congregation (Nashotah) (a/k/a St. Joan of Arc Parish and St. Joan of Arc) | Nashotah |
| St. John Nepomucene Congregation (Racine) (a/k/a St. John Nepomuk Parish) | Racine |
| Saint John Neumann Congregation (Waukesha) (a/k/a St. John Neumann Parish) | Waukesha |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 236 of 329

| | |
|---|---|
| St. John's Congregation (Rubicon) (a/k/a St. John Parish) | Rubicon |
| St. John's Congregation (Clyman) (a/k/a St. John the Baptist Parish) | Clyman |
| St. Johns Congregation (Johnsburg) (a/k/a St. John the Baptist Parish) | Johnsburg |
| Congregation of St. John the Baptist (Plymouth) (a/k/a St. John the Baptist Parish) | Plymouth |
| Congregation of St. John the Baptist (Union Grove) (a/k/a St. John the Baptist Parish) | Union Grove |
| St. John, The Evangelist, Congregation (Greenfield) (a/k/a St. John the Evangelist Parish) | Greenfield |
| St. John Evangelist Congregation (Kohler) (a/k/a St. John the Evangelist Parish and St. John) | Kohler |
| St. John The Evangelist Congregation (Twin Lakes) (a/k/a St. John the Evangelist Parish) | Twin Lakes |
| St. John Vianney Congregation (Brookfield) (a/k/a St. John Vianney Parish) | Brookfield |
| St. Joseph's Congregation (Big Bend) (a/k/a St. Joseph Parish) | Big Bend |
| St. Joseph's Congregation (Grafton) (a/k/a St. Joseph Parish) | Grafton |
| St. Joseph's Congregation (Lyons) (a/k/a St. Joseph Parish), on its own behalf and as successor in interest to the insurance rights of St. Kilian (Lyons Township) | Lyons |
| St. Joseph's Congregation (Racine) (a/k/a St. Joseph Parish) | Racine |
| St. Joseph's Congregation (Waukesha) (a/k/a St. Joseph Parish) | Waukesha |
| St. Josephs Congregation (Waupun) (a/k/a St. Joseph Parish) | Waupun |
| St. Josephs Congregation (Wauwatosa) (a/k/a St. Joseph Parish) | Wauwatosa |
| St. Jude Congregation (Wauwatosa) (a/k/a St. Jude The Apostle Parish) | Wauwatosa |
| St. Katharine Drexel Parish (Beaver Dam), on its own behalf and as successor in interest to the insurance rights of St. Michael (Beaver Dam) and St. Patrick (Beaver Dam) and St. Peter's (Beaver Dam) and Unified Catholic Parish Schools of Beaver Dam Educational | Beaver Dam |

Association (Beaver Dam)

| | |
|---|---|
| St. Kilians Congregation (Hartford) (a/k/a St. Kilian Parish) on its own behalf and as successor on interest to the insurance rights of St. Patrick (Erin) | Hartford |
| St. Lawrence Congregation (St. Lawrence) (a/k/a St. Lawrence Parish), on its own behalf and as successor in interest to the insurance rights of St. Mathias (Nabob) | St. Lawrence |
| St. Leonard Congregation (Muskego) (a/k/a St. Leonard Parish) | Muskego |
| St. Louis' Congregation (Caledonia)(a/k/a St. Louis Parish) | Caledonia |
| St. Lucy Congregation (Racine) (a/k/a St. Lucy Parish) | Racine |
| St. Luke Congregation (Brookfield) (a/k/a St. Luke Parish) | Brookfield |
| St. Margaret Mary Congregation (Milwaukee) (a/k/a St. Margaret Mary Parish) | Milwaukee |
| St. Mark's Congregation (Kenosha) (a/k/a St. Mark Parish) | Kenosha |
| St. Martin of Tours Congregation (Franklin) (a/k/a St. Martin of Tours Parish), on its own behalf and as successor in interest to the insurance rights of Holy Assumption (Franklin) and Sacred Heart (Franklin) | Franklin |
| St. Mary Magdalen Congregation (Milwaukee) (a/k/a St. Mary Magdalen Parish) | Milwaukee |
| St. Mary's of the Hill Congregation (Hubertus) (a/k/a St. Mary of the Hill Parish and St. Mary of the Hill) | Hubertus |
| St. Mary Congregation  (Hales Corners) (a/k/a St. Mary Parish) | Hales Corners |
| St. Marys Congregation (Kansasville) (a/k/a St. Mary Parish) | Kansasville |
| St. Mary's Congregation (Kenosha) (a/k/a St. Mary Parish) on its own behalf and as successor in interest to the insurance rights of St. Thomas Aquinas (Kenosha) | Kenosha |
| St. Mary's Congregation (Lomira) (a/k/a St. Mary Parish) | Lomira |
| St. Mary's Congregation (Marytown) (a/k/a St. Mary Parish and Visitation of BVM) | Marytown |
| Saint Mary's Congregation (Mayville) (a/k/a St. Mary Parish) | Mayville |
| St. Mary's Congregation (Menomonee Falls) (a/k/a St. | Menomonee |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 238 of 329

| | |
|---|---|
| Mary Parish) | Falls |
| St. Mary's Congregation (Port Washington) (a/k/a St. Mary Parish) | Port Washington |
| St. Marys Congregation (Racine) (a/k/a St. Mary Parish and St. Mary by the Lake) | Racine |
| Saint Mary's Congregation (Springvale) (a/k/a St. Mary Parish) | Springvale |
| St. Mary Congregation (Waukesha ) (a/k/a St. Mary Parish) | Waukesha |
| St. Mary's Congregation (Woodland) (a/k/a St. Mary Parish) | Woodland |
| St. Mary's Congregation (Elm Grove) (a/k/a St. Mary's Visitation and Visitation of BVM) | Elm Grove |
| St. Matthew's Congregation (Campbellsport) (a/k/a St. Matthew Parish), on its own behalf and as successor in interest to the insurance rights of St. Kilian (St. Kilian) and St. Martin (Ashford) | Campbellsport |
| St. Matthew's Congregation (Neosho) (a/k/a St. Matthew Parish) | Neosho |
| St. Mathias Congregation (Milwaukee) (a/k/a St. Matthias Parish) | Milwaukee |
| St. Maximillian Kolbe Congregation (Milwaukee) (a/k/a St. Maximilian Kolbe) | Milwaukee |
| St. Michaels' Congregation (Kewaskum) (a/k/a St. Michael Parish and St. Michael), on its own behalf and as successor in interest to the insurance rights of St. John of God (Farmington) | Kewaskum |
| St. Michael's Congregation (Milwaukee) (a/k/a St. Michael Parish) | Milwaukee |
| St. Monica's Congregation (Whitefish Bay) (a/k/a St. Monica Parish) | Whitefish Bay |
| St. Patrick's Congregation (Elkhorn) (a/k/a St. Patrick Parish) | Elkhorn |
| St. Patricks Congregation (Milwaukee) (a/k/a St. Patrick Parish) | Milwaukee |
| St. Patricks Congregation (Racine) (a/k/a St. Patrick Parish) | Racine |
| St. Patricks Congregation (Whitewater) (a/k/a St. Patrick Parish) | Whitewater |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 239 of 329

| | |
|---|---|
| St. Paul's Catholic Church (Genesee Depot) (a/k/a St. Paul Parish) | Genesee Depot |
| St. Paul The Apostle Congregation (Racine) (a/k/a St. Paul the Apostle Parish) | Racine |
| St. Peter Claver Congregation (Sheboygan) (a/k/a St. Peter Claver Parish) | Sheboygan |
| St. Peter Congregation (Port Washington) (a/k/a St. Peter of Alcantara Parish) | Port Washington |
| St. Peters Congregation (East Troy) (a/k/a St. Peter Parish) | East Troy |
| St. Peter's Congregation (Slinger) (a/k/a St. Peter Parish and St. Peter) | Slinger |
| St. Pius Congregation (Wauwatosa) (a/k/a St. Pius X Parish) | Wauwatosa |
| St. Rafael the Archangel Congregation (Milwaukee) (a/k/a St. Rafael the Archangel), on its own behalf and as successor in interest to the insurance rights of Holy Spirit (Milwaukee) and St. Barbara (Milwaukee) and St. Ignatius (Milwaukee) | Milwaukee |
| Congregation of St. Richard (Racine) (a/k/a St. Richard), on its own behalf and as successor in interest to the insurance rights of Holy Name (Racine) and Holy Trinity (Racine) and St. Casimir (Racine) and St. Rose (Racine) and St. Stanislaus (Racine) | Racine |
| St. Rita's Congregation (Racine) (a/k/a St. Rita Parish) | Racine |
| St. Rita's Congregation (West Allis) (a/k/a St. Rita Parish) | West Allis |
| St. Robert Bellarmine Congregation (Union Grove) (a/k/a St. Robert Bellarmine Parish) | Union Grove |
| St. Robert's Congregation (Shorewood) (a/k/a St. Robert Parish) | Shorewood |
| St. Roman Congregation (Milwaukee) (a/k/a St. Roman Parish) | Milwaukee |
| The Congregation of St. Rose (Milwaukee) (a/k/a St. Rose Parish) | Milwaukee |
| St. Sebastian's Congregation (Milwaukee) (a/k/a St. Sebastian Parish) | Milwaukee |
| St. Sebastian Congregation (Sturtevant) (a/k/a St. Sebastian Parish) | Sturtevant |
| St. Theresa's Congregation (Eagle) (a/k/a St. Theresa | Eagle |

Parish and St. Theresa Catholic Church)

| | |
|---|---|
| St. Therese Congregation (Theresa) (a/k/a St. Therese Parish) | Theresa |
| St. Therese Congregation (Milwaukee) (a/k/a St. Therese Parish) | Milwaukee |
| St. Thomas Aquinas Congregation (Elkhart Lake) (a/k/a St. Thomas Aquinas), on its own behalf and as successor in interest to the insurance rights of St. Fridolin (Glenbeulah) and St. George (Elkhart Lake) | Elkhart Lake |
| St. Thomas Aquinas Congregation (Waterford) (a/k/a St. Thomas Aquinas Parish) | Waterford |
| The St. Vincent a Paulo Congregation (Milwaukee) (a/k/a St. Vincent de Paul Parish) | Milwaukee |
| St. Vincent Pallotti Congregation (Milwaukee) (a/k/a St. Vincent Pallotti Parish), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Milwaukee) and St. Anthony of Padua (Milwaukee) | Milwaukee |
| St. William Congregation (Waukesha) (a/k/a St. William Parish) | Waukesha |
| Three Holy Women Congregation (Milwaukee) (a/k/a Three Holy Women), on its own behalf and as successor in interest to the insurance rights of Holy Rosary Church(Milwaukee) and St. Hedwig (Milwaukee) and St. Rita Church (Milwaukee) | Milwaukee |

**Attachment G**

**Notice Information for Related Entities Not Represented by Foley & Lardner LLP**

| Location | Notice Address |
|---|---|
| Calvary Cemetery | Pastor or Parish Administrator<br>c/o Holy Family Parish<br>271 Fourth Street Way<br>Fond du Lac, WI 54937-7508 |
| Calvary Cemetery, Sheboygan, Wisconsin (a/k/a Calvary Cemetery) | Pastor or Parish Administrator<br>c/o St. Dominic Parish<br>2133 N. 22nd Street<br>Sheboygan, WI 53081 |
| Catholic Cemetery Assoc. of Racine Inc. | Pastor or Parish Administrator<br>c/o St. Rita Parish<br>4339 Douglas Avenue<br>Racine, WI 53402-2997 |
| Catholic Charities of the Archdiocese of Milwaukee, Inc. (a/k/a Catholic Charities and Catholic Social Services; f/k/a Catholic Social Services of the Archdiocese of Milwaukee, Inc. and Catholic Social Welfare Bureau) | Executive Director<br>3501 S. Lake Drive<br>P.O. Box 070912<br>Milwaukee, WI 53207-0912 |
| All Saints Catholic East School System, Inc. (a/k/a Catholic East Elementary) | Principal<br>2461 N. Murray Avenue<br>Milwaukee, WI 53211 |
| Catholic Memorial High School of Waukesha, Inc.(a/k/a Catholic Memorial High School) | President<br>601 E. College Avenue<br>Waukesha, WI<br>53186-5538 |
| Christ Child Christian Formation Ministry, Inc. (a/k/a Christ Child Academy) | Supervising Pastor<br>2722 Henry Street<br>Sheboygan, WI 53081 |

| | |
|---|---|
| Consolidated Parochial Elementary School Johnsburg Marytown-Mt. Calvary-St. Cloud, Inc. (a/k/a Consolidated Parochial Elementary) | Principal<br>N9290 County W<br>Fond du Lac, 54937 |
| DeSales Preparatory Seminary, Inc. (a/k/a DeSales Prep/ACCC) | Treasurer<br>3501 S. Lake Drive<br>Milwaukee, WI 53207-0912 |
| Holy Sepulcher Cemetery | Pastor or Parish Administrator<br>c/o Divine Mercy Parish<br>695 College Avenue<br>South Milwaukee, WI 53172 |
| Mary Queen of Saints Catholic Academy | Pastor or Principal<br>c/o St. Aloysius<br>1414 S. 93rd Street<br>West Allis, WI 53214-4299 |
| M.H.S., Inc. (a/k/a Messmer High School) | Vice President<br>742 W. Capitol Drive<br>Milwaukee, WI 53206 |
| Milwaukee Catholic Press Apostolate (a/k/a Milwaukee Catholic Press/Cath Herald and The Catholic Herald) | Executive Editor/General Manager<br>3501 S. Lake Drive<br>PO Box 070913<br>Milwaukee, WI 53207-0913 |
| Northwest Catholic School | Pastor or Parish Administrator<br>c/o St. Bernadette Parish<br>8200 W. Denver Avenue<br>Milwaukee, WI 53233 |
| Milwaukee Archdiocesan Office for World Mission, Inc. (Milwaukee)(a/k/a Office for World Missions) | Director<br>3501 S. Lake Drive<br>Milwaukee, WI 53207-0913 |
| Our Lady of Mount Carmel (Kenosha)(a/k/a Our Lady of Mt Carmel Parish) | Pastor or Parish Administrator<br>1919 54th Street<br>Kenosha, WI 53140 |
| Congregation of the Holy Rosary of Pompeii (Kenosha) (a/k/a Our Lady of the Holy Rosary and Our Lady of Rosary) | Pastor or Parish Administrator<br>2224 45th Street<br>Kenosha, WI 53140 |

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 243 of 329

| | |
|---|---|
| Pius XI High School, Inc. (Milwaukee) (a/k/a Pius XI High School) | President<br>135 N. 76th Street<br>Milwaukee, WI 53213 |
| Port Washington Catholic School, Inc. (Port Washington) (a/k/a Port Washington Catholic Schools) | Principal<br>1802 N. Wisconsin Street<br>Port Washington, WI 53074 |
| Providence Catholic School | Pastor or Parish Administrator<br>c/o St. John the Baptist Parish<br>1704 240th Avenue<br>Kansasville, WI 53139 |
| Society for the Propagation of the Faith, Archdiocese of Milwaukee (Milwaukee) (a/k/a Society for the Propagation of the Faith and Office for the Propagation of the Faith and Office for the Propagation of the Faith) | Director<br>3501 S. Lake Drive<br>Milwaukee, WI 53207-0913 |
| St. Aloysius' Congregation (West Allis) (a/k/a St. Aloysius Parish) | Pastor or Parish Administrator<br>1414 S. 93rd Street<br>West Allis, WI 53214-4299 |
| St. Augustin's Congregation (Trenton) (a/k/a St. Augustine Parish) | Pastor or Parish Administrator<br>521 Congress Street<br>P.O. Box<br>Newburg, WI 53060-0016 |
| St. Catherine's Congregation (Sharon) (a/k/a St. Catherine Parish) | Pastor or Parish Administrator<br>PO Box 502<br>Sharon, WI 53585 |
| St. Charles Cemetery Association | Pastor or Parish Administrator<br>c/o Holy Family Parish<br>271 Fourth Street Way<br>Fond du Lac, WI 54937-7508 |
| St. Charles Youth & Family Services, Inc. (Milwaukee) (a/k/a St. Charles, Inc.) | President<br>151 S. 84th Street<br>Milwaukee, WI 53214 |
| St. Eugene Congregation (Fox Point) (a/k/a St. Eugene Parish) | Pastor or Parish Administrator<br>7600 N. Port Washington Road<br>Fox Point, WI 53217-3199 |

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 244 of 329

| | |
|---|---|
| Saint Francis de Sales Seminary, Inc. (a/k/a St. Francis de Sales Seminary; f/k/a St. Francis Seminary) | Director 3257 S. Lake Drive St. Francis, WI 53234 |
| St. Joseph Catholic Academy, Inc. (Kenosha) (a/k/a St. Joseph Catholic Academy) | President 2401 69th Street Kenosha, WI 53143 |
| St. Mary's Springs Academy of Fond du Lac, Wisconsin, Inc. (Fond Du Lac) (a/k/a St. Mary's Springs Academy) | President 255 County Road K Fond du Lac, WI 54937 |
| St. Matthews Congregation (Oak Creek) (a/k/a St. Matthew Parish) | Pastor or Parish Administrator 9303 S. Chicago Road Oak Creek, WI 53154 |
| St. Maximillian Kolbe Congregation (Milwaukee) (a/k/a St. Maximilian Kolbe) | Pastor or Parish Administrator 2427 S. 15th Street Milwaukee, WI 53215 |
| The St. Michael's Priest Fund of the Archdiocese of Milwaukee (Milwaukee) (a/k/a St. Michael's Priest Fund) | Vice-President 3501 S. Lake Drive Milwaukee, WI 53207-0913 |
| St. Paul's Congregation (Milwaukee) (a/k/a St. Paul Parish) | Pastor or Parish Administrator 1720 E. Norwich Avenue Milwaukee, WI 53207-4618 |
| St. Peter's Congregation (Kenosha) (a/k/a St. Peter Parish) | Pastor or Parish Administrator 2224 S. 30th Avenue Kenosha, WI 53144 |
| The St. Sebastian School Foundation, Inc. (Milwaukee) (a/k/a St. Sebastian School Foundation) | Director 5400 W. Washington Blvd. Milwaukee, WI 53208 |
| The St. Stanislaus Congregation (Milwaukee) (a/k/a St. Stanislaus Parish) | Pastor or Parish Administrator 524 W. Historic Mitchell Street Milwaukee, WI 53204-3599 |
| St. Stephans Congregation (Oak Creek) (a/k/a St. Stephen Parish) | Pastor or Parish Administrator 1441 W. Oakwood Road Oak Creek, WI 53154 |

St. Therese Congregation (Kenosha)        Pastor or Parish Administrator
(a/k/a St. Therese Parish)                9005 22nd Avenue
                                          Kenosha, WI 53143


St. Thomas Aquinas Academy                Pastor or Parish Administrator
                                          c/o St. Veronica Parish
                                          353 E. Norwich Avenue
                                          Milwaukee, WI 53207


Saint Thomas More High School,            Chief Administrator
Inc. (Milwaukee) (a/k/a St. Thomas        2601 E. Morgan Avenue
More High School; f/k/a Thomas            Milwaukee, WI 53207-3725
More High School, Inc.)


