# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

ARCHDIOCESE OF MILWAUKEE,

               Debtor(s).

Chapter: 11

Case No: 11-20059

---

## WISCONSIN DEPARTMENT OF JUSTICE RESPONSE
## IN SUPPORT OF MOTION TO REOPEN AND MOTION FOR ACCESS

---

JOSHUA L. KAUL
Attorney General of Wisconsin

S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

MICHAEL D. MORRIS
Assistant Attorney General
State Bar #1112934

Attorneys for State of Wisconsin,
Department of Justice

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (SMM)
(608) 266-3936 (MDM)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
morrismd@doj.state.wi.us

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................2

I.    DOJ has authority, experience, and expertise to assist survivors of sex crimes, and to investigate and prosecute those crimes.................................................................................2

    A.    DOJ has authority, experience, and expertise to serve crime victims. ...........................................................................3

    B.    DOJ has authority, experience, and expertise to investigate sex crimes...........................................................6

    C.    DOJ has authority, expertise, and experience in prosecuting sex crimes and training and collaborating with other prosecutors. ..............................................8

II.    DOJ has a long, successful history of multidisciplinary efforts to address sex crimes. ..............................................9

III.    The Initiative is an effective, important use of DOJ's authority to serve victims and investigate and prosecute crime. ............................................................................... 11

IV.    DOJ has attempted to collaborate with the Archdiocese in sharing information. ................................................... 14

ARGUMENT ................................................................................................... 15

I.    Access to sealed claims and related sealed documents will further the goals of the Initiative and benefit survivors. ............ 16

    A.    The documents will further the Initiative's work. ............ 16

    B.    The multidisciplinary teams' work will benefit sexual abuse survivors. ................................................. 17

        1.    The documents will help develop complete public lists, which serves survivors by publicly

acknowledging their harm.**Error! Bookmark not defined.**

      2.    Gathering and cross-checking information can help DOJ inform survivors that their abuser is on a public list. ............................................................ 18

      3.    DOJ investigators can build criminal cases by corroborating evidence and developing facts relating to particular suspects. ................................. 19

II.    This Court has authority to grant DOJ access to the requested documents. ................................................................... 20

    A.    The Bankruptcy Court is authorized to give DOJ access to the sealed records. ................................. 20

    B.    More generally, federal courts have inherent authority to review requests for access or unsealing of sealed documents. ............................................................. 22

    C.    The law favors access to judicial records. ........................... 23

    D.    Courts consider requests for access or unsealing without opening closed cases. ........................... 24

    E.    Movants can seek access years after the closure of a case. ................................................................... 25

    F.    The Archdiocese's arguments about DOJ's authority and the standard for reopening are unavailing. ................ 26

      1.    DOJ plainly has authority to conduct the Initiative, but any party has standing to seek access to documents, particularly in furtherance of the public interest. ................................. 26

      2.    DOJ would meet the standards for any limited reopening, if that is needed to give survivors notice. ......................................................... 27

      3.    Federal Rule 60(b) does not apply, but it would also support granting DOJ access. ............................ 31

– ii –

III. DOJ seeks only restricted access, including procedures that protect confidentiality and either the provision of notice to claimants or redaction of documents. ........................................... 32

    A.     DOJ's proposed order will protect the confidentiality of the information. ................................................................. 32

        1.     DOJ will take steps to protect the confidentiality of the data. .......................................................................... 32

        2.     Public records law does not affect the documents' confidentiality. ......................................... 33

        3.     The Archdiocese's accusation that DOJ has not kept documents confidential is wholly unsupported. .................................................................. 36

    B.     DOJ seeks access after notice, which the Archdiocese or DOJ can provide. Alternatively, DOJ is willing to receive redacted documents. ................................................. 37

        1.     The Archdiocese committed to providing abuse survivors with required notices, and it should be ordered to give notice here. ......................................... 38

        2.     If the Archdiocese cannot feasibly provide notice, DOJ can. .......................................................... 39

        3.     Alternatively, if the Court believes no effective notice could be given to survivors, DOJ could receive documents with survivor names redacted. ................................................................... 42

IV. The Archdiocese's remaining objections rest on factual mistakes and legal misunderstandings. ........................................ 42

    A.     The initiative does not violate the discharge injunction or seek to relitigate the content of the plan. ...................... 43

    B.     The information in publicly available documents does not capture what is in the sealed documents. .................... 45

C.    DOJ cannot know with certainty what is in the documents, but unsealed proofs of claims illustrate the value of the sealed documents. ........................................... 46

D.    The 2002 review by "civil authorities," the Archdiocese's past offer to pass along evidence to District Attorneys, and the Archdiocese's letter to DOJ do not substitute for DOJ's Initiative. ............................... 46

E.    Asserted difficulties in adding deceased individuals to the list are beside the point. ............................................... 48

F.    The Archdiocese offers no support for its claims of targeting or bigotry. ............................................................ 49

CONCLUSION ............................................................................... 53

Case 11-20059-gmh    Doc 3496    Filed 09/27/23    Page 5 of 58

# INTRODUCTION

The Wisconsin Department of Justice (DOJ) seeks confidential access to documents relating to abuse survivor claims as part of its Clergy and Faith Leader Abuse Initiative (Initiative), an inter-divisional, multidisciplinary effort by a statewide law enforcement agency to support victims, investigate leads, and prosecute crimes. This work is part and parcel of DOJ's authority and consistent with past, similar DOJ initiatives. Confidential access will allow DOJ to support survivors, help religious entities complete their own public lists, and provide leads for criminal prosecutions.

The Archdiocese's objections are legally and factually unsupported. Parties regularly seek access to documents in closed cases, and any limited reopening here to give survivors notice would satisfy reopening standards. DOJ has extensive experience with confidential materials and has offered robust ways to protect survivors' confidentiality and give them notice. The Archdiocese offers a grab bag of objections, pointing to abuse by other groups, complaining of the difficulties of adding to its list, or imputing ill intent to DOJ, but these objections are either untrue, irrelevant, or both.

DOJ asks this Court to grant it restricted access to the sealed documents and to issue an order requiring notice on the survivor claimants.

## BACKGROUND

To begin, the Archdiocese objection relies on factual misunderstandings that require correction. It asserts that DOJ lacks statutory authority to conduct the Initiative. (Dkt. 3486 ¶ 9.) It claims DOJ is not pursuing criminal cases as part of the initiative. (Dkt. 3486 ¶¶ 16, 17, 41, 147.) And it claims DOJ has not reached out to the Archdiocese with information about alleged abusers. (Dkt. 3486 ¶¶ 44, 101, 107.)

All of these assertions are incorrect. DOJ has authority, experience, and expertise in serving crime victims and investigating and prosecuting crimes, especially sex crimes. DOJ has a successful history of utilizing cross-divisional, multidisciplinary teams to do that work. The Initiative's work includes criminal investigations and prosecutions—a fact reflected by DOJ's interactions with the Archdiocese itself. And DOJ has provided information to the Archdiocese about individuals not currently on its public list about which DOJ has received credible allegations of abuse.

## I.    DOJ has authority, experience, and expertise to assist survivors of sex crimes, and to investigate and prosecute those crimes.

Three separate arms of DOJ carry out the critical work of assisting crime victims, investigating crimes, and prosecuting them.

– 2 –

### A. DOJ has authority, experience, and expertise to serve crime victims.

The Wisconsin Constitution and statutes provide numerous rights to victims of crime, and DOJ facilitates and safeguards those rights. *See e.g.*, Wis. Const. art. I, § 9; Wis. Stat. chs. 949 & 950; (Phelps Aff. ¶ 7). A person's rights as a victim of crime do not depend on a crime being charged or whether the person who allegedly committed the crime is alive or deceased. Wis. Const. art. I, § 9m(1)(a)1, § 9m(2); *see also* Wis. Stat. § 950.02(1m), (4)(a)1., §§ 949.06(4)(a), 949.08(1m)(b) (discussing crime victim compensation); (Phelps Aff. ¶ 8).

The DOJ Office of Crime Victim Services (OCVS) was created over 40 years ago, shortly after Wisconsin became the first state to create a Crime Victim's Bill of Rights. *See* 1979 Wis. Act 219; (Phelps Aff. ¶ 4). The mission of OCVS is to provide and support the provision of trauma-informed, survivor-centered, and culturally responsive victim services. (*Id*. ¶ 6.) OCVS administers statewide resources and programs for crime victims, victims' families, and professionals in the victim services field. (*Id*. ¶ 5.)

OCVS services include crisis counseling, assistance securing resources, administering a crime victim compensation program, funding county victim programs, and administering address confidentiality programs. (Phelps Aff. ¶¶ 11–33.) OCVS manages a toll-free telephone line that connects victims to

OCVS programs. (*Id.* ¶¶ 5, 15–16.) Many of the victims served by these programs are sexual assault survivors. (*Id.* ¶ 14.)

