**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| In re: | Case No. 11-20059-svk |
| ARCHDIOCESE OF MILWAUKEE, | Chapter 11 |
| Reorganized Debtor. | Michael G. Halfenger |

**SUR-REPLY IN SUPPORT OF OBJECTION TO MOTIONS OF
WISCONSIN DEPARTMENT OF JUSTICE TO REOPEN CASE FOR LIMITED
PURPOSE OF DECIDING MOTION OF WISCONSIN DEPARTMENT OF
JUSTICE FOR ACCESS TO CERTAIN SEALED RECORDS AND FOR ACCESS
TO CERTAIN SEALED RECORDS**

The Archdiocese of Milwaukee (the "ADOM") submits this sur-reply pursuant to this Court's order dated September 29, 2023 [Dkt. No. 3506] (the "September Order") and in opposition to the following pleadings filed by Josh L. Kaul in his capacity as the Attorney General (the "AG"): (1) *Motion of Wisconsin Department of Justice to Reopen Case for Limited Purpose of Deciding Motion of Wisconsin Department of Justice for Access to Certain Sealed Records* [Dkt. No. 3473] (the "Motion to Reopen"); (2) *Motion of Wisconsin Department of Justice for Access to Certain Sealed Records* [Dkt. No. 3476] (the "Motion for Access," and with the Motion to reopen, the "Original Motions"); (3) *Wisconsin Department of Justice Response in Support of Motion to reopen and Motion for Access* [Dkt. No. 3496] (the "Response"); and (4) *Wisconsin Department of Justice Supplemental Response in Support of Motion to Reopen and Motion for Access, Addressing Federal Rule of Bankruptcy Procedure 5010* [Dkt. No. 3509] (the "Supplement," and collectively with the Original Motions and the Response, the "AG Pleadings").

## Introduction

Having now received three briefs in support of the AG's Motions to reopen and for access to claims filed in reliance on this Court's order sealing the documents, it is apparent that the AG sees the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the ADOM as at best, an impediment and, at worst, an annoyance in the AG's quest to gain access to Proofs of Claim filed under seal. The AG thinks the AG is entitled to this relief because the AG believes the AG is doing a good thing and has the right to ignore the finality of this Court's Orders, including the Order closing the case. This explains the on-going evolution of justifications for this extraordinary relief. The fact is that the AG is pursuing these records solely as a political response to the criticism the AG received from people like Peter Isley and entities like Nate's Mission with respect to the manner in which the AG conducted the so-called initiative.[1] The Bankruptcy Courts and this Case do not exist to satisfy some political objective. The Claimants in this case filed their Proofs of Claim expecting permanent confidentiality. The AG has not established standing, let alone any legal basis, to grant the relief requested. The AG's Motions should be denied.

## Background

1.      On August 9, 2023, the AG lodged the Original Motions. The Motion to Reopen asked the Court "to reopen this case for the limited purpose of deciding the contemporaneously filed [Motion for Access]." (Motion to Reopen, p.1). The AG does not contend the Court's prior decision was clearly erroneous or would work manifest injustice. In fact, the AG concedes the Court properly restricted access. (Motion for Access, p. 9 ("DOJ supports protecting

---

[1] Objection, ¶¶ 79-80 and accompanying footnotes.

survivor information and believes that survivor bankruptcy filings should not be part of the public domain."); Response, p. 36.)

2. On August 30, 2023, the ADOM filed its objection to the Original Motions [Dkt. No. 3486] (the "Objection").

3. On August 30, 2023, the Court entered an order directing the State to file a response to the Objection [Dkt. No. 3488]. The response dates were later extended to September 27, 2023, for the State and September 20, 2023, for the United States Trustee [Dkt. No. 3494].

4. On September 19, 2023, the United States Trustee filed correspondence stating that "the United States Trustee informs the Court that he takes no position on the motion to reopen." [Dkt. No. 3495].

5. On September 27, 2023, the AG filed the Response.

6. On September 29, 2023, the Court entered another Order [Dkt. 3506], the September Order.

7. On October 16, 2023, the AG filed the Supplement.

8. The AG makes three arguments. First, the AG argues that Rule 5010 is inapplicable because the "party in interest" requirement abridges § 350. Second, the AG argues that in some context courts have found that an attorney general has standing. Third, the AG argues that the statutory rigor for reopening is not applicable because it is not necessary to determine the Motion for Access. At the same time, the AG argues that reopening is necessary to address notice. Finally, the AG argues that reopening will not affect the ADOM.

9. The AG also includes two new arguments to avoid the statutory rigor. First, the AG says reopening can be avoided by giving the AG access to the Proofs of Claim so that the AG can provide notice. Second, the AG says the AG can receive redacted documents.

3

## Argument

### I. The Court Cannot Act on the AG's Request Without Reopening the Case

#### A. The AG Shifts Its Argument as to Why Reopening is Necessary, But Concedes Reopening is Necessary

10.     In the Response, the AG states that the Motion to Reopen was filed "***primarily*** to ensure that the Court could order notice for survivors." (Response, p. 27 (emphasis added).)

11.     In the Supplement, however, the AG states, "The ***only*** reason DOJ has requested reopening is for the Archdiocese to give claimants notice of the pending motion for access to certain sealed records." (Supplement, p. 11 (emphasis added).)

12.     This is not, however, what the Motion to Reopen said:

> The State of Wisconsin, Department of Justice, moves pursuant to 11 U.S.C. § 350(b) and Federal rule of Bankruptcy Procedure 5010 to reopen this case for the limited purpose deciding [sic] the contemporaneously filed Motion of Wisconsin Department of Justice for Access to Certain Sealed Records.

(Motion to Reopen, p. 1.)

13.     Regardless of whether the AG was correct in the Motion to Reopen that the reopening would be necessary to consider the Motion for Access or is correct now in the Supplement that reopening would be necessary to consider notice, the AG must, for at least one reason, demonstrate that reopening is appropriate. The AG has failed to do so.

#### B. The One Bankruptcy Case Cited in the Response Does Not Permit the Court to Act on the AG's Request Without Reopening the Case

14.     Despite filing the Motion to Reopen and arguing that reopening was necessary to determine the Motion for Access, the Response shifts to take the position that reopening is not necessary because courts consider requests for access or unsealing without opening closed cases.

4

In support for this new position, the AG relies on one bankruptcy case, and then on two non-bankruptcy cases for the proposition that "[t]he practice is so accepted it is generally not discussed." (Response, p. 24.)