St. Veronica's Congregation               Pastor or Parish Administrator
(Milwaukee) (a/k/a St. Veronica           353 E. Norwich Avenue
Parish)                                   Milwaukee, WI 53207


Wauwatosa Catholic School, Inc.           Pastor or Parish Administrator
(a/k/a Wauwatosa Catholic School)         c/o St. Bernard Parish
                                          7474 Harwood Avenue
                                          Wauwatosa, WI 53213-2641

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 246 of 329

# EXHIBIT O - LIST OF RELATED ENTITIES

| Location | City |
|---|---|
| 1.      Annunciation Congregation (Fox Lake) (a/k/a Annunciation Parish), on its own behalf and as successor in interest to the insurance rights of St. Gabriel (Randolph), St. Mary's (Fox Lake), and St. Mary's (Lost Lake) | Fox Lake |
| 2.      Blessed John Paul II Congregation (Milwaukee) (a/k/a Blessed John Paul II and Holy Wisdom Academy), on its own behalf and as successor in interest to the insurance rights of St. Alexander (Milwaukee), St. Helen (Milwaukee), and St. John Kanty (Milwaukee) | Milwaukee |
| 3.      Blessed Sacrament Congregation (Milwaukee) (a/k/a Blessed Sacrament Parish) | Milwaukee |
| 4.      Blessed Savior Congregation (Milwaukee)(a/k/a Blessed Savior School), on its own behalf and as successor in interest to the insurance rights of Corpus Christi (Milwaukee), Mother of Perpetual Help (Milwaukee), Our Lady of Sorrows (Milwaukee), St. Philip Neri (Milwaukee), and St. Stephen (Milwaukee) | Milwaukee |
| 5.      Blessed Teresa of Calcutta Congregation (North Lake)  (a/k/a Blessed Teresa of Calcutta), on its own behalf and as successor in interest to the insurance rights of St. Clare (North Lake) and St. John (Monches) | North Lake |
| 6.      Blessed Trinity Congregation (Sheboygan Falls) (a/k/a Blessed Trinity), on its own behalf and as Successor in interest to the insurance rights of St. George (St. George) and St. Mary (Sheboygan Falls) and St. Rose Lima (Sheboygan Falls) | Sheboygan Falls |
| 7.      Calvary Cemetery (Fond du Lac) | Fond Du Lac |
| 8.      Calvary Cemetery, Sheboygan, Wisconsin (a/k/a Calvary Cemetery) | Sheboygan |
| 9.      Congregation of St. John's Cathedral (Milwaukee) (a/k/a Cathedral of St. John the Evangelist) | Milwaukee |
| 10.      Catholic Cemetery Assoc. of Racine, Inc. | Racine |
| 11.      Catholic Charities of the Archdiocese of Milwaukee, Inc. (a/k/a Catholic Charities and Catholic Social Services; f/k/a Catholic Social Services of the Archdiocese of Milwaukee, Inc. and Catholic Social Welfare Bureau) | Milwaukee |
| 12.      All Saints Catholic East School System, Inc. (a/k/a Catholic East Elementary) | Milwaukee |
| 13.      Catholic Memorial High School of Waukesha, Inc.(a/k/a Catholic Memorial High School) | Waukesha |
| 14.      Christ Child Christian Formation Ministry, Inc. (a/k/a Christ Child Academy) | Sheboygan |
| 15.      Christ King Congregation (Wauwatosa)(a/k/a Christ King Parish) | Wauwatosa |
| 16.      Good Shepherd Congregation (Eden) (a/k/a Congregation of Good Shepherd), on its own behalf and as successor in interest to the insurance rights of Our Lady of Angels (Armstrong) and St. Mary (Eden) and St. Michael (Dotyville) | Eden |

and St. Michael (Mitchell)

| | | |
|---|---|---|
| 17. | Consolidated Parochial Elementary School Johnsburg Marytown-Mt. Calvary-St. Cloud, Inc. (a/k/a Consolidated Parochial Elementary) | Mt Calvary |
| 18. | Cristo Rey Congregation (Racine) (a/k/a Cristo Rey Parish) | Racine |
| 19. | DeSales Preparatory Seminary, Inc. (a/k/a DeSales Prep/ACCC) | Milwaukee |
| 20. | Divine Mercy Congregation (South Milwaukee) (a/k/a Divine Mercy), on its own behalf and as successor in interest to the insurance rights of St. John (South Milwaukee) and St. Mary (South Milwaukee) and St. Sylvester (South Milwaukee)and St. Adalbert (South Milwaukee) | South Milwaukee |
| 21. | Divine Savior Congregation (Fredonia) (a/k/a Divine Savior), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Holy Cross) and Mother of Sorrows (Little Kohler) and St. Mary (Belgium) and St. Rose of Lima (Fredonia) | Fredonia |
| 22. | Gesu Parish Inc. (Milwaukee)(a/k/a Gesu Parish) | Milwaukee |
| 23. | Good Shepherd Congregation (Menomonee Falls (a/k/a Good Shepherd Parish) | Menomonee Falls |
| 24. | Congregation of Holy Angels (West Bend) (a/k/a Holy Angels Parish) | West Bend |
| 25. | Congregation of the Holy Apostles (New Berlin (a/k/a Holy Apostles Parish) | New Berlin |
| 26. | Congregation of the Holy Assumption (West Allis) (a/k/a Holy Assumption Parish) | West Allis |
| 27. | Holy Cross Parish (Bristol), on its own behalf and as successor in interest to the insurance rights of Holy Name of Jesus (Wilmot) and St. Scholastica (Bristol) | Bristol |
| 28. | Holy Family Congregation (Fond Du Lac) (a/k/a Holy Family), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Fond Du Lac) and St. Joseph (Fond Du Lac) and St. Louis (Fond Du Lac) and St. Patrick (Fond Du Lac) and St. Peter (Whitewater) | Fond Du Lac |
| 29. | Congregation of the Holy Family (Reeseville)(a/k/a Holy Family Parish) | Reeseville |
| 30. | Holy Family Congregation (Whitefish Bay) (a/k/a Holy Family Parish) | Whitefish Bay |
| 31. | Congregation of the Holy Name (Sheboygan) (a/k/a Holy Name Parish) | Sheboygan |
| 32. | Holy Sepulcher Cemetery | Cudahy |
| 33. | Holy Trinity Congregation (Kewaskum (a/k/a Holy Trinity Parish), on its own behalf and as successor in interest to the insurance rights of St. Bridget (Wayne) and St. Mathias (Auburn) | Kewaskum |
| 34. | Holy Trinity Congregation (Newburg) (a/k/a Holy Trinity Parish) | Newburg |
| 35. | Congregation of the Immaculate Conception (Burlington)(a/k/a Immaculate Conception Parish) | Burlington |
| 36. | The Congregation of the Immaculate Conception (Milwaukee) (a/k/a Immaculate Conception Parish) | Milwaukee |
| 37. | The Congregation of the Immaculate Conception (Saukville (a/k/a | Saukville |

Immaculate Conception Parish)

| | | |
|---|---|---|
| 38. | Immaculate Conception Congregation (Sheboygan) (a/k/a Immaculate Conception Parish) | Sheboygan |
| 39. | Congregation of the Immaculate Conception (West Bend) (a/k/a Immaculate Conception Parish) | West Bend |
| 40. | Immaculate Heart of Mary Congregation (West Allis) (a/k/a Immaculate Heart of Mary) | West Allis |
| 41. | Lumen Christi Congregation (Mequon) (a/k/a Lumen Christi), on its own behalf and as successor in interest to the insurance rights of St. Cecilia (Thiensville) and St. James (Mequon) | Mequon |
| 42. | Mary Queen of Heaven Congregation (West Allis) (a/k/a Mary Queen Of Heaven Parish) | West Allis |
| 43. | Mary Queen of Saints Catholic Academy | West Allis |
| 44. | M.H.S., Inc. (a/k/a Messmer High School) | Milwaukee |
| 45. | Milwaukee Catholic Press Apostolate (a/k/a Milwaukee Catholic Press/Cath Herald and a/k/a The Catholic Herald) | Milwaukee |
| 46. | Mother of Good Counsel Congregation (Milwaukee) (a/k/a Mother of Good Counsel Parish) | Milwaukee |
| 47. | Nativity of the Lord Congregation (Cudahy)(a/k/a Nativity of the Lord), on its own behalf and as successor in interest to the insurance rights of Holy Family (Cudahy) and St. Frederick (Cudahy) and St. Joseph (Cudahy) | Cudahy |
| 48. | Northwest Catholic School | Milwaukee |
| 49. | Milwaukee Archdiocesan Office for World Mission, Inc. (Milwaukee)(a/k/a Office for World Missions) | Milwaukee |
| 50. | St. Mary's Congregation (Milwaukee) (a/k/a Old St. Mary and St. Mary's (Old) Church) (Milwaukee) | Milwaukee |
| 51. | Our Lady of Divine Providence Congregation (Milwaukee) (a/k/a Our Lady Of Divine Providence), on its own behalf and as successor in interest to the insurance rights of St. Casimir (Milwaukee) and St. Mary of Czestochowa Church (Milwaukee) | Milwaukee |
| 52. | Our Lady of Good Hope Congregation (Milwaukee) (a/k/a Our Lady of Good Hope Parish) | Milwaukee |
| 53. | Our Lady of Guadalupe Congregation (Milwaukee) (a/k/a Our Lady of Guadalupe) on its own behalf and as successor in interest to the insurance rights of St. Wenceslaus (Milwaukee) | Milwaukee |
| 54. | Our Lady of Lourdes Congregation (Milwaukee) (a/k/a Our Lady of Lourdes Parish) | Milwaukee |
| 55. | Our Lady of Mount Carmel (Kenosha)(a/k/a Our Lady of Mt Carmel Parish) | Kenosha |
| 56. | Congregation of the Holy Rosary of Pompeii (Kenosha) (a/k/a Our Lady of | Kenosha |

the Holy Rosary and Our Lady of Rosary)

| | |
|---|---|
| 57. Congregation of Our Lady of the Lakes (Random Lake) (a/k/a Our Lady of the Lakes), on its own behalf and as successor in interest to the insurance rights of St. Mary (Cascade) and St. Mary (Random Lake) and St. Nicholas (Dacada) and St. Patrick (Adell) | Random Lake |
| 58. Our Lady, Queen of Peace Congregation (Milwaukee) (a/k/a Our Lady Queen of Peace Parish) | Milwaukee |
| 59. Our Risen Savior Congregation)(Woodhull) (a/k/a Our Risen Savior-Woodhull), on its own behalf and as successor in interest to the insurance rights of St. John the Baptist (Woodhull) and St. Mary (Eldorado) and St. John the Baptist Parish (Fond du Lac) | Woodhull |
| 60. Pius XI High School, Inc. (Milwaukee) (a/k/a Pius XI High School) | Milwaukee |
| 61. Port Washington Catholic School, Inc. (Port Washington) (a/k/a Port Washington Catholic Schools) | Port Washington |
| 62. Church of the Presentation B.V.M. (North Fond Du Lac) (a/k/a Presentation of the Blessed Virgin Mary) | North Fond Du Lac |
| 63. Prince of Peace/Principe de Paz Congregation (Milwaukee) (a/k/a Prince of Peace/Principe de Paz), on its own behalf and as successor in interest to the insurance rights of St. Lawrence (Milwaukee) and St. Matthew (Milwaukee) | Milwaukee |
| 64. Providence Catholic School | Union Grove |
| 65. Queen of Apostles Congregation (Pewaukee) (a/k/a Queen of Apostles Parish), on its own behalf and as successor in interest to the insurance rights of Ss. Peter & Paul (Pewaukee) and St. Mary (Pewaukee) | Pewaukee |
| 66. Congregation of the Resurrection (Allenton) (a/k/a Resurrection Parish), on its own behalf and as successor in interest to the insurance rights of Sacred Heart (Allenton) and Ss. Peter & Paul (Nenno) and St. Anthony (Allenton) | Allenton |
| 67. Sacred Heart of Jesus Congregation (St. Francis) (a/k/a Sacred Heart of Jesus Parish) | St. Francis |
| 68. Sacred Heart Congregation (Milwaukee) (a/k/a Sacred Heart Parish) | Milwaukee |
| 69. Sacred Heart Congregation (Racine) (a/k/a Sacred Heart Parish) | Racine |
| 70. Sacred Heart Congregation (Horicon) (a/k/a Sacred Heart Parish-Horicon), on its own behalf and as successor in interest to the insurance rights of Immaculate Conception (Juneau) and St. Malachy (Muskego) | Horicon |
| 71. Society for the Propagation of the Faith, Archdiocese of Milwaukee (Milwaukee) (a/k/a Society for the Propagation of the Faith and Office for the Propagation of the Faith and Office for the Propagation of the Faith) | Milwaukee |
| 72. Sons of Zebedee: Ss. James and John Congregation (Byron) (a/k/a Sons of Zebedee), on its own behalf and as successor in interest to the insurance rights of St. James (Oakfield) and St. John (Byron) | Byron |
| 73. Ss. Cyril and Methodius Congregation (Milwaukee) (a/k/a Ss. Cyril & | Milwaukee |

Methodius Parish)

| | | |
|---|---|---|
| 74. | Sts. Cyril and Methodius' Congregation (Sheboygan) (a/k/a Ss. Cyril & Methodius Parish) | Sheboygan |
| 75. | Ss. Peter and Paul (Milwaukee) (a/k/a Ss. Peter & Paul Parish) | Milwaukee |
| 76. | St. Adalbert's Congregation (Milwaukee) (a/k/a St. Adalbert Parish) | Milwaukee |
| 77. | St. Agnes Congregation (Butler) (a/k/a St. Agnes Parish) | Butler |
| 78. | St. Aloysius' Congregation (West Allis) (a/k/a St. Aloysius Parish) | West Allis |
| 79. | St. Alphonsus Congregation (Greendale) (a/k/a St. Alphonsus Parish) | Greendale |
| 80. | St. Alphonsus Congregation (New Munster) (a/k/a St. Alphonsus Parish) | New Munster |
| 81. | St. Andrews Congregation (Leroy) (a/k/a St. Andrew) | Leroy |
| 82. | St. Andrew's Congregation (Delavan) (a/k/a St. Andrew Parish) | Delavan |
| 83. | St. Anthony's Congregation (Kenosha) (a/k/a St. Anthony of Padua Parish) | Kenosha |
| 84. | St. Anthony's Congregation (Pewaukee) (a/k/a St. Anthony on the Lake Parish) | Pewaukee |
| 85. | St. Anthony's Congregation (Menomonee Falls) (a/k/a St. Anthony Parish) | Menomonee Falls |
| 86. | St. Anthonys Congregation (Milwaukee) (a/k/a St. Anthony Parish) | Milwaukee |
| 87. | St. Augustin's Congregation (Trenton) (a/k/a St. Augustine Parish) | Trenton |
| 88. | St. Augustin Congregation (West Allis) (a/k/a St. Augustine Parish) | West Allis |
| 89. | St. Augustinus Congregation (Milwaukee) (a/k/a St. Augustine Parish of Hippo) | Milwaukee |
| 90. | St. Benedict's Congregation (Fontana) (a/k/a St. Benedict Parish) | Fontana |
| 91. | St. Bernadette Congregation (Milwaukee) (a/k/a St. Bernadette Parish) | Milwaukee |
| 92. | St. Bernard's Congregation (Wauwatosa) (a/k/a St. Bernard Parish) | Wauwatosa |
| 93. | St. Bonifacius Congregation (Germantown) (a/k/a St. Boniface Parish) | Germantown |
| 94. | St. Brendan's Congregation (Brandon) (a/k/a St. Brendan Parish) | Brandon |
| 95. | St. Bruno's Congregation (Dousman) (a/k/a St. Bruno Parish) | Dousman |
| 96. | St. Catherine's Congregation  (76th Place) (Milwaukee) (a/k/a St. Catherine of Alexandria) | Milwaukee |
| 97. | St. Catherine of Siena Congregation  (Ripon) (a/k/a St. Catherine of Siena), on its own behalf and as successor in interest to the insurance rights of St. Patrick (Ripon) and St. Wenceslaus (Ripon) | Ripon |
| 98. | St. Catherine's Congregation (Mapleton) (a/k/a St. Catherine Parish and Catharine's Congregation) | Mapleton |
| 99. | St. Catherine's Congregation (51st and Center) (Milwaukee) (a/k/a St. Catherine Parish) on its own behalf and as successor in interest to the insurance rights of Holy Redeemer (Milwaukee) and St. Albert (Milwaukee) and St. Nicholas | Milwaukee |

(Milwaukee)

| | | |
|---|---|---|
| 100. | St. Catherine's Congregation (Sharon) (a/k/a St. Catherine Parish) | Sharon |
| 101. | St. Charles Congregation (Burlington) (a/k/a St. Charles Borromeo Parish) | Burlington |
| 102. | St. Charles Borromeo Congregation (Milwaukee) (a/k/a St. Charles Borromeo Parish) | Milwaukee |
| 103. | St. Charles Cemetery Association | Fond Du Lac |
| 104. | St. Charles Congregation (Hartland) (a/k/a St. Charles Parish) | Hartland |
| 105. | St. Charles Youth & Family Services, Inc. (Milwaukee) (a/k/a St. Charles, Inc.) | Milwaukee |
| 106. | St. Clare Congregation (Wind Lake) (a/k/a St. Clare Parish) | Wind Lake |
| 107. | St. Clement's Congregation (Sheboygan) (a/k/a St. Clement Parish) | Sheboygan |
| 108. | St. Columbkill's Congregation (Elba) (a/k/a St. Columbkille Parish) | Elba |
| 109. | St. Dominic's Congregation (Brookfield) (a/k/a St. Dominic Parish) | Brookfield |
| 110. | St. Dominic Congregation (Sheboygan) (a/k/a St. Dominic Parish) | Sheboygan |
| 111. | St. Edward's Congregation (Racine) (a/k/a St. Edward Parish) | Racine |
| 112. | Saint Elizabeth Ann Seton (New Berlin)(a/k/a St. Elizabeth Ann Seton Parish) | New Berlin |
| 113. | Congregation of St. Elizabeth (Kenosha) (a/k/a St. Elizabeth Parish), on its own behalf and as successor in interest to the insurance rights of St. Casimir (Kenosha) and St. George (Kenosha) | Kenosha |
| 114. | St. Eugene Congregation (Fox Point) (a/k/a St. Eugene Parish) | Fox Point |
| 115. | St. Florian's Congregation (W Milwaukee) (a/k/a St. Florian Parish) | W Milwaukee |
| 116. | St. Frances Cabrini Congregation (West Bend) (a/k/a St. Frances Cabrini Parish) | West Bend |
| 117. | Congregation of St. Francis Borgia (Cedarburg) (a/k/a St. Francis Borgia), on its own behalf and as successor in interest to the insurance rights of Church of Divine Word(Cedarburg) | Cedarburg |
| 118. | Congregation of St. Francis de Sales (Lake Geneva) (a/k/a St. Francis de Sales Parish), on its own behalf and as successor in interest to the insurance rights of St. Mary (Pell Lake) | Lake Geneva |
| 119. | Saint Francis de Sales Seminary, Inc. (a/k/a St. Francis de Sales Seminary; f/k/a St. Francis Seminary) | St. Francis |
| 120. | St. Francis Xavier (Brighton) (a/k/a St. Francis Xavier Parish) | Brighton |
| 121. | St. Gabriel Congregation (Hubertus) (a/k/a St. Gabriel Parish), on its own behalf and as successor in interest to the insurance rights of Maternity of BVM (Richfield) and St. Columba(Lake Five) and St. Hubert (Hubertus) | Hubertus |
| 122. | St. Gregory the Great Congregation (Milwaukee) (a/k/a St. Gregory the Great Parish) | Milwaukee |

| | |
|---|---|
| 123. St. Hyacinth's Congregation (Milwaukee) (a/k/a St. Hyacinth Parish) | Milwaukee |
| 124. St. Isidore Congregation (Mt. Calvary), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Mt Calvary) and St. Cloud (St. Cloud) and St. Joseph (St. Cloud) | Mt Calvary |
| 125. St. James Congregation (Franklin) (a/k/a St. James Parish) | Franklin |
| 126. St. James Congregation (Menomonee Falls) (a/k/a St. James Parish) | Menomonee Falls |
| 127. St. James Congregation (Mukwonago) (a/k/a St. James Parish) | Mukwonago |
| 128. St. James Congregation (Kenosha) (a/k/a St. James the Apostle Parish) | Kenosha |
| 129. St. Jerome's Congregation (Oconomowoc) (a/k/a St. Jerome Parish) | Oconomowoc |
| 130. St. Joan of Arc Congregation (Nashotah) (a/k/a St. Joan of Arc Parish and St. Joan of Arc) | Nashotah |
| 131. St. John Nepomucene Congregation (Racine) (a/k/a St. John Nepomuk Parish) | Racine |
| 132. Saint John Neumann Congregation (Waukesha) (a/k/a St. John Neumann Parish) | Waukesha |
| 133. St. John's Congregation (Rubicon) (a/k/a St. John Parish) | Rubicon |
| 134. St. John's Congregation (Clyman) (a/k/a St. John the Baptist Parish) | Clyman |
| 135. St. Johns Congregation (Johnsburg) (a/k/a St. John the Baptist Parish) | Johnsburg |
| 136. Congregation of St. John the Baptist (Plymouth) (a/k/a St. John the Baptist Parish) | Plymouth |
| 137. Congregation of St. John the Baptist (Union Grove) (a/k/a St. John the Baptist Parish) | Union Grove |
| 138. St. John, The Evangelist, Congregation (Greenfield) (a/k/a St. John the Evangelist Parish) | Greenfield |
| 139. St. John Evangelist Congregation (Kohler) (a/k/a St. John the Evangelist Parish and St. John) | Kohler |
| 140. St. John The Evangelist Congregation (Twin Lakes) (a/k/a St. John the Evangelist Parish) | Twin Lakes |
| 141. St. John Vianney Congregation (Brookfield) (a/k/a St. John Vianney Parish) | Brookfield |
| 142. St. Joseph Catholic Academy, Inc. (Kenosha) (a/k/a St. Joseph Catholic Academy) | Kenosha |
| 143. St. Joseph's Congregation (Big Bend) (a/k/a St. Joseph Parish) | Big Bend |
| 144. St. Joseph's Congregation (Grafton) (a/k/a St. Joseph Parish) | Grafton |
| 145. St. Joseph's Congregation (Lyons) (a/k/a St. Joseph Parish), on its own behalf and as successor in interest to the insurance rights of St. Kilian (Lyons Township) | Lyons |
| 146. St. Joseph's Congregation (Racine) (a/k/a St. Joseph Parish) | Racine |