OCVS Victim Services Specialists work directly with victims, providing them with support, information, and referrals to local advocacy agencies. (Phelps Aff. ¶ 39.) They serve as a liaison between victims, criminal justice professionals, and community-based victim advocates in sexual abuse and assault cases under review by DOJ. (*Id.*) In cases investigated and prosecuted by DOJ, they provide victim witness services both before and after the case is charged. (*Id.*) They review cases of sexual assault and abuse reported to DOJ, provide recommendations to internal and external criminal justice professionals about trauma-informed investigations and prosecutions, and participate as members of DOJ's multi-disciplinary teams on initiatives relating to sexual assault and abuse. (*Id.*)

In addition to direct victim services, DOJ and OCVS administer grant programs to assist survivors of crimes at the state and federal levels.

At the state level, OCVS administers a statutory program that reimburses counties for services they are required to provides victims and witnesses. Wis. Stat. § 950.06(2); (Phelps Aff. ¶¶ 18, 21). Through this work, OCVS helps ensure that victims are referred to appropriate resources to assist with the impacts of the trauma and that the rights of sexual abuse victims are honored and upheld. (*Id.* ¶ 20.) OCVS also administers Wisconsin's Sexual

– 4 –

Assault Victim Services Grant Program, which provides grants to nonprofit organizations and public agencies for the provision of services to sexual assault victims, including advocacy, counseling, and educational resources. Wis. Stat. § 165.93(2)(a); (*Id.* ¶¶ 31–32).

At the federal level, DOJ is designated as the State Administering Agency responsible for administering all money received from the federal government for crime victims. *See* Wis. Stat. § 20.455(5)(m), (ma), (mh). These grant programs fund a wide range of services for victims, including community- and systems-based victim services, statewide initiatives, and statutorily mandated statewide victim services. (Phelps Aff. ¶ 34.) These include the Victims of Crime Act grants, through which OCVS awards grants to private and public agencies to support direct services to victims of violent crime. 34 U.S.C. § 20103(a); (Phelps Aff. ¶ 35). They also include grant programs from U.S. Department of Justice's Office on Violence Against Women: the Violence Against Women Act STOP Formula Grant Program, which aims to develop and strengthen effective responses to sexual assault, domestic violence, dating violence, and stalking, and the Violence Against Women Act Sexual Assault Services Grant Program, which provides core services, direct intervention, and related assistance to survivors of sexual assault. (Phelps Aff. ¶ 36); 34 U.S.C. §§ 10441, 10446–10451.

## B. DOJ has authority, experience, and expertise to investigate sex crimes.

Wisconsin Stat. § 165.50(1)(a) grants DOJ authority to investigate crimes that are statewide in nature, importance or influence. (Happ Aff. ¶ 14; Virgil Aff. ¶ 4.) DOJ is invested with the powers conferred by law upon sheriffs and municipal police officers in the performance of these duties. Wis. Stat. § 165.70(2). In the area of child sexual abuse, DOJ has statutory subpoena power under Wis. Stat. § 165.505 for crimes against a child involving the internet (Virgil Aff. ¶ 15) and has issued over 10,000 administrative subpoenas in furtherance of these investigations since 2016 (*Id.* ¶ 16).

To do this work, in its Division of Criminal Investigation (DCI), DOJ employs sworn law enforcement officers identified as Special Agents. (Virgil Aff. ¶ 4.) Special Agents assist local law enforcement agencies and investigate crimes that require highly specialized investigative resources. Those investigations include cases relating to sexual abuse, which encompasses sexual assaults, sexual exploitation, internet crimes against children, and human trafficking. (*Id.* ¶ 5.) They receive training regarding sexual abuse investigations and learn to pursue investigative leads, including interview techniques for suspects, survivors, and witnesses; requesting and reviewing medical records and privately-held documents, photos, and digital records; and locating and reviewing historic, vital, and other public records. (*Id.* ¶ 6.) They

– 6 –

are trained to review records for both corroborative and contradictory evidence. (*Id.* ¶ 5.)

DOJ is highly skilled and experienced in prosecuting sex crimes. In the last decade alone, DCI has investigated over 130 reports of sexual abuse. (Virgil Aff. ¶ 7.) DCI's investigations have led to federal and state prosecutions and convictions for sexual abuse offenses, including human trafficking, and have resulted in lengthy prison sentences for the offenders. (*Id.* ¶¶ 18, 19.) Some of these cases involve investigations of the sexual abuse of minors that occurred long ago. (*See Id.* ¶¶ 7–10, 18–19, 23 (examples of DCI child sexual abuse investigations resulting in convictions and lengthy sentences).)

DCI is also the leader on multiple, ongoing task forces relating to sexual abuse. It is recognized as Wisconsin's leading authority on investigations under the United States Department of Justice Internet Crimes Against Children Task Force, which seeks to combat predators' use of the internet or other online technology to sexually exploit children. (Virgil Aff. ¶ 11.) And DCI leads Wisconsin's Anti-Human Trafficking Task Force, which furthers strong working relationships between law enforcement and victim services in creating a victim-centered, trauma-informed multidisciplinary response to human trafficking. (*Id.* ¶ 17.)

### C. DOJ has authority, expertise, and experience in prosecuting sex crimes and training and collaborating with other prosecutors.

In sex abuse cases, like all criminal cases, assistant attorneys general may be appointed as a special prosecutor at the request of a judge or the district attorney under Wis. Stat. § 978.045(1g) and (1r). (Happ Aff. ¶ 8.) A special prosecutor under Wis. Stat. § 978.045(1g) and(1r) acts with "all the powers of the district attorney." (*Id*. ¶ 9.) Similarly, district attorneys may request that DOJ assign an assistant attorney general to assist on criminal cases. (*Id*. ¶ 10.) Appointed DOJ attorneys "may appear and assist in the investigation and prosecution of any matter for which a district attorney is responsible . . . in like manner as assistants in the prosecutorial unit and with the same authority as the district attorney in the unit in which the action is brought." Wis. Stat. § 978.05(8)(b). In addition, Wis. Stat. § 968.135 grants the attorney general authority akin to a district attorney to request a subpoena for production of documents in furtherance of any criminal investigation. (Happ Aff. ¶ 15.) And DOJ has direct statutory authority to represent the State in sexually violent person proceedings. Wis. Stat. § 165.255; (Happ Aff. ¶ 7.)

DOJ's Criminal Litigation Unit has three prosecutors assigned exclusively to sexual abuse cases, two prosecutors partially assigned to sexual abuse cases, and two prosecutors assigned to Sexually Violent Person cases. (Happ Aff. ¶ 18.) Together, these prosecutors have prosecuted or assisted in

– 8 –

the prosecutions of numerous sexual abuse cases. (*Id.*) In the last decade alone, DOJ has served as special prosecutor or assisted local district attorneys on over 120 sexual abuse investigations and cases. (*Id.* ¶ 17.)

DOJ criminal prosecutors also conduct statewide training for law enforcement on survivor rights and sexual assault. DOJ is statutorily responsible to provide regular training and continuing legal education to prosecutors across the State. (Happ Aff. ¶¶ 20–21.) In the last two decades, these statewide trainings have featured over 60 sessions on sexual abuse and over 40 sessions on victims' rights and best practices for working with victims. (*Id.* ¶ 22.) Last year, DOJ hosted four regional sexual abuse trainings. (*Id.* ¶ 24.)

## II. DOJ has a long, successful history of multidisciplinary efforts to address sex crimes.

The Clergy and Faith Leader Abuse Initiative is not the first DOJ-led initiative focused on sex crimes. To the contrary, the Initiative builds on DOJ's long successful history with this type of effort.

In late 2012, then-Wisconsin Attorney General J.B. Van Hollen created the Attorney General's Sexual Assault Response Team (AG SART), composed of a multidisciplinary group of professionals knowledgeable in the complex issues surrounding sexual assault. (Happ Aff. ¶ 25; Virgil Aff. ¶ 20.) Members of the original AG SART included law enforcement, victim advocates, sexual

– 9 –

assault nurse examiners, the state crime lab, prosecutors, hospital administrators, and policymakers. (*Id.*)

Since 2015, DOJ has led the Wisconsin Sexual Assault Kit Initiative (WiSAKI), a statewide effort to address the accumulation of unsubmitted sexual assault kits in the possession of local law enforcement agencies and hospitals. WiSAKI is a collaborative effort among law enforcement, survivor advocates, sexual assault nurse examiners, prosecutors, health care systems, and the crime lab. (Happ Aff. ¶ 26; Virgil Aff. ¶ 21.) Similar to the current Initiative, WiSAKI utilizes multidisciplinary teams to review cases associated with unsubmitted sexual assault kits. The teams assist local jurisdictions with victim notification protocols, as well as the investigation and prosecution of cases arising from the testing. (Phelps Aff. ¶¶ 27, 46; Happ Aff. ¶¶ 27, 35; Virgil Aff. ¶¶ 22, 30.) Some of the practices developed in WiSAKI have been codified in Wisconsin law. *See* Wis. Stat. §§ 165.775, 165.776; (Phelps Aff. ¶ 30).