15.     The AG principally relies on *In re Motions for Access of Garlock Sealing Technologies LLC*, 488 B.R. 281, 299 (D. Del. 2013) (hereinafter *Garlock Access I*), but the case itself has no real discussion about reopening.

16.     There, the debtor, *Garlock Sealing Technologies, LLC* ("Garlock"), filed motions seeking access to exhibits to Rule 2019 disclosures that, while not publicly available, were never sealed. *Id.* at 289; *see also In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 740 (D. Del. 2018), *aff'd sub nom. In re A C & S Inc*, 775 F. App'x 78 (3d Cir. 2019) (hereinafter *Garlock Access II*) ("The 2019 Orders did not, however, seal the 2019 Exhibits. Rather, the 2019 Orders regulated access to the 2019 Exhibits, in light of privacy concerns, and established a procedure by which a party seeking access to the 2019 Exhibits may request it.")

17.     The court stated it "perceive[d] no need to reopen the closed cases" and appeared to rely on the court's physical possession of records and a quote from *Nixon v. Warner Communications, Inc*. *Garlock Access I*, 488 B.R. at 301-302.

18.     This quote from *Nixon*, actually relates to the Court's ability to deny access:

> It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, ***and access has been denied where court files might have become a vehicle for improper purposes***. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." *In re Caswell*, 18 R.I. 835, 836, 29 A. 259 (1893). Accord, *e. g., C. v. C.*, 320 A.2d 717, 723, 727 (Del.1974). *See also King v. King*, 25 Wyo. 275, 168 P. 730 (1917). Similarly,

courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, *Park v. Detroit Free Press Co.*, 72 Mich. 560, 568, 40 N.W. 731, 734–735 (1888); see *Cowley v. Pulsifer*, 137 Mass. 392, 395 (1884) (per Holmes, J.); *Munzer v. Blaisdell*, 268 App.Div. 9, 11, 48 N.Y.S.2d 355, 356 (1944); *see also Sanford v. Boston Herald-Traveler Corp.*, 318 Mass. 156, 158, 61 N.E.2d 5, 6 (1945), or as sources of business information that might harm a litigant's competitive standing, see, *e. g., Schmedding v. May*, 85 Mich. 1, 5–6, 48 N.W. 201, 202 (1891); *Flexmir, Inc. v. Herman*, 40 A.2d 799, 800 (N.J.Ch.1945).

*Nixon v. Warner Communications, Inc*., 435 U.S. 589, 598 (1978) (emphasis supplied).

19.     Moreover, subsequent decisions recognized that nothing in *Garlock Access I* or elsewhere, permitted limitless access for use outside of judicial proceedings.  *See*, *e.g.*, *In re Owens Corning Armstrong World Indus., Inc.*, 560 B.R. 229, 237 (Bankr. D. Del. 2016), *aff'd sub nom. In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, *aff'd sub nom. In re A C & S Inc*, 775 F. App'x 78 ("Honeywell and Ford both seek limitless access from this Court for use outside judicial proceedings. There is no precedent for this.").  In affirming this decision, the district court said:

> Taking massive quantities of information about asbestos claimants and potential claimants—submitted under sensitive, time-constrained circumstances, in the midst of evolving versions of the 2019 Orders, none of which stated what personal-identifying information lawyers could ***not*** submit (e.g., full social security numbers), and all of which was designed to aid the Bankruptcy Court in the challenging task of managing complex, large-scale bankruptcy proceedings—and allowing it to be used outside of an ongoing, carefully-managed litigation or trust proceeding, would not be proper, as the risks of misuse and harm to individuals would greatly outweigh any value the 2019 Exhibits could possibly have (*e.g.*, for lobbying or legislative efforts).

*In re Motions Seeking Access to 2019 Statements*, 585 B.R. at 755.

20.     The AG does not seek to use the documents in an "ongoing, carefully-managed litigation or trust proceeding."  Moreover, the AG fails to address two key differences between

6

this case and *Garlock Access I*.  First, *Garlock Access I* did not involve documents originally subject to a sealing order and the basis for sealing was discretionary, not mandatory. Second, the court found that the intended use of the information in an estimation proceeding in the movant's own bankruptcy was a proper purpose.  Here, there are multiple sealing orders, the AG concedes sealing is proper, and the AG's "purpose" does not satisfy the rigor required by the Bankruptcy Code or its implementing Bankruptcy Rules.

21.     The AG's "purpose" is not specifically identified. But what is identified conflicts with the restrictions placed in the Bar Date Order.  Nothing in any of the AG Pleadings ever addresses the limitation included in the Bar Date Order and how the AG's use conflicts with it.

22.     In the Original Motions, the AG relied on a hypothetical potential use.  (Motion for Access, § II.)  In the Response though, the AG suggested the AG was acting pursuant to its police and regulatory powers.  (Response, pp. 20-21.)  But while the AG cites some examples of the AG's authority in other contexts,[2] the AG noticeably never says that the AG is proceeding under those here, and of course, the AG has not issued a subpoena for the records.[3]  In fact, the AG concedes that the AG has no actual mechanism to seek the records.  (Response, p, 29.)[4]

---

[2] For example, the specific investigatory or subpoena powers mentioned in any of the AG pleadings do not apply here. Wis. Stat. § 165.505 involves crimes against children using the internet.  (Response, p. 6.) Wis. Stat. § 978.045(1g) and (1r) require the attorney general to have been appointed a special prosecutor (*Id.* at p. 8.).  Wis. Stat. § 978.045(1g) and (1r) apply when a district attorney requests that a DOJ assign an assistant attorney. (*Id.*)  Wis. Stat. § 165.255 applies to sexually violent person proceedings.  (*Id.*)  Even § 968.135, which appears broader, requires a showing of probable cause and court issuance.  The statute is not applicable for a more obvious reason—there can be no criminal prosecution of deceased persons.

[3] The AG has not issued a subpoena or search warrant, and effectively concedes that he cannot. In the Response, the AG says "DOJ has no other avenue for relief outside this forum."  (Response, p. 29.)  In other words, the AG concedes that all of the other "authority" cited in the response does not authorize the investigation or, in other words, any actual exercise of police powers.