| | |
|---|---|
| 147. St. Joseph's Congregation (Waukesha) (a/k/a St. Joseph Parish) | Waukesha |
| 148. St. Josephs Congregation (Waupun) (a/k/a St. Joseph Parish) | Waupun |
| 149. St. Josephs Congregation (Wauwatosa) (a/k/a St. Joseph Parish) | Wauwatosa |
| 150. St. Jude Congregation (Wauwatosa) (a/k/a St. Jude The Apostle Parish) | Wauwatosa |
| 151. St. Katharine Drexel Parish (Beaver Dam), on its own behalf and as successor in interest to the insurance rights of St. Michael (Beaver Dam) and St. Patrick (Beaver Dam) and St. Peter's (Beaver Dam) and Unified Catholic Parish Schools of Beaver Dam Educational Association (Beaver Dam) | Beaver Dam |
| 152. St. Kilians Congregation (Hartford) (a/k/a St. Kilian Parish on its own behalf and as successor on interest to the insurance rights of St. Patrick) (Erin) | Hartford |
| 153. St. Lawrence Congregation (St. Lawrence) (a/k/a St. Lawrence Parish), on its own behalf and as successor in interest to the insurance rights of St. Mathias (Nabob) | St. Lawrence |
| 154. St. Leonard Congregation (Muskego) (a/k/a St. Leonard Parish) | Muskego |
| 155. St. Louis' Congregation (Caledonia)(a/k/a St. Louis Parish) | Caledonia |
| 156. St. Lucy Congregation (Racine) (a/k/a St. Lucy Parish) | Racine |
| 157. St. Luke Congregation (Brookfield) (a/k/a St. Luke Parish) | Brookfield |
| 158. St. Margaret Mary Congregation (Milwaukee) (a/k/a St. Margaret Mary Parish) | Milwaukee |
| 159. St. Mark's Congregation (Kenosha) (a/k/a St. Mark Parish) | Kenosha |
| 160. St. Martin of Tours Congregation (Franklin) (a/k/a St. Martin of Tours Parish), on its own behalf and as successor in interest to the insurance rights of Holy Assumption (Franklin) and Sacred Heart (Franklin) | Franklin |
| 161. St. Mary Magdalen Congregation (Milwaukee) (a/k/a St. Mary Magdalen Parish) | Milwaukee |
| 162. St. Mary's of the Hill Congregation (Hubertus) (a/k/a St. Mary of the Hill Parish and St. Mary of the Hill) | Hubertus |
| 163. St. Mary Congregation  (Hales Corners) (a/k/a St. Mary Parish) | Hales Corners |
| 164. St. Marys Congregation (Kansasville) (a/k/a St. Mary Parish) | Kansasville |
| 165. St. Mary's Congregation (Kenosha) (a/k/a St. Mary Parish) on its own behalf and as successor in interest to the insurance rights of St. Thomas Aquinas (Kenosha) | Kenosha |
| 166. St. Mary's Congregation (Lomira) (a/k/a St. Mary Parish) | Lomira |
| 167. St. Mary's Congregation (Marytown) (a/k/a St. Mary Parish and a/k/a Visitation of BV (Marytown)) | Marytown |
| 168. Saint Mary's Congregation (Mayville) (a/k/a St. Mary Parish) | Mayville |
| 169. St. Mary's Congregation (Menomonee Falls) (a/k/a St. Mary Parish) | Menomonee Falls |
| 170. St. Mary's Congregation (Port Washington) (a/k/a St. Mary Parish) | Port Washington |

| | | |
|---|---|---|
| 171. | St. Marys Congregation (Racine) (a/k/a St. Mary Parish and St. Mary by the Lake) | Racine |
| 172. | Saint Mary's Congregation (Springvale) (a/k/a St. Mary Parish) | Springvale |
| 173. | St. Mary Congregation (Waukesha ) (a/k/a St. Mary Parish) | Waukesha |
| 174. | St. Mary's Congregation (Woodland) (a/k/a St. Mary Parish) | Woodland |
| 175. | St. Mary's Springs Academy of Fond du Lac, Wisconsin, Inc. (Fond Du Lac) (a/k/a St. Mary's Springs Academy) | Fond Du Lac |
| 176. | St. Mary's Congregation (Elm Grove) (a/k/a St. Mary's Visitation and a/k/a Visitation of BVM (Elm Grove)) | Elm Grove |
| 177. | St. Matthew's Congregation (Campbellsport) (a/k/a St. Matthew Parish), on its own behalf and as successor in interest to the insurance rights of St. Kilian (St. Kilian) and St. Martin (Ashford) | Campbellsport |
| 178. | St. Matthew's Congregation (Neosho) (a/k/a St. Matthew Parish) | Neosho |
| 179. | St. Matthews Congregation (Oak Creek) (a/k/a St. Matthew Parish) | Oak Creek |
| 180. | St. Mathias Congregation (Milwaukee) (a/k/a St. Matthias Parish) | Milwaukee |
| 181. | St. Maximillian Kolbe Congregation (Milwaukee) (a/k/a St. Maximilian Kolbe) | Milwaukee |
| 182. | St. Michaels' Congregation (Kewaskum) (a/k/a St. Michael Parish and St. Michael), on its own behalf and as successor in interest to the insurance rights of St. John of God (Farmington) | Kewaskum |
| 183. | St. Michael's Congregation (Milwaukee) (a/k/a St. Michael Parish | Milwaukee |
| 184. | The St. Michael's Priest Fund of the Archdiocese of Milwaukee (Milwaukee) (a/k/a St. Michael's Priest Fund) | Milwaukee |
| 185. | St. Monica's Congregation (Whitefish Bay) (a/k/a St. Monica Parish) | Whitefish Bay |
| 186. | St. Patrick's Congregation (Elkhorn) (a/k/a St. Patrick Parish) | Elkhorn |
| 187. | St. Patricks Congregation (Milwaukee) (a/k/a St. Patrick Parish) | Milwaukee |
| 188. | St. Patricks Congregation (Racine) (a/k/a St. Patrick Parish) | Racine |
| 189. | St. Patricks Congregation (Whitewater) (a/k/a St. Patrick Parish) | Whitewater |
| 190. | St. Paul's Catholic Church (Genesee Depot) (a/k/a St. Paul Parish) | Genesee Depot |
| 191. | St. Paul's Congregation (Milwaukee) (a/k/a St. Paul Parish) | Milwaukee |
| 192. | St. Paul The Apostle Congregation (Racine) (a/k/a St. Paul the Apostle Parish) | Racine |
| 193. | St. Peter Claver Congregation (Sheboygan) (a/k/a St. Peter Claver Parish) | Sheboygan |
| 194. | St. Peter Congregation (Port Washington) (a/k/a St. Peter of Alcantara Parish) | Port Washington |
| 195. | St. Peters Congregation (East Troy) (a/k/a St. Peter Parish) | East Troy |
| 196. | St. Peter's Congregation (Kenosha) (a/k/a St. Peter Parish) | Kenosha |

| | |
|---|---|
| 197. St. Peter's Congregation (Slinger) (a/k/a St. Peter Parish and St. Peter) | Slinger |
| 198. St. Pius Congregation (Wauwatosa) (a/k/a St. Pius X Parish) | Wauwatosa |
| 199. St. Rafael the Archangel Congregation (Milwaukee) (a/k/a St. Rafael the Archangel), on its own behalf and as successor in interest to the insurance rights of Holy Spirit (Milwaukee) and St. Barbara (Milwaukee) and St. Ignatius (Milwaukee) | Milwaukee |
| 200. Congregation of St. Richard (Racine) (a/k/a St. Richard), on its own behalf and as successor in interest to the insurance rights of Holy Name (Racine) and Holy Trinity (Racine) and St. Casimir (Racine) and St. Rose (Racine) and St. Stanislaus (Racine) | Racine |
| 201. St. Rita's Congregation (Racine) (a/k/a St. Rita Parish) | Racine |
| 202. St. Rita's Congregation (West Allis) (a/k/a St. Rita Parish) | West Allis |
| 203. St. Robert Bellarmine Congregation (Union Grove) (a/k/a St. Robert Bellarmine Parish) | Union Grove |
| 204. St. Robert's Congregation (Shorewood) (a/k/a St. Robert Parish) | Shorewood |
| 205. St. Roman Congregation (Milwaukee) (a/k/a St. Roman Parish) | Milwaukee |
| 206. The Congregation of St. Rose (Milwaukee) (a/k/a St. Rose Parish) | Milwaukee |
| 207. St. Sebastian's Congregation (Milwaukee) (a/k/a St. Sebastian Parish) | Milwaukee |
| 208. St. Sebastian Congregation (Sturtevant) (a/k/a St. Sebastian Parish) | Sturtevant |
| 209. The St. Sebastian School Foundation, Inc. (Milwaukee) (a/k/a St. Sebastian School Foundation) | Milwaukee |
| 210. The St. Stanislaus Congregation (Milwaukee) (a/k/a St. Stanislaus Parish) | Milwaukee |
| 211. St. Stephans Congregation (Oak Creek) (a/k/a St. Stephen Parish) | Oak Creek |
| 212. St. Theresa's Congregation (Eagle) (a/k/a St. Theresa Parish and St. Theresa Catholic Church) | Eagle |
| 213. St. Theresa's Congregation (Theresa) (a/k/a St. Theresa Parish) | Theresa |
| 214. St. Therese Congregation (Kenosha) (a/k/a St. Therese Parish) | Kenosha |
| 215. St. Therese Congregation (Milwaukee) (a/k/a St. Therese Parish) | Milwaukee |
| 216. St. Thomas Aquinas Congregation (Elkhart Lake) (a/k/a St. Thomas Aquinas), on its own behalf and as successor in interest to the insurance rights of St. Fridolin (Glenbeulah) and St. George (Elkhart Lake) | Elkhart Lake |
| 217. St. Thomas Aquinas Academy | Milwaukee |
| 218. St. Thomas Aquinas Congregation (Waterford) (a/k/a St. Thomas Aquinas Parish) | Waterford |
| 219. Saint Thomas More High School, Inc. (Milwaukee) (a/k/a St. Thomas More High School; f/k/a Thomas More High School, Inc.) | Milwaukee |
| 220. St. Veronica's Congregation (Milwaukee) (a/k/a St. Veronica Parish) | Milwaukee |
| 221. The St. Vincent a Paulo Congregation (Milwaukee) (a/k/a St. Vincent de | Milwaukee |

Paul Parish)

| | | |
|---|---|---|
| 222. | St. Vincent Pallotti Congregation (Milwaukee) (a/k/a St. Vincent Pallotti Parish), on its own behalf and as successor in interest to the insurance rights of Holy Cross (Milwaukee) and St. Anthony of Padua (Milwaukee) | Milwaukee |
| 223. | St. William Congregation (Waukesha) (a/k/a St. William Parish) | Waukesha |
| 224. | Three Holy Women Congregation (Milwaukee) (a/k/a Three Holy Women), on its own behalf and as successor in interest to the insurance rights of Holy Rosary Church(Milwaukee) and St. Hedwig (Milwaukee) and St. Rita Church (Milwaukee) | Milwaukee |
| 225. | Wauwatosa Catholic School, Inc. (a/k/a Wauwatosa Catholic School) | Wauwatosa |
| 226. | Congregation of All Saints Catholic Church (Milwaukee) (a/k/a All Saints Parish) | Milwaukee |
| 227. | Congregation of St. Martin de Porres Catholic Church (Milwaukee) | Milwaukee |

**Exhibit P – Cemetery Trust Settlement Term Sheet**

[*Remainder of Page Intentionally Left Blank*]

# TERM SHEET

| | |
|---|---|
| Lender: | Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust ("Cemetery Trust") |
| Borrower: | Archdiocese of Milwaukee ("Archdiocese") |
| Line of Credit/Note: | Maximum principal amount of $3,000,000; Archdiocese may draw up to maximum amount but no amounts repaid may be reborrowed. |
| Interest: | Interest rate per annum equal to the lesser of (i) One Year LIBOR (as determined and adjusted annually) plus 200 basis points, or (ii) five (5) percent; interest payable quarterly in arrears, on the first day of each calendar quarter commencing the first calendar quarter which is thirty (30) days after the Amended Plan of Reorganization is approved by a final non-appealable order. |
| Scheduled Principal Payments: | $50,000 quarterly, payable on the first day of each calendar quarter commencing January 1, 2025, and continuing quarterly thereafter, with the entire remaining balance due December 31, 2035. |
| Voluntary Prepayments: | May be made at any time without premium or penalty; to be applied to principal in the inverse order of maturity. |
| Mandatory Prepayments: | In addition to scheduled amortization, the Archdiocese will be required to attempt to sell all of the First Lien Properties (as defined below). Mandatory prepayment of one hundred percent (100%) of the net cash proceeds due to the Archdiocese resulting from the disposition of any real estate (including from any casualty loss) will be due and payable when otherwise due and payable to the Archdiocese; to be applied to principal in the inverse order of maturity. |
| Security: | The Note will be secured by (i) a first mortgage lien on the real estate known as Prospect Hill (New Berlin), Plunkett Property (Germantown), Nicholson Road (Caledonia) and Scarlet Property (Mount Pleasant), All Souls (Franklin) (collectively, the "First Lien Properties"); and (ii) a second mortgage lien on the real estate known as the St. Charles Youth and Family Services Facility (Milwaukee) and the Archbishop Cousins Catholic Center (St. Francis) (collectively, the "Second Lien Properties"), with such lien on the Second Lien Properties to be subordinate to the current mortgage liens of Park Bank on such properties. |
| Subordination: | Loan obligations and repayment to be subordinate to Park Bank (and any replacement lenders) under the terms of a subordination |

agreement acceptable to the Cemetery Trust in its sole discretion.

| | |
|---|---|
| Cemetery Trust Covenant: | The Cemetery Trust will continue making distributions during the term of the loan to the Archdiocese to offset the Archdiocese's costs for providing perpetual care of the cemeteries in an amount not less than $487,500 per quarter so long as the Archdiocese continues to maintain the cemeteries in at least as good condition as currently maintained; either party may seek a recalculation of the amount payable by the Cemetery Trust if either believes the payment does not approximate the actual costs for providing perpetual care of the cemeteries. |
| Cemetery Trust Distribution: | The Cemetery Trust will make a distribution to the Archdiocese in the amount of $5,000,000 thirty (30) days after the Amended Plan of Reorganization is approved by a final non-appealable order to partially offset the Archdiocese's costs for providing perpetual care of the cemeteries incurred from January 4, 2011, through the confirmation of the Amended Plan of Reorganization. |
| Cemetery Trust Contribution: | The Cemetery Trust will make a contribution to the Plan Trust in the amount of $8,000,000 thirty (30) days after the Amended Plan of Reorganization is approved by a final non-appealable order. |
| Representations and Warranties: | Standard for transactions of this type. |
| Events of Default: | Failure to make scheduled interest payments; failure to make scheduled principal payments within ten (10) days of due date; failure to make mandatory prepayments upon the sale of any real estate; failure to market the First Lien Properties for sale upon commercially reasonable terms; and other standard defaults. |
| Legal Fees & Costs: | Each party will bear its own costs incurred in connection with the negotiation and preparation of the loan, security and closing documents, and all due diligence related thereto, including without limitation, legal fees.  The Archdiocese shall pay the costs and expenses of the Cemetery Trust, including without limitation legal fees, incurred in connection with any event of default of the Archdiocese and/or exercise of remedies by the Cemetery Trust. |
| Documentation: | Loan, security and closing documents in form and substance reasonably acceptable to the Cemetery Trust and, subject to the provisions expressly provided in this Term Sheet, to contain conditions precedent, representations, warranties, affirmative and negative covenants, Lender indemnity and reimbursement provisions, events of default, remedies, and other customary provisions.  All other documents, agreements, and certificates to be executed or |

delivered, or relating to the transactions contemplated, on or prior to the closing date to be in form and substance reasonably acceptable to Cemetery Trust.

Major Conditions Precedent:

(a)  The execution and delivery of appropriate canonical documentation authorizing Archbishop Jerome E. Listecki, as the canonical administrator for the Cemetery Trust, to make the extension of credit to the Archdiocese including, if required, approval from the Vatican.

(b)  The execution and delivery of appropriate legal documentation authorizing Archbishop Jerome E. Listecki, as sole trustee of the Cemetery Trust, to make the extension of credit to the Archdiocese including, if required, approval from the Attorney General of the State of Wisconsin.

(c)  Written consent of Park Bank to the grant of a second mortgage lien on the Second Lien Properties.

(d)  Agreement of De Sales Preparatory Seminary, Inc. to pledge St. Francis as collateral on a non-recourse basis.

(e)  Confirmation of the Amended Plan of Reorganization for the Archdiocese by means of a final non-appealable order providing for (i) approval of the terms and conditions of the line of credit and authorizing the Archdiocese to enter into the loan, security and closing documents, (ii) dismissal of the Cemetery Trust Adversary Proceeding with prejudice, and without costs as to any party, and (iii) declaring that, subject to the occurrence of the Effective Date, the Cemetery Trust is not property of the estate pursuant to § 541(d) of the Bankruptcy Code..

This Term Sheet is not a commitment to lend and does not purport to summarize all of the terms and conditions of the proposed line of credit.  None of the terms provided in this Term Sheet shall be binding until final, complete and mutually acceptable legal documentation incorporating such terms has been executed by all parties.

# SETTLEMENT AGREEMENT

THIS AGREEMENT is dated as of November 5, 2015, by and between the Archdiocese of Milwaukee, as debtor-in-possession in Case No. 11-20059-SVK pending in the United States Bankruptcy Court for the Eastern District of Wisconsin ("ADOM"), and the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust").

## RECITALS

A.    On January 4, 2011, ADOM filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Code"), which is pending as Case No. 11-20059-SVK (the "Case") in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Court").

B.    The Trust is an Internal Revenue Code section 501(c)(3) charitable organization created in 2007 for the exclusive benefit in perpetuity of the Cemeteries and Mausoleums, as defined in the Trust Agreement.

C.    After ADOM filed its Chapter 11 petition, the Trust filed an adversary proceeding (the "Adversary Proceeding") seeking a declaration that neither the Trust nor its funds could be property of the bankruptcy estate.

D.    The Bankruptcy Court granted the Official Committee of Unsecured Creditors (the "Committee") derivative standing in the Adversary Proceeding to assert and litigate its own avoidance and turnover counterclaims against the Trust for the benefit of the Debtor's estate.

E.    The Committee filed a partial summary judgment motion on May 25, 2012, limited to Count III under which the Trust sought a declaration that both the First Amendment and Religious Freedom and Restoration Act ("RFRA") preclude a determination that the Trust or its funds can be property of the estate.

F.    In a written decision and order dated January 17, 2013, the Bankruptcy Court granted the Committee partial summary judgment.

G.    On January 31, 2013, the Trust appealed the decision and order to the United States District Court for the Eastern District of Wisconsin.

H.    On July 29, 2013, the District Court entered a decision and order, holding that RFRA and the First Amendment prevented the Committee from reaching the Trust's funds. and dismissing all of the remaining claims in the Adversary Proceeding.

I.    On August 26, 2103, the Committee appealed the District Court's decision to the United States Circuit Court of Appeals for the Seventh Circuit.

J.    On March 9, 2015, the Court of Appeals reversed the District Court on both its constitutional and statutory conclusions of law.

K.    On July 7, 2015, the Trust filed a Petition for a Writ of Certiorari with the United States Supreme Court.

L.    ADOM and the Trust have reached an agreement to settle any and all actions which the Committee brought in or could have been brought in the Adversary Proceeding against

the Trust (the "Claims") and to grant a release to the Trust upon the terms and conditions set forth herein.

      M.    ADOM has filed a plan of reorganization which incorporates the terms of this Agreement and which, among other things, provides for a release of the Trust from and against the Claims against the Trust in consideration of the obligations of the Trust hereunder (the "Plan").