Like the current Initiative, DOJ has utilized WiSAKI to pursue criminal prosecutions. For example, it reviewed reports from two jurisdictions relating to four sexual assault cases linked together by the same, unknown offender. DCI collaborated with local advocacy to contact the victims and investigated. Those efforts resulted in the development of a suspect, later confirmed with a DNA match, and the arrest and conviction of the offender. *State of Wisconsin*

– 10 –

*v. Matthew P. Crockett*, No. 21CF604 (Wis. Cir. Ct. Kenosha Cnty.); (Virgil Aff. ¶ 23; Happ Aff. ¶ 29).

In another statewide initiative focused on sex crimes, Governor Evers asked DOJ to conduct a review of reports of sexual abuse in the Wisconsin Army National Guard. (Phelps Aff. ¶ 41; Happ Aff. ¶ 31; Virgil Aff. ¶ 25.) In response, DOJ assembled multi-disciplinary teams to review every unrestricted report of sexual assault made between 2009 and 2019. The teams collectively reviewed thousands of pages of documents and, on certain occasions, referred cases to a district attorney for further review. (Phelps Aff. ¶ 42; Happ Aff. ¶ 32; Virgil Aff. ¶ 26.)

In similar fashion, the Clergy and Faith Leader Abuse Initiative has assembled multidisciplinary teams to carefully review abuse reported to DOJ. (Happ Aff. ¶ 35; Phelps Aff. ¶ 46; Virgil Aff. ¶ 30.) Like previous initiatives, those teams assess the information and make recommendations for follow up, including additional victim support and referrals to local law enforcement for further investigation. (*Id.*)

## III. The Initiative is an effective, important use of DOJ's authority to serve victims and investigate and prosecute crime.

Like past initiatives, the Clergy and Faith Leader Abuse Initiative is an effective and important use of DOJ's authority to serve victims and investigate and prosecute sex crime. The Initiative seeks reports of abuse by any clergy or

– 11 –

faith leader, regardless of denomination, and DOJ serves as a clearinghouse for reports of abuse from across the State. (Happ Aff. ¶ 33.) DOJ is uniquely positioned to address the needs of victims, make investigative connections across reports, and prosecute cases.

With consent from the survivor, a DOJ multidisciplinary team consisting of a criminal prosecutor, criminal investigator, and victim service specialist reviews each report of abuse made to DOJ. (Happ Aff. ¶ 35; Phelps Aff. ¶ 46; Virgil Aff. ¶ 30.) The multidisciplinary team confers and recommends next steps, which can include follow-up questions for the survivor, gathering of additional documents, or (with the victim's consent) coordination with local law enforcement for further investigation if the alleged abuse may be within the statute of limitations. (Phelps Aff. ¶ 46; Virgil Aff. ¶ 30.)

For example, when a victim reported abuse to DOJ from the 1990s by an Archdiocese priest, a DOJ multidisciplinary team reviewed the report and, because the alleged abuse was within the statute of limitations for criminal charges, recommended sharing that information with the Milwaukee County District Attorney's Office. (Happ Aff. ¶¶ 36–37.) After DOJ shared the information, DOJ and the District Attorney's office filed a joint motion seeking a subpoena directed toward the Archdiocese, based on probable cause that the Archdiocese possessed documents constituting evidence of first degree sexual assault of a child. (Happ Aff. ¶ 37; Virgil Aff. ¶ 32.) The Archdiocese produced

– 12 –

documents to DOJ responsive to the subpoena. (*Id.*) DCI's investigation of the matter remains ongoing. (*Id.*)

In another matter, an individual reported to DOJ that he had been abused repeatedly by Theodore McCarrick, a former Catholic cardinal. After follow-up by a victim specialist and multidisciplinary team review, DOJ reached out to local law enforcement and the local district attorney. (Happ Aff. ¶ 38; Virgil Aff. ¶ 33.) A DCI agent interviewed the reporter, accompanied by a deputy from the local sheriff's office. (*Id.*) Based on the information gathered by DOJ, the district attorney charged McCarrick with fourth degree sexual assault. *See State of Wisconsin v. Theodore McCarrick*, No. 23CM160 (Wis. Cir. Ct. Walworth Cnty.). The case is still pending. (Happ Aff. ¶ 38; Virgil Aff. ¶ 33.)

Also stemming from the Initiative, an individual reported to DOJ that he had been abused as a child by Remington Jon Nystrom, a non-Catholic faith leader and camp counselor. The victim had not reported the assault to either church or legal authorities prior to reporting through DOJ's website for the Initiative. (Happ Aff. ¶ 39; Virgil Aff. ¶ 34.) After follow-up by a DOJ victim specialist at DOJ and multidisciplinary team review, DOJ reached out to local law enforcement to coordinate further investigation. (*Id.*) The district attorney later charged Nystrom with second degree sexual assault of a child, and Nystrom pled guilty and was sentenced to significant confinement time. *See*

– 13 –

*State v. Remington Jon Nystrom*, No. 22CF27 (Wis. Cir. Ct. Waushara Cnty.);
(Happ Aff. ¶ 39; Virgil Aff. ¶ 34).

DOJ continues to receive reports through the Initiative and continues to follow the multidisciplinary review process for each report. (Happ Aff. ¶ 40; Virgil Aff. ¶ 35.)

## IV. DOJ has attempted to collaborate with the Archdiocese in sharing information.

During the Initiative, DOJ has attempted to collaborate with the Archdiocese in sharing information. Those efforts have largely been rebuffed.

On October 19, 2022, DOJ sent the Archdiocese a list of eleven people affiliated with the Archdiocese about whom DOJ had preliminarily concluded there was credible evidence of sexual abuse but who were not on the Archdiocese list of restricted priests. (Murphy Aff. ¶ 2 Ex. A:1–3.) DOJ requested that the Archdiocese share information about those individuals. (*Id*.)

In a November 17, 2022, response, the Archdiocese stated it would not share information with DOJ. (Murphy Aff. ¶ 2 Ex. A:4–5.) Although it had promised in the bankruptcy case that "every report of clergy sexual abuse of a minor, regardless of when the offense occurred, has been taken very seriously," and the confirmed plan requirements extend to deceased clergy, (Dkt. 3277:23; 3322:81–84), the Archdiocese said it would not cooperate, stating that "none of

– 14 –

these people are living priests of the Archdiocese of Milwaukee, let alone living priests who remain in ministry." (Murphy Aff. ¶ 2 Ex. A:5.)

Then, on August 22, 2023[1], DOJ sent the Archdiocese a copy of a report that DCI prepared of an interview with a survivor who alleged abuse by a diocesan priest (now deceased) who served at a parish within the Archdiocese. A copy of that letter (without the accompanying interview report) is filed with this response. (Murphy Aff. ¶ 3 Ex. B.) Although that priest is not on the Archdiocese list of restricted priests, to date the Archdiocese has not indicated that any action is being taken.

If this Court grants DOJ access to the sealed documents, DOJ will review them for additional incidents of abuse that are consistent with the time, circumstances, and person mentioned in that report. If there is such corroboration, DOJ will take appropriate action, including asking that the Archdiocese add that name to its public list.

## ARGUMENT

Information in the requested documents will further DOJ's Initiative, supporting sexual assault survivors and evaluating whether criminal charges are appropriate. Granting DOJ access is consistent with the bankruptcy code, this court's inherent power over its own records, the prior order in this case,

---

[1] The August 22, 2023, letter contains a typo in the date on the letter. The correct date of the letter is August 22, 2023.

and the presumption in favor of access to court records. DOJ seeks access that will protect the confidentiality of the information, and multiple avenues can either provide notice to survivors or redact their names from the documents DOJ receives. The Archdiocese Objection relies on misunderstandings of DOJ's request or the applicable law, and resorts to unfounded personal attacks.

## I. Access to sealed claims and related sealed documents will further the goals of the Initiative and benefit survivors.

### A. The documents will further the Initiative's work.

The requested documents are important across the entire spectrum of the Initiative and will benefit survivors of sexual abuse. There are 579 survivor claims, the vast majority of which are sealed. (*See* Dkt. 3277:24.) Non-sealed claims available to DOJ demonstrate that the proofs of claim include information about the alleged abusers and the circumstances of the alleged abuse. (Murphy Aff. ¶ 4 Ex. C:3 (describing abuse by a priest and a teacher, including timeframe, location, acts committed, and age of victim).)[2]

If the Court grants DOJ access to the requested documents, a DOJ multidisciplinary team will review the documents together with other available materials and facts. (Phelps Aff. ¶ 46; Virgil Aff. ¶ 30.) The results will be used to support victims, help various entities complete their public lists

---

[2] This claim has been publicly filed, but the version filed in support of this motion has been redacted to remove personally identifiable information.

– 16 –

of abusive faith leaders, and where appropriate, pursue further investigation in support of criminal charges.

## B. The multidisciplinary teams' work will benefit sexual abuse survivors.

DOJ's access to the documents will benefit survivors in three ways: (1) helping complete the public list of the Archdiocese and likely helping complete lists of other organizations; (2) helping DOJ connect data from multiple sources and identifying abusers for survivors who currently do not know their abuser's identity; and (3) helping DOJ investigators connect data between existing sources and the sealed documents to build criminal prosecutions.