[4] This is especially important because the Wisconsin AG has very limited authority.  (Objection, § I.)  Thus, the AG's reliance on general "policy power" or "regulatory power" or "public policy" is insufficient.  At one point, the AG says that the actions are "designed to effectuate public policy."  (Response, p. 21.)  But Wisconsin courts have established that the AG has no such general right.  (Objection, ¶¶ 13-14.)  To be clear, under Wisconsin law, the fact that the AG is a "no mere private party" (Response, p. 26) is insufficient to confer any actual authority. (Objection, § I.) The AG never addressed any of these cases.

23.     The AG does not intend to use the documents in any court process and in fact concedes that they will most likely not be used in any such process.  The AG intends to use the documents for an unfettered period of time and for unfettered purposes; something that is inconsistent with *Garlock* and related cases.  *Garlock Access I* required and permitted only one specific use, subject to very specific procedures and established a substantial protocol regarding access to dockets.  (*Order Establishing the Protocol for Production of 2019 Exhibits* (entered April 13, 2019), Case No. 01–01139, Dkt. No. 30490.)  The debtor was permitted to use the documents solely in connection with the estimation proceedings in its own bankruptcy case, and the court explicitly ordered that the documents and the information contained therein could not be used for any other purpose.  The court also implemented a special master protocol, the retention of a vendor for the purposes of scanning and copying the documents, and required that all costs, fees, and expenses, would be itemized and paid for in full by Garlock.

24.     The AG establishes no specific need for a specific document.  Rather, the AG's stated justification is that the documents may be relevant to an, as of yet, non-existent hypothetical situation.  Even if the situation existed, the AG makes no effort to show how access to all of the documents is justified. The AG also concedes that Abuse Survivor claims should not be disclosed or shared, even with law enforcement, without their consent, yet the AG desires to do so here.  In fact, in the Supplement, the AG seems to take the position that the Court should defer to whether claimants want the AG to access the documents.  (Supplement, p. 12.)  And yet, the AG demands that the AG receive access to all Abuse Survivor Claims anyway even without deferring to the claimants.

25.     Finally, the only specific, actual purpose that the AG discloses is an intention to review the claims to "share with the Archdiocese any name that it concludes warrants adding to

the list." (Response, p. 45.)  The fact that the DOJ made a "commitment to not list names" (Response, p. 49), but instead intends to rely on public pressure (not legal process) to "make recommendations" about adding names underscores the complete absence of any proper purpose for the Motion to Reopen.

26.    The improper nature of this purpose is also supported by the AG's allegations about the sufficiency of the Archdiocese's list.

27.    First, this Court already determined that most of the claims involved abusers already on the list.  The AG ignores this, calling its relevance unclear, and instead characterizing this Court's statement as explaining that the claims involved past abuse, not current abuse. (Response, n.7.)  This is despite the following language being included and emphasized in the Objection: "***For the most part, the alleged abusers named in the claims are those previously identified by the Debtor as having substantiated abuse claims made against them. Many of those individuals are deceased; the others have been removed from priestly ministry.***" (Objection, ¶ 87 (emphasis repeated).)

28.    The AG also relies on October 19, 2022, and August 22, 2023, correspondence. The October 19, 2022, letter provided names, none of which the AG is willing to disclose, but no information upon which the ADOM's Diocesan Review Board could conduct any investigation as to whether a name should be added to the list of substantiated abusers.[5]  The August 22, 2023, letter was provided approximately one week before the Objection was due.   The AG also faults ADOM for complying with a subpoena issued under actual authority, but then awaiting the resolution of the criminal investigatory process before taking any steps.  (Response, p. 51.)  This

---

[5] Section 13.5(c) and Exhibit E of the Amended Plan address the Diocesan Review Board's review of allegations of sexual abuse and recommendations about substantiation.

is something the Archdiocese has already done to avoid interfering with the investigatory process.[6]

29.     The AG's stated "purpose" is even more suspect when viewed against the nature and content of the claims.  The claims usually contain minimal information about the allegations of abuse.  The claims do ***not*** reflect any interview process and were never subject to any real investigative or discovery process during the Chapter 11 case. Moreover, at the time the claims were filed, many of the witnesses were deceased.  More have likely died in the decade since then, and certain of the Abuse Survivors have likely passed away as well.  Thus, whether the AG has any right to make "recommendations" to the ADOM, this makes relying on the claims alone to make "recommendations" difficult.  This is especially true where much of the AG's focus appears to be on abusers that were not diocesan priests (Motion for Access, p. 16; Response, p. 18) because the ADOM has limited or no information about them.

30.     There is at least one case from within the Seventh Circuit regarding reopening a bankruptcy case to address the issue of access to documents.  In *In re Ploetz*, the debtor filed a motion to reopen his case and requested, among other things, that the court seal his bankruptcy court records.  *In re Ploetz*, Case No. 19-27795-beh, 2022 WL 190429, *1 (Bankr. E.D Wis. Jan. 20, 2022).

31.     The court started its analysis with the question of "whether there is a basis to reopen the debtor's bankruptcy case." *Id.* at *2. The court outlined the following factors for considering whether to reopen a case:

> (1) the length of time that the case has been closed; (2) whether the debtor would be entitled to relief if the case were reopened; and (3) the availability of non-bankruptcy courts, such as state courts, to

---

[6] The procedures followed when abuse is reported are described in Section II.(F) of the Disclosure Statement.  Those procedures have been followed for decades, and successfully.

entertain the claims.

*Id.* at \*2 (quoting *Redmond v. Fifth Third Bank*, 624 F.3d 793, 798 (7th Cir. 2010).  Although the case had been closed for two years, the court noted that certain of the documents the debtor sought to restrict were filed in 2021.  *Id.* Ultimately, the court reopened the case to allow certain files to be restricted from public view.  *Id.* at \*11.

32.     This is consistent with the history of Rule 5010.

> Although a case has been closed the court may sometimes act without reopening the case. Under Rule 9024, clerical errors in judgments, orders, or other parts of the record or errors therein caused by oversight or omission may be corrected. A judgment determined to be non-dischargeable pursuant to Rule 4007 may be enforced after a case is closed by a writ of execution obtained pursuant to Rule 7069.

1983 Advisory Committee Notes to Fed. R. Bankr. P. 5010.[7]  Rather than suggesting that acting without reopening is the norm, this suggests that a court may only "sometimes act without reopening."   The AG did not seek relief under Rule 9024 (rather, the AG argues it is inapplicable (Response, p. 31).  Indeed, there is no dispute that the issue here is more than correcting clerical records, and this matter does not involve collection with respect to a non-dischargeable debt.