## AGREEMENTS

NOW THEREFORE in consideration of the mutual promises and agreements contained herein and for good and valuable consideration, receipt of which is hereby acknowledged, the parties to this Settlement Agreement agree as follows:

      1.    <u>Recitals True and Correct</u>. The parties acknowledge that the above Recitals are true and correct.

      2.    <u>Release of the Trust</u>. Upon the entry of a Final Order (i) confirming the Plan, (ii) approving this Agreement, including the release of the Trust described in this paragraph 2, (iii) approving the release of the Trust from and against the Claims ("Confirmation Order"), ADOM on behalf of itself and its bankruptcy estate shall automatically, fully and completely release the Trust, its past and present Trustees, its Grantors, its donors, its beneficiaries, its lawyers, its consultants, its investment advisors, all recipients of its grants or loans, any and all of its agents, and any and all of their respective successors and assigns (together the "Released Parties"), from and against the Claims and any and all other claims, obligations, charges, liabilities, defenses, counterclaims or causes of action of any kind or nature, whether known or unknown, fixed or contingent, asserted under any legal theory which ADOM or its estate may have against the Released Parties, arising from the beginning of time through the date of the Confirmation Order, relating directly or indirectly to the creation, establishment, management, operation or conduct of the Released Parties or the investment of the Trust's assets, including without limitation, the creation and funding of the Trust, the solicitation and receipt of donations, the approval and distribution of grants and any other distribution of the Trust's assets (the "Release"). For the purposes of this Settlement Agreement, the term "Final Order" shall mean an order entered by a court of competent jurisdiction as to which the time to appeal has expired and/or no further appeal is possible.

      3.    <u>Consideration</u>. In consideration of the Release, the Trust will:

      (a)    Thirty (30) days after the Plan is approved by the Confirmation Order, issue the ADOM a line of credit with a maximum principal amount of $3,000,000.00 substantially as described in Plan Exhibit P;

      (b)    Thirty (30) days after the Plan is approved by the Confirmation Order, make a one-time distribution to the ADOM of $5,000,000.00 to partially offset the ADOM's costs for providing perpetual care of the cemeteries incurred from January 4, 2011, through the confirmation of the Plan;

(c)     Thirty (30) days after the Plan is approved by the Confirmation Order, contribute a one-time payment of $8,000,000.00 to the Plan Trust established pursuant to the Plan to settle the Adversary Proceeding;

(d)     Commencing thirty (30) days after the Plan is approved by the Confirmation Order and throughout the term of the line of credit described in subparagraph (b) above, continue making distributions to the ADOM to offset the ADOM's costs for providing perpetual care of the cemeteries in an amount not less than $487,500.00 per quarter so long as the ADOM continues to maintain the cemeteries in at least as good condition as currently maintained. Either party may at any time seek from the other a recalculation of the amount payable by the Trust if it believes the payment does not approximate the actual costs for providing perpetual care of the cemeteries and, if both parties agree, may alter the payment without order of the Court or notice to any other party; and

(e)     Upon the occurrences of the conditions in Paragraph 4(a), below, withdraw the Petition for Certiorari.

4.     <u>Conditions; Termination</u>.

(a)     The effectiveness of this Agreement and the obligations of the parties hereunder are specifically conditioned upon the entry of the Confirmation Order and it becoming a Final Order, and

(b)     Dismissal of the Adversary Proceeding by the Committee with prejudice and without costs to any party.

(c)     If (i) the Court enters a confirmation order other than the Confirmation Order; (ii) ADOM files a plan which does not contain the Release; (iii) ADOM amends any plan which is filed to not contain the Release; or (iv) the Chapter 11 proceeding is dismissed prior to the entry of the Confirmation Order, then this Agreement shall automatically terminate and each party shall have no further obligations to the other hereunder.

5.     <u>No Admission</u>.  ADOM acknowledges that the Trust asserts that it has no liability for in the Adversary Proceeding or any other claims and that the Trust is entering into this Agreement solely to avoid the cost and uncertainty of litigation. On behalf of itself and the estate, ADOM agrees that by entering into this Agreement, the Trust is making no admission of liability with respect to the Claims. ADOM further agrees that it will not attempt to introduce the fact or the terms of this Agreement in any action except as necessary to enforce the terms hereof.

6.     <u>Miscellaneous</u>.

(a)     <u>Entire Agreement</u>.  This Agreement reflects the entire understanding of the parties with respect to the subject matter herein contained, and supersedes any prior agreements (whether written or oral) between the parties. Neither party has relied on any promise, representation, agreement or inducement other than those expressly set forth herein.

The terms of this Agreement may not be waived, amended, or supplemented except in a writing signed by all parties hereto.

(b) <u>Survival</u>. All promises, covenants, warranties and representations contained herein shall survive execution of this Agreement and the Exhibits hereto.

(c) <u>Severability</u>. In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not affect the validity or enforceability of any other provision hereof.

(d) <u>Governing Law</u>. This Agreement shall be governed by, and shall be construed in accordance with the Code and laws of the State of Wisconsin (irrespective of such state's choice of laws rules).

(e) <u>Jointly Drafted</u>. The parties to this Agreement jointly participated in its preparation; ambiguities should not be construed in favor of any party. This Agreement shall not be construed against the drafter hereof.

(f) <u>Titles</u>. The titles of sections in this Agreement are for convenience only and do not limit or construe the meaning of any section.

(g) <u>Cooperation</u>. The Parties shall cooperated fully and execute any supplementary documents and perform all additional actions that may be necessary or appropriate to give full force and effect to the premises and covenants set forth herein, as well as the intent of this Agreement.

(h) <u>Execution in Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

(i) <u>Electronic and Facsimile Signatures</u>. Electronic or facsimile copies of any party's signature hereto shall be deemed effective execution of this Agreement by such party.

The Archdiocese of Milwaukee

By _John J. Marek_

Title: _Treasurer_

The Archdiocese of Milwaukee
Catholic Cemetery Perpetual Care Trust

By _Jerome E. Listecki_

(The Most Reverend Jerome E. Listecki
Archbishop of Milwaukee, Trustee

**Exhibit Q – FIOF Trust Settlement Agreement**

[*Remainder of Page Intentionally Left Blank*]

# SETTLEMENT AGREEMENT

THIS AGREEMENT is dated as of _____, 2015, and is by and between The Archdiocese of Milwaukee, as debtor-in-possession in Case No. 11-20059-SVK pending in the United States Bankruptcy Court for the Eastern District of Wisconsin ("ADOM"), and Faith in Our Future Trust ("FIOF").

## RECITALS

A.     On January 4, 2011, ADOM filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Code"), which is pending as Case No. 11-20059-SVK (the "Case") in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Court").

B.     FIOF is an Internal Revenue Code section 501(c)(3) charitable organization created in 2007 for the purpose of collecting donations from private donors and disbursing them to promote Catholic education and faith formation in Southeast Wisconsin and within the global Catholic Church.

C.     The Official Unsecured Creditors Committee appointed in the Case ("Committee") has asserted that ADOM has various claims against FIOF arising from the formation and operation of the trust, including claims for diversion of corporate opportunity and claims arising under sections 548 and 544 of the Code (collectively the "Claims"), and has demanded that ADOM commence an action against FIOF with respect to the Claims.

D.     ADOM has evaluated the Claims and, based upon this evaluation, has declined to commence an action against FIOF with respect to them.

E.     In light of ADOM's declination, the Committee has threatened to ask the Court to give it standing to bring an action against FIOF on the Claims on behalf of the ADOM estate.

F.     To defer the litigation threatened by the Committee, on November 9, 2012, FIOF, ADOM and the Committee entered into a Stipulated Tolling Agreement Extending the Statute of Limitations which was approved by the Court by order dated November 13, 2013 (the "Tolling Agreement").  The Tolling Agreement tolled until January 4, 2014 the statute of limitations under section 546 of the Code for any actions which could be brought against FIOF.  The Committee, ADOM and FIOF have entered into (a) a First Extension of the Tolling Agreement which further tolled the statute of limitations until June 30, 2014; (b) a Second Extension of the Tolling Agreement which further tolled the statute of limitations until December 5, 2014; (c) a Third Extension of the Tolling Agreement which further tolled the statute of limitations until June 30, 2015; and (d) a Fourth Extension of the Tolling Agreement which further tolls the statute of limitations until December 1, 2015.

G.     ADOM and FIOF have reached an agreement to settle any and all actions which could be brought by ADOM or its estate against FIOF based upon the Claims or otherwise, and to grant a release to FIOF upon the terms and conditions set forth herein.

H.     ADOM has filed a plan of reorganization which incorporates the terms of this Agreement and which, among other things, provides for a release of FIOF from and against the Claims and all other claims ADOM or its estate may have against FIOF in consideration of the obligations of FIOF hereunder (the "Plan").

**AGREEMENTS**

NOW THEREFORE in consideration of the mutual promises and agreements contained herein and for good and valuable consideration, receipt of which is hereby acknowledged, the parties to this Settlement Agreement agree as follows:

1.     Recitals True and Correct. The parties acknowledge that the above Recitals are true and correct.

2.     Release of FIOF.  Upon the entry of a Final Order (i) confirming the Plan, (ii) approving this Agreement and (iii) approving the release of FIOF provided for in the Plan and described in this paragraph 2 ("Confirmation Order"), ADOM on behalf of itself and the estate shall automatically, fully and completely release FIOF, its past and present Trustees, its Grantors, its donors, its lawyers, its consultants, its investment advisors, all recipients of its grants, any and all of its agents, and any and all of their respective successors and assigns (together the "Released Parties"), from and against the Claims and any and all other claims, obligations, charges, liabilities, defenses, counterclaims or causes of action of any kind or nature, whether known or unknown, fixed or contingent, asserted under any legal theory which ADOM or its estate may have against the Released Parties, arising from the beginning of time through the date of the Confirmation Order, relating directly or indirectly to the creation, establishment, management, operation or conduct of the Released Parties or the investment of FIOF's assets, including without limitation, the solicitation and receipt of donations, the approval and distribution of grants and any other distribution of FIOF's assets (the "Release").  For the purposes of this Settlement Agreement, the term "Final Order" shall mean an order entered by a court of competent jurisdiction as to which the time to appeal has expired and/or no further appeal is possible.

3.     Approval of Grant Requests.  In consideration of the Release, FIOF shall approve, without additional review or discretion, up to two hundred thousand dollars ($200,000) of grant requests designated by ADOM for projects which are determined by the Trustees to be encompassed within the mission of FIOF.

4.     Conditions; Termination.

(a)     The effectiveness of this Agreement and the obligations of the parties hereunder are specifically conditioned upon the entry of the Confirmation Order and it becoming a Final Order.

(b)     If (i) the Court enters a confirmation order other than the Confirmation Order; (ii) ADOM files a plan which does not contain the Release (iii) ADOM amends any plan which is filed to not contain the Release; or (iv) the Chapter 11 proceeding is dismissed prior to

the entry of the Confirmation Order, then this Agreement shall automatically terminate and each party shall have no further obligations to the other.

(c)     If prior to the entry of the Confirmation Order, the Committee obtains an order from the Court granting it standing to commence an action against the Released Parties, then at any time prior to the entry of the Confirmation Order FIOF shall have the option to terminate this Agreement upon giving five days written notice to ADOM at the address beneath the signature line hereof of its intention to terminate.

5.     <u>No Admission</u>.  ADOM acknowledges that FIOF asserts that it has no liability for the Claims or any other claims and that FIOF is entering into this Agreement solely to avoid the cost and uncertainty of litigation.  On behalf of itself and the estate, ADOM agrees that by entering into this Agreement, FIOF is making no admission of liability with respect to the Claims.  ADOM further agrees that it will not attempt to introduce the fact or the terms of this Agreement in any action brought with respect to the Claims.

6.     <u>Miscellaneous</u>.

(a)     <u>Entire Agreement</u>.  This Agreement reflects the entire understanding of the parties with respect to the subject matter herein contained, and supersedes any prior agreements (whether written or oral) between the parties.  The terms of this Agreement may not be waived, amended, or supplemented except in a writing signed by all parties hereto.

(b)     <u>Severability</u>.  In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not affect the validity or enforceability of any other provision hereof.

(c)     <u>Governing Law</u>.  This Agreement shall be governed by, and shall be construed in accordance with the Code and laws of the State of Wisconsin (irrespective of such state's choice of laws rules).

(d)     <u>Jointly Drafted</u>.  The parties to this Agreement jointly participated in its preparation; ambiguities should not be construed in favor of any party.  This Agreement shall not be construed against the drafter hereof.

(e)     <u>Titles</u>.  The titles of sections in this Agreement are for convenience only and do not limit or construe the meaning of any section.

(f)     <u>Execution in Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

(g)     <u>Electronic and Facsimile Signatures</u>.  Electronic or facsimile copies of any party's signature hereto shall be deemed effective execution of this Agreement by such party.

*[Signatures appear on next page]*

Case 11-20059-svk     Doc 3313     Filed 11/06/15     Page 269 of 329

The Archdiocese of Milwaukee

By_____

(Address)

_____
_____
_____

Faith in Our Future Trust

By_____
      Trustee

By_____
      Trustee

By_____
      Trustee

By_____
      Trustee

Case 11-20059-svk   Doc 3313   Filed 11/06/15   Page 270 of 329

# Exhibit R - List of Debtor's Assets and Liabilities

| CURRENT ASSETS | | |
|---|---|---|
| | **Estimated Liquidation Value** | |
| | Subtotal | Total |
| **Real Property** | | |
| Undeveloped Land | | |
| All Souls Cemetery Property[1] | $2,007,000 | |
| Nicholson Road &Property[2] | $202,500 | |
| Mary Scarlato Property[3] | $225,000 | |
| Plunket Property[4] | $198,675 | |
| Prospect Hill Property[5] | $324,000 | |
| | | $2,957,175 |
| Property in Use for Religious Purposes | | |
| Milwaukee Newman Center | $324,000 | |
| Whitewater Newman Center | $96,000 | |
| Marian Shrine | $75,000 | |
| | | $495,000 |
| Property Leased to Others | | |
| St. Joseph High School | $0 | |
| St. Thomas More High School | $0 | |
| Pius XI High School | $0 | |
| St. Charles Youth  Home | $0 | |
| | | $0 |
| Cemeteries in Active Use | | |
| Blessed Sacrament Cemetery | $0 | |
| Calvary Cemetery | $0 | |
| Holy Cross Cemetery & Mausoleum | $0 | |
| Holy Trinity Cemetery & Mausoleum | $0 | |
| St. Joseph Cemetery & Mausoleum | $0 | |
| Mt. Olivet Cemetery & Mausoleum | $0 | |
| St. Adalbert Cemetery & Mausoleum | $0 | |
| All Saints Cemetery & Mausoleum | $0 | |
| Resurrection Cemetery & Mausoleum | $0 | |
| | | $0 |
| Leasehold Interests | | |
| Cousins Center (encumbered by $4.4MM mortgage) | $0 | |
| | | $0 |
| **Personal Property** | | |
| Insurance Recoveries | | unknown |
| Life Insurance Policies | | $315,470 |
| Cash and Available Savings | | $2,000,000 |

WHD/11842543.1

| | | |
|---|---|---:|
| Personal Property (office equipment) | | $150,000 |
| Personal property (religious vestments, jewelry, and relics) | | $20,000 |
| Personal Property (cemetery property) | | $51,600 |
| Vehicles | | $204,325 |
| Cemetery Equipment | | $100,000 |
| Accounts Receivable | | $0 |
| | | |
| **Total Assets** | | **$6,293,570** |

[1] Based on information supplied by two of Milwaukee's most prominent real estate brokers, the All Souls Cemetery Property has an estimated quick sale liquidation value of $10,000 per acre. The Debtor estimates the value received from any sale of the property would be reduced by approximately 10% as a result of applicable commission, taxes and other costs, yielding an estimated liquidation value of $2,007,000.

[2] In September 2010, the Archdiocese commissioned an appraisal of the Nicholson Road Property. The appraisal valued the Nicholson Road Property at approximately $225,000 as of August 30, 2010. This is a fair market value and the quick sale liquidation value would likely be less. The Debtor estimates the value received from any sale of the property would be reduced by approximately 10% as a result of applicable commission, taxes and other costs, yielding an estimated liquidation value of $202,500.

[3] In September 2010, the Archdiocese commissioned an appraisal of the Mary Scarlato Property. The appraisal valued the Mary Scarlato Property at approximately $250,000 as of August 30, 2010. The Debtor estimates the value received from any sale of the property would be reduced by approximately 10% as a result of applicable commission, taxes and other costs, yielding an estimated liquidation value of $225,000.

[4] Based on information supplied by two of Milwaukee's most prominent real estate brokers, the Plunket Property has an estimated quick sale liquidation value of $12,500 per acre. The Debtor estimates the value received from any sale of the property would be reduced by approximately 10% as a result of applicable commission, taxes and other costs, yielding an estimated liquidation value of $198,675.

[5] Based on information supplied by two of Milwaukee's most prominent real estate brokers, the Prospect Hill Property has an estimated quick sale liquidation value of $15,000 per acre. The Debtor estimates the value received from any sale of the property would be reduced by approximately 10% as a result of applicable commission, taxes and other costs, yielding an estimated liquidation value of $324,000.

| CURRENT LIABILITIES | | |
|---|---|---|
| | Subtotal | Total |
| | | |
| **Post-Petition Liabilities** | | |
| Unpaid Chapter 11 Administrative Expenses | $8,000,000 | |
| Chapter 7 Administrative Expenses | $1,000,000 | |
| | | $9,000,000 |
| **Secured Debt** | | |
| Park Bank Loan (assumes the secured claim is satisfied by its collateral) | | $0 |
| | | |
| **Pension and Retiree Claims** | | |
| Archdiocese of Milwaukee Priest Retiree Medical Plan (withdrawal liability) | $19,855,895 | |
| Archdiocese of Milwaukee Priests' Pension Plan (withdrawal liability)[a] | $0 | |
| Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan (withdrawal liability) | $1,453,291 | |
| Archdiocese of Milwaukee Lay Employees' Pension Plan (withdrawal liability)[a] | $0 | |
| | | $21,309,186 |
| **Unsecured Claims** | | |
| General Unsecured Creditor Claims | $3,848,557 | |
| Cemetery Perpetual Care Claims | $246,433,002 | |
| Abuse Survivor Claims | unknown | |
| | | $250,281,559 |
| | | |
| **TOTAL CLAIMS TO BE PAID BEFORE UNSECURED CLAIMS** | | $9,000,000 |
| **TOTAL PROCEEDS AVAILABLE TO PAY UNSECURED CLAIMS** | | ($2,706,430) |

[a] The Archdiocese of Milwaukee Priests' Pension Plan and the Archdiocese of Milwaukee Lay Employees' Pension Plan are multiple employer plans. The Debtor assumes that there would be no liability associated with the Debtor's withdrawal from these plans because these plans are multiple employer, non-electing church plans which, by their terms, limit any participants claim to the respective plan's assets.

**Exhibit S – Plan Trust Agreement**

[*Remainder of Page Intentionally Left Blank*]

# THE ARCHDIOCESE OF MILWAUKEE ABUSE SURVIVOR TRUST AGREEMENT

This Plan Trust Agreement ("Plan Trust Agreement") is effective as of the Effective Date of the *Second Amended Plan of Reorganization Proposed by the Archdiocese of Milwaukee* (together with any and all amendments thereto, all exhibits and schedules thereto and all documents incorporated by reference therein, as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof (collectively, the "Plan"), in *In re Archdiocese of Milwaukee* (Bankr. E. D. Wis.), Case no. 11-20059.

This Plan Trust Agreement is entered into pursuant to the Plan.

## RECITALS

A.      On the Petition Date, the Archdiocese of Milwaukee (collectively, the "Archdiocese" or the "Debtor") filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor continued in possession of its property and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

B.      On November __, 2015, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order") [Docket Nos. ___ (Plan) and ____ (Confirmation Order)]. Copies of the Plan and the Confirmation Order are attached hereto as Exhibit A and Exhibit B, respectively, and the Plan and the Confirmation Order are incorporated into this Plan Trust Agreement by this reference.

C.      The Plan provides for the creation of The Archdiocese of Milwaukee Abuse Survivor Trust (the "Trust") and the transfer and assignment to the Trust of the Plan Trust Assets.