### 1. The documents will help develop complete public lists, which serves survivors by publicly acknowledging their harm.

An important survivor support task is to assess whether the lists published by faith organizations of people credibly accused of sexual abuse are complete. (Dkt. 3476:13–14.) It is critically important to survivors of sexual abuse that they are listened to and believed. (Phelps Aff. ¶ 61.) When names of abusers who should be on these lists are not, even if those abusers are deceased, their victims live not only with the trauma from the abuse but also the harm of not having their abuse acknowledged. Having their abuser named, and their abuse recognized, can provide healing for victims of abuse. (*Id.* ¶ 49.)

– 17 –

During the Initiative, DOJ has received credible reports of sexual abuse committed by individuals affiliated with the Archdiocese, including diocesan priests, who are not on the Archdiocese's published list of restricted priests. (Phelps Aff. ¶ 56; Murphy Aff. ¶ 2 Ex. A.) Several victims have asked DOJ to pursue having their abuser's name added to the list. (Phelps Aff. ¶ 56.) Access to the claims will help substantiate and corroborate these reports of abuse. DOJ can then share this information with the Archdiocese. (*Id.* ¶ 60.)

The documents can also help complete lists other than the Archdiocese's. The Archdiocese's disclosure statement indicates that 150 bankruptcy claims alleged abuse "by persons who are not employed or controlled by the Archdiocese." (Dkt. 3277:24.) DOJ has received credible reports of sexual abuse committed by non-diocesan priests who served in the Archdiocese, and DOJ is uniquely positioned to make connections across information and give other organizations (such as religious orders) the information they need to complete their lists.

> **2. Gathering and cross-checking information can help DOJ inform survivors that their abuser is on a public list.**

Many of the victims who have reported sexual abuse to the Initiative do not know the name of their abuser or lack other important details about what happened to them. (Phelps Aff. ¶ 57.) This is a common experience for victims

of child sexual abuse due to their age at the time of the abuse and the trauma they experienced. (*Id.*)

Information in the sealed claims will give DOJ important data to piece together and corroborate information, potentially identifying the names of abusers—even abusers already on the Archdiocese's list. (Phelps Aff. ¶ 58.) Knowing the identity of the person who abused them and details about what happened, and seeing the abuse acknowledged, is important to the healing process and closure for a survivor.  (*Id.* ¶ 59.)

### 3. DOJ investigators can build criminal cases by corroborating evidence and developing facts relating to particular suspects.

DOJ criminal litigation attorneys and special agents on multidisciplinary teams can compare the data to verify whether reports are within the statute of limitation, identify the proper venue for case referral, and assess the prosecutorial merit of Initiative reports by identifying consistent and inconsistent statements, witnesses, and potential other acts evidence. (Happ Aff. ¶¶ 41–42; Virgil Aff. ¶¶ 36–37.) This work furthers the goal of developing prosecutions where it is possible to do so.

– 19 –

II.  **This Court has authority to grant DOJ access to the requested documents.**

Granting DOJ access to the documents will further the goals of the Initiative and benefit survivors. This Court has authority to grant that access under the bankruptcy code, this court's inherent power over its own records, the prior order in this case, and the presumption in favor of access to court records. The Archdiocese's arguments about DOJ's authority and the standards for reopening are unavailing.

A.  **The Bankruptcy Court is authorized to give DOJ access to the sealed records.**

This Court has the authority to grant DOJ confidential access under the Bankruptcy Code and its equity powers.

First, the Court has the authority to grant DOJ access to the sealed records under Bankruptcy Code section 107: "[u]pon ex parte application demonstrating cause, the court shall provide access to information protected pursuant to paragraph (1) to an entity acting pursuant to the police or regulatory power of a domestic governmental unit." 11 U.S.C. § 107(c)(2). Bankruptcy courts have "broad discretion" to grant relief under section 107(c). *Stone v. Kettering Adventist Healthcare (In re Stone)*, 587 B.R. 678, 682 (Bankr. S.D. Ohio 2018). There is no time limit for a request under section 107(c).

DOJ satisfies section 107(c)'s requirements. As the statewide law enforcement agency for Wisconsin, DOJ is a domestic governmental unit.

– 20 –

11 U.S.C. § 101(27). DOJ seeks the sealed records pursuant to its police and regulatory powers, which include law enforcement and public protection powers. *In re Towers*, 162 F.3d 952, 956 (7th Cir. 1998) (noting that "state law-enforcement actions are" police and regulatory powers under Bankruptcy Code section 362(b)(4)). DOJ is pursuing a matter of "public safety and welfare," not its own pecuniary interests. 3 Collier on Bankruptcy ¶ 362.05[5][a] (2023). And under the alternative public policy test, DOJ's action "[is] designed to effectuate public policy rather than to adjudicate private rights." *Id.*

Second, the Court has the power to grant DOJ access under its equitable powers. "The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.'" *Ridgeway v. Stryker Corp. (In re Ridgeway)*, 973 F.3d 421, 427 (5th Cir. 2020) (citation omitted). Specifically, Bankruptcy Code section 105 supplies the "basis for a broad exercise of equitable powers by a bankruptcy court." *In re Dunckle Assocs., Inc.*, 19 B.R. 481, 485 (Bankr. E.D. Pa. 1982). It empowers a bankruptcy court to issue "any" order it deems necessary or appropriate "or where equity and substantial justice requires." *In re Final Analysis, Inc.*, 389 B.R. 449, 462 n.10 (Bankr. D. Md. 2008); *see also In re Dunckle Assocs., Inc.*, 19 B.R. at 485.

**B.** **More generally, federal courts have inherent authority to review requests for access or unsealing of sealed documents.**

In addition to the specific authority under the Bankruptcy Code, this federal bankruptcy court has inherent authority to review requests for access, including modifications of protective orders or unsealing of documents. *See In re Garlock Sealing Technologies LLC*, 488 B.R. 281, 299 (Bankr. Del. 2013) (a court has "supervisory power over its own records" (citation omitted)).

That authority allows courts to grant such motions with restrictions on the requesting parties' use, access, or further dissemination of the documents. For example, in *In re Motions for Access of Garlock*, a manufacturer of asbestos products that had filed for chapter 11 protection sought access to information in other, closed asbestos-related bankruptcy cases. 488 B.R. at 287. Those documents included claims by creditors who alleged they were injured by asbestos products. *Id.* at 288–89. The court had entered a protective order that the claims could not be accessed without a motion for relief from the court. *Id.* After weighing the competing interests and Garlock's purpose in seeking the documents, the court held that Garlock could have the documents but could not publicly disclose the information except in aggregate form, and that its receipt would be subject to a new protective order. *Id.* at 302.

– 22 –

**C.**     **The law favors access to judicial records.**

In cases where movants have sought documents subject to protective orders or sealed, courts have repeatedly emphasized that the law favors public access to judicial records. As the Seventh Circuit has observed: "It is beyond dispute that most documents filed in court are presumptively open to the public; members of the media and the public may bring third-party challenges to protective orders that shield court records and court proceedings from public view." *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009). In *Vanda Pharmaceuticals, Inc. v. FDA*, 539 F. Supp. 3d 44, 52 (D.D.C. 2021), the court explained the impact of that principle on the allocation of burdens between the movant requesting access and any responding parties: "[i]t is not the [party seeking unsealing's] burden to proffer a need for public access; the burden is instead the respondent's to demonstrate the <u>absence</u> of a need for public access because the law presumes that the public is entitled to access the contents of judicial proceedings." *Vanda*, 539 F. Supp. 3d at 52 (alteration in original) (citation omitted). Here, DOJ makes a much more modest request—not public access, but limited, confidential access. Consequently, the burdens weigh even in more in its favor.

The Archdiocese argues that orders should not be disturbed, but its cited case (Dkt. 3486 ¶ 126) has nothing to do with the issue at hand. It relies on *In re Gentry*, No. 15-20990, 2020 WL 2479662, at *1 (Bankr. E.D. Wis. May 13,

– 23 –

2020), which involved whether to change a confirmed plan in light of intervening Seventh Circuit precedent. The court generally commented that courts should be conservative in revisiting prior decisions, *Id.* at \*4, although it allowed the debtor to seek a change in the plan. More pertinently, that general standard has nothing to do with the specific presumptions and burdens for a movant seeking documents in a closed case.

### D. Courts consider requests for access or unsealing without opening closed cases.

In fact, when considering requests for access or unsealing of judicial records, courts do not need to reopen the closed proceeding. In *Garlock*, a bankruptcy case, the court specifically held that it did not need to reopen the case. *In re Motions for Access of Garlock*, 488 B.R. at 302.