**C.     The Non-Bankruptcy Cases Cited by the AG Are not Applicable to the Question of Reopening**

33.     The other cases relied on by the AG involve intervention in non-bankruptcy matters.  The fact that these cases do not address reopening under § 350 of the Bankruptcy Code is because the Bankruptcy Code did not apply to them.  Therefore, while these cases do address

---

[7] Similarly, the Bankruptcy Court Miscellaneous Fee Schedule has only few exceptions, none of which are applicable here, to the filing fee requirement for a Motion to Reopen  (https://www.uscourts.gov/services-forms/fees/bankruptcy-court-miscellaneous-fee-schedule#:~:text=For%20filing%20a%20motion%20to%20reopen%2C%20the%20following%20fees%20apply,a%20Chapter%2011%20case%2C%20%20241167.)

access to judicial records, they cannot, by definition, support the AG's position that reopening is not necessary to determine a motion for intervention. Of course, the AG did not file a motion to intervene, and the AG purposefully never addresses whether the AG must demonstrate cause for reopening so as to file a motion to intervene.

34.     In *United States ex rel. Hernandez v. Team Finance, LLC, v. Adler (Movant)*, 80 F. 4th 571, 574 (5th Cir. 2023), the movant sought to intervene permissively pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.[8] The movant sought access to certain records that he believed would be helpful to his research. *Id.* at 575. The court rejected the argument that the court's own supervisory powers meant that no standing was required to intervene for purposes of unsealing records and affirmed the district court's conclusion that the movant must satisfy standing to intervene. *Id.* at 576. The movant based his argument for standing on a public right of access to the documents. As discussed below (*see*, *infra* ¶ 55), neither the Original Motions, the Response, or the Supplement, argue that the proofs of claim should be publicly available.

35.     The court also addressed the requirement that a motion to intervene be timely, which required consideration of the following factors: "(1) the length of time the movant waited to file, (2) the prejudice to the existing parties from any delay, (3) the prejudice to the movant if the intervention is denied, and (4) any unusual circumstances." *Id.* at 578.

36.     The AG addresses none of these factors, and all of them weigh against intervention. The length of time is measured from the moment the prospective intervenor knew his interests would no longer be protected. In *Hernandez*, the court said that the proper measurement was not from when the movant learned of his interest in the case, but rather from when he realized that the documents would not be unsealed after the case's closure. *Id.* This

---

[8] The AG makes no effort to address the requirements of Rule 24 of the Federal Rules of Civil Procedure.

Case 11-20059-gmh    Doc 3510    Filed 10/24/23    Page 12 of 28

was based, in part, on the fact that, during the pendency of the case, the movant's interests were protected by the parties' litigation of the protective orders and confidentiality designations. *Id.* at 578-79.

37.     Here, the delay has been ***years*** regardless of when the Court starts measuring the length of time. If *Hernandez*'s use of case closure and the realization that the documents would not be unsealed is the standard, it has been seven years. Moreover, under the reasoning of *Hernandez*, the time likely began to run long before. Unlike *Hernandez*, the AG could not rely on other parties' litigation to protect his interests. First, sealing of Abuse Survivor Claims in the Archdiocese was permanent. Second, the AG knew or should have known that access to Abuse Survivor Claims was specifically limited, and any party desiring access would have to make a request, instead of waiting on eventual unsealing at the close of the case, which was never going to happen. Third, the AG purports to act in a criminal prosecutorial capacity. Criminal cases have statutes of limitation. Regardless of the positions of the parties in the case, if the AG was in fact acting in an actual criminal prosecutorial capacity, the AG would not have been able to wait for the eventual resolution of the issue as between the parties. Thus, unlike *Hernandez*, the appropriate measure of delay starts well before case closure and likely has been close to, if not more than, a decade. Even if the Court only looked at when the AG knew ADOM would not and could not voluntarily provide documents, the AG waited two years after that.

38.     The other factors – prejudice to the existing parties, prejudice to the movant, and unusual circumstances – also weigh against intervention.

39.     Indeed, prejudice to ADOM and the other parties exists in multiple ways.

40.     The ADOM will continue to spend substantial time and money to address the AG's demands.[9]  It is also not true that the costs of giving notice "do not stem from delay." (Response, p. 30.)  The costs related to notice stem from the fact that the addresses are outdated. This "cost" is both the cost to update the address – the cost of searches and the time to review them – and also the potential exposure if an incorrect address is used.  Moreover, had the AG raised this demand during the pendency of the case, this issue could have been addressed then, avoiding the need for the ADOM to go through repetitive litigation.  Also, the vast majority of the Abuse Survivors were represented at that time, and the Official Committee vigorously advocated for Abuse Survivors.[10]  The costs and logistics of addressing hundreds of unrepresented persons is much different than being able to coordinate with opposing counsel for a majority of claimants.  Given the AG's real purpose – to make "recommendations," to criticize the accuracy of the Archdiocese's list, and to satisfy persons and entities like Peter Isley and Nate's Mission – the delay also creates prejudice.  First, the AG is using the court of public opinion to re-negotiate the non-monetary undertakings in the Amended Plan.  Second, due to the passage of time, it was already difficult to investigate many of the claims, and this issue has only become more difficult.  Thus, the ability to investigate the AG's "recommendations" would have been substantially different seven-plus years ago.

41.     Harm exists to Abuse Survivors in at least three ways.  First, notice to an outdated (or incorrectly updated address) risks inadvertent disclosure.  Second, the AG recognizes that it

---

[9] Just the cost of responding to these motions has already exceeded tens of thousands of dollars in fees.

[10] This is another way that this case is unlike *Hernandez* where the movant asserted he was "uniquely well-qualified to study" the information.  Most Abuse Survivors were represented by their own counsel, and also represented by the Official Committee which employed a national law firm with specific bankruptcy experience (both in that the firm specializes in bankruptcy matters and has been involved diocesan and religious order bankruptcies).  The questions of the handling of Abuse Survivor claims, the accuracy of the Archdiocese's lists, and what information could and should be publicly disclosed were addressed in this case, litigated by more-than-able counsel, and resolved by this Court.