D.      The Trust is established for the benefit of the Beneficiaries (as defined in **Article** 1.2.2 hereof) and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

E.      Pursuant to the Plan and the Confirmation Order, Eric Schwarz (Omni Management Acquisition Corp.) (the "Plan Trustee") was duly appointed as a representative of the Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

F.      The Trust is intended to qualify as a "grantor trust" for federal income tax purposes and the Plan Trustee shall administer and maintain the Trust in compliance with the guidelines for liquidating trusts as set forth in Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation Section 1.671-4(a) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service (the "IRS").

G.      The Plan Trustee has a list setting forth the Holders of Claims filed and/or scheduled that are classified in Classes 8 and 9.

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the premises and the provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Debtor and the Plan Trustee agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Defined Terms.  Unless otherwise stated herein, capitalized terms used in this Plan Trust Agreement shall have the meanings assigned to them in the Plan, the General Allocation Protocol the Province Allocation Protocol (collectively, the "Allocation Protocols"). Terms defined in the Bankruptcy Code, and not otherwise specifically defined in the Plan or herein, when used herein, have the meanings attributed to them in the Bankruptcy Code.

1.2     Additional Defined Terms.  As used herein, the following terms shall have the meanings set forth below, unless the context otherwise requires:

> 1.2.1   "Plan Trust Agreement" shall have the meaning set forth in the introductory paragraph hereof.

> 1.2.2   "Beneficiary" means (a) the Class 8 and Class 9 Claimants and (b) the FCR Claims.

> 1.2.3   "Holder" means, depending on the context, any Person holding a Claim in the Cases, or any Person holding the interest of a Beneficiary.

> 1.2.4   "Reserves" means the reserves established by the Plan Trustee pursuant to this Plan Trust Agreement and the Plan.

## ARTICLE II

## NAME OF THE TRUST

2.1     The trust created by this Plan Trust Agreement shall be known as the "The Archdiocese of Milwaukee Abuse Survivor Trust" and referred to herein as the "Plan Trust."

## ARTICLE III

## APPOINTMENT AND ACCEPTANCE OF PLAN TRUSTEE

3.1     Eric Schwarz (Omni Management Acquisition Corp.) hereby accepts the trusteeship of the Plan Trust created by this Plan Trust Agreement and the grant, assignment, transfer, conveyance and delivery of assets to the Trust, subject to the terms and conditions set

forth in the Plan, the Confirmation Order and this Plan Trust Agreement. The Plan Trustee shall have all the rights, powers and duties set forth in the Plan and this Plan Trust Agreement and available under applicable law for accomplishing the purposes of the Trust. The Plan Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Plan Trust and not otherwise, and in accordance with applicable law. The Plan Trustee shall have the authority to bind the Plan Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Plan Trustee, and not individually.

## ARTICLE IV

## DECLARATION AND ESTABLISHMENT OF THE TRUST

4.1     Pursuant to the Plan and the Confirmation Order, the Plan Trust is created and the Debtor irrevocably transfers, absolutely grants, assigns, conveys, sets over, and delivers to the Plan Trustee, and at such times as is set forth in the Plan, all of its right, title and interest in and to the Plan Trust Assets to be held in trust and for the uses and purposes stated herein and in the Plan. The Plan Trustee hereby agrees to accept and hold the Plan Trust Assets in trust for the Beneficiaries subject to the terms of the Plan and this Plan Trust Agreement and, on behalf of the Trust. The Plan Trustee is hereby authorized to file with the governmental authorities any documents necessary or helpful to establish the Trust.

## ARTICLE V

## CORPUS OF THE TRUST

5.1     The assets of the Plan Trust (the "Plan Trust Assets") shall include all property transferred to the Plan Trust pursuant to the Plan and future orders of the Bankruptcy Court including but not limited to:

> 5.1.1     Twenty One Million Two Hundred Fifty Thousand Dollars ($21,250,000);

> 5.1.2     One-half of the proceeds of a claim with the United Kingdom's Financial Services Compensation Scheme (but only to the extent of 50% of any recoveries actually received);

> 5.1.3     The right (but not the obligation) to pursue recoveries against any Non-Settling Insurer; and

> 5.1.4     All income and sale proceeds derived from any of the above assets of the Plan Trust.

5.2     From and after the Effective Date of the Plan, pursuant to, and at such times set forth in the Plan, title to and all rights and interests in the Plan Trust Assets shall be transferred to the Plan Trust free and clear of all Liens, Claims, encumbrances or interests of any kind in such

property of any other Person (including all Liens, Claims, encumbrances or interests of creditors of or Holders of Claims against or Interests in the Debtor) in accordance with sections 1123, 1141 and 1146(a) of the Bankruptcy Code, except as otherwise expressly provided for in the Plan. The Plan Trustee, on behalf of the Trust, shall receive the Plan Trust Assets when they are transferred to the Trust.

5.3    Upon the transfer of the Plan Trust Assets, the Plan Trustee succeeds to all of the Debtor's and the Estate's right, title and interest in the Plan Trust Assets and the Debtor and the Estate will have no further right or interest in or with respect to the Plan Trust Assets or this Trust, except as provided herein, in the Plan or the Confirmation Order.

## ARTICLE VI

## **PURPOSE OF THE TRUST**

6.1    On the Effective Date, and subject to the terms of the Plan, the Plan Trust will assume all of the rights and duties of the Plan Trust contemplated by the Plan. Nothing contained in this Plan Trust Agreement is intended to affect, diminish or impair the Abuse Survivors' rights under the Plan against any third party. Except as set forth in the Plan and Confirmation Order, nothing contained in this Plan Trust Agreement is intended to affect, diminish or impair the Abuse Survivors' rights against any third party.

6.2    The Plan Trust will assume responsibility for: (a) establishing Reserves; (b) making payments to the holders of payable Class 8 and 9 Claims and Future Abuse Claims that become payable under the Plan, the Allocation Protocol, and Plan Trust Agreement, (c) receiving, collecting, liquidating, maintaining and distributing the Plan Trust Assets; and (d) fulfilling all other obligations under the Plan Trust Agreement. The Plan Trust will be administered consistent with the liquidating purpose of the Trust, and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the liquidation value of the Plan Trust Assets (including the prosecution of litigation), or as otherwise provided in the Plan.

6.3    This Plan Trust Agreement sets forth the terms of the Plan Trust contemplated by the Plan. In the event of any inconsistency between the Plan and this Plan Trust Agreement, the provisions of the Plan Trust shall govern.

6.4    No Beneficiary shall have any interest in any Reserve other than the Reserve established for the payment of such Beneficiary's Claim. No other creditors have any right, title or interest in the Plan Trust Assets.

# ARTICLE VII

## IRREVOCABILITY OF THE TRUST

7.1     The Plan Trust shall be irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Plan Trustee to return any of the Plan Trust Assets to the Reorganized Debtor.

# ARTICLE VIII

## DISSOLUTION AND TERMINATION OF THE TRUST

8.1     The Plan Trust shall become effective as of the Effective Date and shall remain and continue in full force and effect until entry of a final order of the Bankruptcy Court upon motion of the Plan Trustee terminating the Trust.  The Bankruptcy Court may order dissolution of the Plan Trust or may order that the Plan Trustee undertake such further actions as the Bankruptcy Court deems necessary and appropriate to carry out the provisions of the Plan and the Plan Trust Agreement.  Upon entry of an order by the Bankruptcy Court authorizing dissolution of the Trust, the Plan Trustee will promptly proceed to wind up the affairs of the Trust.

8.2     After the dissolution of the Plan Trust and solely for the purpose of liquidating and winding up its affairs, the Plan Trustee shall continue to act in such capacity until the Plan Trustee's duties hereunder have been fully performed.  The Plan Trustee shall retain the books, records and files that shall have been delivered to or created by the Plan Trustee until distribution of all the Trust's assets.  Except as provided below, at the Plan Trustee's discretion, all of such records and documents may be destroyed at any time following the later of (x) the third anniversary of the final distribution of the Trust's assets, and (y) the date until which the Plan Trustee is required by applicable law to retain such records and documents; provided that notwithstanding the foregoing the Plan Trustee shall not destroy or discard any records or documents relating to the Plan Trust without giving the Service Parties and the Reorganized Debtor reasonable prior written notice thereof and opportunity to object.  Any documents received from the Reorganized Debtor shall be returned to the Reorganized Debtor.  All releases signed by any Beneficiary and records of payment to Beneficiaries shall be delivered to the Reorganized Debtor.

8.3     Upon termination of the Trust, and provided that all fees and expenses of the Plan Trust have been paid or provided for in full, the Plan Trustee will deliver all funds and other investments remaining in the Plan Trust (including amounts in the Unknown Abuse Survivor Reserve), if any, including any investment earnings thereon, to a charity supporting survivors of childhood sexual Abuse, which at the Plan Trustee's discretion may include the Therapy Fund, provided that such funds and investments shall not exceed $10,000.

8.4     The Plan Trustee may request that the Court Order terminating the Plan Trust provide, *inter alia*, for the discharge of the Plan Trustee and its professionals, the exculpation of

the Plan Trustee and its professionals from liability, and the exoneration of the Plan Trustee's bond (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Plan Trustee or his designated agents or representatives).

## ARTICLE IX

## POWERS OF PLAN TRUSTEE

9.1     The Plan Trustee is vested with all powers described in the Plan and necessary or appropriate to effectuate the purpose of the Plan Trust and to carry out the duties of the Plan Trustee as set forth in the Plan. These powers include, but are not limited to, the following:

9.1.1     Act as custodian of, receive, control, manage, liquidate, sell, monetize and dispose of all Plan Trust Assets for the benefit of the Beneficiaries as the Plan Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms of this Plan Trust Agreement, the Plan and the Confirmation Order without further approval of or application to the Bankruptcy Court.

9.1.2     On 15 days' written notice to the Trust's Beneficiaries, abandon any property which it determines in its reasonable discretion to be of *de minimis* value or otherwise burdensome to the Trust, including any pending adversary proceeding or other legal action, provided that if any Person to whom such notice is given provides a written objection to the Plan Trustee prior to the expiration of such fifteen-day period with respect to the proposed abandonment of such property, then such property may be abandoned only pursuant to a Final Order of the Bankruptcy Court after notice and opportunity for a hearing.

9.1.3     Protect and enforce the rights to the Plan Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

9.1.4     Enter into contracts in the course of operating the Plan Trust Assets for liquidation or in conjunction with its disposition under the Plan and herein.

9.1.5     Open and maintain bank accounts in the name of the Trust, deposit funds therein, and draw checks and drafts thereon on the sole signature of the Plan Trustee, as appropriate under the Plan, the Confirmation Order and this Plan Trust Agreement and terminate such accounts as the Plan Trustee deems appropriate.

9.1.6   Obtain all reasonably necessary insurance coverage with respect to any property that is or may in the future become Plan Trust Assets.

9.1.7   The Plan Trustee is empowered to incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs and expenses described in the Plan.  These fees, costs and expenses include those incurred by the Plan Trustee in maintaining and administering the Trust, including (a) the fees and costs of Professional Persons employed by the Plan Trustee, such as investment advisors, accountants, agents, managers, attorneys and contract attorneys, actuaries, or auditors, and (b) the premiums charged by insurers, including professional liability insurers, title insurers, and escrow agents.

9.1.8   The Plan Trustee is empowered to pay Abuse Survivor Claims pursuant to the terms of the Plan, including the Allocation Protocol. The Plan Trustee is empowered to comply with instructions of an Abuse Survivor Claimant to distribute funds from the Plan Trust to a third party for the purposes of creating a structured settlement fund; however the Plan Trustee and the Plan Trust shall not be liable to the Abuse Survivor Claimant if the purposes of a structured settlement fund are not accomplished.

(a)   The Plan Trustee shall be entitled to rely on the authenticity of the signature of the Abuse Claim Reviewer, and the accuracy of the information set forth by the Abuse Claim Reviewer in the administration of the Allocation Protocol without any verification or confirmation.

9.1.9   The Plan Trustee shall not have any duty to monitor the Debtor's compliance with any provision of Article 13.5 of the Plan.

9.1.10  Except as restricted by applicable professional ethics rules such as the Rules of Professional Conduct, the Plan Trustee is entitled to retain any attorney, contract attorney, accountant, investment advisor, bankruptcy management company, or such other agents and advisors as are necessary and appropriate (and shall be entitled to rely on advice given by such advisors within its areas of competence) to:

(a)   effectuate the purpose of the Plan Trust and/or the Plan; and

(b)   maintain and administer the Trust.

Nothing in the Plan, Plan Documents or any Trust Document restricts the Plan Trustee's ability to retain any professional employed by the Committee or the Debtor in the Chapter 11 Case.

9.1.11  The Plan Trustee is empowered to make, sign, execute, acknowledge and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan and/or the Plan Trust or to maintain and

administer the Trust. The Plan Trustee is empowered to comply with all requirements imposed by applicable law, rule, or regulation.

9.1.12  The Plan Trustee may file a motion with the Bankruptcy Court, with notice to the Service Parties and the Reorganized Debtor, for a modification of the provisions of this Plan Trust Agreement if the Plan Trustee determines that such modifications are necessary to conform to legal and/or administrative requirements and to the purposes of the Trust.

9.1.13  Distributions May Be Delayed to Wind Up Affairs of the Trust.

(a)  Upon any event terminating the Trust, the right to distributions shall vest immediately, but the Plan Trustee may defer distribution of property from the Plan Trust for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and taxes.

9.1.14  Tax Returns.

(a)  The Plan Trustee shall cause the timely preparation, distribution and/or filing of any necessary tax returns and other documents or filings as required by applicable law and pay any taxes shown as due thereon and which are payable by the Plan Trust by virtue of its existence and operations.  Each Beneficiary shall be responsible for the payment of any tax due on its own items of income, gain, loss, deduction or credit, if any.

(b)  The Plan Trustee shall pay out of the Plan Trust Assets, any taxes imposed on the Plan Trust or the Plan Trust Assets.

9.1.15  The Plan Trustee may request an expedited determination of any unpaid tax liability of the Plan Trust under section 505(b) of the Bankruptcy Code prior to termination of the Trust, and shall represent the interest and account of the Plan Trust before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

9.1.16  Investments.

(a)  The Plan Trustee shall comply with 11 U.S.C. § 345 with regard to the investment of Plan Trust Assets.  The Plan Trustee is relieved of any obligation to diversify.

9.1.17  Plan Trust Division.

(a)  The Plan Trustee is authorized to and shall segregate the monetary Plan Trust Assets into separate subaccounts, funds or reserves, as required by the Plan, for ease of administration, or for any tax election or allocation.  Any segregation shall be made according to the fair market value of the assets of the Plan Trust at the time of segregation; the appreciation or depreciation of the property allocated to each account or fund, including cash, shall be fairly representative of the appreciation or depreciation to the date of each segregation of all property

available for allocation; and the segregation shall otherwise be in accordance with applicable tax law. Nothing in this provision shall restrict the Plan Trustee's authority to pool such accounts or funds for investment purposes or require separate bank accounts for such accounts or funds. Pursuant to and in accordance with the Plan, the Plan Trustee may establish accounts, funds or reserves for: (1) Abuse Survivor Claims; (2) FCR Claims; and (3) fees, costs and expenses payable to or on behalf of the Trust's professionals and the Plan Trustee.

(b) The Plan Trustee may establish additional Reserves as the Plan Trustee determines are appropriate and may fund such additional Reserves pursuant to the Plan and the Plan Trust Agreement. If, at any time, the Plan Trustee determines that any Reserve is not reasonably likely to be adequate to satisfy purposes of the Reserve, then, the Plan Trustee may increase the amount previously reserved.

(c) If at any time, the Plan Trustee determines that the value of a Reserve is greater or lesser than the amount that is reasonably likely to satisfy the purpose for which the assets of the Reserve have been reserved, the Plan Trustee may release the excess amounts from such Reserve or increase the amounts reserved and the amounts released would be deposited in any other Reserve or become distributable to the Abuse Survivor Claimants or the FCR Claimants.

9.2     Limitations on the Plan Trustee.

9.2.1   Notwithstanding anything in this Plan Trust Agreement to the contrary, the Plan Trustee shall not do or undertake any of the following:

(a)     guaranty any debt;

(b)     loan Plan Trust Assets;

(c)     transfer Plan Trust Assets to another trust with respect to which the Plan Trustee serves as trustee; and

(d)     make any transfer or Distribution of Plan Trust Assets, other than those authorized under the Plan, the Confirmation Order, the Allocation Protocol or this Plan Trust Agreement.

9.2.2   Notwithstanding anything in this Plan Trust Agreement to the contrary, the Plan Trustee, acting in his capacity as Plan Trustee, other than to the extent necessary to preserve the liquidation value of the Plan Trust Assets, shall not and shall not be authorized to engage in any trade or business, and shall take such actions consistent with the orderly liquidation of the Plan Trust Assets as are required by applicable law, and such actions permitted hereunder. Notwithstanding any other authority granted herein, the Plan Trustee is not authorized to engage in any investments or activities inconsistent with the treatment of the Plan Trust as a Trust within the meaning of Treasury Regulations Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684.

9.2.3   Subject to the limitations in section 9.1.16(a) of this Plan Trust Agreement, the Plan Trust shall not hold the stock (in either vote or value) of any Person that is treated as a non-public reporting company for federal income tax purposes, nor have any interest in an Person that is treated as a partnership for federal income tax purposes, unless such stock or partnership interest was obtained involuntarily or as a matter of practical economic necessity, including through foreclosure of security interests and execution of judgments, in order to preserve the value of the Plan Trust Assets; provided, however, the Plan Trust shall not hold more than 4.9% of the issued and outstanding securities of any public reporting company.

9.2.4   The Plan Trustee shall be responsible for only that property delivered to it, and shall have no duty to make, nor incur any liability for failing to make, any search for unknown property or for any liabilities.

9.2.5   Insurance Settlement Agreements.  Any insurance settlement agreement approved by the Bankruptcy Court is binding on the Plan Trust and, to the extent of any inconsistencies between this Plan Trust Agreement and the insurance settlement agreements, the insurance settlement agreements will control.

9.2.6   Perpetuities.

(a)   Notwithstanding any other provisions of this Plan Trust Agreement, each trust hereby created, if not previously terminated under other provisions of this Plan Trust Agreement, shall in any event terminate upon ten (10) years after the date of this Plan Trust Agreement.  Upon such termination, all the assets thereof shall be distributed pursuant to the Allocation Protocol.

9.2.7   Anti-Assignment Clause.

(a)   To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily assigned, alienated or encumbered except as may be ordered by the Bankruptcy Court.

## ARTICLE X

## IMMUNITY AND INDEMNIFICATION OF PLAN TRUSTEE

10.1   Neither the Plan Trustee nor any of his duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Plan Trustee in good faith, other than acts or omissions resulting from the recklessness, negligence, willful misconduct, knowing and material violation of law, or fraud of the Plan Trustee or his designated agents or representatives.  The Plan Trustee may, in connection with the performance of his functions, and in his sole and absolute discretion, consult with his attorneys, accountants,

financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Plan Trustee shall be under no obligation to consult with his attorneys, accountants, financial advisors or agents, and his good faith determination to not do so shall not result in the imposition of liability on the Plan Trustee, unless such determination is based on the Plan Trustee's recklessness, negligence, willful misconduct, knowing and material violation of law, or fraud.

10.2     The Plan Trust shall defend, indemnify and hold the Plan Trustee harmless from and against any and all uninsured claims, liabilities, costs, damages or expenses arising from any contract, obligation or liability made or incurred by the Plan Trustee provided that the Plan Trustee meets the standards of conduct set forth in Article 10.1. Nothing in this Article shall be construed or interpreted to limit in any way the protections and immunities, if any, afforded to the Plan Trustee pursuant to federal and/or state statutory and common law. Notwithstanding the foregoing, this indemnification, obligation of defense and covenant to hold harmless shall not apply to any liability arising from a criminal proceeding where the Plan Trustee had reasonable cause to believe that the conduct in question was unlawful.

10.3     The Plan Trust shall defend, indemnify and hold the Plan Trustee's professionals harmless from and against any and all uninsured claims, liabilities, costs, damages or expenses arising from services rendered to the Plan Trustee provided that the Plan Trustee's professionals meet the standards of conduct set forth in Article 10.1.

10.4     No recourse shall ever be had, directly or indirectly, against the Plan Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of this Plan Trust Agreement or the Plan by the Plan Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or the Plan Trust Agreement whatsoever executed by the Plan Trustee in implementation of this Plan Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Plan Trustee under the Plan for any purpose authorized by this Plan Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Plan Trust Agreements of the Plan Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Plan Trust Assets or such part thereof as shall under the term of any such Plan Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Plan Trust Assets. Notwithstanding the foregoing, the Plan Trustee may be held liable for his recklessness, negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had against (a) the Plan Trustee's bond or applicable insurance coverage, and, (b) to the extent not covered by such bond, directly against the Plan Trustee.