The practice is so accepted it is generally not discussed. For example, in *United States ex rel. Hernandez v. Team Finance, LLC, v. Adler (Movant)*, 2023 WL 5618996, \*1 (5th Cir. 2023), the Fifth Circuit considered a request by a health care economist to review sealed documents in a closed case. The movant asserted that the information would be highly informative to his research on health care billing, a topic he contended was of interest to the public. *Id.* The court considered the movant's claim without reopening the case. *Id.* at \*4; *see also Quinonez-Castellano v. Performance Contractors Inc.*, Nos. 16CV4097, 17CV4058, 17CV4062, 2018 WL 10015527, at \*1–2 (N.D. Iowa

Oct. 9, 2018) (considering request for documents subject to a protective order in a closed case).

### E. Movants can seek access years after the closure of a case.

The Archdiocese argues that it is too late to seek the documents in question. (Dkt. 3486 ¶¶ 31–34.) That is not the case.

Courts agree that, where a movant simply seeks documents in a closed case, it does not matter how long the case has been closed. *In Vanda*, after reasoning that the timeliness requirement for Rule 24(b) intervention need not apply when the existing parties have settled their dispute and intervention is for a collateral purpose, the court concluded, "Accordingly, there is 'consensus among the courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated.'" *Vanda Pharmaceuticals, Inc.*, 539 F. Supp. 3d at 50 (citation omitted)*; see also Quinonez-Castellanos*, 2018 WL 10015527, at *3 ("district court may properly consider a motion to intervene permissively for the limited purpose of modifying a protective order even after the underlying dispute between the parties has long been settled." (citation omitted)); *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (same).

– 25 –

**F.** **The Archdiocese's arguments about DOJ's authority and the standard for reopening are unavailing.**

The Archdiocese Objection paints DOJ's request for access as an extraordinary occurrence, arguing that DOJ does not have authority to undertake the Initiative at all or that it cannot meet the standard for relief under standards applicable for other types of relief. All of these arguments are unavailing.

**1.** **DOJ plainly has authority to conduct the Initiative, but any party has standing to seek access to documents, particularly in furtherance of the public interest.**

The Archdiocese argues that DOJ should not have access because it should not be assisting victims or pursuing convictions of child molesters in the first place (Dkt. 3486 ¶¶ 9–18), and that DOJ has no "actual legal right of access." (Dkt. 3486 ¶¶ 22, 36–38, 122). Both assertions are incorrect.

As discussed above in the Background, DOJ is no mere private party. DOJ is a statewide law enforcement agency with ample authority and decades of experience and success, under multiple Attorneys General, in leading and assisting survivor support and sex-crime prosecution efforts and initiatives.

Ultimately, though, any party—public or private—has standing to request documents from federal courts. Federal circuit courts agree that third parties generally may seek access to documents previously subject to protective orders or sealing without further demonstrating an "interest" in the case.

– 26 –

*EEOC*, 146 F.3d at 1045; *In re Motions of Access of Garlock*, 488 B.R. at 294–95. That is particularly true where the movant seeks access to vindicate an important public interest. *Hernandez*, 2023 WL 5618996, at *3.

### 2. DOJ would meet the standards for any limited reopening, if that is needed to give survivors notice.

The Archdiocese argues that DOJ cannot meet the standard for reopening. (Dkt. 3486 ¶¶ 23–45.) DOJ filed two motions, including a motion to reopen, the latter primarily to ensure that the Court could order notice for survivors. Even assuming that reopening is needed for that purpose, DOJ would meet the standard here.

There are many reasons to reopen a case, and not all of them relate to benefiting creditors, administering assets or providing relief to the debtor, as the Archdiocese narrowly contends. (Dkt. 3486 ¶¶ 28, 30.) Bankruptcy Code section 350(b) allows reopening for "administer[ing] assets, [or] accord[ing] relief to the debtor, *or for other cause*." 11 U.S.C. § 350(b) (emphasis added).

The Archdiocese seeks to narrow that broad "other" language based on the canon of *ejusdem generis*, but that interpretive tool is used when a statutory list is comprised of similar items. *United States v. Aguilar*, 515 U.S. 593, 615 (1995) (Scalia, J. concurring, in part, and dissenting, in part) (example of "fishing rods, nets, hooks, bobbers, sinkers, and other equipment").

– 27 –

It does not apply where, as here, the general term follows two "distinct and independent" terms, *Id.,* administering assets and according the debtor relief.

Bankruptcy courts can, and routinely do, reopen closed cases for limited purposes. That is because reopening a case is "merely a ministerial or mechanical act [that] . . . has no independent legal significance and determines nothing with respect to the merits of the case." *DeVore v. Marshack (In re DeVore)*, 223 B.R. 193, 198 (B.A.P. 9th Cir. 1998) (citation omitted); *accord Wood v. Kenan (In re Woods)*, 173 F.3d 770, 777 (10th Cir. 1999). Reopening for limited purposes does not reopen the whole case or affect any prior orders. For example, reopening a case to permit the debtor to enforce the discharge injunction against a creditor does not affect the finality of the confirmed plan. 11 U.S.C. §§ 1327, 1141. And a court need not even reopen a closed case to exercise jurisdiction over a dischargeability proceeding. *Menk v. Lapaglia (In re Menk)*, 241 B.R. 896, 912 (B.A.P. 9th Cir. 1999).

If reopening is necessary here, it would only be for the limited purpose of arranging notice for survivors, and nothing more. Such a limited purpose is well within the Court's authority and entirely consistent with the limited scope in other reopened cases.

Section 350(b) "gives the court broad discretion in the reopening of a case." 3 Collier on Bankruptcy ¶ 350.03 (2023); *see also Redmond v. Fifth Third Bank*, 624 F.3d 793, 798 (7th Cir. 2010) ("The decision to reopen a bankruptcy

– 28 –

case is within the broad discretion of the bankruptcy court."). In cases that "do not concern administration of the case, a motion to reopen may not be necessary for the court to render a decision." *In re Menk*, 241 B.R. at 910 (quoting 3 Collier on Bankruptcy ¶ 350.03(4)).

The standard is permissive, and courts have dealt with motions to reopen in different ways. *See In re Bianucci*, 4 F.3d 526, 528 (7th Cir. 1993). The factors a court considers "depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy court proceedings." *Case v. Citizens Bank & Tr., Co. (In re Case)*, 937 F.2d 1014, 1018 (5th Cir. 1991).

The Archdiocese relies on *Redmond*, (Dkt. 3486 ¶ 27), but DOJ would also satisfy the test used by the court there. In *Redmond*, the court explained that, in evaluating a motion to reopen, "[a] bankruptcy judge may consider a number of nonexclusive factors in determining whether to reopen, including (1) the length of time that the case has been closed; (2) whether the debtor would be entitled to relief if the case were reopened; and (3) the availability of nonbankruptcy courts, such as state courts, to entertain the claims." *Redmond*, 624 F.3d at 798.

Here, those factors weight in DOJ's favor. DOJ has no other avenue for relief outside this forum; this case is DOJ's only hope to view these critically important documents. There is no possibility that DOJ's review of the sealed

– 29 –

claims will adversely affect the people protected by the sealing order. The purpose of the sealing order was to protect survivors, not the Archdiocese. (Dkt. 211 ¶ 21; 331 ¶ 24(v).) DOJ seeks access to review the sealed claims to further the Initiative. Equity principles weigh heavily in favor of granting the motion.

And, contrary to the Archdiocese's view, the passage of time does not weigh against reopening. As discussed above, courts entertain requests for access to documents long after a case is closed. And even if reopening is needed, "[p]assage of time in itself does not constitute prejudice." *In re Bianucci*, 4 F.3d at 528. Rather, delays can be prejudicial if, during the delay, the nonmoving party suffered harm that it would not have had the motion been filed earlier. In cases cited by the Archdiocese, *Bianucci* and *Redmond*, delay between closure and the motion to reopen caused creditors to incur costs pursing collection remedies that they otherwise would not have incurred. *Bianucci*, 4 F.3d at 528; *Redmond*, 624 F.3d at 799.

Here, the Archdiocese makes no argument that it has incurred costs at all, much less relating to the time between closure and DOJ's motions. The costs of giving notice do not stem from delay, but would be present regardless of when DOJ sought access.

### 3. Federal Rule 60(b) does not apply, but it would also support granting DOJ access.

Federal Rule 60(b) does not apply here because DOJ does not seek to disturb a final order. But even if Federal Rule 60(b) were relevant, DOJ's request falls within the Court's authority.

Federal Rule of Civil Procedure 60 authorizes obtaining relief from "a final judgment, order, or proceeding" for six separate reasons. Fed. R. Civ. P. 60(b); *see also* Bankr. Rule 9024 (making Rule 60(b) applicable in bankruptcy proceedings). Here, the Rule 60 analysis does not apply because the original order sealing the documents was not a final order. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (rule applies only to a final judgment, order, or proceeding). Instead, this Court can reconsider or modify confidentiality/sealing orders for cause, a lesser standard than Rule 60(b)(6). *See Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 528 (M.D.N.C. 2022.) Cause is amply shown for the all the reasons described in this Response.

But even if Rule 60(b) were the standard, Rule 60 would support DOJ's request. One basis is for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). One federal appellate court has described Rule 60(b)(6) as a "grand reservoir of equitable power to do justice in a particular case." *In re Woods*, 173 F.3d at 780.