14

is important to promise (and keep the promise) to Abuse Survivors that their claims and information will not be shared with others, including law enforcement, without their consent. While the AG repeatedly makes this promise of confidentiality and non-disclosure to people that report to the AG's office,[11] the AG stubbornly insists there is no harm to the Abuse Survivors here if their claims are disclosed without their consent. Third, certain Abuse Survivors may be traumatized receiving notices from this case years after it has concluded. The AG's office "is experienced in giving notice on statewide issues," and has done so here. And yet, the majority of Abuse Survivors elected not to share their reports with the AG's office.[12] That decision should be respected. The AG appears to concede as much in the Supplement.

42.     There is also harm to the persons named in the Abuse Survivor claims as alleged abusers (who are not), especially where the claim has already been investigated by civil authorities with the appropriate investigative authority.

43.     There is no prejudice to the AG. The AG's arguments regarding prejudice are circular. The AG does not argue that the AG has a legal right to the documents, but rather concedes the AG has no legal right and argues that this demonstrates prejudice. That the AG would be denied access to documents to which the AG has no legal right is not prejudice.

44.     The AG does not address that *Hernandez* did not grant access to the documents, but rather remanded the matter to the district court for consideration of timeliness and other

---

[11] "DOJ is committed . . . to allowing survivors to report anonymously without telling DOJ their names and to not sharing information outside of DOJ without their consent." (Response, p. 36; *see also* (Objection, § III(C)(iv).) The AG says that information from Abuse Survivor claims will be held to the same standard, except the AG is asking the Court to order the Archdiocese to share the claims without Abuse Survivor consent.

[12] The AG repeatedly stated publicly that the Initiative received 250 reports statewide. That number is less than one half of the total proofs of claim received by ADOM during this case. Then, when one factors in that the 250 reports to the AG are statewide, it becomes readily apparent that a significant majority of abuse survivors has chosen not to contact the AG.

reasons for denial.  *Hernandez*, 80 F.4th at 579.  In addition, the court raised other relevant issues for the district court to address:

> [W]e reiterate the district court's discretion in ultimately deciding Adler's motion. The district court is better situated to assess the exact length of Adler's delay, any explanations for such delay, and prejudice to the parties—along with ancillary considerations such as the contents of the sealed documents, prior consideration by the court and litigants, and the tentative nature of the court's evidentiary rulings in light of an upcoming, but ultimately averted, trial.

*Id.*

45.     The AG also relies on *Quinonez-Castellano v. Performance Contractors Inc*., Nos. 16CV4097, 17CV4058, 17CV4062, 2018 WL 10015527 (N.D. Iowa Oct. 9, 2018).  This case also related to Rule 24.  *Id.* at 3.  However, this case involved the question of whether a protective order could be modified to allow plaintiffs to share confidential discovery.  *Id.* at 1-2.

46.     Moreover, the court recognized that the movant must still address relevance.  *Id.* at 5.  The AG never addresses relevance, instead relying on hypothetical examples of possible relevance.

47.     In addition, the documents shared were covered by similar protective orders in both cases.  *Id.* at 6.  The AG is not agreeing to be bound by the same restrictions, but rather seeking to use the documents for a purpose directly prohibited by the Bar Date Order.

48.     As a technical matter, the AG's reliance on these cases is questionable because the AG did not file a motion to intervene.  Moreover, each of those cases involve intervention under Rule 24 of the Federal Rules of Civil Procedure.  That rule is inapplicable here because Rule 24 only applies to adversary proceedings.  Fed. R. Bankr. P. 7024.

16

49.	Instead, the applicable rule is Rule 2018 of the Federal Rules of Bankruptcy

Procedure, which provides, in relevant part, as follows:

> (a) PERMISSIVE INTERVENTION. In a case under the Code, after
> hearing on such notice as the court directs and for cause shown, the
> court may permit any interested entity to intervene generally or
> with respect to any specified matter.
>
> (b) INTERVENTION BY ATTORNEY GENERAL OF A STATE. In a
> chapter 7, 11, 12, or 13 case, the Attorney General of a State may
> appear and be heard on behalf of consumer creditors if the court
> determines the appearance is in the public interest, but the
> Attorney General may not appeal from any judgment, order, or
> decree in the case.

Fed. R. Bankr. P. 2018.

50.	This rule implements §§ 1109 and 1164. *See also* 1983 Advisory Committee

Note to Fed. R. Bankr. P. 2018. The rule itself recognizes that a state attorney general has

limited standing in bankruptcy cases and is not, automatically, a party in interest. *See also* 1983

Advisory Committee Note to Fed. R. Bankr. P. 2018 ("This subdivision does not grant the

Attorney General the status of party in interest. In other contexts, the Attorney General will, of

course, be a party in interest as for example, in representing a state in connection with a tax

claim.")

51.	The AG is not appearing here on behalf of consumer creditors, and as discussed

below (*see*, *infra* Section II), the AG is not a party in interest.

**D.	This is Not a Public Access Case and the State Concedes Sealing is
	Appropriate**

52.	The greatest flaw and the biggest concern with the AG's new position on

unsealing is that the AG relies on cases that address the ***public*** right of access to documents. In

other words, these cases do not address the issue of who should have limited access when

17

documents are properly sealed, but rather whether a member of the public can challenge a protective order on the basis that there is no basis for sealing.[13]

53.     For example, in the Response the AG also relied on *Vanda Pharmaceuticals, Inc. v. Food & Drug Administration*, 539 F. Suppl. 3d 44 (D. D.C. 2021).  The court recognized that documents properly sealed would not be disclosed and thus denying the request to unseal with respect to one document permitted the remaining documents to be redacted prior to unsealing. *Id.* at 57-59.  The AG completely overlooks this.

54.     In *Hernandez*, the Court recognized that "absent some underlying right" the desire to intervene to pursue unsealing of the record is not a justiciable controversy or claim."  80 F.4th at 576.  But the court recognized that the movant had alleged an "underlying right" – a violation of the public right of access to judicial records.

55.     There is no alleged violation of a public right of access to judicial records here, as the AG concedes that the Abuse Survivor Claims should not be publicly available: "As DOJ affirmatively argued in its motion, 'DOJ supports protecting survivor information and believes that survivor bankruptcy filings should not be part of the public domain.' (Dkt. 3476:9.)") (Response, p. 36.)  Thus, it is baffling that the AG relies on cases that address whether documents should be unsealed because of a "public right of access" and arguing that "[u]ltimately, though, any party – public or private – has standing to request documents." (Response, p. 26.)  This argument also seems to concede ADOM's concern that granting these motions will lead to "any party" obtaining access to these documents.