10.5     Medicare Secondary Payer Act

10.5.1   Except to the extent of any residual liability resulting from the terms of the insurance settlement agreements, neither the Trust, the Plan Trustee nor the Plan Trustee's agents and professionals shall have any

liability to any entity, including any governmental entity pursuant to the Medicare Secondary Payer Act or any state law statute that is substantially similar to the Medicare Secondary Payer Act.


# ARTICLE XI

## PLAN TRUSTEE COMPENSATION

11.1     The Plan Trustee shall be entitled to receive as compensation from the monetary assets of the Plan Trust in such amounts as described in Exhibit C attached hereto and as the same may be amended from time to time during the term of this Plan Trust Agreement.  Such amendments to Exhibit C, if any, shall be filed with a notice setting forth the proposed compensation for the Plan Trustee for subsequent period(s).

11.1.1  Any professional or any Person retained by the Plan Trustee pursuant to the Plan will be entitled to reasonable compensation for services rendered at a rate reflecting actual time billed by such professional or Person on an hourly basis, at the standard billing rates in effect at the time of service, or such other rate or basis of compensation that is reasonable and agreed upon by the Plan Trustee.

11.1.2  Any and all reasonable and necessary costs and expenses incurred by the Plan Trustee and any professional or other Person retained by the Plan Trustee, in performing their respective duties under this Plan Trust Agreement, will be reimbursed by the Plan Trustee from the Plan Trust Assets.

11.1.3  The Plan Trustee and each professional employed by the Plan Trustee shall provide to the Plan Trustee a statement setting forth its aggregate fees and expenses incurred in connection with the engagement not previously billed, together with reasonable documentation of such expenses.

# ARTICLE XII

## SUCCESSOR PLAN TRUSTEES

12.1     Vacancy Caused by Plan Trustee Resignation or Removal.

12.1.1  Plan Trustee Resignation.  The Plan Trustee may resign at any time.  The Plan Trustee shall file a written resignation with the Bankruptcy Court and serve it on the Service Parties. The resignation shall take effect within thirty (30) days of delivery of resignation to the Service Parties. The Plan Trustee shall, by the earliest date possible, deliver to the Plan

Trustee's successor all of the Plan Trust Assets which were in the possession of the Plan Trustee along with a complete record and inventory of all such assets.

12.1.2  Plan Trustee Removal.  The Bankruptcy Court may remove a Plan Trustee on a motion submitted by a Beneficiary following notice to parties in interest, including without limitation, Beneficiaries and the Service Parties.  The ground for removal is good cause.  The removal will take effect upon the date the Bankruptcy Court specifies.  The Plan Trustee shall, by the earliest date possible, deliver to the Plan Trustee's successor all of the Plan Trust Assets which were in the possession of the Plan Trustee along with a complete record and inventory of all such Plan Trust Assets.

12.1.3  The death, resignation, or removal of the Plan Trustee shall not operate to terminate the Plan Trust created by this Plan Trust Agreement or to revoke any existing agency (other than any agency of the Plan Trustee as the Plan Trustee) created pursuant to the terms of this Plan Trust Agreement or invalidate any action taken by the Plan Trustee, and the Plan Trustee agrees that the provisions of this Plan Trust Agreement shall be binding upon and inure to the benefit of the Plan Trustee and the Plan Trustee's successors or assigns, as the case may be.

12.1.4  In the event of the resignation or removal of the Plan Trustee, in addition to preparation an interim report (containing unreported information to be included in annual reports pursuant to Paragraph 13.1.1 below through the effective date of the termination), the former Plan Trustee promptly shall:

(a)     execute and deliver by the effective date of resignation or removal such documents, instruments, and other writings as may be reasonably requested by the successor Plan Trustee to effect the termination of the resigning or removed Plan Trustee's capacity under this Plan Trust Agreement and the conveyance of the Plan Trust Assets then held by the resigning or removed Plan Trustee to the successor Plan Trustee;

(b)     deliver to the successor Plan Trustee all documents, instruments, records and other writings relating to the Plan Trust Assets as may be in the possession or under the control of the resigning or removed Plan Trustee; and

(c)     otherwise assist and cooperate in effecting the assumption of the resigning or removed Plan Trustee's obligations and functions by the successor Plan Trustee.

12.1.5  The resigning, removed or departed Plan Trustee hereby irrevocably appoints the successor Plan Trustee (and the Interim Plan Trustee) as his or her attorney–in-fact and agent with full power of substitution for his or her name, place and stead to do any and all acts that such resigning or removed Plan Trustee is obligated to perform under this Plan Trust Agreement. Such appointment shall not be affected by the subsequent disability or

incompetence of the Plan Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Plan Trustee and the appointment of the successor Plan Trustee.

12.2    Appointment of Successor Plan Trustee. Any vacancy in the office of Plan Trustee shall be filled by the nomination of a majority of the members of the Committee (notwithstanding the dissolution of the Committee on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to the Service Parties and a hearing. If at least three (3) members of the Committee do not participate in the nomination of a successor Plan Trustee within thirty (30) days after the Plan Trustee resigns or becomes unable to serve, the Bankruptcy Court shall designate a successor after notice to Beneficiaries and a hearing.

12.3    Acceptance of Appointment of Successor Plan Trustee. Any successor Plan Trustee's acceptance of appointment as a successor Plan Trustee shall be in writing and shall be filed with the Bankruptcy Court. The acceptance shall become effective when filed with the Bankruptcy Court. The Plan Trustee shall thereupon be considered a Plan Trustee of the Plan Trust without the necessity of any conveyance or instrument. Each successor Plan Trustee shall have all of the rights, powers, duties, authority, and privileges as if initially named as a Plan Trustee hereunder. Each successor Plan Trustee shall be exempt from any liability related to the acts or omissions of the Plan Trustee prior to the appointment of the successor Plan Trustee and the successor Plan Trustee shall be under no duty to examine the actions or inactions of any prior Plan Trustee.

12.4    Preservation of Record of Changes in Plan Trustees. A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Plan Trust Agreement.

## ARTICLE XIII

## INSTRUCTIONS TO PLAN TRUSTEE

13.1    In addition to the other duties set forth in the Plan or this Plan Trust Agreement, the Plan Trustee is hereby specifically directed to do the following:

### 13.1.1  Annual Financial Reports.

In lieu of compliance with applicable law regarding the Plan Trustee's obligation to prepare accountings and/or reports, the Plan Trustee shall prepare on behalf of the Plan Trust an annual (as of each December 31 after the Effective Date) financial reports describing the then remaining assets and the manner in which the assets of the Plan Trust are then invested. The reports shall include an itemization of categories of expenses and corresponding amounts. The reports shall also include an estimate of the current market value of the invested assets of the Plan Trust and a description of the obligations, income and expenses of the Trust. The Plan Trustee may, but shall not be required to, employ valuation experts. The reports shall include an

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 288 of 329

itemized statement of all sums disbursed to Tort Claimants. The reports shall be prepared within forty-five (45) days of the close of the reporting period. Copies of the reports shall be available to Beneficiaries upon request. The reports shall be prepared on an accrual basis.

### 13.1.2 Additional Reporting to the Court.

The Plan Trustee shall report to the Bankruptcy Court, by public disclosure on the Docket for the Case, with respect to any matter arising from the administration of the Plan Trust that the Plan Trustee deems advisable to bring to the attention of the Bankruptcy Court. The Plan Trustee shall report to the Bankruptcy Court, with respect to any matter arising from the administration of the Plan Trust upon request of the Bankruptcy Court.

### 13.1.3 Reporting to the Reorganized Debtor.

Periodically, and at least thirty (30) days after the distribution of any Plan Trust Assets to any Beneficiary, provide the Reorganized Debtor with amount of the distribution, the recipient of the distribution and a copy of any release signed by any Beneficiary.

## ARTICLE XIV

## GRANTOR TRUST ELECTION

14.1    The Debtor shall elect to treat the Plan Trust as a grantor trust pursuant to Treasury Reg. § 1.468B-1(k). Payment of taxes, if any, attributable to Plan Trust income shall be the obligation of the Trust.

## ARTICLE XV

## SECTION 468B SETTLEMENT FUND

15.1    Generally.

15.1.1  In accordance with the Plan, the Plan Trustee will take all reasonable steps to ensure that the Plan Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of § 468B of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and the regulations promulgated pursuant thereto. The Debtor is the "transferor" within the meaning of Treasury Regulations § 1.468B-1(d) (1). The Plan Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation § 1.468B-2(k) (3).

15.1.2  It is further intended that the transfers to the Plan Trust will satisfy the "all events test" and the "economic performance" requirement of Section 461(h) (1) of the Tax Code, and Treasury Regulation Section 1.461-1(a) (2).

15.2    Employer Identification Number.

Upon establishment of the Trust, the Plan Trustee shall apply for an employer identification number for the Plan Trust pursuant to Internal Revenue Service Form SS-4 and in accordance with Treasury Regulation § 1.468B-2(k) (4).

15.3    Relation-Back Election.

15.3.1  If applicable, the Plan Trustee and the Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation § 1.468B-1(j) (2), to treat the Plan Trust as coming into existence as a settlement fund as of the earliest possible date.

15.4    Reporting Requirements.

15.4.1  The Plan Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulations § 1.468B-2(k)(1).  The Debtor shall file an election statement(s) satisfying the requirements of Treasury Regulation § 1.468B-1(k) (2) (ii) so that the Plan Trust is treated as a grantor trust under § 671 of the Tax Code and the regulations promulgated thereunder.  The Debtor's election statement shall be made on the Trust's first timely filed trust income tax return.  The Debtor (or some other person on behalf the Debtor) shall supply to the Plan Trustee and to the Internal Revenue Service the statement described in Treasury Regulation § 1.468B-3(e) (2), no later than February 15th of the year following each calendar year in which the Debtor (or some other person on behalf of the Debtor) makes a transfer to the Trust.

15.5    Broad Powers of the Plan Trustee.

15.5.1  The Plan Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as he deems necessary to reasonably ensure that the Plan Trust is treated as a "Designated" or "Qualified" settlement fund under § 468B of the Tax Code, and the regulations promulgated pursuant thereto.  Further, the Plan Trustee may amend, either in whole or in part, any administrative provision of this Plan Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

## ARTICLE XVI

## BENEFICIARIES

16.1    Identification of Beneficiaries; Allocation of Interests

16.1.1  Plan Trust Beneficiaries.  The Beneficiaries are the parties identified in Article 1.2.2 of this Plan Trust Agreement.

16.2    Names and Addresses

The Plan Trustee shall keep a register (the "Register") in which the Plan Trustee shall at all times maintain the names and addresses of the Beneficiaries, and the awards made to the Beneficiaries pursuant to the Plan.  The Plan Trustee may rely upon this Register for the purposes of delivering Distributions or notices.  In preparing and maintaining this Register, the Plan Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by such Holder in the Chapter 11 Case, or (ii) proper notice of a name or address change has been delivered by such Beneficiary to the Plan Trustee.  The Plan Trustee and any of his agents, employees, and professionals are subject to the orders of the Bankruptcy Court regarding confidentiality of the filed proofs of claim and the Register is confidential under the terms of such orders and shall be required to sign the related confidentiality agreements.

16.3    Rights of Beneficiaries

Each Beneficiary will be entitled to participate in the rights due to a Beneficiary hereunder and under the Plan.  The rights of a Beneficiary shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of such Beneficiary and such death, insolvency or incapacity shall not terminate or affect the validity of this Plan Trust Agreement.  A Beneficiary shall have no title to, right to, possession of, management of, or control of the Plan Trust Assets, or any right to call for a partition or division of the Plan Trust Assets.  Title to all the Plan Trust Assets shall be vested in the Plan Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to such Persons under this Plan Trust Agreement and the Plan.

**ARTICLE XVII**

**FINAL REPORT AND DISCHARGE OF PLAN TRUSTEE**

17.1.1  Final Report.  Prior to termination of the Trust, the Plan Trustee shall prepare a final report (the "Final Report"), which shall contain the following information:  (i) all Plan Trust Assets including assets originally charged under the Plan Trustee's control; (ii) all funds transferred into and out of the Reserves; (iii) an accounting of all purchases, sales, gains, losses, and income and expenses in connection with the Plan Trust Assets during the Plan Trustee's term of service (including any predecessor Plan Trustee); (iv) a statement setting forth the total Distributions to the Beneficiaries (but not the Distributions to individual Beneficiaries); (v) the ending balance of all Plan Trust Assets; (vi) a narrative describing actions taken by the Plan Trustee in the performance of its duties which materially affect the Trust; and (vii) schedule(s) reflecting that:

(a)      all Plan Trust Assets (including Claims and/or Defenses) have been either:

(i) reduced to Cash; or (ii) abandoned by the Plan Trustee, in accordance with the provisions of this Plan Trust Agreement and the Plan;

(b)    all expenses of the Plan Trust have been paid (or will be paid); and

(c)    all payments and final Distributions to be made to Beneficiaries have been made (or will be made) by the Plan Trustee in accordance with the provisions of this Plan Trust Agreement, the Plan and the Allocation Protocol.

17.1.2  Approval of Final Report and Discharge of the Plan Trustee.  The Plan Trustee's Final Report, prepared pursuant to the Plan and this Plan Trust Agreement, shall be filed with the Bankruptcy Court and served on all Beneficiaries, along with a motion for approval of the Final Report and discharge of the Plan Trustee.  Upon the entry of the order of the Bankruptcy Court approving the Final Report, the Plan Trustee shall be discharged from all liability to the Plan Trust or any Person who or which has had or may then or thereafter have a claim against or the Plan Trust for acts or omissions in the Plan Trustee's capacity as the Plan Trustee or in any other capacity contemplated by this Plan Trust Agreement or the Plan, unless the Bankruptcy Court orders otherwise for good cause.

## ARTICLE XVIII

## MISCELLANEOUS PROVISIONS

18.1    Interpretation.

18.1.1  As used in this Plan Trust Agreement, words in the singular include the plural and words in the plural include the singular.  The masculine, feminine and neuter genders shall be deemed to include all genders. The descriptive heading for each paragraph and subparagraph of this Plan Trust Agreement are for the reader's convenience and shall not affect the interpretation or the legal efficacy of this Plan Trust Agreement.

18.1.2  Notices.

(a)    The Plan Trustee shall maintain a list of service parties.  The list shall consist of all persons who submit a request in writing to the Plan Trustee (the "Service Parties").  Such requests shall include the requestor's street address and may include the requestor's fax number and email address.

(b)    All notices or deliveries required or permitted hereunder shall be in writing and shall be deemed given on the first of the following dates:  (i) when personally delivered; (ii) when actually received by means of facsimile transmission or e-mail; (iii) when received by overnight express courier delivery; (iv) when delivered and receipted for by certified mail, postage prepaid, return receipt requested (or in the event of attempted delivery and refusal

of acceptance, then on the date of the first attempted delivery). Service on Beneficiaries may be effected by service on counsel who signed the Beneficiary's proof of claim or ballot.

### 18.1.3 Choice of Law.

(a)     This Plan Trust Agreement shall be administered, governed by, construed, and enforced according to the internal laws of the State of Wisconsin applicable to contracts and Plan Trust Agreements made and to be performed therein, except that all matters of federal tax law and this Trust's compliance with § 468B of the Tax Code and Treasury Regulations thereunder, shall be governed by federal income tax law, and all matters of federal bankruptcy law shall be governed by federal bankruptcy law.

### 18.1.4 Invalidity and Unenforceability.

(a)     If any term or provision of this Plan Trust Agreement shall be invalid or unenforceable, the remainder of this Plan Trust Agreement shall not be affected thereby, and each remaining term and provision of this Plan Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

### 18.2     Waiver.

No failure or delay of any party to exercise any right or remedy pursuant to this Plan Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

### 18.3     Tax Identification Numbers.

(a)     The Plan Trustee may require any Beneficiary to furnish to the Plan Trustee (a) its employer or taxpayer identification number as assigned by the IRS, and (b) such other records or documents necessary to satisfy the Plan Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Plan Trustee may condition the payment of any Distribution to any Beneficiary upon receipt of such identification number and requested documents.

### 18.4     Headings.

(a)     The Article headings contained in this Plan Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Plan Trust Agreement or of any term or provision hereof.

### 18.5     Reimbursement of Costs.

(a)     If the Plan Trustee or the Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Plan Trust Agreement or the enforcement thereof, the Plan Trustee or the Trust, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including

Case 11-20059-svk    Doc 3313    Filed 11/06/15    Page 293 of 329

attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action. To the extent that the Plan Trust has advanced such amounts, the Plan Trust may recover such amounts from the non-prevailing party.

18.6    Entirety of Plan Trust Agreement.

(a)    This Plan Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter hereof. This Plan Trust Agreement, together with the Exhibits hereto, the Plan, and the Confirmation Order, contain the sole and entire Plan Trust Agreement and understanding with respect to the matters addressed therein.

18.7    Counterparts.

(a)    This Plan Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.8    Independent Legal and Tax Counsel.

**ALL PARTIES TO THIS TRUST AGREEMENT HAVE BEEN REPRESENTED BY COUNSEL AND ADVISORS (COLLECTIVELY REFERRED TO AS "COUNSEL") OF THEIR OWN SELECTION IN THIS MATTER. CONSEQUENTLY, THE PARTIES AGREE THAT THE LANGUAGE IN ALL PARTS OF THIS TRUST AGREEMENT SHALL IN ALL CASES BE CONSTRUED AS A WHOLE ACCORDING TO ITS FAIR MEANING AND NEITHER STRICTLY FOR NOR AGAINST ANY PARTY. IT IS SPECIFICALLY ACKNOWLEDGED AND UNDERSTOOD THAT THIS TRUST AGREEMENT HAS NOT BEEN SUBMITTED TO, NOR REVIEWED OR APPROVED BY, THE INTERNAL REVENUE SERVICE OR THE TAXING AUTHORITIES OF ANY STATE OR TERRITORY OF THE UNITED STATES OF AMERICA**.

18.8.1 Jurisdiction.

The United States Bankruptcy Court for the Eastern District of Wisconsin shall have jurisdiction over all matters related to the Plan and this Plan Trust Agreement. The Plan Trustee, upon notice to the Debtor or the Reorganized Debtor and any affected party, may commence an action in the Courts of the State of Wisconsin or in any other state court of original jurisdiction for relief in any matter concerning the interpretation or resolution of any dispute related to the Trust, or for enforcement of any rights claimed by the Plan Trustee.

IN WITNESS WHEREOF, the Plan Trustee and the Debtor execute this Plan Trust Agreement as of the date set forth in the opening paragraph.

**ERIC A. SCHWARZ**


By: _____
      Eric R. Schwarz, solely as Plan Trustee



**ARCHDIOCESE OF MILWAUKEE**


By: _____
      John J. Marek, Treasurer and Chief Financial Officer

**EXHIBIT A**

WHD/11852227.4 DOCS_LA:290627.2 05058/003

**EXHIBIT B**

**EXHIBIT C**

**COMPENSATION FOR TRUSTEE**

The Plan Trustee shall charge for the time of its principals at the following hourly rates:

1. Eric R. Schwarz $250

The Plan Trustee shall charge for the time of its employees at its standard hourly rates; provided that no employee's rate is higher than the principals' rates. The hourly rates are subject to annual increases beginning in January 2016; however, the annual increases shall not exceed ten percent.

**Exhibit T – Allocation Protocol**

[*Remainder of Page Intentionally Left Blank*]

**ALLOCATION PROTOCOL FOR ABUSE SURVIVOR CLAIMS AND
AN FCR CLAIMS FILED IN THE CHAPTER 11 CASE OF THE
ARCHDIOCESE OF MILWAUKEE**


## 1. PURPOSE

The purpose of this protocol is to provide for the distribution of funds to certain Class 8 and Class 9 Abuse Survivors and any FCR Claimants.

## 2. DEFINITIONS

### 2.1 Capitalized Terms.

Capitalized terms used herein shall have the meanings given them in the Plan or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated herein by reference.

"Abuse Claims Reviewer" means the person, including the designee of such person, who will assess Abuse Survivor Claims and any FCR Claims. Subject to the Plan's provisions for replacement of the Abuse Claims Reviewer and order of the Bankruptcy Court, the Abuse Claims Reviewer is Paul Finn.

"FCR Claim" has the same meaning as in the Plan.

"FCR" has the same meaning as in the Plan.

"FCR Claims Reserve" has the same meaning as in the Plan.

"Plan" means and refers to the *Second Amended Plan of Reorganization Proposed by the Archdiocese of Milwaukee* dated as of September 25, 2015 (as the same may be amended).