### III. DOJ seeks only restricted access, including procedures that protect confidentiality and either the provision of notice to claimants or redaction of documents.

The Archdiocese focuses on issues surrounding confidentiality and notice. DOJ's proposed order has multiple safeguards to protect confidentiality, and workable solutions to either provide notice to survivors or receive redacted documents.

#### A. DOJ's proposed order will protect the confidentiality of the information.

DOJ requests access to sealed documents only for purposes of the Initiative and with the utmost concern for the confidentiality of survivors of sexual assault. As described in the proposed order, DOJ proposes several safeguards to protect the data. And the Archdiocese is wrong in asserting that public records law would result in disclosing confidential information.

##### 1. DOJ will take steps to protect the confidentiality of the data.

DOJ will receive only hard copies to eliminate the risk of electronic interception; keep all documents confidential, including in the case of a public records request; no document will become part of a prosecutorial file without consent; and, even with survivor consent, no document will be produced without an order. (Dkt. 3478 ¶¶ 3–6.)

The Archdiocese misreads the last restriction as a loophole, raising the inference that a document may be ordered disclosed without survivor consent.

(Dkt. 3486 ¶ 66.) Under the terms of proposed order, no claim document will even be in an investigatory file without consent, so nothing in the investigatory file will be present without consent to begin with.

DOJ is experienced in handling and keeping confidential personally identifiable information, including victim information in criminal cases; health information in prisoner medical treatment claims; voter information in election procedures cases; and voluminous personal identity information in voter ID litigation. And DOJ will agree to reasonable measures to safeguard the data beyond those it has suggested in the proposed order.

### 2. Public records law does not affect the documents' confidentiality.

The Archdiocese objects that DOJ "does not and cannot promise confidentiality" for the sealed reports (Dkt. 3486 ¶¶ 64–72), but this misunderstands both DOJ's request and Wisconsin's public records law.

Although the public records law creates a "presumption" of public access to public records (Wis. Stat. § 19.31), two relevant statutory exceptions exist. First, Wis. Stat. § 19.35(1)(a) provides that "[e]xcept as otherwise provided by law, any requester has a right to inspect any [public] record." Second, Wis. Stat. § 19.36(1) states that "[a]ny record which is specifically exempted from disclosure by state or federal law . . . is exempt from disclosure under [Wis. Stat. §] 19.35(1)." In other words, when federal law prohibits disclosure,

DOJ must categorically honor that prohibition, without applying the "balancing test" that it otherwise uses when analyzing public records requests. *Cf. Journal/Sentinel, Inc. v. Aagerup*, 145 Wis. 2d 818, 822, 429 N.W.2d 772 (Ct. App. 1988).

Here, the proposed order contains language that would trigger both these categorical statutory exceptions:

> Except as otherwise provided herein, DOJ shall keep all sealed documents confidential. DOJ may not publish any such documents or release copies. Any sealed document made available to DOJ may not be released in response to a public records request.

(Dkt. 3478 ¶ 5.) Such an order from a federal court is a "specific[ ] exempt[ion] from disclosure by . . . federal law" under Wis. Stat. § 19.36(1) and would provide a confidentiality obligation "otherwise provided by law" under Wis. Stat. § 19.35(1)(a). Both statutory provisions would mandate that DOJ deny any public records requests for materials covered by the order.

The Archdiocese responds that this exception would only "give[ ] [DOJ] an initial basis to refuse to provide documents" because a requester might challenge DOJ's denial in "separate litigation." (Dkt. 3486 ¶ 67.) But a Wisconsin court cannot override those express statutory exceptions any more than DOJ can.

Leaving aside public records law, criminal prosecutions may occur based partly on information acquired through the sealed documents, which might

create *Brady* disclosure obligations that could implicate those documents. Language in the proposed order addresses this:

> No document made available to DOJ will be produced in any proceeding, including in any criminal proceeding, absent an order from a court of competent jurisdiction requiring such disclosure following appropriate notice.

(Dkt. 3478 ¶ 6.) This language adds a layer of protection to ensure that victims know when relevant documents are about to be disclosed to the defense. It has nothing to do with public records requests.

It is no loophole. To the contrary, in a criminal prosecution context, the only records a prosecutor would have are those given with the subject's knowledge and consent:

> If a person who filed a claim in the bankruptcy case, including a sealed claim, has also reported abuse to DOJ, DOJ may ask permission from that claimant to have documents made available to DOJ related to the claim become part of an investigative and/or prosecutorial file. If permission is granted, those documents may become part of an investigative and/or prosecutorial file.

(Dkt. 3478 ¶ 3.) Because the subject would have already agreed that DOJ could include the documents in a prosecutorial file, there is no chance of a confidentiality breach through a court-ordered *Brady* disclosure.

### 3. The Archdiocese's accusation that DOJ has not kept documents confidential is wholly unsupported.

The Archdiocese accuses DOJ of "Violations of Promises," announcing that "the AG seeks to do to Abuse Survivors in this Case exactly what the AG promised it would not do to Abuse Survivors – remove their anonymity and share their proofs of claim with others without consent." (Dkt. 3486 ¶ 78.) That accusation offers *no* factual support whatsoever.

The Initiative provides survivors with access to a neutral third party and law enforcement agency that has the resources and expertise to assist them. People who were abused by faith leaders can report that abuse without having to face their abuser or an entity that housed the abuser. DOJ is committed— today and forever—to allowing survivors to report anonymously without telling DOJ their names and to not sharing information outside of DOJ without their consent.

Information from sealed documents will be held to the same standard. DOJ's proposed procedures make clear that such documents or any personally identifiable information will not be disclosed without survivor consent. As DOJ affirmatively argued in its motion, "DOJ supports protecting survivor information and believes that survivor bankruptcy filings should not be part of the public domain." (Dkt. 3476:9.)

The citations the Archdiocese offers do not support its argument. The Archdiocese states that abuse survivors have called the initiative "[i]neffective and harmful" and include a footnote to a news article. (Dkt. 3486 ¶¶ 78–80.) Those quotations were a reporter's opening line of an article discussing survivors, not a statement by a survivor.[3] But more importantly, what some survivors were complaining of, as reported by the article, was not that their information was not kept confidential, but instead that the Initiative was not accomplishing enough.[4]

The Archdiocese twists the quotes of survivors to argue survivor information will not be safe with DOJ. That is a misleading and false argument. DOJ has kept survivor information safe and will continue to do so.

**B.    DOJ seeks access after notice, which the Archdiocese or DOJ can provide. Alternatively, DOJ is willing to receive redacted documents.**

DOJ shares the Archdiocese's concern in making sure that survivors have notice and an opportunity to be heard if their identity is shared with DOJ. (Dkt. 3486 ¶¶ 15–18, 33, 46–47.) There are three workable solutions: the

––––––––––––––––––

[3] Elizabeth Wadas, *AG Kaul stands behind his clergy abuse initiative one survivor calls ineffective and harmful to victims,* NBC-15 (Jan. 12, 2023), https://www.nbc15.com/2023/01/13/ag-kaul-stands-behind-his-clergy-abuse-initiative-one-survivor-calls-ineffective-harmful-victims/.

[4] *Id.* at n.3.

– 37 –

Archdiocese can provide notice; DOJ can provide notice; or the documents can be redacted to remove survivor names.

        **1.**    **The Archdiocese committed to providing abuse survivors with required notices, and it should be ordered to give notice here.**

Under the original Order Authorizing Special Confidentiality Procedures To Protect Abuse Survivors, (Dkt. 327), the Archdiocese filed a supplement to its mailing matrix under seal that contained survivor information. (Dkt. 327:2.) That order required the Archdiocese to give notices to abuse survivors. The Archdiocese was required to automatically send certain critical notices to survivors. (Dkt. 327:3.) The order also required that "Abuse Survivors will also receive notices of any other pleadings for which the Court so orders." (Dkt. 327:3.) And it provided for a summary notice procedure allowing abbreviated notices to be issued to survivors that "focus on likely Abuse Survivors' concerns." (Dkt. 327:3.)

DOJ's motions are the sort of motion that the Archdiocese should serve on the service list. DOJ has already given notice of its motion to critical parties for whom notice information is known, and stated that "[p]rocedures were put in place for the Archdiocese to provide certain notices to abuse survivors without publicly disclosing the service list."[5] (Dkt. 3476:24.)

---

[5] The Archdiocese's argument that DOJ failed to address notice is not accurate. (Dkt. 3486 ¶ 61.)

– 38 –

The Archdiocese objects that survivors do not have notice of DOJ's motions (Dkt. 3486 ¶ 46), but that is only because the Archdiocese, the entity with the survivors' name and address information, has not given notice. The solution is already in the procedures in this case.

The Archdiocese complains that giving notice would be hard. (Dkt. 3486 ¶¶ 48–63.) The Archdiocese obtained enormous benefits from the resolution of the chapter 11 proceeding, including caps on the amount survivors recovered, significantly limiting the Archdiocese's potential monetary liability. (*See* Dkt. 6 ¶¶ 28, 38 (describing pre-filing liabilities).) In exchange, the Archdiocese agreed to certain obligations. The cost of $23 searches to make sure a survivor gets notice pales in comparison to those benefits. (Dkt. 3486 ¶ 51.)