---

[13] In this respect, the AG also makes no effort to bridge the difference between cases modifying stipulated protective orders, *e.g.*, *Hernandez*  and *Quinonez-Castellanos.*, and the case here where the Court entered orders sealing proofs of claim and repeatedly confirmed the sealed nature of the claims.  There is a difference between a protective order entered in the context if discovery where the parties are able to designate documents as confidential, and the Court's determination that documents must be sealed.

18

## II.   Rule 5010 Does Not Authorize the AG to File the Motion to Reopen

56.     The Court directed the AG to "present the claimed factual and legal bases for its contention that Rule 5010 authorizes it to file a motion to reopen this case in order to pursue access to sealed court filings." (September Order).

57.     The AG did not do so.  Instead, the AG takes the position that Rule 5010 is inapplicable because it would "abridge" § 350(b).  (Supplement, p. 2.) Alternatively, the AG argues that, in other cases involving other circumstances, courts recognized that the state may be a party in interest.  These both fall far short of complying with the September Order.

### A.     The Court's Authority Does not Confer Authority on the AG

58.     The AG starts with the false premise that "the rules are intended to provide procedural guidance with respect to the statutory grounds for submitting claims."  (Supplement, p. 3.)  A review of the rules themselves demonstrates this is not true.  Moreover, the case cited, *In re Montagne*, does not support this conclusion.  The statement in that case applied to a specific rule, not all rules.  *In re Montagne*, 421 B.R. 65, 82 (Bankr. D. Vt. 2009) ("Failure to comply with [R]ule 3001(c) does not result in disallowance of a claim: it is merely intended to provide procedural guidance with respect to the statutory grounds for submitting claims.").

59.     All of the authority that the AG relies on addresses the court's ability to *sua sponte* reopen a case.  From this, the AG argues "any reading of Rule 5010 that restricts the permissible moving parties is invalid."  (Supplement, p. 4.) But the case the AG relies on for this proposition does not say this.  The AG argues:

> The Eastern District of New York has likewise concluded in the context of examining reaffirmation agreements that any reading of Rule 5010 that restricts the permissible moving parties is invalid: "Fed. R. Bankr. P. 5010 improperly restricts the scope of this section by identifying (and perhaps limiting by negative implication) the movant as 'the debtor or the other party in interest pursuant (sic) to section 350(b) of the Code.'"  *In re Bruzzese*, 214

B.R. 444, 449 (Bankr. E.D.N.Y. 1997). "It is a cardinal rule of construction that when a rule impermissibly restricts, it is inconsistent with, or contradicts the provisions of the Bankruptcy Code, the Rule is invalid."

(Supplement, pp. 4-5.) The AG, however, omits the key sentence that immediately follows:

In this instance, this Court finds that the Rule is unduly restrictive in excluding by negative implication the *sua sponte* authority of the Court to reopen cases "to accord relief to the debtor or for other cause."

*In re Bruzzese*, 214 B.R. 444, 449 (Bankr. E.D.N.Y 1997). The conclusion in *In re Bruzzese* was not that any reading of Rule 5010 that restricts the moving parties is invalid; the conclusion was that the Rule was invalid "in excluding by negative implication the *sua sponte* authority of the Court."

60. The AG cites no case for the proposition that **the AG** does not have to establish standing to move to reopen, instead relying on the Court's *sua sponte* authority. *In re Searles*, 70 B.R. 266, 271 (D.R.I. 1987) ("Whether a bankruptcy court can reopen a case *sua sponte*."); *In re Bruzzese*, 214 B.R. at 449 ( (addressing whether the rule was "unduly restrictive in excluding by negative implication the sua sponte authority of the Court"); *Donaldson v. Bernstein*, 104 F.3d 547, 552 (3d Cir. 1997) (recognizing the court's authority to reopen the case on its own motion); *In re Tall*, 79 B.R. 291, 293 (Bankr. S.D. Ohio 1987) (court *sua sponte* reopened case).

61. That Rule 5010 does not eliminate the Court's *sua sponte* authority is not surprising given the text of § 105(a) ("No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action . . .."). It also does not follow that just because the Court's *sua sponte* authority exists, all requirements related to standing are eliminated. Standing requirements are, of course, not limited to motions to reopen.

20

**B.      The AG is Not a Party in Interest**

62.      Rule 5010's party in interest requirement is not the solitary instance of such a requirement under the Bankruptcy Code.

63.      As the Court's orders remind the parties, the Court has the inherent authority to address standing on its own initiative.  *Matter of Rimsat, Ltd.*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996).

64.      "[L]imits on standing are vital in bankruptcy, where clouds of persons indirectly affected by the acts and entitlements of others may buzz about, delaying final resolution of cases." *Matter of Deist Forest Prods., Inc.,* 850 F.2d 340, 341 (7th Cir. 1988).

65.      Section 1109 of the Bankruptcy Code provides, in relevant part, that:

> A party in interest, including the debtor, the <u>trustee</u>, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture <u>trustee</u>, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109.   Even standing under § 1109 is, on its own, insufficient. *Matter of Rimsat, Ltd.,* 193 B.R. at 502–03 ("Consequently, the right to appear and be heard is not the same as standing and § 1109(b) does not necessarily mean that every party in interest can seek relief on every issue.").  "To have standing to invoke a statute, you must be one of the persons whom the statute is intended to protect." *Matter of James Wilson Associates,* 965 F.2d 160, 168 (7th Cir. 1992). As noted by the Seventh Circuit: "[T]o qualify as a party in interest requires more than merely being interested in the outcome of the bankruptcy. It requires a direct legal interest in the case." *Matter of Rimstat*, at 502.  Moreover, contrary to the AG's position, "the focus is on the party, not the claim itself." *Id.* at 501.  In other words, the AG's argument that the Court should look only to the merits of the argument, and not to the question of whether the AG has the standing to bring the argument is categorically untrue.

66.     Nor is the AG's desire to advocate on behalf of abuse survivors generally (assuming the AG had such authority, it does not) sufficient to grant standing. "A party's desire to protect the rights of others does not permit the court to adjudicate a claim." *Matter of Rimsat, Ltd.*, 193 B.R. at 503.