"Abuse Survivor Claim" has the same meaning as in the Plan.

"Plan Trust" has the same meaning as in the Plan.

"Plan Trustee" has the same meaning as in the Plan.

"Plan Trust Agreement" has the same meaning as in the Plan.

## 3. RULES OF INTERPRETATION AND GENERAL GUIDELINES

### 3.1 Sole and Exclusive Method.

The Plan and this protocol shall together be the sole and exclusive method by which an Abuse Survivor in Class 8 or an FCR Claimant may seek distribution on account of an

Abuse Survivor Claim against the Debtor. This protocol also provides that the Abuse Claims Reviewer, upon the Committee's request, may review a Class 9 claim to determine if it is credible and/or relates to the Sexual Abuse of a minor. The Plan and the Plan Trust Agreement contemplate that a separate reserve of at least $250,000 will be established for payment of Future Abuse Survivor Claims.

### 3.2 Conflict with Plan.

The terms of the confirmed Plan (as it may be amended) or the Confirmation Order shall prevail if there is any conflict between the terms of the Plan and the terms of this protocol.

### 3.3 Non-Compensatory Damages and Other Theories of Liability.

In determining the distribution to any Abuse Survivor or an FCR Claimant, punitive damages and damages that do not compensate the Abuse Survivor or an FCR Claimant shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law.

### 3.4 Withdrawal of Claims.

An Abuse Survivor or an FCR Claimant can irrevocably withdraw an Abuse Survivor Claim or an FCR Claim, as the case may be, at any time upon written notice to the Plan Trustee.

### 3.5 Res Judicata Effect.

The Abuse Claims Reviewer's determination with respect to an Abuse Survivor Claim or an FCR Claim shall have no preclusive, res judicata judicial estoppel or similar effect outside of this Case as to any third party. That is, the Abuse Claims Reviewer's determination may not be used against any Abuse Survivor or an FCR Claimant in any other matter, case or proceeding.

### 3.6 Confidentiality and Privilege.

All information that the Abuse Claims Reviewer receives from any source about any Abuse Survivor or an FCR Claimant shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Abuse Survivor or an FCR Claimant (or such Claimant's counsel of record). All information the Abuse Claims Reviewer receives from any Abuse Survivor or an FCR Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Abuse Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

4. **Abuse Claims Reviewer**

Paul Finn is the "Abuse Claims Reviewer", subject to an order of the Bankruptcy Court. The Abuse Claims Reviewer shall conduct a review of each of the Abuse Survivor Claims and FCR Claims (as and when such Claims may be filed) and, according to the guidelines set forth in section 5 below, make determinations upon which individual monetary distributions will be made subject to the Plan and the Plan Trust Documents. The Abuse Claims Reviewer's review as to each Abuse Survivor or an FCR Claimant shall be the final review, subject only to reconsideration as set forth in section 8 below.

5. **PROCEDURE FOR ALLOCATION AMONG ALLOWED ABUSE SURVIVOR CLAIMS**

5.1 **Proof of Abuse.**

The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Abuse Survivor or an FCR Claimant in the Abuse Survivor's or an FCR Claimant's filed proof of claim. The Bankruptcy Court order appointing the Abuse Claims Reviewer provided that within 30 days' notice from the Abuse Claims Reviewer, Abuse Survivors may submit supplemental information under penalty of perjury to the Abuse Claims Reviewer in support of their Abuse Survivor Claims. Subject to the Abuse Claims Reviewer's sole discretion, an FCR Claimant may not supplement their Proofs of Claim.

The Abuse Claims Reviewer may consider, but is not required to consider, information provided by the Debtor.

By a date to be established by the Abuse Claims Reviewer and upon written request by an Abuse Survivor or an FCR Claimant or such Claimant's counsel of record, the Abuse Claims Reviewer may interview any Abuse Survivor or any FCR Claimant; provided that for any face to face interview, the travel costs/expenses of the Abuse Claims Reviewer (including the Abuse Claims Reviewer's fees incurred for travel time) shall be advanced by the Abuse Survivor or an FCR Claimant prior to the interview. Setoff of such costs/expenses against the Claimant's award shall not be an acceptable means of advancing such costs/expenses. The Abuse Claims Reviewer may limit the duration of any interview to a reasonable period of time.

5.2 **Deceased Abuse Survivor.**

The Abuse Claims Reviewer shall review the claim of a deceased Abuse Survivor without regard to the Abuse Survivor's death, except that the Abuse Claims Reviewer may require evidence that the person submitting the claim on behalf f the decedent is authorized to do so. If an FCR Claim is filed by a deceased FCR Claimant's legal representative, the Abuse Claims Reviewer shall award 0 points to the FCR Claim.

5.3 **Previous Settlements With Entities Other Than Debtor.**

Any compensation on account of the abuse alleged in an Abuse Survivor Claim shall be set off by 100% of the amounts previously paid to the Abuse Survivor by any entity other

than the Debtor; provided that the set off shall not reduce the compensation to a resulting balance of less than $3500 and the Abuse Survivor has satisfied the Initial Evaluation. On the Plan Trustee's or Abuse Claims Reviewer's request, an Abuse Survivor shall provide the Plan Trustee with a copy of the settlement agreement memorializing any previous settlements, if available; if the settlement agreement is not available, the Abuse Survivor shall state under penalty of perjury the amount of the previously paid compensation to the Abuse Survivor by the entity. If the Abuse Survivor fails to provide the Plan Trustee or the Abuse Claims Reviewer the requested information within 20 days after the request (or such additional time as the Plan Trustee or the Abuse Claims Reviewer may grant), the Abuse Survivor shall receive $0 on account of the Abuse Survivor Claim.

**5.4**     **Guidelines for Allocation for Abuse Survivor Claims.**

    **(a)**     **Initial Evaluation.**

Solely with respect to an FCR Claimant, before making a final determination regarding a particular FCR Claim, the Abuse Claims Reviewer shall consider whether an FCR has proven by a preponderance of the evidence that the Abuse was perpetrated by a person for whose actions the Debtor could have been liable in whole or in part and whether the claimant is an FCR.

Solely with respect to a Class 8 or 9 Claim identified by the Committee, the Abuse Claims Reviewer shall consider whether the Class 8 or 9 Claimant has proven by a preponderance of the evidence that the Claimant suffered Abuse perpetrated by a person for whose actions the Debtor could have been liable in whole or in part and whether the Claimant was a minor when the Abuse was perpetrated.

The Abuse Claims Reviewer's review with respect to all other Abuse Survivors shall be limited to determining the allocation of points for such Claimants pursuant to section 5.2(b) below.

    **(b)**     **Evaluation Factors**

Each Class 8 Abuse Survivor Claim or any FCR Claim will be evaluated by the Abuse Claims Reviewer. As to each claim that has satisfied the requirements of the Initial Evaluation, each Claim will be scored according to the following system.

        **(i)**     **Minimum Award**          **4 Points**

        **(ii)**     **Nature of the Sexual Abuse:**          **0 to 10 points (5 is average)**

        **(iii)**

            (1)     Duration;

(2)     Frequency/ number of instances;

(3)     Degree of intrusiveness into child's body (*e.g.* clothed/unclothed, oral, anal, vaginal);

(4)     Level or severity of force/violence/coercion/threats;

(5)     Control of environment (*e.g.* boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Debtors);

(6)     Number of Perpetrators of the Debtor that abused the Claimant;

(7)     Physical pain suffered; and/or

(8)     Grooming.

**(iv)     Impact of the Sexual Abuse:          0 to 4 points (2 is average)**

**(v)**

(1)     School behavior problems;

(2)     School academic problems;

(3)     Getting into legal trouble as a minor;

(4)     Loss of faith;

(5)     Damage to family relationships/ interpersonal difficulties;

(6)     Risk factors, including:

a.     Childhood of poverty;

b.     Family breakdown;

c.     Exposure to substance abuse in home;

d.     Absence of parental supervision; and/or

e.     Being the victim of sexual or physical child abuse by someone other than a perpetrator of the Debtor or witnessing sexual or physical child abuse of a third person;

(7)     Mental health symptoms, including:

a.      Depression;

b.      Suicide Attempt and suicidal ideation;

c.      Anxiety;

d.      Substance abuse;

e.      Sexual acting out;

f.      Runaway;

g.      Flashbacks; and/or

h.      Nightmares; and/or

(8)      Adult and current functioning:

a.      Criminal record as an adult;

b.      Underemployment/unemployment;

c.      Relationship problems; and/or

d.      Substance abuse.

**(vi)   Other Factors**

(1)      Pre-bankruptcy litigation against Debtor (0 to 5 points)

(2)      Perpetrator(s) history/prior acts of abuse (2 points)

**5.5**    In evaluating the claims, the Abuse Claims Reviewer shall disregard any considerations related to the statute of limitations with respect to sexual abuse and/or sexual assault claims. Except as set forth herein, there will be no consideration of joint or several liability issues vis-à-vis non-Archdiocese of Milwaukee individuals or entities that may potentially be liable for the abuse to the Abuse Survivors or any FCR Claimants; the primary function of the evaluation is to facilitate the equitable division of the proceeds of this settlement among the Class 8 Abuse Survivors, certain Class 9 Abuse Survivors identified by the Committee and any FCR Claimants.

**6.**   **CLASS 9 DISTRIBUTION**

Notwithstanding anything to the contrary herein or in the Plan, every holder of a Class 9 Abuse Survivor Claim shall receive a distribution of $2000 and no other distribution from the Plan Trust, provided: (a) that the Class 9 Abuse Survivor has not requested the Bankruptcy Court to include the Abuse Survivor in Class 8, as provided in the Plan (See Plan, Section __) and (b) as to Class 9 Claimants identified by the Committee, the Class 9 Claimant has proven by a

preponderance of the evidence that the Claimant suffered Abuse perpetrated by a person for whose actions the Debtor could have been liable in whole or in part. This provision shall not apply to any FCR Claims.

## 7. **MONETARY DISTRIBUTION.**

(a)  The Abuse Claims Reviewer will determine a point total for each Abuse Survivor or an FCR Claimant taking into account the above factors. If the Abuse Claims Reviewer determines an Abuse Survivor Claim alleges Abuse solely by a person who is not a priest ordained by the Archdiocese of Milwaukee or incardinated to the Archbishop of Milwaukee, the points determined by the Abuse Claims Reviewer will be reduced using the following table:

| | |
|---|---|
| 21 to 25 points | 5 point deduction |
| 16 to 20 points | 4 point deduction |
| 11 to 16 points | 3 point deduction |
| 7 to 11 points | 2 point deduction |
| 6 to 7 points | 1 point deduction |

(b)  Deduction of Reimbursable Costs

The Plan Trustee shall calculate the distribution due to Class 8 Abuse Claimants according to their counsel of record. The Plan Trustee shall provide State Court Counsel ten (10) days' notice to provide the Plan Trustee with client costs that are reimbursable under applicable retainer agreements. The Plan Trustee shall deduct the total client costs payable to each State Court Counsel from the amount distributable to such State Court Counsel's clients. The net amount will establish the value of each point for that State Court Counsel's clients. For avoidance of doubt, the reimbursable costs of any particular State Court Counsel shall not be deducted from the amount distributable to any other State Court Counsel's clients. For avoidance of doubt, the reimbursable costs of any particular State Court Counsel shall not be deducted from the amounts distributable to unrepresented Abuse Claimants. This section shall not be applicable to FCR Claims.

(c)  Allocation Protocol For FCR Claims

Unknown Abuse Survivor Claims will be subject to the same Allocation Protocol and scoring as the Class 8 Abuse Survivor Claims with each claim receiving a score commensurate with the facts of their case. The par value of a point will be established by the Class 8 Survivor Claims.

The Plan Trustee shall calculate the value of an individual "point" after all Abuse Survivor Claims or any FCR Claims have been reviewed. The point value will be determined by dividing (x) the total amount of dollars in the amount funded for Class 8 Abuse Survivor Claims or an

FCR Claim by (y) the total number of points awarded to the individual Abuse Survivor Claims or any FCR Claims. By way of example only, if 50 are claimants awarded a total of 5,000 points, with a total settlement fund of $2 million, each point would be valued at $400.

In such an example the par value of an individual point would be established as $400. Should the Abuse Claims Reviewer determine that an FCR Claim is analogous to a Class 9 Abuse Survivor Claim, that claim will be awarded the point equivalent of $2,000. Using the above example of $400 per point, such a claim would receive 5 points ($2,000 / $400). At the time of the final determination, the aggregate number of points resulting from the filed FCR Claims would be divided into the total FCR Trust Fund Reserve to determine the final point value. For example if

- the total number of claims filed were 10,
  - of which 5 were deemed analogous to Class 9, and
  - the other 5 totaled 75 points,
- the value of each point as determined using the Class 8 Abuse Survivor Claims was $400 per point, and
- the amount to be distributed was $20,000, then
- first, the Class 9 type claims would be granted their point equivalent of $2,000 or 5 points each ($2,000 / $400)
- next the aggregate point number of points would be calculated: 100 (75 plus 5 times 5), then
- the value of each point would be determined: $200 ($20,000 / 100).

The above indicates an example where all claims share a proportional reduction in distribution based on the resulting aggregate point awards. In no case shall the value of each point exceed that of the Class 8 Abuse Survivor Claim per point average (par value). If for example only one (1) claim with 25 awarded points were submitted, that claim would receive 25 times the par value (25 times $400), or $10,000. Any amount remaining in the FCR Reserve after the later of: (i) the 1st anniversary of the conclusion of the Insurance Litigation or (ii) the seventh (7th) anniversary of the Effective Date will be distributed to a charitable entity mutually agreed upon by the Debtor or the Reorganized Debtor, as appropriate, and the FCR.

8.    **DETERMINATIONS BY THE ABUSE CLAIMS REVIEWER AND REQUESTS FOR RECONSIDERATION AND APPEAL.**

The Plan Trustee shall notify each Abuse Survivor or any FCR Claimant in writing of the preliminary monetary distribution with respect to the Abuse Survivor's or an FCR Claimant's Claim, which distribution may be greater or smaller than the actual distribution to be received based on reserves established by the Plan Trustee and the outcome of any reconsideration of claims. The Abuse Claims Reviewer shall provide the Debtor a copy of his preliminary distribution spreadsheet and the Debtor may comment on some or all of the distributions within the time period allowed for Abuse Survivors to seek reconsideration of the point allocations. The Abuse Claims Reviewer may consider, but is not required to consider, this information provided by the Debtor. The Plan Trustee shall mail this preliminary determination to the Abuse Survivor or any FCR to the Abuse Survivor's or any FCR Claimant's counsel of record, or in the case of unrepresented parties, to the address based on the Abuse Survivor's or an FCR

Claimant's filed proof of claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Survivor or an FCR Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Survivor or an FCR Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award.

The Abuse Survivor or an FCR Claimant may request reconsideration of the Abuse Claims Reviewer's point award by delivering: (a) a written request for reconsideration to the Plan Trustee within 10 calendar days after the date of mailing of the preliminary monetary distribution and (b) a check for $400 payable to Omni Management Acquisition Corp., Trustee (e.g. the Abuse Claims Reviewer's fee for his reconsideration review of the point award). The Abuse Survivor or an FCR Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request upon a showing that such additional information could not have been provided in accordance with this protocol. The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

9.      **COSTS OF ADMINISTRATION**

All costs of administration associated with the matters discussed in this Protocol, whether incurred by the Plan Trustee or the Abuse Claims Reviewer shall be an expense of the Plan Trust.

**Exhibit U – Therapy Payment Process**

[*Remainder of Page Intentionally Left Blank*]

WHD/11842543.1

# Archdiocese of Milwaukee Therapy Payment Process

## I.     Overview

This Therapy Payment Process is established pursuant to the Second Amended Plan of Reorganization dated September 25, 2015 (the "Amended Plan") for purposes of outlining the procedures for holders of Abuse Survivor Claims to request therapy payment assistance from the Archdiocese.

Unless otherwise stated herein, capitalized terms used herein shall have the meanings assigned to them in the Amended Plan.

Holders of Allowed Abuse Survivor Claims shall be entitled to request therapy payment assistance in accordance with the procedures outlined below.  The Archdiocese may, in its sole discretion, provide therapy assistance to holders of Disallowed Abuse Survivor Claims.

The Archdiocese will normally pay for cognitive-behavior, prolonged exposure, and eye movement desensitization and reprocessing (EMDR) treatment approaches.  The Archdiocese will not pay for missed or cancelled appointments, telephone or email consultations, normal and customary treatment reports, transportation expenses, or expenses associated with missed work or child-care.

## II.     Procedure for Requesting Therapy Payment Assistance

### A.     Prior Request Required

All requests for therapy assistance must be made in advance.  The Archdiocese is not obligated to provide therapy assistance unless the request for therapy assistance has been provided to and approved of by the Archdiocese.

In cases of emergency, the Claimant's clinician or the Claimant may seek retroactive payment of therapy costs incurred; **provided, however,** that (i) the payment will be provided in the Archdiocese's sole discretion; (ii) the Archdiocese will only pay costs incurred in the two (2) weeks preceding the date on which Archdiocese receives the payment request; and (iii) the Archdiocese will only pay costs incurred and not otherwise paid by the Claimant's insurance.

### B.     Procedure for Requesting Therapy Payment Assistance

To request therapy assistance, Claimant's clinician must complete the attached "Request for Therapy Assistance" form (attached as **Exhibit A**) and return the form along with a copy of the clinician's license to:

Victim Assistance Coordinator
Archdiocese of Milwaukee
P.O. Box 079127
Milwaukee, Wisconsin 53207-0912

To ensure the quality of the therapy and objectivity in review of the proposed treatment plans, all treatment plans will be reviewed by a qualified, outside professional in the field, independent of the Archdiocese, and with the professional credentials necessary to review such plans.

The Archdiocese will respond to all requests for therapy assistance within seven (7) days.

The Archdiocese will approve the therapy request and provide for therapy assistance as outlined in Section II.C below provided the following conditions are met:

1) the Request for Therapy Assistance form is complete;

2) the patient is entitled to therapy assistance pursuant to the Amended Plan;

3) the clinician is licensed as required in Section II.B.1 below;

4) the clinician provides a treatment plan, subject to the Archdiocese's right to request a second opinion, and an executed authorization for release of medical records to the Archdiocese as required in Section II.B.2 below; and

5) the clinician submits monthly bills as required in Section II.B.4 below.

1.    **Licensed Clinician**

The Archdiocese will not pay for therapy unless the clinician is licensed as a counselor, social worker, therapist, psychologist, or psychiatrist in the state in which the clinician is practicing and will be treating the patient.

2.    **Treatment Plan**

The clinician must submit a treatment plan (substantially in the form attached hereto as **Exhibit B**) and an executed authorization for release of medical records (in a form, satisfactory to the Archdiocese and that complies with applicable state and federal law, including but not limited to the Health Insurance Portability and Accountability Act of 1996 and Chapter 146 of the Wisconsin Statutes, substantially in the form attached hereto as **Exhibit C**) to the Archdiocese as soon as practical.  In all cases, the treatment plan and the executed authorization for release of medical records must be submitted to the Archdiocese prior to the clinician's fourth session with the patient.  If the patient will have three (3) or fewer sessions with the clinician, the clinician is not required to submit a treatment plan.

The authorization for release of medical records is required to allow the clinician to provide the treatment plan and copies of any other supporting materials the clinician believes are necessary for the clinician to document and justify the clinical appropriateness of the treatment and to obtain payment from the Archdiocese.  In accordance with the authorization for release of medical records, the Archdiocese may provide the treatment plan and any supporting materials to an independent third party, qualified to review the clinical appropriateness of the treatment plan. The Archdiocese and the independent third party retained to review the treatment plan will only

use and disclose confidential information in accordance with the terms of the authorization for release of medical records.

The clinician must submit a follow-up treatment plan (substantially in the form attached hereto as **Exhibit B**) after the completion of the twenty-sixth (26th) session, but prior to the thirtieth (30th) session. The Archdiocese is not required to pay for treatment sessions beyond the twenty-sixth (26th) session if the clinician does not submit a follow-up treatment plan.

### 3. Second Opinion of Treatment Plan

The Archdiocese intends to provide therapy assistance to the holders of Allowed Abuse Survivor Claims for as long as is medically efficacious. To ensure that resources remain available for those desiring and benefiting from therapy, the Archdiocese reserves the right to request a second opinion of the treatment plan submitted by the clinician.