### 2. If the Archdiocese cannot feasibly provide notice, DOJ can.

The Archdiocese indicates that it is resorting to online guides for databases it is not subscribed to for advice on how to give notice to survivors. (Dkt. 3486 ¶¶ 51–53.) If the Archdiocese lacks the ability to effectively provide notice, DOJ will take on the obligation and cost of updating the Survivor Service List, creating a summary notice, printing that notice, and mailing it. DOJ staff is experienced in giving notice on statewide issues and can do so here. (Phifer Aff. ¶¶ 3, 6, 9–11.)

– 39 –

DOJ has experience with Accurint, a widely accepted tool available to governments to locate individuals, which utilizes data-linking methods to extract information from tens of billions of records. (*Id.* ¶¶ 3–4, 9–11.) DOJ uses Accurint to update addresses or learn that a person has died. Accurint searches for individuals provide the person's most probable current address (an address verified by two or more sources), prior addresses, and a date of death if applicable. (Phifer Aff. ¶ 7 Ex. A: 9–10.)

Accurint can reliably locate current addresses for the service list utilizing the known contact information about the claimants, including name, last known addresses, or telephone numbers. (*See* Dkt. 331:30.) Even if this information is not current, it provides Accurint a means to locate the present address:

> Older addresses and phone numbers can be just as useful as recent/current ones when researching a subject. For example, a phone number from ten years ago could still be associated to an individual within the data, and the composite created by our advanced linking technology can provide a current phone number and address.

(Phifer Aff. ¶ 8 Ex. B.)

Accurint's reliability is enhanced by DOJ's experience using the program. (*See id.* ¶¶ 3, 6, 9–11.) DOJ uses Accurint to locate witnesses and distribute restitution in consumer protection cases. (*Id.* ¶¶ 3, 9–11.) This includes using Accurint to identify consumers' current addresses based on last-known address and telephone number. (*Id.* ¶¶ 10–11.)

– 40 –

In contrast with the costs that the Archdiocese asserts would make the system too burdensome for it to use (Dkt. 3486 ¶¶ 48–63), DOJ pays $0.50 per search under its license, and DOJ staff has experience with the product. (Phifer Aff. ¶ 5.)

DOJ can update the survivor service list without compromising confidentiality. The list can be redacted to disclose only names, address, and telephone number. The DOJ employee who updates the list can be walled off from the Initiative team members and receive the list directly from the Archdiocese or the Court.

DOJ can then utilize the summary notice procedure already in place, with a notice stating simply that the DOJ filed a motion seeking to review sealed records, that the recipient has a right to object, and provide a means to obtain a complete copy of the DOJ's motion free of cost. (*See* Dkt. 327 ¶ 5 (describing summary notice procedure).) Such a notice limits the risk of violating the claimant's confidentiality in the unlikely event the notice is opened by a person other than the claimant.

The Archdiocese focuses on the challenges of giving notice in asserting that the effort should be abandoned. That outcome is unwarranted in light of the workable solutions at hand.

### 3. Alternatively, if the Court believes no effective notice could be given to survivors, DOJ could receive documents with survivor names redacted.

If the Court concluded that the proposed notice procedures were infeasible or ineffective, there is another alternative: personally identifiable information about the claimant could be redacted, and the remaining information about abusers and details of abuse could be reviewed by DOJ. This outcome is not ideal because it would make linking claims to people who have separately reported to DOJ more challenging, but it would still meaningfully allow DOJ to link information it has received with specific accounts in the documents.

## IV. The Archdiocese's remaining objections rest on factual mistakes and legal misunderstandings.

The remaining points in the Archdiocese objection rest on misunderstandings of the relief DOJ seeks, irrelevant concerns, or unsupported facts. Nothing about the motions seeks to disturb this Court's discharge injunction or raise other legal claims. The information in publicly available documents does not substitute for the requested documents. A prior effort to review claims, or the Archdiocese's offers to pass along information to district attorneys or DOJ, are not equivalent to the Initiative. And the personal attacks are simply untrue.

**A.    The initiative does not violate the discharge injunction or seek to relitigate the content of the plan.**

The Archdiocese argues that DOJ's request violates the discharge injunction or impermissibly seeks to relitigate the confirmed plan. Such a result is far beyond the scope of DOJ's limited request and, more pointedly, forbidden by the Bankruptcy Code, 11 U.S.C. § 1141, and principles of *res judicata*. All DOJ seeks is access to the sealed claims.

The Archdiocese argues that DOJ's motion violates the discharge injunction. The Archdiocese misunderstands the nature of a bankruptcy discharge and the Bankruptcy Code's statutory injunction.

As an initial matter, the Archdiocese's argument is poorly developed. Although it cites to a generic plan provision enjoining future acts with respect to a "Discharged *Claim*" (Dkt. 3486 ¶ 21 (emphasis added)), the Archdiocese does not explain how this provision applies to DOJ's request to inspect sealed claims.

DOJ is taking no action contrary to the discharge injunction. A discharge under the Bankruptcy Code basically does two things: eliminates a debtor's personal liability on a discharged debt and enjoins creditors from taking actions to collect upon such debts. 11 U.S.C. § 524. A "debt" is a "liability on a claim." 11 U.S.C. § 101(12). And a "claim" means either a "right to payment" of money or to "an equitable remedy for breach of performance if

– 43 –

such breach gives rise to a right to payment" of money. 11 U.S.C. § 101(5). It has nothing to do with a request to view court records.

The Archdiocese's next argument—that DOJ's request seeks to relitigate its confirmed plan (Dkt. 3486 ¶¶ 19–21)—fares no better.

Here again, the Archdiocese fails to develop its argument. Nowhere does the Archdiocese explain how DOJ is attempting to modify plan terms or relitigate the plan. Instead, the Archdiocese generally complains that it is a victim of so-called "veiled allegations" and threats made by DOJ (and others) in its efforts to support survivors by ensuring that the list of abusers is complete and accurate.[6] (Dkt. 3486 ¶¶ 83–89, 93–94.)[7] None of these unsupported assertions support an argument DOJ is attempting to change the plan's terms.

DOJ has only a single purpose before this Court—to obtain confidential access to judicial records. That effort has nothing to do with disturbing the

---

[6] The Archdiocese also argues that DOJ seeks to relitigate the separate legal existence of non-debtor religious entities and religious orders. (Dkt. 3486 ¶ 94). This is not true, as shown by the Archdiocese's failure to cite to anything in DOJ's motion for support.

[7] The Archdiocese includes a long block quote to selected portions of a hearing evidently about whether children currently in the church were in danger, to which the court explained that the filed claims did not evidence a current danger to children because they involved past abuse, not current abuse. (Dkt. 3486 ¶ 87.) The relevance of these selected quotes, even to the Archdiocese's tangential complaints about the list's completeness, is unclear. In any event, the court statements have nothing to do with the Archdiocese's argument that DOJ is seeking to relitigate the confirmed plan.

– 44 –

terms of the plan or the bankruptcy discharge. DOJ cannot force the Archdiocese to add a name to its list, but it will share with the Archdiocese any name that it concludes warrants adding to the list. What the Archdiocese chooses to do with that information is entirely up to the Archdiocese.

### B. The information in publicly available documents does not capture what is in the sealed documents.

The Archdiocese argues that other states, such as Iowa, received information with limits. (Dkt. 3486 ¶ 136–38.) This argument includes quotation marks but no citation, and the Archdiocese does not explain what information such states received or how that is relevant to the current request. Perhaps the inference is that the Archdiocese would be willing to produce some information that is has not already made available. If that is the case, the Archdiocese should do so. But it has not so far, and its arguments about what some other states have produced to their Attorney General's offices are not a valid objection to what is being requested now.[8]

---

[8] The Archdiocese accuses DOJ of ignoring what has happened in this case or in other states. (Dkt. 3486 ¶¶ 98–103.) To the contrary, the Motion for Access describes what happened in this case with citations to the record, including the Archdiocese's prior release of certain redacted records. (Dkt. 3476:8–12.) DOJ did not "ignore" that prior release of documents. (Dkt. 3486 ¶ 108.)

– 45 –

### C. DOJ cannot know with certainty what is in the documents, but unsealed proofs of claims illustrate the value of the sealed documents.

The Archdiocese argues that DOJ cannot be sure of the benefits, asserting that DOJ's motion relies primarily on hypotheticals about what access may achieve. (Dkt. 3486 ¶¶ 96–97.) DOJ does not have access to the information, so of course DOJ cannot establish with evidentiary conclusiveness what the documents will show. But DOJ has years of facts developed from other sources, and it has seen an unsealed claim that shows how the sealed claims are likely to help. (*See e.g.* Murphy Aff. ¶ 4 Ex. C.)

### D. The 2002 review by "civil authorities," the Archdiocese's past offer to pass along evidence to District Attorneys, and the Archdiocese's letter to DOJ do not substitute for DOJ's Initiative.