67.     This is confirmed by the fact that numerous circuit courts recognize that only a party in interest may seek to reopen a bankruptcy case. *See, e.g., Alexandria Consulting Group, LLC v. Alexandria Surveys Int'l LLC*, 589 Fed.Appx. 126 (4th Cir. 2014); *Goldenberg v. Deutsche Bank Nat'l Trust Co. (In re Papazov)*, 610 Fed.Appx. 700 (9th Cir. 2015); *Nintendo Co. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353 (10th Cir. 1995).

68.     Just as the Court's *sua sponte* authority does not confer standing on the AG, the fact that in other, non-analogous circumstances the state attorney general has standing, does not confer standing on the AG here.

69.     The AG relies on *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. 546, 554 (Bankr. D.N.H. 1988) for the following statement: "where a bankruptcy involves a regulated industry, a state was 'a party in interest in every practical sense' and was allowed to intervene." (Supplement, p. 7.) This case does not involve a regulated industry. The AG also said that "[t]he bankruptcy court in *New Hampshire* determined that the realities of the case and the public interest at large made the state, through its Attorney General, a party in interest." (*Id.*) This is not true. The court relied on the state's "statutory basis for being involved in this reorganization" and concerns regarding regulatory compliance in determining that the state was a party in interest. *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. at 555. As for "public interest" this issue related to whether the state could rely on public interest in light of the fact that § 1129 no longer included a requirement that the plan be found to be in the public interest. *Id.* at

556.  Far from deciding the issue of standing on this basis, the court said that "it is at least arguable that the public interest factor must still be considered by the reorganization court in a case having a manifest public impact."  *Id.*  This appears to be a reference to the fact that the debtor was a utility.  *Id.* at 556, n. 4.  Here, ADOM is not a utility, and the plan has already been confirmed, thus the AG cannot rely on any alleged public interest requirements under §1129 to confer standing here.

70.    In *In re Citizens Loan & Thrift Co.*, 7 B.R. 88 (Bankr. N.D. Iowa 1980) standing was based on the state's "interest in its duty and responsibility in supervising industrial loan companies."  *Id.* at 91.  This case does not involve an industrial loan company.  While the case also addressed the state's interest in protecting the welfare of its citizens, the Wisconsin AG has no such authority.  (Objection, § I.)[14]

71.    *In re Mattiace Industries, Inc.*, 76 B.R. 44 (Bankr. E.D.N.Y. 1987), addressed intervention for purposes of addressing environmental contamination.

72.    *In re Winsted Mem'l Hosp.*, 236 B.R. 556, 559 (Bankr. D. Conn. 1999) involved a charitable trust fund.  Although there were charitable trust funds in this case, the AG never intervened to protect them during the pendency of the case, and that is not at issue here.   There was also a specific **statutory** basis charging the state attorney general with "represent[ing] the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes."  *Id.* at 559 and 559, n.2.[15]

---

[14] The AG is silent as to the Court's consideration of other factors related to intervention, *e.g.*, timeliness.  *See In re Citizens Loan & Thrift Co.*, 7 B.R. at 91.

[15] In Wisconsin, the AG does have some authority with respect to charitable trusts.  *See*, *e.g.*, Wis. Stat. §701.10(3)(a)(2) (granting authority to bring a proceeding to enforce a charitable trust), 701.16(4)(a).  The specificity of this grant of authority is substantially different than the general authority the AG relies on.  And, or course, the existence of a grant of authority in a field, is not the same as a grant of authority for all matters in that field.  *See Estate of Sharp*, 63 Wis. 2d 254, 217 N.W.2d 258 (Wis. 1974) (holding that existence of this statutes and other statues requiring notice be provided to the Attorney General in some instances, did not confer authority to intervene in an estate proceeding that involved a charitable trust).

23

73.     In *In re Lewis*, 459 B.R. 281, 288 (N.D. Ill. 2011), the court relied on the state attorney general's statutory enforcement authority to bring deceptive trade practices in the context of a plan objection.  This matter involves neither statutory enforcement authority, deceptive trade practices, or plan objection.  That the AG has an interest in reviewing claims (Supplement, p. 8), is not sufficient to establish standing.

74.     Unlike any of the cited cases, the AG here is not purporting to act pursuant to statutory authority or in the context of a regulatory utility, environmental contamination, a charitable trust, or enforcement of state laws regarding deceptive trade practices.  Moreover, that the AG has some authority with respect to sexual abuse survivors and law enforcement does not confer the necessary specific authority here.  *See Estate of Sharp*, 63 Wis. 2d 254.  This is also evidenced by the AG's examples of its authority.  *See*, *e.g.*, Wis. Stat. 978.045(1g) and (1r) (authority when acting as a special prosecutor at the request of a judge or district attorney); Wis. Stat. § 165.505 (statutory subpoena power for crimes against children involving the internet; Wis. Stat. § 165.255 (representing the state in sexually violent person proceedings.  If the AG's "status" as the statewide support resource and state law enforcement agency was sufficient to confer authority, each of these specific grants would be superfluous.

75.     ADOM identified one bankruptcy case addressing the authority of the Wisconsin AG.  *See In re Rusty Jones, Inc.*, 128 B.R. 1001 (Bankr. N.D. Ill. 1991).  This case involved the question of whether, in an adversary proceeding, certain "Wisconsin officials," which included the then-attorney general, had standing to be appointed as class representatives.

76.     The debtor in this case was in the business of selling rust-proofing warranties for automobiles.  *Id.* at 1003.  The debtor and an insurer entered into a warranty bond to secure payment of valid warranties.  *Id.*  The obligee on the bond was the State of Wisconsin.  *Id.*

Thereafter, there was a concern that the claims would exceed the amount of the bond, and the then-attorney general issued an opinion that the bond could be reformed to cover all valid claims, which led to the underlying dispute. *Id.* at 1004.

77.     The insurer-defendant filed an adversary proceeding, and then sought to certify the defendant class. *Id.* at 1004-05. The court rejected the ability of the Wisconsin officials, including the then-attorney general, to represent the class because "the Wisconsin Supreme Court has found that unless a statute specifically authorizes a public official to prosecute an action on behalf of its citizens, the public official has no standing to do so" and that it was "clear that the Wisconsin constitution . . . does not recognize any *parens patriae* powers on the part of its public officials." *Id.* at 1008-1009. The court also rejected the argument that statutes conferring authority in other contexts were sufficient to confer authority here. *Id.* at 1009-10.