In such circumstances, the Archdiocese may request that the clinician consult with a counter-part independent licensed clinician and obtain a second opinion from a counter-part independent licensed clinician regarding the treating clinician's proposed treatment of the patient. If such a request is made, the Archdiocese is not obligated to continue payments until the treating clinician submits an updated treatment plan containing (i) the results of the consultation with the independent clinician and (ii) a certification from the independent clinician that the independent clinician agrees with the proposed treatment. If the independent clinician disagrees with the proposed treatment, and the clinicians cannot agree on an acceptable treatment, the Archdiocese may decline payment for the additional sessions.

For purposes of this section a counter-part independent licensed clinician is a clinician who: (i) is licensed in the state in which the patient is being treated; (ii) possesses the same type of license as the treating clinician (e.g., counselor, social worker, therapist, psychologist, or psychiatrist) and; (iii) is not related to or employed by the treating clinician, employed by the same entity or an entity under common ownership as the treating clinician, or employed by the Archdiocese.

In the event the Archdiocese declines payments for additional sessions pursuant to this section, the patient may ask for a review by a second independent clinician. The opinion of the second independent clinician will be binding.

Nothing in this section prevents a patient from requesting therapy assistance at a later date or from a different clinician, provided the requirements of Section II are met.

### 4. Procedure for Billing

The clinician must submit a monthly bill, including (i) the clinician's state license number; (ii) the clinician's tax identification number (or social security number); and (iii) the patient's name and address to:

Victim Assistance Coordinator
Archdiocese of Milwaukee
P.O. Box 079127
Milwaukee, Wisconsin 53207-0912

**C.      Change in Law or Circumstance**

The Archdiocese reserves the right to revise, amend, or supplement these procedures from time to time as necessary to account for changed facts or circumstances or to comply with changes in applicable law.

**III.      Therapy Assistance to be Provided**

If the requirements in Section II.B are met, the Archdiocese will pay for one (1), one (1) hour session per week, with a clinical therapy hour being considered to be sixty minutes.  More frequent sessions  may be approved on a case-by-case basis, at the Archdiocese's sole discretion. The Archdiocese will pay normal and customary fees for sessions with the clinician.

Payment for psychotropic medications, evaluation, and care may be approved on a case-by-case basis, at the Archdiocese's sole discretion.

Payment for inpatient psychological treatment or AODA treatment may be approved on a case-by-case basis provided that the patient's clinician has made a referral for this level of care and that other requirements are met.

**Exhibit A**

**REQUEST FOR THERAPY ASSISTANCE**

# REQUEST FOR THERAPY ASSISTANCE

**Date** _____

## Patient Information

Name of Patient: _____

Address _____

_____

## Clinician Information

### General Information
Name of Clinician _____

Address _____

_____

Phone Number _____

Tax Identification Number
    OR
Social Security Number _____

Email _____

### License Information
State of Licensure _____

License Number _____

Expiration Date _____

Type of License    ___ Clinical Psychologist    ___Licensed Clinical Social Worker
   ___ Other, please specify: _____

Have you ever had disciplinary action taken against your license: ___ Yes ___ No
If yes, please explain on additional paper.

### Degree/Education Information
Type of Degree    ___ M.S.W.    ___ Ph.D.
   ___ Psy.D
   ___ Other, please specify: _____

Where did you receive your degree from: _____

Explain your approach and preferred methods with regard to psychological intervention:

_____
_____
_____
_____
_____


**<u>Practice Information</u>**

Practice Type          ___ Solo Practice (Name of Business: _____)

         ___ Group Practice (Group Name: _____)

         ___ Facility Based Practice (Facility Name: _____)

Practice Location
(if different than address
above)        _____

       _____


Fees          What is your fee per session: $_____

         Do you offer a sliding scale: ____ Yes      ____No


Which of the following age groups do     ___ Children (0-12)
you treat?          ___ Adolescents (13-17)

         ___ Adults (18-39)

         ___Adults (over 40)


Which of the following treatment      ___ Individual
modalities do you use in your practice?    ___ Group/Classes

         ___ Family

         ___ Marital

         ___ Other


What are the major problems/disorders you primarily deal with in psychotherapy:

_____
_____
_____
_____


Please summarize your clinical expertise in dealing with people who have been sexually abused:

_____
_____
_____
_____


Please list courses/workshops you have recently taken on the topic of sexual abuse:

_____
_____
_____
_____

**Insurance Information**

Name of Malpractice Insurance Carrier _____

_____

Address _____

Policy Number _____

Expiration Date _____

Amount of Coverage Per Occurrence _____

**Required Documentation**

Please include copies of the following documents with the completed Request for Therapy Assistance

1. A copy of your license
2. A copy of your business card
3. A copy of your malpractice insurance certificate or evidence of insurance

*YOU MUST INCLUDE A COPY OF AN EXECUTED AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS WHEN YOU SUBMIT THE TREATMENT PLAN TO THE ARCHDIOCESE*

---

*For internal use only*

Date of Receipt _____     Patient Bankruptcy Claim Number _____

Date of Approval _____     Patient Bankruptcy Classification     9, 10, 12
                                         (circle one)                          Unknown Abuse Survivor

**Exhibit B**

**TREATMENT PLAN**

**ARCHDIOCESE OF MILWAUKEE**
**SEXUAL ABUSE PREVENTION AND RESPONSE SERVICES**
**COUSIN'S CENTER**
**3501 SOUTH LAKE DRIVE**
**MILWAUKEE, WISCONSIN 53207**
**Treatment Plan**

**Patient Name/ID:** _____          [   ] Initial
                                                                [   ] Follow-Up

          **Clinician's Name:** _____
          **Address:** _____
          _____
          _____
          **Phone:** _____
          **Fax:** _____
          **Email:** _____
          **State of Licensure:** _____
          **License Number:** _____

**Presenting Difficulties:**_____
_____
_____
_____
_____
_____

**Please describe the purpose of your sessions with the patient (attach additional pages if necessary):** _____
_____
_____
_____
_____
_____

**Please describe the psychotherapeutic approach or methods used with the patient (attach additional pages if necessary):**
_____
_____
_____
_____
_____
_____

**Have you discussed your approach or methods with other professionals or considered alternative approaches or methods:**
_____
_____
_____
_____
_____
_____

**Current Psychiatric Medications:** _____Yes _____No
**If yes, please identify:**

_____
_____
_____
_____

**Have you had contact with the prescribing physician?** _____Yes _____No

**Treatment Goals:**

_____
_____
_____
_____
_____

**Is the patient progressing in treatment?** _____Yes _____No

**Methods Used to Assess Progress:**

_____
_____
_____
_____
_____

**Proposed Treatment Modality**

|  | Start Date | How Often? |
|---|---|---|
| [ ] Medication Management | _____ | _____ |
| [ ] Individual Therapy (30') | _____ | _____ |
| [ ] Individual Therapy (50-60') | _____ | _____ |
| [ ] Family/Couple Therapy | _____ | _____ |
| [ ] Group Therapy | _____ | _____ |

**Initial Date of Treatment** _____      **Estimated End of Treatment:** _____

*YOU MUST INCLUDE A COPY OF AN EXECUTED AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS WITH THE TREATMENT PLAN*

*For internal use only*
[ ] Approved as submitted
[ ] Second opinion of treatment plan required

_____
_____
_____
_____

**<u>Exhibit C</u>**

**<u>Authorization for Release of Medical Records</u>**

**AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS**

TO:     Medical Records Department

I, _____, authorize my clinician, _____,
(print patient's name)                                    (print name of clinician or clinician's employers)
to provide copies of certain medical records, as described below, to the Victim Assistance Coordinator of the Archdiocese of Milwaukee, of Milwaukee, Wisconsin (the "Archdiocese"), or its representatives and agents, for the purpose of obtaining therapy payment assistance pursuant to the Archdiocese's Amended Plan of Reorganization Dated August 24, 2015 (the "Amended Plan").

This authorization applies to all health and medical records, including current and previous records from other providers, that are included in or related to the treatment plan to be submitted by my clinician, on my behalf, to the Archdiocese, for the purpose of obtaining therapy payment assistance. I understand that my health and medical records may include reports and findings relating to care, evaluation, testing, history, progress, diagnosis, prognosis and treatment, including summaries, team conference reports, medical, surgical, pathological, psychiatric, psychological, pharmaceutical, school, vocational, social service, and day service reports. Records of child and adolescent patients may include reference to parental emotional illness, including the treatment of alcohol and drug abuse. This authorization also includes records for billings and payments for such health care services.

By putting my initials by each item below, I understand that I am authorizing my clinician to give the Archdiocese records that may contain information about:
_____ mental health,
_____transmittable diseases like HIV/AIDS,
_____genetic records, and/or
_____drug and alcohol records.

I understand that the above information will only be provided to the Archdiocese to the extent that is in or related to my treatment plan that my clinician is submitting to the Archdiocese. I understand that I am not required to authorize the disclosure of the above information, but that obtaining therapy payment assistance from the Archdiocese may be affected if I withhold my consent.

I understand that the information disclosed under this authorization may be redisclosed by the Archdiocese to its attorneys, its insurance carriers and their attorneys, an independent third party retained by the Archdiocese to review the clinical appropriateness of my treatment plan or other organizations or persons performing services in connection with the Amended Plan.

I understand that:
- I have the right to refuse to sign this authorization, but if I do not, I will not be eligible for therapy payment assistance pursuant to the Amended Plan.
- Refusing to sign this authorization will not affect my treatment, payment, enrollment or eligibility for benefits with respect to my relationship with the clinician.
- I may inspect and receive a copy of the disclosed information as well as a copy of this signed authorization.
- I may take back (revoke) this authorization in writing, but revoking this authorization will not affect any actions already taken based upon it.
- This authorization shall be effective for a period of one (1) year or until completion of the purposes for which this authorization was given.
- With limited exceptions, if the requestor or receiver is not a health plan or health care provider, the released information may no longer by protected by federal privacy rules and may be shared with others.
- A photostatic copy of this authorization shall be considered as effective and as valid as the original.


Patient's Signature: _____        Date:_____

Print Name: _____        DOB: _____

Patient's Authorized Representative's Signature: _____

Relationship of Authorized Representative: _____

WHD/11875017.1

**Exhibit V – Sole Corporate Member, Directors, and Officers of the Reorganized Debtor**

<u>Sole Corporate Member of the Reorganized Debtor</u>

Most Reverend Jerome E. Listecki, Archbishop of Milwaukee

<u>Directors of the Reorganized Debtor</u>

Most Reverend Jerome E. Listecki, Archbishop of Milwaukee

Vicar General/Auxiliary Bishop (role is currently vacant)

Barbara Anne Cusack, Secretary

John J. Marek, Treasurer and Chief Financial Officer

Very Reverend Jeffrey R. Haines

<u>Officers of the Reorganized Debtor</u>

President – Most Reverend Jerome E. Listecki, Archbishop of Milwaukee

Vice President – Auxiliary Bishop/Vicar General (role is currently vacant)

Secretary – Barbara Anne Cusack

Treasurer and Chief Financial Officer – John J. Marek

**Exhibit W – Executory Contracts and Leases to be Assumed Pursuant to the Plan**

| Name and Mailing Address of Other Parties to Lease or Contract | Description of Lease or Contract |
|---|---|
| Archdiocesan Cemeteries of Milwaukee Union Employee's Pension Plan c/o John Marek, Archdiocese of Milwaukee 3501 South Lake Drive P.O. Box 070912 Milwaukee, WI 53207 | Archdiocesan Cemeteries of Milwaukee Union Employee's Pension Plan |
| Archdiocese of Milwaukee Catholic Community Foundation, Inc. 637 E. Erie Street Milwaukee, WI 53202 | Administrative Services Agreement |
| Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust c/o Archbishop of Archdiocese of Milwaukee 3501 S. Lake Drive Milwaukee, WI 53207 | Services Agreement |
| Archdiocese of Milwaukee Catholic Cemeteries and Union Local 113 3501 S. Lake Drive Milwaukee, WI 53207 | Collective Bargaining Agreement |
| Archdiocese of Milwaukee Lay Employees' Pension Plan c/o John Marek, Archdiocese of Milwaukee 3501 South Lake Drive P.O. Box 070912 Milwaukee, WI 53207 | Archdiocese of Milwaukee Lay Employees' Pension Plan |
| Archdiocese of Milwaukee Priest's Pension Plan c/o John Marek, Archdiocese of Milwaukee 3501 South Lake Drive P.O. Box 070912 Milwaukee, WI 53207 | Archdiocese of Milwaukee Priest's Pension Plan |

| | |
|---|---|
| Archdiocese of Milwaukee Priest's Retiree Medical Plan c/o John Marek, Archdiocese of Milwaukee 3501 South Lake Drive P.O. Box 070912 Milwaukee, WI 53207 | Archdiocese of Milwaukee Priest's Retiree Medical Plan |
| Bustos Media of Wisconsin, LLC La Gran D 104.7 FM 1138 S. 108th Street Milwaukee, WI 53214 | Radio Broadcast Contract |
| Cassidy Turley Barry, Inc. 1232 N. Edison Street Milwaukee, WI 53202 | Real Estate Broker Contract |
| Catholic Charities of the Archdiocese of Milwaukee, Inc. 3501 S. Lake Drive, 3rd Floor Milwaukee, WI 53207 | Sublease for space at 3501 S. Lake Drive |
| Catholic Mutual Relief Society of America 10843 Old Mill Road Omaha, NE 68154-2643 | General liability, worker's compensation and other miscellaneous insurance coverages. |
| Church Unemployment Pay Program PO Box 44635 Madison, WI 53744-4635 | Unemployment Pay Program |
| Clear Channel Broadcasting/WKOY 12100 W. Howard Avenue Milwaukee, WI 53228 | Radio Broadcast Contract |
| Digital Innovation Incorporated 134 Industry Land, Suite 3 Forest Hill, MD 21050 | CaseMaster Case Management Software License Agreement |
| Diversified Benefit Services, Inc. 625 Walnut Ridge Drive, Suite 190 Hartland, WI 53029 | Section 105 HRA Plan |
| Diversified Benefit Services, Inc. 625 Walnut Ridge Drive, Suite 190 Hartland, WI 53029 | Section 125 FSA Plan |
| EthicsPoint, Inc. | Services Agreement for Confidential 24/7/365 |

| | |
|---|---|
| 13221 SW 68th Parkway, Suite 129<br>Portland, OR 97223 | Reporting System |
| Equitable Variable Life Insurance Co.<br>Life Insurance Policy No. 45261172 for the<br>benefit of the Debtor<br>Des Moines Service Center<br>PO Box BW<br>Des Moines, IA 50306 | Life Insurance Policy |
| Faith in Our Future Trust<br>P.O. Box 070504<br>Milwaukee, WI 53207 | Administrative Services Agreement |
| Gallagher Benefit Services, Inc.<br>The Gallagher Centre<br>Two Pierce Place<br>Itasca, IL 60143 | Independent Actuary for Archdiocesan<br>Cemeteries of Milwaukee Union Employees'<br>Pension Plan |
| Iron Mountain Information Management, Inc.<br>1000 Campus Drive<br>Collegeville, PA 19426 | Document Management Service |
| J.P. Morgan Investment Management Inc.<br>1111 Polaris Parkway, Suite 3F<br>Columbus, OH 43240 | Investment Management Agreement |
| Johnson Bank<br>333 East Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the Archdiocesan Cemeteries of<br>Milwaukee Union Employees' Pension Plan |
| Johnson Bank<br>333 East Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the St. Raphael Health Plan<br>Irrevocable Trust |
| Johnson Bank<br>333 East Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the St. Raphael Life Insurance<br>Plan Irrevocable Trust |
| Johnson Bank<br>333 East Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the St. Raphael Accidental<br>Death and Dismemberment Insurance Plan<br>Irrevocable Trust |

| | |
|---|---|
| JSO Technology<br>10437 Innovation Drive<br>Milwaukee, WI 53202 | Master Services Agreement |
| Knoernschild Trust, Ltd.<br>St. Charles Youth & Family Services<br>c/o US Bank – MK-WI-TWPT<br>PO Box 3194<br>Milwaukee, WI 53201-3194 | Contribution Agreement which coexists with the Lease to St. Charles Youth & Family Services, Inc. |
| Milwaukee Bucks, LLC. | Sublease, as amended, for space at 3501 S. Lake Drive. |
| Milwaukee Catholic Press Apostolate | Sublease for space at 3501 S. Lake Drive |
| New Cingular Wireless PCS, LLC<br>PO Box 2088<br>Rancho Cordova, CA 95741-2088 | Ground Site Lease Agreement |
| Northwestern Mutual Life Insurance Co.<br>Life Insurance Policy No. 10155450 for the benefit of the Debtor<br>Attn: Policy Services Dept<br>720 E Wisconsin Ave<br>Milwaukee, WI 53202 | Life Insurance Policy |
| Northwestern Mutual Life Insurance Co.<br>Life Insurance Policy No. 12829155 for the benefit of the Debtor<br>Attn: Policy Services Dept<br>720 E Wisconsin Ave<br>Milwaukee, WI 53202 | Life Insurance Policy |
| Northwestern Mutual Life Insurance Co.<br>Life Insurance Policy No. 12829169 for the benefit of the Debtor<br>Attn: Policy Services Dept<br>720 E Wisconsin Ave<br>Milwaukee, WI 53202 | Life Insurance Policy |
| Northwestern Mutual Life Insurance Co.<br>Life Insurance Policy No. 13090746 for the benefit of the Debtor<br>Attn: Policy Services Dept<br>720 E Wisconsin Ave<br>Milwaukee, WI 53202 | Life Insurance Policy |

| | |
|---|---|
| Northwoods Software<br>4600 W. Schroeder Drive<br>Milwaukee, WI 53223 | Titan CMS Maintenance and Support Agreement |
| Northwoods Software<br>4600 W. Schroeder Drive<br>Milwaukee, WI 53223 | Website Development and Annual Maintenance/Support |
| Patrick Dean<br>3501 S. Lake Drive<br>Milwaukee, WI 53207 | Services Agreement |
| Pius XI High School, Inc.<br>135 N. 76th Street<br>Milwaukee, WI 53213 | Ground Lease/Educational Use Dedication/Memorandum of Lease |
| Professional Interpreting Enterprise<br>6510 W. Layton Avenue, Suite 2<br>Milwaukee, WI 53220 | Interpreter Services Contract |
| Proqur Consulting, Inc.<br>6S001 Timberlane Drive<br>Naperville, IL 60563 | Master Consulting Agreement |
| RFP Commercial, Inc.<br>330 E. Kilbourn, Suite 800<br>Milwaukee, WI 53202 | Real Estate Broker Contract |
| Saint Francis de Sales Seminary, Inc.<br>3257 S. Lake Drive<br>Milwaukee, WI 53207 | Administrative Services Agreement |
| ScriptLogic Corporation<br>6000 Broken Sound Parkway NW<br>Boca Raton, FL 33487-2742 | Archive Manager – Jump Start Contract |
| St. Charles Youth & Family Services, Inc.<br>151 S. 84th Street<br>Milwaukee, WI 53214-1456 | Lease of real property and improvements at 151 S. 84th Street |
| St. Francis Institute<br>P.O. Box 468<br>Cedarburg, WI 53012 | Sublease of space at 3501 S. Lake Drive |

| | |
|---|---|
| St. Joseph High School of Kenosha, Wisconsin<br>2401 69th Street<br>Kenosha, WI 53143 | Ground Lease/Educational Use<br>Dedication/Memorandum of Lease |
| Staples Contract & Commercial, Inc.<br>500 Staples Drive<br>Framingham, MA 01702 | Master Purchasing Agreement |
| Thomas More High School, Inc.<br>2601 E. Morgan Avenue<br>Milwaukee, WI 53207 | Ground Lease/Educational Use<br>Dedication/Memorandum of Lease |
| TimeWarner Cable of Southeastern Wisconsin<br>1320 N. Dr. Martin Luther King Drive<br>Milwaukee, WI 53212 | Road Runner Business Class System<br>Installation and Service Agreement |
| U.S. Bank, National Association<br>777 E. Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the Archdiocese of Milwaukee<br>Lay Employees' Pension Plan Trust |
| U.S. Bank, National Association<br>777 E. Wisconsin Avenue<br>Milwaukee, WI 53202 | As Trustee for the Archdiocese of Milwaukee<br>Priests' Pension Plan Trust |
| UnitedHealthcare Insurance Company<br>United Health Group Center<br>9900 Bren Road East<br>Hopkins, MN 55343 | Medicare Advantage with Prescription Drug<br>Benefit Group Agreement |
| Unitrends Corporation<br>320 McGrath Lane<br>Heartland, WI 53029 | Data Protection System Contract |
| World Mission, Inc.<br>3501 South Lake Drive<br>Milwaukee, WI 53207 | Administrative Services Agreement |