The Archdiocese argues that the Initiative is unnecessary because of other outlets: (1) a past "civil" review (Dkt. 3486 ¶¶ 132–34), (2) the Archdiocese's past commitment to forward information it obtained to local district attorneys (Dkt. 3486 ¶ 133), or (3) its offer to cooperate regarding allegations against "living perpetrators," citing a June 1, 2021, letter (Dkt. 3486 ¶ 133). None substitute for the expertise and purposes of DOJ's Initiative.  The reference to a 2002 civil investigation points to a section at from the Archdiocese's disclosure statement: "In 2002, this process was repeated when civil authorities reviewed the Archdiocese's files to verify that

– 46 –

there were no prosecutable criminal cases falling within the criminal statute of limitations." (Dkt. 3277:22 as cited in Dkt. 3486 ¶ 134.) Neither that statement nor the Objection gives information about what this "civil authority" was, the scope of that review, or what information was reviewed.

A 2002 review by an unnamed civil authority is no substitute for the Initiative, either in expertise, scope of materials reviewed, or purpose. There is no indication that it focused on survivor support; no civil authority would have the same expertise to evaluate potential criminal charges that DOJ's criminal investigators and prosecutors do; and the passage of 21 years has brought additional materials forward that can aid in a comprehensive review.

The Archdiocese's past commitment to send information to local district attorneys is irrelevant for similar reasons. District attorney review would not have been for survivor support. Further, a core purpose of the Initiative is to coordinate a statewide effort and tie together information from different counties. Additionally, the information sent to district attorneys presumably did not include the sealed information requested here, meaning that no criminal authority has ever reviewed that information.

Finally, the Archdiocese's purported commitment in a June 1, 2021, letter does not say what the Archdiocese asserts, and such cooperation again would not substitute for the Initiative's work, in any case.

Even as a step toward creating a list of substantiated abusers in the Archdiocese, the letter offered only to take steps if DOJ provides it "the name of an alleged perpetrator from the ranks of the AOM's living diocesan priests."[9] That would require DOJ to know the name of the abuser (without the sealed documents), and would exclude religious order priests and non-clergy who served in the Archdiocese.[10] Without the documents, DOJ would not have all the information to trigger this cooperation, and even as to the creation of complete lists, the goals of the Initiative are not limited to the Archdiocese's list.

### E.  Asserted difficulties in adding deceased individuals to the list are beside the point.

The Archdiocese complains that there are investigatory challenges m with adding deceased persons to its list. (Dkt. 3486 ¶¶ 112–13.) Aside from the fact that the Archdiocese committed in its plan to add "names of diocesan priests of the Archdiocese who have been (or would be if they were still alive)" stripped of duties, (Dkt. 3322:83–84), it is beside the point of the motions here.

---

[9] Letter from Frank LoCoco, Att'y., HuschBlackwell, LLP, to Joshua Kaul, Wis. Att'y. Gen., Wis. Dep't. of Justice (June 1, 2021), https://wpr-public.s3.amazonaws.com/wprorg/aom_response_to_ag_letter_request_for_document.pdf.

[10] The Archdiocese cites its June 1, 2021, letter as evidence that DOJ agreed during a meeting that the Initiative should not extend to deceased abusers. (Dkt. 3486 ¶ 111.) There was no such agreement. The Archdioceses added that incorrect claim in a footnote in a letter it sent following the meeting.

The Archdiocese also points to DOJ's commitment not to name abusers independently of the Archdiocese, (Dkt. 3486 ¶ 113), but that is also beside the point. DOJ's commitment to not list names is intended to invite a collaborative process where faith leader groups update their own lists. Some religious entities are doing just that. Because of the Initiative, one faith organization has added the name of a deceased faith leader to their credibly accused list. (Phelps Aff. ¶ 55.)

## F. The Archdiocese offers no support for its claims of targeting or bigotry.

The Archdiocese asserts that the Initiative improperly targets the Archdiocese. Its evidence shows nothing of the sort.

The Archdiocese points out that the Initiative has received reports of abuse related to entities other than the Archdiocese. (Dkt. 3486 ¶ 101.) That is indeed true. (Phelps Aff. ¶ 48.) That just illustrates the reality that the Initiative targets no particular group.

The Archdiocese also asserts that DOJ has disclaimed pursuing criminal investigations (Dkt. 3486 ¶¶ 17, 41, 147), as if that would mean the only purpose of the Initiative would be to target the Archdiocese. The premise is unsupported, and the underlying fact is untrue: DOJ is pursuing criminal investigations. The Archdiocese—which itself has actively participated in criminal discovery undertaken by DOJ—knows that. (Happ Aff. ¶ 37; Virgil

– 49 –

Aff. ¶ 32.) And there have been two prosecutions so far, with an additional pending active investigation. (Happ Aff. ¶¶ 36–39; Virgil Aff. ¶¶ 31–34.)

The Archdiocese claims that in an interview in May 2021, the Attorney General "said he did not expect prosecutable cases." (Dkt. 3486 ¶ 16.) Nothing in that interview supports that claim. In fact, expressly to the contrary, at minute 14:20, the Attorney General was asked "what is the goal here of reviewing cases that may no longer be prosecuted . . . ?" The Attorney General responded, "there may be some cases that are older but for various reasons may not be barred from prosecution" . . . "so one thing we want to make sure we're doing is gathering the facts so that if there are cases that can be investigated and ultimately prosecuted within the statute of limitations that we are not missing those cases—we're getting criminal accountability where possible."[11] That fact gathering is exactly what the pending motions seek.

The Archdiocese states that in the two years of the initiative "the AG has not identified any name that should be added" to the Archdiocese list, (Dkt. 3486 ¶ 107), that "the AG is not willing to provide any names or evidence," (Dkt. 3486 ¶ 44), and that "and no information has been shared about the reports or what they allege, including how many involve ADOM

---

[11] Keegan Kyle, *Wisconsin Attorney General Discusses Clergy Abuse Review,* Wis. Pub. Radio, (May 10, 2021), https://www.wpr.org/wisconsin-attorney-general-discusses-clergy-abuse-review.

– 50 –

clergy or if any have been substantiated" (Dkt. 3486 ¶ 101). That is also incorrect. The Archdiocese makes these assertions long after receiving, on October 19, 2022, and August 22, 2023, the names of eleven people with credible reports of abuse who are not on the Archdiocese's list, and after having received a court-issued subpoena jointly obtained by DOJ to produce information regarding child sex abuse by one alleged abuser. (Murphy Aff. ¶¶ 2–3 Ex. A, B; Happ Aff. ¶ 37; Virgil Aff. ¶ 32.)

Deflecting, the Archdiocese points to alleged abuse by others, such as the Boy Scouts of America. (Dkt. 3486 ¶ 121.) DOJ condemns sexual abuse and supports prosecution of all child molesters, but pointing fingers at others does not negate the importance of the sealed documents relating to sexual abuse in the Archdiocese.

The Archdiocese suggests, with no citation, that DOJ's request is "for a publicity campaign." (Dkt. 3486 ¶ 143.) To the contrary, the Initiative is a statewide, multidisciplinary effort with a team of prosecutors, DCI criminal investigators, and crime victim specialists who take every report seriously. (Phelps Aff. ¶ 46; Virgil Aff. ¶ 30.)

Through its Objection, the Archdiocese characterizes the motions in terms of a dispute with the Attorney General. (Dkt. 3486:1 (reframing motions as filed by "the Josh L. Kaul" and referring to "the AG" rather than DOJ).) But the only goals are survivor support and criminal justice for child molesters.

– 51 –

Finally, the Archdiocese accuses DOJ of bigotry. (Dkt. 3486 ¶ 95.) That inflammatory attack is wrong, made without any legitimate basis, and has no place in court proceedings. Indeed, accusing an opposing party of bigotry has supported sanctions in federal cases. *Maus v. Ennis*, 513 F. App'x 872, 878 (11th Cir. 2013) (where defendant "sent numerous harassing e-mails to the plaintiffs, accusing [plaintiff] of being a 'bigot' and a 'racist'" . . . "the district court did not abuse its discretion for entering a default judgment, in part, as a sanction."); *Isaacson v. Manty*, 721 F.3d 533, 536 (8th Cir. 2013) (affirming sanctions in bankruptcy proceedings where party alleged "bigotry" against bankruptcy judge, trustee, and the United States trustee.)

DOJ does not request sanctions here. However, the Archdiocese's misstatements and personal attacks do implicate the persuasiveness of its objection. They are unwarranted and not reasons to deny DOJ's request.

## CONCLUSION

DOJ asks the Court to grant it confidential access to the requested records under the terms in the proposed order and order that the Archdiocese provide the claimants with notice.

Dated this 27th day of September 2023.

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ S. Michael Murphy
S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

MICHAEL D. MORRIS
Assistant Attorney General
State Bar #1112934

Attorneys for State of Wisconsin,
Department of Justice

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (SMM)
(608) 266-3936 (MDM)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
morrismd@doj.state.wi.us

– 53 –