78.     Acknowledging this case does not address Rule 5010 or § 1109, the court's analysis demonstrates that the inquiry fails at the outset because the AG cannot be a party-in-interest and does not have standing because it lacks the requisite authority.

79.     That the Archdiocese provided notice to the AG is not a concession that the AG is a party in interest for any or all purposes. Of course, the AG cites no legal support for this allegation. Debtors provide broad notices for many reasons – it hardly makes every notice recipient a party in interest for every matter before a bankruptcy court. This is consistent with decisions that not all creditors have standing to move to reopen. *See*, *e.g.*, *In re Friede Goldman Halter Inc.*, 600 B.R. 526, 532 (Bankr. S.D. Miss. 2019); *see also In re E.S. Bankest, L.C.*, 321 B.R. 590, 595 (Bankr. S.D. Fla. 2005) ("The Bankruptcy Code is replete with examples where a creditor may not have standing to object."). Moreover, the AG refuses to address why it never acted in response to any such notices during the pendency of the case. Rather, the AG takes the

untenable position that the AG can sit on the AG's alleged rights during the pendency of the case, and there are no limits to the AG's ability to require re-litigation of them long-after the case is closed.

80.     Like the AG's reliance on the mere receipt of notice, the AG fails to address properly the cases cited in the September Order.

81.     The AG rejects the applicability of *In re Friede Goldman Halter Inc.*,[16] 600 B.R. at 532 and *In re Woldeyohannes*, No. 18-21369, 2022 WL 3135287, at *2-4 (Bankr. D. Conn. Aug. 3, 2022), on the basis that the movants' interest on those cases was "even less connected to the bankruptcy." (Supplement, p. 10.)  But the relevance of those cases was not just whether the party in question had standing, but also that the court followed Rule 5010.  The AG never addresses the applicability of Rule 5010.

82.     The AG also misunderstands or misconstrues *In re Friede Goldman Halter Inc.* The AG described the result in *In re Friede Goldman Halter Inc.* as the court denying the motion primarily because the movant was not a successor, so reopening would be futile.  (Supplement, p. 10.)  This related to the court's consideration of futility of the underlying motion as an independent basis to deny a motion to reopen, and it ignores the entirety of the court's consideration of standing.  The court's determination of futility was in addition to the court's determination that even as a creditor, the movant did not have standing.  600 B.R. at 531-32.

83.     The AG similarly only focuses on whether the movant, a creditor, in *Dworsky v. Canal St. Ltd. P'ship (In re Canal St. Ltd. P'ship)*, had standing and incorrectly limits the analysis to whether a creditor was a party in interest.  But the court's discussion was broader.

---

[16] In *In re Friede Goldman Halter Inc.*, the court also rejected the argument that mere listing as a co-debtor in one of the debtor's schedules as sufficient to confer standing.  600 B.R. at 531.  Therefore, this case does not support the AG's reliance on merely receiving notice as conferring standing.

For example, the Court said, "[s]tanding is an element of federal subject matter jurisdiction which cannot be waived and may be raised at any time by a party or by the court." *In re Canal St. Ltd. P'ship* 269 B.R. 375, 379 (BAP 8th Cir. 2001). Also, the court noted that "case law on standing in the circumstance of reopening a closed case has been confined to debtors, creditors, and trustees with a particular and/or direct stake in the reopened case.") *Id.* at 379.

84.     While both *In re Krowel* and *In re Riley* addressed the questions of standing, the September Order cited them with respect to the requirement that the movant's interest in reopening has a bankruptcy purpose. The AG does not even attempt to address this.

85.     The AG relies on *In re Stahl, Asano, Shigetomi Assocs.*, 36 B.R. 179 (Bankr. D. Haw. 1983,) and makes the argument that "a bankruptcy case has been reopened for purposes of giving notice." (Supplement, p. 11.) The case was not reopened for the purpose of giving notice but reopened "for the sole purpose of rehearing the matter of Mr. Wiesman's fees." *In re Stahl, Asano, Shigetomi Assocs.* 36 BR. 179 at 184. Thus, this case supports the fact that consideration of reopening is required, but also that it is required simply to consider the substantive request.

86.     The AG's standing fails based on the AG's lack of legal authority. But as addressed above, all of the AG's arguments for standing fail as well. The AG cannot rest on the alleged merits of the reopening generally under § 350; the AG must also establish that the AG is the proper party to raise the merits of the claim. The AG cannot rely on its general advocacy on behalf of others. Not only is this insufficient for standing, but in Wisconsin, the AG specifically does not have the ability to act in *parens patrie* capacity.

87.     In its closing, the AG raises a new argument that reopening will only minimally inconvenience ADOM because it is a ministerial task. This ignores the Seventh Circuit standard (*see* Objection, § III(A)) in favor of focusing the actual logistics of reopening from the Court's or

Clerk's perspective. *See also In re Riley*, Case No. 13-61356, 2017 WL 4334033, at *3 (Bankr. N.D.N.Y. Sept. 28, 2017) (holding that case stating that reopening is "merely ministerial" or has "no legal significance" "does not stand for the proposition that a motion to reopen pursuant to § 350(b) is merely ministerial such that it should be granted as a matter of course").

88.     In addition, the AG attempts to shift the prejudice analysis from the ADOM to the Court and the Court's staff arguing that the Court can have the AG's office provide notice or receive redacted documents. ADOM has already addressed how having the AG's office provide notice is circular. (*See, infra* ¶ 43.). Moreover, merely having the AG provide notice does not eliminate the fact that updating addresses invariably includes some margin of error. ADOM has also already addressed why redaction is not a guaranty of protection. (Objection, ¶ 70.) Not only is redaction inherently subjective, but redaction errors happen, including recently by the AG in this matter. *See*, *e.g.*, *Motion to Restrict Public Access and Redact Document* [Dkt. No. 3508].

The AG's motions are unsupported and must be denied.

Dated this 24th day of October, 2023.

HUSCH BLACKWELL LLP
*Attorneys for Archdiocese of Milwaukee*

By:     s/ Francis H. LoCoco
        Francis H. LoCoco
        Bruce G. Arnold
        Lindsey M. Greenawald

P.O. ADDRESS:
511 North Broadway, Suite 1100
Milwaukee, Wisconsin 53202
414.273.2100 / 414.223.5000 (fax)
Francis.LoCoco@huschblackwell.com
Bruce.Arnold@huschblackwell.com
Lindsey.Greenawald@huschblackwell.com